UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE LUKIS, individually and on behalf of all others similarly situated, | ) ) ) | 19 C 4871 |
| Plaintiff, | ) ) | Judge Gary Feinerman |
| vs. | ) ) | |
| WHITEPAGES INCORPORATED, | ) ) | |
| Defendant. | ) ) | |
| ROBERT FISCHER and STEPHANIE LUKIS, individually and on behalf of all others similarly situated, | ) ) ) ) | 19 C 4892 |
| Plaintiffs, | ) ) | Judge Gary Feinerman |
| vs. | ) ) | |
| INSTANT CHECKMATE LLC, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Stephanie Lukis brought a putative class action against Whitepages Inc., and Lukis and

Robert Fischer brought a putative class action against Instant Checkmate LLC, in the Circuit

Court of Cook County, Illinois, both alleging violations of the Illinois Right of Publicity Act

("IRPA"), 765 ILCS 1075/1 *et seq*. Doc. 1-1 (19 C 4871); Doc. 1-1 (19 C 4892). Defendants

timely removed the suits under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Doc. 1 (19

C 4871); Doc. 1 (19 C 4892). Whitepages moves under Civil Rules 12(b)(2) and 12(b)(6) to

dismiss the suit against it, Doc. 16 (19 C 4871), while Instant Checkmate moves under Rule

12(b)(6) to dismiss the suit against it, Doc. 14 (19 C 4892). The motions are denied.

1

**Background**

In resolving Whitepages's Rule 12(b)(2) motion, the court considers the complaint's well-pleaded allegations and the evidentiary materials submitted by both sides. No party requests an evidentiary hearing, so the court accepts Lukis's factual allegations and resolves all factual disputes in her favor. *See Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012) ("[W]here, as here, the issue [of personal jurisdiction] is raised on a motion to dismiss, … [w]e … accept as true all well-pleaded facts alleged in the complaint and resolve any factual disputes … in favor of the plaintiff.") (citation omitted).

In resolving Whitepages's and Instant Checkmate's Rule 12(b)(6) motions, the court assumes the truth of the complaints' well-pleaded factual allegations, though not their legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint[s], documents that are critical to the complaint[s] and referred to in [them], and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' briefs opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013). The facts are set forth as favorably to Plaintiffs as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

## No. 19 C 4871

Lukis resides in Cook County, Illinois. Doc. 1-1 at ¶ 1 (all docket citations in this section of the Background are to 19 C 4871). Whitepages, a Washington-headquartered corporation organized under Washington law, owns and operates a website (www.whitepages.com) that sells

"background reports" on people. *Id*. at ¶¶ 2, 6-7. Whitepages compiles and generates the reports, and in so doing "ingest[s]" into its internal database over two billion records per month. *Id*. at ¶ 17 (internal quotation marks omitted). Whitepages knowingly searches for and obtains private and public records and identifying information regarding Illinois residents, and directly sells its reports to Illinois consumers. *Id*. at ¶¶ 20-21.

Anybody interested in obtaining background reports from Whitepages can enter a first and last name in the search bar on its homepage. *Id*. at ¶ 8. Doing so yields a list of actual persons identified by Whitepages as having that name. *Id*. at ¶ 9. For each person listed, Whitepages provides a limited, free preview of a background report containing enough information—the person's middle initial, age range, phone number, current address, previous residential addresses, and other information—to identify the person. *Id*. at ¶¶ 10-11. Here are screen captures showing Whitepages's free previews of background reports on Lukis:





*Id*. at pp. 8-9.

These previews reflect that Whitepages obtained information about Lukis from public records, including court and law enforcement databases ("criminal history," "[c]riminal records," "[b]ankruptcies and foreclosures"), local government property databases ("[p]roperty ownership info"), and state and/or local regulatory agency databases ("[p]rofessional licenses and permits"), *ibid*.—thus confirming Lukis's allegation, noted above, that Whitepages knowingly searches for and obtains public records concerning Illinois residents in generating its background reports, *id*. at ¶ 20.

Whitepages's sole purpose in offering free previews is to advertise products available on its website. *Id*. at ¶ 12. Those products include monthly subscriptions enabling the subscriber to view background reports of persons in Whitepages's database, with the cost of each subscription depending on the number of reports a subscriber wishes to obtain per month. *Id*. at ¶¶ 12-16. In the free previews reproduced above, clicking on "view results," "get their background check," "continue to results," "view all relatives," or "criminal records" leads to a pay screen offering monthly subscription packages. *Id*. at ¶ 14.

In 2018, Lukis discovered that Whitepages uses her name, age range, city of domicile, and relatives' names in advertisements on its website that are the same or substantially similar to those free previews. *Id*. at ¶ 22. The previews provide accurate information that would enable a viewer to identify her as *the* Stephanie Lukis described therein. *Id*. at ¶¶ 23-24. Lukis did not provide Whitepages with written consent to use any aspect of her identity in the previews or any advertisement. *Id*. at ¶ 25. Lukis is not and has never been a Whitepages customer, nor has she had any relationship with Whitepages. *Id*. at ¶ 26. Whitepages's use of Lukis's identity has caused her emotional distress, *id*. at ¶ 27; she has not been compensated by Whitepages in any

way, *id*. at ¶ 28; and she does not want Whitepages to use her identity for any commercial advertising purpose, *id*. at ¶ 29.

## No. 19 C 4892

Like Lukis, Fischer resides in Cook County. Doc. 1-1 at ¶¶ 1-2 (all docket citations in this section of the Background are to 19 C 4892). Instant Checkmate owns and operates a website (www.instantcheckmate.com) that sells "background reports" on people. *Id*. at ¶¶ 3, 6-7. Instant Checkmate compiles and generates the reports, and in so doing "continually searches for new data and adds it to [its] reports the minute it becomes available." *Id*. at ¶ 17 (internal quotation marks omitted) (alteration in the original). Instant Checkmate knowingly searches for and obtains private and public records and identifying information regarding Illinois residents, and directly sells its reports to Illinois consumers. *Id*. at ¶¶ 20-21.

Anybody interested in obtaining background reports from Instant Checkmate can enter a first and last name in the search bar on its homepage. *Id*. at ¶ 8. Doing so yields a list of actual persons identified by Instant Checkmate as having that name. *Id*. at ¶ 9. For each person listed, Instant Checkmate provides a limited, free preview of a background report containing enough information—the person's middle initial, age, current city and state of residence, previous cities the individual lived in, and other information—to identify the person. *Id*. at ¶¶ 10-11. Here are screen captures showing free previews of background reports on Lukis and Fischer:



| NAME | AGE | LOCATION | POSSIBLE RELATIVES | VERIFIED RESULT | FULL REPORT |
|---|---|---|---|---|---|
| **Stephanie J. Lukis** <br> aka: Stephanie J. Lukis, Stephanie J. Flanigan | 38 | Chesapeake, VA <br> Woodlawn, TN <br> Panama City Beach, FL <br> Clarksville, TN <br> Virginia Beach, VA <br> Russellville, KY <br> Falcon, MO <br> Cunningham, TN <br> Las Vegas, NV | Franklin Lukis <br> Franks Lukis | | OPEN REPORT |
| **Stephanie M. Lukis** <br> aka: Stephanie M. Lukis, Stephanie Klatt, Stephanie M. Klatte, Stephanie M. Malmgren, Steph Malmgren, Stephani Klatte | 42 | Chicago, IL <br> Homewood, IL <br> Herndon, VA <br> Lorton, VA <br> Fairfax, VA <br> Stafford, VA <br> Reston, VA <br> Alexandria, VA <br> Ashburn, VA <br> Spring, TX <br> Houston, TX <br> Alexandria, MN | Deborah Egan <br> Arlene Garcia <br> Brian Klatte <br> Susan Klatte <br> Susan Klatte <br> Dennis Lukis <br> Joseph Lukis <br> Paul Lukis | | OPEN REPORT |
| **Sheyzee S. Mcnutt** <br> aka: Sheyzee S. Mcnutt, Sheyzee Nutt, Sheyzee Mcnutt Lukis, Sheyzee Lukis | | Aston, PA <br> Glen Mills, PA <br> Hialeah, FL <br> Aston Township, PA | Shanice Lukis | | OPEN REPORT |

*Id*. at p. 8.

Instant Checkmate's sole purpose in offering free previews is to advertise products available on its website. *Id*. at ¶ 12. Those products include a monthly subscription enabling the subscriber to view background reports of persons in Instant Checkmate's database. *Id*. at ¶¶ 12-16. In the free previews reproduced above, clicking on "view report" or "open report" leads to a pay screen offering the monthly subscription package. *Id*. at ¶ 14.

Fischer and Lukis discovered that Instant Checkmate uses their names, ages, current cities of domicile, and relatives' names in advertisements on its website that are the same or substantially similar to those free previews. *Id*. at ¶¶ 22, 30. The previews provide accurate information that would enable a viewer to identify Lukis as *the* Stephanie Lukis and Fischer as *the* Robert Fischer described therein. *Id*. at ¶¶ 23-24, 31-32. Lukis and Fischer did not provide Instant Checkmate with written consent to use any aspect of their identities in the previews or any advertisement. *Id*. at ¶¶ 25, 33. Lukis and Fischer are not and have never been Instant Checkmate customers, nor have they had any relationship with Instant Checkmate. *Id*. at ¶¶ 26, 34. Instant Checkmate's use of their identities has caused them emotional distress, *id*. at ¶¶ 27, 35; they have not been compensated by Instant Checkmate in any way, *id*. at ¶¶ 28, 36; and they do not want Instant Checkmate to use their identities for any commercial advertising purpose, *id*. at ¶¶ 29, 37.

## Discussion

The complaints allege that Whitepages and Instant Checkmate violated the IRPA by using Plaintiffs' names and other identifying information in free previews to advertise their monthly subscription services. Doc. 1-1 at ¶¶ 38-44 (19 C 4871); Doc. 1-1 at ¶¶ 46-52 (19 C

4892).  From this point forward, all record citations are to 19 C 4871 (Lukis's case against Whitepages) unless indicated otherwise.

## I.     Whether Whitepages Is Subject to Personal Jurisdiction

Whitepages argues that it is not subject to personal jurisdiction.  Doc. 17 at 10-13.  "The plaintiff bears the burden of establishing personal jurisdiction." *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 799 (7th Cir. 2014).  "Where, as here, the district court rules on a defendant's motion to dismiss based on the submission of written materials without holding an evidentiary hearing, the plaintiff need only make out a *prima facie* case of personal jurisdiction." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (internal quotation marks omitted).

"District courts exercising diversity jurisdiction apply the personal jurisdiction rules of the state in which they are located." *Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 912 (7th Cir. 2015).  "The Illinois long-arm statute permits the court to exercise jurisdiction to the full extent permitted by the Due Process Clause of the Fourteenth Amendment." *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017) (citing 735 ILCS 5/2-209(c)).  Accordingly, the court must determine "whether the exercise of personal jurisdiction [over Whitepages] would violate federal due process." *Mobile Anesthesiologists Chi., LLC v. Anethesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010).

"Under the Fourteenth Amendment's Due Process Clause, a court may exercise personal jurisdiction over an out-of-state defendant when that defendant has 'minimum contacts with the [forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Philos*, 802 F.3d at 912-13 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (alteration in original) (internal quotation marks omitted).  "The defendant's conduct and connection with the forum state must be substantial enough to make it

10

reasonable for the defendant to anticipate that he could be haled into court there. This purposeful-availment requirement ensures that a defendant's amenability to jurisdiction is not based on 'random, fortuitous, or attenuated contacts,' but on contacts that demonstrate a real relationship with the state with respect to the transaction at issue." *N. Grain*, 743 F.3d at 492-93 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks omitted)) (internal citation omitted). "While there are two branches of personal jurisdiction theory—general and specific," *Philos*, 802 F.3d at 913, Lukis focuses solely on specific jurisdiction.

"Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities. The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice." *N. Grain*, 743 F.3d at 492 (internal quotation marks and citations omitted); *see also Philos*, 802 F.3d at 913 ("For a court to exercise specific jurisdiction, the lawsuit must 'result[] from alleged injuries that arise out of or relation to' the defendant's contacts with the forum.") (quoting *Burger King*, 471 U.S. at 472-73) (alteration in original) (internal quotation marks omitted). "Only intentional contacts by the defendant with the forum jurisdiction can support specific jurisdiction." *Noboa v. Barceló Corporación Empresarial, SA*, 812 F.3d 571, 572 (7th Cir. 2016); *see also Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum."). Accordingly, "[i]t is the defendant—not the plaintiff or third parties—that must create the contacts in the forum state, and those contacts must be 'with the forum State itself, not … with

persons who reside there.'" *Philos*, 802 F.3d at 913 (quoting *Walden*, 571 U.S. at 285); *see also Advanced Tactical*, 751 F.3d at 801 ("The relevant contacts are those that center on the relations among the defendant, the forum, and the litigation.") (citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984)). Put another way, "[t]he 'mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction,'" *Advanced Tactical*, 751 F.3d at 801 (quoting *Walden*, 571 U.S. at 291) (alteration in original), and "'the plaintiff cannot be the only link between the defendant and the forum,'" *id*. at 802 (quoting *Walden*, 571 U.S. at 285); *see also Noboa*, 812 F.3d at 572 ("[*Walden*] shows that the pertinent question is whether the defendant has links to the jurisdiction in which the suit was filed, not whether the plaintiff has such links.").

Applying these principles to the present record yields the conclusion that Whitepages is subject to personal jurisdiction: Whitepages purposefully directed its activities towards Illinois; Lukis's alleged injuries arise from its forum-related activities; and exercising personal jurisdiction over it would not offend traditional notions of fair play and substantial justice.

*Purposeful Direction*. The complaint alleges that Whitepages knowingly searches for and obtains private and public records regarding Illinois residents, Doc. 1-1 at ¶ 20 & pp. 8-9, identifies Illinois residents in its search results and profiles them in free previews, *id*. at ¶¶ 9-10, and sells monthly subscriptions for background reports that it prepares from those records, *id*. at ¶¶ 20-21. The complaint further alleges that Whitepages compiles family, age, and address information about Illinois residents, without their consent, in free previews used to advertise its subscription services. *Id*. at ¶¶ 12-16. These actions qualify as the kind of "intentional contacts … with [Illinois]" required for the exercise of specific jurisdiction. *Noboa*, 812 F.3d at 572; *see Tamburo v. Dworkin*, 601 F.3d 693, 706 (7th Cir. 2010) (finding personal jurisdiction where the

defendants were "alleged to have published [tortious] statements about [the plaintiff], either on their public websites or in blast emails to other proprietors of online … databases," with some identifying the plaintiff's "Illinois address" and urging "readers … to contact and harass him," and where the defendants "engaged in this conduct with the knowledge that [the plaintiff] lived in Illinois," so that "although they acted from points outside the forum state, [they] specifically aimed their tortious conduct at [the plaintiff] … in Illinois with the knowledge that he lived, worked, and would suffer the brunt of the injury there") (internal quotation marks omitted); *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir. 1996) (finding personal jurisdiction where the defendant "advertised in trade magazines circulated in [the forum state], sent out 144 newsletters to [forum state] residents, sold its products to at least a dozen [forum state residents], signed up a [forum state] distributor[,] and once conducted dealer training in [the forum state]"); *U.S. Bank N.A. v. Bank of Am. N.A.*, 916 F.3d 143, 152 (2d Cir. 2019) (finding personal jurisdiction where "the obligations expressly undertaken by [the] [d]efendant … were purposefully directed toward residents of [the forum state], and the suit arose from and related directly to those [forum state] contacts"); *Greene v. Mizuho Bank, Ltd.*, 169 F. Supp. 3d 855, 864 (N.D. Ill. 2016) (finding personal jurisdiction where the defendant "[was] alleged to have had tort-related contacts with" the forum state).

Pressing the opposite result, Whitepages observes that it "is not alleged to—and in fact does not—sell access to publicly available information about *only* Illinois residents or to *only* Illinois residents." Doc. 17 at 12 (emphasis added). According to Whitepages, finding purposeful direction here would "subject every Web site operator to suit in any state from which its Web site is accessible," contrary to the Seventh Circuit's decision in *Advanced Tactical*. *Id.* at 10.

In *Advanced Tactical*, the defendant firm—which was alleged to have placed infringing content on its interactive website—had no ties to Indiana beyond "fulfill[ing] a few orders" in Indiana, "sen[ding] at least two misleading email blasts to a list that included Indiana residents," and making its website "available to residents of Indiana." 751 F.3d at 801. In concluding that those ties did not qualify as purposeful direction of conduct towards Indiana, the Seventh Circuit reasoned that there was no evidence that any Indiana customer purchased the defendant's product after viewing the infringing content on its website, and that merely maintaining an interactive website available to residents of a particular State does not subject the defendant to personal jurisdiction in that State. *Ibid.* ("The only sales that would be relevant are those that were related to [the defendant's] allegedly unlawful activity. [The plaintiff]—which has the burden of proof here—has not provided evidence of any such sales."). Holding otherwise, the Seventh Circuit explained, "would mean that a plaintiff could bring suit in literally any state where the defendant shipped at least one item," resulting in a "*de facto* universal jurisdiction" incompatible with settled precedent. *Id.* at 801-02. There is no such danger with finding purposeful direction here, as Whitepages is alleged to have engaged in repeated, intentional conduct directed at Illinois and its residents—using their personal information, derived from databases operated by state and local governments in Illinois—to advertise its subscription services. Doc. 1-1 at ¶ 20 & pp. 8-9. Whitepages's Illinois-directed conduct, far from being "random, fortuitous, or attenuated," "demonstrate[s] a real relationship with" Illinois. *N. Grain*, 743 F.3d at 493 (internal quotation marks omitted).

*Injuries Arising from Forum-Related Activity.* The complaint alleges that Lukis suffered emotional and financial harm due to Whitepages's deploying her personal information in free previews used to advertise its subscription services. Doc. 1-1 at ¶¶ 27-28. As shown above,

Whitepages's conduct was directed towards Illinois. It follows that Lukis's alleged injuries arise from Whitepages's forum-related conduct. *See Tamburo*, 601 F.3d at 709 (finding personal jurisdiction where the defendants "expressly aimed their allegedly tortious conduct at [the plaintiff] and his Illinois-based business for the purpose of causing him injury there" and where "these 'contacts' with the forum state [were] the cause in fact and the legal cause of [the plaintiff's] injury").

*Fair Play and Substantial Justice*. As noted, exercising personal jurisdiction over a defendant must "comport with traditional notions of fair play and substantial justice." *N. Grain*, 743 F.3d at 492. The factors relevant to this requirement include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Felland*, 682 F.3d at 677 (quoting *Burger King*, 471 U.S. at 477). Here, exercising jurisdiction over Whitepages satisfies this requirement. Lukis alleges tortious activity directed toward Illinois, Doc. 1-1 at ¶¶ 8-10, 20 & pp. 8-9, and Illinois has a "strong interest in providing a forum for its residents … to seek redress for tort injuries suffered within the state and inflicted by out-of-state actors." *Tamburo*, 601 F.3d 709. Further underscoring Illinois's interest in this case, Lukis alleges tortious activity resulting from Whitepages's use of the State's own public records and those of its local governments. Doc. 1-1 at ¶ 20.

Whitepages's contrary arguments, to which it devotes only a paragraph, do not persuade. Whitepages contends that it would face a "significant burden" if subjected to personal jurisdiction because it is "an out-of-state company with no contacts in the state of Illinois." Doc.

17 at 13. This argument fails because, as shown above, Whitepages *has* had significant purposeful contacts with Illinois, Doc. 1-1 at ¶¶ 8-10, 20 & pp. 8-9, that gave rise to Lukis's alleged injury, *id.* at ¶¶ 27-28. Whitepages also argues that "the interests of judicial economy and the shared interests of the states would be best served by handling litigation against Whitepages in its home state [Washington], where there would be more ready access to evidence and greater oversight by state officials." Doc. 17 at 13. But Whitepages fails to specify *how* using Washington as a forum would provide "more ready access to evidence" or "greater oversight," and any such marginal gain in judicial economy would be outweighed by Illinois's "strong interest in providing a forum for its residents … to seek redress for tort injuries suffered within the state and inflicted by out-of-state actors." *Tamburo*, 601 F.3d 709; *see also Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 760 (7th Cir. 2010) ("[The "fair play and substantial justice"] factors rarely will justify a determination against personal jurisdiction because there are other mechanisms available … to accommodate the various interests at play.") (internal quotation marks omitted); *Felland*, 682 F.3d at 677 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.") (quoting *Burger King*, 471 U.S. at 477).

## II.     Whether Plaintiffs State IRPA Claims

Plaintiffs allege that Whitepages and Instant Checkmate violated Section 30(a) of the IRPA, which provides: "A person may not use an individual's identity for commercial purposes … without having obtained previous written consent[.]" 765 ILCS 1075/30(a).

### A.     Commercial Purpose

Whitepages contends that its free previews identifying Lukis did not serve a "commercial purpose[]" within the meaning of Section 30(a). Doc. 17 at 13-14. The IRPA defines

"commercial purpose" to mean "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." 765 ILCS 1075/5. The complaint alleges that Whitepages used Lukis's identity—reflected by her name, age range, and city of domicile, along with the names of some of her relatives—in free previews used to advertise, promote, and offer for sale its monthly subscription services. Doc. 1-1 at ¶¶ 12-16, 22-24. That is a textbook example under the IRPA of using a person's identity for a commercial purpose. *See Trannel v. Prairie Ridge Media, Inc.*, 987 N.E.2d 923, 930-31 (Ill. App. 2013) (holding the defendant's use of the plaintiff's photograph on a media kit used to sell newspaper subscriptions qualified as a commercial purpose); *Blair v. Nev. Landing P'ship*, 859 N.E.2d 1188, 1194 (Ill. App. 2006) (considering an IRPA claim based on the plaintiff's "picture [being] used to promote a single product, the Buckingham Steakhouse"); *Gabiola v. Sarid*, 2017 WL 4264000, at *6 (N.D. Ill. Sept. 26, 2017) (holding that the plaintiffs stated an IRPA claim where they "allege[d] that defendants [were] using their likenesses [on Mugshots.com], in the form of arrest photographs, without their consent to solicit enrollment in the subscription removal service").

In pressing the opposite result, Whitepages cites *Dobrowolski v. Intelius, Inc.*, No. 17 C 1406 (N.D. Ill. May 21, 2018), ECF No. 62, which dismissed IRPA claims brought against other purveyors of background reports. Doc. 17 at 14. Much like Whitepages, the defendants in *Dobrowolski* used the plaintiffs' identities—their names, ages, employment histories, and locations—in free previews to advertise the defendants' background report products. *Dobrowolski*, slip op. at 1-2. As the *Dobrowolski* court described it, however, the defendants there used the free previews to advertise only background reports regarding the person identified

in the preview. *Id.* at 5 ("The marketing page lists defendants' reports that are available for purchase, and for each listing there is a preview of the information in the underlying report."). Given this, the court held that "[t]he plaintiffs' identities are not used to promote a separate product—they are used because plaintiffs' identities are part of the product offered for sale"— and for that reason were not being used for a commercial purpose under Section 30(a). *Ibid.* (citing *Thompson v. Getty Images, Inc.*, 2013 WL 3321612, at *2 (N.D. Ill. July 1, 2013) ("The Court is unpersuaded that showing a buyer a photograph of a person that she is considering whether to buy qualifies as a 'commercial purpose' as the [IRPA] uses that term.")). Here, by contrast, Whitepages used Lukis's identity to advertise not a background report regarding *Lukis*, but a monthly subscription service giving the purchaser access to background reports on anybody in Whitepages's database. Doc. 1-1 at ¶¶ 12-16. Thus, Lukis's identity was not part and parcel of the entire product or service being advertised, meaning that Whitepages's use of her identity had a commercial purpose even on *Dobrowolski*'s understanding of Section 30(a).

Relatedly, Whitepages contends that the IRPA does not apply here because its free previews merely amalgamated otherwise public information about Lukis. Doc. 17 at 15-16. This argument fails because Section 30(a) covers all aspects of a person's identity, whether the information is derived from public or private sources. *See Gabiola*, 2017 WL 4264000, at *2 (holding that the plaintiff properly alleged an IRPA claim where the defendant "use[d] software to copy the information publicly available on the websites [of] departments of corrections").

### B.     Identity

As noted, Section 30(a) prohibits the "use [of] an individual's *identity* for commercial purposes … without having obtained previous written consent[.]" 765 ILCS 1075/30(a) (emphasis added). Whitepages argues that "the name 'Stephanie Lukis'" does not qualify as an

18

"identity" under Section 30(a) because "multiple people with the same name are listed" when a search is conducted for "Stephanie Lukis," meaning that "viewing the search results makes it no more or less likely that the ads identify Lukis, as opposed to another individual with the same name."  Doc. 17 at 14-15 (internal quotation marks and alterations omitted).  Instant Checkmate makes the same argument, though only in a footnote.  Doc. 15 at 12 n.3 (19 C 4892).

The argument fails because Whitepages did far more than use the name "Stephanie Lukis" in advertising its monthly subscription services, and Instant Checkmate did far more than use the names "Stephanie Lukis" and "Robert Fischer" in advertising its service.  Rather, Whitepages associated "Stephanie Lukis" with a middle initial, an age range, two telephone numbers, a Chicago address, a Virginia address, and as a relation of Paul M. Lukis, Doc. 1-1 at pp. 8-9, and Instant Checkmate associated "Stephanie Lukis" and "Robert Fischer" with middle initials, exact ages, past cities and states of residence, and possible relatives, Doc. 1-1 at p. 8 (19 C 4892).  Given this, it is entirely plausible, as Plaintiffs allege, that Lukis could be uniquely identified as *the* Stephanie Lukis, and Fischer could be uniquely identified as *the* Robert Fischer, referenced in the previews.  Doc. 1-1 at ¶¶ 23-24; Doc. 1-1 at ¶¶ 23-24 (19 C 4892).  It follows that the previews used Plaintiffs' "identit[ies]" within the meaning of Section 30(a).  *See* 765 ILCS 1075/5 (defining "identity" as "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener").

### C.   IRPA Exclusions

#### 1.   Section 35(b)(1)

Section 35(b)(1) provides that the IRPA does not apply to "use of an individual's identity in an attempt to portray, describe, or impersonate that individual in a live performance, a single and original work of fine art, play, book, article, musical work, film, radio, television, or other

audio, visual, or audio-visual work, *provided that* the performance, work, play, book, article, or film does not constitute in and of itself a commercial advertisement for a product, merchandise, goods, or services." 765 ILCS 1075/35(b)(1) (emphasis added). Instant Checkmate argues that this exclusion applies "[b]ecause [its] 'background reports' are effectively an online book or encyclopedia about people." Doc. 15 at 9 (19 C 4892).

Instant Checkmate's argument misses the point, as it fails to acknowledge that Lukis's and Fischer's IRPA claim is directed at the free previews, not the background reports. Doc. 1-1 at ¶¶ 12-16 (19 C 4892); *see* Doc. 15 at 10 (19 C 4892) (where Instant Checkmate elsewhere acknowledges that "Plaintiffs do not allege that use of their identities in Instant Checkmate's 'background reports' product violates IRPA" and that "Plaintiffs' liability theory is instead that Instant Checkmate's alleged use of their identities in 'limited, free preview of [its] "background reports"' … violates IRPA"). Even indulging the generous assumption that the free previews qualify as a "performance, work, play, book, article, or film," they are alleged to be "a commercial advertisement for a product, … goods, or services," 765 ILCS 1075/35(b)(1)— specifically, for Instant Checkmate's monthly subscription service, *id*. at ¶¶ 12-16—and thus fall outside the scope of Section 35(b)(1) given the provision's "provided that" clause. It follows, at least at the pleadings stage, that the Section 35(b)(1) exclusion does not shield Instant Checkmate from liability.

### 2. Section 35(b)(2)

Section 35(b)(2) provides that the IRPA does not apply to "use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign." 765 ILCS 1075/35(b)(2). Defendants seek refuge in this exemption, with Instant Checkmate arguing that its background reports involve "public affairs," Doc. 15 at 9

(19 C 4892), and Whitepages arguing that its background reports reflect "a matter of public concern," Doc. 17 at 18.

As with Instant Checkmate's appeal to Section 35(b)(1), Defendants' invocation of Section 35(b)(2) forgets that Plaintiffs' claims are directed towards the free previews, not toward the subscription services advertised by the previews. And as shown in Section II.A, *supra*, the free previews serve a "commercial purpose" under Section 30(a), which necessarily means that they do not serve a "non-commercial purpose[]" under Section 35(b)(2). *See Maksym v. Bd. of Elec. Comm'rs of City of Chi.*, 950 N.E.2d 1051, 1062 (Ill. 2011) ("[W]here the same, or substantially the same, words or phrases appear in different parts of the same statute they will be given a generally accepted and consistent meaning, where the legislative intent is not clearly expressed to the contrary.") (internal quotation marks omitted); *see also U.S. Fire Ins. Co. v. Barker Car Rental*, 132 F.3d 1153, 1156 (7th Cir. 1997) ("[I]n ascertaining the meaning of [an Illinois statute], we must apply the same rules of statutory construction that the Supreme Court of Illinois would apply if it were faced with the same task."). It follows, at least on the pleadings, that Defendants are not protected by Section 35(b)(2).

### 3. Section 35(b)(4)

Section 35(b)(4) provides that the IRPA does not apply to "promotional materials, advertisements, or commercial announcements for a use described" in Sections 35(b)(1) and (b)(2). 765 ILCS 1075/35(b)(4). Recognizing (at last) that Plaintiffs' claims are directed towards the free previews, Defendants argue that because the previews are used to advertise their monthly subscriptions, and because the background reports available through the subscriptions are covered by Sections 35(b)(1) or (b)(2), the previews are covered by Section 35(b)(4). Doc. 15 at 10-13 (19 C 4892); Doc. 17 at 18.

Defendants' argument rests on the premise that their background reports qualify as "a live performance, a single and original work of fine art, play, book, article, musical work, film, radio, television, or other audio, visual, or audio-visual work," 765 ILCS 1075/35(b)(1), or "[the] use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign," 765 ILCS 1075/35(b)(2). That premise is far from self-evident, particularly on the present record, which does not include an example or full description of a background report. Granted, a report might be protected from IRPA liability if it were limited to information gleaned from judicial records, *see Nieman v. VersusLaw*, 2012 WL 3201931, at *4 (C.D. Ill. Aug. 3, 2012), *aff'd*, 512 F. App'x 635 (7th Cir. 2013), but it appears that Defendants' reports include far more information than that. Doc. 1-1 at ¶ 10 & pp. 8-9; Doc. 1-1 at ¶ 10 & p. 8 (19 C 4892). One might still ask whether Defendants' reports more like (i) a newspaper or magazine article regarding a person, or (ii) a private investigator's report on that person. The record does not say, and if the answer is (ii), Defendants do not address whether a private investigator's report qualifies as a "book," "article," "visual … work" under Section 35(b)(1) or as "news" or "public affairs" under Section 35(b)(2). It therefore is impossible to agree, as a matter of law and at this juncture, with Defendants' submissions that their free previews are protected from liability by Section 35(b)(4).

### D.     Communications Decency Act

Whitepages contends that Lukis's IRPA claim is barred by the Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 230. Doc. 17 at 19-20. The CDA states in relevant part: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). As the Seventh Circuit has explained, the CDA applies to online forums serving as "a mere passive

conduit for disseminating [actionable] statements." *Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016).

On the present record, Whitepages did not act as a mere passive transmitter or publisher of information that was "provided by another information content provider." Doc. 17 at 19. Rather, it is alleged to have actively compiled and collated, from several sources, information regarding Lukis. Doc. 1-1 at ¶ 17. The CDA therefore does not shield Whitepages from liability. *See Huon*, 841 F.3d at 742 (holding that the CDA did not protect Gawker from liability where it "edited, shaped, and choreographed" the content of the comments it published online) (internal quotation marks omitted); *cf. Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008) (holding that the CDA protected Craigslist from liability because "[n]othing in the service [it] offer[ed] induce[d] anyone to post any particular listing or express a preference for discrimination").

### E.     First Amendment

Finally, Whitepages argues that its free previews are entitled to First Amendment protection because they simply "promote Whitepages' directory, which is itself protected by the First Amendment." Doc. 17 at 16. As with Defendants' invocation of Section 35(b)(4), *see* Section II.C.3, *supra*, because no background report is in the record, it is impossible to agree, as a matter of law and at this juncture, with Whitepages's submission that its reports are protected by the First Amendment and therefore with Whitepages's argument that the previews do nothing more than advertise First Amendment-protected materials.

**Conclusion**

Whitepages's and Instant Checkmate's motions to dismiss are denied. Each shall answer the complaint filed against it by May 14, 2020.

April 16, 2020

_____
United States District Judge