UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEPHANIE LUKIS, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　　　　Plaintiffs,<br><br>　vs.<br><br>WHITEPAGES INCORPORATED,<br><br>　　　　　　　　　　　　　Defendant. | 19 C 4871<br><br>Judge Gary Feinerman |
| ROBERT FISCHER and STEPHANIE LUKIS, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　　　　Plaintiffs,<br><br>　vs.<br><br>INSTANT CHECKMATE LLC,<br><br>　　　　　　　　　　　　　Defendant. | 19 C 4892<br><br>Judge Gary Feinerman |

**MEMORANDUM OPINION AND ORDER**

　　　Stephanie Lukis brought a putative class action against Whitepages Inc., and she and Robert Fischer brought a putative class action against Instant Checkmate LLC, in the Circuit Court of Cook County, alleging violations of the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075/1 *et seq*. Doc. 1-1 (19 C 4871); Doc. 1-1 (19 C 4892). Defendants timely removed the suits under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Doc. 1 (19 C 4871); Doc. 1 (19 C 4892). The court earlier this year denied Defendants' motions to dismiss. Docs. 36-37 (19 C 4871); Docs. 35-36 (19 C 4892) (reported at 454 F. Supp. 3d 746 (N.D. Ill. 2020)).

　　　Whitepages moves for reconsideration of that decision, certification of an interlocutory appeal under 28 U.S.C. § 1292(b), and summary judgment. Docs. 40, 43, 61 (19 C 4871).

1

Instant Checkmate does the same and seeks leave to file a supplemental brief in support of its summary judgment motion. Docs. 39, 51, 80 (19 C 4892). In the Instant Checkmate suit, Plaintiffs move under Civil Rule 56(d) to partially continue the summary judgment motion to allow them to take further discovery. Doc. 64 (19 C 4892). Instant Checkmate's motion for leave to file a supplemental brief is granted, and the other motions are denied.

## Background

The following facts are set forth as favorably to Plaintiffs, the nonmovants, as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Donley v. Stryker Sales Corp.*, 906 F.3d 635, 636 (7th Cir. 2018).

Defendants own and operate websites that sell "background reports" on people. Doc. 76 (19 C 4871) at ¶¶ 1, 6; Doc. 66 (19 C 4892) at ¶¶ 1, 6. The complaints allege that the websites violate the IRPA by using Plaintiffs' identities to promote the sale of Defendants' background report services. Doc. 1-1 (19 C 4871) at ¶¶ 38-44; Doc. 1-1 (19 C 4892) at ¶¶ 46-52; *see* 765 ILCS 1075/30(a). The parties' submissions at summary judgment add little to the record available when Defendants moved to dismiss. 454 F. Supp. 3d at 751-56. As Defendants explain in their summary judgment motions, the only material additions to the record are copies of Whitepages's background report on Lukis and Instant Checkmate's background report on Fischer. Doc. 64 (19 C 4871) at 6; Doc. 50 (19 C 4892) at 6-7.

### *Lukis v. Whitepages, Inc.* **(No. 19 C 4871)**

Anyone can search the Whitepages website for a person's name and gain access to free information connected with that name. Doc. 76 at ¶ 4 (all docket citations in this section of the Background are to 19 C 4871). A search for Lukis returns her name, age range, phone number, current and previous addresses, and relatives. *Id.* at ¶ 5. Whitepages calls this the "Free

Information," and Lukis calls it the "Free Preview." Doc. 64 at 7; Doc. 78 at 1. The court will use the term "free preview" for consistency's sake.

Before continuing, the court addresses Whitepages's objections to the facts asserted in Lukis's Local Rule 56.1(b)(3)(C) statement. Doc. 77. Lukis's statement relies extensively on a declaration from her counsel that summarizes his review of the Whitepages website and attaches certain screen captures. Doc. 77-1. Whitepages argues that Lukis's counsel: (1) lacks personal knowledge of its website; (2) was not listed as a witness in her initial disclosures; and (3) cannot testify at trial under the rules of professional conduct. Doc. 80 at ¶ 1; *see* Fed. R. Civ. P. 56(c)(2) (allowing a party on summary judgment to object to asserted facts not supported by admissible evidence); Fed. R. Civ. P. 37(c)(1) (holding that a party may be barred from using a witness if it fails to disclose the witness); Ill. R. Prof'l Conduct r. 3.7(a) (barring a lawyer from serving as a counsel "at a trial in which the lawyer is likely to be a necessary witness").

Whitepages's objections to Lukis's Local Rule 56.1(b)(3)(C) statement are overruled. Lukis's counsel avers that he "personally interacted" with the Whitepages website, Doc. 77-1 at ¶ 2, giving him the requisite personal knowledge. *See* Fed. R. Evid. 602 ("Evidence to prove personal knowledge may consist of the witness's own testimony."). As for Lukis's failure to list her counsel as a witness in her initial disclosures, Whitepages surely knows the contents of its own website—the sole subject of counsel's declaration—so Lukis's omission was harmless. *See* Fed. R. Civ. P. 37(c)(1) (allowing a party to use a witness where its failure to properly disclose that witness is "harmless"). Finally, because anyone with knowledge of the Whitepages website could testify regarding its content, counsel is unlikely to be a necessary trial witness, so his declaration as to uncontroversial matters at the summary judgment stage does not raise ethical concerns. *Cf. Olson v. Bemis Co.*, 2013 WL 1790133, at *3 (E.D. Wis. Apr. 26, 2013)

3

(explaining that most jurisdictions apply the attorney-witness rule only at trial, not during pretrial proceedings).

Aside from the free previews, Whitepages offers two fee-based options: (1) a subscription-based "Premium Membership"; and (2) a one-time purchase of a "Smart Check Background Report." Doc. 76 at ¶ 6; Doc. 77 at ¶¶ 14-18, 25-27. Both options give access to information not included in the free previews. *Id.* at ¶¶ 15, 26. The precise distinctions between the two fee-based options are immaterial here, and Whitepages refers to both as the "Full Background Report." Doc. 76 at ¶ 7. Whitepages promotes the sale of background reports by inviting users to purchase them when they are viewing a free preview. Doc. 76 at ¶ 5; Doc. 77 at ¶¶ 20, 29.

Lukis's free preview provides only a landline phone number and physical address, and advertises that more information is available through "Premium" or "Smart Check" purchases. Doc. 63 at 22. In Lukis's background report, a summary page lists the following categories of information: (1) home address; (2) cell phone numbers; (3) related people; (4) address and property history; (5) criminal and traffic history; (6) financial history; (7) legal history; and (8) licenses and permits. *Id.* at 7. The pages that follow provide more detailed information in each of those areas; for instance, a section titled "Stephanie's Home" provides statistics regarding property sales and crime rates in her neighborhood. *Id.* at 9. The sections on criminal, legal, and financial history contain information about legal matters in which Lukis has been involved. *Id.* at 12-14, 17-20, 23.

The parties dispute whether the cell phone numbers listed in Lukis's background report are publicly available from other sources. Whitepages submits a declaration from Nadine Thisselle, its Vice President of Finance and Operations, who avers that Lukis's cell phone

4

numbers can be obtained on "numerous Web sites," including "truepeoplesearch.com, searchpeoplefree.com, beenverified.com, intelius.com, anywho.com, checkpeople.com, usphonebook.com, and onlinereverselookup.com." Doc. 62-1 at ¶¶ 10-11. And Whitepages contends in its brief that "[m]any of those Web sites display [Lukis's] name and cell phone number for free … ." Doc. 64 at 15 n.4. In response, Lukis's counsel avers that he searched those websites and that none makes available her cell phone numbers for free. Doc. 77-1 at ¶ 8. The genuine factual dispute on that issue must be resolved in Lukis's favor at this stage. *See Johnson*, 892 F.3d at 893.

### *Fischer v. Instant Checkmate LLC* (No. 19 C 4892)

Anyone can search the Instant Checkmate website for a person's name and gain access to a free preview of information connected with that name. Doc. 66 at ¶¶ 2-3 (all docket citations in this section of the Background are to 19 C 4892). Instant Checkmate's free previews include a person's name, age, city and state of residence, and other identifying information. *Id*. at ¶ 4. Like Whitepages, Instant Checkmate sells background reports that give access to information not included in the free previews. *Id*. at ¶¶ 1-3. By its own admission, Instant Checkmate uses its free previews to "promote and sell its background reports." *Id*. at ¶ 6. Instant Checkmate sells access to its background reports only through a subscription service, not through the sale of individual reports. *Id*. at ¶¶ 8-9.

Fischer's background report contains the following categories of information: (1) name; (2) birth date; (3) aliases; (4) jobs; (5) marriages and divorces; (6) relatives; (7) related social media pages; (8) phone numbers, including cell phone numbers; (9) email addresses; (10) physical addresses; (11) criminal records; and (12) vehicles owned or driven. Doc. 62 at 4-29. Much of the information in Fischer's report is inaccurate. Doc. 65 at ¶¶ 1-4. For instance, the report lists him as having been married ten times and divorced nine, with his first wedding

5

occurring before his seventh birthday. Doc. 62 at 4-7. In fact, Fischer is still married to his first and only wife, but the report does not include that marriage. Doc. 65 at ¶¶ 3-4.

Instant Checkmate asserts that all information in its free previews is "obtained from publicly available federal, state, and/or local government public records," and Plaintiffs dispute that assertion. Doc. 66 at ¶ 5. Significantly, however, Instant Checkmate does not assert that its background reports contain only publicly available information.

## Discussion

### I. Summary Judgment Motions

Defendants' summary judgment motions raise two principal questions. First, could a reasonable jury find that Defendants' use of Plaintiffs' identities in the free previews violates the IRPA? Second, if the answer to the first question is yes, does the First Amendment protect Defendants from liability? The statutory question will be addressed first. *See Eastland Music Group, LLC v. Lionsgate Entm't, Inc.*, 707 F.3d 869, 871 (7th Cir. 2013) ("[C]ourts should avoid unnecessary constitutional adjudication."). Because Whitepages's briefs appear to conflate the free previews with the paywalled background reports, Doc. 64 (19 C 4871) at 10-14; Doc. 79 (19 C 4871) at 9-16, it is important to note that Lukis alleges only that the free previews infringe her rights under the IRPA. Doc. 1-1 (19 C 4871) at ¶¶ 10-18.

#### A. Liability Under the IRPA

The parties focus most of their attention to the question whether the free previews fall within one of the IRPA's statutory exemptions set forth in 765 ILCS/1075/35(b). But Defendants also renew arguments, initially made in their motions to dismiss, that the free previews do not meet the *prima facie* requirements for IRPA liability set forth in 765 ILCS/1075/35(b). The court will address the *prima facie* requirements first and then turn to the exemptions.

6

### 1. *Prima Facie* Requirements for IRPA Liability

The IRPA prohibits "us[ing] an individual's identity for commercial purposes … without having obtained previous written consent … ." 765 ILCS 1075/30(a). As in its motion to dismiss, Whitepages argues that the free previews do not use Lukis's "identity" because "many people share the same name." Doc. 64 (19 C 4871) at 17 n.6. But none of the new evidence in the summary judgment record undermines the court's holding in its prior opinion that Lukis could be uniquely identified from the information in the free preview, including her middle initial, age range, and two addresses. 454 F. Supp. 3d at 761. A reasonable jury could draw the same conclusion on the summary judgment record.

Next, citing *Dobrowolski v. Intelius, Inc.*, 2018 WL 11185289 (N.D. Ill. May 21, 2018), Defendants again argue that their use of Plaintiffs' identities was not "for commercial purposes." Doc. 64 (19 C 4871) at 17-18; Doc. 50 (19 C 4892) at 13-14. The IRPA defines "commercial purposes" to mean: "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." 765 ILCS 1075/5. As a textual matter, the free previews easily fall within this definition because Defendants use the previews to "promot[e]" their "products" or "services," *i.e.*, the paywalled background reports. Doc. 77 (19 C 4871) at ¶ 15; Doc. 66 (19 C 4892) at ¶ 6.

Pointing to the IRPA's legislative history, two district court decisions have held that the Illinois legislature meant to limit the term "commercial purposes" to situations where a person's identity is used to promote a "separate product," *Dobrowolski*, 2018 WL 11185289, at *3, or "some other product," *Thompson v. Getty Images (US), Inc.*, 2013 WL 3321612, at *2 (N.D. Ill.

7

July 1, 2013), apart from the person's identity itself.  Keying off those decisions, Defendants argue that because the background reports contain all the information set forth in the free previews, the previews fail the "separate product" test.  Doc. 64 (19 C 4871) at 17-18; Doc. 50 (19 C 4892) at 13-14.

The court rejected that argument in its prior opinion, 454 F. Supp. 3d at 760-61, and adheres to that decision here.  It remains undisputed that Defendants use the free previews to sell subscriptions to their background reports.  Doc. 77 (19 C 4871) at ¶ 18; Doc. 66 (19 C 4892) at ¶ 8.  So, even if IRPA liability required that the defendant use the plaintiff's identity to promote a "separate product"—a matter that is far from clear, *see DeSmet ex rel. Estate of Hays v. Cnty. of Rock Island*, 848 N.E.2d 1030, 1039 (Ill. 2006) (holding that "[w]here an enactment is clear and unambiguous," a court is "not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations or conditions that the legislature did not express")—the free previews promote a subscription service that provides information separate from the aspects of a person's identity revealed in the free previews.  454 F. Supp. 3d at 760-61.  Moreover, the background reports contain far more information than do the free previews, so the background reports quite plainly are a product "separate" from the aspects of identity included in the free previews.

### 2. Statutory Exemptions

The next question is whether the free previews fall within one of the IRPA's statutory exemptions.  The IRPA exempts five categories of uses, *see* 765 ILCS 1075/35(b), three of which are relevant here.  Exemption (1) covers creative works, exempting from IRPA liability the "use of an individual's identity in an attempt to portray, describe, or impersonate that individual in a live performance, a single and original work of fine art, play, book, article,

8

musical work, film, radio, television, or other audio, visual, or audio-visual work." 765 ILCS 1075/35(b)(1). As detailed below, exemption (2) is essentially a catch-all for core First Amendment speech, covering the "use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign." 765 ILCS 1075/35(b)(2). And exemption (4) covers the advertisement of material protected by the other exemptions: "promotional materials, advertisements, or commercial announcements for a use described under paragraph (1), (2), or (3) of this subsection." 765 ILCS 1075/35(b)(4).

Defendants argue that because background reports fit within exemptions (1) and (2), the free previews fit within exemption (4) because they advertise background reports. Doc. 64 (19 C 4871) at 16; Doc. 50 (19 C 4892) at 13. The key question here, then, is whether the background reports fit within exemptions (1) or (2), for if the answer is yes, the free previews are protected by exemption (4) because they in fact advertise background reports.

As for exemption (1), Defendants submit that a background report is a "book," an "article," or a "visual work." Doc. 64 (19 C 4871) at 5; Doc. 50 (19 C 4892) at 4. Specifically, Whitepages contends that its website is a "digital book," with each background report being a "page," Doc. 64 (19 C 4871) at 11, while Instant Checkmate describes its service as an "online encyclopedia" containing "millions of biographical articles," Doc. 50 (19 C 4892) at 9. In so arguing, Defendants do not account for the adjectival phrase "single and original" that modifies "book," "article," and "visual work." 765 ILCS 1075/35(b)(1). To qualify for exemption (1), then, each background report must be a "single and original" book, article, or visual work, and not just any words or images on a screen.

Even assuming Defendants' websites are the functional equivalent of books filled with articles, they do not compile information into an "original" form and thus do not fall within

9

exemption (1).  The Supreme Court has held that because old-fashioned white pages were "devoid of even the slightest trace of creativity," they were not "original" and thus did not qualify for copyright protection.  *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 362 (1991).  Although the Court's holding interpreted the Copyright Act, 17 U.S.C. § 101 *et seq.*, and not the IRPA, its reasoning well illustrates the common meaning of the term "original" as connoting something more than a "mechanical or routine" compilation of basic, preexisting facts.  499 U.S. at 362.  Defendants' background reports are unoriginal in this sense, and so exemption (1) does not protect them.

Exemption (2) is potentially a better fit, broadly embracing all "non-commercial purposes," including "news" and "public affairs."  765 ILCS 1075/35(b)(2).  Courts and legislatures have long recognized that right-of-publicity laws can conflict with the First Amendment, and thus have created carve-outs to preserve the constitutionally legitimate scope of those laws.  *See Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1232 (7th Cir. 1993) ("[T]he First Amendment greatly circumscribes the right even of a private figure to obtain damages for the publication of newsworthy facts about him … ."); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (describing a "First Amendment defense" to the California commercial misappropriation of name and likeness tort); *Cardtoons, L.C. v. MLB Players Ass'n*, 95 F.3d 959, 968 (10th Cir. 1996) ("The Oklahoma publicity statute contains two exceptions designed to accommodate the First Amendment."); *Rogers v. Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989) ("[C]ourts delineating the right of publicity … have recognized the need to limit the right to accommodate First Amendment concerns.").  Exemption (2) belongs to that tradition.  Indeed, during the legislative debates, the IRPA's sponsor—plainly referring to exemption (2)— explained that the statute "includes exceptions that will protect the First Amendment interest of

individuals, such as artists and reporters." H.R. Journal, 90th Gen. Assemb., Reg. Sess. 226 (Ill. Apr. 24, 1997). It follows that exemption (2) should be construed to align with First Amendment law—not as a matter of constitutional avoidance, but because the Illinois legislature meant to incorporate First Amendment concepts. *See In re Pension Reform Litig.*, 32 N.E.3d 1, 23 (Ill. 2015) (giving particular weight to the remarks of "the chief sponsor of the legislation"); *Krohe v. City of Bloomington*, 789 N.E.2d 1211, 1214 (Ill. 2003) (citing the remarks of a bill's sponsor as a "[v]aluable construction aid[] in interpreting an ambiguous statute").

As evidenced by its reference to "non-commercial purposes," including "news" and "public affairs," 765 ILCS 1075/35(b)(2), exemption (2) incorporates two concepts from First Amendment law: the distinction between noncommercial and commercial speech, and the distinction between speech on matters of public concern and speech of solely private concern. *See Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[N]ot all speech is of equal First Amendment importance, … and where matters of purely private significance are at issue, First Amendment protections are often less rigorous.") (internal quotation marks omitted); *Zauderer v. Office of Disciplinary Counsel of the Sup. Ct. of Ohio*, 471 U.S. 626, 637 (1985) ("[W]hat has come to be known as 'commercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech.'"). Defendants focus almost entirely on the public concern/private concern distinction, contending that because the background reports contain "publicly available" information from sources like court records, they qualify as "news" or "matters of public concern." Doc. 64 (19 C 4871) at 12-16; Doc. 50 (19 C 4892) at 12-13.

The Supreme Court recently addressed the public concern/private concern distinction in *Snyder v. Phelps*, *supra*, which explored First Amendment limits on a state law intentional

11

infliction of emotional distress tort. 562 U.S. at 450. The Court held that the application of those First Amendment limits "turns largely on whether [the] speech is of public or private concern, as determined by all the circumstances of the case." *Id*. at 451. As the Court explained, the "content, form, and context" of the speech factor in this inquiry. *Id*. at 453 (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985)). "While none of the three factors is dispositive, content is the most important." *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 794 (7th Cir. 2016). And as to "content," "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453 (internal quotation marks omitted). Speech of private concern, by contrast, does not "seek to communicate to the public or to advance a political or social point of view." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011).

  At least on the summary judgment record, the background reports are properly characterized as private concern, not public concern, speech. The background reports do not relate to "political" or "social" issues; rather, they list information like phone numbers, current and past addresses, and possible relatives. Whitepages argues that those facts are of "public interest" because they could help with "attempting to locate a distant family member who may have moved, conducting a background check on a potential new employee, or contacting a nearby neighbor in a time of emergency." Doc. 79 (19 C 4871) at 15. Yet those uses are private, not public, as *Snyder* understands the distinction. Thus, although the background reports may be helpful to specific individuals—a family member, an employer, or a neighbor—they are not "a subject of general interest." *Snyder*, 562 U.S. at 453.

The most "public" aspect of the reports is the information derived from court and other public records: marriages and divorces, bankruptcies, and civil and criminal cases. Doc. 63 (19 C 4871) at 12-14, 17-20, 23; Doc. 62 (19 C 4892) at 4-7, 16-26. But because Plaintiffs are not public figures, it is unclear why those records, whatever their provenance, are "a subject of legitimate news interest," which was *Snyder*'s primary consideration. 562 U.S. at 453. Moreover, as discussed below, even if *some* of the information included in the background reports derive from court and other public records, the reports also include purely private information like cellphone numbers and email addresses. Doc. 63 (19 C 4871) at 10; Doc. 62 (19 C 4892) at 8-10.

In addressing this general point, Defendants invoke a line of cases that, in distinguishing public concern speech from private concern speech, gives substantial weight to whether the information is derived from public or private sources. That line begins with *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975), which held that Georgia could not impose civil liability on a journalist for publishing the name of a sexual assault victim obtained from court records. *Id.* at 496-97. In so holding, the Court came close to saying that anything in the public record is of public concern: "Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media." *Id.* at 495. Applying *Cox Broadcasting* to a privacy lawsuit against a journalist, the Seventh Circuit observed a quarter century ago that "the First Amendment creates a privilege to publish matters contained in public records even if publication would offend the sensibilities of a reasonable person." *Haynes*, 8 F.3d at 1231-32. But the Seventh Circuit recently clarified that those cases reflect the special role of *the press* in publicizing court proceedings. *See Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1069 (7th

13

Cir. 2018) ("Press access in particular is important.") (citing *Cox Broad.*, 420 U.S. at 491-92). Here, by contrast, the background reports do not inform the public at large through journalistic coverage of court proceedings; rather, they provide only barebones summaries of court records for the benefit of private purchasers of such reports.

So understood, background reports fall within the ambit of *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, *supra*, which *Snyder* cited as "an example of speech of only private concern." 562 U.S. at 453. *Dun & Bradstreet* involved a defamation suit against a credit reporting agency for falsely reporting that the plaintiff had filed for bankruptcy. 472 U.S. at 751. In holding that the credit report concerned "no public issue," the Supreme Court reasoned that the report was "solely in the individual interest of the speaker and its specific business audience" and was "made available to only five subscribers, who, under the terms of the subscription agreement, could not disseminate it further." *Id*. at 762.

Notably, the dissenting Justices in *Dun & Bradstreet* took the same position that Defendants take here. Citing *Cox Broadcasting*, the dissent contended that because every bankruptcy is "a matter of public record," the credit report should "fall[] within any reasonable definition of 'public concern.'" *Id.* at 789 (Brennan, J., dissenting). The *Dun & Bradstreet* majority rejected that categorical rule, which would have immunized all speech derived from public records without regard to content, form, or context. Like the credit reports in *Dun & Bradstreet*, Defendants' background reports include some information derived from public records. Moreover, like the purveyor of the credit reports, Defendants sell their background reports in private business transactions. (Indeed, Whitepages's terms of use provide that its background reports "may not be published, sold, or rented to any third party." Doc. 77-1 (19 C 4871) at 13.) Given all this, the background reports are speech of private, not public, concern.

14

Indeed, under *Dun & Bradstreet* and *Snyder*, the background reports might qualify as private concern speech even if their content derived entirely from publicly available sources. But the court need not go that far to reject Defendants' submission on summary judgment that background reports fit within exemption (2). The reason is that Plaintiffs adduce evidence that the reports contain some information—their cell phone numbers and email addresses—unavailable from any public source. Doc. 77 (19 C 4871) at ¶ 34; Doc. 65 (19 C 4892) at ¶ 5. The fact that the reports blend public and non-public information, considered together with their sale in a private, non-journalistic context, establishes at the summary judgment stage that they are speech of private concern and therefore that they fall outside the scope of exemption (2) even on Defendants' understanding that the exemption turns on the public concern/private concern distinction and on their further understanding that the distinction turns on the source of the reported information.

The background reports still could qualify for exemption (2) if they used Plaintiffs' identities for "non-commercial purposes." Defendants largely neglect this component of exemption (2), focusing primarily on their public/private concern argument, but they do briefly contend that the reports are "not 'commercial speech'" despite being "sold for profit." Doc. 64 (19 C 4871) at 14; Doc. 50 (19 C 4892) at 13. Defendants are wrong, at least on the summary judgment record.

As an initial matter, the meaning of "non-commercial purposes" in exemption (2), 765 ILCS 1075/35(b)(2), is not the mirror image of the meaning of "commercial purposes" in 765 ILCS 1075/30(a), the provision that fixes *prima facie* liability under the IRPA. As discussed above, exemption (2) alludes to federal First Amendment doctrine and its concept of noncommercial speech; the term "commercial purposes" in § 30(a), by contrast, is defined by § 5

15

of the IRPA. *See* 765 ILCS 1075/5 (defining "commercial purposes" to mean "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising"). The Seventh Circuit has noted this dissonance. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 514 n.4 (7th Cir. 2014) ("It is true that each of the statutory and common-law claims alleged here has a 'commercial' element in one form or another, but it's not clear that the Supreme Court's commercial-speech doctrine should be used to define this term in each cause of action."). Accordingly, use of a person's identity could be "commercial" so as to establish a *prima facie* IRPA violation, but still "non-commercial" so as to qualify for exemption (2). *Cf. Best v. Berard*, 776 F. Supp. 2d 752, 756, 759 (N.D. Ill. 2011) (holding that a television broadcast had a "commercial purpose" under § 30(a), but still qualified for exemption (2) as "a matter of public concern").

      Although Defendants insist that their background reports are noncommercial in the sense of exemption (2) and the First Amendment, they leave the point severely underdeveloped. The law on how to distinguish noncommercial from commercial speech under the First Amendment is complex. As the Seventh Circuit has explained, "there is a 'common-sense distinction' between commercial speech and other varieties of speech, and we are to give effect to that distinction." *Jordan*, 743 F.3d at 517 (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56 (1978)). And citing *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66-67 (1983), the Seventh Circuit has held that "relevant considerations [to the distinction] include whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech." *Jordan*, 743 F.3d at 517 (quotation marks omitted). But

Defendants' arguments on this point are conclusory, making no reference to the *Bolger* factors or other leading cases. The court therefore will not grant summary judgment to Defendants on the ground that the background reports qualify as noncommercial speech under the First Amendment and thus fall within exemption (2). *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived … ."); *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped.").

Instant Checkmate belatedly and substantially expands its noncommercial speech argument in a supplemental brief and moves for leave to file that brief. Doc. 80 (19 C 4892); Doc. 81 (19 C 4982) at 1-2. The motion is granted inasmuch as the court has reviewed the brief. Citing a recent Ninth Circuit decision concerning celebrity profiles on IMDb.com, *IMDb.com Inc. v. Becerra*, 962 F.3d 1111 (9th Cir. 2020), Instant Checkmate argues that its background reports are noncommercial speech under the three *Bolger* factors. Doc. 81 (19 C 4982) at 2-4. IMDb's "free, publicly available" profiles of celebrities—who qualify as public figures—are likely distinguishable from Instant Checkmate's paywalled background reports of private individuals. *IMDb.com, Inc.*, 962 F.3d at 1122. In any event, a "district court is entitled to find that an argument raised for the first time in a reply brief is forfeited," *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009), and that is doubly true of an argument raised for the first time in a supplemental brief filed by a party that has already filed a reply brief.

In sum, a reasonable jury could find on the summary judgment record that the background reports do not qualify for exemption (1) or (2), and therefore that the free previews are not exempted from IRPA liability by exemption (4).

17

### B. First Amendment Defense

The next question is whether the First Amendment bars applying the IRPA to the free previews. Up to this point, the First Amendment has played only an indirect role via its incorporation in exemption (2) and, derivatively, exemption (4). But with Plaintiffs having adduced evidence sufficient for a reasonable jury to find a non-exempted IRPA violation, the First Amendment can operate directly as an affirmative defense to liability. Instant Checkmate declined to move for summary judgment on First Amendment grounds, relying only on the statutory exemptions. Doc. 50 (19 C 4892) at 13. Whitepages, by contrast, contends that the free previews—and, for that matter, the background reports—are protected speech under the First Amendment. Doc. 64 (19 C 4871) at 10-11, 14.

Whitepages again fails to develop its position on this point. The free previews, if anything, present a more difficult First Amendment case for Defendants than do the background reports because they "propose a commercial transaction" and thus fall "within the core notion of commercial speech." *Jordan*, 743 F.3d at 516 (citing *Bolger*, 463 U.S. at 66). Whitepages does not explain why the free previews nevertheless qualify as noncommercial speech. And if the free previews are commercial speech, their regulation would be subject to only intermediate scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 562-64 (1980), another case that Whitepages does not cite. Its underdeveloped First Amendment argument accordingly is forfeited. *See M.G. Skinner*, 845 F.3d at 321.

## II. Motions to Reconsider and for Interlocutory Appeal

Defendants also ask the court to reconsider its denial of their motions to dismiss or, alternatively, to certify interlocutory appeals of the denial. Docs. 40, 43 (19 C 4871); Docs. 39, 51 (19 C 4892). The reconsideration motions are denied, as they merely "rehash[] old

arguments," many of which the court has again addressed in denying the summary judgment motions. *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000).

A district court may certify an order for an interlocutory appeal only if it determines that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "There are four statutory criteria for the grant of a section 1292(b) petition to guide the district court: there must be a question of law, it must be controlling, it must be contestable, and its resolution must promise to speed up the litigation … . Unless all these criteria are satisfied, the district court may not and should not certify its order … for an immediate appeal under section 1292(b)." *Ahrenholz v. Bd. of Trs. of the Univ. of Ill.*, 219 F.3d 674, 675-76 (7th Cir. 2000) (emphasis omitted). Pertinent here, the question of law must be a "pure" question of law, "something the court of appeals could decide quickly and cleanly without having to study the record," such as "a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine." *Id*. at 676-77. As demonstrated by the court's opinion denying Defendants' motion to dismiss, applying the IRPA's statutory exemptions and the First Amendment law they incorporate is case specific and fact intensive. Neither the exemptions nor the First Amendment creates a legal defense that the Seventh Circuit could decide "quickly and cleanly without having to study the record."

The Seventh Circuit's decision in *In re Text Messaging Antitrust Litigation*, 630 F.3d 622 (7th Cir. 2010), is not to the contrary. That decision authorized an appeal under § 1292(b) to consider whether a complaint plausibly alleged antitrust violations under the standard announced in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), even though the appeal required "apply[ing] a legal standard … to a set of factual allegations." 630 F.3d at 625, 627. The

19

Seventh Circuit distinguished *Ahrenholz* on the ground that *Twombly* was "a recent decision, and its scope unsettled," leaving "[p]leading standards in federal litigation … in ferment." *Id*. at 626-27.  As a result, the Seventh Circuit explained, an early appeal could potentially "head off protracted litigation." *Id*. at 627.  In so holding, the Seventh Circuit reiterated the general rule that "routine applications of well-settled legal standards to facts alleged in a complaint are [not] appropriate for interlocutory appeal." *Id*. at 626.

This court's decision denying Defendants' motions to dismiss falls squarely within the general rule established by *Ahrenholz* and does not qualify for the narrow exception recognized in *Text Messaging*.  The scope and application of *Twombly*'s plausibility standard is now settled, and no other recent, thinly interpreted Supreme Court decision potentially controls the issues presented by Defendants' motions to dismiss.  Interlocutory appeals of the court's denial of those motions therefore would be inappropriate.

## Conclusion

Defendants' motions for reconsideration, for certification of interlocutory appeals, and for summary judgment are denied.  Instant Checkmate's motion for leave to file a supplemental brief is granted.  Plaintiffs' motion to continue Instant Checkmate's summary judgment motion to allow further discovery is denied as moot.

October 27, 2020

_____
United States District Judge