# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STEPHANIE LUKIS, individually and on behalf of all others similarly situated, | |
| Plaintiff, | No. 1:19-cv-04871 |
| v. | Judge Gary Feinerman |
| | Mag. Judge Jeffrey Gilbert |
| WHITEPAGES, INC., | |
| Defendant. | |

<u>**DECLARATION OF BLAINE C. KIMREY**</u>

I, Blaine C. Kimrey, hereby swear, under oath, to the following:

1.      I am over 18 years of age.  I am a Shareholder at Vedder Price P.C. in Chicago, Illinois, and I represent Whitepages, Inc. ("Whitepages"), in this litigation.  I have been involved in litigating this case since its inception.

2.      A true and correct copy of the January 5, 2021 Transcript of the Deposition of Stephanie Lukis is attached as **Exhibit A**.

3.      A true and correct copy of the January 13, 2021 Transcript of the Deposition of Stephanie Lukis is attached as **Exhibit B**.

4.      On October 9, 2020, Whitepages served Lukis with interrogatories, requests for production, and requests for admissions.

5.      On December 10, 2020, Lukis provided written responses, but produced no documents whatsoever.

1

6.      On December 15, 2020, Whitepages' counsel sent a letter to Lukis's counsel, outlining the numerous problems with Lukis's responses.  A true and correct copy of that letter is attached as **Exhibit C**.

7.      On December 22, 2020, my colleague Jonathon Reinisch and I held a ***three-hour*** meet and confer discussion with Lukis's counsel William Beaumont, in which it was clear that Lukis's counsel had not adequately considered or prepared to discuss the problems raised.

8.      Whitepages' counsel summarized that discussion in a letter dated December 23, 2020.  A true and correct copy of that letter is attached as **Exhibit D**.

9.      Lukis did not supplement her responses or produce any documents until after 4:00 p.m. Central on January 4, 2021, the day before Lukis's deposition was set to proceed.  A true and correct copy of Lukis's supplemental discovery responses are attached as **Exhibits E-G**.

10.     The document production on January 4, 2021 consisted solely of Lukis's data from Facebook and LinkedIn and comprised 2,205 pages, including hundreds of pages that were fully redacted without explanation.

11.     Lukis later provided a much more meager production of her Twitter profile.

12.     In total, Whitepages entered 47 exhibits comprising 2,701 pages in Lukis's two deposition sessions, largely based on Whitepages' independent research.

13.     On January 11, 2021, Whitepages' counsel sent another meet and confer letter (which also addressed Whitepages' Rule 11 concerns).  A true and correct copy of that letter is attached as **Exhibit H**.

14.     Lukis's counsel has not responded to this letter.

15. On January 13, 2021, Whitepages' counsel sent an email to Lukis's counsel, following up on certain discovery issues. A true and correct copy of that email string is attached as **Exhibit I**.

16. On January 14, 2021, having received no response, Whitepages' counsel sent another email to Lukis's counsel. *See* Exh. I.

17. On January 18, 2021, Lukis's counsel responded, refusing to provide any additional information. *See* Exh. I.

18. A true and correct copy of the Lukis's engagement letter with her counsel, as produced, is attached as **Exhibit J**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed by me on February 3, 2021, at Evanston, Illinois.

*/s/ Blaine C. Kimrey*
Blaine C. Kimrey

# Exhibit A

Page 1

1
                IN THE UNITED STATES DISTRICT COURT
2                   NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION
3
4    STEPHANIE LUKIS, individually )
     and on behalf of all others   )
5    similarly situated,           )
                                   )
6            Plaintiffs,           )
                                   )
7        vs.                       )   No. 1:19-cv-04871
                                   )
8    WHITEPAGES, INC.,             )
                                   )
9            Defendant.            )
10
11
             The videotaped deposition of STEPHANIE LUKIS,
12
     called for examination, taken pursuant to the Federal
13
     Rules of Civil Procedure of the United States District
14
     Courts pertaining to the taking of depositions, taken
15
     before KELLY A. BRICHETTO, CSR No. 84-3252, Certified
16
     Shorthand Reporter of the State of Illinois, on the 5th
17
     day of January, 2021, at 9:30 a.m.
18
19
20
21
     REPORTED REMOTELY FROM CHICAGO, ILLINOIS
22
23
24

Page 2

1 REMOTE APPEARANCES:
2
         On behalf of the Plaintiffs:
3
            BEAUMONT COSTALES, LLC, by
4            MR. WILLIAM BEAUMONT
             MR. ROBERTO LUIS COSTALES
5            107 West VanBuren Street
             Suite 209
6            Chicago, Illinois 60605
             (773) 831-8000
7            whb@beaumontcostales.com
             rlc@beaumontcostales.com
8
9        On behalf of the Defendant:
10           VEDDER PRICE, by
             MR. BLAINE C. KIMREY
11           MR. JONATHON P. REINISCH
             MR. NICK VERA
12           222 North LaSalle Street
             Chicago, Illinois 60601
13           (312) 609-7500
             bkimrey@vedderprice.com
14           jreinisch@vedderprice.com
             nvera@vedderprice.com
15
16           - - - - - - -
17
18 ALSO PRESENT:
19 MICHAEL TOTH, Concierge
20 KEVIN DUNCAN, Legal Videographer
21
22
23
24

Page 3

1           TRANSCRIPT INDEX

2 APPEARANCES . . . . . . . . . . . . . . . . . . . . . 2
3
4 INDEX OF EXHIBITS . . . . . . . . . . . . . . . . 4
5
6 EXAMINATION OF STEPHANIE LUKIS
7 BY MR. KIMREY . . . . . . . . . . . . . . . . . . . . 7
8
9
10
11 REPORTER'S CERTIFICATE . . . . . . . . . . . . . . 294
12
13 EXHIBIT CUSTODY
14 EXHIBIT SHARE
15
16
17
18
19
20
21
22
23
24

Page 4

1           INDEX OF EXHIBITS
2 NUMBER          DESCRIPTION          IDENTIFIED
3 Exhibit No. 1    Lexis pdf              33
   Exhibit No. 2    CheckPeople pdf       97
4 Exhibit No. 3    MyLife pdf           107
   Exhibit No. 4    FastPeople pdf       112
5 Exhibit No. 6    LinkedIn pdf         129
   Exhibit No. 7    Twitter pdf          168
6 Exhibit No. 8    Facebook pdf         183
   Exhibit No. 9    YouTube pdf          197
7 Exhibit No. 10   Google pdf           208
   Exhibit No. 11   Whitepages pdf       219
8 Exhibit No. 12   Stephanie Lukis eviction  251
   Exhibit No. 13   Stephanie Lukis mortgage  253
9 Exhibit No. 14   Stephanie Lukis registered
   agent                                  254
10 Exhibit No. 15  Stephanie Lukis bankruptcy 256
   Exhibit No. 16   SOF Thisselle Dec. 1
11    background                          259
   Exhibit No. 17   Plf. LR 56.1          277
12 Exhibit No. 18   2.9 pdf              237
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1       THE VIDEOGRAPHER: Good morning. We are going
2 on the video record at 9:35 a.m. on January 5th, 2021.
3       Please note that your microphones may be
4 sensitive and could pick up whispering, private
5 conversations and cellular interference. Please be
6 mindful that this can interfere with the deposition's
7 audio.
8       Audio and video recording will continue to
9 take place unless all parties agree to go off the record.
10       Here begins media unit one in the video
11 recorded deposition of Ms. Stephanie Lukis taken on
12 behalf of the Defendant in the case matter of Stephanie
13 Lukis versus Whitepages, Inc., filed in the U.S. District
14 Court for the Northern District of Illinois, Eastern
15 Division bearing case number 1:19-cv-04871.
16       This is a remote virtual deposition hosted
17 by Veritext Legal Solutions. My name is Kevin Duncan,
18 and I am a certified legal video specialist from the firm
19 of Veritext Legal Solutions, and the court reporter today
20 is Ms. Kelly Kilcoyne from Veritext Legal Solutions.
21       I'm not authorized to administer an oath.
22 I'm not related to any party in this action nor am I
23 financially interested in the outcome.
24       Counsel, will you please identify

2 (Pages 2 - 5)

Page 6

1 yourselves for the record starting with the noticing
2 party.
3       MR. KIMREY:  The noticing party is the
4 Plaintiff, so that would be starting with Mr. Costales
5 and Mr. Beaumont.
6       MR. BEAUMONT:  William Beaumont on behalf of
7 the Plaintiff.
8       MR. COSTALES:  Roberto Costales here on behalf
9 of Plaintiffs.
10       MR. KIMREY:  Blaine Kimrey of Vedder Price on
11 behalf of Whitepages.
12       MR. REINISH:  And Jonathon Reinish also from
13 Vedder Price also on behalf of Whitepages.
14       MR. KIMREY:  I also note for the record that
15 Nick Vera from Vedder Price is also here.  Although he
16 may not be here for the entire deposition.
17       Okay.  Please swear in the witness.
18       THE REPORTER:  I have a brief read to read
19 first.
20       Due to the need for this deposition to
21 take place remotely, will both parties please stipulate
22 that the court reporter may swear in the witness over
23 Veritext virtual video conference.
24       MR. BEAUMONT:  Yes.

Page 7

1       MR. KIMREY:  Yes.
2              (Witness sworn.)
3 WHEREUPON:
4              STEPHANIE LUKIS,
5 called as a witness herein, having been first duly sworn,
6 was examined and testified as follows:
7              DIRECT EXAMINATION
8 BY MR. KIMREY:
9    Q.   Good morning, Ms. Lukis.  As I noted, I'm
10 Blaine Kimrey from Vedder Price in Chicago.
11       How are you?
12    A.   Not bad.  Everybody is in Chicago.
13    Q.   That's where the case is pending.
14       Have you given a deposition before?
15    A.   No.
16    Q.   Have you ever observed live a deposition
17 before?
18    A.   No.
19    Q.   So I'm going to give you some of the ground
20 rules.  This is pretty basic.
21       I'm going to ask you questions.  I'd like for
22 you to answer the questions.  If you don't understand the
23 questions, please feel free to ask me to elaborate or
24 clarify.

Page 8

1       Wait for me to finish asking a question
2 before you answer just because the court reporter has a
3 hard time recording people speaking simultaneously.
4       Does that make sense?
5    A.   Yep.
6    Q.   You can take breaks whenever you want.  You
7 can't take a break while a question is pending unless the
8 question implicates attorney/client privilege, work
9 product protection, work trade secret protection.  So
10 unless those issues are implicated go ahead and answer
11 the question.  Then you can take a break.
12       If you need to take a break for, you know,
13 the bathroom, food, whatever, that's all fine.
14       Does that all make sense?
15    A.   Perfect sense.
16    Q.   Have you taken any medications today or last
17 night that would inhibit your ability to give truthful
18 testimony today?
19    A.   No.
20    Q.   Do you understand that you're under oath in
21 this deposition today?
22    A.   Yes.
23    Q.   Do you understand that because of that you're
24 obligated to state the truth?

Page 9

1    A.   Yes.
2    Q.   And if you don't state the truth, do you
3 understand that that suffers a potential penalty of
4 perjury?
5    A.   Yes.
6    Q.   I'd like to go through some, you know,
7 background information related to you as the Plaintiff in
8 this case.
9       Let's start with where you've lived during
10 your whole life.  If you could just walk me through, this
11 doesn't have to have scientific precision, just roughly
12 where you were born, where you went after that next, et
13 cetera.
14    A.   I was born in Minnesota.  I grew up a child
15 of the military and the U.S. government, so I've lived in
16 19 states and 3 foreign countries.  Would you like for me
17 to list all of them?
18    Q.   Yes.
19    A.   Okay.
20    Q.   In chronological order.
21    A.   Oh, that's going to be fun.
22       Minnesota, California, Mississippi, Alabama.
23 Oh, boy.  Am I leaving some out?  Texas, Turkey then back
24 to -- no, visited 19 states not lived in.  I think it's

3 (Pages 6 - 9)

Page 10

1 lived in eight or nine. Okay. Went to Turkey back to
2 Texas then Florida back to Minnesota, Oklahoma back to
3 Minnesota, Texas, Virginia then Chicago then back to
4 Virginia then back to Chicago. I think that's all of
5 them. And then one more Virginia to Chicago again.
6 Currently living in Chicago. I think I got all of them.
7    Q.  Was your dad or your mom or both in the
8 military?
9    A.  My father was in the Air Force. My
10 step-fathers were in the DEA and U.S. Customs.
11    Q.  How many step-fathers do you have?
12    A.  My mother is on husband number six. So one
13 father, five step-fathers.
14    Q.  Your dad was your mom's first husband?
15    A.  My father was my mother's first husband, and
16 he was in the Air Force.
17       Oh, I missed Greece.
18    Q.  I'm sorry. What did you say?
19    A.  I -- I missed living in Greece and Germany.
20 I was a young kid, so I forgot about those.
21    Q.  When were you born?
22    A.  1977.
23    Q.  What's your birth date?
24    A.  February 24th, 1977.

Page 11

1    Q.  When you were born, were your parents
2 married?
3    A.  Yes.
4    Q.  When did your parents divorce?
5    A.  1987, I believe.
6    Q.  Where did you live at that time?
7    A.  Outside of Los Angeles, California.
8    Q.  Which parent got custody of you?
9    A.  My dad did initially, but then we ended up
10 moving in with my mom six months later.
11    Q.  In LA?
12    A.  When -- oh, I forgot Missouri too.
13       When my mother got custody, we moved to
14 outside of St. Louis, Missouri.
15    Q.  When did your mom first remarry?
16    A.  1987, 1988.
17    Q.  Was that in St. Louis?
18    A.  In Missouri. They were working in a small
19 town outside of -- somewhere in rural Missouri.
20    Q.  What is your biological father's name?
21    A.  Gregory Claddy.
22    Q.  Does he have a middle name?
23    A.  James.
24    Q.  What is your mom's full name?

Page 12

1    A.  Do you want me to include all of her last
2 names that she's had?
3    Q.  Sure. Let's do that in chronological order
4 starting with her maiden name and then going by husband.
5    A.  Deborah Rae Reynolds married Claddy married
6 Springer married McDaniels.
7    Q.  Sorry. I'm writing these down. Could you
8 slow down a little bit?
9    A.  Sure.
10    Q.  Deborah Rae Reynolds then?
11    A.  Married Claddy married Springer married
12 McDaniel married Horn. Let's see. I don't remember the
13 last name of husband number five. They were only married
14 for like a year and a half, and I lived in Chicago, and
15 currently -- current husband is -- what is his last name?
16 I don't remember the two most recent husbands' last
17 names. I -- let me look.
18    Q.  Are you looking at a cell phone right now?
19    A.  Yeah. I'm looking at my contacts. See if I
20 can figure out -- Egan. Current husband is Egan.
21    Q.  E-A-G-O-N?
22    A.  E-G-A-N.
23    Q.  Okay.
24    A.  I don't remember the last name of husband

Page 13

1 number five.
2    Q.  Is that in your contacts in your phone?
3    A.  No. She was married to him for a short
4 period of time, and I only met him at the wedding.
5    Q.  What are the full names of all of those
6 stepdads in order?
7    A.  Everett Dean Springer, Michael McDaniel, John
8 Horn. Wait. Springer, McDaniel, Horn. I don't remember
9 husband number five and then husband number six is -- oh,
10 come on. What's his name? I don't remember the name of
11 husband number six.
12    Q.  It's in your contacts? Do you just have his
13 last name?
14    A.  No, I don't have his phone number. I just
15 have my mom's name in my contacts.
16    Q.  Got it.
17    A.  Got her current last name.
18    Q.  What kind of phone are you looking at?
19    A.  An Android. I don't even know what kind
20 of -- it's just an Android -- let me look at my settings
21 because I have no idea what kind of phone this is.
22 LG Stylo 5.
23    Q.  How long have you had that phone?
24    A.  Year and a half.

4 (Pages 10 - 13)

Page 14

1    Q.   What kind of phone did you have before that?
2    A.   Samsung Galaxy.
3    Q.   How long did you have the Samsung Galaxy?
4    A.   Three years.
5    Q.   Do you still have the Samsung Galaxy, sorry,
6  Galaxy phone?
7    A.   No.  When I got the LG, I turned it in for
8  credit, but I had already factory reset and wiped it
9  before I gave it over to T Mobile.
10   Q.   When did that occur?
11   A.   Year and a half ago.
12   Q.   Did that occur after this lawsuit was filed?
13   A.   I'm not sure.
14   Q.   Might it have occurred after this lawsuit was
15  filed?
16   A.   I would have to double check with my
17  attorneys what date the lawsuit was filed versus when I
18  got -- switched out the phones.  To my knowledge, I
19  believe the lawsuit was filed after this, after I
20  switched phones.
21   Q.   Before you wiped the Samsung Galaxy did you
22  back it up or transfer the data on it to your LG Stylo 5?
23   A.   It was backed up on the Cloud for Google.
24   Q.   Do you still have access to that Cloud

Page 15

1  account?
2    A.   Yes.
3    Q.   Does the back-up of that Samsung Galaxy still
4  exist in the Cloud?
5        MR. BEAUMONT:  Objection.  I'm not sure what
6  the relevance of this is, but the witness can answer --
7  the witness can answer if she knows.
8  BY THE WITNESS:
9    A.   I have no idea.  I'd have to log into my
10  Google account and check.
11       MR. KIMREY:  I'll just note for the record
12  that objecting based on relevance is improper in a
13  deposition.  I ask that you not do that, Mr. Costales.
14  BY MR. KIMREY:
15   Q.   So do you have a Google Drive account?
16   A.   Yes, through my e-mail account.
17   Q.   What is your e-mail?  Is it Gmail?
18   A.   Yes, it's a Gmail account.
19   Q.   How long have you had the Gmail account?
20   A.   I'd have to look, but I -- it -- my guess is
21  more than ten years.  I jumped on Gmail pretty much as
22  soon as it came out.
23   Q.   In addition to your LG Stylo 5, do you
24  currently have any other cell phones?

Page 16

1    A.   No.
2    Q.   When you had the Samsung Galaxy, did you have
3  any other cell phones in addition to the Samsung Galaxy?
4    A.   No.
5    Q.   During the time that you've had the Gmail
6  account, you said approximately ten years, have you had
7  any other personal e-mail accounts?
8    A.   I have two e-mail accounts I use and one
9  e-mail account I use to sign up -- whenever I have to do
10  sign up for junk mail stuff.
11   Q.   What are your current e-mail accounts?
12   A.   Autumnsilver@gmail.com and
13  stephanie.lukis@gmail.com.  The third one, the junk
14  e-mail is smlukis@gmail.com.
15   Q.   Besides those three Gmail accounts do you
16  have currently any other e-mail accounts?
17   A.   No.
18   Q.   Besides those three Gmail accounts have you
19  historically had any other e-mail accounts?
20   A.   One.
21   Q.   What is that?
22   A.   Autumnsilver@aol.com.
23   Q.   Does that account still exist?
24   A.   No.

Page 17

1    Q.   When was that account terminated?
2    A.   When I started the Gmail account over ten
3  years ago.
4    Q.   Are you using a computer right now?
5    A.   Yes.
6    Q.   What kind of computer is it?
7    A.   A Dell laptop.
8    Q.   Do you know what type of Dell it is?
9    A.   No.  I'd have to look in the settings and go
10  hunting to try to figure it out.
11   Q.   Could you look at the settings right now and
12  tell me what it says?
13       MR. BEAUMONT:  I object to the form of the
14  question.
15  BY THE WITNESS:
16   A.   It doesn't list what kind it is.  It just
17  says Inspiron.  I guess that's the type of laptop it is.
18  BY MR. KIMREY:
19   Q.   Yes.
20   A.   Yeah, it just says Inspiron 3584.
21   Q.   How long have you had that laptop?
22   A.   Two years, I think, year and a half.
23   Q.   Is that your only computer currently?
24   A.   Currently, yes.

5 (Pages 14 - 17)

Page 18

1    Q.   What kind of computer did you have before the
2  Dell Inspiron 3584?
3    A.   It was an HP desktop.  I do not know the
4  specifics of it.
5    Q.   Do you still have the HP desktop?
6    A.   I still have the hard drive for it.  The
7  motherboard crashed on it.  The hard drive is sitting in
8  a drawer like ten feet from me.
9    Q.   Other than the Dell laptop that you're
10 currently on and the HP laptop for which you still have
11 the hard drive have you ever had any other computers and
12 if so, what were they?
13   A.   I had --
14       MR. BEAUMONT:  Objection, form.
15 BY MR. KIMREY:
16   Q.   You can answer.
17   A.   I'm sorry.  What was that?
18       MR. BEAUMONT:  Just objection to the form of
19 the question, but you could answer if you -- if you know.
20 BY THE WITNESS:
21   A.   I had one other Dell Desktop for ten years.
22 BY MR. KIMREY:
23   Q.   During what period roughly?
24   A.   I got it in 2006 through 2016.

Page 19

1    Q.   Do you still have that desktop?
2    A.   The hard drive.
3    Q.   Where is the hard drive?
4    A.   Ten feet from me in a drawer.
5    Q.   Have you had any other computers beyond those
6  you've testified about so far today?
7    A.   I have not.
8       MR. BEAUMONT:  Objection, form.
9  BY MR. KIMREY:
10   Q.   Do you use text messages?
11   A.   Yes.
12   Q.   Do you use any kind of instant messaging
13 technology?
14   A.   Facebook Messaging.  That's about it.
15   Q.   In producing documents in response to
16 Whitepages' discovery request in this case, did you
17 search the LG Stylo 5?
18   A.   No.
19   Q.   In producing documents in response to
20 Whitepages' discovery in this case, did you search your
21 Google Drive account?
22   A.   I don't know.
23   Q.   Is it possible that you did not?
24   A.   I don't think that I produced any documents

Page 20

1  for this case.  I think my attorneys handled all of that.
2  What -- are you referring to what information I gave
3  them?
4    Q.   Right now I'm just referring to documents,
5  production of documents, whether they be hard copy or
6  digital.
7    A.   I don't think I produced any documents for
8  this case.
9    Q.   In producing documents in response to
10 Whitepages' discovery, did you search your Gmail
11 accounts, plural?
12       MR. BEAUMONT:  Objection, form.
13 BY THE WITNESS:
14   A.   Not that I can think of.
15       MR. BEAUMONT:  Blaine, we're going to go ahead
16 and take a quick break.
17       MR. KIMREY:  Okay.
18       THE VIDEOGRAPHER:  Going off the video record
19 at 9:58 a.m.
20       (WHEREUPON, a break was
21        taken.)
22       We are back on record at 10:03 a.m.
23       You may proceed.
24 BY MR. KIMREY:

Page 21

1    Q.   Ms. Lukis, what did you and your counsel talk
2  about during the break?
3       MR. BEAUMONT:  Objection, attorney/client
4  privilege.  We're not -- don't answer the question.
5       MR. KIMREY:  That's improper, Mr. Costales.
6  She's on the record even during breaks, and I'm entitled
7  to ask her what was discussed during the breaks.  The
8  rules are clear on that.
9       I'll pose the question again.
10 BY MR. KIMREY:
11   Q.   Ms. Lukis, what did you discuss during a
12 break with your counsel?
13       MR. BEAUMONT:  Objection, attorney/client
14 privilege, and we're not answering the question.
15 BY MR. KIMREY:
16   Q.   Are you taking your counsel's instruction to
17 not answer that question, Ms. Lukis?
18   A.   Yes, sir, I am.
19       MR. COSTALES:  I'd also like to -- this is
20 Roberto Costales on the record.  That was Mr. Beaumont
21 speaking, Blaine, not me, so just making that
22 observation.  Thank you.
23       MR. KIMREY:  It's hard to tell because neither
24 one of you is on video.

6 (Pages 18 - 21)

Page 22

1      And just to make the record clear, the
2  Federal rules are crystal clear that I'm entitled to ask
3  the witness what was discussed during a break with
4  counsel unless that discussion involved analysis of the
5  application of attorney/client privilege, work product
6  protection or trade secret protection.
7  BY MR. KIMREY:
8      Q.   Did the discussion that you had with your
9  counsel, Ms. Lukis, address attorney/client priv --
10  application of attorney/client privilege, work product
11  protection, work trade secret protection?
12      MR. BEAUMONT:  Objection, attorney/client
13  privilege.  Our -- our discussion is attorney/client
14  privilege.
15      MR. KIMREY:  Are you instructing the witness
16  not to answer?
17      MR. BEAUMONT:  I'm instructing the witness not
18  to answer.
19      MR. KIMREY:  Okay.  That's inappropriate, and,
20  you know, we reserve our right to move for disclosure of
21  what was discussed during that break.  And I note for the
22  record that nobody has said that the discussion involved
23  potential application of privilege, work product or trade
24  secret protection, and as such, the discussion is proper

Page 23

1  ponder for questioning in this deposition because
2  Ms. Lukis is on the record sworn under oath both when
3  she's on video and when she's talking to her counsel
4  during breaks.
5  BY MR. KIMREY:
6      Q.   So are you following your counsel's advice
7  not to answer, Ms. Lukis?
8      MR. BEAUMONT:  I instruct the witness not --
9  not to -- not to answer the question on the grounds of
10  attorney/client privilege.
11  BY MR. KIMREY:
12      Q.   Are you following your counsel's advice,
13  Ms. Lukis?
14      A.   I will.
15      Q.   Okay.  As to the Dell Inspiron 3584 that
16  you're on today, did you search that laptop in looking
17  for documents responsive to Whitepages' written discovery
18  in this case?
19      A.   I used this computer to get the archives of
20  Facebook and Indeed.
21      Q.   What was that second one -- Facebook and?
22      A.   Indeed.com, the -- web page for like
23  looking for jobs.
24      MR. BEAUMONT:  I'm sorry.  I didn't hear the

Page 24

1  answer.
2  BY THE WITNESS:
3      A.   I used the computer to get the archives for
4  Facebook and Indeed.com.
5      MR. BEAUMONT:  Just a point of clarification.
6  Are you saying Indeed or are you saying LinkedIn?
7      THE WITNESS:  I'm sorry.  LinkedIn.
8      MR. KIMREY:  Stop.
9      THE WITNESS:  I don't have an Indeed account.
10  What am I -- sorry.
11      MR. BEAUMONT:  I just want to use --
12      MR. KIMREY:  Yeah, Mr. Beaumont, that's
13  improper coaching of the witness.  You just told her how
14  to testify.
15      THE WITNESS:  I'm sorry.  I'm looking through
16  e-mails.  Sorry.
17      MR. BEAUMONT:  I'd just like to --
18      THE WITNESS:  Sorry.
19      MR. KIMREY:  You can't testify, Mr. Beaumont.
20  BY THE WITNESS:
21      A.   Where is my -- let me see if I can get my
22  phone to cooperate.  No, it's LinkedIn.  Sorry.  I just
23  got -- my husband just got an e-mail from Indeed.com.
24  That's why I said Indeed.  I just -- sorry.

Page 25

1
2  BY MR. KIMREY:
3      Q.   Do you have an Indeed.com account?
4      A.   No, I don't.  I have a LinkedIn profile.
5      Q.   Did you use the Dell laptop Inspiron 3584 to
6  search for anything beyond your LinkedIn account and your
7  Facebook account?
8      A.   I attempted to download my Twitter
9  information, but Twitter still has not gotten -- has not
10  gotten me the -- the download information yet.
11      Q.   Did you use the Dell laptop Inspiron 3584 to
12  search for anything related to this case beyond your
13  LinkedIn account, your Facebook account and your Twitter
14  account?
15      A.   No.
16      Q.   When did you use the laptop to search for
17  your Facebook account?
18      A.   Three days ago.
19      Q.   Did you try to do that before then?
20      A.   No.  I've never downloaded my whole Facebook
21  archive.
22      Q.   When did you search for your LinkedIn account
23  in relation --
24      A.   Also three days ago.

7 (Pages 22 - 25)

1  Q.  -- to this case? I'm sorry. Go ahead.
2  A.  Also three days ago.
3  Q.  Did you search for your LinkedIn account in
4  relation to this case before then?
5  A.  No.
6  Q.  When did you search for your Twitter account
7  in relation to this case?
8  A.  Three days ago.
9  Q.  Did you search for your Twitter account in
10 relation to this case before then?
11 A.  No.
12 Q.  Before three days ago did you search for any
13 documents in relation to this case in any way whatsoever?
14 A.  No.
15 Q.  Did you ever search your HP desktop hard
16 drive for information related to this case?
17 A.  No.
18 Q.  Did you ever search your Dell desktop hard
19 drive for any information related to this case?
20 A.  No.
21      MR. BEAUMONT: Objection, form.
22 BY MR. KIMREY:
23 Q.  Other than searching for your Facebook
24 account, your LinkedIn account and your Twitter account

1  three days ago have you engaged in any effort to locate
2  and produce any information related to this case?
3      MR. BEAUMONT: Objection. That is
4  attorney/client privilege, and I instruct the witness not
5  to answer.
6      MR. KIMREY: That is not privileged. It's a
7  matter of fact, and it goes to diligence in discovery, so
8  the instruction not to answer is clearly inappropriate.
9  BY MR. KIMREY:
10 Q.  Are you going to follow your counsel's
11 instruction not to answer, Ms. Lukis?
12 A.  Yes.
13     MR. BEAUMONT: If you'd like to rephrase the
14 question, you're more than welcome to rephrase the
15 question.
16 BY MR. KIMREY:
17 Q.  Did you do anything other than searching your
18 Twitter, LinkedIn and Facebook accounts in retrieving
19 information and producing it in relation to this case?
20     MR. BEAUMONT: Objection, attorney/client
21 privilege. Are you asking her other than -- I just would
22 like to make clear that you're not asking her for any --
23 any -- when you say anything that she's done, you're not
24 asking her for any -- any conversations with counsel? I

1  assume that --
2      MR. KIMREY: I'm not.
3      MR. BEAUMONT: Okay. So I'd just like to
4  make -- so can you make that clear in your -- in your
5  question to Ms. Lukis now?
6      MR. KIMREY: Please reread my question.
7          (Requested portion of the
8          record read.)
9  BY THE WITNESS:
10 A.  No.
11     MR. BEAUMONT: And -- and -- well --
12 BY MR. KIMREY:
13 Q.  Where does your mom currently live?
14 A.  Herndon, Virginia.
15 Q.  Are you in frequent touch with her?
16 A.  No.
17 Q.  How would you characterize your relationship
18 with her?
19 A.  No contact at all.
20     MR. BEAUMONT: Objection, form.
21 BY MR. KIMREY:
22 Q.  You can answer the question.
23 A.  No contact at all.
24 Q.  When is the last time you had contact with

1  your mom?
2      MR. BEAUMONT: Objection, form.
3  BY THE WITNESS:
4  A.  September 2018.
5  BY MR. KIMREY:
6  Q.  Why did you cease contact with your mom?
7  A.  Because she's very abusive emotionally and
8  mentally.
9  Q.  How is she abusive emotionally and mentally?
10 A.  She gaslights me. She tries to convince me
11 that I am a horrible person and that -- that I am
12 worthless, I am a horrible mother and that I should --
13 basically she tries to convince me that I shouldn't be on
14 this planet.
15 Q.  When is the last time you had contact with
16 your biological father?
17 A.  Jeeze.
18     MR. BEAUMONT: Objection to form.
19 BY THE WITNESS:
20 A.  At my wedding in 2007.
21 BY MR. KIMREY:
22 Q.  Why have you not had contact with him since
23 then?
24 A.  We never had a close relationship. I've

8 (Pages 26 - 29)

Page 30

1  never talked, really talked to him.
2      Q.  Do you have currently a relationship with any
3  of your stepdads?
4      A.  No.
5          MR. BEAUMONT:  Objection, form.
6  BY MR. KIMREY:
7      Q.  Did you graduate from high school?
8      A.  Yes.
9      Q.  What high school?
10     A.  Klein High School in Spring, Texas.
11     Q.  What year?
12     A.  1996.
13     Q.  Did you go to school after that?
14     A.  Some college in northern Virginia and
15 Chicago.  No graduation.
16     Q.  Did you go to college right -- the fall after
17 your graduation from Klein High School?
18     A.  One semester in Houston at a community
19 college.
20     Q.  What is the name of the college?
21     A.  I don't remember.
22     Q.  What did you do as far as education or a job
23 right after you graduated from high school?
24     A.  I worked retail or in a restaurant.

Page 31

1      Q.  What are the colleges including community
2  colleges that you've taken classes at?
3          MR. BEAUMONT:  Objection, form.
4  BY THE WITNESS:
5      A.  I don't remember the name of the one in
6  Texas, but it was Northern Virginia Community College and
7  Harold Washington College.
8      Q.  Did you have a major at any time?
9      A.  No.
10     Q.  Roughly how many months of college have you
11 attended overall?
12         MR. BEAUMONT:  Objection, form.
13 BY THE WITNESS:
14     A.  About a year and a half.
15 BY MR. KIMREY:
16     Q.  Do you hold any post high school degrees or
17 certifications?
18         MR. BEAUMONT:  Objection, form.
19 BY THE WITNESS:
20     A.  A Coursera Google certification for a couple
21 classes but that's it.
22 BY MR. KIMREY:
23     Q.  When did you marry first?
24     A.  Only married once.  Courthouse marriage was

Page 32

1  August 2007 in Chicago.  The family ceremony was
2  September 2007 in northern Virginia.
3      Q.  Are you still married?
4      A.  Yes.
5      Q.  What is your husband's full name?
6      A.  Paul Michael Lukis.
7      Q.  Do you have kids?
8      A.  One.
9      Q.  What is your child's name?
10     A.  Genevive Audrey Lukis.
11     Q.  Is she the biological daughter of yours and
12 Paul's?
13     A.  Yes.
14     Q.  How old is she?
15     A.  Three and a half.  She turns four in
16 February.
17     Q.  I know you gave us your birth date, but I'm
18 not good at quick math.  How old are you?
19     A.  43.
20     Q.  How old is your husband Paul?
21     A.  38. 37.  Sorry.
22     Q.  Let's enter folder 1.1 Lexis.
23         So just to explain to you what's going on,
24 Ms. Lukis, I have a helper today because this deposition

Page 33

1  is virtual who's going to present various exhibits to
2  you.
3          The exhibit that we're looking at right now
4  is -- I don't see the marking on it, but it should be
5  marked as Exhibit 1.
6          I ask that it be so marked.
7          MR. BEAUMONT:  Counsel, I don't believe I've
8  been provided a copy of this.
9          MR. KIMREY:  It's available to you via the
10 Exhibit Share, and these are publicly -- well, this is a
11 publicly available document.
12         MR. BEAUMONT:  Okay.  I will -- I will try
13 to -- it's available in Exhibit Share?  How do I access
14 that?
15         MR. TOTH:  You guys want to go off the record
16 for a minute?
17         MR. KIMREY:  Yeah.  Let's go off the record.
18 You can explain to counsel how to access the exhibits.
19         THE VIDEOGRAPHER:  Going off the video record
20 at 10:21 a.m.
21             (WHEREUPON, a break was
22             taken.)
23         We are back on record at 10:23 a.m.
24         You may proceed.

9 (Pages 30 - 33)

Page 34

1
2 BY MR. KIMREY:
3    Q.   So we've just introduced, Ms. Lukis, Exhibit
4 Number 1, but before we get into that, I have a few other
5 questions.
6         Do you understand why you're here today?
7    A.   Yes.
8    Q.   Why are you here today?
9    A.   As the Plaintiff for the court case.
10   Q.   What are you asserting in the court case?
11   A.   That my personal information should not be
12 available on Whitepages.com.
13   Q.   Are you asserting anything else?
14   A.   I don't know.  I'd have to check with my
15 lawyer if there's anything else I should be saying.  I
16 just don't believe my information should be publicly
17 available on a web page.
18   Q.   Is there -- are you asserting anything else
19 beyond that?
20   A.   Not that I know of.
21   Q.   Do you know what the Illinois Right of
22 Publicity Act is?
23   A.   I read it back when this got started, but I
24 only remember it in very vague details, and I couldn't on

Page 35

1 the record tell you anything about it.
2    Q.   How did you meet your counsel in this case?
3    A.   Through Craigslist.
4    Q.   How?
5    A.   I answered an ad.
6    Q.   What did the ad say?
7    A.   They were looking for people who did not want
8 their information on Whitepages.com.
9    Q.   When is the first time you used Craigslist,
10 roughly?  It doesn't have to be scientifically precise.
11        MR. BEAUMONT:  Objection, form.
12 BY THE WITNESS:
13   A.   I have no idea.
14 BY MR. KIMREY:
15   Q.   Two years ago?  Three years ago?
16   A.   Somewhere between five and seven years ago.
17 I don't know how long the web page has been running.
18   Q.   When did you see the ad by your counsel
19 looking for plaintiffs?
20   A.   Hold on.  Let me check my e-mail.
21        MR. BEAUMONT:  Objection to form.  And I'd
22 just like to make clear I instructed the witness not to
23 answer any attorney/client privilege matters.
24        MR. KIMREY:  Just to be clear, I'm just asking

Page 36

1 when she saw the ad.
2        MR. BEAUMONT:  And she can testify if she has
3 the information.
4        MR. KIMREY:  She currently I note for the
5 record is looking at her e-mail to retrieve that
6 information --
7        THE WITNESS:  Yeah.
8        MR. KIMREY:  -- on her cell phone.
9        THE WITNESS:  Yeah, that's --
10       MR. BEAUMONT:  We're going to -- to avoid any
11 possibility of attorney/client privilege being discussed,
12 we're going to take a break.
13       MR. KIMREY:  I have a question pending.
14       MR. BEAUMONT:  Well, I mean we -- to avoid the
15 possibility of any attorney/client privilege being
16 discussed, we're going to take a break.
17       MR. KIMREY:  Okay.
18       THE VIDEOGRAPHER:  Okay.  Please stand by.
19 Going off the video record at 10:27 a.m.
20            (WHEREUPON, a break was
21             taken.)
22       We are back on record at 10:33 a.m.
23        You may proceed.
24       MR. KIMREY:  Please reread the question I

Page 37

1 posed right before the break.
2            (Requested portion of the
3             record read.)
4        Ms. Lukis has put us on mute and is
5 talking to someone in her apartment.
6        THE WITNESS:  Sorry.  I was answering a
7 question for my husband.
8        MR. KIMREY:  Could you reread that interchange
9 again, please.
10            (Requested portion of the
11             record read.)
12       MR. BEAUMONT:  Hello?  Is it -- I believe I
13 got disconnected.  Can you hear me?
14       MR. KIMREY:  Let's go off the record.
15       MR. BEAUMONT:  Wait.  I'm sorry.  I just
16 got -- my screen -- I don't understand what happened.  My
17 screen just went out.
18       MR. KIMREY:  Let's go off the record.
19       THE VIDEOGRAPHER:  Going off the record at
20 10:34 a.m.
21            (Discussion had off the
22             record.)
23       We are back on record at 10:35 a.m.
24        You may proceed.

10 (Pages 34 - 37)

Page 38

1     MR. KIMREY: Please reread my question that
2 immediately preceded the break.
3           (Requested portion of the
4           record read.)
5     MR. BEAUMONT: And I'd like to say that I
6 object to that question on the grounds of attorney/client
7 privilege, and I instruct the witness not to answer the
8 question.
9 BY MR. KIMREY:
10    Q.   Are you following your counsel's instruction
11 not to answer the question, Ms. Lukis?
12    A.   Yes, because that is when attorney/client
13 privilege began.
14    Q.   When did you first see the Craigslist ad that
15 was posted presumably to every Craigslist user in the
16 universe?
17        MR. BEAUMONT: I object to any -- this calls
18 for attorney/client privilege. I object to the extent
19 it's not the -- the witness can answer if she knows.
20        MR. KIMREY: That was unintelligible.
21 BY MR. KIMREY:
22    Q.   When did you first see the ad, Ms. Lukis?
23    A.   Sometime in 2019.
24    Q.   What did it say?

Page 39

1     A.   I don't remember. It -- the best vague thing
2 I can remember is they were looking for people who did
3 not want their information on Whitepages.com.
4     Q.   Do you still have a copy of the ad?
5     A.   No.
6     Q.   What did you do in response to the ad?
7        MR. BEAUMONT: Objection. This calls for
8 attorney/client privilege. I instruct the witness not to
9 answer.
10       MR. KIMREY: It doesn't call for privileged
11 information.
12 BY MR. KIMREY:
13    Q.   Are you following your counsel's instruction
14 not to answer, Ms. Lukis?
15    A.   Yes.
16    Q.   Who posted the ad?
17    A.   I -- the attorneys.
18    Q.   What were the names of the attorneys in the
19 ad?
20    A.   I don't remember.
21    Q.   Was William Beaumont's name in the ad?
22    A.   I do not remember.
23    Q.   Was Roberto Costales' name in the ad?
24    A.   I do not remember.

Page 40

1     Q.   Is it possible that William Beaumont's name
2 was in the ad?
3     A.   I do not remember the specifics of the
4 advertisement. I only remember --
5     Q.   Is it possible that Roberto Costales' name
6 was in the ad?
7     A.   I do not remember.
8     Q.   Who did you call in response to the ad?
9        MR. BEAUMONT: Objection. Yeah, this is
10 getting into attorney/client privilege, and I instruct
11 the witness not to answer.
12 BY MR. KIMREY:
13    Q.   Are you following your counsel's instruction
14 not to answer?
15    A.   Yes.
16        MR. KIMREY: So all of these instructions are
17 completely inappropriate. Who she called in response to
18 the public ad is not privileged or work product protected
19 or confidential in any other way.
20        I'll ask the question one more time to
21 give you an opportunity, Mr. Beaumont, to extricate
22 yourself from this quagmire.
23 BY MR. KIMREY:
24    Q.   Ms. Lukis -- I note that somebody just walked

Page 41

1 in and hit Ms. Lukis with a towel.
2     A.   My husband was moving a blanket on our couch.
3     Q.   Ms. Lukis, you know that this is a federal
4 proceeding. You're under oath and you're in a
5 deposition.
6     A.   Yes.
7     Q.   You know it's inappropriate for your husband
8 to hit you in the head with a blanket during the
9 deposition in federal court. Do you understand?
10    A.   Yes. He was moving a blanket from the couch.
11        MR. COSTALES: Hold on a second. Hold on.
12 Hold on. Ms. Lukis, Ms. Lukis, Ms. Lukis, please let me
13 answer. This is Roberto Costales.
14        That's an improper characterization,
15 Blaine. Can you just move forward with the deposition
16 and stop with all the editorializing? This woman is
17 giving a deposition in her home, and there is something
18 that's outside of her control that has occurred, and it
19 doesn't affect her ability to answer questions so --
20 BY MR. KIMREY:
21    Q.   Who did you call in response to the ad?
22        MR. BEAUMONT: And the objection is that this
23 is attorney/client privilege. You can ask -- you can
24 rephrase your question so that it excludes any

11 (Pages 38 - 41)

Page 42

1 communications that she has or had with her counsel, but
2 otherwise, it is -- this possibly calls into question
3 attorney/client privilege, and so, therefore, I instruct
4 the witness not to answer unless you would like to
5 clarify.
6 　　　MR. KIMREY: My question is crystal clear.
7 Who did she call? That doesn't ask for what she said
8 during the call.
9 BY MR. KIMREY:
10 　　Q. Who did you call in response to the ad?
11 　　　MR. BEAUMONT: I instruct the witness not to
12 answer because it -- because there's a possibility of
13 this implicating attorney/client privilege, and so as a
14 result, I instruct the witness not to answer. If you --
15 　　　MR. KIMREY: You can't instruct her not to
16 answer based on the possibility of application of
17 attorney/client privilege, and who she called is not
18 privileged.
19 　　　　By the way, Mr. Costales, you're not
20 entitled to object. One objector not both of you. Mr.
21 Beaumont apparently is defending this deposition. Mr.
22 Costales, you can witness it, but you can't object.
23 Understood? I'll take your silence as a yes.
24 BY MR. KIMREY:

Page 43

1 　　Q. Who did you call, Ms. Lukis, in response to
2 the Craigslist ad trolling for plaintiffs?
3 　　　MR. BEAUMONT: Objection.
4 BY THE WITNESS:
5 　　A. The law firm.
6 　　　MR. BEAUMONT: Objection. I object to the
7 question.
8 BY MR. KIMREY:
9 　　Q. What law firm did you call?
10 　　A. I don't remember the name of it.
11 　　Q. Was it Beaumont Costales?
12 　　　MR. BEAUMONT: We're going to take a break
13 right now. We're going to take a break.
14 　　　MR. KIMREY: There's a question pending. You
15 can't take a break.
16 BY MR. KIMREY:
17 　　Q. Was it Beaumont Costales?
18 　　　MR. BEAUMONT: I object. I object as
19 attorney/client privilege, and I instruct the witness not
20 to answer.
21 BY MR. KIMREY:
22 　　Q. Are you following your counsel's instruction
23 not to answer, Ms. Lukis?
24 　　A. I am informing you that --

Page 44

1 　　　MR. BEAUMONT: I instruct the witness not to
2 answer the question.
3 BY THE WITNESS:
4 　　A. Very well. I am following his instructions.
5 BY MR. KIMREY:
6 　　Q. Not to answer?
7 　　　MR. BEAUMONT: Okay. We're going to -- I told
8 you we're taking a break, so we're taking a break.
9 　　　MR. KIMREY: For what?
10 　　　MR. BEAUMONT: We're just going to take --
11 we're taking a break. I think it is a good -- it's a --
12 　　　MR. KIMREY: Okay. That's fine. Go ahead.
13 　　　MR. BEAUMONT: We're going to take a break.
14 　　　MR. KIMREY: Off the record.
15 　　　THE VIDEOGRAPHER: Going off the video record
16 at 10:42 a.m.
17 　　　　　(WHEREUPON, a break was
18 　　　　　taken.)
19 　　　We are back on record at 10:50 a.m.
20 　　　You may proceed.
21 BY MR. KIMREY:
22 　　Q. Ms. Lukis, what did you discuss with your
23 counsel during the break?
24 　　　MR. BEAUMONT: Objection, attorney/client

Page 45

1 privilege. Don't answer the question.
2 BY MR. KIMREY:
3 　　Q. Are you following your counsel's instruction
4 not to answer?
5 　　A. Yes.
6 　　　MR. BEAUMONT: And I'd just like to jump in
7 here.
8 　　　MR. KIMREY: Let me ask my question.
9 BY MR. KIMREY:
10 　　Q. Did you discuss potential application of
11 attorney/client privilege, work product protection or
12 trade secrets during the break?
13 　　　MR. BEAUMONT: Objection, attorney/client
14 privilege. I instruct the witness not to answer.
15 BY MR. KIMREY:
16 　　Q. Are you following your counsel's instruction
17 not to answer, Ms. Lukis?
18 　　A. Yes.
19 　　Q. Are you willing to answer any questions about
20 your counsel's Craigslist ad?
21 　　A. Yes.
22 　　Q. What questions are you willing to answer?
23 　　A. How I responded to the -- the Craigslist ad.
24 　　Q. How did you respond to the Craigslist ad?

12 (Pages 42 - 45)

1    A.   I hit the reply button.  Craigslist gave me a
2 random chain of letters and numbers to reply to, and I
3 sent an e-mail.  After that attorney/client privilege
4 began because I was responded to by the attorneys.
5    Q.   To whom did you send the e-mail?
6    A.   A random series of letters and numbers that
7 you get when you hit the reply button on a Craigslist
8 e-mail or a Craigslist ad.
9    Q.   Do you still have a copy of that e-mail?
10    A.   Some -- I think somewhere in my sent file.
11    Q.   That would be in which Gmail account?
12    A.   Stephanie.lukis@gmail.com.
13    Q.   What happened after that?
14    A.   I was contacted by my attorney.
15        MR. BEAUMONT:  Objection.
16 BY MR. KIMREY:
17    Q.   Who contacted you?
18        MR. BEAUMONT:  Objection, attorney/client
19 privilege.  I instruct the witness not to answer.
20 BY MR. KIMREY:
21    Q.   Are you following your counsel's instruction
22 not to answer my question who contacted you?
23    A.   Yes, because I was speaking with the law
24 firm.

1    Q.   Who you spoke with at the law firm is not
2 attorney/client privilege.  Your counsel in this case is
3 public record.  I'll ask one more time.
4        To whom did you speak?
5    A.   The exact person I spoke with I don't
6 remember.
7        MR. BEAUMONT:  Hold on.
8 BY MR. KIMREY:
9    Q.   Was it Mr. Costales?
10        MR. BEAUMONT:  Objection.  Objection.  Blaine,
11 the -- I'm making an objection to the attorney/client
12 privilege here, and so what I'm trying to understand
13 is -- is -- I guess I'm trying to understand what it is
14 that your question is getting at.
15 BY MR. KIMREY:
16    Q.   Was it Mr. Costales?
17        MR. BEAUMONT:  Objection.  So I'd like -- I
18 object to the form of the question that this is
19 attorney/client privilege, and I instruct the witness not
20 to answer the question.  If you can rephrase it so that
21 it's not attorney/client privilege, then that's fine.
22        MR. KIMREY:  It's not privileged, so I don't
23 need to rephrase it.
24        MR. BEAUMONT:  But it's who she's talking to

1 about her representation.  I believe that is -- that
2 is what your question is, and also your question is that
3 is -- is specifically what attorney she's talking to for
4 her current -- for this current case.
5 BY MR. KIMREY:
6    Q.   To whom did you speak, Ms. Lukis?
7    A.   I don't remember.
8    Q.   Was it Mr. Costales?
9        MR. BEAUMONT:  I object.  I object.  I
10 instruct the witness not to answer.  This is -- this is
11 attorney/client privilege.
12 BY MR. KIMREY:
13    Q.   Are you following your counsel's instruction
14 not to answer?
15    A.   Yes.
16        MR. KIMREY:  I note the instruction's
17 improper.
18 BY MR. KIMREY:
19    Q.   What did you do to prepare for your
20 deposition today?
21    A.   Spoke with my attorneys.
22        MR. BEAUMONT:  Objection.  I object to
23 attorney/client privilege.  You can rephrase the question
24 if you're asking for matters other than speaking with her

1 counsel.
2 BY MR. KIMREY:
3    Q.   Did you meet with counsel to prepare for your
4 deposition today?
5        MR. BEAUMONT:  Objection.  Are you -- are
6 you -- we're just not going to get into matters that she
7 spoke with us about -- about in preparation for this
8 deposition or in preparation for any other matters where
9 she spoke with counsel.
10        MR. KIMREY:  Are you instructing her not to
11 answer, Mr. Beaumont?
12        MR. BEAUMONT:  I'm instructing her not to
13 answer.  However, I would suggest though that if your
14 question said other than speaking with her counsel what
15 did she do for -- in preparation for this deposition,
16 that is a perfectly fine question that I would not object
17 to.
18        MR. KIMREY:  It's a perfectly fine question to
19 ask if she met with counsel in preparation for her
20 deposition.  I'll ask it again.
21 BY MR. KIMREY:
22    Q.   Did you meet with your counsel in preparation
23 for this deposition?
24        MR. BEAUMONT:  Objection to that --

13 (Pages 46 - 49)

Page 50

1        MR. KIMREY:  Let me finish the question,
2  Mr. Beaumont.
3        MR. BEAUMONT:  I thought you were finished.
4  Go ahead.
5        MR. KIMREY:  Could you reread my question,
6  please, Ms. Kilcoyne.
7              (Requested portion of the
8               record read.)
9        MR. BEAUMONT:  Ms. Lukis, you can go ahead and
10  answer the question.
11  BY THE WITNESS:
12     A.   Yes.
13  BY MR. KIMREY:
14     Q.   With whom did you meet?
15     A.   My attorneys.
16     Q.   What are their names?
17     A.   William Beaumont, Roberto -- I didn't
18  actually -- I have not actually met with Roberto Costales
19  other than today.
20     Q.   When did you meet with William Beaumont in
21  preparation for your deposition?
22        MR. BEAUMONT:  Objection.  This is clearly
23  attorney/client privilege and we're not --
24        MR. KIMREY:  No, it's not.  You're wrong.

Page 51

1        MR. BEAUMONT:  You can't --
2        MR. KIMREY:  You're wrong.
3  BY THE WITNESS:
4     A.   You're asking when I met with my attorney.
5        MR. BEAUMONT:  This is clearly attorney/client
6  privilege.  We're not going to get -- this is --
7        MR. KIMREY:  Are you instructing her not to
8  answer?
9        MR. BEAUMONT:  I -- I --
10        MR. KIMREY:  Are you instructing her not to
11  answer?  Can't just say attorney/client privilege and
12  then not instruct her not to answer.
13  BY MR. KIMREY:
14     Q.   Okay.  You can answer because he hasn't --
15  when did you meet with Mr. Beaumont in preparation for
16  the deposition?
17        MR. BEAUMONT:  Are you asking like what days?
18  I would just like to clarify what --
19        MR. KIMREY:  The question is clear.  She can
20  answer.  You're disrupting this deposition.  You're not
21  instructing her not to answer.  You're being obstructive.
22  BY MR. KIMREY:
23     Q.   When, Ms. Lukis, did you meet with Mr.
24  Beaumont in preparation for your deposition?

Page 52

1        MR. BEAUMONT:  No, it's not clear because I
2  don't understand -- I don't understand what this is --
3  what -- are you asking about what days she met or are you
4  asking --
5        MR. KIMREY:  I'm not deposing you, and you're
6  not objecting, and you're giving speaking objections, and
7  this is improper.  I'll ask the question again.  If you
8  have an objection as to form, Mr. Beaumont, you can make
9  it.  Otherwise, you need to be quiet.
10  BY MR. KIMREY:
11     Q.   Ms. Lukis, when did you meet with Mr.
12  Beaumont in preparation for your deposition?
13        MR. BEAUMONT:  I need to understand the
14  question in order to object.  I'm sorry.  I -- I -- and
15  so I would ask that you clarify what the question means
16  and what you -- because I need to understand what it
17  means.  Are you asking like for what days she met?
18  BY MR. KIMREY:
19     Q.   The question is clear.  You can answer, Ms.
20  Lukis.
21        MR. BEAUMONT:  I need -- I'm sorry.  I will
22  need to make sure that the witness does not -- that we're
23  not talking about any attorney/client privilege and that
24  we're not getting into that, so I need to make sure that

Page 53

1  I understand the question so that I can properly instruct
2  the witness.
3        MR. KIMREY:  You're improperly engaging in
4  speaking objections that are not objections as to form.
5  You, Mr. Beaumont, are unnecessarily prolonging this
6  deposition.
7        I note on the record that we will seek
8  additional time to depose Ms. Lukis for many reasons
9  including but not limited to your behavior in this
10  deposition.
11        I will ask my crystal clear question
12  again.
13  BY MR. KIMREY:
14     Q.   Ms. Lukis, when did you meet with Mr.
15  Beaumont to prepare for this deposition?
16        MR. BEAUMONT:  Okay.  If you're not going to
17  clarify the question, then I object.  Yeah, I object
18  to -- I object to -- to the -- to the question as -- I
19  make a form objection to the question.  I instruct the
20  witness not to disclose any issues concerning
21  attorney/client privilege.
22  BY MR. KIMREY:
23     Q.   You could answer.
24     A.   I don't think it's relevant as to when I

14 (Pages 50 - 53)

Page 54

1 spoke with my attorney. That's literally talking to my
2 attorney. Therefore, I am -- when I'm speaking to my
3 attorney -- what days I've spoken with him is not
4 relevant because -- well, it's speaking to my attorney.
5     Q.   Are you refusing to answer the question?
6     A.   Yes, I'm not going to give you the dates and
7 times I spoke with my attorney. That's literally
8 attorney/client privilege. I'm talking to my lawyer.
9     Q.   Are you a lawyer?
10        MR. BEAUMONT: Objection. Blaine, I'm sorry.
11 Objection is attorney/client privilege, and we're not
12 answering the question, and that question right there --
13 I'm asking you not to harass the witness, please.
14 BY MR. KIMREY:
15    Q.   Are you a lawyer?
16    A.   No.
17    Q.   Have you received any legal training
18 whatsoever?
19    A.   I'm following my attorney's advice to not
20 answer the question regarding attorney/client privilege
21 of when I spoke to my attorney.
22    Q.   Have you received any sort of legal training
23 whatsoever?
24    A.   No.

Page 55

1     Q.   Okay. When did you meet with Mr. Beaumont in
2 preparation for this deposition?
3        MR. BEAUMONT: I just covered that.
4 Objection, attorney/client privilege. I instruct the
5 witness not to answer.
6 BY MR. KIMREY:
7     Q.   Are you following your counsel's instruction
8 not to answer that question?
9     A.   Yes.
10    Q.   How long did you meet with Mr. Beaumont in
11 preparation for your deposition?
12        MR. BEAUMONT: Objection --
13 BY THE WITNESS:
14    A.   I'm not going to tell you --
15        MR. BEAUMONT: -- attorney/client privilege.
16 I instruct the witness not to answer the question.
17 BY MR. KIMREY:
18    Q.   Are you following your counsel's instruction
19 not to answer?
20    A.   Yes.
21    Q.   Did you review any documents in preparation
22 for this deposition when you met with Mr. Beaumont?
23        MR. BEAUMONT: Objection, attorney/client
24 privilege. I instruct the witness not to answer the

Page 56

1 question. You're fine to -- it's fine if you rephrase
2 your question as to whether she's reviewed any documents.
3 I think that's -- that be fine for her to answer.
4 BY MR. KIMREY:
5     Q.   Are you following your counsel's instruction
6 not to answer, Ms. Lukis?
7     A.   I am following my counsel's instruction not
8 to answer about when I spoke to him about any
9 documentation for this court case.
10    Q.   Did your counsel in preparation for this
11 deposition show you any documents?
12        MR. BEAUMONT: Objection, attorney/client
13 privilege. I instruct the witness not to answer the
14 question. However --
15 BY MR. KIMREY:
16    Q.   Are you going to follow your counsel's
17 instruction not to answer, Ms. Lukis?
18    A.   I would like for him to finish his statement
19 before you interrupted.
20        MR. BEAUMONT: Yes, and I would like to finish
21 my statement. If you'd like to clarify your -- your
22 objection as -- as to say other than conversations that
23 she's had with counsel, then the question I think would
24 be fine, but as it stands --

Page 57

1
2 BY MR. KIMREY:
3     Q.   Are you following your counsel's instruction
4 not to answer, Ms. Lukis?
5     A.   Yes.
6     Q.   Did your counsel in preparation for this
7 deposition show you any documents to refresh your
8 recollection about anything related to the case?
9        MR. BEAUMONT: Objection, attorney/client
10 privilege. I instruct the witness not to answer.
11 However, if you'd like to clarify this question so that
12 it's not directly asking about communications between
13 Ms. Lukis and counsel, then this question would be fine,
14 but as it stands, I instruct the witness not to answer.
15 BY MR. KIMREY:
16    Q.   Are you following your counsel's instruction
17 not to answer, Ms. Lukis?
18    A.   Yes.
19    Q.   Did you review any documents, Ms. Lukis, in
20 preparation for this deposition?
21    A.   No.
22    Q.   Did you speak with anybody other than Mr.
23 Beaumont in preparation for this deposition?
24    A.   No.

15 (Pages 54 - 57)

Page 58

1    Q.    Okay.  So let's go ahead and look at Exhibit
2  1.
3         MR. BEAUMONT:  And before you begin with
4  Exhibit 1, I'd like to note for the record that there is
5  no Bates number on Exhibit 1 and that this Exhibit 1 has
6  not been provided to counsel for Ms. Lukis or Ms. Lukis
7  prior to just right now.  Ms. Lukis has not had the
8  opportunity to review this document.
9  BY MR. KIMREY:
10   Q.    Ms. Lukis, this is a LexisNexis Accurint for
11 Legal Professionals report that was pulled on
12 December 30th, 2020, and you can see the date there.  Do
13 you see December 30th, '20 --
14   A.    Yes
15   Q.    -- on the document?
16   A.    Yes.
17   Q.    I'm sorry?
18   A.    Yes, I do.
19   Q.    And the name on the first page of Exhibit 1
20 is Stephanie Marie Klatte.  Am I pronouncing that right?
21   A.    Klatte.
22   Q.    Klatte?
23   A.    Yes.
24   Q.    Is that you?

Page 59

1    A.    That is my maiden name, yes.
2    Q.    The date of birth is February, the specific
3  date is X'ed out, 1977.  Your date of birth is in
4  February or was in February 1977; correct?
5    A.    Yes.
6    Q.    And you are 43; correct?
7    A.    Yes.
8    Q.    There's a Social Security number here.  It's
9  truncated.  The first five digits are provided: 562-61.
10 Does that correlate with your Social Security number?
11   A.    Yes.
12   Q.    And you were -- you resided in California
13 when your Social Security number was issued; is that
14 correct?
15   A.    Yes.
16   Q.    You can see in the middle of the page there
17 is permutations of your name -- Stephanie Marie Klatte,
18 Stephanie M. Klatte, Stephanie Klatte, Stephanie S.
19 Klatte, Stephanie M. Lukis, Stephanie Lukis, Stephanie
20 Marie Lukis, Stephanie Klatt and Stephani without an E
21 Klatte.  As far as you know, given the fact that the ages
22 are all 43 and the truncated Social Security numbers are
23 all the same, do all of those refer to you?
24        MR. BEAUMONT:  Objection, form.

Page 60

1
2  BY THE WITNESS:
3    A.    Well, no, they don't.
4  BY MR. KIMREY:
5    Q.    Why not?
6    A.    My middle name does not begin with an S, and
7  my full name is -- my last name -- my maiden name has an
8  E on the end of it.  My first name has an E on the end of
9  it.
10   Q.    Other than that do the names refer to you?
11   A.    Yes.
12        MR. BEAUMONT:  Object to form.
13 BY MR. KIMREY:
14   Q.    On right-hand side of the first page there's
15 a reference to Indicators.  Do you see that?
16   A.    Yes.
17   Q.    Bankruptcy is listed, and it says:  "Yes."
18 Do you see that?
19   A.    Yes, I see it.
20   Q.    Have you ever declared bankruptcy?
21   A.    Yes.
22   Q.    When?
23   A.    2004, 2005, somewhere back then.
24   Q.    Have you declared bankruptcy only once?

Page 61

1    A.    Yes.
2    Q.    As to property, it says:  "No."  Have you
3  ever owned any property?
4    A.    No.
5    Q.    Have you ever taken out a mortgage for any
6  property?
7    A.    No.
8    Q.    Have you ever taken out any form of loan
9  related to real property?
10        MR. BEAUMONT:  Objection, form.
11 BY THE WITNESS:
12   A.    No.
13 BY MR. KIMREY:
14   Q.    Have you ever requested your credit score?
15        MR. BEAUMONT:  I'm making a form objection to
16 this line of questioning.
17        You can answer the question.
18 BY THE WITNESS:
19   A.    Yes.
20 BY MR. KIMREY:
21   Q.    When have you requested your credit score?
22   A.    I don't recall.  I -- I have an account with
23 creditkarma.com, and I don't remember the last time I
24 logged into the account.

16 (Pages 58 - 61)

Page 62

1    Q.   How long have you had an account -- and,
2  again, it doesn't need to be scientifically precise. How
3  long have you had an account with Credit Karma?
4    A.   Couple years.  Who knows?
5    Q.   Did you search your Credit Karma account in
6  responding to discovery in this case?
7    A.   No.
8    Q.   Have you ever requested your credit score
9  from Experion?
10   A.   I don't know which --
11       MR. BEAUMONT:  Objection to form.
12 BY THE WITNESS:
13   A.   I don't know which accounts are on Credit
14 Karma.
15 BY MR. KIMREY:
16   Q.   So you don't know whether you've ever
17 requested your credit score from Experion?
18   A.   I think I requested my credit report from
19 them a couple years back.
20   Q.   When you request a credit report from Credit
21 Karma, does it give you just one score or does it give
22 you multiple scores?
23       MR. BEAUMONT:  Objection, form.
24 BY THE WITNESS:

Page 63

1    A.   It -- it's two different credit reporting
2  agencies, but I don't know which two.
3  BY MR. KIMREY:
4    Q.   Is it possible that one of them is Experion?
5    A.   I don't know.
6    Q.   Is it possible that one of them is
7  TransUnion?
8        MR. BEAUMONT:  Objection, form.
9  BY THE WITNESS:
10   A.   I think so.  I don't know.
11 BY MR. KIMREY:
12   Q.   Is it possible that one of them was Equifax?
13   A.   I don't know.
14   Q.   Are you aware that there are only three
15 credit reporting agencies in the United States?
16   A.   Yes.
17       MR. BEAUMONT:  Objection, form.
18 BY MR. KIMREY:
19   Q.   What did you say?
20   A.   Yes.
21   Q.   And are you aware that they are Equifax,
22 Experion and TransUnion?
23   A.   Since you just said them, yes.
24   Q.   Have you ever requested your credit report

Page 64

1  from TransUnion?
2    A.   Probably a couple years ago.
3    Q.   Have you ever requested your credit report
4  from Equifax?
5    A.   Again, probably a couple years ago.  I don't
6  remember.
7    Q.   In asking for credit reports via Credit
8  Karma, did you agree to any terms and conditions?
9        MR. BEAUMONT:  Objection, form.
10 BY THE WITNESS:
11   A.   I don't know.
12 BY MR. KIMREY:
13   Q.   What did you say?
14   A.   I don't know.
15   Q.   Is it possible that you did?
16       MR. BEAUMONT:  Objection, form.
17 BY THE WITNESS:
18   A.   I -- I don't know.
19 BY MR. KIMREY:
20   Q.   Did you agree to Credit Karma's privacy
21 policy?
22   A.   I don't know.
23       MR. BEAUMONT:  Objection, form.
24 BY MR. KIMREY:

Page 65

1    Q.   Have you ever read Credit Karma's terms and
2  conditions?
3    A.   No.
4        MR. BEAUMONT:  Objection, form.
5  BY MR. KIMREY:
6    Q.   Have you ever read Credit Karma's privacy
7  policy?
8    A.   No.
9    Q.   Are you aware that Credit Karma has terms and
10 conditions?
11   A.   Not that I know of, no.
12   Q.   Are you aware that Credit Karma has a privacy
13 policy?
14       MR. BEAUMONT:  Objection, form.
15 BY THE WITNESS:
16   A.   Not that I know.
17 BY MR. KIMREY:
18   Q.   Have you ever read Experion's terms and
19 conditions?
20   A.   That I can say no.
21   Q.   Have you ever read Experion's privacy policy?
22   A.   No.
23   Q.   Have you ever read Equifax's terms and
24 conditions?

17 (Pages 62 - 65)

Page 66

1    A.    No.
2    Q.    Have you ever read Equifax's privacy policy?
3    A.    No.
4    Q.    Have you ever read TransUnion's terms and
5    conditions?
6    A.    No.
7    Q.    Have you ever read TransUnion's privacy
8    policy?
9    A.    No.
10    Q.    As to Credit Karma, do you know whether the
11    terms and conditions provide for sharing of the
12    information that you provide to Credit Karma with third
13    parties?
14        MR. BEAUMONT:    Objection, form.
15    BY THE WITNESS:
16    A.    It's not allowed to as far as I'm aware.
17    BY MR. KIMREY:
18    Q.    What is that awareness based on?
19    A.    The fact that all it does is pull the
20    information from two credit agencies.
21    Q.    Is it based on anything else?
22    A.    My belief.
23    Q.    Is it based on anything else?
24    A.    No.

Page 67

1    Q.    Do you know whether Credit Karma's privacy
2    policy provides for sharing of your information that you
3    provide to Credit Karma to third parties?
4        MR. BEAUMONT:    Objection, form.
5    BY THE WITNESS:
6    A.    I would assume not.
7    BY MR. KIMREY:
8    Q.    Repeat that.
9    A.    I would assume not.
10    Q.    What's that assumption based on?
11    A.    Personal opinion.
12    Q.    Anything else?
13    A.    No.
14    Q.    Are you aware of whether Equifax's terms and
15    conditions allow for sharing of your information with
16    third parties?
17    A.    No.
18    Q.    Are you aware of whether Equifax's privacy
19    policy allows for sharing of your information with third
20    parties?
21    A.    No.
22        MR. BEAUMONT:    Objection, form and also
23    objection to the previous question as to form.
24    Objection.

Page 68

1    BY MR. KIMREY:
2    Q.    Are you aware of Experion's terms and
3    conditions allowing for sharing of your information with
4    third parties?
5    A.    No.
6    Q.    Are you aware --
7        (Zoom interruption.)
8        THE REPORTER:    I'm sorry.    You keep breaking
9    up.    I didn't hear your question, Blaine.
10        MR. KIMREY:    Could you reread my last
11    question?    Can you hear me?
12        THE REPORTER:    Yeah, I can hear you.
13        The last question I have is:    "Are you
14    aware of Experion's terms and conditions allowing for
15    sharing of your information with third parties."    Answer:
16    "No."    Question:    "Are you aware --"    And then I lost you
17    for --
18    BY MR. KIMREY:
19    Q.    -- of Experion's privacy policy allowing for
20    sharing of your information with third parties?
21        MR. BEAUMONT:    Objection, form.
22    BY THE WITNESS:
23    A.    No.
24    BY MR. KIMREY:

Page 69

1    Q.    Are you aware of TransUnion's terms and
2    conditions allowing for sharing of your information --
3    A.    No
4    Q.    -- to third parties?
5        You said no?
6    A.    No.
7    Q.    Are you aware of Experion's privacy policy --
8    I'm sorry.
9        Are you aware of -- please -- did I say
10    TransUnion on the last question?    I believe I did.
11        Are you aware of TransUnion's privacy policy
12    allowing for sharing of your information with third
13    parties?
14    A.    No.
15    Q.    Are you aware of Equifax's terms and
16    conditions allowing for sharing of your information with
17    third parties?
18    A.    No.
19    Q.    Are you aware of Equifax's privacy policy
20    allowing for sharing of your information with third
21    parties?
22    A.    No.
23    Q.    Is it possible that in requesting credit
24    reports you consented to sharing of your information with

18 (Pages 66 - 69)

1 third parties?
2      MR. BEAUMONT: Objection, form.
3 BY THE WITNESS:
4      A.   No.
5 BY MR. KIMREY:
6      Q.   Why is that?
7      A.   When you request your credit report, you're
8 just asking that company for their information. I don't
9 see why they would request to share it with anybody else.
10      Q.   But you haven't read the terms and conditions
11 or privacy policy for Credit Karma; right?
12      MR. BEAUMONT: Objection, asked and answered.
13 BY THE WITNESS:
14      A.   Like I said before, no.
15 BY MR. KIMREY:
16      Q.   You haven't read any terms and conditions
17 ever related to requesting your credit reports; correct?
18      MR. BEAUMONT: Objection, form.
19 BY THE WITNESS:
20      A.   No.
21 BY MR. KIMREY:
22      Q.   When you say no, are you saying that I'm
23 correct in that way?
24      A.   I have not -- I have not read any terms and

1 conditions for credit reporting agencies' websites.
2      Q.   Have you reviewed any of their privacy
3 policies?
4      A.   No, I haven't.
5      MR. BEAUMONT: Objection, asked and answered.
6 BY THE WITNESS:
7      A.   Like I said before, no, I haven't.
8 BY MR. KIMREY:
9      Q.   Going back to Exhibit 1, down in the lower
10 left-hand corner of the first page it says:
11 "Comprehensive Report Summary." Do you see that?
12      A.   Yeah.
13      Q.   It notes the bankruptcy, and then it notes
14 liens and judgments, and it says five found. Have there
15 been five liens or judgments entered against you?
16      MR. BEAUMONT: Objection, form. Also I -- I
17 think the witness should have an opportunity to review
18 this document in full.
19      MR. KIMREY: I'm not asking her about the full
20 document. I'm just asking her about Page 1.
21 BY THE WITNESS:
22      A.   I have no idea.
23      MR. BEAUMONT: I guess my question is --
24 there's a clarification. I think it's fair to the

1 witness if the witness is given an opportunity to refer
2 to -- to understand what this -- what this -- what this
3 summary on the first page is -- is referring to.
4      MR. KIMREY: I don't understand your
5 statement.
6 BY MR. KIMREY:
7      Q.   So, again, have you --
8      MR. BEAUMONT: I think it would be helpful if
9 we could take a break to --
10      MR. KIMREY: Let me finish. Don't interrupt
11 me.
12 BY MR. KIMREY:
13      Q.   Have five liens or judgments been entered
14 against you, Ms. Lukis?
15      A.   I don't know. I would have to look at the
16 full document to see what it says.
17      Q.   Okay. We'll --
18      MR. BEAUMONT: Let's take a break and look at
19 the document. We're going to take a break now.
20      MR. KIMREY: Okay. Let's go off the record.
21      THE VIDEOGRAPHER: We're off the video record
22 at 11:19 a.m.
23           (WHEREUPON, a break was
24           taken.)

1      We are back on record at 12:24 a.m.
2      MR. BEAUMONT: This is Will Beaumont.
3      THE VIDEOGRAPHER: I'm sorry. 11:24. 11:24
4 a.m. Sorry.
5      MR. BEAUMONT: I'd like the record to reflect
6 that we were just provided a 62-page document in this
7 exhibit, Exhibit 1, and we haven't had an opportunity to
8 review this document and that questions are now being
9 asked about it.
10      MR. KIMREY: I'd like to note that's ironic
11 because after 4 p.m. Central last night Plaintiffs'
12 counsel produced for the first time to us documents in
13 this case. Before that Plaintiffs' counsel had produced
14 no documents, and those documents comprise approximately
15 2500 pages, so --
16      MR. BEAUMONT: And just to clarify that --
17 BY MR. KIMREY:
18      Q.   If you look at Exhibit 1 --
19      MR. BEAUMONT: I'd just like to clarify that.
20 Those documents concern simply a Facebook account and a
21 LinkedIn account, and while they are voluminous, they
22 concern two different -- two different social media
23 accounts.
24      MR. KIMREY: Right, and they were responsive

19 (Pages 70 - 73)

Page 74

1  to discovery that we propounded months ago.
2  BY MR. KIMREY:
3      Q.  So if you look at Exhibit 1, Page 1,
4  Ms. Lukis, under Comprehensive Report Summary, you see
5  where it says driver's license?
6      A.  Yes.
7      Q.  It says three found.  Have you had driver's
8  licenses in three different states as far as you recall?
9      A.  Well, the driver's licenses in the file only
10  list Texas driver's licenses.
11      Q.  Have you had a driver's license anywhere
12  other than in Texas?
13      A.  Yes.
14      Q.  Where else have you had driver's licenses?
15      A.  Virginia and Illinois.
16      Q.  Do you currently have an active driver's
17  license in good standing --
18      A.  Yes.
19      Q.  -- in Illinois?
20      A.  Yes.
21      Q.  It says:  "Possible criminal records,"
22  farther down, "six found."  Are you aware of any criminal
23  cases that have ever been filed against you?
24      A.  No.

Page 75

1      Q.  Is it possible that a criminal case was at
2  some time filed against you?
3      A.  Not to my knowledge.
4      Q.  Go to the next page, Page 2 of Exhibit 1.
5  Near the top in the upper left-hand corner it says:
6  "Voter registration," and it says:  "None found."  Do you
7  see that?
8      A.  Yes.
9      Q.  Are you registered to vote?
10      A.  Yes, I am.
11      Q.  Are you registered to vote in the State of
12  Illinois?
13      A.  Yes, I am.
14      Q.  Have you been registered to vote in any other
15  state?
16      A.  Virginia and Texas.
17      Q.  Okay.  Any other state beyond that?
18      A.  No.
19      Q.  Going back to the first page of Exhibit 1, do
20  you know how LexisNexis acquired all of this information?
21      MR. BEAUMONT:  Objection, form.
22  BY THE WITNESS:
23      A.  No.  I'm reading the top paragraph.
24  BY MR. KIMREY:

Page 76

1      Q.  Is it possible that the information came from
2  public records?
3      A.  I wouldn't know.
4      Q.  Is it possible --
5      MR. BEAUMONT:  Objection.
6  BY MR. KIMREY:
7      Q.  -- that all of the information in this report
8  came from public records?
9      MR. BEAUMONT:  Objection, form.
10  BY THE WITNESS:
11      A.  I don't know how they got this information.
12  BY MR. KIMREY:
13      Q.  If you look at the second page, there are
14  various addresses listed under Address Summary.  Could
15  you read the addresses that you've actually resided at as
16  listed here?
17      MR. BEAUMONT:  Objection, form.
18  BY THE WITNESS:
19      A.  Let me go through this list.  3314 South
20  Lituanica, 1816 West 34th Place, 901 West 33rd Street,
21  2519 John Eppes Road, 444 West 44th Street, 7506 Pollen
22  Street, 816 West 34th Place.  The Halsted address is
23  messed up.  That's not correct.  3450 South Halsted, 649
24  West 43rd Street, Apartment 2 West, 8006 Downington

Page 77

1  Court, 20933 Reserve Falls Terrace, 4317 South Emerald,
2  1525 West Ardmore, 1804 Sycamore Valley Drive --
3      Q.  Which apartment -- the 101 or the 1?
4      A.  Apartment 101.
5      -- 5445 North Morgan Street, 42954
6  Farmingdale Drive, 15915 Kuykendahl Road, 816 West 34th
7  Place and 20593 Morningside Terrace.
8      Q.  The addresses other than those you've
9  listed --
10      A.  I've never lived at any of those addresses
11  that are -- that are -- that I did not list.
12      Q.  Okay.  And those that you listed, are they
13  all rentals?
14      A.  They're all apartments, yes, rental.
15      Q.  In renting these apartments, did you have to
16  enter into a lease or leases?
17      A.  Some of them.
18      Q.  Did you have to provide any information about
19  yourself in those leases?
20      A.  My name and previous addresses.
21      MR. BEAUMONT:  Objection, form.
22  BY MR. KIMREY:
23      Q.  Anything else?
24      A.  I don't know.

20 (Pages 74 - 77)

Page 78

1     Q.   Does LexisNexis having this information
2  bother you?
3          MR. BEAUMONT:  Objection, form.
4  BY THE WITNESS:
5     A.   I don't know what LexisNexis is used for, but
6  yes, I'm uncomfortable with having a random website
7  having my information.
8  BY MR. KIMREY:
9     Q.   Why is that?
10    A.   Because I am an individual, private person
11 not a public figure.
12    Q.   Any other reasons?
13         MR. BEAUMONT:  Objection, form.
14 BY THE WITNESS:
15    A.   I don't like people knowing where I've lived
16 in the past.  It's nobody's business.
17 BY MR. KIMREY:
18    Q.   Any other reasons?
19    A.   No.
20    Q.   Turn to Page 3 of Exhibit 1.  Do you know who
21 Gabriel Arriaga is?
22    A.   My landlord.
23    Q.   Is he related to you in any way?
24    A.   No.

Page 79

1     Q.   Going down to 2908 Pleasant Drive --
2     A.   Oh, his first name's Marty.
3     Q.   I was about to ask you that.  Okay.  So the
4  stepfather with the last name Egan is Martin Joseph Egan;
5  is that right?
6     A.   Yeah.  I couldn't remember his first name.
7     Q.   Who is Deborah Rae Horn?
8     A.   My mother.
9     Q.   Okay.  Who is Gloria Jordan Jones?
10    A.   No idea.
11    Q.   Who is Brian J. Klatte?
12    A.   My brother.
13    Q.   How many siblings do you have?
14    A.   One living, one deceased.
15    Q.   Sorry about that.
16         Is Brian still alive?
17    A.   Yes.
18    Q.   This suggests that you're a current resident
19 at this address in Fairfax County, Virginia but that's
20 inaccurate; right?
21    A.   I've never lived there.
22    Q.   Let's turn to Page 13.  So at the bottom do
23 you see where it says:  "Liens and Judgments," Ms. Lukis?
24    A.   Yes.

Page 80

1     Q.   This refers to a civil judgment in the 19th
2  General District Court in the State of Virginia with an
3  original filing date of 6-10 2019.  Do you see that?
4     A.   Yes.
5     Q.   The amount says $565.  Do you see that?
6     A.   Yes.
7     Q.   And the debtor's Social Security number
8  truncated is listed as 562-61.  Do you see that?
9     A.   Yes.
10    Q.   The creditor is the Children's Heart
11 Institute if you look at Page 14.  At the top the
12 Children's Heart Institute VA PC, do you see that?
13    A.   Yes.
14    Q.   Was there a judgment entered against you in
15 this matter of $565?
16    A.   Not that I was aware of.
17    Q.   Is this the first time you've seen anything
18 related to this alleged judgment?
19         MR. BEAUMONT:  Objection, form.
20 BY THE WITNESS:
21    A.   Yes.
22 BY MR. KIMREY:
23    Q.   Did you seek any services at Children's Heart
24 Institute?

Page 81

1     A.   I think that might be my daughter's
2  cardiologist, so I -- I would say I guess, yes.
3     Q.   Okay.  The next item is filing number 59 GB
4  180 -- this is on Page 14 -- 1199800, and it says a civil
5  judgment in Fairfax District Court, Virginia with an
6  original filing date of October 16, 2018 in the amount of
7  $4,178.  Do you see that?
8     A.   Yes.
9     Q.   The debtor name is listed as Stephanie M.
10 Lukis.  Do you see that?
11    A.   Yes.
12    Q.   The truncated Social Security number is
13 562-61.  Do you see that?
14    A.   Yes.
15    Q.   The creditor is Capital One Bank USA NA.  Do
16 you see that?
17    A.   Yes.
18    Q.   Was a judgment entered against you in this
19 case for $4,178?
20    A.   This is the first I'm learning about it.
21    Q.   Is it possible that this judgment was entered
22 against you?
23    A.   It's possible, yes.
24    Q.   Are you aware of any efforts to collect from

21 (Pages 78 - 81)

Page 82

1 you on this judgment?
2    A.   No.
3    Q.   Okay.  Next item -- well, let me back up.
4         Did you have a debt due to Capital One Bank
5 USA in the amount of $4,178?
6    A.   It wasn't that high, but yes, I did have a
7 credit card with Capital One.
8    Q.   Did you pay the balance in full?
9    A.   I thought I did.
10    Q.   Is it possible that you did not?
11    A.   Anything's possible.
12    Q.   Next item, this is a judgment in Illinois.
13 It says original filing date 9-1 2010.  This is at Page
14 14 of Exhibit 1.  Do you see that?
15    A.   Yes.
16    Q.   It says the amount is $4,208.  Do you see
17 that?
18    A.   Yes.
19    Q.   The debtor name is Stephanie Lukis.  Do you
20 see that?
21    A.   Yes.
22    Q.   This truncated Social Security number is
23 562-61.  Do you see that?
24    A.   Yes.

Page 83

1    Q.   Another debtor is Paul Lukis.  Do you see
2 that?
3    A.   Yes.
4    Q.   Then another debtor is Jim Swanson.  Do you
5 see that?
6    A.   Yes.
7    Q.   Who is Jim Swanson?
8    A.   My roommate at the time Samantha Swanson's
9 father.
10    Q.   Who is Samantha Swanson?
11    A.   My roommate at the time.  She was a friend.
12    Q.   And the creditor is Mega Properties, Inc.
13 Was that the landlord for 3450 South Halted, Unit 217?
14    A.   Yes.
15    Q.   That was the unit that you lived in with your
16 husband Paul, Jim Swanson and Samantha Swanson; is that
17 correct?
18    A.   Jim Swanson did not live there.
19    Q.   But Samantha did?
20    A.   Yes.
21    Q.   Other than you, Paul Lukis and Samantha
22 Swanson did anyone else live there while you lived there?
23    A.   No.
24    Q.   Before you saw this today were you aware of a

Page 84

1 $4,208 judgment being entered against you in Illinois
2 related to this rental?
3    A.   Yes.
4    Q.   How were you aware of that?
5    A.   It was an agreement in order to prevent an
6 eviction going on my record.
7    Q.   So you agreed to the judgment and then paid
8 the judgment?
9    A.   I haven't paid it, but I did agree to it.
10    Q.   Did you run a -- so you haven't -- you
11 haven't paid the judgment yet?
12    A.   No.
13    Q.   Is the judgment due?
14    A.   I don't know.  I've never heard anything from
15 Mega Properties.
16    Q.   Did you run a business out of 3450 South
17 Halsted?
18    A.   No.
19    Q.   Did you ever list this address as the address
20 for Evergreen Pest Management, LLC?
21    A.   Oh, my husband ran a pest control company.
22 They used this address as its address?
23    A.   Yes.
24    Q.   What was the name of the pest control

Page 85

1 company?
2    A.   Evergreen Pest Management.
3    Q.   Did you have a role with that company?
4         MR. BEAUMONT:  Object to form.
5 BY THE WITNESS:
6    A.   On paper, yes.
7 BY MR. KIMREY:
8    Q.   What do you mean by on paper, yes?
9    A.   On paper I was the owner or manager of the
10 company in order for it to be a woman-owned business.
11    Q.   Were you actually the owner and manager of
12 the business?
13    A.   No.
14         MR. BEAUMONT:  Objection, form.
15 BY MR. KIMREY:
16    Q.   Who was the owner of the business?
17    A.   Paul Lukis.
18    Q.   Who was the manager of the business?
19    A.   Paul Lukis.
20    Q.   What were the benefits of its being on paper
21 a woman-owned business?
22         MR. BEAUMONT:  I'm going to object to the form
23 of this question.
24

22 (Pages 82 - 85)

Page 86

1 BY THE WITNESS:
2    A.  I don't remember.
3 BY MR. KIMREY:
4    Q.  But you did not manage the business; correct?
5    A.  The most I did was paperwork.
6    Q.  And you did not own the business; correct?
7    A.  No.  My husband did.
8        MR. BEAUMONT:  Objection, form.
9 BY MR. KIMREY:
10   Q.  Next item, civil judgment.  This is in the
11 middle of the page, Page 14.  Filing number 10 M 1717956.
12 Do you see that?
13   A.  Yes.
14   Q.  Actually, this looks like it's a duplicate of
15 the prior entry.
16   A.  Yes, it is.
17   Q.  Yeah, so never mind.
18       Next item down in the lower left-hand corner
19 on Page 14 of Exhibit 1, it says filing number 99018538.
20   A.  I see that.
21   Q.  Judgment, Virginia Circuit Court.  Do you see
22 that?
23   A.  Yes.
24   Q.  Original filing date 9-8 1999.  Do you see

Page 87

1 that?
2    A.  Yes.
3    Q.  Release date 11-15 2001.  Do you see that?
4    A.  Yes.
5    Q.  It says the amount is $530.  Do you see that?
6    A.  Yes.
7    Q.  Debtor name, Stephanie Klatte.  Do you see
8 that?
9    A.  Yes.
10   Q.  Debtor SSN 562-61-xxxx.  Do you see that?
11   A.  Yes.
12   Q.  It says the creditor is, on the next page,
13 this is Page 15 of Exhibit 1, Douglas W. Brown, DC.  Do
14 you see that?
15   A.  Yes.
16   Q.  Do you know what this is for?
17   A.  No idea.
18   Q.  Do you know who Douglas W. Brown, DC is?
19   A.  No idea.
20   Q.  Next item, Page 15, do you see where it says
21 People At Work?
22   A.  Yes.
23   Q.  The first item is Stephanie Lukis, Manager,
24 562-61-xxxx.  Do you see that?

Page 88

1    A.  Yes.
2    Q.  Again, you were not the manager of Evergreen
3 Pest Management, LLC; correct?
4        MR. BEAUMONT:  Objection, form.
5 BY MR. KIMREY:
6    Q.  You can answer.
7    A.  No.
8    Q.  So, in other words, you're saying no, you
9 were not the manager of Evergreen Pest Management, LLC?
10   A.  No, I was not.
11   Q.  Did Ever -- there are several addresses
12 listed here for Evergreen -- 3450 South Halsted, 6816
13 West 34th Street.  I guess not several.  There are two
14 addresses.  Did Evergreen have two different addresses?
15   A.  Those are our -- my home addresses for the
16 time that my husband was running the company.
17   Q.  Okay.  And did Evergreen have actual clients
18 for which it provided pest management services?
19   A.  Yes.
20       MR. BEAUMONT:  Object to form.
21 BY MR. KIMREY:
22   Q.  How many clients during its existence roughly
23 did Evergreen have?
24   A.  I don't remember.

Page 89

1    Q.  More than five?
2    A.  I think so.
3    Q.  More than ten?
4    A.  I don't know.
5    Q.  Did Evergreen perform any services other than
6 pest management?
7    A.  No.
8    Q.  During its -- when was Evergreen formed?
9    A.  According to this, January of 2010.  I don't
10 recall.
11   Q.  Is that possibly accurate?
12   A.  I would guess so.
13       MR. BEAUMONT:  Object to form.
14 BY MR. KIMREY:
15   Q.  And when did it dissolve, roughly?
16       MR. BEAUMONT:  Object to form.
17 BY THE WITNESS:
18   A.  I don't remember.
19 BY MR. KIMREY:
20   Q.  During its entire life cycle, what roles did
21 you perform for Evergreen?
22   A.  Occasionally I would do the billing, sending
23 out the accounts payable.
24   Q.  Anything else?

23 (Pages 86 - 89)

Page 90

1    A.   That's it.
2    Q.   Let's go to Page 28 of Exhibit 1.  Actually,
3  let's make that Page 27.  That's it.  Okay.  Down at the
4  bottom do you see, lower left-hand side, where it says:
5  "Possible criminal records," Ms. Lukis?
6    A.   Yes.
7    Q.   The first one refers to Virginia Court,
8  Stephanie Marie Klatte, SSN:  562-61-xxxx, State of
9  origin:  Virginia, Party status:  Released on summons,
10  Race:  White, Sex:  Female, Case number:  059 GT
11  0508666100, Case type description:  Misdemeanor.  Do you
12  see that?
13    A.   Yes.
14    Q.   Then on the next page, Page 28, it says:
15  Offense number 1, Offense date:  4-17 2005, Arrest date:
16  4-17 2005, Court description:  Fairfax County General
17  District, Court case number:  059 GT 05086666100, Court
18  offense:  No driver's license.  Do you see that?
19    A.   Yes.
20    Q.   Do you remember being charged with this
21  misdemeanor?
22    A.   Nope.
23    Q.   Is it possible you were, in fact, charged
24  with this misdemeanor?

Page 91

1    A.   It's possible.
2    Q.   Do you remember ever being busted for driving
3  without a license?
4    A.   Nope.
5        MR. BEAUMONT:  Objection, form.
6  BY MR. KIMREY:
7    Q.   Next item down at the bottom of Page 28 it
8  says Virginia Court, Stephanie Marie Klatte, et cetera.
9  The first misdemeanor.  The court offense is listed as
10  DRIV space under space revo/suspension.  Do you see that?
11    A.   Yes.
12    Q.   Do you recall being charged with driving
13  while having a revoked or suspended license?
14    A.   Nope.
15    Q.   Is it possible that you were charged with
16  that?
17        MR. BEAUMONT:  Objection, form.
18  BY THE WITNESS:
19    A.   It's possible.
20  BY MR. KIMREY:
21    Q.   The next page, Page 29, there's -- up in the
22  upper left-hand corner it says Virginia Court, name:
23  Stephanie Marie Klatte.  It has that same truncated
24  Social Security number, and it refers to case number 107

Page 92

1  GT 0501185600.  Do you see that?
2    A.   Yes.
3    Q.   And it lists the offense as reg/lic/title,
4  Offense:  Expired registration.  Do you see that?
5    A.   Yes.
6    Q.   Do you remember ever being charged for
7  driving with an expired registration?
8    A.   No.
9    Q.   You see it says:  "Guilty in absentia"?
10    A.   Yes.
11    Q.   Do you know what that means?
12    A.   Apparently I missed a court date.
13    Q.   And what happened when you missed the court
14  date?
15    A.   The judge apparently found me guilty.
16        MR. BEAUMONT:  Objection, form.
17  BY MR. KIMREY:
18    Q.   What was that, Ms. Lukis?
19    A.   Apparently the judge found me guilty.  Kind
20  of hard when I don't remember it.
21    Q.   In the middle of the page it says Virginia
22  Court, so this is Page 29, Exhibit 1, and it has
23  identifying information for you apparently, and it
24  describes the case number as 059 GT 0300360600.  Do you

Page 93

1  see that?
2    A.   Yes.
3    Q.   And the court offense is:  "Fail pay full
4  time and attention.  No DMV.  Guilty in absentia."  Do
5  you see that?
6    A.   Yes.
7    Q.   Do you recall being charged with this crime?
8    A.   No.
9    Q.   What does guilty in absentia mean again?
10    A.   A judge found me guilty because I didn't show
11  up for court.
12        MR. BEAUMONT:  Object to this line of
13  questioning.  Objection to the form.
14  BY MR. KIMREY:
15    Q.   Do you know why you didn't show up for court?
16    A.   I guess that's what it means.
17    Q.   No, but do you know why you didn't show up
18  for court?
19    A.   I don't remember ever being charged with
20  anything for paying attention.
21    Q.   But is it possible that you were so charged?
22    A.   Possible.
23    Q.   And then the next page -- actually, let's
24  stay on 29.  There's an Ohio Court in the lower left-hand

24 (Pages 90 - 93)

1 corner. Did you ever live at 120, and you may have told
2 me this already but I couldn't remember it because, you
3 know, as a military kid you've had a lot of addresses,
4 but did you ever live at 120 Patrick Street Southeast,
5 Vienna, Virginia?
6     A.   Nope.
7     Q.   Okay. Did you have ever have a license that
8 indicated you lived there?
9     A.   Nope.
10     Q.   Have you ever had any fake IDs --
11     A.   No.
12     Q.   -- for instance, to --
13        MR. BEAUMONT: Objection to form.
14 BY MR. KIMREY:
15     Q.   -- potentially buy alcohol when you're under
16 age?
17     A.   No.
18        MR. BEAUMONT: Objection to form.
19 BY MR. KIMREY:
20     Q.   Are your eyes brown?
21     A.   No.
22     Q.   Okay. Have you ever been charged with
23 speeding?
24        MR. BEAUMONT: Objection, form.

1 BY THE WITNESS:
2     A.   Not that I know of.
3 BY MR. KIMREY:
4     Q.   Who is Laura Mazur Rao? I'm on Page 30.
5     A.   No idea.
6     Q.   Who is Joseph Albert Coutcher?
7     A.   Oh, that's husband number five.
8     Q.   Okay. Who is Chris M. Coutcher?
9     A.   I think that's one of his sons.
10     Q.   Who is Edel Traut Coutcher? I'm putting in
11 an R.
12     A.   It's Coutcher.
13     Q.   Coutcher.
14     A.   I think that's his dead wife.
15     Q.   Who is Brian Anthony Coutcher?
16     A.   I think that's one of Joe's sons.
17     Q.   Who is -- this is on Page 33. Who is
18 Christina Morelli?
19     A.   I -- I don't know.
20     Q.   Who is Robert Michael Horn?
21     A.   Husband number four's son.
22     Q.   Who is Frank Michael McDaniel?
23     A.   Husband number three.
24     Q.   Who is -- Page 34. Who is Ionel McGee?

1     A.   Never heard of him.
2     Q.   Who is Debbie Elyse Hahn?
3     A.   This is going to be weird. It's husband
4 number four who transitioned to being female.
5     Q.   Okay. Who is Kyleigh Coutcher?
6     A.   No idea. Might be husband number five's kid.
7     Q.   Now to the last page of Exhibit 1 which is
8 Page 35. Do you see here it says -- well, let's go back
9 to Page 34. You see in the lower left hand, Page 34
10 lower left-hand corner Source Information? Do you see
11 that?
12     A.   Yes.
13     Q.   It says all sources: 181 source documents;
14 Bankruptcy records: 1 source document; Liens and
15 judgments: 6 source documents. Then you go on to the
16 next page. It says driver's licenses: 3 source
17 documents; Motor vehicle registrations: 22 source
18 documents; Person locater 1: 17 source documents,
19 Historical person locater: 43 source documents; person
20 locater 2: 2 source documents; Criminal: 6 source
21 documents; Utility locater: 4 source documents; Person
22 locater 5: 49 source documents; Person locater 6: 28
23 source documents. Do you see that?
24     A.   Yes.

1     Q.   Did I read that accurately?
2     A.   Yes.
3     Q.   So does this mean that all of the information
4 that is in this report came from these sources as far as
5 you're aware?
6        MR. BEAUMONT: Objection, form.
7 BY THE WITNESS:
8     A.   I guess.
9 BY MR. KIMREY:
10     Q.   Is it possible that all of this information,
11 whether it be accurate, inaccurate, partially accurate,
12 whatever, derived from public sources?
13        MR. BEAUMONT: Objection, form.
14 BY THE WITNESS:
15     A.   I guess so.
16 BY MR. KIMREY:
17     Q.   Okay. Let's move to -- sorry. Hold on a
18 second -- folder 1.2 to be marked as Stephanie Lukis
19 Deposition Exhibit 2. All right.
20        MR. BEAUMONT: Excuse me, Blaine. I haven't
21 been able to load that -- that exhibit yet in the Egnyte
22 program.
23        MR. KIMREY: Can we go off the record?
24        MR. BEAUMONT: I see it. I see it now.

25 (Pages 94 - 97)

Page 98

1    MR. KIMREY: Okay.
2  BY MR. KIMREY:
3    Q.   So, Ms. Lukis, this is a CheckPeople report
4  that we obtained by searching your name. I assume you've
5  never seen this before; is that correct?
6    A.   Never seen it before.
7    MR. BEAUMONT: And also I'd like to object to
8  this Exhibit 2 because we've never been provided this
9  exhibit before in discovery. It does not have a Bates
10 number on it, and I'm seeing this for the very first --
11 very first time also.
12   MR. KIMREY: And we only recently became aware
13 of it, and it's in the public record.
14 BY MR. KIMREY:
15   Q.   Do you see that at the top it refers to
16 Stephanie Klatte in Herndon, Virginia, age 43, Ms. Lukis?
17   A.   Yes.
18   Q.   It says current address 2519 John Eppes Road,
19 Apartment 403, Herndon, Virginia, 20171. Do you see
20 that?
21   A.   Yes
22   Q.   That's inaccurate; correct?
23   A.   That is incorrect.
24   Q.   But it once was an address of yours?

Page 99

1    A.   Almost two years ago.
2    Q.   Okay. And then it says you lived at, and
3  there's a listing in the middle of the page. Do you see
4  all those addresses that it says you lived at?
5    A.   I see a bunch of zip codes, cities and zip
6  codes, yeah.
7    Q.   Did you live in all of those cities and zip
8  codes?
9    A.   I never lived in Sterling, Virginia.
10   Q.   Other than that did you live at all these
11 cities and zip codes?
12   MR. BEAUMONT: Object to form.
13 BY THE WITNESS:
14   A.   I think so.
15 BY MR. KIMREY:
16   Q.   Okay. Do you see the phone numbers listed?
17   A.   Yes.
18   Q.   Have you ever had the phone number (773)
19 801-0023?
20   A.   Yes.
21   Q.   Do you currently have that phone number?
22   A.   No.
23   Q.   When did you have that phone number?
24   A.   Four years ago.

Page 100

1    Q.   For what period of time, roughly?
2    A.   For about three years. Would have been 2014
3  to 2017. 2013 to 2017, something like that.
4    Q.   Is that a cell phone number?
5    A.   No. It's a Comcast phone number.
6    Q.   A Comcast land line phone number?
7    A.   Yes.
8    Q.   Did you enter into a contract with Comcast
9  for this number and the related service?
10   A.   I don't know. I don't recall.
11   Q.   In -- the next number is (703) 313-6405. Do
12 you see that?
13   A.   Yes.
14   Q.   Did you ever hold that number?
15   A.   No.
16   Q.   Are you familiar with that number at all?
17   A.   Nope.
18   Q.   The next number is (773) 957-6403. Do you
19 see that?
20   A.   Yes.
21   Q.   Did you ever hold that number?
22   A.   Nope.
23   Q.   Is it familiar to you?
24   A.   Nope.

Page 101

1    Q.   The next number is (773) 855-9178 over on the
2  right-hand side. Did you ever hold that number?
3    A.   Not that I can think of.
4    Q.   Is it familiar to you at all?
5    A.   Nope.
6    Q.   The last number is (703) 313-1364. Do you
7  see that?
8    A.   Yes.
9    Q.   Did you ever hold that number?
10   A.   Nope.
11   Q.   Is it familiar to you?
12   A.   Not at all.
13   Q.   What is your current cell phone number?
14   A.   Is that relevant?
15   MR. BEAUMONT: Objection, form.
16 BY MR. KIMREY:
17   Q.   You can answer the question.
18   A.   (313) 6 -- hold on. What is my current phone
19 number? I don't know my own frickin' phone number. Hold
20 on. (313) -- no. Oh, come on. I have to look up my own
21 phone number. (312) 459-0876.
22   Q.   (312) 459-0786; is that right?
23   A.   0876.
24   Q.   (312) 459-0876?

26 (Pages 98 - 101)

Page 102

1    A.   Yes.
2    Q.   Do you have any other cell numbers --
3    A.   Nope.
4    Q.   -- currently?
5         Have you had other cell numbers in the past?
6         MR. BEAUMONT:   Objection, form.
7  BY THE WITNESS:
8    A.   I can only remember one.  Actually, no, I
9  can't even remember that one because I haven't had it for
10 years.  (313) -- (312) I think 313-6404.
11   Q.   Any others?
12   A.   Not that I can recall.
13   Q.   How long have you had (312) 459-0876?
14   A.   Since September of 2018.
15   Q.   What is the carrier?
16   A.   T Mobile.
17   Q.   Did you enter into a contract with T Mobile
18 for that phone and the related service?
19   A.   I don't know.
20   Q.   In producing any discovery in this case, in
21 preparing for this deposition, did you look for your T
22 Mobile contract?
23   A.   No.
24   Q.   Does your T Mobile contract allow for sharing

Page 103

1  with third parties of (312) 459-0876?
2         MR. BEAUMONT:   Objection, form.
3  BY THE WITNESS:
4    A.   Not to my knowledge.
5  BY MR. KIMREY:
6    Q.   Is it possible that it does?
7    A.   I would think not, no.
8    Q.   Why would you think not?
9    A.   Because there's no reason for T Mobile to
10 give my phone number to anybody else.
11   Q.   Have you ever read any contract related to
12 provision of T Mobile service via (312) 459-0876?
13   A.   I think so, yeah.
14   Q.   When?
15   A.   September of 2018.
16   Q.   What did it say?
17   A.   That I'm -- they're assigning me that phone
18 number and from -- I have to pay the -- how much my bill
19 is going to be, how much it's gonna cost for my phone.
20 I -- and I think there was something about that they're
21 not -- something about that they don't -- they're not
22 gonna give away -- give my phone number to anybody unless
23 like -- like ordered by a court, that my phone number is
24 mine and it's not like free information if I recall.

Page 104

1  It's -- it's been a year and a half, two years.
2    Q.   Anything else?
3    A.   I just remember general stuff about it.
4         MR. KIMREY:   Counsel, we'd like a copy of that
5  contract as well as any contracts with Credit Karma,
6  Equifax, TransUnion and Experion which are all responsive
7  to our pending discovery.
8  BY MR. KIMREY:
9    Q.   So you said you got that number in September
10 of 2018.  Before that was your cell phone number this
11 (312) 313-6404?
12   A.   Yes.
13        MR. BEAUMONT:   Objection, form.
14 BY MR. KIMREY:
15   Q.   Who was the service provider?
16   A.   Sprint.
17   Q.   Did you enter into a contract with Sprint
18 related to that number?
19   A.   Not that I recall.
20   Q.   Is it possible that you did?
21        MR. BEAUMONT:   Objection, form.
22 BY THE WITNESS:
23   A.   I don't know.
24

Page 105

1  BY MR. KIMREY:
2    Q.   Did you read any contract with Sprint related
3  to provision of (312) 313-6404?
4    A.   Just the same thing, that this is my phone
5  number, this is how much the phone is going to be --
6  cost, this is how much my monthly bill is.
7    Q.   So you do recall there was a contract with
8  Sprint?
9    A.   I --
10        MR. BEAUMONT:   Objection, form.
11 BY THE WITNESS:
12   A.   I know there was a thing that we had to fill
13 out for getting the phone number.
14        MR. KIMREY:   We'd also like the Sprint
15 contract or contracts which are, you know, responsive to
16 our discovery, counsel.
17 BY MR. KIMREY:
18   Q.   Let's go to Exhibit 2, Page 15.  So, Ms.
19 Lukis, again this is a CheckPeople report.  I'd like you
20 to look at 8 in the middle of Page 15 of Exhibit 2.  It
21 says: "CheckPeople wants your personal information to be
22 complete and accurate.  As stated in the terms of
23 service, by using the service, you represent and warrant
24 that all information you provide in connection with your

27 (Pages 102 - 105)

Page 106

1 use of the service is current, complete and accurate and
2 that you will update that information as needed to
3 maintain its completeness and accuracy. To confirm the
4 completeness and accuracy or make changes to your
5 personal information, visit your personal profile.
6 Through your personal profile, you may review and update
7 your personal information that we have already
8 collected." Did I read that accurately?
9     A.   Yes.
10     Q.   Have you ever visited CheckPeople?
11     A.   Never heard of --
12         MR. BEAUMONT: Objection, form.
13 BY THE WITNESS:
14     A.   Never heard of it before today.
15 BY MR. KIMREY:
16     Q.   Now that you know that CheckPeople has
17 information about you, some of which is accurate, some of
18 which is inaccurate, do you plan to notify CheckPeople of
19 the inaccuracies?
20         MR. BEAUMONT: Objection, form.
21 BY THE WITNESS:
22     A.   I'm not planning on contacting them at all.
23 BY MR. KIMREY:
24     Q.   Do you plan on asking them to remove your

Page 107

1 profile?
2         MR. BEAUMONT: Objection, form.
3 BY THE WITNESS:
4     A.   I would like to. There's no reason anybody
5 should have access to my personal information.
6 BY MR. KIMREY:
7     Q.   Why is that?
8     A.   Because I'm a private citizen not a public
9 figure or celebrity.
10     Q.   Does your private information include your
11 name?
12     A.   I would -- yes. My name is not something
13 that should be searchable on anybody's website, to be
14 able to pull up my name, address and phone number.
15     Q.   Okay. Let's go onto number 3, so this is
16 Exhibit Number 3. It's actually folder 1, sub 3. Are
17 you familiar with MyLife?
18     A.   Never heard of it.
19     Q.   We pulled this information from
20 www.mylife.com as indicated at the top of Page 1. Do you
21 see that?
22         MR. BEAUMONT: Just for the record, I object
23 to this line of questioning, the previous MyLife question
24 and this question. You can answer the question.

Page 108

1 BY THE WITNESS:
2     A.   Yes, I see it's from mylife.com.
3 BY MR. KIMREY:
4     Q.   At the bottom of the first page -- well, let
5 me just back up.
6         Does this appear to be a record related to
7 you?
8     A.   Yes.
9     Q.   Down at the bottom it says: "Temporary at
10 Robert Half International is presently Stefanie's
11 occupation." Is that true?
12     A.   No.
13         MR. BEAUMONT: Objection, form.
14 BY MR. KIMREY:
15     Q.   Have you ever been a temporary staff through
16 Robert F. Legal or Robert Half International?
17     A.   Oh, jeeze.
18         MR. BEAUMONT: Objection, form.
19 BY THE WITNESS:
20     A.   2004, I think.
21 BY MR. KIMREY:
22     Q.   Did you enter into a contract with Robert
23 Half?
24     A.   No.

Page 109

1         MR. BEAUMONT: Objection, form.
2 BY MR. KIMREY:
3     Q.   Have you ever signed up for any other
4 staffing agencies?
5     A.   I don't know.
6     Q.   Have you ever signed up for Monster?
7     A.   No.
8     Q.   Have you ever signed up for Kelly?
9     A.   Never heard of it.
10     Q.   Let's go to Page 21 of Exhibit 3. You see in
11 the middle of the page it says: "How we collect your
12 information," Ms. Lukis?
13     A.   Yeah.
14     Q.   And then it lists, going from Page 21 to Page
15 23, voluntary submissions, testimonials, Facebook Connect
16 and other social network, APIs, third-party sources and
17 publicly available information, referral information,
18 passive collection, cookies, web beacons and other
19 tracking technologies. Do you see all of that?
20     A.   Yes.
21     Q.   Did I read all of that accurately?
22     A.   Yes.
23     Q.   Do you have any reason to believe that
24 MyLife's assertion about where it gets this information

28 (Pages 106 - 109)

1 is false?

2      MR. BEAUMONT: Objection, form.

3 BY THE WITNESS:

4      A.  I don't know.

5 BY MR. KIMREY:

6      Q.  Okay.  Do you know what Facebook Connect and

7 other social network -- I'm on Page 21.  Do you know what

8 Facebook Connect and other social network APIs means?

9      MR. BEAUMONT: Objection, form.

10 BY THE WITNESS:

11     A.  No.

12 BY MR. KIMREY:

13     Q.  Do you know what an API is?

14     A.  No, I do not.

15     MR. BEAUMONT: Objection, form.

16 BY MR. KIMREY:

17     Q.  Do you know what Facebook Connect is?

18     A.  No, I do not.

19     Q.  On Page 27 MyLife says quote -- first full

20 paragraph at the top:  "If you would like to request that

21 we remove a member profile or a public profile from our

22 active database or claim ownership of a member profile,

23 simply visit our Help section or contact Customer Care

24 toll free at 888-466-1066 Monday through Friday 6 a.m. to

1 9 p.m. PST.  Upon receipt of any such request, we will

2 take reasonable steps to validate that you are the

3 correct owner of the profile that is the subject of your

4 request.  This precaution is designed to protect our

5 users and their privacy and may require us to connect --

6 to contact you for confirmation purposes.  Following

7 verification of profile ownership, we will take

8 reasonable steps to remove a profile from public display

9 on the website.  However, some portions of the

10 information contained in your profile may remain in our

11 back-up systems."  Did I read that accurately?

12     A.  Yes.

13     Q.  Have you ever contacted MyLife to change or

14 remove your profile?

15     A.  I didn't know it existed before today.

16     MR. BEAUMONT: Objection, form.

17 BY MR. KIMREY:

18     Q.  Could you repeat that?

19     A.  I didn't know it existed before today.

20     Q.  Now that you know that, what do you intend to

21 do?

22     A.  Contact them and get my information pulled

23 off of their website.

24     Q.  Why is that?

1      A.  Because I am a private citizen not a public

2 official or celebrity.  There's no reason anybody should

3 have my information.

4      Q.  Is there any other reason?

5      A.  I don't want my information available to the

6 public.

7      Q.  Is there any other reason?

8      A.  The main reason is so that way my stalker

9 mother can't find my phone number or mailing address.

10     Q.  Is there any other reason?

11     A.  No.

12     Q.  Let's go to folder 1, sub 4, FastPeople.

13 This is a FastPeople report that we pulled as well as the

14 terms and conditions in the privacy policy.  I assume,

15 Ms. Lukis, you've never seen what I'm showing you at Page

16 1 of --

17     A.  I've never heard of the website, so --

18     MR. BEAUMONT: Objection.  Objection.  Is this

19 marked as an exhibit?

20     MR. KIMREY: Yeah, it's marked as Exhibit 4, I

21 believe.

22     MR. BEAUMONT: So I'm going to continue my

23 objection to the MyLife and FastPeople reports marked as

24 Exhibits 3 and 4 as this has never been provided in

1 discovery and is not Bates labeled.  It has not been

2 provided to Ms. Lukis or counsel for her until just now.

3      MR. KIMREY: It's publicly available, and we

4 just became aware of it.

5 BY MR. KIMREY:

6      Q.  Okay.  So do you see the phone number on Page

7 1 (773) 801-0023?

8      A.  Yes.

9      Q.  I may have asked you this before in

10 connection with one of the other reports, but do you

11 recognize that phone number?

12     A.  Yes.  It is my Comcast number from four years

13 ago.

14     Q.  Okay.  Do you have any reason to believe that

15 that number isn't public record?

16     A.  I would think that it's an unlisted number,

17 but I don't know what the current owner of that phone

18 number is doing with it.

19     Q.  Did you put it -- is it -- sorry.  Was the

20 number unlisted by you?

21     A.  Yes.

22     Q.  Was it unlisted from its assignment to you

23 until its relinquishment by you?

24     A.  Yes.

29 (Pages 110 - 113)

1    Q.   Was it listed on the do not call registry?
2    A.   Yes.
3    Q.   Did you list it on --
4    A.   Yes.
5    Q.   -- the do not call registry?
6    A.   Yes.
7    Q.   Let's go to Page 7.  Do you see the telephone
8  numbers near the middle of the page?
9    A.   Yes.
10    Q.   Do you recognize (773) 957-6403?
11    A.   No.
12    Q.   Do you recognize (312) 351-2022?
13    A.   Yes.
14    Q.   What is that?
15    A.   That was my husband's cell phone number.
16    Q.   Do you recognize (773) 801-0023?
17    A.   Yes.  That's the Comcast number from four
18  years ago.
19    Q.   Do you recognize (571) 230-6064?
20    A.   No.
21    Q.   Do you recognize (773) 855-9178?
22    A.   No.
23    Q.   Do you recognize (703) 313-6405?
24    A.   No.

1    Q.   Do you recognize (703) 313-1364?
2    A.   No.
3        MR. BEAUMONT:  Counsel, we're a few minutes
4  away from 12:30.  What are your plans as far as like a
5  lunch break?  I don't know how much more you have or
6  what.
7        MR. KIMREY:  How about 1-ish Central?  That
8  kind of presents a natural break in the exhibits.  Will
9  that work?
10        MR. BEAUMONT:  Ms. Lukis?
11        THE WITNESS:  That's fine by me.
12  BY MR. KIMREY:
13    Q.   Okay.  I'd like to turn to Page 28 of this
14  exhibit.  Do you see, Ms. Lukis, that it says:  "Privacy
15  Policy" at the top?
16    A.   Yes.
17    Q.   If you turn to the next page, Page 29, it
18  lists -- FastPeople Search lists the categories of
19  personal information that it collects and the various
20  sources.  Do you see that?
21    A.   Yes.
22    Q.   Do you have any reason to believe that the
23  sources listed by FastPeople Search are inaccurate?
24        MR. BEAUMONT:  Objection, form.

1  BY THE WITNESS:
2    A.   Not that I know of.
3  BY MR. KIMREY:
4    Q.   Turn to Page 36.  Do you see at IV it says:
5  "Your rights"?
6    A.   Yes.
7    Q.   And below that it says:  "Delete"?
8    A.   Yes.
9    Q.   It says:  "Upon request we can block the
10  records we have control over in our database from being
11  shown on our applications.  You can request for your
12  personal information to be blocked from being searched
13  using the link below.  Unless otherwise required by law,
14  we will only accept opt-out requests directly from the
15  individual whose information is being opted-out, and we
16  reserve the right to require verification of identity and
17  reject opt-out requests at our sole discretion.  Of
18  course, we are unable to remove any information --" I'm
19  now on Page 37 "-- any information about you from
20  databases operated by third parties.  We may need you to
21  provide additional information to verify your request
22  such as providing data elements so that we can confirm
23  they match the information already maintained by us.  We
24  will not use this additional information for anything

1  other than handling your request.  We do not accept
2  opt-out requests via fax or e-mail.  To manage or remove
3  your public records from our database, please go to," and
4  it provides a web address.  Do you see that?
5    A.   Yes.
6    Q.   Were you aware before today that FastPeople
7  Search had a profile on you?
8        MR. BEAUMONT:  Object to form.
9  BY THE WITNESS:
10    A.   I was unaware of FastPeople Search at all.
11  BY MR. KIMREY:
12    Q.   Now that you know that FastPeople Search has
13  a profile on you, what do you intend to do?
14    A.   Remove my information from their database.
15    Q.   Why is that?
16    A.   Because I am a private citizen not a public
17  official or celebrity.  Nobody should have access to my
18  private information.
19    Q.   Any other reasons?
20    A.   No.
21    Q.   Okay.  Let's go to 1, sub 5.  Okay.  So this
22  is now marked as Exhibit 5 for this deposition.  This is
23  a PeekYou report that we pulled.  Do you see that your
24  name, your maiden name is listed near the top,

1 Stephanie M. Klatte?
2          MR. BEAUMONT:  First of all, again, we have
3 not been provided this Exhibit 5 until right now.  This
4 does not -- Exhibit 5 is not Bates numbered.  I don't
5 believe that Stephanie Lukis is aware of this Exhibit 5,
6 and I believe she -- if she so needs, she should have an
7 opportunity to review this document.
8 BY MR. KIMREY:
9     Q.   Ms. Klatte, do you see your name is at the
10 top?
11          MR. BEAUMONT:  Objection.  The Plaintiff's
12 name is Stephanie Lukis.  You addressed her as Ms.
13 Klatte.
14          MR. KIMREY:  Stop testifying, Mr. Beaumont.
15          THE WITNESS:  I was about to say the same
16 thing.  My last name is Lukis not Klatte.
17 BY MR. KIMREY:
18     Q.   Right.  Your maiden name is Klatte; right?
19     A.   Yes, but my current name is Lukis.
20     Q.   Okay.  So in referring to Stephanie M.
21 Klatte, do you think that this refers to you?
22     A.   Yes.  They got my age wrong.
23     Q.   Let's turn to Page 12.  Do you see that this
24 says PeekYou privacy policy --

1     A.   Yes.
2     Q.   -- Ms. Lukis?
3          Then at Page 13, at C it says:  "Information
4 from other sources.  We also receive information from
5 other sources.  The categories of sources from which we
6 collect and have collected information including the last
7 12 months include data brokers or resellers, social
8 networks, partners and public sources."  Do you see all
9 of that?
10     A.   Yes.
11     Q.   Do you have any reason to believe that
12 PeekYou's representation about where it gets
13 information --
14          MR. BEAUMONT:  Objection.
15 BY MR. KIMREY:
16     Q.   -- from other sources is false?
17          MR. BEAUMONT:  Objection, form.
18 BY THE WITNESS:
19     A.   No.
20 BY MR. KIMREY:
21     Q.   Turn to Page 15.  Do you see at 7 it says:
22 "Your rights and choices"?
23     A.   Yes.
24     Q.   Then it says at 7A:  "Removing search results

1 about you;" correct?
2     A.   Yes.
3     Q.   It goes on to say:  "PeekYou is a search
4 engine that indexes information from unaffiliated
5 websites on the public internet.  You may remove
6 information --" Well, let me stop there.  Do you have any
7 reason to believe that statement by PeekYou is false?
8          MR. BEAUMONT:  Objection, form.
9 BY THE WITNESS:
10     A.   No.
11 BY MR. KIMREY:
12     Q.   Okay.  Going on:  "You may remove information
13 from www.peekyou.com by filling out the web form
14 available at," and it gives a URL.  Removing information
15 from our services does not constitute removal from the
16 internet.  As such, you understand that your information
17 may resurface on www.peekyou.com if you do not take
18 additional steps to limit your privacy settings or remove
19 your information on unaffiliated websites that are the
20 original sources of information.  We may require
21 additional information from you to allow us to confirm
22 your identity prior to removal."  Did I read that
23 accurately?
24     A.   Yes.

1     Q.   Were you aware of this profile related to you
2 on PeekYou before this deposition?
3     A.   I was not aware of peekyou.com at all.
4     Q.   Now that you are aware of PeekYou and this
5 profile, what do you intend to do?
6     A.   Go onto their website and remove the
7 information.
8          MR. BEAUMONT:  Objection to form.
9 BY MR. KIMREY:
10     Q.   Why is that?
11     A.   Because I'm a private citizen not a public
12 official or celebrity, and there's no reason anybody
13 should have access to my private information.
14     Q.   Any other reason?
15     A.   No.
16          MR. KIMREY:  Okay.  I think now's a good
17 breaking point.  It's actually before 1 -- 12:35.  So I'd
18 keep going, Ms. Lukis, but if you want to take a break
19 for lunch, we can do that.  It's totally up to you.
20          THE WITNESS:  No, I'd like to go get something
21 to eat.
22          MR. KIMREY:  Okay.  So let's go off the
23 record.
24          How long do you need, Ms. Lukis?

31 (Pages 118 - 121)

1     THE WITNESS: Say about half an hour.

2     MR. KIMREY: Okay. Let's go ahead and resume

3 at 1:10 Central. Does that work for everybody?

4     MR. BEAUMONT: Yep.

5     THE WITNESS: Sure.

6     THE VIDEOGRAPHER: Okay. Going off the video

7 record at 12:35 p.m.

8            (WHEREUPON, a lunch break

9            was taken.)

10     Good afternoon. We are going back on the

11 video record at 1:14 p.m.

12     You may proceed.

13 BY MR. KIMREY:

14     Q. Good afternoon, Ms. Lukis.

15        You understand that you're still under oath?

16     A. Yep.

17     Q. Did you confer with your counsel at all

18 during our lunch break?

19     MR. BEAUMONT: Objection. We're not going to

20 get into conversations that Ms. Lukis had with -- with

21 counsel. It's attorney/client privilege, and I instruct

22 the witness not to answer.

23 BY MR. KIMREY:

24     Q. Do you follow your counsel's advice not to

1 answer, Ms. Lukis?

2     A. Yes, I do.

3     MR. KIMREY: Okay. I just want to note, Mr.

4 Beaumont, again, it's a mischaracterization of the law.

5 During breaks the witness is still under oath, and the

6 discussions with counsel are proper ponder for

7 questioning unless application of privilege, work product

8 or trade secret protection are discussed. So the

9 position you're taking with respect to discussions with

10 counsel during breaks while Ms. Lukis is still under oath

11 is just flat out wrong. Do you want to reconsider that

12 position?

13     MR. BEAUMONT: No. The -- our position is

14 that conversations that we had are protected by

15 attorney/client privilege, and so we are instructing her

16 not -- not -- not to answer.

17 BY MR. KIMREY:

18     Q. Are you following your counsel's advice, Ms.

19 Lukis?

20     A. Yes, I am.

21     Q. Did you review any documents during the lunch

22 break?

23     A. No.

24     Q. Did you speak to your husband during the

1 lunch break?

2     A. About whether -- about our kid.

3     Q. Did you discuss anything else with him

4 related to the deposition?

5     A. No.

6     Q. You said earlier I believe that the first

7 time you had met Plaintiffs' counsel Roberto Costales was

8 today; is that right?

9     A. Yes. I've been dealing with William

10 Beaumont.

11     Q. When did you first meet William Beaumont?

12     MR. BEAUMONT: Objection. I don't understand

13 the relevancy. Well, objection to the form.

14        You can answer the question if you recall.

15 BY THE WITNESS:

16     A. It was September -- not September. I think

17 June of last -- of 2019, I think. Yeah, I think it was

18 June of 2019.

19 BY MR. KIMREY:

20     Q. How many times have you spoken with Mr.

21 Beaumont between then and now roughly?

22     MR. BEAUMONT: Objection. Objection,

23 attorney/client privilege. We're not going to -- I

24 instruct the witness not to answer any -- any -- the

1 content of any communications with her counsel or the

2 number of meetings or whatnot I think are privileged

3 communications under attorney/client privilege.

4     MR. KIMREY: I didn't ask for content. I

5 asked for about how many times she had met with you.

6     MR. BEAUMONT: I think that that's --

7     MR. KIMREY: Mr. Beaumont --

8     MR. BEAUMONT: I think that is also

9 attorney/client privilege. I think -- and I instruct the

10 witness not to answer.

11     MR. KIMREY: Okay. You're wrong about that.

12 BY MR. KIMREY:

13     Q. Are you going to follow your counsel's

14 instruction not to answer, Ms. Lukis?

15     A. Yes.

16     Q. Did you meet with Mr. Beaumont yesterday?

17     MR. BEAUMONT: Objection. Again, I

18 instruct -- this is attorney/client privilege, and I

19 instruct the witness not to answer.

20     MR. KIMREY: It's not privileged.

21 BY MR. KIMREY:

22     Q. But are you going to follow your counsel's

23 instruction not to answer?

24     A. Yes.

1    Q.   Have you met with Mr. Beaumont at any time in
2 2021 other than today?
3        MR. BEAUMONT:  Objection.  Again, counsel,
4 this is -- this is privileged matters, and so I object on
5 the grounds of attorney/client privilege, and I instruct
6 the witness not to answer.
7        MR. KIMREY:  Okay.  It's not privileged.
8 You're wrong.
9 BY MR. KIMREY:
10    Q.   Are you going to follow your counsel's advice
11 not to answer?
12    A.   Yes.
13    Q.   How many times in 2020 did you meet with Mr.
14 Beaumont?
15        MR. BEAUMONT:  Objection.  Again, this is
16 calling for communications and discussions with her
17 lawyer, and I just don't see how this is -- this is
18 appropriate, and I believe this is attorney/client
19 privilege.
20        MR. KIMREY:  I clearly didn't ask for the
21 content of any communications, and this is not
22 attorney/client privilege, and the position you're taking
23 is inaccurate and, in fact, sanctionable.
24

1 BY MR. KIMREY:
2    Q.   But, Ms. Lukis, do you want to follow your
3 counsel's advice and not answer?
4    A.   Honestly I don't know.  As in I don't know
5 how many times I talked to him.  You're asking questions
6 I don't know the answer to.
7    Q.   Did you speak with him in 2021 before today?
8    A.   I -- probably.  I don't know.
9    Q.   So you don't know as you sit here today on
10 January 5th --
11    A.   I don't know the --
12    Q.   -- whether you spoke to him on January 1st,
13 January 2nd, January 3rd or January 4th?
14    A.   I talked to him yesterday, but I don't see
15 the relevance.
16    Q.   Is yesterday the only time you spoke with him
17 in 2021 before today?
18    A.   Yes.
19    Q.   How long did you speak with him?
20    A.   I don't know.
21        MR. BEAUMONT:  Objection.  We're not going to
22 get into -- not going to get into that.  That's getting
23 into the content of communications, and we're just not
24 going to get into that.  I instruct the witness not to

1 answer.
2 BY MR. KIMREY:
3    Q.   Are you going to follow your counsel's
4 instruction not to answer?
5    A.   Yes.
6    Q.   Are you being compensated in any way to serve
7 as a Plaintiff in this case?
8    A.   No.
9    Q.   Have you signed an engagement letter with
10 Beaumont Costales related to their representation of you
11 in this case?
12    A.   I don't know what that is.  Can you clarify?
13    Q.   Did you sign any form of contract with the
14 law firm representing you in this matter?
15    A.   Yes, I think so.  Let me look.  I have no --
16 yeah.
17    Q.   Do you recall what it said?
18    A.   No.  It was an agreement to work with them as
19 the class representative.  I don't remember the exact
20 details.
21    Q.   Has the firm offered you any kind of
22 incentive to serve as the class representative?
23    A.   No.
24    Q.   Okay.  Let's move onto the next exhibit which

1 is folder 1, sub 6 to be marked as Exhibit 6.
2        Before we go there, Ms. Lukis, before today
3 were you even aware that Roberto Costales exists?
4    A.   Yes.
5    Q.   How were you aware of that?
6    A.   I -- it's -- I don't know how to -- his name
7 has been included in communications, I think.  I don't --
8 I don't remember.
9    Q.   Before the Complaint was filed in this case
10 was it shared with you?
11    A.   No.
12    Q.   Did you provide any input on the Complaint in
13 this case?
14    A.   No.
15    Q.   Have you ever seen the Complaint?
16    A.   Yes.
17    Q.   When?
18    A.   I don't know the date -- the dates of when
19 I've -- when I've seen it, but I've been in communication
20 about what -- what's going on so that way I'm aware of
21 what's in the Complaint.
22    Q.   Have you read the Complaint?
23    A.   At one point.
24    Q.   When?

33 (Pages 126 - 129)

Page 130

1    A.   I don't know.  I've gotten -- every time
2  there's been updates in filings I've gotten copies of
3  them.
4    Q.   How do you receive copies?
5    A.   They e-mail me the information so that way
6  I'm kept in the loop.
7    Q.   To what e-mail address?
8    A.   Stephanie.lukis@gmail.com.
9    Q.   Has your counsel ever shared with you any of
10 the filings before they were filed?
11   A.   No.
12   Q.   Okay.  Exhibit 6.
13   A.   That thing's ancient.
14   Q.   So this is a LinkedIn account we identified
15 on December 30th, 2020.  You can see up in the upper
16 left-hand corner the date.  Do you see that?
17   A.   Yes.
18        MR. KIMREY:  And, Michael, are you there?
19        MR. TOTH:  Yeah, I'm here.
20 BY MR. KIMREY:
21   Q.   You said this thing is ancient.  So do you
22 recognize this, Ms. Lukis?
23   A.   Yes.  I was referring to the content of where
24 it says "seeking a challenging new position." I haven't

Page 131

1  updated that thing in LinkedIn in six months or in the --
2  yeah.  Oh, my brain's not working today.  I haven't
3  updated that thing in forever.  I never go on line and
4  post anything.
5    Q.   Is this your LinkedIn account?
6    A.   Yes.
7    Q.   Is this your only LinkedIn account?
8    A.   Yes.
9    Q.   Is this the only LinkedIn account you've ever
10 had since the beginning of your life?
11   A.   Yes.
12   Q.   Okay.  So at Page 1 where it says "Stephanie
13 Lukis," you actually entered that name; right?
14   A.   Yes.
15   Q.   And it says lower on Page 1 that your
16 experience includes being a server at McCormick &
17 Schmick's from May 2018 to September of 2018; is that
18 accurate?
19   A.   Yes.
20   Q.   What McCormick & Schmick's?
21   A.   Reston, Virginia.
22   Q.   And then you list Client Services
23 Coordinator, Homeliving May 2018 to September 2018.  Do
24 you see that?

Page 132

1    A.   Yes.
2    Q.   Is Homeliving a company?
3    A.   Yes.  It's Homeliving Fireplaces.  They build
4  fireplaces and outdoor pagodas.
5    Q.   What did you do there?
6    A.   I was the person who if you came into the
7  store I talked to you about fireplaces, talked to you
8  about pagodas, try and sell stuff.
9    Q.   The only experience you list in your LinkedIn
10 profile is McCormick & Schmick's and Homeliving.  Why is
11 that?
12        MR. BEAUMONT:  Objection, form.
13 BY THE WITNESS:
14   A.   Because I never update my LinkedIn profile.
15 I don't get on line very often.  I don't constantly post
16 on LinkedIn.  I don't constantly post on Facebook.
17 BY MR. KIMREY:
18   Q.   Since these entries are for May of 2018 to
19 September of 2018, is it fair to assume that you entered
20 them on or after September of 2018?
21   A.   Yeah.
22   Q.   Before September of 2018 did you have any
23 work experience other than McCormick & Schmick's and
24 Homeliving?

Page 133

1    A.   Yes, but I don't put it on my Facebook or on
2  my LinkedIn.
3    Q.   Why is that?
4    A.   Because it's nobody's business.
5    Q.   Why is McCormick & Schmick's and Homeliving
6  people's business but your other jobs are not?
7        MR. BEAUMONT:  Form.
8  BY THE WITNESS:
9    A.   Because I only list my most recent jobs.  If
10 and when I ever update, it I'm removing those and putting
11 Amazon on there.  I only keep my current employment.
12 BY MR. KIMREY:
13   Q.   Why would you put Amazon on there?
14   A.   Because that's my current employer.
15   Q.   Are you a W2 employee of Amazon?
16   A.   Yes.
17   Q.   What do you do for Amazon?
18   A.   I am a --
19        MR. BEAUMONT:  Objection to form.
20 BY THE WITNESS:
21   A.   -- shopper at Whole Foods.
22 MR. KIMREY:
23   Q.   I'm sorry.  What is that?
24   A.   I am an Amazon Prime shopper at a Whole Foods

34 (Pages 130 - 133)

1 rest -- Whole Foods grocery store.

2    Q.   What Whole Foods?

3    A.   Hyde Park.

4    Q.   What's the address?

5    A.   I don't know.  51st and Lake Park Avenue.

6    Q.   How long have you been an Amazon Prime Whole

7 Foods shopper?

8    A.   Since the middle of November, so two months.

9    Q.   Have you held any other jobs during that

10 period?

11    A.   Not since I was working at Homeliving.

12    Q.   Did you fill out an application to be an

13 employee at Whole Foods?

14    A.   Yeah.

15       MR. KIMREY:  Counsel, we would like a copy of

16 that application.  We'd also like a copy of the

17 Craigslist ad or ads that you ran to solicit Plaintiffs

18 for this matter, all of which is responsive to the

19 discovery we propounded long ago.

20 BY MR. KIMREY:

21    Q.   Did you fill out an application to be

22 employed by Homeliving?

23    A.   No.

24    Q.   Did you fill out an application to be an

1 employee of McCormick & Schmick's?

2    A.   Yes.

3       MR. KIMREY:  We'd also like that application,

4 counsel.

5 BY MR. KIMREY:

6    Q.   Do you know what kind of information you

7 shared on that application?

8    A.   Name, birth date, previous employers.

9    Q.   Anything else?

10    A.   That's about it.

11    Q.   Did you share the same sorts of information

12 with Amazon to be a Prime shopper?

13    A.   Yes.

14    Q.   Did the application say anything about use of

15 or sharing of the information that you provided?

16    A.   It said that they will not share my

17 information.  It was only --

18    Q.   Go ahead.

19    A.   It says that the information is for the

20 purposes of applying for a job and there's no -- and

21 they're not going to be sharing my information with

22 anybody else.

23    Q.   Did it say anything else about sharing or use

24 of your information?

1    A.   No, not that I know of.

2    Q.   When did you join LinkedIn?

3    A.   I have no idea.

4    Q.   Was it a year ago, two years ago, three years

5 ago?

6    A.   Probably two years ago.

7    Q.   By joining did you agree to LinkedIn's terms

8 and conditions?

9    A.   Probably.

10       MR. KIMREY:  Somebody's typing.  Could you go

11 on mute, please.

12 BY MR. KIMREY:

13    Q.   In joining did you agree to LinkedIn's

14 privacy policy?

15    A.   I don't know.

16    Q.   Is it possible that you did?

17    A.   Possibly, yeah.

18    Q.   Is there any reason why you would have agreed

19 to the terms and conditions but not the privacy policy?

20    A.   Maybe if I forgot to click a button.  I don't

21 know.

22    Q.   Have you ever read LinkedIn's terms and

23 conditions?

24    A.   I've skimmed it but didn't actually read it

1 word for word.

2    Q.   What do they say?

3    A.   As far as I can recall, it's stuff like

4 their -- my information is going on their website and

5 they're not gonna share it with others.

6    Q.   Anything else?

7    A.   It was -- it's been awhile.  I don't remember

8 all the details.

9    Q.   Did you read LinkedIn's privacy policy?

10    A.   That one's another one that says that they're

11 not gonna share my information with anybody else, but

12 other than that -- that's the main clause I look for in

13 any -- anything like that.

14    Q.   Does it say anything else?

15    A.   I don't remember anything -- anything else.

16    Q.   Okay.  So based on your memory, LinkedIn's

17 terms and conditions say they won't share your

18 information with anybody no matter what; is that correct?

19       MR. BEAUMONT:  Objection, form.

20 BY THE WITNESS:

21    A.   No matter what?  It says they just will

22 not -- it doesn't use the words no matter what, but it

23 says they will not share my information with anyone else.

24

35 (Pages 134 - 137)

Page 138

1 BY MR. KIMREY:
2    Q.   And LinkedIn's privacy policy says LinkedIn
3 won't share your information with anyone else; is that
4 correct?
5    A.   Yes.
6        MR. BEAUMONT: Objection, form.
7 BY MR. KIMREY:
8    Q.   How did you agree to LinkedIn's terms and
9 conditions?
10   A.   You check a box.
11   Q.   And did you check the box?
12   A.   Yes.
13   Q.   How did you agree to LinkedIn's privacy
14 policy?
15   A.   By checking a box.
16   Q.   Did you check a box?
17   A.   Yeah. You kind of -- I think you have to.
18   Q.   Page 8. Page 8 is the beginning of
19 LinkedIn's User Agreement. You can see at the top it
20 says "User Agreement." Do you see that, Ms. Lukis?
21   A.   Yeah.
22   Q.   And at paragraph 1.1 more than halfway down
23 the page, it says: "You agree that by clicking join now,
24 join LinkedIn, sign up or similar registering, accessing

Page 139

1 or using our services described below, you are agreeing
2 to enter into a legally binding contract with LinkedIn
3 even if you are using our services on behalf of the
4 company. If you do not agree to this contract, contract
5 or user agreement, do not click join or similar and do
6 not access or otherwise use any of our services." Did I
7 read that accurately?
8    A.   Yes.
9    Q.   Did you agree to that in signing up for
10 LinkedIn?
11       MR. BEAUMONT: Objection, form.
12 BY THE WITNESS:
13   A.   Yes.
14 BY MR. KIMREY:
15   Q.   Turn to Page 10. You see at 2.5, this is
16 Page 10 of Exhibit 6, it says: "Sharing"? Do you see
17 that?
18   A.   Yes.
19   Q.   And it says, I quote, "Our services allow
20 messaging and sharing of information in many ways, such
21 as your profile, articles, group posts, links to news
22 articles, job postings, messages and InMails.
23 Information and content that you share or post may be
24 seen by other members, visitors or others including off

Page 140

1 of the services." Did I read that accurately?
2    A.   Yes.
3    Q.   Did you agree to that by using LinkedIn?
4        MR. BEAUMONT: Objection, form.
5 BY MR. KIMREY:
6    Q.   You can answer.
7    A.   I said yes.
8    Q.   Okay. Going to 3 on Page 10 -- wait a
9 second. Do you use LinkedIn InMail?
10   A.   No.
11   Q.   Have you ever used LinkedIn InMail?
12   A.   No.
13   Q.   Are you familiar with your privacy settings
14 within LinkedIn?
15   A.   Yes.
16   Q.   Since the time you joined LinkedIn to the
17 present how many times have you changed your privacy
18 settings?
19   A.   One when I saw --
20       MR. BEAUMONT: Objection, form.
21 BY THE WITNESS:
22   A.   One when I signed up for it and made
23 everything private.
24

Page 141

1 BY MR. KIMREY:
2    Q.   So you only modified your privacy settings
3 upon the initial sign-up but didn't modify them any
4 further thereafter; is that correct?
5    A.   That's correct.
6        MR. BEAUMONT: Object to form.
7 BY MR. KIMREY:
8    Q.   Have you produced your privacy settings in
9 this case in response to Whitepages' discovery?
10   A.   If it's in the file that was submitted.
11   Q.   And you're talking about the information that
12 you pulled within the past three days?
13   A.   Yes.
14   Q.   Okay. Let's go to 3 on Page 10, paragraph 3.
15 It says, 3.1: "Your license to LinkedIn. As between you
16 and LinkedIn, you own the content and information that
17 you submit or post to the services, and you are only
18 granting LinkedIn and our affiliates the following
19 non-exclusive license: Worldwide, transferable and
20 sublicenseable right to use, copy, modify, distribute,
21 publish and process information and content that you
22 provide through our services and the services of others
23 without any further consent, notice and/or compensation
24 to you or others." Did I read that accurately?

36 (Pages 138 - 141)

Page 142

1    A.   Yes.
2    Q.   Did you agree to that term in using LinkedIn?
3    A.   Yes.
4         MR. BEAUMONT:  Objection, form.
5  BY MR. KIMREY:
6    Q.   You could answer.
7    A.   I said yes.
8    Q.   Then go down to sub 2 on the same page.  The
9  second sentence it says:  "However, we have the right
10 without payments to you or others to serve ads near your
11 content and information, and your social actions may be
12 visible and included with ads as noted in the privacy
13 policy.  If you use a service feature, we may mention
14 that with your name or photo to promote that feature
15 within our services subject to your settings."  Did I
16 read that accurately?
17   A.   Yes.
18   Q.   Did you agree to that in using LinkedIn?
19   A.   Yes.
20        MR. BEAUMONT:  Objection, form.
21 BY MR. KIMREY:
22   Q.   Sorry.  Your counsel objected over you.  What
23 did you say?
24   A.   Yes.

Page 143

1    Q.   So is it your understanding that you've
2  agreed to allow LinkedIn to serve advertising in
3  connection with your profile?
4         MR. BEAUMONT:  Objection, form.
5  BY THE WITNESS:
6    A.   Yeah.
7  BY MR. KIMREY:
8    Q.   And is it your understanding that that
9  consent extends to third parties with which LinkedIn
10 interacts?
11        MR. BEAUMONT:  Objection, form.
12 BY THE WITNESS:
13   A.   I think so.  I don't know.
14 BY MR. KIMREY:
15   Q.   At 3, second sentence it says:  "However, if
16 you choose to share your posts as public, we will enable
17 a feature that allows other members to embed that public
18 post on the third-party services and enable search
19 engines to make that public content findable through the
20 services."  Did I read that accurately?
21   A.   Yes.
22   Q.   By using LinkedIn did you agree to that term?
23   A.   Yes.
24        MR. BEAUMONT:  Objection, form.

Page 144

1  BY MR. KIMREY:
2    Q.   Then at paragraph 5 at Page 11, second
3  paragraph 5 or right below 5 where it says:  "You and
4  LinkedIn," it says:  "You and LinkedIn agree that we may
5  access, store, process and use any information and
6  personal data that you provide in accordance with the
7  terms of the privacy policy and your choices including
8  settings."  Did I read that accurately?
9    A.   Yes.
10   Q.   Did you agree to that term in using LinkedIn?
11        MR. BEAUMONT:  Objection, form.
12 BY THE WITNESS:
13   A.   Yes.
14 BY MR. KIMREY:
15   Q.   Let's go to Page 16 of Exhibit 6.  Do you see
16 it says "Privacy Policy" at the top, Ms. Lukis?
17   A.   Yes.
18   Q.   This is LinkedIn's Privacy Policy.  Turn to
19 Page 17.  And at 1.1 it says:  "Data you provide to us,
20 Registration.  To create an account, you need to provide
21 data including your name, e-mail address and/or mobile
22 number and a password.  If you register for Premium
23 service, you will need to provide payment, e.g., credit
24 card and billing information."  Did I read that

Page 145

1  accurately?
2    A.   Yes.
3    Q.   In using LinkedIn did you agree to that term?
4    A.   Yes.
5         MR. BEAUMONT:  Objection, form.
6  BY MR. KIMREY:
7    Q.   Do you have a LinkedIn Premium account?
8    A.   No, I do not.
9    Q.   Have you ever had a LinkedIn Premium account?
10   A.   No, I have not.
11   Q.   Let's go to Page 21 of Exhibit 6.  You see at
12 the bottom it says:  "How we share information," Ms.
13 Lukis?  Do you see that?
14   A.   Yes.
15   Q.   It says at 3.1:  "Our services profile.  Your
16 profile is fully visible to all members and customers of
17 our services subject to your settings.  It can also be
18 visible to others on or off our services, e.g. visitors
19 to our services or users of third-party search engines as
20 detailed in our Help Center, your settings, degree of
21 connection with the viewing member, the subscriptions
22 they may have, their usage of our services, access
23 channels and search guides, e.g. by name or by key word
24 impact the availability of your profile and whether they

37 (Pages 142 - 145)

1 can view certain fields in your profile."  Did I read
2 that accurately?
3      A.   Yes.
4      Q.   By using LinkedIn did you agree to that term?
5      A.   Yes.
6          MR. BEAUMONT:  Objection, form.
7 BY THE WITNESS:
8      A.   Yes.
9 BY MR. KIMREY:
10     Q.   Okay.  Let's go to 22.  3.3 you see where it
11 says:  "Others services"?
12     A.   Yes.
13     Q.   It says:  "Subject to your settings, other
14 services may look up your profile.  When you opt to link
15 your account with other services, personal data will
16 become available to them.  The sharing and use of that
17 personal data will be described in or linked to a consent
18 screen when you opt to link the accounts.  For example,
19 you may link your Twitter or WeChat account to share
20 content from our services into these services or your
21 e-mail provider may give you the option to upload your
22 LinkedIn contacts into its own service.  Third-party
23 services have their own privacy policies, and you may be
24 giving them permission to use your data in ways that we

1 would not.  You may revoke the link with such accounts."
2 Did I read that accurately?
3      A.   Yes.
4      Q.   By using LinkedIn did you agree to those
5 terms?
6      A.   Yes.
7          MR. BEAUMONT:  Objection, form.
8 BY MR. KIMREY:
9      Q.   And it goes on to say:  "Subject to your
10 settings, excerpts from your profile will appear on the
11 services of others, e.g. search engine results, mail-in
12 calendar applications that show a user limited profile
13 data of the person they are meeting or messaging, social
14 media aggregators, talent and lead managers.  All profile
15 information remains on these services until they update
16 their data cash with changes you made to your profile."
17 Did I read that accurately?
18     A.   Yes.
19     Q.   By using LinkedIn did you agree to that term?
20     A.   Yes.
21          MR. BEAUMONT:  Objection, form.
22 BY MR. KIMREY:
23     Q.   Page 23.  At 4.2 towards the bottom it says:
24 "Rights to accessing, control your personal data."  Do

1 you see that?
2      A.   Yes.
3      Q.   It says:  "We provide many choices about the
4 collection, use and sharing of your data, from deleting
5 or correcting data you include in your profile and
6 controlling the visibility of your posts to advertising
7 opt-outs and communication controls.  We offer you
8 settings to control and manage the personal data we have
9 about you.  Personal data that we have about you you
10 can," first bullet point "delete data.  You can ask us to
11 erase or delete all or some of your personal data, e.g.
12 that's no longer necessary to provide services to you."
13 Bullet point:  "Change Or correct data.  You can edit
14 some of your personal data through your account.  You can
15 also ask us to change, update or fix your data in certain
16 cases particularly if it's inaccurate."  Next bullet
17 point:  "Object to or limit or restrict use of data.  You
18 can ask us to stop using all or some of your personal
19 data, e.g. if we have no legal right to keep using it or
20 to limit our use of it, e.g. if your personal data is
21 inaccurate or unlawfully known."  Next bullet point:
22 "Right to access and/or take your data.  You can ask us
23 for a copy of your personal data, and you can ask for a
24 copy of personal data you provided in machine readable

1 form."  Okay.  Did I read that accurately?
2      A.   Yes.
3      Q.   By using LinkedIn did you agree to those
4 terms?
5      A.   Yes.
6      Q.   Have you ever asked LinkedIn to do any of the
7 things in the bullet points I just read?
8      A.   I have limited the use of my data.
9      Q.   And the only time you say you did that was
10 when you signed up for the account; is that correct?
11     A.   Yes.
12     Q.   And ever since your sign-up to the account
13 you've never altered your settings at all; is that right?
14     A.   That's correct.
15     Q.   Last night your counsel produced to us a
16 rather large volume of LinkedIn-related material and
17 Facebook-related material.  We have not had an
18 opportunity because of the late production to review all
19 of that for this deposition, and we reserve the right to
20 recall you at a time when we can review those materials.
21          But generally speaking, what sorts of things
22 have you posted to LinkedIn beyond what we just looked
23 at?
24     A.   Nothing really.

38 (Pages 146 - 149)

Page 150

1        MR. BEAUMONT:  Objection, form.
2    BY THE WITNESS:
3        A.   I don't post onto LinkedIn very often.  I
4    might -- at most I've used it to search for jobs.
5    BY MR. KIMREY:
6        Q.   Have you shared any telephone numbers on
7    LinkedIn?
8        A.   No.
9        Q.   Does LinkedIn have any telephone numbers for
10   you?
11       MR. BEAUMONT:  Objection, form.
12   BY THE WITNESS:
13       A.   I -- no, I don't think so.
14   BY MR. KIMREY:
15       Q.   Have you shared any contact information for
16   you on LinkedIn?
17       A.   No.
18       MR. BEAUMONT:  Objection to form.
19   BY MR. KIMREY:
20       Q.   Does LinkedIn have any contact information
21   for you?
22       A.   My e-mail address.
23       Q.   Did you provide your e-mail address to
24   LinkedIn?

Page 151

1        A.   Yes.
2        Q.   What e-mail address did you provide to
3    LinkedIn?
4        A.   Stephanie.lukis@gmail.com.
5        Q.   What else did you provide to LinkedIn?
6        A.   Nothing.
7        Q.   Did you provide your name to LinkedIn?
8        A.   Yes.
9        Q.   Did you provide any other e-mail addresses to
10   LinkedIn?
11       A.   No.
12       Q.   Did you provide any telephone numbers to
13   LinkedIn?
14       A.   Just --
15       MR. BEAUMONT:  Objection, form.
16   BY THE WITNESS:
17       A.   My phone number's not listed on LinkedIn.
18   BY MR. KIMREY:
19       Q.   But did you provide a telephone number to
20   LinkedIn?
21       A.   No.
22       Q.   Did you provide a physical address to
23   LinkedIn?
24       A.   No.

Page 152

1        Q.   Did you provide --
2        MR. BEAUMONT:  Objection, form.
3    BY MR. KIMREY:
4        Q.   -- city locale to LinkedIn?
5        A.   I believe my city information is on there.
6    That's it, and it's listed as I think the greater
7    Chicagoland area.
8        Q.   Have you provided LinkedIn with any other
9    information beyond what we've addressed here?
10       A.   No.
11       Q.   Have you linked LinkedIn with your Twitter
12   account?
13       A.   No.
14       MR. BEAUMONT:  Objection, form.
15   BY MR. KIMREY:
16       Q.   Have you linked LinkedIn with your Facebook
17   account?
18       MR. BEAUMONT:  Objection, form.
19   BY THE WITNESS:
20       A.   No.
21   BY MR. KIMREY:
22       Q.   Have you linked LinkedIn with your contacts?
23       A.   No.
24       MR. BEAUMONT:  Objection, form.

Page 153

1    BY MR. KIMREY:
2        Q.   Have you linked LinkedIn with any e-mail
3    accounts?
4        A.   As in?  What do you mean?
5        Q.   Providing LinkedIn the ability to access your
6    e-mail accounts.
7        A.   No.
8        Q.   Where are your contacts stored?
9        A.   For --
10       MR. BEAUMONT:  Objection to form.
11   BY THE WITNESS:
12       A.   -- e-mail?  General contacts or LinkedIn
13   contacts?
14   BY MR. KIMREY:
15       Q.   Where are your general contacts stored?
16       A.   Gmail.
17       Q.   Where are your LinkedIn contacts stored?
18       A.   I have four people that I talk to on LinkedIn
19   that are in my LinkedIn profile.
20       Q.   So you're connected to only four people on
21   LinkedIn; is that correct?
22       A.   That's correct.
23       Q.   Who are they?
24       A.   I don't see that that's relevant, and I'd

39 (Pages 150 - 153)

1 have to go log into LinkedIn to figure it out. I think
2 it's my --
3     Q. I see you're on a computer. Can you do that?
4     A. I think -- I don't see how it's relevant
5 but --
6     MR. BEAUMONT: So we're not -- if -- that's a
7 document production request, and she has produced her
8 LinkedIn documents, and she's not going to be logging
9 into the accounts at this time.
10     MR. KIMREY: Her computer is a document that
11 she's brought to this deposition. She's performing the
12 search on video right now. It's clear that she can pull
13 this information. I asked who her connections are in
14 LinkedIn. She says she has four, and she's now providing
15 their names.
16 BY THE WITNESS:
17     A. My husband and three friends.
18 BY MR. KIMREY:
19     Q. Who are the friends?
20     A. I'm not going to give you my friends' names.
21 It's none of your business.
22     Q. That's not a basis not to answer, Ms. Lukis.
23     A. There's -- I have no reason to tell you
24 people who I'm connected to on LinkedIn other than my

1 husband. It's not relevant to who I talk to on LinkedIn.
2     Q. You can't refuse to answer based on relevance
3 in a deposition, Ms. Lukis.
4     And, by the way, you may have produced your
5 entire LinkedIn account to us already. I just don't know
6 because we haven't had time to review materials because
7 your counsel produced it way, way, way after we
8 propounded our discovery. So I don't think you have a
9 basis to claim that it's private because I think he may
10 have already given it to us.
11     So who are the friends?
12     A. I'm trying to find it.
13     MR. BEAUMONT: Objection. I object to Ms.
14 Lukis performing any kind of examination into -- a
15 forensic examination on -- using her computer. It's
16 inappropriate, and I don't think that that is
17 appropriate. If she recalls, she can provide that
18 information. She has provided her LinkedIn data
19 download, so I don't think that -- that she needs to be
20 producing -- she needs to be performing any type of
21 search right now. She can say what she has in her
22 memory, and that's the extent of this examination.
23     MR. KIMREY: That's not a rule, Mr. Beaumont,
24 and she has this information available to her in her

1 possession in this deposition, and Ms. Lukis already
2 produced some part of her LinkedIn account to us, and
3 oftentimes connections on LinkedIn are public anyway. I
4 just ask --
5 BY THE WITNESS:
6     A. My settings on my LinkedIn account,
7 everything is private, so no, my -- if you look on the
8 information, that -- Exhibit 6, all it lists is that I
9 have four connections. It does not list their names. If
10 LinkedIn didn't provide you their names, I don't think I
11 should be required to either.
12 BY MR. KIMREY:
13     Q. But I think you may already done so.
14     A. I'm looking at the document that --
15 BY MR. KIMREY:
16     Q. Do you know what you gave us?
17     A. Exhibit --
18     MR. BEAUMONT: I think it's -- I think we need
19 to take a break and I'll -- we'll talk to Ms. Lukis and
20 we'll be right back.
21     MR. KIMREY: Okay.
22     THE VIDEOGRAPHER: Going off the video record
23 at 1:58 p.m.
24

1     (WHEREUPON, a break was
2     taken.)
3     We are back on record at 2:10 p.m.
4     You may proceed.
5 BY MR. KIMREY:
6     Q. Ms. Lukis, who are your connections on
7 LinkedIn?
8     A. A guy named Sam whose last name I don't
9 remember, Chris Minchella and one other. The only reason
10 I know I have three friends on LinkedIn is because it
11 says that there are four connections, one of which is my
12 husband, and then three friends. So I know there's a guy
13 named Sam. I know there is a guy named Chris Minchella.
14 I don't know who the fourth is, and I'm not going to --
15     Q. Is it Samuel Dietzmann?
16     A. Yeah.
17     Q. And is he with Envoy Global something?
18     A. I don't know who he works for.
19     Q. How do you know Samuel Dietzmann?
20     A. He's a friend I met through a social club.
21     Q. What social club?
22     A. Jeeze. I think Minds Eye Society, I think.
23     Q. What is Minds Eye Society?
24     A. A LARP group.

40 (Pages 154 - 157)

Page 158

1  Q.  What?
2  A.  Live action role playing.
3  Q.  How do members of Minds Eye Society live
4  action role play?
5  A.  What do you mean?
6  MR. BEAUMONT:  Objection, form.  I really
7  don't understand the relevance but I guess --
8  BY THE WITNESS:
9  A.  How does a social club that I was in years
10  ago matter?  I'm confused as to the purpose of the
11  question.
12  BY MR. KIMREY:
13  Q.  I don't need to give you the purpose.  You
14  just need to answer the question unless your counsel
15  tells you not to.
16  A.  Then can you clarify the question because I
17  don't understand what you're asking me?
18  Q.  I'm asking how members of Minds Eye Society
19  live action role play.
20  A.  We --
21  MR. BEAUMONT:  Objection, form.
22  BY THE WITNESS:
23  A.  -- used to.  Back when I actually
24  participated in it, we used to meet up at like colleges

Page 159

1  and just hang out.
2  BY MR. KIMREY:
3  Q.  How is that live action role played?
4  A.  We pretended to be vampires.
5  MR. BEAUMONT:  Objection, form.
6  BY MR. KIMREY:
7  Q.  I'm sorry.  I missed that.  You what?
8  A.  We pretended to be vampires.  We played a
9  game called Vampire of the Masquerade.  It's a boring
10  game, and I haven't played it in years.
11  Q.  What is Vampire of the Masquerade?
12  MR. BEAUMONT:  Objection, form.
13  BY THE WITNESS:
14  A.  A live action role playing game.
15  BY MR. KIMREY:
16  Q.  How do you play the game?
17  MR. BEAUMONT:  Objection.  This is -- this is
18  being harassing.  I don't understand any -- if this has
19  some relevance, then I would ask that you explain it.
20  Otherwise, this is just purely -- this is purely
21  harassment, and this is not appropriate for -- for this
22  deposition.
23  MR. KIMREY:  You're wrong.  That's a speaking
24  objection.  It's inappropriate.  It's sanctionable.

Page 160

1  MR. BEAUMONT:  This is harassment.
2  BY MR. KIMREY:
3  Q.  How do you play Vampire of the Masquerade?
4  A.  I already told you.  You make a character.
5  You interact with people.  And I don't see how that has
6  anything to do with the lawsuit with Whitepages.com, what
7  I do with my social -- my social free time.
8  Q.  That's improper testimony from you, Ms.
9  Lukis.  I don't have to explain the basis for my
10  questions, but here this one time I will.
11  You've taken issue with sharing of
12  information about you.  You've taken issue with use of
13  information about you.  You've taken the position that
14  everything about you including astonishingly your name is
15  private.  You have placed at issue in this case every
16  single way in which you share information about yourself
17  including but not limited to LinkedIn.  And what you did
18  with Samuel Dietzmann with live role play and vampires
19  ties into information you shared with others about
20  yourself including the fact that you like to dress up and
21  pretend to be a vampire and that ties in -- in front of
22  other people at colleges, and that ties into what is a
23  reasonable expectation of privacy and what is not.
24  MR. BEAUMONT:  First of all --

Page 161

1  BY MR. KIMREY:
2  Q.  You put this out there on your LinkedIn
3  account.  You produced to me Samuel Dietzmann's name.
4  You've now told me in this deposition that you belong to
5  a club with him called the Minds Eye Society involving
6  live action role play and the game Vampire of the
7  Masquerade which involves you going to colleges with
8  other people, and you are pretending to be a vampire, and
9  I think that is directly relevant to whether you're an
10  adequate class representative here or not.  Do you
11  understand?
12  MR. BEAUMONT:  Blaine, please lower your
13  voice.  That is totally inappropriate.  Ms. Lukis and
14  this lawsuit is concerning her identity and her
15  IDENTITY -- how one plays a LARP or any other game has
16  absolutely nothing to do with her identity and
17  Whitepages' use of her identity, and your questioning
18  down this line is totally inappropriate, totally off
19  base --
20  MR. KIMREY:  You're wrong.  Are you
21  instructing her not to answer?
22  MR. BEAUMONT:  What's the question?
23  MR. KIMREY:  You're entitled to make an
24  objection based on form and that's it, and that's not

41 (Pages 158 - 161)

Page 162

1 what you're doing. You're prolonging this deposition
2 unnecessarily. Your objections are all ill-founded. You
3 actually haven't articulated a single valid objection as
4 to form in this deposition.
5      Are you instructing her not to answer or
6 not?
7      MR. BEAUMONT: What is the question?
8      MR. KIMREY: Read back my question. Well,
9 scratch that.
10 BY MR. KIMREY:
11     Q. How did you engage in Vampire of the
12 Masquerade? When? Where? Who? Why? How and with
13 whom?
14     MR. BEAUMONT: Objection. This is harassment.
15 I instruct her not to answer.
16 BY MR. KIMREY:
17     Q. Are you going to follow your counsel's
18 instruction not to answer?
19     A. Yes.
20     Q. It's completely inappropriate.
21     A. Your line of questioning about my personal
22 activities five years ago is a little bit inappropriate
23 too.
24     Q. What kind of information did you have to

Page 163

1 share to become a member of the Minds Eye Society?
2     A. My name.
3     Q. Anything else?
4     A. Nope.
5     Q. When did you become a member of the Minds Eye
6 Society?
7     A. I don't know.
8     Q. Roughly?
9     A. I have no idea. I haven't interacted with
10 that group in five years. I don't remember when I
11 started. I know when I quit. That's it.
12     Q. When did you quit?
13     A. Yes. I quit five years ago.
14     Q. Why did you quit?
15     A. Because I had a child.
16     MR. BEAUMONT: Objection.
17 BY MR. KIMREY:
18     Q. What did you say?
19     A. Because I had a child, and I was no longer
20 interested in participating.
21     Q. How many colleges did you go to pretending to
22 be a vampire?
23     A. I have no idea.
24     MR. BEAUMONT: Objection. This is harassment,

Page 164

1 Blaine. This is -- this has nothing to do with this
2 case, and I ask you to say why that has something to do
3 with this case and because --
4     MR. KIMREY: I already articulated it, and
5 you're wasting our time.
6     MR. BEAUMONT: I'm not.
7 BY MR. KIMREY:
8     Q. How many colleges did you go to dressed as a
9 vampire?
10     MR. BEAUMONT: Ms. Lukis has a right not to be
11 harassed.
12     MR. KIMREY: I'm not harassing her.
13     MR. BEAUMONT: And that is a harassing
14 question. I instruct her not to answer.
15     MR. KIMREY: It's not harassing.
16 BY MR. KIMREY:
17     Q. Are you following your counsel's instruction
18 not to answer?
19     A. Yes, I am because I view it as harassment.
20 You asking about my private life, and personal life is
21 not relevant to this lawsuit.
22     Q. You placed it at issue in this case, Ms.
23 Lukis, by signing up to be a class rep. And the activity
24 you've engaged in and your conception of what's private

Page 165

1 and public ties directly into what you say you're suing
2 for in this case.
3     So, again, did you go to one college
4 pretending to be a vampire?
5     MR. BEAUMONT: Objection. That is -- that is
6 harassment, and I instruct her not to answer. This is --
7 that has nothing to do with the use of her identity or
8 Whitepages' lack of consent to -- or using her identity
9 in its advertisements, and Ms. Lukis has a right not to
10 be harassed, and I instruct her not to answer.
11 BY MR. KIMREY:
12     Q. Are you going to follow your counsel's advice
13 not to answer?
14     A. Absolutely.
15     Q. How many members did the Minds Eye Society
16 have while you were a member?
17     A. I don't know.
18     Q. Can you estimate?
19     A. Nope.
20     Q. How did you join?
21     A. I don't remember.
22     Q. Was there some kind of ritual to join?
23     MR. BEAUMONT: Objection. That is -- this is
24 harassment, Blaine. There is no -- there is no relevant

42 (Pages 162 - 165)

Page 166

1 basis for that question.
2 BY MR. KIMREY:
3    Q.   You could answer.
4        MR. BEAUMONT:  No.  No.  I -- she should not
5 answer.  She cannot answer.  That is -- I instruct her
6 not to answer that question.  This is harassment on -- of
7 her.
8        MR. KIMREY:  No, it's not, and your
9 instruction is improper.
10 BY MR. KIMREY:
11   Q.   Are you going to follow your counsel's
12 instruction?
13   A.   Yes, I am.
14   Q.   Do you refuse to answer any further questions
15 related to Samuel Dietzmann --
16   A.   I refuse to answer questions about --
17   Q.   -- live action role play --
18   A.   I refuse to answer any questions about the
19 Minds Eye Society, Vampire of the Masquerade, LARP or my
20 connection to Samuel Dietzmann from that from at least
21 five years ago.
22   Q.   Okay.  Who is Mark Owens?
23   A.   An old roommate.
24   Q.   Where did you live with him?

Page 167

1    A.   Reston, Virginia.
2    Q.   Is he at Spark Soft?
3    A.   I have no idea.
4    Q.   Is he one of your connections on LinkedIn?
5    A.   It's probably number three.  I couldn't
6 remember who the third one was.
7    Q.   Have you ever worked at Spark Soft?
8    A.   Nope.
9    Q.   Who is Christopher Minchella?
10   A.   A friend of mine.
11   Q.   Does he work at Micor -- and this may be
12 truncated but it says Anal Managing?
13   A.   It's supposed to be Micor Analytics.
14   Q.   Does he work at Micor Analytics?
15   A.   Yes.
16   Q.   Have you ever worked there?
17   A.   No.
18   Q.   How do you know Christopher?
19   A.   He's a friend.
20   Q.   How did you meet him?
21   A.   I think we met at -- I don't remember.  Known
22 him for almost 15 years.
23   Q.   Have you been a member of any other clubs?
24   A.   Nope.

Page 168

1    Q.   What do you do for fun?
2    A.   Read, watch TV, go to the gym.
3    Q.   Are you a member of any professional
4 societies?
5    A.   Nope.
6    Q.   Have you ever been a member of any
7 professional societies?
8    A.   Nope.
9    Q.   Have you -- beyond pretending to be a vampire
10 have you engaged in any other role play activities?
11   A.   Nope.
12       MR. BEAUMONT:  Objection.  This is harassment.
13       MR. KIMREY:  She already answered.
14 BY MR. KIMREY:
15   Q.   All right.  Let's move onto Exhibit 7 which
16 is 1, sub 7.  Ms. Lukis, this is a Twitter account that
17 we located.  Is your Twitter handle @smlukis?
18   A.   I don't know.  I don't have a -- haven't
19 logged into Twitter in -- other than to try and download
20 a copy of it in months.
21   Q.   But you logged onto it within the past three
22 days; correct?
23   A.   Yeah, to try and download a copy of it, but I
24 haven't gotten it, and I didn't look at what my user name

Page 169

1 is.
2    Q.   Okay.  Could you log in now and confirm that
3 your user name is @smlukis?
4    A.   No.  I'm not going to log into my Twitter
5 account, no.
6    Q.   So you're refusing to log into your Twitter
7 account on the computer that's sitting in front of you to
8 confirm that your handle is @smlukis; is that correct?
9        MR. BEAUMONT:  Blaine, the -- I would like to
10 jump in here.  Counsel, there is -- this is not -- this
11 is a deposition, an oral deposition of Ms. Lukis and
12 the -- this is not an inspection of her Twitter account.
13 We had no idea that you were going to be requesting to --
14 that Ms. Lukis go onto her Twitter account or access her
15 Twitter account prior to this deposition, and it is
16 inappropriate for you to now do that.
17       MR. KIMREY:  That's incorrect.  We actually
18 asked her to pull her entire Twitter account to provide
19 to me in anticipation of this deposition, so this comes
20 to you as no surprise at all, and your behavior in this
21 deposition is inappropriate and frankly sanctionable.
22 BY MR. KIMREY:
23   Q.   Ms. Lukis, is it possible that @smlukis is
24 your Twitter handle?

43 (Pages 166 - 169)

Page 170

1    A.   Probably.
2    Q.   And -- okay.  Let's -- let's flip the page to
3  Page 2.  So this provides a little bit more information
4  about this account.  And it says Stephanie Lukis at the
5  top three tweets.  Do you see that?
6    A.   Yeah.
7    Q.   Stephanielukis@smlukis joined July 2010.
8  Does that roughly correlate with when you joined?
9    A.   I have no idea.
10   Q.   Is it possible that you joined --
11   A.   I guess it's true.
12   Q.   Is it possible that you joined in July of
13  2010?
14   A.   That's what it says, so I guess so.
15   Q.   Is this your Twitter account?
16   A.   I think so, yeah.
17   Q.   And is that based on the tweet which says:
18  "You could win a freakin' house from Trulia.  Remember,
19  prize is awarded in form of $350,000 check."  Did you
20  tweet that?
21   A.   Yeah, probably.
22   Q.   So is this your Twitter account?
23   A.   Looks like it, yeah.
24       MR. BEAUMONT:  Objection, form.

Page 171

1
2  BY MR. KIMREY:
3    Q.   Do you see how on the right-hand side there's
4  a What's Happening column?
5    A.   Yeah.
6    Q.   Do you see among the things listed is NCAA
7  Football live?
8    A.   Yeah.
9    Q.   Demon Deacons at Badgers?
10   A.   Yes.
11   Q.   Do you view that ad to be using your identity
12  without your permission?
13       MR. BEAUMONT:  Objection, form.
14  BY THE WITNESS:
15   A.   I don't see how that ad has anything to do
16  with me or my Twitter account other than it's just
17  talking about NCAA Football.
18  BY MR. KIMREY:
19   Q.   Okay.  So you don't view placement of that ad
20  for NCAA Football as unauthorized use of your identity in
21  violation of the Illinois Right of Publicity Act?
22   A.   It's not using my identity at all.  It is an
23  ad pushed to me not using my identity to talk to NCAA
24  Football.

Page 172

1    Q.   Okay.  So you don't see it as a violation of
2  the Illinois Right of Publicity Act?
3    A.   I haven't read the Illinois Right of
4  Publicity Act, so I wouldn't know.  I'd have to talk --
5  I'd have to ask my attorney what that is.
6    Q.   Okay.  Let's flip to the next page.  This is
7  the Twitter home page.  Do you see how there are links in
8  the middle to the terms of service in the privacy policy?
9    A.   Yes.
10   Q.   In signing up for Twitter did you agree to
11  the terms of service in the privacy policy?
12   A.   Yes.
13   Q.   In using Twitter did you agree to the terms
14  of service in the privacy policy?
15       MR. BEAUMONT:  Objection, form.
16  BY THE WITNESS:
17   A.   Yes.
18  BY MR. KIMREY:
19   Q.   Okay.  Page 4, this is the beginning of the
20  Twitter User Agreement.  Have you ever read the Twitter
21  User Agreement?
22       MR. BEAUMONT:  Objection, form.
23  BY THE WITNESS:
24   A.   Probably not.

Page 173

1
2  BY MR. KIMREY:
3    Q.   But in using Twitter you would agree to it;
4  correct?
5    A.   You have to in order to sign up for it.
6    Q.   Let's go to Page 7.  Do you see 2, "Privacy,"
7  at the top, Ms. Lukis?
8    A.   Yes.
9    Q.   And it says: "Our privacy policy describes
10  how we handle the information you provide to us when you
11  use our services.  You understand that through your use
12  of the services you consent to the collection and use as
13  set forth in the privacy policy of this information,
14  including the transfer of this information to the United
15  States, Ireland and/or other countries for storage,
16  processing and use by Twitter and its affiliates."  Did I
17  read that accurately?
18   A.   Yes.
19   Q.   In using Twitter did you agree to that term?
20   A.   Yes.
21   Q.   Then under 3, second sentence, first
22  paragraph it says: "You should only provide content that
23  you are comfortable sharing with others."  Did I read
24  that accurately?

44 (Pages 170 - 173)

Page 174

1    A.  Yes.
2    Q.  In using Twitter did you agree to that term?
3    A.  Yes.
4        MR. BEAUMONT:  Objection, form.
5  BY MR. KIMREY:
6    Q.  Page 8, at the bottom:  "By submitting," last
7  paragraph break it says:  "By submitting, posting or
8  displaying content on or through the services, you grant
9  us a worldwide non-exclusive royalty-free license with
10  the right to sublicense to use, copy, reproduce, process,
11  adapt, modify, publish, transmit, display and distribute
12  such content in any and all media or distribution channels
13  now known or later developed.  For clarity, these rights
14  include, for example, curating, transforming and
15  translating.  This license authorizes us to make your
16  content available to the rest of the world and to let
17  others do the same.  You agree that this license includes
18  the right for Twitter to provide, promote and improve the
19  services and to make content submitted to or through the
20  services available to other companies, organizations and
21  individuals for the syndication, broadcast, distribution,
22  re-tweet, promotion or publication of such content on
23  other media and services, subject to our terms and
24  conditions for such content use.  Such additional uses by

Page 175

1  Twitter or other companies, organizations or individuals
2  is made with no compensation paid to you with respect to
3  the content that you submit, post, transmit or otherwise
4  make available through the services as the use of the
5  services by you is hereby agreed as being sufficient
6  compensation for the content and grants of rights
7  herein."  Did I read that accurately?
8    A.  Yes.
9    Q.  By using Twitter did you agree to those
10  terms?
11    A.  Yes.
12        MR. BEAUMONT:  Objection, form.
13  BY MR. KIMREY:
14    Q.  Page 9, last paragraph break, first sentence
15  it says:  "In consideration for Twitter granting you
16  access to and use of the services, you agree that Twitter
17  and its third-party providers and partners may place
18  advertising on the services or in connection with the
19  display of content or information from the services
20  whether submitted by you or others."  Did I read that
21  accurately?
22    A.  Yes.
23    Q.  By using Twitter did you agree to that term?
24        MR. BEAUMONT:  Objection, form.

Page 176

1
2  BY THE WITNESS:
3    A.  Yes.
4  BY MR. KIMREY:
5    Q.  Have you had only one Twitter account since
6  the beginning of your life?
7    A.  Yes.
8    Q.  Okay.  Let's turn to Page 15.  Actually,
9  let's turn to Page 22.  So this is the Twitter Privacy
10  Policy.  You see that at the top of the page, Ms. Lukis?
11    A.  Yes.
12    Q.  On Page 23, third bullet point it says:  "We
13  give you control through your settings to limit the data
14  we collect from you and how we use it and to control
15  things like account security, marketing preferences, apps
16  that can access your account and address book contacts
17  you've uploaded to Twitter.  You can also download
18  information you have shared on Twitter."  Did I read that
19  accurately?
20    A.  Yes.
21    Q.  By using Twitter did you agree to that term?
22    A.  Yes.
23        MR. BEAUMONT:  Objection, form.
24  BY MR. KIMREY:

Page 177

1    Q.  What was the answer?
2    A.  Yes.
3    Q.  Have you ever visited settings on Twitter?
4    A.  Yes.
5    Q.  When did you visit settings on Twitter?
6    A.  When I created my account.
7    Q.  Is that the only time you've visited settings
8  on Twitter?
9    A.  As far as I'm aware.
10    Q.  And it was awhile ago.  It was 2010, but to
11  the extent you can recall, how did you set those
12  settings?
13    A.  I thought I had set everything to private,
14  but since you were able to search my profile, apparently
15  not.  Looks like I need to go in and fix it after this.
16    Q.  Let's go to 25.  At 1.2 at the top it says:
17  "Most activity on Twitter is public including your
18  profile information, your time zone and language, when
19  you created your account and your tweets and certain
20  information about your tweets like the date, time and
21  application and version of Twitter you tweeted from."
22  Did I read that accurately?
23    A.  Yes.
24    Q.  Did you agree to that term in using Twitter?

45 (Pages 174 - 177)

1    A.   Yes.

2    Q.   Okay.  Last paragraph break on that page it

3  says: "By publicly posting content when you tweet, you

4  are directing us to disclose that information as broadly

5  as possible including through APIs, in directing those

6  accessing the information through our APIs to do the

7  same.  To facilitate the fast global dissemination of

8  tweets to people around the world we use technology like

9  application programming interfaces, APIs, and embeds to

10  make the information available to websites and others for

11  their use, for example, displaying tweets on a news

12  website or analyzing what people say on Twitter.  We

13  generally make this content available in limited

14  quantities for free and charge licensing fees for

15  large-scale access.  We have standard terms that govern

16  how this data can be used and a compliance program to

17  enforce these terms, but these individuals and companies

18  are not affiliated with Twitter and their offerings may

19  not reflect updates you make on Twitter."  Did I read

20  that accurately?

21    A.   Yes.

22    Q.   In using Twitter did you agree to those

23  terms?

24    A.   Yes.

1    Q.   Page 30 at 2.6 it says -- starting at the

2  middle of the page with:  "Our ad partners."  "Our ad

3  partners and affiliates share information with us such as

4  browser, cookie IDs, mobile device IDs, hashed e-mail

5  addresses, demographic you're interested in, how to view

6  or actions taken on a website or app.  Some of our ad

7  partners, particularly our advertisers, also enable us to

8  collect similar information directly from their website

9  or app by integrating our advertising technology.

10  Information shared by our ad partners and affiliates are

11  collected by Twitter from the websites and apps but ad

12  partners and affiliates may be combined.  The other

13  information you share with Twitter and that Twitter

14  receives of value described elsewhere in our privacy

15  policy."  Did I read that accurately?

16    A.   Yes.

17    Q.   Did you agree to that in using Twitter?

18    A.   Yes.

19        MR. BEAUMONT:  Objection, form.

20  BY MR. KIMREY:

21    Q.   Page 31, 2.9, last paragraph, middle of the

22  paragraph starting with:  "Subject to."  "Subject to your

23  settings, we also use this information in order to infer

24  other information about your identity, for example, by

1  associating your account with hashes of e-mail addresses

2  that share common components with the e-mail address you

3  have provided to Twitter.  We do this to operate and

4  personalize our services.  For example, if you visit

5  websites with sports content on your laptop, we may show

6  you sports-related ads on Twitter for Android, and if the

7  e-mail address associated with your account shares

8  components with another e-mail address such as shared

9  first name, last name or initials, we may later match

10  advertisements to you from advertisers that we're trying

11  to reach e-mail addresses containing those components."

12  Did I read that accurately?

13    A.   Yes.

14    Q.   By using Twitter did you agree to those

15  terms?

16    A.   Yes.

17    Q.   Page 33, 3.1, first sentence:  "We share."

18  "We share or disclose your personal data with your

19  consent or at your direction, such as when you authorize

20  a third party web client or application to access your

21  account or when you direct us to share your feedback with

22  a business." Did I read that accurately?

23    A.   Yes.

24    Q.   Did you agree to that term by using Twitter?

1    A.   Yes.

2        MR. BEAUMONT:  Object to form.

3  BY MR. KIMREY:

4    Q.   34, 3.2, second sentence from the top:  "For

5  example, we use a variety of third-party services to help

6  operate our services such as hosting our various blogs

7  and wikis and to help us understand the use of our

8  services such as Google Analytics.  We may share your

9  private, personal data with such service providers

10  subject to obligations consistent with this privacy

11  policy and any other appropriate confidentiality and

12  security measures and on the condition that the third

13  parties use your private personal data only on our behalf

14  and pursuant to our instructions.  Service providers may

15  use other non-personal data for their benefit."  Did I

16  read that accurately?

17    A.   Yes.

18    Q.   Did you agree to those terms by using

19  Twitter?

20    A.   Yes.

21    Q.   36.  Do you see at 4.1 it says:  "Accessing

22  or rectifying your personal data"?

23    A.   Yes.

24    Q.   And then at 4.2 it refers to Deletion?

46 (Pages 178 - 181)

Page 182

1     A.   Yes.
2     Q.   Other than initially setting your privacy
3   settings when you signed up for Twitter have you reached
4   out to Twitter to rectify any errors to your personal
5   data or delete any of your personal data?
6     A.   No.
7     Q.   Do you plan to do so now?
8     A.   Yeah.
9     Q.   Why?
10    A.   Because I don't like having -- everybody
11  having access to my information.  Probably just going to
12  delete my Twitter account since I have -- I've only
13  posted three times in ten years.
14    Q.   Do you also intend to now delete your
15  LinkedIn account?
16    A.   No.  I'm just going to --
17    Q.   Why not?
18    A.   -- secure the privacy.  Because the privacy
19  settings are set that only people who I know can actually
20  see it, and I also never post on there.
21    Q.   But I could see your account.
22    A.   Then I am going to fix the privacy settings
23  so nobody can see it.
24    Q.   Okay.  Let's go to folder 1/8 being entered

Page 183

1   as Exhibit 8.  Ms. Lukis, this is information we pulled
2   from Facebook.  Do you have a Facebook account?
3     A.   Yes.
4     Q.   We think we've identified your Facebook
5   account, but we'd like for you to confirm it for us.
6          Do you see Stephanie Lukis at the second
7   entry from the top?
8     A.   Yes.
9     Q.   I can see you, and I can see that photo.
10  They appear to be the same person.  Are they?
11    A.   Yes.
12         MR. BEAUMONT:  Object to form.
13  BY MR. KIMREY:
14    Q.   Okay.  So the Stephanie Lukis lives in
15  Chicago, Illinois, that's the second from the top, that
16  is your Facebook account; is that correct?
17    A.   Yes.
18    Q.   Is that your only Facebook account?
19    A.   Yes.
20    Q.   Have you ever had another Facebook account?
21    A.   Nope.
22    Q.   Let's go to Page 3.  The picture on Page 3 of
23  Exhibit 8 is of you; correct?
24    A.   Yes.

Page 184

1     Q.   Did you post that picture yourself?
2     A.   Yes.
3     Q.   When did you post the picture?
4     A.   I don't remember.  Sometime in the past year.
5     Q.   Is that picture publicly available?
6     A.   Yeah, if you guys got it.
7          MR. BEAUMONT:  Object to -- object to the form
8   of the question.  I'm asking for a point of clarification
9   what publicly available means but --
10  BY MR. KIMREY:
11    Q.   You understand what I mean when I say
12  publicly available, Ms. Lukis?
13    A.   Yes, whether or not it's -- my name is
14  searchable.
15    Q.   Okay.  So you said that you signed up for
16  Facebook within the past year.  Did you not have a
17  Facebook account before then?
18    A.   No.  I said I changed the picture in the past
19  year.  I don't remember when I signed up for Facebook.
20    Q.   Oh, roughly when did you sign up?
21    A.   I -- I don't remember.  Sometime in the past
22  15 years.
23    Q.   Okay.  When you signed up, did you work on
24  your privacy settings?

Page 185

1     A.   Yes.
2     Q.   Since you signed up have you altered your
3   privacy settings?
4     A.   Yes.
5     Q.   When?
6     A.   September of 2018.
7     Q.   Why did you do that?
8     A.   Because I was trying to get away from my
9   stalker/abusive mother, and I didn't want her to have
10  access to my phone number anymore because I changed it.
11    Q.   Was your phone number before then available
12  on Facebook?
13    A.   I think so.  I changed all of my privacy
14  settings to make everything completely un -- as
15  restricted as possible.
16    Q.   Before September of 2018 was your Facebook
17  account available to the public?
18    A.   No.
19         MR. BEAUMONT:  Object to form.
20  BY MR. KIMREY:
21    Q.   So before September of 2018 you had invoked
22  some privacy settings and then in September of 2018 you
23  increased the privacy settings; is that right?
24    A.   Yes.

47 (Pages 182 - 185)

Page 186

1     Q.   Other than when you signed up in September of
2  2018 have you ever changed your privacy settings on
3  Facebook?
4     A.   That was the last time I changed my privacy
5  settings.
6     Q.   So during your whole -- during the whole life
7  span of your account on Facebook, you've manipulated your
8  privacy settings twice; is that right?
9          MR. BEAUMONT:  Object to form.
10 BY THE WITNESS:
11    A.   Yes.
12 BY MR. KIMREY:
13    Q.   Page 5.  This is the home page, Ms. Lukis,
14 for Facebook.  You can see, you know, you can enter your
15 e-mail and phone number and your password to log in.  Do
16 you see down at the bottom there are a series of words
17 and the -- so in the footer -- go to the footer.  In
18 the -- the last word in the second line is "Privacy."  Do
19 you see that?
20    A.   Yes.
21    Q.   And then in the next line the second to the
22 last word is "Terms."  Do you see that?
23    A.   Yes.
24    Q.   Are you aware that Facebook has a privacy

Page 187

1  policy?
2     A.   Yes.
3     Q.   Are you aware that Facebook has terms?
4     A.   Yes.
5     Q.   How are you aware that Facebook has a privacy
6  policy?
7     A.   Because I -- it comes up when you change your
8  privacy settings.
9     Q.   Okay.  Any other reason?
10    A.   No.
11    Q.   How are you aware that Facebook has terms?
12    A.   Because when you sign up for it, you have to
13 click a button that says terms -- do you accept the terms
14 of service, same with the privacy settings.
15    Q.   And did you click the button for both?
16    A.   Yes.  Can't sign up without doing it.
17    Q.   Okay.  Go to Page 8.  Do you see number 2,
18 "How our services are funded"?
19    A.   Yes.
20    Q.   First paragraph:  "Instead of paying to use
21 Facebook and the other products and services we offer, by
22 using the Facebook products covered by these terms, you
23 agree that we can show you ads that businesses and
24 organizations pay us to promote on and off the Facebook

Page 188

1  Company Products.  We use your personal data such as
2  information about your activity and interests to show you
3  ads that are more relevant to you."  Did I read that
4  accurately?
5     A.   Yes.
6     Q.   By using Facebook did you agree to those
7  terms?
8     A.   Yes.
9     Q.   Page 10.  Do you see in the middle number 3:
10 "The permissions you give us"?
11    A.   Yes.
12    Q.   It says:  "We need certain permissions from
13 you to provide our services."  Then there's subject
14 matter headings.  1:  "Permission to use content you
15 create and share."  2 on the next page:  "Permission to
16 use your name, profile, picture and information about
17 your actions with ads and sponsored content," and 3:
18 "Permission to update software to use or download."  Did
19 you agree to all of the terms at 1, 2 and 3 by using
20 Facebook?
21         MR. BEAUMONT:  Object to form.
22 BY THE WITNESS:
23    A.   Yes.
24 BY MR. KIMREY:

Page 189

1     Q.   Page 14.  First full paragraph at Number 6 it
2  says these -- well, second sentence.  "All of our rights
3  and obligations under these terms are freely assignable
4  by us in connection with a merger, acquisition or sale of
5  assets or by operation of law or otherwise."  Do you see
6  that?
7     A.   Yes.
8     Q.   Did I read that accurately?
9     A.   Yes.
10    Q.   By using Facebook did you agree to that term?
11         MR. BEAUMONT:  Object to form.
12 BY THE WITNESS:
13    A.   Yes, but I also agreed to the terms of --
14 term of the first sentence of that paragraph.
15 BY MR. KIMREY:
16    Q.   Which says:  "These terms do not confer any
17 third-party beneficiary rights"?
18    A.   Yes.
19    Q.   But you also agreed to the second sentence;
20 correct?
21    A.   Yes.
22    Q.   Let's go to 16.  This is the Data Policy for
23 Facebook.  Can you see it says "Data Policy" at the top
24 of this, Ms. Lukis?

48 (Pages 186 - 189)

Page 190

1    A.   Yes.
2    Q.   And it says that: "This policy describes the
3  information we process to support Facebook, Instagram,
4  Messenger and other products and features offered by
5  Facebook."  Did I read that accurately?
6    A.   Yes.
7    Q.   Do you have an Instagram account?
8    A.   No.
9        MR. BEAUMONT:  Object to form.
10 BY MR. KIMREY:
11   Q.   Have you ever had an Instagram account?
12   A.   No.
13   Q.   Do you use Facebook Messenger?
14       MR. BEAUMONT:  Object to form.
15 BY THE WITNESS:
16   A.   I don't know.  I don't have it on my phone,
17 so --
18 BY MR. KIMREY:
19   Q.   Are you aware of ever having used Facebook
20 Messenger?
21       MR. BEAUMONT:  Object to form.
22 BY THE WITNESS:
23   A.   Possibly.
24 BY MR. KIMREY:

Page 191

1    Q.   Did you search any messages to or from you
2  related to Messenger for anything responsive to our
3  discovery in this case?
4    A.   No.
5    Q.   Let's go to Page 20.  Right before the first
6  paragraph ends at the last sentence of that paragraph it
7  says: "We also receive information about your on-line
8  and off-line actions and purchases from third-party data
9  providers who have the rights to provide us with your
10 information.  Partners receive your data when you visit
11 or use their services or through third parties they work
12 with.  We require each of these partners to have lawful
13 rights to collect, use and share your data before
14 providing any data to us.  Learn more about the types of
15 partners we receive data from."  Did I read that
16 accurately?
17   A.   Yes.
18   Q.   Did you agree to that by using Facebook?
19   A.   Yes.
20       MR. BEAUMONT:  Object to form.
21 BY MR. KIMREY:
22   Q.   Have you ever clicked on that learn more
23 link?
24   A.   No.

Page 192

1    Q.   Let's go to Page 24.  Do you see at the
2  bottom where the paragraph begins with: "Public
3  information," Ms. Lukis?
4    A.   Yes.
5    Q.   It says: "Public information can be seen by
6  anyone on or off our products including if they don't
7  have an account.  This includes your Instagram user name,
8  any information you share with a public audience,
9  information in your public profile on Facebook and
10 content you share on a Facebook page, public Instagram
11 account or any other public forum such as Facebook
12 Marketplace.  You, other people using Facebook and
13 Instagram, and we can provide access to or send public
14 information to anyone on or off our products, including
15 other Facebook Company Products, in search results or
16 through tools and APIs.  Public information can also be
17 seen, accessed, reshared and downloaded through
18 third-party services such as search engines, APIs and
19 off-line media such as TV and by apps, websites and other
20 services that integrate with our products."  Did I read
21 that accurately?
22   A.   Yes.
23   Q.   Did you agree to those terms in using
24 Facebook?

Page 193

1    A.   Yes.
2        MR. BEAUMONT:  Object to form.
3  BY MR. KIMREY:
4    Q.   Do you use Facebook Marketplace?
5    A.   No.
6    Q.   Have you ever used Facebook Marketplace?
7    A.   No.
8    Q.   As to Craigslist, do you have only one
9  Craigslist account?
10   A.   Yes.
11   Q.   Have you always just had one Craigslist
12 account?
13   A.   Yes.
14       MR. BEAUMONT:  Object to form.
15 BY MR. KIMREY:
16   Q.   Did you search your Craigslist account for
17 any documents responsive to our discovery in this
18 litigation?
19   A.   No.
20   Q.   Do you ever use eBay?
21   A.   I did way back in the day when it was --
22 first came out, but I haven't used it in probably years.
23   Q.   Do you have an eBay account?
24   A.   I think so.

49 (Pages 190 - 193)

Page 194

1 Q. Did you search your eBay account for any
2 documents that may be responsive to our discovery in this
3 litigation?
4 A. No.
5 Q. Do you have an Amazon account?
6 A. Yes.
7 Q. Have you ever had more than one Amazon
8 account?
9 A. No.
10 Q. Have you searched your Amazon account for any
11 information responsive to our discovery in this case?
12 A. No.
13 MR. BEAUMONT: Object to form.
14 BY MR. KIMREY:
15 Q. Do you have a Yelp account?
16 A. No.
17 Q. Have you ever had a Yelp account?
18 A. No, not to my knowledge.
19 Q. Do you have a DoorDash account?
20 A. No.
21 Q. Have you ever had a DoorDash account?
22 A. Nope.
23 Q. Do you have an Uber account?
24 A. Yes.

Page 195

1 Q. Have you had only one Uber account during
2 your entire life?
3 A. Yes.
4 Q. Have you searched your Uber account for
5 documents responsive to our discovery in this litigation?
6 A. No.
7 Q. Do you have a Lyft account?
8 A. No.
9 Q. Have you ever had a Lyft account?
10 A. No.
11 Q. Do you have a Zoom account?
12 A. No --
13 Q. Have you ever had a --
14 A. -- not until I signed up for this.
15 Q. Before today had you ever used Zoom?
16 A. No.
17 Q. Do you have a Skype account?
18 A. No, I don't think so.
19 Q. Have you ever had a Skype account?
20 A. I don't know.
21 Q. If you had a Skype account, have you searched
22 it for any documents potentially responsive to our
23 discovery in this litigation?
24 A. No.

Page 196

1 Q. Do you have a GrubHub account?
2 A. No.
3 Q. Have you ever had a GrubHub account?
4 A. No.
5 Q. Do you have an Angie's List account?
6 A. No.
7 Q. Have you ever had an Angie's List account?
8 A. No.
9 Q. Do you have a MySpace account?
10 A. That's ancient. Probably.
11 Q. Have you searched your MySpace account for
12 any information that might be responsive to our discovery
13 in this litigation?
14 A. No.
15 MR. BEAUMONT: Object to form.
16 BY MR. KIMREY:
17 Q. Do you have an Outlook account?
18 A. A what?
19 Q. An Outlook, Microsoft Outlook account.
20 A. No.
21 Q. Have you ever had a Microsoft Outlook
22 account?
23 A. No. Actually, through -- through an old -- a
24 job back in 2005 I think I had an Outlook account.

Page 197

1 Q. Okay. Beyond that have you had one?
2 A. No.
3 Q. Any more recently?
4 A. No.
5 Q. Page 32. At the top it says, Ms. Lukis: "We
6 share information globally, both internally within the
7 Facebook Companies and externally with our partners and
8 with those you connect and share with around the world in
9 accordance with this policy." Did I read that
10 accurately?
11 A. Yes.
12 Q. Did you agree to that in using Facebook?
13 A. Yes.
14 Q. Okay. Next exhibit, and this is folder 1,
15 sub 9 which will be marked as Exhibit 9.
16 MR. TOTH: You have two things in that
17 folder. Which one do you want to mark as Exhibit 9? All
18 right. You want to make it 9A and 9B?
19 MR. KIMREY: Oh, yes, let's do that. So this
20 will be -- the PDF is 9A.
21 BY MR. KIMREY:
22 Q. Okay. This is a screen capture for uTube
23 upload by a Stephanie Lukis. Have you ever used uTube,
24 Ms. Lukis?

50 (Pages 194 - 197)

Page 198

1      A.   Yes.
2      Q.   Do you have a YouTube account?
3      A.   Yes.
4      Q.   Did you search your uTube account for
5  information potentially responsive to our discovery in
6  this case?
7      A.   No.
8      Q.   This appears to -- it's a screen capture.
9  I'm going to play the video for you, but it says: "Asked
10  for a supervisor at Com Ed," and it says: "Spoke with a
11  customer service agent who couldn't help, so I asked to
12  speak with a supervisor.  Have been on hold for more than
13  45 minutes waiting for a human being."  Did you post that
14  post?
15      A.   I don't recall.
16      Q.   Is it possible that you posted this post?
17      A.   It's possible.
18         MR. BEAUMONT:  Object to form.
19         MR. KIMREY:  Pull up 9B and go ahead and mark
20  it, the video.
21  BY MR. KIMREY:
22      Q.   Okay.  So this is the video for which we just
23  had a screen capture in 9A.
24         Please play the video.

Page 199

1
2              (WHEREUPON, the following
3              proceedings were played during
4              the video:)
5         UNIDENTIFIED SPEAKER:  "Now hold for the next
6  available representative."
7              (Music playing.)
8  BY MR. KIMREY:
9      Q.   Does that refresh your recollection about
10  whether you made this post?  And we can play it again if
11  you want.
12      A.   Yeah, play it again because I don't --
13              (WHEREUPON, the following
14              proceedings were played during
15              the video:)
16         UNIDENTIFIED SPEAKER:  "Now hold for the next
17  available representative."
18              (Music playing.)
19  BY MR. KIMREY:
20      Q.   So you can see that the carrier is Sprint?
21      A.   Yeah.
22      Q.   This post occurred six years ago, so I think
23  that correlates with who you said was your carrier at
24  that point in time?

Page 200

1         MR. BEAUMONT:  Object to form.
2  BY MR. KIMREY:
3      Q.   Do you remember posting that video?
4      A.   No.
5      Q.   Is it possible that you posted that video?
6      A.   Yeah, I guess.
7         MR. BEAUMONT:  Object to form.
8  BY MR. KIMREY:
9      Q.   Okay.  But regardless, you have used uTube;
10  correct?
11      A.   Yes.
12      Q.   And in using uTube did you agree to uTube's
13  terms and conditions?
14      A.   Yes.
15      Q.   In using uTube did you agree to uTube's
16  privacy policy?
17      A.   Yes.
18      Q.   Are you aware that uTube is owned by Google?
19      A.   Yes.
20      Q.   Do you recall what information you provided
21  to uTube?
22      A.   I think an e-mail address.
23         MR. BEAUMONT:  Object to form.
24  BY MR. KIMREY:

Page 201

1      Q.   What e-mail address?
2      A.   I don't know.
3      Q.   Have you provided any other information to
4  uTube?
5      A.   No.
6      Q.   Let's turn to Page 6 of 9A.  Actually, let's
7  turn to Page 4 of 9A.  This is the uTube Terms of
8  Service, Ms. Lukis.  Have you ever read these before?
9      A.   Nope.
10      Q.   Do you have any reason to doubt that these
11  are the uTube Terms of Service?
12      A.   No.
13         MR. BEAUMONT:  Object to form.
14  BY MR. KIMREY:
15      Q.   Okay.  Page 5 -- Page 6 I mean.  You'll see
16  in the middle there's subject matter headings that say
17  "License To uTube, License To Other Uses, Duration Of
18  License, Right To Monetize and Removing Your Content."
19  Do you see that?
20      A.   Yes.
21      Q.   Did you agree to those terms in using uTube?
22      A.   Yes.
23      Q.   Let's go to 9, Page 9 of 9A.  This is the
24  Google Privacy Policy, Ms. Lukis, which applies to uTube

51 (Pages 198 - 201)

Page 202

1 because Google owns uTube. Do you have any reason to
2 doubt that this is the Google Privacy Policy?
3     A. No.
4     Q. In using uTube did you agree to this policy?
5     A. Yes.
6     MR. BEAUMONT: Object to form.
7 BY MR. KIMREY:
8     Q. Let's go to 21. So, Ms. Lukis, you testified
9 that you have a Gmail account which relates to Google
10 Drive which also relates to uTube. You didn't testify
11 about that. I'm saying that because uTube's owned by
12 Google. What I'd like to refer you to is the bottom of
13 21 where it says: "You can export a copy of your
14 information or delete it from your Google account at any
15 time." Do you see that?
16     A. Yes.
17     Q. So in responding to discovery in this case,
18 did you export any information from Google to potentially
19 produce in the case?
20     A. No.
21     Q. One thing I caution you about is, and your
22 counsel can advise you on this, but you have the duty to
23 retain certain things, so one thing I wouldn't want you
24 to do is go out and start deleting a bunch of stuff

Page 203

1 without somehow saving it for purposes of production in
2 the litigation. Does that make sense?
3     A. Yes.
4     Q. Okay. Let's go to 26. Do you see where it
5 says at the top of the page: "Parties with whom
6 information may be shared"?
7     A. Yes.
8     Q. And a few lines down it says: "Third parties
9 to whom you consent to sharing your information such as
10 services that integrate with Google Services. You can
11 review and manage third-party apps and sites with access
12 to data in your Google account." Did I read that
13 accurately?
14     A. Yes.
15     Q. Have you ever managed your settings in your
16 Google account?
17     A. Yes.
18     Q. When did you do that?
19     A. I don't recall.
20     Q. How many times have you done it?
21     A. I have no idea.
22     Q. Since when have you had a Google account?
23     A. I'd say -- I don't -- early 2000s.
24     Q. Okay. Do you know actually how many times

Page 204

1 you changed the settings?
2     A. Not really.
3     Q. What's the -- so both of your cell phones
4 that we talked about today, those are on the Android
5 operating system; is that right?
6     A. Yes.
7     Q. Are you aware that Android is owned by
8 Google?
9     A. Yes.
10     Q. Did you try to pull any Android data in
11 response to discovery by us in this case?
12     A. No.
13     Q. Have you ever had an Apple device?
14     A. No.
15     Q. 36, Page 36. Do you see where it says:
16 "Phone number"?
17     A. Yes.
18     Q. It says: "If you add your phone number to
19 your account, it can be used for different purposes
20 across Google Services depending on your settings. For
21 example, your phone number can be used to help you access
22 your account, if you forget your password, help people
23 find and connect with you and make the ads you see more
24 relevant to you." Did I read that accurately?

Page 205

1     A. Yes.
2     Q. By using Goggle's Services did you agree to
3 that term?
4     A. Yes.
5     Q. Do you see where it says: "Learn more"?
6     A. Yes.
7     Q. Have you ever clicked on that link?
8     A. I don't recall.
9     Q. Page 38. Do you know what information you've
10 provided to any company owned by Google?
11     A. My name and phone number.
12     Q. Have you provided any physical addresses?
13     A. I don't think so.
14     Q. When you say a phone number, do you mean land
15 line, mobile phone --
16     A. My cell phone.
17     Q. -- or both?
18     A. Just my cell phone number.
19     Q. Would that be both of your cell phone
20 numbers?
21     A. Yes.
22     Q. Do you see where it says: "Third parties" at
23 the bottom?
24     A. Yes.

52 (Pages 202 - 205)

Page 206

1  Q.  It says: "For example, we process your
2  information to report use statistics to rights holder
3  about how their content is used in our services. We may
4  also process your information if people search for your
5  name, and we display search results for sites containing
6  publicly information --" I'm sorry -- "public information
7  about you." Did I read that accurately?
8      MR. BEAUMONT: Object to form.
9  BY THE WITNESS:
10     A.  Close enough. You missed publicly available
11 information.
12 BY MR. KIMREY:
13     Q.  Then I corrected myself; correct?
14     A.  Yeah.
15     Q.  Did you agree to that term in using Goggle's
16 services?
17     A.  Yes.
18     Q.  Then at Page 39 under: "Your activity on
19 other sites and apps --" do you see that?
20     A.  Yes.
21     Q.  It says: "This activity might come from your
22 use of Google services like from syncing your account
23 with Chrome." Do you use Chrome?
24     A.  Yes.

Page 207

1  Q.  Do you have a Chromebook?
2  A.  No.
3  Q.  Did you search any of your internet search
4  engine search history in responding to our discovery in
5  this case?
6  A.  No.
7  Q.  Okay. Backing up, under "Your activity on
8  other sites and apps" it says: "This activity may have
9  come from your use of Google Services like from syncing
10 your account with Chrome or your visits to sites and apps
11 that partner with Google. Many websites and apps partner
12 with Google to improve their content and services. For
13 example, a website might use our advertising services
14 like AdSense or analytics tools like Google Analytics or
15 it might embed other content such as videos from uTube.
16 These services may share information about your activity
17 with Google. Depending on your account settings and the
18 products in use, for instance, when a partner uses Google
19 Analytics in conjunction with our advertising services,
20 this data may be associated with your personal
21 information." Did I read that accurately?
22     A.  Yes.
23     Q.  By using Google Services did you agree to
24 that term?

Page 208

1  A.  Yes.
2  Q.  Next exhibit, folder 1, sub 10. This will be
3  marked as Exhibit 10.
4  A.  Good grief.
5  Q.  So this, Ms. Lukis, is a search we performed
6  on January 4th of 2021 on Google of Stephanie Lukis. So
7  you can see the first page is the Google home page. Do
8  you see that?
9  A.  Yes.
10     Q.  And do you see at the bottom it says -- let's
11 go to the home page. Is this Page 1?
12     MR. TOTH: Yes.
13 BY MR. KIMREY:
14     Q.  Okay. We'll just go with it. Okay. So Page
15 1 is the search result, and you can see, for instance,
16 the first thing that pops up is your lawsuit. Do you see
17 that?
18     A.  Yes.
19     Q.  Okay. And, you know, some of these -- we
20 went five pages in, but some of these search returns
21 relate to you, some of them don't, which is typically the
22 case when you search someone's name. Do you view the,
23 you know, use of your name in connection with -- do you
24 see the Google logo up in the upper left-hand corner?

Page 209

1  A.  Yes.
2  Q.  Do you view this as Google's using your
3  identity to promote its services without your consent?
4  A.  I'm not sure how to answer that question.
5  Q.  Does it bother you that Google is promoting
6  itself with its logo in connection with your name?
7  A.  I mean it's annoying but you can't --
8  Google's basically the one place that you can't get your
9  name off of.
10     Q.  Are there other search engines where you
11 can't get your name off of?
12     A.  I don't know. I don't use any other search
13 engines.
14     Q.  Is Chrome a search engine?
15     A.  No. It's a web browser.
16     Q.  Okay. If you search in a Chrome web browser,
17 do you see the same Google logo or a Google logo because
18 they're constantly changing?
19     A.  When you open Chrome, it -- if you haven't
20 changed your home page, you do.
21     Q.  Do you see -- Let me strike that.
22     So you prefer -- you would prefer if it could
23 be done that Google's logo not be posted in connection
24 with your name; is that right?

53 (Pages 206 - 209)

Page 210

1    A.   I'd prefer it, yeah but --
2    Q.   Do you feel like Goggle's doing this harms
3  you in any way?
4    A.   All it is providing is things -- is publicly
5  available information where my name is listed.  It's not
6  providing any -- it's not providing my phone number.
7  It's not providing my mailing address.  It's not
8  providing my e-mail address, so this is not -- this is
9  not similar in any way, shape or form to Whitepages.
10    Q.   But doesn't Google link to services like
11  Whitepages when you search your name?
12    A.   Yes.  It lists it as ads.
13    Q.   And so isn't Google complicit in unauthorized
14  use of your name?
15    A.   I don't know how to answer.
16       MR. BEAUMONT:  Object to form.
17  BY MR. KIMREY:
18    Q.   So, for instance, if you look at Page 4 --
19  let's go to Page 4 of this exhibit.  You can see a little
20  bit up from the middle of the page one of the search
21  returns is Whitepages.  So this search return one could
22  argue, I'm not taking a position on this, but this search
23  return is advertising -- so let's back up so we can see
24  the Google search.  Is that advertising Google as well as

Page 211

1  Whitepages?
2       THE VIDEOGRAPHER:  Excuse me, counsel.  Excuse
3  me, counsel.  Your microphone --
4  BY MR. KIMREY:
5    Q.   Do you agree with that?
6       THE VIDEOGRAPHER:  You guys are breaking up.
7  BY THE WITNESS:
8    A.   I don't -- sorry.
9       THE VIDEOGRAPHER:  Sorry, counsel.  Your mike
10  was breaking up during the questioning.  Can you repeat?
11  BY MR. KIMREY:
12    Q.   Yeah.  So do you view given the search return
13  that Google and Whitepages are using your name to
14  advertise their services?
15       MR. BEAUMONT:  Object to form.
16  BY THE WITNESS:
17    A.   I wouldn't say that Google's doing it but
18  Whitepages definitely does.
19  BY MR. KIMREY:
20    Q.   Why do you draw that distinction?
21    A.   Because Google is just a generic search
22  engine that pulls it from everywhere.  Whitepages pulls
23  specific information directly about me and sells that
24  information in order -- you log in and buy that

Page 212

1  information.
2  BY MR. KIMREY:
3    Q.   But Google is pulling information about you
4  when you search your name; correct?
5       MR. BEAUMONT:  Objection, form.
6  BY THE WITNESS:
7    A.   It's pulling information about my name, but
8  it's not monetizing it.  There's no -- you click on any
9  of these locations, it's not going to say hey, you've got
10  to pay in order to get the information about the court
11  case.
12  BY MR. KIMREY:
13    Q.   Well, some of them will and some of them
14  won't.  Do you know how Google makes money?
15    A.   Probably through ads.
16    Q.   Okay.  So if they serve ads in connection
17  with your name, are they using your name without your
18  consent under the Illinois Right of Publicity Act?
19       MR. BEAUMONT:  Object to form.
20  BY THE WITNESS:
21    A.   I've -- I have not read the law, so I really
22  wouldn't know how to answer that question.
23  BY MR. KIMREY:
24    Q.   Okay.  So let's go back to the beginning,

Page 213

1  number 1.  The first search return when you searched your
2  name on Google at this particular point in time was
3  Casetext.com.  Do you see that?
4    A.   Yes.
5    Q.   And it appears from the summary that the
6  posting is some kind of posting related to your lawsuit;
7  right?
8    A.   Yes.
9    Q.   Does the use of your name in connection with
10  this Casetext.com posting bother you?
11    A.   It bothers me, but it's -- it's not --
12  Casetext.com as far as I'm not aware is not listed here
13  as an ad where if they're being monetizing using my name
14  with an article about the court case.
15    Q.   Okay.
16    A.   If it said --
17    Q.   Does Casetext.com sell advertising, do you
18  know?
19    A.   Is what?
20    Q.   Does Casetext.com sell advertising?
21    A.   I have no idea.
22    Q.   Do you know if Casetext.com makes money?
23    A.   No.  I've never been on the website.
24    Q.   The next return is the CookCountyrecord.com.

54 (Pages 210 - 213)

Page 214

1 Do you see that?
2    A.   Yes.
3    Q.   And, again, this appears to be a reference to
4 your lawsuit; right?
5    A.   Yes.
6    Q.   Does this search return in connection with
7 the use of your name bother you?
8    A.   It's not monetizing use of my name.  It's
9 just a news article about the Whitepages Instant
10 CheckMate lawsuits.
11   Q.   Do you know whether the Cook County Records
12 sells ads?
13   A.   I have no idea.  Never been on the website.
14   Q.   Do you know whether the Cook County Records
15 sells subscriptions?
16   A.   I don't know.
17        MR. KIMREY:  Can we pull up the web Live and
18 run that URL for Ms. Lukis?
19        MR. TOTH:  Sure.  Just give me one second.
20             (Brief pause.)
21        MR. KIMREY:  Michael, should we go off --
22 there we go.  Okay.
23 BY MR. KIMREY:
24   Q.   So Michael just clicked on that link for the

Page 215

1 Cook County Record, and we can now see the article.  Do
2 you see that, Ms. Lukis?
3    A.   Yes.
4    Q.   It says -- the headline is:  "Judge Okays
5 Class Actions to Continue Versus Whitepages Instant
6 CheckMate Accusing Sites of Using People's Identities in
7 Ads."  Do you see that?
8    A.   Yes.
9    Q.   And do you see that there are ads on the
10 right-hand side of this page posted by the Cook County
11 Record?
12   A.   Yes.
13   Q.   And do you think it's fair to assume that the
14 Cook County Record makes money off of those ads?
15        MR. BEAUMONT:  Form.
16 BY THE WITNESS:
17   A.   Yes.
18 BY MR. KIMREY:
19   Q.   Did you say yes?
20   A.   Yes.
21   Q.   So is the Cook County Record using your
22 identity to sell ads on the Cook County Record?
23        MR. BEAUMONT:  Form.
24 BY THE WITNESS:

Page 216

1    A.   It's not using my identity.  It's just
2 using -- it's just a news article.  It could -- there
3 is -- as it's obvious on there, in April of 2020, they
4 had more than just this ad on there or just -- I'm
5 sorry -- just this news article, an article on there, so
6 it's not using my identity to sell ads.  It's using a
7 news article to sell ads.  My name just happens to be in
8 it.
9 BY MR. KIMREY:
10   Q.   Okay.  Is -- Scratch that.
11        So you're perfectly fine with the Cook County
12 Record selling ads in connection with this article --
13        MR. BEAUMONT:  Object to form.
14 BY MR. KIMREY:
15   Q.   -- is that right?
16   A.   It has nothing to do with me.  Every news
17 article they have will have ads on it.  It is not
18 directly using my name, my cell phone number, my -- any
19 home phone number.
20   Q.   Well, your name is in the article.  Can we
21 scroll down to the first reference to Ms. Lukis in the
22 article?
23        So second paragraph:  "Robert Fisher and
24 Stephanie Lukis both sued instant CheckMate," et cetera.

Page 217

1 It's definitely using your name --
2    A.   But it's not profiting --
3    Q.   -- right?
4    A.   It's not profiting off of my name.  It's
5 profiting off of their content which is just a news
6 article.  It's not specifically my -- by using my name
7 they're getting a -- they're making a profit.  It's just
8 a news article.  It's not --
9    Q.   By using your name --
10   A.   -- using my name you have to sign in.
11        MR. BEAUMONT:  Hold on.  Counsel, please let
12 her finish her response.
13 BY MR. KIMREY:
14   Q.   So how does the news article --
15        MR. BEAUMONT:  Counsel --
16 BY MR. KIMREY:
17   Q.   Why is the --
18        MR. BEAUMONT:  Do you have an additional
19 response?
20        MR. KIMREY:  Let me finish.  Let me finish.
21        MR. BEAUMONT:  No.  No.  No.
22        MR. KIMREY:  Let me finish.
23        MR. BEAUMONT:  Counsel --
24 BY MR. KIMREY:

55 (Pages 214 - 217)

Page 218

1    Q.   How is the news article different from the
2 data made available by Whitepages?
3    A.   Like I said, this website is not using my
4 specific name giving people access to my address, my
5 phone numbers, contact information about me in order to
6 be able to sell ads.  All it has is my name on there on a
7 news article.  It's completely different than what
8 Whitepages does.
9    Q.   Which is what?
10    A.   Provides my personal information, my address
11 and -- my address, current address and every address I've
12 ever lived at, a list of phone numbers that are connected
13 with my name.  It lists off whether I've had a bankruptcy
14 or whether I've had traffic tickets.  What -- that
15 information is what you guys -- what Whitepages makes
16 their money off of by making people pay for that -- pay
17 to access my full unredacted file.  This is not making
18 money directly off of my name.  This is just a news
19 article my name happens to be a part of.
20    Q.   Let's go onto folder 1.11.
21       MR. BEAUMONT:  Counsel, we've been going for
22 quite a while now.  I think it may be appropriate to take
23 a five-minute break.
24       MR. KIMREY:  Sure.

Page 219

1       THE VIDEOGRAPHER:  Okay.  Going off the video
2 record at 3:31 p.m.
3              (WHEREUPON, a break was
4              taken.)
5       We're back on the record at 3:40 p.m.
6       You may proceed.
7       MR. KIMREY:  Okay.  I'm going to withdraw
8 Exhibit 11, what's up on the screen, so let's deem that
9 withdrawn, and I'm subbing in another 11 which in the
10 folder structure is 1 11.5, so 11.5.  So it's at -- 1
11 11.5 is now becoming official Exhibit 11.
12 BY MR. KIMREY:
13    Q.   Okay.  Ms. Lukis, this is a search on
14 January 4th of 2021.  Can you see the date up in the
15 upper left-hand corner --
16    A.   Now I can.
17    Q.   -- January 4th, 2021?  Am I reading that
18 accurately?
19    A.   Yes.
20    Q.   Of Stephanielukis.  Those two words together,
21 and then the return on that search on Whitepages.com.
22 Are any of the people listed here as far as you can tell
23 you?
24    A.   Nope.

Page 220

1    Q.   Did you request that your identity or your
2 profile be removed from Whitepages.com?
3    A.   No.
4    Q.   Have you ever visited other than sitting in
5 this deposition Whitepages.com?
6    A.   Not to my knowledge.  Wait.  No.  Not to my
7 knowledge.
8       MR. BEAUMONT:  Can you repeat the question?  I
9 didn't hear the question.
10       MR. KIMREY:  I asked Ms. Lukis whether she had
11 ever visited Whitepages.com.
12 BY THE WITNESS:
13    A.   I'm not sure.
14 BY MR. KIMREY:
15    Q.   Is it possible that you have visited
16 Whitepages.com before?
17    A.   I heard -- I've heard about it.  I found out
18 about it through my mother but -- I'm trying to think.  I
19 can't recall.
20    Q.   Have you searched your browser history on
21 your digital devices to see if and when you visited
22 Whitepages.com?
23    A.   No.
24    Q.   In your or your counsel's written discovery

Page 221

1 responses -- let me back up.
2       We propounded interrogatories, document
3 requests and requests to admit to you in the case.  Were
4 those shared with you?
5    A.   I believe a copy of the original search for
6 Whitepages.com for my name was.
7    Q.   Well, so here's my question.  We served
8 requests to admit on your counsel asking for various
9 admissions.  Were those shared with you?
10    A.   The -- I've gotten copies of the -- the court
11 documents.  I don't know.  Hold on.  I don't even know.
12 I'm not sure.  I -- I don't recall.
13    Q.   Were our interrogatories shared with you?
14    A.   I -- I believe so.
15    Q.   Were our document requests shared with you?
16    A.   Yes.
17    Q.   Did you provide input on the request to
18 admit, interrogatory and document request responses?
19    A.   Yes.
20    Q.   Okay.  In your discovery responses, you
21 indicated that you had, indeed, visited Whitepages.com
22 before?
23    A.   Again, I -- I think so.  I just -- I just
24 don't remember at the moment.

56 (Pages 218 - 221)

Page 222

1   Q.   If you said in your discovery responses that
2 you had visited Whitepages.com before, is that the truth?
3   A.   Then I guess I visited Whitepages.com before.
4 Again, it's been -- it's been six hours, and I'm just
5 getting tired, so sorry. I'm -- yeah, I think I've seen
6 it before. I think I've been on it before but, again,
7 it's -- yeah.
8   Q.   In visiting Whitepages.com did you agree to
9 the terms of service?
10   A.   No.
11   Q.   Why not?
12   A.   Because I never registered for an account,
13 and I never -- it -- if you don't sign up for an account,
14 you don't get -- you don't have to agree to the terms of
15 service.
16   Q.   In visiting Whitepages.com did you agree to
17 the privacy policy?
18   A.   No.
19   Q.   How many times did you visit Whitepages.com?
20   A.   From what I can recall, once when I found out
21 that the web page existed.
22   Q.   You said your mom told you it existed. What
23 did she say to you?
24   A.   I had changed my phone number after I moved

Page 223

1 back to Chicago to get away from her, and she ended up
2 calling me on my cell phone after I changed my number,
3 and I was like how the hell did you get my phone number,
4 and she told me about Whitepages and Instant CheckMate
5 and that she had paid for the unredacted report for my
6 name to get my new cell phone number.
7   Q.   When did that -- was that an oral
8 conversation you had with her?
9   A.   It was a conversation over the phone.
10   Q.   When did that occur?
11   A.   November of 2018.
12   Q.   Was that before or after you saw the
13 Craigslist ad by your counsel?
14   A.   Way before.
15   Q.   After your mom told you that she was able to
16 find your new cell phone number via Whitepages and via
17 Instant CheckMate did you go to those sites and try to
18 remove your profile?
19   A.   No. I didn't know that was possible. I
20 found out later that I could have done it.
21   Q.   Had you known at the time that it was
22 possible would you have done it?
23   A.   Yes, but that would have involved signing up
24 for the website and I -- the only way -- that's the only

Page 224

1 way you can do it.
2   Q.   Would you have gone ahead and done that, so
3 removed the profile?
4   A.   In order to remove the profile, I would have,
5 but I -- again, I don't -- I was just so mad that she had
6 gotten my number and that when I just typed in my name,
7 my name was the first thing that came up, I got irked off
8 and turned off the computer. I didn't know that I could
9 have removed my name until much later.
10   Q.   Okay.
11   A.   And at the time I -- I don't -- I don't know
12 if I would have signed in to remove my name. I think I
13 would have just done the contact us and requested my name
14 be removed.
15   Q.   Okay. So understandably you were upset
16 because you were avoiding being contacted by your mom.
17 You had changed your cell phone number. I mean is that
18 right? You were avoiding being contacted by your mom;
19 right?
20   A.   Yes. My mother is very emotionally and
21 mentally abusive, and I was getting away from her because
22 she was causing me mental health issues.
23   Q.   And you had changed your phone number for the
24 sole purpose of avoiding her; is that right?

Page 225

1   A.   Yes. I changed my phone number and carrier.
2   Q.   Did you on Craigslist look for an opportunity
3 to sue Whitepages and Instant CheckMate?
4   A.   No. I was just -- I was looking for a job
5 and I -- it happened to just pop up.
6   Q.   Okay. And before that popped up did you have
7 any intent to sue Whitepages or ICM?
8   A.   No. I didn't think it was possible. I don't
9 have money to be able to start a lawsuit.
10   Q.   If you had called Whitepages and said remove
11 my profile and Whitepages had done that, would you have
12 filed suit?
13       MR. BEAUMONT: Form.
14 BY THE WITNESS:
15   A.   I don't know.
16 BY MR. KIMREY:
17   Q.   And if you would have filed suit, what would
18 your claim have been? What would you -- what would you
19 say -- how would you say you were harmed?
20   A.   I'm literally trying to get away from
21 somebody who was abusive towards me and now that person
22 has my new phone number even though I changed it to get
23 away from her.
24   Q.   And were you harmed in any other way?

57 (Pages 222 - 225)

Page 226

1    A.   I don't know how to answer that question.
2    Q.   Well, I'm just asking you are you aware of
3  having been harmed in any other way than your mom finding
4  the number that you didn't want her to find.
5    A.   That was the reason I changed my phone number
6  and moved to Chicago was to get away from her.
7    Q.   Understood.  And were you harmed in any other
8  way by the Whitepages profile other than its having
9  apparently made your new phone number available to your
10  mom?
11      MR. BEAUMONT:  Object to form.
12  BY THE WITNESS:
13    A.   It's caused me a lot of stress, anxiety and
14  mental like anguish because I don't -- the woman abused
15  me for 40 years, and having her -- having her call me out
16  of the blue when I changed my phone number gave me a
17  panic attack.  She showed up at my house when I live 900
18  miles away just to come and try to talk to me even though
19  I wanted nothing to do with her which caused my panic
20  attacks, stress and depression because it seemed no
21  matter what I did to get away from this woman -- you guys
22  provided my information.  All she had to do was pay a
23  fee.  Even if I changed my phone number again, she'd
24  still be able to get my information because you guys

Page 227

1  allow her -- allow a website to pay -- for somebody to
2  pay your website in order to give that information away.
3  I could change the phone number again.  The second she
4  realizes my phone number has changed she's just going to
5  get it again, and I don't need that panic attack every
6  time I change my phone number and she calls me.  I don't
7  need to have to go to a therapist every time I change my
8  phone number because she's got it again and she's
9  harassing me again.
10  BY MR. KIMREY:
11    Q.   Understood.  I understand the harm that
12  you've articulated.  But what I'm trying to figure out is
13  beyond your mom finding the phone number that you didn't
14  want her to have and the anxiety, the stress --
15    A.   I've also had to --
16    Q.   -- the mental anguish --
17    A.   I've also had to deal with my brother
18  harassing me, her husband harassing me, aunts and uncles
19  harassing me because I cut her off.  So I have my entire
20  family on her side of the family constantly harassing me
21  until I was able to figure out how to block them because
22  I cut her off and stopped talking to her.  It caused me a
23  ton of anxiety and frustration and gave me an ulcer
24  because I was constantly having to deal with this.

Page 228

1    Q.   So did she share your new number with other
2  relatives?
3    A.   She gave my number to everybody --
4      MR. BEAUMONT:  Form.
5  BY THE WITNESS:
6    A.   -- who was mad that I cut her off, and the
7  narrative that she gave them is she didn't do anything
8  wrong, how dare I cut her off.  So I got harassing phone
9  calls and harassing voicemails from a bunch of different
10  family members because I cut her off.  So it gave me an
11  ulcer.  It gives me panic attacks.  It --
12  BY MR. KIMREY:
13    Q.   Have you seen a doctor for the ulcer?
14    A.   Yes.
15    Q.   What's the name of the doctor?
16    A.   That's covered under HIPAA.
17    Q.   Are you claiming in this case monetary
18  damages related to the ulcer?
19      MR. BEAUMONT:  Object to form.
20  BY THE WITNESS:
21    A.   Related to the ulcer, no.
22  BY MR. KIMREY:
23    Q.   Are you claiming monetary damages in this
24  case related to the anxiety you testified about?

Page 229

1    A.   No.
2    Q.   Are you claiming monetary damages in this
3  case related to the emotional distress you testified
4  about?
5    A.   No.  I just -- I just need to get my name and
6  information off of every website possible, and this seems
7  to be the only way to do it.
8    Q.   Okay.  So what are the monetary damages
9  you're seeking in this case?
10      MR. BEAUMONT:  Object to form.
11  BY THE WITNESS:
12    A.   That would have to be up -- up to my
13  attorney.  We haven't discussed anything like that.  I'd
14  have to talk to him.
15  BY MR. KIMREY:
16    Q.   So you never requested directly to Whitepages
17  that your profile be removed; correct?
18    A.   I didn't know I could do that until I found
19  out during this case.
20    Q.   But now you know; right?
21    A.   But that's not gonna help every -- I -- it's
22  not going to be able to help every other person who
23  wishes to not be on this -- on this website, and the way
24  the website operates according to my attorneys is illegal

58 (Pages 226 - 229)

Page 230

1 in the State of Illinois.
2    Q.   And as you sit here today, you can't tell me
3 what your monetary damages are; is that correct?
4       MR. BEAUMONT: Object to form.
5 BY THE WITNESS:
6    A.   I would have to talk to my attorney.  I don't
7 know.
8 BY MR. KIMREY:
9    Q.   Okay.  You know that there are a lot of other
10 sites that provide information of this kind; right?
11    A.   Yes, and you gave me a list of them that I'm
12 going to be -- that have the ability to opt-out-of, and
13 I'm going to be going to them after this and opting out
14 of every single one I can find.
15    Q.   Okay.  Do you plan to make a request to
16 Whitepages to, you know, basically blacklist your --
17    A.   I'd have to talk to my attorney about that.
18 I don't know how that would affect this, so I'd have to
19 talk to him.
20    Q.   Okay.  As you sit here today, do you know how
21 many times you visited the Whitepages website?
22    A.   I don't remember.  I know --
23    Q.   Your mom -- so you didn't know about the
24 existence of Whitepages or Instant CheckMate until your

Page 231

1 mom called you and said, you know, in September of 2018
2 hey, I have your number because I'm calling you right now
3 and I got it off of these two websites?  Is that what she
4 said?
5       MR. BEAUMONT: Object to form.
6 BY THE WITNESS:
7    A.   She informed me that she paid to get my new
8 phone number.
9 BY MR. KIMREY:
10    Q.   Did she say she paid Whitepages to get it?
11    A.   Yeah, she paid Whitepages and she paid
12 Instant CheckMate to get the unredacted information to be
13 able to get my phone number.
14    Q.   And before that call did you know anything
15 about Whitepages at all?
16    A.   No.
17    Q.   And before that call did you know anything
18 about Instant CheckMate at all?
19    A.   No.
20    Q.   But now you're curious I assume because she
21 told you that's how she got the number and you then
22 visited both websites?
23    A.   I looked at them to see what it -- what
24 information it was, and when my name was the first one to

Page 232

1 pop up when I searched my first and last name, it freaked
2 me out and I turned off the computer.
3    Q.   Did -- when the search return came back, did
4 it show, you know, in front of the pay wall as we refer
5 to it your new cell phone number?
6       MR. BEAUMONT: Object to form.
7 BY THE WITNESS:
8    A.   No.  That's why she had to pay to get it.  It
9 showed my name, the city, couple cities I've lived in and
10 people who are connected to me as well as my maiden name.
11 BY MR. KIMREY:
12    Q.   Okay.  But you didn't then go get a
13 background report to confirm it had what she said it had
14 in it; right?
15    A.   No, because I didn't want to sign up for the
16 website.  I -- it made me freak out and caused another
17 panic attack, and I turned my computer off.
18    Q.   Okay.  Did she provide you a copy of the
19 background report that she obtained from Whitepages?
20    A.   No.  I found out about it -- I got a copy of
21 it later when I found out about it, and I think it's part
22 of the file that you have on where they -- where the
23 attorneys pulled my information.
24    Q.   Okay.  Did she provide you with a copy of the

Page 233

1 background report that she obtained from Instant
2 CheckMate?
3    A.   No.  She -- she had already been blocked on
4 my e-mail at that point, and I didn't know that you could
5 pay to get my new phone number and mailing address.
6    Q.   So your mom never provided you with a copy of
7 the Whitepages background report or the ICM background
8 report; correct?
9    A.   No.
10    Q.   When you say no, do you agree with me?
11    A.   That she did not provide me the information.
12 She didn't give me a copy of it.  She just told me what
13 was on it.
14    Q.   Okay.  So in Exhibit -- well, before I move
15 off of that, so beyond the ulcer, the anxiety, the
16 emotional distress have -- do you feel as if you've
17 suffered in any way as a result of the actions of
18 Whitepages?
19    A.   I think the -- the ulcer and the anxiety and
20 panic attacks is -- the emotional distress is suffering
21 because of Whitepages having my information available.
22    Q.   Did your mom before she made this phone call
23 cause you emotional distress?
24    A.   Did she cause me emotional distress before

59 (Pages 230 - 233)

Page 234

1 this phone call?
2    Q.   Yes.
3    A.   Yes.  She was very emotionally and mentally
4 abusive.  She -- I still get panic attacks because of the
5 things that she said and did to me when I was -- up until
6 I cut her off.
7    Q.   And did your mom cause you anxiety before the
8 phone call in which she told you she obtained your number
9 from Whitepages and ICM?
10    A.   Not to the degree that it happened after the
11 fact.
12    Q.   But she did cause you to suffer anxiety
13 before then?
14    A.   She caused me stress, frustration and anxiety
15 but never to the point that I needed anxiety medication.
16    Q.   When were you first diagnosed with the ulcer?
17       MR. BEAUMONT:  Object to form.
18 BY THE WITNESS:
19    A.   Not sure.  I don't remember.  I've been -- I
20 saw a bunch of different doctors about stuff, so I
21 don't --
22 BY MR. KIMREY:
23    Q.   But you're not seeking any monetary recovery
24 for the ulcer, the anxiety or the emotional distress in

Page 235

1 this case; correct?
2       MR. BEAUMONT:  Object to form.
3 BY THE WITNESS:
4    A.   I need to talk to my attorney to figure out
5 what exactly you're talking about because I don't
6 under -- I don't understand what you mean, so I have to
7 talk to --
8 BY MR. KIMREY:
9    Q.   Well, just to elaborate, we get to take
10 discovery of all of your doctor visits, all of your
11 medication, all of your diagnostic history despite HIPAA
12 if you're seeking recovery for those things in this case.
13 However, if you're not seeking recovery for those things
14 in this case, then it's not relevant, and I won't ask you
15 any more questions about it.  But if you are seeking
16 recovery for mental issues and medication and anxiety and
17 emotional distress, we're completely entitled to seek,
18 you know, the identity of the doctors you're seeing.
19    A.   I'm not -- I'm not seeking -- I'm not seeking
20 monetary --
21       MR. BEAUMONT:  Objection, asked and answered.
22 BY MR. KIMREY:
23    Q.   You can answer.
24    A.   I am not seeking any --

Page 236

1       MR. BEAUMONT:  Objection.
2       THE WITNESS:  I'm sorry.  Will?
3       MR. BEAUMONT:  Object as asked and answered.
4 She's already answered this question.
5 BY MR. KIMREY:
6    Q.   And she can -- you can answer.  He's not
7 instructing you not to answer.
8    A.   I already told you I'm not seeking
9 monetary -- I'm not seeking you to pay my medical bills
10 or pay for my in -- medications or anything like that if
11 that's what you're asking.
12    Q.   Are you seeking for us to pay for the
13 monetary value of your emotional distress?
14       MR. BEAUMONT:  Object to form.
15 BY THE WITNESS:
16    A.   No.  It's -- any -- any compensation for this
17 I'd have to discuss with my attorney but not for the
18 medical situation.
19 BY MR. KIMREY:
20    Q.   And not for the emotional situation; right?
21       MR. BEAUMONT:  Object to form.
22 BY THE WITNESS:
23    A.   I'm pretty sure I've already answered that
24 question three times now.

Page 237

1
2 BY MR. KIMREY:
3    Q.   Please answer it.
4    A.   Not for the emotional distress.  Anything
5 else I've got to talk to my attorney about.
6    Q.   What else would there be?
7    A.   I don't know.  That's why I need to talk to
8 him about it.  Again, I have to talk to him about what's
9 going -- what's going on.
10    Q.   Okay.  Let's refer to what's Bates as 18 in
11 this exhibit in the lower right-hand corner, so that's
12 later.  It's one, two, three, four, five, six -- there we
13 go.  That's the page.  Okay.
14       So this is the Whitepages Terms of Use that
15 we produced in this case, Ms. Lukis, and you can tell
16 that we produced it in the case because it bears a Bates
17 stamp down in the lower right-hand corner which for
18 some -- yeah, there you go.  Do you have any reason not
19 to think these are the Whitepages Terms of Use produced
20 in this case?
21       MR. BEAUMONT:  Object to form.
22 BY THE WITNESS:
23    A.   I have no reason to believe it's not.
24 BY MR. KIMREY:

60 (Pages 234 - 237)

Page 238

1  Q.  Okay.  If you look at the second paragraph
2  from the top, so it says: "Acceptance of these terms of
3  use." Second paragraph says: "Each time that you access
4  or use the services you signify that you have read,
5  understand and agree to be bound by these terms as well
6  as our privacy policy which is incorporated by reference
7  herein."  Did I read that accurately?
8  A.  Yes.
9  Q.  So you can see that Whitepages takes the
10 position that when you use the website you agree to the
11 terms in the privacy policy.  Do you understand that?
12 A.  Yes.
13 Q.  Do you agree with that?
14 A.  No.
15     MR. BEAUMONT: Object to form.
16 BY MR. KIMREY:
17 Q.  Why not?
18 A.  Because in every other website I've ever been
19 to the only way you're bound to the terms and privacy
20 policy is if you signed up for the website.  If I had
21 signed up for an account, yes, I would be bound to the
22 terms.  I didn't -- there's no reason to be bounded by
23 the terms and privacy policy of a website that I've never
24 created an account for.

Page 239

1  Q.  Okay.  Is it your position that -- okay.
2  Strike that.
3        Are you aware that your counsel Roberto
4  Costales accepted the terms and conditions in the privacy
5  policy of Whitepages?
6  A.  I have no idea what they have done or not
7  done.
8  Q.  Do you know whether Mr. Costales has visited
9  the Whitepages website in investigating and prosecuting
10 your claim?
11 A.  Yes.
12 Q.  How do you know that?
13 A.  Because it's one of the documents that was --
14 that is available to me to look at.
15 Q.  Do you know whether Mr. Costales accepted the
16 terms and conditions in the privacy policy --
17 A.  I have no idea.
18 Q.  -- in connection with investigating and
19 prosecuting your claim?
20 A.  I have no idea.  I can't tell you what they
21 may or may not have done.
22 Q.  Isn't that also in the pleadings?
23 A.  I -- again, I have read some -- I have read
24 most of the documents.  I don't know whether or not they

Page 240

1  signed -- they created an account for it.
2  Q.  So you don't know whether Mr. Costales has
3  conceded in this case that he accepted the terms and
4  conditions in the privacy policy in investigating and
5  prosecuting your claim?
6     MR. BEAUMONT: Objection, asked and answered.
7  This is the third time you're -- this is the third time
8  this is being asked and she's provided answers.  I don't
9  understand why -- this is fully asked and answered.
10 BY MR. KIMREY:
11 Q.  You can answer.
12 A.  I've already done it twice.  My answer's --
13 Q.  Do it again.
14 A.  -- not gonna change.
15     MR. BEAUMONT: There's no need for her to say
16 it three times.  We can have the court reporter
17 read back -- read back the questions and answers if you
18 don't recall -- don't recall her answers.
19     MR. KIMREY: That's an improper speaking
20 objection again.
21 BY MR. KIMREY:
22 Q.  So you have no awareness, Ms. Lukis, of
23 whether your counsel Roberto Costales accepted the terms
24 and conditions in the privacy policy of Whitepages in

Page 241

1  investigating and prosecuting your claim; is that right?
2     MR. BEAUMONT: Objection, asked and answered,
3  and she's provided -- provided her answer.
4  BY MR. KIMREY:
5  Q.  Is that right?
6  A.  I've answered the question twice already.
7  Q.  You're required to answer it again.
8     MR. BEAUMONT: She's not required -- she's
9  already provided her answer.  I think we should ask the
10 court reporter to -- Ms. Court Reporter, would you
11 please -- would you please read back --
12     MR. KIMREY: No. No.  This is my deposition.
13 Your behavior is inappropriate, Mr. Beaumont.  You're
14 engaging in speaking objections.  You're wasting our
15 time.
16 BY MR. KIMREY:
17 Q.  Answer the question.
18 A.  And so are you by asking the same question
19 three times.
20 Q.  What was your answer?
21 A.  Again, like I said twice before, I do not
22 know.  I'm not an attorney.  I don't know what they have
23 done.
24 Q.  What do you know that they've done in

61 (Pages 238 - 241)

Page 242

1 investigating and prosecuting your case?
2      MR. BEAUMONT: Objection. I believe this is
3 calling for -- this is calling for attorney/client
4 privilege matter.
5 BY THE WITNESS:
6    A. You're asking me to speculate about what my
7 attorneys have done.
8 BY MR. KIMREY:
9    Q. They're your counsel.
10    A. Yes.
11    Q. They're acting as agents for you.
12    A. And you're asking me --
13    Q. You should know what they're doing.
14    A. -- to speculate.
15    Q. And you're free to testify about it to the
16 extent it's public record. What are you aware of that is
17 public record that your attorneys have done to
18 investigate and prosecute your case?
19    A. I've read all of the -- the depositions, or
20 not the depositions, the -- what do you call it? The
21 filings to the courts. Well, most of them. I probably
22 might have missed a couple, but I've read those wherein
23 it says what's going on, why -- why it's an objection, a
24 bunch of -- a ton of questions that you asked me about my

Page 243

1 opinion on things, but you're -- you're asking me to make
2 a -- set a position about what my attorneys have done,
3 and I can't tell you that I know for certain what they've
4 done. That's asking me to make an assumption, and I'm
5 not going to make an assumption about something somebody
6 else has done. Unless they specifically have told me
7 that they did this I don't know.
8    Q. Is it your testimony that you visited the
9 Whitepages website only once in your entire life?
10    A. Yes. I looked at it, got freaked out about
11 it, turned off my computer.
12    Q. Have you searched for and produced your
13 browser history related to your visiting the Whitepages
14 website in response to Whitepages' written discovery in
15 this case?
16    A. I can't.
17    MR. BEAUMONT: Object to form.
18 BY THE WITNESS:
19    A. It's on a hard drive on a com -- that doesn't
20 have a computer anymore.
21 BY MR. KIMREY:
22    Q. What hard drive would that search history be
23 on?
24    A. That would be on the HP desktop that the

Page 244

1 motherboard crashed on.
2    MR. BEAUMONT: Object to form.
3 BY MR. KIMREY:
4    Q. Definitely preserve the two hard drives that
5 you currently have possession of and don't tamper with
6 them.
7    A. Yeah. They're sitting in a drawer.
8    Q. Have you ever agreed to arbitration in any
9 way?
10    A. No.
11    MR. BEAUMONT: Object to form.
12 BY MR. KIMREY:
13    Q. I don't mean as to Whitepages. I mean just
14 generally. Have you ever agreed to arbitration related
15 to or arising out of any dispute?
16    MR. BEAUMONT: Object to form.
17 BY THE WITNESS:
18    A. No.
19 BY MR. KIMREY:
20    Q. Have you ever agreed to waiver of class
21 action rights related to or arising out of any dispute?
22    MR. BEAUMONT: Object to form.
23 BY THE WITNESS:
24    A. No.

Page 245

1
2 BY MR. KIMREY:
3    Q. Have you ever agreed to litigate in a state
4 other than Illinois arising out of or related to a
5 dispute?
6    A. No.
7    Q. Have you ever agreed to limit the damages you
8 can seek arising out of or related to any dispute?
9    A. No.
10    Q. Have you ever agreed to indemnify anybody
11 related to or arising out of any dispute?
12    A. No.
13    MR. BEAUMONT: Object to form.
14 BY MR. KIMREY:
15    Q. Have you ever agreed to defend anybody
16 related to or arising out of any dispute?
17    MR. BEAUMONT: Object to form.
18 BY THE WITNESS:
19    A. No.
20 BY MR. KIMREY:
21    Q. Have you ever agreed to liquidated damages
22 related to or arising out of any dispute?
23    MR. BEAUMONT: Object to form.
24 BY THE WITNESS:

62 (Pages 242 - 245)

Page 246

1      A.   No.
2   BY MR. KIMREY:
3      Q.   Have you ever agreed to recovery of or
4   payment of attorneys' fees related to or arising out of
5   any dispute?
6          MR. BEAUMONT:  Object to form.
7   BY THE WITNESS:
8      A.   No.
9   BY MR. KIMREY:
10     Q.   Have you searched for any written contracts
11  at all in response to Whitepages' written discovery in
12  this case?
13         MR. BEAUMONT:  Object to form.
14  BY THE WITNESS:
15     A.   No.
16  BY MR. KIMREY:
17     Q.   Have you ever read Whitepages' Terms and
18  Conditions?
19     A.   No.
20     Q.   Have you ever read Whitepages' Privacy
21  Policy?
22     A.   No.
23         MR. BEAUMONT:  Object to form.
24  BY MR. KIMREY:

Page 247

1      Q.   Have you ever attempted to opt-out of
2   Whitepages' Terms and Conditions?
3      A.   I didn't know that was an availability.
4      Q.   So the answer is no?
5      A.   The answer is no.
6      Q.   Have you ever opt -- have you ever attempted
7   to opt-out of Whitepages' Privacy Policy?
8      A.   No.
9      Q.   Let's turn to Bates stamp 25.  I've actually
10  lost the exhibit.  Can you guys see the exhibit?
11  Michael?  There it is.
12         So let's go to Bates stamp 25.  So it says
13  here at 3:  "How we collect data."  Do you see that, Ms.
14  Lukis?
15     A.   Yes.
16     Q.   It says:  "The data we collect depends on the
17  services and features of our products that you use.  You
18  provide some data directly such as when you create an
19  account, submit a search query or contact us for support.
20  Our servers collect information known as log data that
21  includes your IP address.  It's on your computer or
22  device visited the site, the URL of the website you
23  arrived from and the type of device or browser you used
24  to access the site.  We also get information by recording

Page 248

1   how you use our services, whether you navigate between
2   our service and others.  For example, we use cookies
3   (small text files placed on your device) and web beacons
4   (small graphic images contained in a web page or
5   e-mail)."  Did I read that accurately?
6      A.   Yes.
7      Q.   Do you have any reason to believe that what I
8   just read is inaccurate factually?
9          MR. BEAUMONT:  Object to form.
10  BY THE WITNESS:
11     A.   No.
12  BY MR. KIMREY:
13     Q.   Then at 4 it says:  "Access to data not
14  collected directly by Whitepages.  Our users are able to
15  access, contact and background information from third
16  parties to meet a number of needs, including fraud
17  prevention for verifying identities and updating contact
18  information.  Such data is not compiled by Whitepages and
19  instead is provided by third parties."  Did I read that
20  accurately?
21     A.   Yes.
22     Q.   Do you have any reason to believe that that
23  statement is factually incorrect?
24     A.   No.

Page 249

1      Q.   Do you believe that if someone signs up for
2   an account on Whitepages like your mom apparently did
3   that they agree to be bound by the terms and conditions
4   in the privacy policy?
5          MR. BEAUMONT:  Object to form.
6   BY THE WITNESS:
7      A.   Yes.
8   BY MR. KIMREY:
9      Q.   In investigating and prosecuting this case is
10  Mr. Costales working on your behalf?
11     A.   Yes.
12     Q.   Does he have authority from you to do
13  whatever he thinks is appropriate to investigate and
14  prosecute this case on your behalf?
15     A.   Yes.
16     Q.   Do you know what an agent is?
17     A.   In -- I believe so, yes.
18     Q.   So I'll define agent for you.  Someone who's
19  authorized to, you know -- someone who is authorized to
20  operate on your behalf.  Is Mr. Costales for purposes of
21  investigating and prosecuting this case your agent?
22     A.   Yes.
23         MR. BEAUMONT:  Objection, legal conclusion.
24  BY MR. KIMREY:

63 (Pages 246 - 249)

1    Q.   Is Mr. Beaumont in investigating and
2  prosecuting this case your agent?
3    A.   Yes.
4        MR. BEAUMONT:  Objection, legal conclusion.
5  BY MR. KIMREY:
6    Q.   Are they the only two lawyers you've worked
7  with in investigating and prosecuting your case?
8        MR. BEAUMONT:  Objection, legal -- objection.
9  BY THE WITNESS:
10    A.   I believe so.
11  BY MR. KIMREY:
12    Q.   Have you talked to any other lawyers beyond
13  Mr. Costales and Mr. Beaumont related to your case?
14    A.   No.
15    Q.   Let's turn to "How do I edit or remove a
16  personal listing" which should be after the privacy
17  policy.  Maybe it's not.
18        So if you scroll forward, Michael, it should
19  be -- is that the end, Michael?  There we go.  Okay.
20        So do you see, Ms. Lukis, it says:  "How do I
21  edit or remove a personal listing"?
22    A.   Yes.
23    Q.   And you see that this is at Whitepages
24  because you can see the, you know, website address at the

1  bottom?  Do you see that?
2    A.   Yes.
3    Q.   Have you ever reviewed this -- these policies
4  related to removal of a listing?
5    A.   I'm sorry.  Could you repeat that?
6    Q.   Have you ever removed -- have you ever
7  reviewed this information about removal of a profile?
8    A.   No.
9    Q.   Okay.  Let's go to 12.  That is folder 1.12.
10  Okay.  This is a Cook County, Illinois docket, and it
11  appears to be an eviction case.  One of the defendants is
12  Stephanie Lukis.  Is that you, Ms. Lukis?
13    A.   Yes.
14    Q.   Were you a defendant in an eviction case in
15  which the plaintiff was Mega Properties?
16    A.   Yes.
17    Q.   Were you, in fact, evicted?
18    A.   No.
19    Q.   Was a judgment entered against you?
20    A.   Yes.
21    Q.   Do you know whether all of the information on
22  this docket is publicly available?
23        MR. BEAUMONT:  Object to form.
24  BY THE WITNESS:

1    A.   I don't know.
2  BY MR. KIMREY:
3    Q.   I have it because it is publicly available.
4  Do you have any reason to dispute that all of the
5  information on this docket and all of the related
6  pleadings are publicly available?
7        MR. BEAUMONT:  Object to form.
8  BY THE WITNESS:
9    A.   I don't have any reason to doubt it's public
10  record.
11  BY MR. KIMREY:
12    Q.   Would you object if Whitepages made available
13  any information from this docket?
14    A.   Yes.
15    Q.   Why is that?
16    A.   Because it is profiting off of this
17  information, and it's being pulled from a website that
18  most people wouldn't even know to look for let alone
19  search.
20    Q.   Do you think that your being sued in an
21  eviction case is newsworthy to some people, for instance,
22  future landlords?
23        MR. BEAUMONT:  Object to form.
24  BY THE WITNESS:

1    A.   I don't know.  I would have to ask the
2  respective landlords.  Since that happened I've never had
3  a landlord who had an issue or even looked it up.
4  BY MR. KIMREY:
5    Q.   Would they have told you that they looked it
6  up?
7        MR. BEAUMONT:  Object to form.
8  BY THE WITNESS:
9    A.   I'm pretty sure they would have told me
10  because I wouldn't have been able to get an apartment
11  through them if I had -- if they knew I had an eviction
12  on my record.
13  BY MR. KIMREY:
14    Q.   Okay.  Let's go to the next item.  It's 13.
15  So that's folder 1.13.  Ms. Lukis, this is a publicly
16  available mortgage document that lists as the borrower
17  Joseph P. Lukis and David M. Lukis.
18    A.   Dawn M. Lukis.
19    Q.   Dawn M. Lukis.  And who is Joseph Lukis?
20    A.   My father-in-law.
21    Q.   And Dawn M. Lukis is?
22    A.   His wife.
23    Q.   Okay.  And the property is 18254 South
24  Springfield Avenue.  Do you see that?

Page 254

1    A.   Yes.
2    Q.   In Homewood, Illinois?
3    A.   Yes.
4    Q.   Do you know what that property is?
5    A.   It's my father-in-law's house.
6    Q.   Okay.  Did you ever have an ownership
7 interest in that house?
8    A.   No.
9    Q.   Do you object to this information being
10 publicly available?
11      MR. BEAUMONT:  Object to form.
12 BY THE WITNESS:
13    A.   I -- I don't have an opinion on whether or
14 not his mortgage is publicly available.
15 BY MR. KIMREY:
16    Q.   Let's move onto 14.  So that's folder 1.14.
17 This is from the Secretary of State's website, Ms. Lukis,
18 and it's the Corporate LLC Certificate of Good Standing
19 for Evergreen Pest Management.  And it lists you as a
20 manager.  Do you see that down towards the bottom?
21    A.   Not right now.  It's zoomed in.
22    Q.   Could we zoom out?
23    A.   The agent information, yeah.
24    Q.   Well, down where it says manager Stephanie

Page 255

1 Lukis?
2    A.   Yeah.
3    Q.   Did you participate in filing this
4 information with the Secretary of State?
5    A.   Yes.
6    Q.   Do you have any objection to this information
7 being publicly available?
8    A.   No, but, again, it's something that somebody
9 would actually have to know to search for because they'd
10 have to search for Evergreen Pest Management, and nobody
11 even knows that the business ever existed except for a
12 few clients.
13    Q.   Do you have a preference that this not be
14 known by people?
15    A.   I'd rather it not be, but I can't control
16 things that are on the Secretary of State's website.
17    Q.   Why would you rather it not be known?
18    A.   Because I don't see any reason for anybody to
19 be looking for a business that dissolved in 2013.
20    Q.   Okay.  Did the business receive any sort of
21 benefits for being an allegedly woman-managed business?
22    A.   Nope.
23    Q.   What benefits were you hoping to receive in
24 characterizing the business as a woman-managed business?

Page 256

1    A.   It is helpful to try and get government
2 contracts, but we never went after any government
3 contracts or anything like that, so it was pretty much
4 useless.
5    Q.   If you had, you know, I guess engaged in an
6 RFP for a government contract, would you have
7 characterized the business as a woman-owned business?
8      MR. BEAUMONT:  Object to form.
9 BY THE WITNESS:
10    A.   It doesn't really matter because I never
11 tried to get an RFP.
12 BY MR. KIMREY:
13    Q.   Okay.  Moving on, let's go to 2, so 2.15, the
14 bankruptcy.  So this is entered as Exhibit 15.  These are
15 records off the public docket in the U.S. Bankruptcy
16 Court for the Eastern District of Virginia related to
17 your bankruptcy, Ms. Lukis.  Do you have any reason to
18 dispute that?
19    A.   No.
20    Q.   Do you object to these documents being
21 publicly available?
22    A.   Yes, because --
23      MR. BEAUMONT:  Object to form.
24 BY THE WITNESS:

Page 257

1    A.   Yes, because it's -- after seven years
2 bankruptcy falls off your record.  The only way you can
3 find it is through -- finding out about it through
4 Whitepages and then searching the docket.  After seven
5 years it's no longer on your credit report or anywhere
6 that is publicly available unless you go -- unless you
7 know to go to the bankruptcy court and to search for it.
8 BY MR. KIMREY:
9    Q.   Did you approve of these filings?
10    A.   In 2005 I did.
11    Q.   Did you approve of appearing on the public
12 docket all information that's in these files?
13    A.   In 2005 I did.
14    Q.   Did you put a time limit on your approval?
15    A.   By federal law bankruptcies fall off of your
16 public record after seven years, so --
17    Q.   This docket is still in the public record.
18    A.   Yes, but it's not -- if somebody searches for
19 me for bankruptcy, it doesn't show up on a credit report
20 which is where it was for seven years.  It's no longer on
21 my credit report, so it's no longer considered an easy
22 thing to find.  Somebody would have to know to go to the
23 bankruptcy court website in Virginia to look for this
24 document.  It's not something -- while it may be publicly

65 (Pages 254 - 257)

1 available for people to find, nobody's going to go
2 looking for it because nobody knows anymore that I filed
3 for bankruptcy. It is off of my credit reports and was
4 dropped off of my credit reports in 20 -- in 2012.
5     Q.   Have you asked Whitepages to not provide
6 information related to your bankruptcy?
7     A.   I've never contacted Whitepages.
8         MR. BEAUMONT:  Object to form.
9 BY MR. KIMREY:
10     Q.   What was the answer?
11     A.   I've never contacted Whitepages.
12     Q.   Are you aware that your bankruptcy records
13 are available via various other services on the web?
14         MR. BEAUMONT:  Object to form.
15 BY THE WITNESS:
16     A.   Yes.  When I find the places where my
17 information is on those websites, I'm going to request
18 them all to remove it.
19 BY MR. KIMREY:
20     Q.   Is everything accurate in Exhibit 15?
21     A.   I have no idea.
22         MR. BEAUMONT:  Object to form.
23 BY THE WITNESS:
24     A.   I'd have to look at the entire document.

1
2 BY MR. KIMREY:
3     Q.   Did you think that it was accurate when it
4 was filed?
5     A.   Yes.
6         MR. BEAUMONT:  Object to form.
7 BY MR. KIMREY:
8     Q.   Do you think that -- Scratch that.
9         Let's go to folder 2.6, so we're skipping,
10 and this will be marked as Exhibit 16.  This is -- this
11 was filed in your case, Ms. Lukis, and as you can see,
12 it's labeled "Whitepages, Inc.'s Local Rule 56.1
13 Statement of Undisputed Material Facts."  The first
14 paragraph says:  "Whitepages owns and operates the
15 website www.whitepages.com."  Do you disagree with that?
16     A.   No.
17         MR. BEAUMONT:  Objection, legal conclusion.
18 BY MR. KIMREY:
19     Q.   The second paragraph says:  "Whitepages
20 provides and sells to the general public access to an
21 on-line directory of information about people."  Do you
22 disagree with that?
23         MR. BEAUMONT:  Objection, legal conclusion.
24 BY THE WITNESS:

1     A.   No.
2 BY MR. KIMREY:
3     Q.   The third paragraph says:  "That directory
4 information comes in two forms."  Do you disagree with
5 that?
6     A.   No.
7     Q.   The fourth paragraph says:  "First,
8 Whitepages provides free access to information related to
9 a searched name."  Do you disagree with that?
10         MR. BEAUMONT:  Objection, form and legal
11 conclusion.
12 BY THE WITNESS:
13     A.   I don't --
14         MR. BEAUMONT:  Object to speculation.
15 BY THE WITNESS:
16     A.   I don't know.  I guess.
17 BY MR. KIMREY:
18     Q.   Okay.  Then it says at paragraph 5:  "For the
19 search term Stephanie M. Lukis as set forth in the
20 Complaint, free data types include name, age range, phone
21 number, current address, previous residential locations,
22 relatives and reference to the following additional data
23 types in the background report correlating with the name
24 searched available for a fee, 1, mobile phone and land

1 line numbers; 2, additional relatives; 3, criminal
2 history."  There's a typo 3 which should be 4.  "Full
3 address history," next "public records," next "criminal
4 reports," next "bankruptcy and foreclosure records," next
5 "property ownership information" and next "professional
6 license and permit records."  Do you disagree with any of
7 that?
8         MR. BEAUMONT:  Objection, speculation.
9 BY THE WITNESS:
10     A.   I don't -- I don't know.  I've never looked
11 at the -- the paid version of it.
12 BY MR. KIMREY:
13     Q.   Okay.
14     A.   I'm assuming this is correct because of all
15 the information that you have on me.
16     Q.   Then it says at 6:  "Second, Whitepages sells
17 background reports with information that correlates to
18 the searched name."  Do you disagree with that?
19         MR. BEAUMONT:  Objection, speculation.
20 BY MR. KIMREY:
21     Q.   You can answer.
22     A.   I guess.
23     Q.   "The full background report correlating with
24 the search term Stephanie M. Lukis contained the

66 (Pages 258 - 261)

Page 262

1 following data types: Name, age, date of birth, current
2 address, past address, statistics about the neighborhood
3 where Stephanie M. Lukis might reside, phone numbers,
4 family members and their ages, individuals with whom
5 Stephanie M. Lukis may be linked based on her potential
6 past and present addresses, individuals with whom
7 Stephanie M. Lukis may be linked by business or
8 transaction, bankruptcy records, legal judgments, legal
9 judgment records and traffic records." Do you disagree
10 with any of that?
11     MR. BEAUMONT: Objection, speculation,
12 compound.
13 BY THE WITNESS:
14     A. Since you've shown me that that's all the
15 information you have, I'm assuming that's correct.
16 BY MR. KIMREY:
17     Q. Okay. So going back to 5, do you object to
18 Whitepages having made available for free your name?
19     A. Yes.
20     Q. Do you object to -- well, I'll stop there.
21 Why?
22     A. Because, again, I am a private citizen not a
23 public -- not a public servant. I'm not a celebrity.
24     Q. Any other reason?

Page 263

1     A. That's a pretty big one is that I'm just a
2 private citizen.
3     Q. But any other reason?
4     A. No.
5     Q. Do you object to Whitepages having provided
6 for free your age range?
7     A. Yes.
8     Q. Same reason?
9     A. Yes.
10     Q. Do you object to Whitepages having provided
11 for free a phone number?
12     A. Yes.
13     Q. Same reason?
14     A. Same reason.
15     Q. Do you object to Whitepages having provided
16 for free a current address?
17     A. Yes, same reason.
18     Q. You object to it for the same reason;
19 correct?
20     A. Yes.
21     Q. Do you object to Whitepages having provided
22 for free previous residential locations?
23     A. Yes --
24     Q. Same reason?

Page 264

1     A. -- same reason. Same reason.
2     Q. Do you object to Whitepages having provided
3 relatives for free?
4     A. Yes, for the same reason.
5     Q. And then for a fee do you object to
6 Whitepages having provided mobile phone and land line
7 numbers?
8     A. Yes, for the same reason.
9     Q. Additional relatives?
10     A. Yes, for the same reason.
11     Q. Criminal history?
12     A. Yes, for the same reason.
13     Q. Full address history?
14     A. Yes, for the same reason.
15     Q. Public records?
16     A. Yes, for the same reason.
17     Q. Criminal records?
18     A. Yes, for the same reason.
19     Q. Bankruptcy and foreclosure records?
20     A. Yes, for the same reason.
21     Q. Property ownership information?
22     A. Yes, for the same reason.
23     Q. Professional license and permit records?
24     A. Yes, for the same reason.

Page 265

1     Q. Okay. And then on the full background report
2 at 7, I assume you'd object to provision of the name for
3 the same reason; is that correct?
4     A. Yes.
5     Q. Same goes for age?
6     MR. BEAUMONT: I'd just like to note for the
7 record that we've been going here -- in 20 minutes we'll
8 be going for seven hours during this deposition. I need
9 to have some time for Redirect if I need some. When do
10 you anticipate --
11     MR. KIMREY: What's our running time, Kevin?
12     MR. BEAUMONT: What's that?
13     THE VIDEOGRAPHER: I'm unable to -- you know,
14 I need to go off record to do that.
15     MR. KIMREY: Okay. Let's go off record.
16     THE VIDEOGRAPHER: Going off the video record
17 at 4:38 p.m.
18         (WHEREUPON, a break was
19         taken.)
20     We are back on the record at 4:39 p.m.
21     You may proceed.
22     MR. KIMREY: Okay. I just want to correct
23 something that Mr. Beaumont just said. He said we've
24 been going for seven hours almost. We haven't -- Kevin,

67 (Pages 262 - 265)

Page 266

1  our videographer, just told us that we've been going for
2  5 hours and 39 minutes.
3      MR. BEAUMONT: Well, I'd just like to say
4  though that this deposition started at 9:30 a.m. We took
5  a 30-minute lunch break and --
6      MR. KIMREY: You want to take a break?
7      MR. BEAUMONT: No. So we've taken a -- so
8  we're -- we started at 9:30.
9      MR. KIMREY: Let's go off the record.
10     THE VIDEOGRAPHER: Okay. Going off the record
11 at 4:39 p.m.
12         (WHEREUPON, a break was
13          taken.)
14     We are back on the record at 4:32 p.m.
15     You may proceed.
16 BY MR. KIMREY:
17     Q.  Okay. As to 7C, I think that's where we left
18 off at Page 2, do you object to provision of the date of
19 birth?
20     A.  Yes.
21     Q.  Same reason?
22     A.  Same reason.
23     Q.  Current address?
24     A.  Yes, same reason.

Page 267

1      Q.  Past addresses?
2      A.  Yes, same reason.
3      Q.  Statistics about the neighborhood?
4      A.  Yes, same reason.
5      Q.  Phone numbers?
6      A.  Yes, same reason.
7      Q.  Family members and their ages?
8      A.  Yes, same reason.
9      Q.  Individuals with whom you may be linked based
10 on essential past and present addresses?
11     A.  Yes, same reason.
12     Q.  Individuals with whom you may be linked by
13 business transaction?
14     A.  Yes, same reason.
15     Q.  Bankruptcy records?
16     A.  Yes, same reason.
17     Q.  Legal judgment records?
18     A.  Yes, same reason.
19     Q.  Traffic records?
20     A.  Yes, same reason.
21     Q.  Other than the reason you've articulated in
22 your testimony in this deposition do you have any other
23 reason to object to Whitepages having made the free
24 information available or the information available behind

Page 268

1  its payable?
2      MR. BEAUMONT: Objection, form.
3  BY THE WITNESS:
4      A.  Other than the fact that I am a private
5  citizen and my information shouldn't be available to the
6  general public, not that I can think of.
7  BY MR. KIMREY:
8      Q.  Okay. At 8 it says: "The mobile phone
9  numbers associated with Stephanie M. Lukis are found at
10 numerous websites." Without talking about the websites
11 that are referred to at paragraph 9 of this declaration,
12 based on what I've shown you today, do you agree that
13 mobile phone numbers associated with you are found at
14 numerous websites in addition to Whitepages.com?
15     MR. BEAUMONT: Objection, form.
16 BY THE WITNESS:
17     A.  Yes, I do -- I have an issue with my
18 information being on the -- any of those websites.
19 BY MR. KIMREY:
20     Q.  But you agree it's available on other
21 websites than Whitepages.com?
22     MR. BEAUMONT: Objection to form.
23 BY THE WITNESS:
24     A.  Now that you've told me, yes, I am aware.

Page 269

1  Now that you've said something. I did not know those
2  websites exist before today.
3  BY MR. KIMREY:
4      Q.  Okay. Let's turn to the exhibit that has the
5  slip sheet. It says "Sealed Exhibit A" in the same
6  exhibit. So just scroll forward, Michael. Okay. Zoom
7  in.
8      Okay. So this is the full background report,
9  Ms. Lukis, that we produced in the case. It was filed
10 under seal but this is the unsealed version so we can
11 read it in this deposition. Let's -- so as of the filing
12 of the case in June of 2019, was your address -- can we
13 zoom in on the address so we can see it at the top? Was
14 your address 816 West 34th Place, Apartment 2, Chicago,
15 Illinois, 60608?
16     A.  No.
17     Q.  Okay. So that information is actually
18 incorrect?
19     A.  That is my previous address.
20     Q.  When did you leave that address, roughly?
21     A.  May of 2017, I believe.
22     Q.  Okay. The first number that's listed, the
23 mobile number or the alleged mobile number, is (312)
24 459-0876. Do you see that?

68 (Pages 266 - 269)

Page 270

1    A.   Yes.
2    Q.   Is -- was that ever a number of yours?  We've
3  talked about so many numbers I can't remember from
4  earlier in the deposition, so forgive me.  Is that a
5  number you ever held?
6    A.   That is my current cell phone number.
7    Q.   Okay.  So that's the number you're upset
8  about your mom having gotten; is that correct?
9    A.   Yep.
10       MR. BEAUMONT:  Form.
11 BY THE WITNESS:
12   A.   And that's available on the free version
13 apparently.
14 BY MR. KIMREY:
15   Q.   Well, right now we're looking at the
16 background report after you pay.
17   A.   Okay.
18   Q.   Well, we're actually looking at the full data
19 set related to you at this point in time.
20       So the second mobile number (773) 222-7378,
21 was that a number held by you?
22   A.   That's not a mobile number.  That's a Google
23 Voice number.
24   Q.   Did you have a Google Voice account?

Page 271

1  A.   Yes.
2  Q.   Do you still have a Google Voice account?
3  A.   Nope.
4  Q.   When did you use cease having a Google Voice
5  account?
6    A.   That would be January of 2013.  That was the
7  phone number to be used for Evergreen Pest.
8    Q.   Oh, so that was the business number for
9  Evergreen?
10   A.   Yes.
11   Q.   And would Evergreen share that with people
12 with whom Evergreen was doing business?
13   A.   It was the number any of our clients
14 contacted us at.
15   Q.   Did Evergreen have business cards?
16   A.   Nope.
17   Q.   Okay.  And then the next number is (773)
18 957-6403.  Do you see that?
19   A.   Yeah.
20   Q.   Is that a number that you are familiar with?
21   A.   I don't think so.
22   Q.   Let's scroll down.  Let's go -- it's hard to
23 see.  There's another listing of numbers -- of telephone
24 numbers about four or five pages in.  Yeah, keep going.

Page 272

1  Well, go backwards.  Is that your -- was that your
2  residence?
3    A.   The building on the right was.
4    Q.   Okay.  But it wasn't your residence as of the
5  filing of the case?
6    A.   No.
7    Q.   Okay.  So let's scroll down more.  Yeah,
8  right there, those numbers.  Okay.  We talked about --
9  well, wait.  So (312) 459-0876 is a typo; is that right?
10   A.   That's my current cell phone number.
11   Q.   Okay.  And that's the number we just looked
12 at.  All right.
13       Do you ever share that number with anybody?
14       MR. BEAUMONT:  Objection, form.
15 BY THE WITNESS:
16   A.   Not really.  Only very close friends.
17 BY MR. KIMREY:
18   Q.   How many people do you think you've shared
19 that number with?
20       MR. BEAUMONT:  Objection, form.
21 BY THE WITNESS:
22   A.   I don't know.  Maybe 15.
23 BY MR. KIMREY:
24   Q.   Do you have any other number right now?

Page 273

1    A.   House phone number, but nobody knows it.
2  It's just for emergency purposes.
3    Q.   Okay.  So your primary phone number is this
4  mobile phone number (312) 459-0876; correct?
5    A.   Yes.
6    Q.   If businesses need to get in contact with
7  you, is that the number you give to them?
8    A.   I normally don't give out my phone number to
9  random businesses.
10   Q.   Well, have you given your phone number to
11 your medical providers?
12   A.   My doctors, yes.
13   Q.   Have you given your phone number to, you
14 know, restaurants you order delivery from?
15   A.   Nope.
16   Q.   Is your phone number on the do not call list?
17   A.   Yes.
18   Q.   Do you text with that phone number?
19       MR. BEAUMONT:  Object to form.
20 BY THE WITNESS:
21   A.   To my husband and to my mother-in-law.
22 BY MR. KIMREY:
23   Q.   Have you looked in your text history to see
24 to what degree you shared that number by virtue of

69 (Pages 270 - 273)

1 texting people?
2      MR. BEAUMONT:  Object to form.
3 BY THE WITNESS:
4      A.   Again, I only really text with my
5 mother-in-law and my husband.
6 BY MR. KIMREY:
7      Q.   But did you look at your text history in
8 response to Whitepages' discovery in this case to see --
9      A.   No.
10      Q.   -- to what degree you shared this cell phone
11 number with others?
12      A.   No. I don't give out my cell phone number.
13      Q.   But you text with it; right?
14      A.   Yes.  Again, only to my husband and my
15 mother-in-law.
16      Q.   And absolutely no one else, you're 100
17 percent confident?
18      MR. BEAUMONT:  Objection, this calls for
19 speculation.
20 BY MR. KIMREY:
21      Q.   You have your phone in front of you; right?
22      A.   Yes, and I'm not looking into my phone to be
23 able to look to see if I texted anybody else.  I get spam
24 calls all the time.  I get spam texts all the time from

1 random people, and apparently the person who had my phone
2 number before me was Chinese, so I get tons of text
3 messages and phone calls in Chinese. I don't speak
4 Chinese.
5      Q.   Yeah, I'm talking about texts that you would
6 have sent out.
7      A.   I text my mother-in-law and my husband.
8      Q.   So then you haven't texted anybody else with
9 (312) 459-0876 --
10      MR. BEAUMONT:  Objection. That
11 mischaracterizes testimony.
12 BY MR. KIMREY:
13      Q.   -- is that right?
14      A.   I've already said multiple times no.
15      Q.   Do you recognize this (703) 313-1364 number?
16      A.   Nope.
17      Q.   Do you recognize the (773) 801-0023 number?
18      A.   That was my Comcast land line when I lived at
19 816.
20      Q.   Do you -- do you know whether this
21 information is the information your mom obtained from
22 Whitepages?
23      MR. BEAUMONT:  Objection.
24 BY THE WITNESS:

1      A.   My current mobile phone number is there.  I
2 would assume so.
3 BY MR. KIMREY:
4      Q.   But do you know?  If you don't know, you can
5 say I don't know.
6      A.   When she told me that she got my phone number
7 from Whitepages and Instant CheckMate, yes, I would
8 assume this is where she got my phone number.
9      Q.   You'd assume that but you don't know;
10 correct?
11      A.   She informed me that she -- that's where she
12 got it.
13      Q.   But you -- you never saw the background
14 report she obtained; right?
15      A.   No.
16      Q.   So you agree with me you never saw the
17 background report?
18      A.   I've never seen the background report, but I
19 was told by her this is where she got my number.
20      MR. BEAUMONT:  For the record, this is I
21 believe the third or fourth time that you've asked this
22 question and Ms. Lukis has provided a response.
23
24 BY MR. KIMREY:

1      Q.   Let's go to 8, and that would be 2, sub 8
2 which will now be marked as Exhibit 17.  Have you ever
3 seen this document before, Ms. Lukis?
4      A.   That the one that has 130 questions?  It
5 looks familiar, yes.
6      Q.   Did you review this before it was filed?
7      A.   No, I did not.
8      MR. BEAUMONT:  Objection, form.
9 BY MR. KIMREY:
10      Q.   You said no, you didn't?
11      A.   No.  I received a copy of it after it was
12 filed, I believe.
13      Q.   Okay.  Let's move to 2, sub 9 which will be
14 marked as 18.  As you can see, Ms. Lukis, this first
15 document, and this is a combo exhibit that includes the
16 Request for Admission Responses, the Interrogatory
17 Responses and the Document Request Responses.  The
18 document on the top is labeled "Stephanie Lukis'
19 Responses to Defendant's First Set of Request for
20 Admission."  Do you see that?
21      A.   I see that.
22      Q.   Okay.  Did you review and provide info on
23 these before they were shared with us?
24      A.   Yes.

Page 278

1     MR. BEAUMONT: For the record, I was just
2 going to say this has already been asked and answered.
3 BY MR. KIMREY:
4     Q.   So at response 1 it says at the second
5 sentence: "This request is further irrelevant because
6 Defendant admits that it did not obtain Plaintiff's
7 written consent to use her identity in an advertisement."
8 Do you see that?
9     A.   Yes.
10     Q.   How did the Defendant Whitepages admit that?
11     MR. BEAUMONT: Objection. This calls for a
12 legal conclusion. Object to the form of the question.
13 The witness can answer if she knows.
14 BY THE WITNESS:
15     A.   I don't know how to answer that question.
16 BY MR. KIMREY:
17     Q.   Do you have an answer?
18     MR. BEAUMONT: Objection, speculation. The
19 witness can answer if she knows.
20 BY THE WITNESS:
21     A.   I don't have an answer for that question
22 because I -- I don't know -- I can't -- I can't figure
23 out what you're trying to ask.
24 BY MR. KIMREY:

Page 279

1     Q.   I'm asking what is your basis for asserting
2 that Whitepages admits that it did not obtain Plaintiff's
3 written consent to use her identity in advertisement.
4     MR. BEAUMONT: Objection, legal conclusion.
5 The witness can answer if she knows.
6 BY THE WITNESS:
7     A.   I never gave -- anybody can -- I never gave a
8 website, Whitepages or otherwise, permission to use my
9 name for somebody who asked for it.
10 BY MR. KIMREY:
11     Q.   Yeah, but that's not responsive to my
12 question. My question is how did Whitepages admit that
13 it did not obtain Plaintiff's written consent to use her
14 identity in an advertisement.
15     MR. BEAUMONT: Objection, calls for a legal
16 conclusion. The witness can answer if she knows.
17 BY THE WITNESS:
18     A.   I'm not a lawyer. I don't understand what
19 you're looking for. I don't understand what -- how it's
20 relevant to admitting that you didn't obtain my
21 permission.
22 BY MR. KIMREY:
23     Q.   Your request to admit response says that
24 Whitepages admitted that it didn't get your written

Page 280

1 consent. How did Whitepages admit that?
2     MR. BEAUMONT: Objection, legal conclusion.
3 BY THE WITNESS:
4     A.   I'm not a lawyer. I don't know how to
5 explain legalese.
6 BY MR. KIMREY:
7     Q.   Do you understand what the word admit means?
8     A.   Yes, but, again, I -- I don't know how to
9 explain that -- I'm not sure what you're looking for me
10 to say about you guys admitting that I -- you didn't get
11 permission from me. I don't know how -- I don't know
12 what you want me to say, so I'm -- I can't answer the
13 question when I don't know what you want me to say.
14     Q.   I just want to know what your basis is for
15 asserting in request to admit response number 1 that
16 Whitepages admitted allegedly that it didn't obtain
17 written consent.
18     MR. BEAUMONT: Objection, legal conclusion.
19 BY THE WITNESS:
20     A.   Again, I'm not a lawyer. I -- I did not
21 write out that specific sentence, so I don't know -- I
22 can't tell you how that would -- what that -- again,
23 you're trying to get me to tell you something about a
24 legal sentence in a court document. I'm not a lawyer. I

Page 281

1 don't know how to answer that question.
2 BY MR. KIMREY:
3     Q.   Do you need to be a lawyer to understand what
4 the word admit means?
5     A.   I need to be a --
6     MR. BEAUMONT: Form.
7 BY THE WITNESS:
8     A.   I would need to be a lawyer to understand why
9 it is irrelevant that you did not obtain my -- the
10 Plaintiff's written consent to use my identity in an
11 advertisement. I don't know how -- you're -- again,
12 you're asking the same question over and over. I'm not a
13 lawyer. I don't know how to explain legal sen --
14 legal -- how the legal construct of this sentence -- how
15 I'm supposed to explain the legal construct of this
16 sentence. I'm not a lawyer. I don't understand how the
17 admitting that it did not -- that -- trying to get me to
18 say anything about that when I'm not a lawyer and I
19 didn't write this statement. I just said that I don't --
20 you didn't have permission to use my identity.
21 BY MR. KIMREY:
22     Q.   Let's go to request number 43, request 43.
23     THE WITNESS: 7 1/2.
24 BY MR. KIMREY:

71 (Pages 278 - 281)

Page 282

1    Q.   Do you see this request says: "Admit that
2  you gave your consent to a person or corporate entity to
3  share your name with others"?  Do you see that?
4    A.   Yes.
5    Q.   And then at the end of the response on Page
6  18 it says: "Plaintiff admits that she has given written
7  consent to specific third parties to share her name on a
8  limited basis with others."  Are you able to identify who
9  those third parties are?
10    A.   No, because you're asking me a general
11  question about anybody I gave my phone number to.  I've
12  never given written consent for anybody to share my name
13  or information with anybody.  I -- every time something
14  comes up where I have to sign up for it I purposefully
15  set it up that I make my information private and I don't
16  get -- I don't give it out to anybody.
17    Q.   But the response says that you admit that you
18  have given written consent to specific third parties to
19  share your name on a limited basis with others.
20    A.   The only thing I can -- the only thing I can
21  think of, that is like Facebook having -- because
22  Facebook gives -- does whatever.  I can only think like
23  Facebook and Google, but I don't just randomly give third
24  parties consent to have my name.  Facebook and Google

Page 283

1  have my phone number in it, but I don't hand out my phone
2  number willy nilly.
3    Q.   Request 44 says: "Admit that you gave your
4  consent to a person or corporate entity to share your
5  date of birth with others," and then if you look at the
6  last sentence of the response, it says that you "Admit
7  that you have given written consent to specific third
8  parties to share your date of birth on a limited basis
9  with others."  Do you know who those others are?
10    A.   I've given my name and date of birth to
11  employers in order for them to -- in case -- when they
12  need to run background checks, and only very few
13  employers have ever asked for that information.  Amazon
14  asked for my name and date of birth to run a background
15  check.
16    Q.   Anybody else?
17    A.   Not for the past ten years.  I've been
18  unemployed.  I can't think of anybody else I might have
19  given my information to.
20    Q.   45 says: "Admit that you gave your consent
21  to a person or corporate entity to share your current
22  address with others."  And then the last sentence of the
23  response at 19 says: "Plaintiff has made a reasonable
24  inquiry, and the information she knows or can reasonably

Page 284

1  obtain is insufficient to enable her to admit or deny
2  because Plaintiff does not recall giving written consent
3  to anyone to share her current address with others."
4  What investigation did you conduct to determine whether
5  you've given written consent to anyone to share your
6  current address?
7    A.   I -- I have looked up my -- my name and my
8  address on Google, and nobody's got it.  Nobody except
9  you guys have -- I've never found my name or address
10  anywhere but it's -- I can't guarantee that -- that
11  there's not a website out there other than you guys.
12  Well, actually, that is -- you guys are the ones that
13  have all of that information.
14    Q.   Did you do anything else to determine whether
15  you've given written consent to anyone to share your
16  current address with others?
17    A.   Could you repeat that?  I'm -- I'm getting
18  tired.
19    Q.   Did you do anything else beyond what you just
20  testified to to determine whether you've given written
21  consent to anyone to share your current address with
22  others?
23    A.   I don't know.
24    Q.   Did you look for e-mails to see whether you

Page 285

1  had done that?
2    A.   I don't give out my current address via
3  e-mail.  I don't -- there's very few places where I've
4  ever typed in my current address.
5    Q.   So --
6    MR. BEAUMONT:  So Plaintiff has indicated that
7  she's tired, and so is there -- is there a break -- I
8  think that we -- I think we should take a five-minute
9  break and come back in five minutes and resume.
10    THE WITNESS:  Honestly, it's -- it's -- not on
11  the record it's been 7 1/2 hours, and I'm getting
12  exhausted at repeating myself constantly three and four
13  times when you ask me the same question.  It's really
14  starting to get tiring that you constantly ask the same
15  question over and over and over.
16    MR. BEAUMONT:  Let's take a five-minute break.
17    MR. KIMREY:  So you are the class
18  representative in this case, Ms. Lukis.  I'm entitled
19  under the default federal rule time limitation to take
20  testimony from you for seven hours on the record.
21    Your counsel has extended that time period
22  by not producing a single document in this case until
23  yesterday giving me an inadequate amount of time to
24  review those documents.  If you don't want to comply with

72 (Pages 282 - 285)

Page 286

1 the rules and sit for this deposition that's completely
2 consistent with the Federal Rules of Civil Procedure, you
3 may not want to serve as a class representative in this
4 case.
5       THE WITNESS: No, I --
6       MR. KIMREY: You asked me to take a break.
7 Let's take a break.
8       THE VIDEOGRAPHER: Going off the video record
9 at 5:08 p.m.
10             (WHEREUPON, a break was
11             taken.)
12       We are back on the record at 5:31 p.m.
13       You may proceed.
14       MR. COSTALES: Great, thanks. This is Roberto
15 Costales, Plaintiff's counsel.
16 Blaine, I wanted to get this conversation
17 on the record in the event that a court ends up looking
18 at it.
19       We began at 9:30 today. I know we took
20 breaks. It's now 5:30 Central. Are you prepared to
21 continue deposing Ms. Lukis until -- how long are you
22 willing to go today?
23       MR. KIMREY: I had intended to ask her --
24       MR. COSTALES: Yeah.

Page 287

1       MR. KIMREY: I intended to ask her many more
2 questions related to the RFAs, the interrogatories and
3 the document request, but I also know that we have a
4 running time right now I think of 606 and maybe a little
5 bit of change.
6       MR. COSTALES: Right.
7       MR. KIMREY: So because of the late production
8 last night, I'm going to jump over my prior preparation
9 that I had done before the production and start trying to
10 dip my toes in the production. And I'm anticipating
11 you're going to start objecting as we approach seven.
12       It would be nice if we could get an
13 agreement about dealing with these documents. I mean
14 there are -- they're produced in a weird fashion. Many
15 of them are messed up or corrupt. There are giant
16 redactions in a couple of them, and I don't know whether
17 that's intentional or on purpose. They were produced in
18 multiple folders and subfolders and not in native format
19 so that they've been very challenging for us to
20 assimilate, and even if they weren't voluminous and
21 organized in a weird fashion, it's not fair to produce
22 the first documents in the case to us less than 24 hours
23 before Ms. Lukis' deposition.
24       MR. COSTALES: Are you prepared to ask

Page 288

1 questions on them today? Are you prepared to ask
2 questions on them today?
3       MR. KIMREY: Not -- I'm going to start dipping
4 my toe into them, but there's no way I've had enough time
5 to be able to process these documents. I mean right now
6 I'm looking at from that production potential number of
7 exhibits that I have not reviewed of 1, 2 like -- it's
8 like 35 exhibits.
9       MR. COSTALES: Are you available next Tuesday?
10 Are you available next Tuesday?
11       MR. KIMREY: I don't know. Do you want to do
12 this on the record? Is there any --
13       MR. COSTALES: We're on the record right now.
14       MR. KIMREY: Yeah, I know, but I'm saying do
15 you want to go off the record because now I'm checking my
16 calendar.
17       MR. COSTALES: That's fine.
18       MR. KIMREY: So next Tuesday we have set for I
19 believe Laura Murkin. Well, no. No. No, I'm not. I'm
20 in a prep session on Tuesday.
21       If we're going to talk about calendaring,
22 let's do it off the record because it sounds to me like
23 you --
24             (Zoom interruption.)

Page 289

1       -- based on the additional production.
2       MR. COSTALES: Well, yeah. What I'm going to
3 say is we're going to propose you do it next Tuesday
4 because we're not going to give you the additional hour
5 outside of court order because this deposition has gone
6 on way too long. We don't believe you're entitled to
7 more than an hour. So our thought was you come and you
8 can take her deposition next Tuesday and have the benefit
9 of the additional week to review these documents.
10       MR. KIMREY: No, I'm going to continue going
11 right now. I want to get into these additional
12 documents. I'm not going to show up for another session
13 of her deposition for an hour especially when you
14 produced 2500 documents, 2500 pages of documents right
15 before her deposition.
16       MR. COSTALES: So you're not willing to
17 entertain that compromise?
18       MR. KIMREY: That's not a compromise. That's
19 a complete -- yeah, that's not a compromise.
20       MR. COSTALES: Okay. However you want to
21 characterize it. You're not willing to accept that
22 offer?
23       MR. KIMREY: Let's go off the record. You're
24 burning up my time. You're wasting my time.

73 (Pages 286 - 289)

Page 290

1     MR. COSTALES: I just want to confirm you're
2 not interested in that offer?
3     MR. KIMREY: I don't even know why I'm talking
4 to you and not Mr. Beaumont because Mr. Beaumont is
5 defending the deposition but the objections --
6     MR. COSTALES: Wait. Are you interested in
7 that offer or not?
8     MR. KIMREY: -- are ridiculous and
9 ill-founded, and this deposition has taken --
10        (Zoom interruption.)
11     -- because of the way you've behaved, Mr.
12 Beaumont has behaved in the deposition.
13     MR. COSTALES: Are you interested in the
14 offer, Blaine, or not in coming back next week?
15     MR. KIMREY: No. No. I'm only interested in
16 coming back another day if you stipulate to more time in
17 light of the fact that you produced for the first time
18 2500 pages in documents before the --
19     MR. COSTALES: We're offering you an hour next
20 week to do that. We're offering you an hour next week to
21 do that. You don't want to do that. Great.
22     Let's continue with the deposition.
23     MR. KIMREY: An hour in addition to seven?
24     MR. COSTALES: Is that -- are you proposing

Page 291

1 that next Tuesday?
2     MR. KIMREY: I don't understand what you're
3 saying. Are you proposing that we go for seven hours
4 here and then that you give me another -- you agree to
5 another hour at some later date in the near future for a
6 total of eight hours? Is that what you're suggesting?
7     MR. COSTALES: I can -- I can -- no. I was
8 suggesting giving you a flat seven. Stopping now and
9 giving you an additional hour next week but if you're
10 counter-proposing --
11     MR. KIMREY: It's not an additional hour. I
12 get the hour. Okay. Let's move on.
13     MR. COSTALES: Don't raise your -- don't
14 raise -- do not raise your voice but if you're --
15     MR. KIMREY: You're raising your voice. Are
16 you kidding me?
17     MR. COSTALES: If you're proposing now a total
18 of eight hours, I can discuss that with my client. Is
19 that what you're proposing?
20     MR. KIMREY: No, I'm not proposing it. I
21 don't understand what you're talking about. You're
22 wasting my time in this deposition.
23     MR. COSTALES: Okay.
24     MR. KIMREY: Let's move on. You haven't come

Page 292

1 up with a solution. Maybe you can think about it longer
2 because you're not defending this deposition and then we
3 can go off the record and discuss an appropriate
4 solution.
5     MR. COSTALES: No. This needs to be on the
6 record. I have offered --
7     MR. KIMREY: It's my deposition. Let's move
8 on. We're introducing the next exhibit.
9     MR. COSTALES: No. I want to confirm your
10 position. So you're saying that an additional hour for a
11 total of eight hours, you're not interested in that
12 either?
13     MR. KIMREY: I'm not having this discussion on
14 the record. If you keep going, we're going off the
15 record.
16     MR. COSTALES: You're not interested in that?
17     MR. KIMREY: Off the record. Let's go.
18     THE VIDEOGRAPHER: Going off the record at
19 5:38 p.m.
20        (WHEREUPON, a break was
21        taken.)
22     We are back on the record at 5:53 p.m.
23     You may proceed.
24     MR. KIMREY: Off the record Mr. Costales and I

Page 293

1 have reached a compromise about how to proceed, and the
2 elements of the compromise as I understand them are as
3 follows. We are going to conclude for tonight Ms. Lukis'
4 deposition. Now it's not over. We're just suspending it
5 and keeping it open, and we will resume the deposition at
6 9:30 a.m. Central on January 13th, and we have agreed
7 that that session will be limited to an additional three
8 hours on the record. This agreement is without prejudice
9 to any motion to compel we may file, and it is contingent
10 on the additional agreement that we will stipulate to an
11 extension of our deadline to oppose amendment from
12 January 13th to January 22nd and stipulate to extension
13 of our deadline to reply in support of arbitrability and
14 class waiver from January 20th to January 29th.
15     I think some of the reasons for doing this
16 include, number one, it's late. Ms. Lukis is not a
17 professional deposition giver, and she needed to take a
18 break which is fine. We got a big document production,
19 the first document production in the case by Ms. Lukis
20 last night. We haven't had a chance to fully review it.
21 And, again, it's subject to the stipulated extensions on
22 the briefing and, you know, without waiver of any motion
23 to compel we might file related to what we might view to
24 be inadequate discovery responses including but not

74 (Pages 290 - 293)

Page 294

1 limited to inadequate document production.

2    Mr. Costales, did I get that right?

3    MR. COSTALES: Yeah, you got it right.

4    Also it's our understanding that the

5 deposition dates for the -- for our -- that we have for

6 the defense witnesses are not going to change in January

7 as a result of this agreement.

8    MR. KIMREY: That's correct. My intent is to

9 present --

10    MR. COSTALES: Okay.

11    MR. KIMREY: -- the witnesses we've agreed to

12 in January on the previously agreed to dates.

13    MR. COSTALES: Great. And then we'll discuss

14 at another time extending the discovery on this case. I

15 think we have a status due at the end of the month

16 anyway.

17    MR. KIMREY: Yeah, and I'm not taking a

18 position on that right now. I acknowledge that you want

19 to do that, but I'm not prepared to address, you know,

20 what position we'll take on that.

21    MR. COSTALES: Sure. Sure. Okay.

22    MR. KIMREY: And -- yeah, so we're just

23 holding it open.

24    Thank you for your time, Ms. Lukis. We'll

Page 295

1 see you again at 9:30 a.m. Central on January 13th.

2    We probably need to paper the briefing

3 extensions with the court, Mr. Costales, so we'll prepare

4 a stip for your consideration and likely get that on file

5 after you approve it tomorrow. Does that work for you?

6    MR. COSTALES: Works for me. I'll be looking

7 for it.

8    MR. KIMREY: Okay. Anything else, anybody

9 else?

10    (No response.)

11    MR. COSTALES: Great. Thank you all.

12    THE VIDEOGRAPHER: Okay. We are going off the

13 video record at 5:57 p.m.

14    That concludes today's testimony.

15    Master media will be retained by Veritext

16 Legal Solutions.

17    Thank you, all. Have a good evening.

18

19

20

21

22

23

24

Page 296

1    SIGNATURE:

2 It was agreed by and between counsel and the parties that

3 the Deponent will read and sign the transcript of said

4 deposition.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 297

1 STATE OF ILLINOIS )

   ) SS:

2 COUNTY OF C O O K )

3    I, KELLY A. BRICHETTO, a Certified Shorthand

4 Reporter of said state, do hereby certify

5 that the within named witness, STEPHANIE LUKIS, was by me

6 first duly sworn to testify the truth, the whole truth

7 and nothing but the truth in the cause aforesaid; that

8 the testimony then given by the above-referenced witness

9 was by me reduced to stenotype in the presence of said

10 witness; afterwards transcribed, and that the foregoing

11 is a true and correct transcription of the testimony so

12 given by the above-referenced witness.

13    I do further certify that this deposition was

14 taken at the time and place in the foregoing caption

15 specified and was completed without adjournment.

16    I do further certify that I am not a relative,

17 counsel or attorney for either party or otherwise

18 interested in the event of this action.

19

20

21

22

23

24

75 (Pages 294 - 297)

Page 298

1  IN WITNESS WHEREOF, I do hereunto set my hand
2  this 8th day of January, 2021.
3
4
5
       *Kelly Brichetto*
6
7  KELLY A. BRICHETTO
8  CSR License No. 84-3252
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 299

1              Veritext Legal Solutions
                  1100 Superior Ave
2                    Suite 1820
                 Cleveland, Ohio 44114
3               Phone: 216-523-1313
4
   January 8, 2021
5
   To: Mr. Beaumont
6
   Case Name: Lukis, Stephanie  v. Whitepages, Inc.
7
   Veritext Reference Number: 4390026
8
   Witness: Stephanie Lukis      Deposition Date:  1/5/2021
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24 NO NOTARY REQUIRED IN CA

Page 300

1          DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
3     ASSIGNMENT REFERENCE NO: 4390026
      CASE NAME: Lukis, Stephanie  v. Whitepages, Inc.
      DATE OF DEPOSITION: 1/5/2021
4     WITNESS' NAME: Stephanie Lukis
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____          _____
9  Date              Stephanie Lukis
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
         Statement; and
14    Their execution of this Statement is of
         their free act and deed.
15
      I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
      _____
18    Notary Public
19    _____
      Commission Expiration Date
20
21
22
23
24
25

Page 301

1          DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
3     ASSIGNMENT REFERENCE NO: 4390026
      CASE NAME: Lukis, Stephanie  v. Whitepages, Inc.
      DATE OF DEPOSITION: 1/5/2021
4     WITNESS' NAME: Stephanie Lukis
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9     I request that these changes be entered
   as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
   _____
13 Date              Stephanie Lukis
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18       in the appended Errata Sheet;
      They signed the foregoing Sworn
19       Statement; and
      Their execution of this Statement is of
20       their free act and deed.
21    I have affixed my name and official seal
22 this _____ day of_____, 20____.
23    _____
      Notary Public
24    _____
25    Commission Expiration Date

76 (Pages 298 - 301)

Page 302

1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2           ASSIGNMENT NO: 4390026
3    PAGE/LINE(S) /      CHANGE      /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____    _____
20   Date        Stephanie Lukis
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
         Notary Public
24
     _____
25       Commission Expiration Date

**[& - 2018]**                                                                                    Page 1

| & |
| --- |

**&**   131:16,20
132:10,23 133:5
135:1

| 0 |
| --- |

**0300360600**   92:24
**04871**   1:7 5:15
**0501185600**   92:1
**0508666100**   90:11
**05086666100**
90:17
**059**   90:10,17 92:24
**0876**   101:23

| 1 |
| --- |

**1**   4:3,10 33:5 34:4
58:2,4,5,5,19 71:9
71:20 73:7,18
74:3,3 75:4,19
77:3 78:20 82:14
86:19 87:13 90:2
90:15 92:22 96:7
96:14,18 107:16
107:20 112:12,16
113:7 115:7
117:21 121:17
129:1 131:12,15
168:16 188:14,19
197:14 208:2,11
208:15 213:1
219:10,10 260:24
278:4 280:15
288:7
**1.1**   32:22 138:22
144:19
**1.11.**   218:20
**1.12.**   251:9
**1.13.**   253:15
**1.14.**   254:16
**1.2**   97:18 177:16

**1/2**   281:23 285:11
**1/5/2021**   299:8
300:3 301:3
**1/8**   182:24
**10**   4:7 86:11
139:15,16 140:8
141:14 188:9
208:2,3
**100**   274:16
**101**   77:3,4
**107**   2:5 4:4 91:24
**10:03**   20:22
**10:21**   33:20
**10:23**   33:23
**10:27**   36:19
**10:33**   36:22
**10:34**   37:20
**10:35**   37:23
**10:42**   44:16
**10:50**   44:19
**11**   4:7 144:2 219:8
219:9,11
**11-15**   87:3
**11.5**   219:10,11
**11.5.**   219:10
**1100**   299:1
**112**   4:4
**1199800**   81:4
**11:19**   72:22
**12**   4:8 118:23
119:7 251:9
**120**   94:1,4
**12498**   298:5
**129**   4:5
**12:24**   73:1
**12:30**   115:4
**12:35**   121:17
122:7
**13**   4:8 79:22 119:3
253:14

**130**   277:4
**13th**   293:6,12
295:1
**14**   4:9 80:11 81:4
82:14 86:11,19
189:1 254:16
**15**   4:10 87:13,20
105:18,20 119:21
167:22 176:8
184:22 256:14
258:20 272:22
**1525**   77:2
**15915**   77:6
**16**   4:10 81:6
144:15 189:22
259:10
**168**   4:5
**17**   4:11 96:18
144:19 277:2
**1717956**   86:11
**18**   4:12 237:10
277:14 282:6
**180**   81:4
**1804**   77:2
**181**   96:13
**1816**   76:20
**1820**   299:2
**18254**   253:23
**183**   4:6
**19**   9:16,24 283:23
**197**   4:6
**1977**   10:22,24 59:3
59:4
**1987**   11:5,16
**1988**   11:16
**1996**   30:12
**1999**   86:24
**19th**   80:1
**1:10**   122:3
**1:14**   122:11

**1:19**   1:7 5:15
**1:58**   156:23
**1st**   127:12

| 2 |
| --- |

**2**   3:2 4:3 75:4
76:24 96:20,20
97:19 98:8 105:18
105:20 142:8
170:3 173:6
187:17 188:15,19
256:13 261:1
266:18 269:14
277:1,13 288:7
**2.15**   256:13
**2.5**   139:15
**2.6**   179:1 259:9
**2.9**   4:12 179:21
**20**   58:13 191:5
258:4 265:7
300:16 301:22
302:22
**2000s**   203:23
**2001**   87:3
**2004**   60:23 108:20
**2005**   60:23 90:15
90:16 196:24
257:10,13
**2006**   18:24
**2007**   29:20 32:1,2
**2010**   82:13 89:9
170:7,13 177:10
**2012**   258:4
**2013**   100:3 255:19
271:6
**2014**   100:2
**2016**   18:24
**2017**   100:3,3
269:21
**20171**   98:19
**2018**   29:4 81:6
102:14 103:15

104:10 131:17,17
131:23,23 132:18
132:19,20,22
185:6,16,21,22
186:2 223:11
231:1
**2019** 38:23 80:3
124:17,18 269:12
**2020** 58:12 126:13
130:15 216:3
**2021** 1:17 5:2
126:2 127:7,17
208:6 219:14,17
298:2 299:4
**20593** 77:7
**208** 4:7
**209** 2:5
**20933** 77:1
**20th** 293:14
**21** 109:10,14 110:7
145:11 202:8,13
**216-523-1313**
299:3
**217** 83:13
**219** 4:7
**22** 96:17 146:10
176:9
**222** 2:12
**222-7378** 270:20
**22nd** 293:12
**23** 109:15 147:23
176:12
**230-6064** 114:19
**237** 4:12
**24** 192:1 287:22
**24th** 10:24
**25** 177:16 247:9,12
**2500** 73:15 289:14
289:14 290:18
**251** 4:8

**2519** 76:21 98:18
**253** 4:8
**254** 4:9
**256** 4:10
**259** 4:11
**26** 203:4
**27** 90:3 110:19
**277** 4:11
**28** 90:2,14 91:7
96:22 115:13
**29** 91:21 92:22
93:24 115:17
**2908** 79:1
**294** 3:11
**29th** 293:14
**2:10** 157:3
**2nd** 127:13

### 3

**3** 4:4 9:16 78:20
96:16 107:15,16
107:16 109:10
112:24 140:8
141:14,14 143:15
173:21 183:22,22
188:9,17,19
247:13 261:1,2
**3.1** 141:15 145:15
180:17
**3.2** 181:4
**3.3** 146:10
**30** 95:4 179:1
266:5
**30th** 58:12,13
130:15
**31** 179:21
**312** 2:13 101:21,22
101:24 102:10,13
103:1,12 104:11
105:3 114:12
269:23 272:9
273:4 275:9

**313** 101:18,20
102:10
**313-1364** 101:6
115:1 275:15
**313-6404** 102:10
104:11 105:3
**313-6405** 100:11
114:23
**32** 197:5
**33** 4:3 95:17
180:17
**3314** 76:19
**33rd** 76:20
**34** 95:24 96:9,9
181:4
**3450** 76:23 83:13
84:16 88:12
**34th** 76:20,22 77:6
88:13 269:14
**35** 96:8 288:8
**350,000** 170:19
**351-2022** 114:12
**3584** 17:20 18:2
23:15 25:5,11
**36** 116:4 181:21
204:15,15
**37** 32:21 116:19
**38** 32:21 205:9
**39** 206:18 266:2
**3:31** 219:2
**3:40** 219:5
**3rd** 127:13

### 4

**4** 3:4 4:4 73:11
96:21 112:12,20
112:24 172:19
201:7 210:18,19
248:13 261:2
**4,178** 81:7,19 82:5
**4,208** 82:16 84:1

**4-17** 90:15,16
**4.1** 181:21
**4.2** 147:23 181:24
**40** 226:15
**403** 98:19
**42954** 77:5
**43** 32:19 59:6,22
96:19 98:16
281:22,22
**4317** 77:1
**4390026** 299:7
300:2 301:2 302:2
**43rd** 76:24
**44** 283:3
**44114** 299:2
**444** 76:21
**44th** 76:21
**45** 198:13 283:20
**459-0786** 101:22
**459-0876** 101:21
101:24 102:13
103:1,12 269:24
272:9 273:4 275:9
**49** 96:22
**4:32** 266:14
**4:38** 265:17
**4:39** 265:20
266:11
**4th** 127:13 208:6
219:14,17

### 5

**5** 13:22 14:22
15:23 19:17 96:22
117:21,22 118:3,4
118:5 144:2,3,3
186:13 201:15
260:18 262:17
266:2
**51st** 134:5
**530** 87:5

**[5445 - account]**

**5445** 77:5
**56.1** 4:11 259:12
**562-61** 59:9 80:8
  81:13 82:23 87:10
  87:24 90:8
**565** 80:5,15
**571** 114:19
**59** 81:3
**5:08** 286:9
**5:30** 286:20
**5:31** 286:12
**5:38** 292:19
**5:53** 292:22
**5:57** 295:13
**5th** 1:16 5:2
  127:10

**6**

**6** 4:5 96:15,20,22
  101:18 110:24
  129:1,1 130:12
  139:16 144:15
  145:11 156:8
  189:1 201:6,15
  261:16
**6-10** 80:3
**606** 287:4
**60601** 2:12
**60605** 2:6
**60608** 269:15
**609-7500** 2:13
**62** 73:6
**649** 76:23
**6816** 88:12

**7**

**7** 3:7 4:5 114:7
  119:21 168:15,16
  173:6 265:2
  281:23 285:11
**703** 100:11 101:6
  114:23 115:1

**275:15**
**7506** 76:21
**773** 2:6 99:18
  100:18 101:1
  113:7 114:10,16
  114:21 270:20
  271:17 275:17
**7a** 119:24
**7c** 266:17

**8**

**8** 4:6 105:20
  138:18,18 174:6
  183:1,23 187:17
  268:8 277:1,1
  299:4
**8006** 76:24
**801-0023** 99:19
  113:7 114:16
  275:17
**816** 76:22 77:6
  269:14 275:19
**831-8000** 2:6
**84-3252** 1:15
  298:8
**855-9178** 101:1
  114:21
**888-466-1066**
  110:24
**8th** 298:2

**9**

**9** 4:6 111:1 175:14
  197:15,15,17
  201:23,23 268:11
  277:13
**9-1** 82:13
**9-8** 86:24
**900** 226:17
**901** 76:20
**957-6403** 100:18
  114:10 271:18

**97** 4:3
**99018538** 86:19
**9:30** 1:17 266:4,8
  286:19 293:6
  295:1
**9:35** 5:2
**9:58** 20:19
**9a** 197:18,20
  198:23 201:6,7,23
**9b** 197:18 198:19

**a**

**a.m.** 1:17 5:2
  20:19,22 33:20,23
  36:19,22 37:20,23
  44:16,19 72:22
  73:1,4 110:24
  266:4 293:6 295:1
**ability** 8:17 41:19
  153:5 230:12
**able** 97:21 107:14
  177:14 218:6
  223:15 225:9
  226:24 227:21
  229:22 231:13
  248:14 253:10
  274:23 282:8
  288:5
**absentia** 92:9 93:4
  93:9
**absolutely** 161:16
  165:14 274:16
**abused** 226:14
**abusive** 29:7,9
  185:9 224:21
  225:21 234:4
**accept** 116:14
  117:1 187:13
  289:21
**acceptance** 238:2
**accepted** 239:4,15
  240:3,23

**access** 14:24 33:13
  33:18 107:5
  117:17 121:13
  139:6 144:5
  145:22 148:22
  153:5 169:14
  175:16 176:16
  178:15 180:20
  182:11 185:10
  192:13 203:11
  204:21 218:4,17
  238:3 247:24
  248:13,15 259:20
  260:8
**accessed** 192:17
**accessing** 138:24
  147:24 178:6
  181:21
**account** 15:1,10
  15:15,16,18,19
  16:6,9,23 17:1,2
  19:21 24:9 25:3,6
  25:7,13,13,14,17
  25:22 26:3,6,9,24
  26:24,24 46:11
  61:22,24 62:1,3,5
  73:20,21 130:14
  131:5,7,9 144:20
  145:7,9 146:15,19
  148:14 149:10,12
  152:12,17 155:5
  156:2,6 161:3
  168:16 169:5,7,12
  169:14,15,18
  170:4,15,22
  171:16 176:5,15
  176:16 177:6,19
  180:1,7,21 182:12
  182:15,21 183:2,5
  183:16,18,20
  184:17 185:17

186:7 190:7,11
192:7,11 193:9,12
193:16,23 194:1,5
194:8,10,15,17,19
194:21,23 195:1,4
195:7,9,11,17,19
195:21 196:1,3,5,7
196:9,11,17,19,22
196:24 198:2,4
202:9,14 203:12
203:16,22 204:19
204:22 206:22
207:10,17 222:12
222:13 238:21,24
240:1 247:19
249:2 270:24
271:2,5
**accounts** 16:7,8,11
16:15,16,18,19
20:11 27:18 62:13
73:23 89:23
146:18 147:1
153:3,6 154:9
**accuracy** 106:3,4
**accurate** 89:11
97:11,11 105:22
106:1,17 131:18
258:20 259:3
**accurately** 97:1
106:8 109:21
111:11 120:23
139:7 140:1
141:24 142:16
143:20 144:8
145:1 146:2 147:2
147:17 149:1
173:17,24 175:7
175:21 176:19
177:22 178:20
179:15 180:12,22
181:16 188:4

189:8 190:5
191:16 192:21
197:10 203:13
204:24 206:7
207:21 219:18
238:7 248:5,20
**accurint** 58:10
**accusing** 215:6
**acknowledge**
294:18 300:11
301:16
**acquired** 75:20
**acquisition** 189:4
**act** 34:22 171:21
172:2,4 212:18
300:14 301:20
**acting** 242:11
**action** 5:22 158:2
158:4,19 159:3,14
161:6 166:17
244:21 297:18
**actions** 142:11
179:6 188:17
191:8 215:5
233:17
**active** 74:16
110:22
**activities** 162:22
168:10
**activity** 164:23
177:17 188:2
206:18,21 207:7,8
207:16
**actual** 88:17
**ad** 35:5,6,18 36:1
38:14,22 39:4,6,16
39:19,21,23 40:2,6
40:8,18 41:21
42:10 43:2 45:20
45:23,24 46:8
134:17 171:11,15

171:19,23 179:2,2
179:6,10,11
213:13 216:4
223:13
**adapt** 174:11
**add** 204:18
**addition** 15:23
16:3 268:14
290:23
**additional** 53:8
116:21,24 120:18
120:21 174:24
217:18 260:22
261:1 264:9 289:1
289:4,9,11 291:9
291:11 292:10
293:7,10
**address** 22:9
76:14,22 79:19
84:19,19,22,22
98:18,24 107:14
112:9 117:4 130:7
134:4 144:21
150:22,23 151:2
151:22 176:16
180:2,7,8 200:22
201:1 210:7,8
218:4,10,11,11,11
233:5 247:21
250:24 260:21
261:3 262:2,2
263:16 264:13
266:23 269:12,13
269:14,19,20
283:22 284:3,6,8,9
284:16,21 285:2,4
294:19 299:15
**addressed** 118:12
152:9
**addresses** 76:14
76:15 77:8,10,20

88:11,14,14,15
94:3 99:4 151:9
179:5 180:1,11
205:12 262:6
267:1,10
**adequate** 161:10
**adjournment**
297:15
**administer** 5:21
**admission** 277:16
277:20
**admissions** 221:9
**admit** 221:3,8,18
278:10 279:12,23
280:1,7,15 281:4
282:1,17 283:3,6
283:20 284:1
**admits** 278:6
279:2 282:6
**admitted** 279:24
280:16
**admitting** 279:20
280:10 281:17
**ads** 134:17 142:10
142:12 180:6
187:23 188:3,17
204:23 210:12
212:15,16 214:12
215:7,9,14,22
216:6,7,12,17
218:6
**adsense** 207:14
**advertise** 211:14
**advertisement**
40:4 278:7 279:3
279:14 281:11
**advertisements**
165:9 180:10
**advertisers** 179:7
180:10

[advertising - answer]                                                          Page 5

**advertising** 143:2
   148:6 175:18
   179:9 207:13,19
   210:23,24 213:17
   213:20
**advice** 23:6,12
   54:19 122:24
   123:18 126:10
   127:3 165:12
**advise** 202:22
**affect** 41:19
   230:18
**affiliated** 178:18
**affiliates** 141:18
   173:16 179:3,10
   179:12
**affixed** 300:15
   301:21
**aforesaid** 297:7
**afternoon** 122:10
   122:14
**age** 94:16 98:16
   118:22 260:20
   262:1 263:6 265:5
**agencies** 63:2,15
   66:20 71:1 109:4
**agent** 4:9 198:11
   249:16,18,21
   250:2 254:23
**agents** 242:11
**ages** 59:21 262:4
   267:7
**aggregators**
   147:14
**ago** 14:11 17:3
   25:18,24 26:2,8,12
   27:1 35:15,15,16
   64:2,5 74:1 99:1
   99:24 113:13
   114:18 134:19
   136:4,4,5,6 158:10

162:22 163:13
   166:21 177:10
   199:22
**agree** 5:9 64:8,20
   84:9 136:7,13
   138:8,13,23 139:4
   139:9 140:3 142:2
   142:18 143:22
   144:4,10 145:3
   146:4 147:4,19
   149:3 172:10,13
   173:3,19 174:2,17
   175:9,16,23
   176:21 177:24
   178:22 179:17
   180:14,24 181:18
   187:23 188:6,19
   189:10 191:18
   192:23 197:12
   200:12,15 201:21
   202:4 205:2
   206:15 207:23
   211:5 222:8,14,16
   233:10 238:5,10
   238:13 249:3
   268:12,20 276:16
   291:4
**agreed** 84:7
   136:18 143:2
   175:5 189:13,19
   244:8,14,20 245:3
   245:7,10,15,21
   246:3 293:6
   294:11,12 296:2
**agreeing** 139:1
**agreement** 84:5
   128:18 138:19,20
   139:5 172:20,21
   287:13 293:8,10
   294:7

**ahead** 8:10 20:15
   26:1 44:12 50:4,9
   58:1 122:2 135:18
   198:19 224:2
**air** 10:9,16
**alabama** 9:22
**albert** 95:6
**alcohol** 94:15
**alive** 79:16
**alleged** 80:18
   269:23
**allegedly** 255:21
   280:16
**allow** 67:15
   102:24 120:21
   139:19 143:2
   227:1,1
**allowed** 66:16
**allowing** 68:3,14
   68:19 69:2,12,16
   69:20
**allows** 67:19
   143:17
**altered** 149:13
   185:2
**amazon** 133:11,13
   133:15,17,24
   134:6 135:12
   194:5,7,10 283:13
**amendment**
   293:11
**amount** 80:5 81:6
   82:5,16 87:5
   285:23
**anal** 167:12
**analysis** 22:4
**analytics** 167:13
   167:14 181:8
   207:14,14,19
**analyzing** 178:12

**ancient** 130:13,21
   196:10
**android** 13:19,20
   180:6 204:4,7,10
**angeles** 11:7
**angie's** 196:5,7
**anguish** 226:14
   227:16
**annoying** 209:7
**answer** 7:22 8:2
   8:10 15:6,7 18:16
   18:19 21:4,17
   22:16,18 23:7,9
   24:1 27:5,8,11
   28:22 35:23 38:7
   38:11,19 39:9,14
   40:11,14 41:13,19
   42:4,12,14,16
   43:20,23 44:2,6
   45:1,4,14,17,19,22
   46:19,22 47:20
   48:10,14 49:11,13
   50:10 51:8,11,12
   51:14,20,21 52:19
   53:23 54:5,20
   55:5,8,16,19,24
   56:3,6,8,13,17
   57:4,10,14,17
   61:17 68:15 88:6
   101:17 107:24
   122:22 123:1,16
   124:14,24 125:10
   125:14,19,23
   126:6,11 127:3,6
   128:1,4 140:6
   142:6 154:22
   155:2 158:14
   161:21 162:5,15
   162:18 164:14,18
   165:6,10,13 166:3
   166:5,5,6,14,16,18

177:1 209:4
210:15 212:22
226:1 235:23
236:6,7 237:3
240:11 241:3,7,9
241:17,20 247:4,5
258:10 261:21
278:13,15,17,19
278:21 279:5,16
280:12 281:1
**answer's** 240:12
**answered** 35:5
70:12 71:5 168:13
235:21 236:3,4,23
240:6,9 241:2,6
278:2
**answering** 21:14
37:6 54:12
**answers** 240:8,17
240:18
**anthony** 95:15
**anticipate** 265:10
**anticipating**
287:10
**anticipation**
169:19
**anxiety** 226:13
227:14,23 228:24
233:15,19 234:7
234:12,14,15,24
235:16
**anybody** 57:22
70:9 103:10,22
107:4 112:2
121:12 135:22
137:11,18 245:10
245:15 255:18
272:13 274:23
275:8 279:7
282:11,12,13,16
283:16,18 295:8

**anybody's** 107:13
**anymore** 185:10
243:20 258:2
**anything's** 82:11
**anyway** 156:3
294:16
**aol.com.** 16:22
**apartment** 37:5
76:24 77:3,4
98:19 253:10
269:14
**apartments** 77:14
77:15
**api** 110:13
**apis** 109:16 110:8
178:5,6,9 192:16
192:18
**app** 179:6,9
**apparently** 42:21
92:12,15,19,23
177:14 226:9
249:2 270:13
275:1
**appear** 108:6
147:10 183:10
300:11 301:15
**appearances** 2:1
3:2
**appearing** 257:11
**appears** 198:8
213:5 214:3
251:11
**appended** 301:11
301:18
**apple** 204:13
**application** 22:5
22:10,23 42:16
45:10 123:7
134:12,16,21,24
135:3,7,14 177:21
178:9 180:20

**applications**
116:11 147:12
**applies** 201:24
**applying** 135:20
**approach** 287:11
**appropriate**
126:18 155:17
159:21 181:11
218:22 249:13
292:3
**approval** 257:14
**approve** 257:9,11
295:5
**approximately**
16:6 73:14
**apps** 176:15
179:11 192:19
203:11 206:19
207:8,10,11
**april** 216:3
**arbitrability**
293:13
**arbitration** 244:8
244:14
**archive** 25:21
**archives** 23:19
24:3
**ardmore** 77:2
**area** 152:7
**argue** 210:22
**arising** 244:15,21
245:4,8,11,16,22
246:4
**arrest** 90:15
**arriaga** 78:21
**arrived** 247:23
**article** 213:14
214:9 215:1 216:2
216:5,5,7,12,17,20
216:22 217:6,8,14
218:1,7,19

**articles** 139:21,22
**articulated** 162:3
164:4 227:12
267:21
**asked** 70:12 71:5
73:9 113:9 125:5
149:6 154:13
169:18 198:9,11
220:10 235:21
236:3 240:6,8,9
241:2 242:24
258:5 276:21
278:2 279:9
283:13,14 286:6
**asking** 8:1 27:21
27:22,24 35:24
48:24 51:4,17
52:3,4,17 54:13
57:12 64:7 70:8
71:19,20 106:24
127:5 158:17,18
164:20 184:8
221:8 226:2
236:11 241:18
242:6,12 243:1,4
279:1 281:12
282:10
**asserting** 34:10,13
34:18 279:1
280:15
**assertion** 109:24
**assets** 189:5
**assignable** 189:3
**assigning** 103:17
**assignment** 113:22
300:2 301:2 302:2
**assimilate** 287:20
**associated** 180:7
207:20 268:9,13
**associating** 180:1

**assume** 28:1 67:6
  67:9 98:4 112:14
  132:19 215:13
  231:20 265:2
  276:2,8,9
**assuming** 261:14
  262:15
**assumption** 67:10
  243:4,5
**astonishingly**
  160:14
**attached** 301:7
**attack** 226:17
  227:5 232:17
**attacks** 226:20
  228:11 233:20
  234:4
**attempted** 25:8
  247:1,6
**attended** 31:11
**attention** 93:4,20
**attorney** 8:8 21:3
  21:13 22:5,9,10,12
  22:13 23:10 27:4
  27:20 35:23 36:11
  36:15 38:6,12,18
  39:8 40:10 41:23
  42:3,13,17 43:19
  44:24 45:11,13
  46:3,14,18 47:2,11
  47:19,21 48:3,11
  48:23 50:23 51:4
  51:5,11 52:23
  53:21 54:1,2,3,4,7
  54:8,11,20,21 55:4
  55:15,23 56:12
  57:9 122:21
  123:15 124:23
  125:3,9,18 126:5
  126:18,22 172:5
  229:13 230:6,17

235:4 236:17
  237:5 241:22
  242:3 297:17
**attorney's** 54:19
**attorneys** 14:17
  20:1 39:17,18
  46:4 48:21 50:15
  229:24 232:23
  242:7,17 243:2
  246:4
**audience** 192:8
**audio** 5:7,8
**audrey** 32:10
**august** 32:1
**aunts** 227:18
**authority** 249:12
**authorize** 180:19
  301:11
**authorized** 5:21
  249:19,19
**authorizes** 174:15
**autumnsilver**
  16:12,22
**availability**
  145:24 247:3
**available** 33:9,11
  33:13 34:12,17
  109:17 112:5
  113:3 120:14
  146:16 155:24
  174:16,20 175:4
  178:10,13 184:5,9
  184:12 185:11,17
  199:6,17 206:10
  210:5 218:2 226:9
  233:21 239:14
  251:22 252:3,6,12
  253:16 254:10,14
  255:7 256:21
  257:6 258:1,13
  260:24 262:18

267:24,24 268:5
  268:20 270:12
  288:9,10
**ave** 299:1
**avenue** 134:5
  253:24
**avoid** 36:10,14
**avoiding** 224:16
  224:18,24
**awarded** 170:19
**aware** 63:14,21
  65:9,12 66:16
  67:14,18 68:2,6,14
  68:16 69:1,7,9,11
  69:15,19 74:22
  80:16 81:24 83:24
  84:4 97:5 98:12
  113:4 117:6 118:5
  121:1,3,4 129:3,5
  129:20 177:9
  186:24 187:3,5,11
  190:19 200:18
  204:7 213:12
  226:2 239:3
  242:16 258:12
  268:24
**awareness** 66:18
  240:22
**awhile** 137:7
  177:10

**b**

**back** 9:23 10:1,2,2
  10:3,4 14:22 15:3
  20:22 33:23 34:23
  36:22 37:23 44:19
  60:23 62:19 71:9
  73:1 75:19 82:3
  96:8 108:5 111:11
  122:10 156:20
  157:3 158:23
  162:8 193:21

196:24 210:23
  212:24 219:5
  221:1 223:1 232:3
  240:17,17 241:11
  262:17 265:20
  266:14 285:9
  286:12 290:14,16
  292:22 299:15
**backed** 14:23
**background** 4:11
  9:7 232:13,19
  233:1,7,7 248:15
  260:23 261:17,23
  265:1 269:8
  270:16 276:13,17
  276:18 283:12,14
**backing** 207:7
**backwards** 272:1
**bad** 7:12
**badgers** 171:9
**balance** 82:8
**bank** 81:15 82:4
**bankruptcies**
  257:15
**bankruptcy** 4:10
  60:17,20,24 71:13
  96:14 218:13
  256:14,15,17
  257:2,7,19,23
  258:3,6,12 261:4
  262:8 264:19
  267:15
**base** 161:19
**based** 15:12 42:16
  66:18,21,23 67:10
  137:16 155:2
  161:24 170:17
  262:5 267:9
  268:12 289:1
**basic** 7:20

**basically** 29:13
209:8 230:16
**basis** 154:22 155:9
160:9 166:1 279:1
280:14 282:8,19
283:8
**bates** 58:5 98:9
113:1 118:4
237:10,16 247:9
247:12
**bathroom** 8:13
**beacons** 109:18
248:3
**bearing** 5:15
**bears** 237:16
**beaumont** 2:3,4
6:5,6,6,24 15:5
17:13 18:14,18
19:8 20:12,15
21:3,13,20 22:12
22:17 23:8,24
24:5,11,12,17,19
26:21 27:3,13,20
28:3,11,20 29:2,18
30:5 31:3,12,18
33:7,12 35:11,21
36:2,10,14 37:12
37:15 38:5,17
39:7 40:9,21
41:22 42:11,21
43:3,6,11,12,17,18
44:1,7,10,13,24
45:6,13 46:15,18
47:7,10,17,24 48:9
48:22 49:5,11,12
49:24 50:2,3,9,17
50:20,22 51:1,5,9
51:15,17,24 52:1,8
52:12,13,21 53:5
53:15,16 54:10
55:1,3,10,12,15,22

55:23 56:12,20
57:9,23 58:3
59:24 60:12 61:10
61:15 62:11,23
63:8,17 64:9,16,23
65:4,14 66:14
67:4,22 68:21
70:2,12,18 71:5,16
71:23 72:8,18
73:2,2,5,16,19
75:21 76:5,9,17
77:21 78:3,13
80:19 85:4,14,22
86:8 88:4,20
89:13,16 91:5,17
92:16 93:12 94:13
94:18,24 97:6,13
97:20,24 98:7
99:12 101:15
102:6 103:2
104:13,21 105:10
106:12,20 107:2
107:22 108:13,18
109:1 110:2,9,15
111:16 112:18,22
115:3,10,24 117:8
118:2,11,14
119:14,17 120:8
121:8 122:4,19
123:4,13 124:10
124:11,12,21,22
125:6,7,8,16,17
126:1,3,14,15
127:21 128:10
132:12 133:7,19
137:19 138:6
139:11 140:4,20
141:6 142:4,20
143:4,11,24
144:11 145:5
146:6 147:7,21

150:1,11,18
151:15 152:2,14
152:18,24 153:10
154:6 155:13,23
156:18 158:6,21
159:5,12,17 160:1
160:24 161:12,22
162:7,14 163:16
163:24 164:6,10
164:13 165:5,23
166:4 168:12
169:9 170:24
171:13 172:15,22
174:4 175:12,24
176:23 179:19
181:2 183:12
184:7 185:19
186:9 188:21
189:11 190:9,14
190:21 191:20
193:2,14 194:13
196:15 198:18
200:1,7,23 201:13
202:6 206:8
210:16 211:15
212:5,19 215:15
215:23 216:13
217:11,15,18,21
217:23 218:21
220:8 225:13
226:11 228:4,19
229:10 230:4
231:5 232:6
234:17 235:2,21
236:1,3,14,21
237:21 238:15
240:6,15 241:2,8
241:13 242:2
243:17 244:2,11
244:16,22 245:13
245:17,23 246:6

246:13,23 248:9
249:5,23 250:1,4,8
250:13 251:23
252:7,23 253:7
254:11 256:8,23
258:8,14,22 259:6
259:17,23 260:10
260:14 261:8,19
262:11 265:6,12
265:23 266:3,7
268:2,15,22
270:10 272:14,20
273:19 274:2,18
275:10,23 276:20
277:8 278:1,11,18
279:4,15 280:2,18
281:6 285:6,16
290:4,4,12 299:5
**beaumont's** 39:21
40:1
**beaumontcostal...**
2:7,7
**becoming** 219:11
**began** 38:13 46:4
286:19
**beginning** 131:10
138:18 172:19
176:6 212:24
**begins** 5:10 192:2
**behalf** 1:4 2:2,9
5:12 6:6,8,11,13
139:3 181:13
249:10,14,20
**behaved** 290:11
290:12
**behavior** 53:9
169:20 241:13
**belief** 66:22
**believe** 11:5 14:19
33:7 34:16 37:12
48:1 69:10 109:23

112:21 113:14
115:22 118:5,6
119:11 120:7
124:6 126:18
152:5 221:5,14
237:23 242:2
248:7,22 249:1,17
250:10 269:21
276:21 277:12
288:19 289:6
**belong** 161:4
**beneficiary**
189:17
**benefit** 181:15
289:8
**benefits** 85:20
255:21,23
**best** 39:1
**beyond** 19:5 25:6
25:12 34:19 75:17
149:22 152:9
168:9 197:1
227:13 233:15
250:12 284:19
**big** 263:1 293:18
**bill** 103:18 105:6
**billing** 89:22
144:24
**bills** 236:9
**binding** 139:2
**biological** 11:20
29:16 32:11
**birth** 10:23 32:17
59:2,3 135:8
262:1 266:19
283:5,8,10,14
**bit** 12:8 162:22
170:3 210:20
287:5
**bkimrey** 2:13

**blacklist** 230:16
**blaine** 2:10 6:10
7:10 20:15 21:21
41:15 47:10 54:10
68:9 97:20 161:12
164:1 165:24
169:9 286:16
290:14
**blanket** 41:2,8,10
**block** 116:9
227:21
**blocked** 116:12
233:3
**blogs** 181:6
**blue** 226:16
**book** 176:16
**boring** 159:9
**born** 9:12,14
10:21 11:1
**borrower** 253:16
**bother** 78:2 209:5
213:10 214:7
**bothers** 213:11
**bottom** 79:22 90:4
91:7 108:4,9
145:12 147:23
174:6 186:16
192:2 202:12
205:23 208:10
251:1 254:20
**bound** 238:5,19,21
249:3
**bounded** 238:22
**box** 138:10,11,15
138:16
**boy** 9:23
**brain's** 131:2
**break** 8:7,11,12
20:16,20 21:2,12
22:3,21 33:21
36:12,16,20 37:1

38:2 43:12,13,15
44:8,8,11,13,17,23
45:12 72:9,18,19
72:23 115:5,8
121:18 122:8,18
123:22 124:1
156:19 157:1
174:7 175:14
178:2 218:23
219:3 265:18
266:5,6,12 285:7,9
285:16 286:6,7,10
292:20 293:18
**breaking** 68:8
121:17 211:6,10
**breaks** 8:6 21:6,7
23:4 123:5,10
286:20
**brian** 79:11,16
95:15
**brichetto** 1:15
297:3 298:7
**brief** 6:18 214:20
**briefing** 293:22
295:2
**broadcast** 174:21
**broadly** 178:4
**brokers** 119:7
**brother** 79:12
227:17
**brought** 154:11
**brown** 87:13,18
94:20
**browser** 179:4
209:15,16 220:20
243:13 247:23
**build** 132:3
**building** 272:3
**bullet** 148:10,13
148:16,21 149:7
176:12

**bunch** 99:5 202:24
228:9 234:20
242:24
**burning** 289:24
**business** 78:16
84:16 85:10,12,16
85:18,21 86:4,6
133:4,6 154:21
180:22 255:11,19
255:20,21,24,24
256:7,7 262:7
267:13 271:8,12
271:15
**businesses** 187:23
273:6,9
**busted** 91:2
**button** 46:1,7
136:20 187:13,15
**buy** 94:15 211:24

c

**c** 2:10 119:3 297:2
**ca** 299:24
**calendar** 147:12
288:16
**calendaring**
288:21
**california** 9:22
11:7 59:12
**call** 39:10 40:8
41:21 42:7,8,10
43:1,9 114:1,5
226:15 231:14,17
233:22 234:1,8
242:20 273:16
**called** 1:12 7:5
40:17 42:17 159:9
161:5 225:10
231:1
**calling** 126:16
223:2 231:2 242:3
242:3

**calls** 38:17 39:7 42:2 227:6 228:9 274:18,24 275:3 278:11 279:15
**capital** 81:15 82:4 82:7
**caption** 297:14
**capture** 197:22 198:8,23
**card** 82:7 144:24
**cardiologist** 81:2
**cards** 271:15
**care** 110:23
**carrier** 102:15 199:20,23 225:1
**case** 5:12,15 7:13 9:8 19:16,20 20:1 20:8 23:18 25:12 26:1,4,7,10,13,16 26:19 27:2,19 34:9,10 35:2 47:2 48:4 56:9 57:8 62:6 73:13 75:1 81:19 90:10,11,17 91:24 92:24 102:20 128:7,11 129:9,13 141:9 160:15 164:2,3,22 165:2 191:3 194:11 198:6 202:17,19 204:11 207:5 208:22 212:11 213:14 221:3 228:17,24 229:3,9,19 235:1 235:12,14 237:15 237:16,20 240:3 242:1,18 243:15 246:12 249:9,14 249:21 250:2,7,13 251:11,14 252:21

259:11 269:9,12 272:5 274:8 283:11 285:18,22 286:4 287:22 293:19 294:14 299:6 300:3 301:3
**cases** 74:23 148:16
**casetext.com** 213:10,12,17,20 213:22
**casetext.com.** 213:3
**cash** 147:16
**categories** 115:18 119:5
**cause** 233:23,24 234:7,12 297:7
**caused** 226:13,19 227:22 232:16 234:14
**causing** 224:22
**caution** 202:21
**cease** 29:6 271:4
**celebrity** 107:9 112:2 117:17 121:12 262:23
**cell** 12:18 15:24 16:3 36:8 100:4 101:13 102:2,5 104:10 114:15 204:3 205:16,18 205:19 216:18 223:2,6,16 224:17 232:5 270:6 272:10 274:10,12
**cellular** 5:5
**center** 145:20
**central** 73:11 115:7 122:3 286:20 293:6 295:1

**ceremony** 32:1
**certain** 146:1 148:15 177:19 188:12 202:23 243:3
**certificate** 3:11 254:18 301:11
**certification** 31:20 300:1 301:1
**certifications** 31:17
**certified** 1:15 5:18 297:3
**certify** 297:4,13 297:16
**cetera** 9:13 91:8 216:24
**chain** 46:2
**challenging** 130:24 287:19
**chance** 293:20
**change** 111:13 148:13,15 187:7 227:3,6,7 240:14 287:5 294:6 299:13,14 301:8 302:3
**changed** 140:17 184:18 185:10,13 186:2,4 204:1 209:20 222:24 223:2 224:17,23 225:1,22 226:5,16 226:23 227:4
**changes** 106:4 147:16 299:12 300:7 301:7,9
**changing** 209:18
**channels** 145:23
**character** 160:4

**characterization** 41:14
**characterize** 28:17 289:21
**characterized** 256:7
**characterizing** 255:24
**charge** 178:14
**charged** 90:20,23 91:12,15 92:6 93:7,19,21 94:22
**check** 14:16 15:10 34:14 35:20 138:10,11,16 170:19 283:15
**checking** 138:15 288:15
**checkmate** 214:10 215:6 216:24 223:4,17 225:3 230:24 231:12,18 233:2 276:7
**checkpeople** 4:3 98:3 105:19,21 106:10,16,18
**checks** 283:12
**chicago** 1:21 2:6 2:12 7:10,12 10:3 10:4,5,6 12:14 30:15 32:1 183:15 223:1 226:6 269:14
**chicagoland** 152:7
**child** 9:14 163:15 163:19
**child's** 32:9
**children's** 80:10 80:12,23
**chinese** 275:2,3,4

choices 119:22
144:7 148:3
choose 143:16
chris 95:8 157:9
157:13
christina 95:18
christopher 167:9
167:18
chrome 206:23,23
207:10 209:14,16
209:19
chromebook
207:1
chronological 9:20
12:3
circuit 86:21
cities 99:5,7,11
232:9
citizen 107:8
112:1 117:16
121:11 262:22
263:2 268:5
city 152:4,5 232:9
civil 1:13 80:1
81:4 86:10 286:2
300:5 301:5
claddy 11:21 12:5
12:11
claim 110:22
155:9 225:18
239:10,19 240:5
241:1
claiming 228:17
228:23 229:2
clarification 24:5
71:24 184:8
clarify 7:24 42:5
51:18 52:15 53:17
56:21 57:11 73:16
73:19 128:12
158:16

clarity 174:13
class 128:19,22
161:10 164:23
215:5 244:20
285:17 286:3
293:14
classes 31:2,21
clause 137:12
clear 21:8 22:1,2
27:22 28:4 35:22
35:24 42:6 51:19
52:1,19 53:11
154:12
clearly 27:8 50:22
51:5 126:20
cleveland 299:2
click 136:20 139:5
187:13,15 212:8
clicked 191:22
205:7 214:24
clicking 138:23
client 8:8 21:3,13
22:5,9,10,12,13
23:10 27:4,20
35:23 36:11,15
38:6,12,18 39:8
40:10 41:23 42:3
42:13,17 43:19
44:24 45:11,13
46:3,18 47:2,11,19
47:21 48:11,23
50:23 51:5,11
52:23 53:21 54:8
54:11,20 55:4,15
55:23 56:12 57:9
122:21 123:15
124:23 125:3,9,18
126:5,18,22
131:22 180:20
242:3 291:18

clients 88:17,22
255:12 271:13
close 29:24 206:10
272:16
cloud 14:23,24
15:4
club 157:20,21
158:9 161:5
clubs 167:23
coaching 24:13
codes 99:5,6,8,11
collect 81:24
109:11 119:6
176:14 179:8
191:13 247:13,16
247:20
collected 106:8
119:6 179:11
248:14
collection 109:18
148:4 173:12
collects 115:19
college 30:14,16
30:19,20 31:6,7,10
165:3
colleges 31:1,2
158:24 160:22
161:7 163:21
164:8
column 171:4
com 198:10
243:19
combined 179:12
combo 277:15
comcast 100:5,6,8
113:12 114:17
275:18
come 13:10 101:20
206:21 207:9
226:18 285:9
289:7 291:24

comes 169:19
187:7 260:4
282:14
comfortable
173:23
coming 290:14,16
commission
300:19 301:25
302:25
common 180:2
communication
129:19 148:7
communications
42:1 57:12 125:1
125:3 126:16,21
127:23 129:7
community 30:18
31:1,6
companies 174:20
175:1 178:17
197:7
company 70:8
84:21 85:1,3,10
88:16 132:2 139:4
188:1 192:15
205:10
compel 293:9,23
compensated
128:6
compensation
141:23 175:2,6
236:16
compiled 248:18
complaint 129:9
129:12,15,21,22
260:20
complete 105:22
106:1 289:19
completed 297:15
299:15

**completely** 40:17
162:20 185:14
218:7 235:17
286:1
**completeness**
106:3,4
**compliance**
178:16
**complicit** 210:13
**comply** 285:24
**components** 180:2
180:8,11
**compound** 262:12
**comprehensive**
71:11 74:4
**comprise** 73:14
**compromise**
289:17,18,19
293:1,2
**computer** 17:4,6
17:23 18:1 23:19
24:3 154:3,10
155:15 169:7
224:8 232:2,17
243:11,20 247:21
**computers** 18:11
19:5
**conceded** 240:3
**conception** 164:24
**concern** 73:20,22
**concerning** 53:20
161:14
**concierge** 2:19
**conclude** 293:3
**concludes** 295:14
**conclusion** 249:23
250:4 259:17,23
260:11 278:12
279:4,16 280:2,18
**condition** 181:12

**conditions** 64:8
65:2,10,19,24 66:5
66:11 67:15 68:3
68:14 69:2,16
70:10,16 71:1
112:14 136:8,19
136:23 137:17
138:9 174:24
200:13 239:4,16
240:4,24 246:18
247:2 249:3
**conduct** 284:4
**confer** 122:17
189:16
**conference** 6:23
**confident** 274:17
**confidential** 40:19
**confidentiality**
181:11
**confirm** 106:3
116:22 120:21
169:2,8 183:5
232:13 290:1
292:9
**confirmation**
111:6
**confused** 158:10
**conjunction**
207:19
**connect** 109:15
110:6,8,17 111:5
197:8 204:23
**connected** 153:20
154:24 218:12
232:10
**connection** 105:24
113:10 143:3
145:21 166:20
175:18 189:4
208:23 209:6,23
212:16 213:9

214:6 216:12
239:18
**connections**
154:13 156:3,9
157:6,11 167:4
**consent** 141:23
143:9 146:17
165:8 173:12
180:19 203:9
209:3 212:18
278:7 279:3,13
280:1,17 281:10
282:2,7,12,18,24
283:4,7,20 284:2,5
284:15,21
**consented** 69:24
**consideration**
175:15 295:4
**considered** 257:21
**consistent** 181:10
286:2
**constantly** 132:15
132:16 209:18
227:20,24 285:12
285:14
**constitute** 120:15
**construct** 281:14
281:15
**contact** 28:19,23
28:24 29:6,15,22
110:23 111:6,22
150:15,20 218:5
224:13 247:19
248:15,17 273:6
**contacted** 46:14
46:17,22 111:13
224:16,18 258:7
258:11 271:14
**contacting** 106:22
**contacts** 12:19
13:2,12,15 146:22

152:22 153:8,12
153:13,15,17
176:16
**contained** 111:10
248:4 261:24
**containing** 180:11
206:5
**content** 125:1,4
126:21 127:23
130:23 139:23
141:16,21 142:11
143:19 146:20
173:22 174:8,12
174:16,19,22,24
175:3,6,19 178:3
178:13 180:5
188:14,17 192:10
201:18 206:3
207:12,15 217:5
**contingent** 293:9
**continue** 5:8
112:22 215:5
286:21 289:10
290:22
**contract** 100:8
102:17,22,24
103:11 104:5,17
105:2,7,15 108:22
128:13 139:2,4,4
256:6
**contracts** 104:5
105:15 246:10
256:2,3
**control** 41:18
84:21,24 116:10
147:24 148:8
176:13,14 255:15
**controlling** 148:6
**controls** 148:7
**conversation**
223:8,9 286:16

conversations 5:5
27:24 56:22
122:20 123:14
convince 29:10,13
cook 214:11,14
215:1,10,14,21,22
216:11 251:10
cookcountyrecor...
213:24
cookie 179:4
cookies 109:18
248:2
cooperate 24:22
coordinator
131:23
copies 130:2,4
221:10
copy 20:5 33:8
39:4 46:9 104:4
134:15,16 141:20
148:23,24 168:20
168:23 174:10
202:13 221:5
232:18,20,24
233:6,12 277:11
corner 71:10 75:5
86:18 91:22 94:1
96:10 130:16
208:24 219:15
237:11,17
corporate 254:18
282:2 283:4,21
correct 59:4,6,14
70:17,23 76:23
83:17 86:4,6 88:3
98:5,22 111:3
120:1 137:18
138:4 141:4,5
148:13 149:10,14
153:21,22 168:22
169:8 173:4

183:16,23 189:20
200:10 206:13
212:4 229:17
230:3 233:8 235:1
261:14 262:15
263:19 265:3,22
270:8 273:4
276:10 294:8
297:11
corrected 206:13
correcting 148:5
corrections 299:12
301:17
correlate 59:10
170:8
correlates 199:23
261:17
correlating 260:23
261:23
corrupt 287:15
cost 103:19 105:6
costales 2:3,4 6:4
6:8,8 15:13 21:5
21:19,20 39:23
40:5 41:11,13
42:19,22 43:11,17
47:9,16 48:8
50:18 124:7
128:10 129:3
239:4,8,15 240:2
240:23 249:10,20
250:13 286:14,15
286:24 287:6,24
288:9,13,17 289:2
289:16,20 290:1,6
290:13,19,24
291:7,13,17,23
292:5,9,16,24
294:2,3,10,13,21
295:3,6,11

couch 41:2,10
counsel 5:24 21:1
21:12 22:4,9 23:3
27:24 33:7,18
35:2,18 42:1
44:23 47:2 49:1,3
49:9,14,19,22
56:10,23 57:6,13
58:6 73:12,13
104:4 105:16
113:2 115:3
122:17,21 123:6
123:10 124:7
125:1 126:3 130:9
134:15 135:4
142:22 149:15
155:7 158:14
169:10 202:22
211:2,3,9 217:11
217:15,23 218:21
221:8 223:13
239:3 240:23
242:9 285:21
286:15 296:2
297:17
counsel's 21:16
23:6,12 27:10
38:10 39:13 40:13
43:22 45:3,16,20
46:21 48:13 55:7
55:18 56:5,7,16
57:3,16 122:24
123:18 125:13,22
126:10 127:3
128:3 162:17
164:17 165:12
166:11 220:24
counter 291:10
countries 9:16
173:15

county 79:19
90:16 214:11,14
215:1,10,14,21,22
216:11 251:10
297:2 300:10
301:15
couple 31:20 62:4
62:19 64:2,5
232:9 242:22
287:16
course 116:18
coursera 31:20
court 1:1 5:14,19
6:22 8:2 34:9,10
41:9 56:9 77:1
80:2 81:5 86:21
90:7,16,17,17 91:8
91:9,22 92:12,13
92:22 93:3,11,15
93:18,24 103:23
212:10 213:14
221:10 240:16
241:10,10 256:16
257:7,23 280:24
286:17 289:5
295:3 300:7
courthouse 31:24
courts 1:14 242:21
coutcher 95:6,8,10
95:12,13,15 96:5
covered 55:3
187:22 228:16
craigslist 35:3,9
38:14,15 43:2
45:20,23,24 46:1,7
46:8 134:17 193:8
193:9,11,16
223:13 225:2
crashed 18:7
244:1

**create** 144:20
188:15 247:18
**created** 177:6,19
238:24 240:1
**credit** 14:8 61:14
61:21 62:3,5,8,13
62:17,18,20,20
63:1,15,24 64:3,7
64:7,20 65:1,6,9
65:12 66:10,12,20
67:1,3 69:23 70:7
70:11,17 71:1
82:7 104:5 144:23
257:5,19,21 258:3
258:4
**creditkarma.com**
61:23
**creditor** 80:10
81:15 83:12 87:12
**crime** 93:7
**criminal** 74:21,22
75:1 90:5 96:20
261:1,3 264:11,17
**crystal** 22:2 42:6
53:11
**csr** 1:15 298:8
**curating** 174:14
**curious** 231:20
**current** 12:15,20
13:17 16:11 48:4
48:4 79:18 98:18
101:13,18 106:1
113:17 118:19
133:11,14 218:11
260:21 262:1
263:16 266:23
270:6 272:10
276:1 283:21
284:3,6,16,21
285:2,4

**currently** 10:6
12:15 15:24 16:16
17:23,24 18:10
28:13 30:2 36:4
74:16 99:21 102:4
244:5
**custody** 3:13 11:8
11:13
**customer** 110:23
198:11
**customers** 145:16
**customs** 10:10
**cut** 227:19,22
228:6,8,10 234:6
**cv** 1:7 5:15
**cycle** 89:20

**d**

**dad** 10:7,14 11:9
**damages** 228:18
228:23 229:2,8
230:3 245:7,21
**dare** 228:8
**data** 14:22 116:22
119:7 144:6,19,21
146:15,17,24
147:13,16,24
148:4,5,8,9,10,11
148:13,14,15,17
148:19,20,22,23
148:24 149:8
155:18 176:13
178:16 180:18
181:9,13,15,22
182:5,5 188:1
189:22,23 191:8
191:10,13,14,15
203:12 204:10
207:20 218:2
247:13,16,18,20
248:13,18 260:20
260:22 262:1

270:18
**database** 110:22
116:10 117:3,14
**databases** 116:20
**date** 10:23 14:17
32:17 58:12 59:2
59:3,3 80:3 81:6
82:13 86:24 87:3
90:15,15 92:12,14
129:18 130:16
135:8 177:20
219:14 262:1
266:18 283:5,8,10
283:14 291:5
299:8 300:3,9,19
301:3,13,25
302:20,25
**dates** 54:6 129:18
294:5,12
**daughter** 32:11
**daughter's** 81:1
**david** 253:17
**dawn** 253:18,19
253:21
**day** 1:17 193:21
290:16 298:2
300:16 301:22
302:22
**days** 25:18,24 26:2
26:8,12 27:1
51:17 52:3,17
54:3 141:12
168:22 299:18
**dc** 87:13,18
**dea** 10:10
**deacons** 171:9
**dead** 95:14
**deadline** 293:11
293:13
**deal** 227:17,24

**dealing** 124:9
287:13
**dean** 13:7
**dear** 299:10
**debbie** 96:2
**deborah** 12:5,10
79:7
**debt** 82:4
**debtor** 81:9 82:19
83:1,4 87:7,10
**debtor's** 80:7
**dec** 4:10
**deceased** 79:14
**december** 58:12
58:13 130:15
**declaration**
268:11
**declared** 60:20,24
**deed** 300:14
301:20
**deem** 219:8
**deemed** 299:19
**default** 285:19
**defend** 245:15
**defendant** 1:9 2:9
5:12 251:14 278:6
278:10
**defendant's**
277:19
**defendants** 251:11
**defending** 42:21
290:5 292:2
**defense** 294:6
**define** 249:18
**definitely** 211:18
217:1 244:4
**degree** 145:20
234:10 273:24
274:10
**degrees** 31:16

**[delete - distribute]** Page 15

delete 116:7
148:10,11 182:5
182:12,14 202:14
deleting 148:4
202:24
deletion 181:24
delivery 273:14
dell 17:7,8 18:2,9
18:21 23:15 25:5
25:11 26:18
demographic
179:5
demon 171:9
deny 284:1
department
299:22
depending 204:20
207:17
depends 247:16
deponent 296:3
depose 53:8
deposing 52:5
286:21
deposition 1:11
5:11,16 6:16,20
7:14,16 8:21
15:13 23:1 32:24
41:5,9,15,17 42:21
48:20 49:4,8,15,20
49:23 50:21 51:16
51:20,24 52:12
53:6,10,15 55:2,11
55:22 56:11 57:7
57:20,23 97:19
102:21 117:22
121:2 124:4
149:19 154:11
155:3 156:1
159:22 161:4
162:1,4 169:11,11
169:15,19,21

220:5 241:12
265:8 266:4
267:22 269:11
270:4 286:1
287:23 289:5,8,13
289:15 290:5,9,12
290:22 291:22
292:2,7 293:4,5,17
294:5 296:4
297:13 299:8,11
300:1,3 301:1,3
deposition's 5:6
depositions 1:14
242:19,20
depression 226:20
derived 97:12
described 139:1
146:17 179:14
describes 92:24
173:9 190:2
description 4:2
90:11,16
designed 111:4
desktop 18:3,5,21
19:1 26:15,18
243:24
despite 235:11
detailed 145:20
details 34:24
128:20 137:8
determine 284:4
284:14,20
developed 174:13
device 179:4
204:13 247:22,23
248:3
devices 220:21
diagnosed 234:16
diagnostic 235:11
dietzmann 157:15
157:19 160:18

166:15,20
dietzmann's 161:3
different 63:1
73:22,22 74:8
88:14 204:19
218:1,7 228:9
234:20
digital 20:6 220:21
digits 59:9
diligence 27:7
dip 287:10
dipping 288:3
direct 7:7 180:21
directing 178:4,5
direction 180:19
directly 57:12
116:14 161:9
165:1 179:8
211:23 216:18
218:18 229:16
247:18 248:14
directory 259:21
260:3
disagree 259:15
259:22 260:4,9
261:6,18 262:9
disclose 53:20
178:4 180:18
disclosure 22:20
disconnected
37:13
discovery 19:16
19:20 20:10 23:17
27:7 62:6 74:1
98:9 102:20 104:7
105:16 113:1
134:19 141:9
155:8 191:3
193:17 194:2,11
195:5,23 196:12
198:5 202:17

204:11 207:4
220:24 221:20
222:1 235:10
243:14 246:11
274:8 293:24
294:14
discretion 116:17
discuss 21:11
44:22 45:10 124:3
236:17 291:18
292:3 294:13
discussed 21:7
22:3,21 36:11,16
123:8 229:13
discussion 22:4,8
22:13,22,24 37:21
292:13
discussions 123:6
123:9 126:16
display 111:8
174:11 175:19
206:5
displaying 174:8
178:11
dispute 244:15,21
245:5,8,11,16,22
246:5 252:4
256:18
disrupting 51:20
dissemination
178:7
dissolve 89:15
dissolved 255:19
distinction 211:20
distress 229:3
233:16,20,23,24
234:24 235:17
236:13 237:4
distribute 141:20
174:11

**distribution** 174:12,21
**district** 1:1,2,13 5:13,14 80:2 81:5 90:17 256:16
**division** 1:2 5:15
**divorce** 11:4
**dmv** 93:4
**docket** 251:10,22 252:5,13 256:15 257:4,12,17
**doctor** 228:13,15 235:10
**doctors** 234:20 235:18 273:12
**document** 33:11 58:8,15 71:18,20 72:16,19 73:6,8 96:14 118:7 154:7 154:10 156:14 221:2,15,18 253:16 257:24 258:24 277:3,15 277:17,18 280:24 285:22 287:3 293:18,19 294:1
**documentation** 56:9
**documents** 19:15 19:19,24 20:4,5,7 20:9 23:17 26:13 55:21 56:2,11 57:7,19 73:12,14 73:14,20 96:13,15 96:17,18,18,19,20 96:21,21,22,23 123:21 154:8 193:17 194:2 195:5,22 221:11 239:13,24 256:20 285:24 287:13,22

**288:5 289:9,12,14 289:14 290:18**
**doing** 113:18 162:1 187:16 210:2 211:17 242:13 271:12 293:15
**doordash** 194:19 194:21
**double** 14:16
**doubt** 201:10 202:2 252:9
**douglas** 87:13,18
**downington** 76:24
**download** 25:8,10 155:19 168:19,23 176:17 188:18
**downloaded** 25:20 192:17
**draw** 211:20
**drawer** 18:8 19:4 244:7
**dress** 160:20
**dressed** 164:8
**driv** 91:10
**drive** 15:15 18:6,7 18:11 19:2,3,21 26:16,19 77:2,6 79:1 202:10 243:19,22
**driver's** 74:5,7,9 74:10,11,14,16 90:18 96:16
**drives** 244:4
**driving** 91:2,12 92:7
**dropped** 258:4
**due** 6:20 82:4 84:13 294:15
**duly** 7:5 297:6

**duncan** 2:20 5:17
**duplicate** 86:14
**duration** 201:17
**duty** 202:22

**e**

**e** 12:21,22 15:16 15:17 16:7,8,9,11 16:14,16,19 24:16 24:23 35:20 36:5 46:3,5,8,9 59:20 60:8,8 117:2 130:5,7 144:21 146:21 150:22,23 151:2,9 153:2,6,12 179:4 180:1,2,7,8 180:11 186:15 200:22 201:7 210:8 233:4 248:5 284:24 285:3
**e.g.** 144:23 145:18 145:23 147:11 148:11,19,20
**earlier** 124:6 270:4
**early** 203:23
**eastern** 1:2 5:14 256:16
**easy** 257:21
**eat** 121:21
**ebay** 193:20,23 194:1
**ed** 198:10
**edel** 95:10
**edit** 148:13 250:15 250:21
**editorializing** 41:16
**education** 30:22
**effort** 27:1
**efforts** 81:24

**egan** 12:20,20 79:4 79:4
**egnyte** 97:21
**eight** 10:1 291:6 291:18 292:11
**either** 156:11 292:12 297:17
**elaborate** 7:23 235:9
**elements** 116:22 293:2
**elyse** 96:2
**email** 299:17
**embed** 143:17 207:15
**embeds** 178:9
**emerald** 77:1
**emergency** 273:2
**emotional** 229:3 233:16,20,23,24 234:24 235:17 236:13,20 237:4
**emotionally** 29:7,9 224:20 234:3
**employed** 134:22
**employee** 133:15 134:13 135:1
**employer** 133:14
**employers** 135:8 283:11,13
**employment** 133:11
**enable** 143:16,18 179:7 284:1
**enclosed** 299:11
**ended** 11:9 223:1
**ends** 191:6 286:17
**enforce** 178:17
**engage** 162:11
**engaged** 27:1 164:24 168:10

256:5
engagement 128:9
engaging 53:3
241:14
engine 120:4
147:11 207:4
209:14 211:22
engines 143:19
145:19 192:18
209:10,13
enter 32:22 77:16
100:8 102:17
104:17 108:22
139:2 186:14
entered 71:15
72:13 80:14 81:18
81:21 84:1 131:13
132:19 182:24
251:19 256:14
301:9
entertain 289:17
entire 6:16 89:20
155:5 169:18
195:2 227:19
243:9 258:24
300:5 301:5
entitled 21:6 22:2
42:20 161:23
235:17 285:18
289:6
entity 282:2 283:4
283:21
entries 132:18
entry 86:15 183:7
envoy 157:17
eppes 76:21 98:18
equifax 63:12,21
64:4 104:6
equifax's 65:23
66:2 67:14,18
69:15,19

erase 148:11
errata 299:13,18
301:7,10,18 302:1
errors 182:4
especially 289:13
essential 267:10
estimate 165:18
et 9:12 91:8
216:24
evening 295:17
event 286:17
297:18
everett 13:7
evergreen 84:20
85:2 88:2,9,12,14
88:17,23 89:5,8,21
254:19 255:10
271:7,9,11,12,15
everybody 7:12
122:3 182:10
228:3
evicted 251:17
eviction 4:8 84:6
251:11,14 252:21
253:11
exact 47:5 128:19
exactly 235:5
examination 1:12
3:6 7:7 155:14,15
155:22
examined 7:6
example 146:18
174:14 178:11
179:24 180:4
181:5 204:21
206:1 207:13
248:2
excerpts 147:10
excludes 41:24
exclusive 141:19
174:9

excuse 97:20
211:2,2
executed 301:10
execution 300:14
301:19
exhausted 285:12
exhibit 3:13,14 4:3
4:3,4,4,5,5,6,6,7,7
4:8,8,9,10,10,11
4:12 33:3,5,10,13
34:3 58:1,4,5,5,19
71:9 73:7,7,18
74:3 75:4,19
78:20 82:14 86:19
87:13 90:2 92:22
96:7 97:19,21
98:8,9 105:18,20
107:16 109:10
112:19,20 115:14
117:22 118:3,4,5
128:24 129:1
130:12 139:16
144:15 145:11
156:8,17 168:15
183:1,23 197:14
197:15,17 208:2,3
210:19 219:8,11
233:14 237:11
247:10,10 256:14
258:20 259:10
269:4,5,6 277:2,15
292:8
exhibits 3:4 4:1
33:1,18 112:24
115:8 288:7,8
exist 15:4 16:23
269:2
existed 111:15,19
222:21,22 255:11
existence 88:22
230:24

exists 129:3
expectation
160:23
experience 131:16
132:9,23
experion 62:9,17
63:4,22 104:6
experion's 65:18
65:21 68:2,14,19
69:7
expiration 300:19
301:25 302:25
expired 92:4,7
explain 32:23
33:18 159:19
160:9 280:5,9
281:13,15
export 202:13,18
extended 285:21
extending 294:14
extends 143:9
extension 293:11
293:12
extensions 293:21
295:3
extent 38:18
155:22 177:11
242:16
externally 197:7
extricate 40:21
eye 157:22,23
158:3,18 161:5
163:1,5 165:15
166:19
eyes 94:20

f

f 108:16
facebook 4:6
19:14 23:20,21
24:4 25:7,13,17,20
26:23 27:18 73:20

109:15 110:6,8,17
132:16 133:1
149:17 152:16
183:2,2,4,16,18,20
184:16,17,19
185:12,16 186:3,7
186:14,24 187:3,5
187:11,21,22,24
188:6,20 189:10
189:23 190:3,5,13
190:19 191:18
192:9,10,11,12,15
192:24 193:4,6
197:7,12 282:21
282:22,23,24
**facilitate** 178:7
**fact** 27:7 59:21
66:19 90:23
126:23 160:20
234:11 251:17
268:4 290:17
**factory** 14:8
**facts** 259:13
**factually** 248:8,23
**fail** 93:3
**fair** 71:24 132:19
215:13 287:21
**fairfax** 79:19 81:5
90:16
**fake** 94:10
**fall** 30:16 257:15
**falls** 77:1 257:2
**false** 110:1 119:16
120:7
**familiar** 100:16,23
101:4,11 107:17
140:13 271:20
277:5
**family** 32:1 227:20
227:20 228:10
262:4 267:7

**far** 19:6 30:22
59:21 66:16 74:8
97:4 115:4 137:3
177:9 213:12
219:22
**farmingdale** 77:6
**farther** 74:22
**fashion** 287:14,21
**fast** 178:7
**fastpeople** 4:4
112:12,13,23
115:18,23 117:6
117:10,12
**father** 10:9,13,15
29:16 83:9 253:20
254:5
**father's** 11:20
**fathers** 10:10,11
10:13
**fax** 117:2
**feature** 142:13,14
143:17
**features** 190:4
247:17
**february** 10:24
32:16 59:2,4,4
**federal** 1:12 22:2
41:3,9 257:15
285:19 286:2
**fee** 226:23 260:24
264:5
**feedback** 180:21
**feel** 7:23 210:2
233:16
**fees** 178:14 246:4
**feet** 18:8 19:4
**female** 90:10 96:4
**fields** 146:1
**figure** 12:20 17:10
78:11 107:9 154:1
227:12,21 235:4

278:22
**file** 46:10 74:9
141:10 218:17
232:22 293:9,23
295:4
**filed** 5:13 14:12,15
14:17,19 74:23
75:2 129:9 130:10
225:12,17 258:2
259:4,11 269:9
277:6,12
**files** 248:3 257:12
**filing** 80:3 81:3,6
82:13 86:11,19,24
255:3 269:11
272:5
**filings** 130:2,10
242:21 257:9
**fill** 105:12 134:12
134:21,24
**filling** 120:13
**financially** 5:23
**find** 112:9 155:12
204:23 223:16
226:4 230:14
257:3,22 258:1,16
299:11
**findable** 143:19
**finding** 226:3
227:13 257:3
**fine** 8:13 44:12
47:21 49:16,18
56:1,1,3,24 57:13
115:11 216:11
288:17 293:18
**finish** 8:1 50:1
56:18,20 72:10
217:12,20,20,22
**finished** 50:3
**fireplaces** 132:3,4
132:7

**firm** 5:18 43:5,9
46:24 47:1 128:14
128:21
**first** 6:19 7:5
10:14,15 11:15
31:23 35:9 38:14
38:22 58:19 59:9
60:8,14 71:10
72:3 73:12 75:19
79:2,6 80:17
81:20 87:23 90:7
91:9 98:10,11
108:4 110:19
118:2 124:6,11
148:10 160:24
173:21 175:14
180:9,17 187:20
189:1,14 191:5
193:22 208:7,16
213:1 216:21
224:7 231:24
232:1 234:16
259:13 260:7
269:22 277:14,19
287:22 290:17
293:19 297:6
**fisher** 216:23
**five** 10:13 12:13
13:1,9 35:16 59:9
71:14,15 72:13
89:1 95:7 162:22
163:10,13 166:21
208:20 218:23
237:12 271:24
285:8,9,16
**five's** 96:6
**fix** 148:15 177:15
182:22
**flat** 123:11 291:8
**flip** 170:2 172:6

**florida** 10:2
**folder** 32:22 97:18
107:16 112:12
129:1 182:24
197:14,17 208:2
218:20 219:10
251:9 253:15
254:16 259:9
**folders** 287:18
**follow** 27:10 56:16
122:24 125:13,22
126:10 127:2
128:3 162:17
165:12 166:11
**following** 23:6,12
38:10 39:13 40:13
43:22 44:4 45:3
45:16 46:21 48:13
54:19 55:7,18
56:5,7 57:3,16
111:6 123:18
141:18 164:17
199:2,13 260:22
262:1
**follows** 7:6 293:3
**food** 8:13
**foods** 133:21,24
134:1,2,7,13
**football** 171:7,17
171:20,24
**footer** 186:17,17
**force** 10:9,16
**foreclosure** 261:4
264:19
**foregoing** 297:10
297:14 300:13
301:18
**foreign** 9:16
**forensic** 155:15
**forever** 131:3

**forget** 204:22
**forgive** 270:4
**forgot** 10:20 11:12
136:20
**form** 17:13 18:14
18:18 19:8 20:12
26:21 28:20 29:2
29:18 30:5 31:3
31:12,18 35:11,21
47:18 52:8 53:4
53:19 59:24 60:12
61:8,10,15 62:11
62:23 63:8,17
64:9,16,23 65:4,14
66:14 67:4,22,23
68:21 70:2,18
71:16 75:21 76:9
76:17 77:21 78:3
78:13 80:19 85:4
85:14,22 86:8
88:4,20 89:13,16
91:5,17 92:16
93:13 94:13,18,24
97:6,13 99:12
101:15 102:6
103:2 104:13,21
105:10 106:12,20
107:2 108:13,18
109:1 110:2,9,15
111:16 115:24
117:8 119:17
120:8,13 121:8
124:13 128:13
132:12 133:7,19
137:19 138:6
139:11 140:4,20
141:6 142:4,20
143:4,11,24
144:11 145:5
146:6 147:7,21
149:1 150:1,11,18

151:15 152:2,14
152:18,24 153:10
158:6,21 159:5,12
161:24 162:4
170:19,24 171:13
172:15,22 174:4
175:12,24 176:23
179:19 181:2
183:12 184:7
185:19 186:9
188:21 189:11
190:9,14,21
191:20 193:2,14
194:13 196:15
198:18 200:1,7,23
201:13 202:6
206:8 210:9,16
211:15 212:5,19
215:15,23 216:13
225:13 226:11
228:4,19 229:10
230:4 231:5 232:6
234:17 235:2
236:14,21 237:21
238:15 243:17
244:2,11,16,22
245:13,17,23
246:6,13,23 248:9
249:5 251:23
252:7,23 253:7
254:11 256:8,23
258:8,14,22 259:6
260:10 268:2,15
268:22 270:10
272:14,20 273:19
274:2 277:8
278:12 281:6
**format** 287:18
**formed** 89:8
**forms** 260:4

**forth** 173:13
260:19
**forum** 192:11
**forward** 41:15
250:18 269:6
299:15
**found** 71:14 74:7
74:22 75:6 92:15
92:19 93:10
220:17 222:20
223:20 229:18
232:20,21 268:9
268:13 284:9
**founded** 162:2
290:9
**four** 32:15 96:4
99:24 113:12
114:17 153:18,20
154:14 156:9
157:11 237:12
271:24 285:12
**four's** 95:21
**fourth** 157:14
260:7 276:21
**frank** 95:22
**frankly** 169:21
**fraud** 248:16
**freak** 232:16
**freaked** 232:1
243:10
**freakin** 170:18
**free** 7:23 103:24
110:24 160:7
174:9 178:14
242:15 260:8,20
262:18 263:6,11
263:16,22 264:3
267:23 270:12
300:14 301:20
**freely** 189:3

**frequent** 28:15
**frickin** 101:19
**friday** 110:24
**friend** 83:11
  157:20 167:10,19
**friends** 154:17,19
  154:20 155:11
  157:10,12 272:16
**front** 160:21 169:7
  232:4 274:21
**frustration** 227:23
  234:14
**full** 11:24 13:5
  32:5 60:7 71:18
  71:19 72:16 82:8
  93:3 110:19 189:1
  218:17 261:2,23
  264:13 265:1
  269:8 270:18
**fully** 145:16 240:9
  293:20
**fun** 9:21 168:1
**funded** 187:18
**further** 141:4,23
  166:14 278:5
  297:13,16
**future** 252:22
  291:5

**g**

**g** 12:21,22
**gabriel** 78:21
**galaxy** 14:2,3,5,6
  14:21 15:3 16:2,3
**game** 159:9,10,14
  159:16 161:6,15
**gaslights** 29:10
**gb** 81:3
**general** 80:2 90:16
  104:3 153:12,15
  259:20 268:6
  282:10

**generally** 149:21
  178:13 244:14
**generic** 211:21
**genevive** 32:10
**germany** 10:19
**getting** 40:10
  47:14 52:24
  105:13 127:22
  217:7 222:5
  224:21 284:17
  285:11
**giant** 287:15
**give** 7:19 8:17
  40:21 54:6 62:21
  62:21 63:10,22
  103:22 146:21
  154:20 158:13
  176:13 188:10
  214:19 227:2
  233:12 273:7,8
  274:12 282:16,23
  285:2 289:4 291:4
**given** 7:14 59:21
  72:1 155:10
  211:12 273:10,13
  282:6,12,18 283:7
  283:10,19 284:5
  284:15,20 297:8
  297:12
**giver** 293:17
**gives** 120:14
  228:11 282:22
**giving** 41:17 52:6
  146:24 218:4
  284:2 285:23
  291:8,9
**global** 157:17
  178:7
**globally** 197:6
**gloria** 79:9

**gmail** 15:17,18,19
  15:21 16:5,15,18
  17:2 20:10 46:11
  153:16 202:9
**gmail.com** 16:12
**gmail.com.** 16:13
  16:14 46:12 130:8
  151:4
**go** 5:9 8:10 9:6
  17:9 20:15 26:1
  30:13,16 33:15,17
  37:14,18 44:12
  50:4,9 58:1 72:20
  75:4 76:19 90:2
  96:8,15 97:23
  105:18 107:15
  109:10 112:12
  114:7 117:3,21
  121:6,20,22 122:2
  129:2 131:3
  135:18 136:10
  141:14 142:8
  144:15 145:11
  146:10 154:1
  163:21 164:8
  165:3 168:2
  169:14 173:6
  177:15,16 182:24
  183:22 186:17
  187:17 189:22
  191:5 192:1
  198:19 201:23
  202:8,24 203:4
  208:11,14 210:19
  212:24 214:21,22
  218:20 223:17
  227:7 232:12
  237:13,18 247:12
  250:19 251:9
  253:14 256:13
  257:6,7,22 258:1

  259:9 265:14,15
  266:9 271:22
  272:1 277:1
  281:22 286:22
  288:15 289:23
  291:3 292:3,17
**goes** 27:7 120:3
  147:9 265:5
**goggle's** 205:2
  206:15 210:2
**going** 5:1 7:19,21
  9:21 12:4 20:15
  20:18 27:10 32:23
  33:1,19 36:10,12
  36:16,19 37:19
  43:12,13 44:7,10
  44:13,15 49:6
  51:6 53:16 54:6
  55:14 56:16 71:9
  72:19 75:19 79:1
  84:6 85:22 96:3
  103:19 105:5
  109:14 112:22
  120:12 121:18
  122:6,10,19
  124:23 125:13,22
  126:10 127:21,22
  127:24 128:3
  129:20 135:21
  137:4 140:8 154:8
  154:20 156:22
  157:14 161:7
  162:17 165:12
  166:11 169:4,13
  182:11,16,22
  198:9 212:9
  218:21 219:1,7
  227:4 229:22
  230:12,13,13
  237:9,9 242:23
  243:5 258:1,17

262:17 265:7,8,16
265:24 266:1,10
271:24 278:2
286:8 287:8,11
288:3,21 289:2,3,4
289:10,10,12
292:14,14,18
293:3 294:6
295:12
**gonna** 103:19,22
137:5,11 229:21
240:14
**good** 5:1 7:9 32:18
44:11 74:17
121:16 122:10,14
208:4 254:18
295:17
**google** 4:7 14:23
15:10,15 19:21
31:20 181:8
200:18 201:24
202:1,2,9,12,14,18
203:10,12,16,22
204:8,20 205:10
206:22 207:9,11
207:12,14,17,18
207:23 208:6,7,24
209:5,17,17
210:10,13,24,24
211:13,21 212:3
212:14 213:2
270:22,24 271:2,4
282:23,24 284:8
**google's** 209:2,8
209:23 211:17
**gotten** 25:9,10
130:1,2 168:24
221:10 224:6
270:8
**govern** 178:15

**government** 9:15
256:1,2,6
**graduate** 30:7
**graduated** 30:23
**graduation** 30:15
30:17
**grant** 174:8
**granting** 141:18
175:15
**grants** 175:6
**graphic** 248:4
**great** 286:14
290:21 294:13
295:11
**greater** 152:6
**greece** 10:17,19
**gregory** 11:21
**grew** 9:14
**grief** 208:4
**grocery** 134:1
**ground** 7:19
**grounds** 23:9 38:6
126:5
**group** 139:21
157:24 163:10
**grubhub** 196:1,3
**gt** 90:10,17 92:1
92:24
**guarantee** 284:10
**guess** 15:20 17:17
47:13 71:23 81:2
88:13 89:12 93:16
97:8,15 158:7
170:11,14 200:6
222:3 256:5
260:16 261:22
**guides** 145:23
**guilty** 92:9,15,19
93:4,9,10
**guy** 157:8,12,13

**guys** 33:15 184:6
211:6 218:15
226:21,24 247:10
280:10 284:9,11
284:12
**gym** 168:2

**h**

**hahn** 96:2
**half** 12:14 13:24
14:11 17:22 31:14
32:15 104:1
108:10,16,23
122:1
**halfway** 138:22
**halsted** 76:22,23
84:17 88:12
**halted** 83:13
**hand** 60:14 71:10
75:5 86:18 90:4
91:22 93:24 96:9
96:10 101:2
130:16 171:3
208:24 215:10
219:15 237:11,17
283:1 298:1
**handle** 168:17
169:8,24 173:10
**handled** 20:1
**handling** 117:1
**hang** 159:1
**happened** 37:16
46:13 92:13 225:5
234:10 253:2
**happening** 171:4
**happens** 216:7
218:19
**harass** 54:13
**harassed** 164:11
165:10
**harassing** 159:18
164:12,13,15

227:9,18,18,19,20
228:8,9
**harassment**
159:21 160:1
162:14 163:24
164:19 165:6,24
166:6 168:12
**hard** 8:3 18:6,7,11
19:2,3 20:5 21:23
26:15,18 92:20
243:19,22 244:4
271:22
**harm** 227:11
**harmed** 225:19,24
226:3,7
**harms** 210:2
**harold** 31:7
**hashed** 179:4
**hashes** 180:1
**head** 41:8
**headings** 188:14
201:16
**headline** 215:4
**health** 224:22
**hear** 23:24 37:13
68:9,11,12 220:9
**heard** 84:14 96:1
106:11,14 107:18
109:9 112:17
220:17,17
**heart** 80:10,12,23
**held** 134:9 270:5
270:21
**hell** 223:3
**hello** 37:12
**help** 110:23
145:20 181:5,7
198:11 204:21,22
229:21,22
**helper** 32:24

**helpful** 72:8 256:1
**hereunto** 298:1
**herndon** 28:14
  98:16,19
**hey** 212:9 231:2
**high** 30:7,9,10,17
  30:23 31:16 82:6
**hipaa** 228:16
  235:11
**historical** 96:19
**historically** 16:19
**history** 207:4
  220:20 235:11
  243:13,22 261:2,3
  264:11,13 273:23
  274:7
**hit** 41:1,8 46:1,7
**hold** 31:16 35:20
  41:11,11,12 47:7
  97:17 100:14,21
  101:2,9,18,19
  198:12 199:5,16
  217:11 221:11
**holder** 206:2
**holding** 294:23
**home** 41:17 88:15
  172:7 186:13
  208:7,11 209:20
  216:19
**homeliving** 131:23
  132:2,3,10,24
  133:5 134:11,22
**homewood** 254:2
**honestly** 127:4
  285:10
**hoping** 255:23
**horn** 12:12 13:8,8
  79:7 95:20
**horrible** 29:11,12
**hosted** 5:16

**hosting** 181:6
**hour** 122:1 289:4
  289:7,13 290:19
  290:20,23 291:5,9
  291:11,12 292:10
**hours** 222:4 265:8
  265:24 266:2
  285:11,20 287:22
  291:3,6,18 292:11
  293:8
**house** 170:18
  226:17 254:5,7
  273:1
**houston** 30:18
**hp** 18:3,5,10 26:15
  243:24
**human** 198:13
**hunting** 17:10
**husband** 10:12,14
  10:15 12:4,13,15
  12:20,24 13:9,9,11
  24:23 32:20 37:7
  41:2,7 83:16
  84:21 86:7 88:16
  95:7,21,23 96:3,6
  123:24 154:17
  155:1 157:12
  227:18 273:21
  274:5,14 275:7
**husband's** 32:5
  114:15
**husbands** 12:16
**hyde** 134:3

**i**

**icm** 225:7 233:7
  234:9
**idea** 13:21 15:9
  35:13 71:22 79:10
  87:17,19 95:5
  96:6 136:3 163:9
  163:23 167:3

169:13 170:9
  203:21 213:21
  214:13 239:6,17
  239:20 258:21
**identified** 4:2
  130:14 183:4
**identify** 5:24
  282:8
**identifying** 92:23
**identities** 215:6
  248:17
**identity** 116:16
  120:22 161:14,15
  161:16,17 165:7,8
  171:11,20,22,23
  179:24 209:3
  215:22 216:1,6
  220:1 235:18
  278:7 279:3,14
  281:10,20
**ids** 94:10 179:4,4
**illegal** 229:24
**illinois** 1:2,16,21
  2:6,12 5:14 34:21
  74:15,19 75:12
  82:12 84:1 171:21
  172:2,3 183:15
  212:18 230:1
  245:4 251:10
  254:2 269:15
  297:1
**images** 248:4
**immediately** 38:2
**impact** 145:24
**implicated** 8:10
**implicates** 8:8
**implicating** 42:13
**improper** 15:12
  21:5 24:13 41:14
  48:17 52:7 160:8
  166:9 240:19

**improperly** 53:3
**improve** 174:18
  207:12
**inaccuracies**
  106:19
**inaccurate** 79:20
  97:11 98:22
  106:18 115:23
  126:23 148:16,21
  248:8
**inadequate** 285:23
  293:24 294:1
**inappropriate**
  22:19 27:8 40:17
  41:7 155:16
  159:24 161:13,18
  162:20,22 169:16
  169:21 241:13
**inc.'s** 259:12
**incentive** 128:22
**include** 12:1
  107:10 119:7
  148:5 174:14
  260:20 293:16
**included** 129:7
  142:12 299:13
**includes** 131:16
  174:17 192:7
  247:21 277:15
**including** 31:1
  53:9 119:6 139:24
  144:7,21 160:14
  160:17,20 173:14
  177:17 178:5
  192:6,14 248:16
  293:24
**incorporated**
  238:6 301:12
**incorrect** 98:23
  169:17 248:23
  269:18

increased 185:23
indeed.com 23:22
  25:3
indeed.com. 24:4
  24:23
indemnify 245:10
index 3:1,4 4:1
indexes 120:4
indicated 94:8
  107:20 221:21
  285:6
indicating 299:13
indicators 60:15
individual 78:10
  116:15
individually 1:4
individuals 174:21
  175:1 178:17
  262:4,6 267:9,12
infer 179:23
info 277:22
information 9:7
  20:2 25:9,10
  26:16,19 27:2,19
  34:11,16 35:8
  36:3,6 39:3,11
  66:12,20 67:2,15
  67:19 68:3,15,20
  69:2,12,16,20,24
  70:8 75:20 76:1,7
  76:11 77:18 78:1
  78:7 92:23 96:10
  97:3,10 103:24
  105:21,24 106:2,5
  106:7,17 107:5,10
  107:19 109:12,17
  109:17,24 111:10
  111:22 112:3,5
  115:19 116:12,15
  116:18,19,21,23
  116:24 117:14,18

119:3,4,6,13 120:4
120:6,12,14,16,19
120:20,21 121:7
121:13 130:5
135:6,11,15,17,19
135:21,24 137:4
137:11,18,23
138:3 139:20,23
141:11,16,21
142:11 144:5,24
145:12 147:15
150:15,20 152:5,9
154:13 155:18,24
156:8 160:12,13
160:16,19 162:24
170:3 173:10,13
173:14 175:19
176:18 177:18,20
178:4,6,10 179:3,8
179:10,13,23,24
182:11 183:1
188:2,16 190:3
191:7,10 192:3,5,8
192:9,14,16
194:11 196:12
197:6 198:5
200:20 201:3
202:14,18 203:6,9
205:9 206:2,4,6,6
206:11 207:16,21
210:5 211:23,24
212:1,3,7,10 218:5
218:10,15 226:22
226:24 227:2
229:6 230:10
231:12,24 232:23
233:11,21 247:20
247:24 248:15,18
251:7,21 252:5,13
252:17 254:9,23
255:4,6 257:12

258:6,17 259:21
260:4,8 261:5,15
261:17 262:15
264:21 267:24,24
268:5,18 269:17
275:21,21 282:13
282:15 283:13,19
283:24 284:13
informed 231:7
  276:11
informing 43:24
inhibit 8:17
initial 141:3
initially 11:9
  182:2
initials 180:9
inmail 140:9,11
inmails 139:22
input 129:12
  221:17
inquiry 283:24
inspection 169:12
inspiron 17:17,20
  18:2 23:15 25:5
  25:11
instance 94:12
  207:18 208:15
  210:18 252:21
instant 19:12
  214:9 215:5
  216:24 223:4,17
  225:3 230:24
  231:12,18 233:1
  276:7
institute 80:11,12
  80:24
instruct 23:8 27:4
  38:7 39:8 40:10

42:3,11,14,15
43:19 44:1 45:14
46:19 47:19 48:10
51:12 53:1,19
55:4,16,24 56:13
57:10,14 122:21
124:24 125:9,18
125:19 126:5
127:24 162:15
164:14 165:6,10
166:5
instructed 35:22
instructing 22:15
  22:17 49:10,12
  51:7,10,21 123:15
  161:21 162:5
  236:7
instruction 21:16
  27:8,11 38:10
  39:13 40:13 43:22
  45:3,16 46:21
  48:13 55:7,18
  56:5,7,17 57:3,16
  125:14,23 128:4
  162:18 164:17
  166:9,12
instruction's
  48:16
instructions 40:16
  44:4 181:14
insufficient 284:1
integrate 192:20
  203:10
integrating 179:9
intend 111:20
  117:13 121:5
  182:14
intended 286:23
  287:1
intent 225:7 294:8

intentional 287:17
interact 160:5
interacted 163:9
interacts 143:10
interchange 37:8
interest 254:7
interested 5:23
163:20 179:5
290:2,6,13,15
292:11,16 297:18
interests 188:2
interfaces 178:9
interfere 5:6
interference 5:5
internally 197:6
international
108:10,16
internet 120:5,16
207:3
interrogatories
221:2,13 287:2
interrogatory
221:18 277:16
interrupt 72:10
interrupted 56:19
interruption 68:7
288:24 290:10
introduced 34:3
introducing 292:8
investigate 242:18
249:13
investigating
239:9,18 240:4
241:1 242:1 249:9
249:21 250:1,7
investigation
284:4
invoked 185:21
involved 22:4,22
223:23

involves 161:7
involving 161:5
ionel 95:24
ip 247:21
ireland 173:15
irked 224:7
ironic 73:10
irrelevant 278:5
281:9
ish 115:7
issue 160:11,12,15
164:22 253:3
268:17
issued 59:13
issues 8:10 53:20
224:22 235:16
item 81:3 82:3,12
86:10,18 87:20,23
91:7 253:14
iv 116:4

**j**

j 79:11
james 11:23
january 1:17 5:2
89:9 127:10,12,13
127:13,13 208:6
219:14,17 271:6
293:6,12,12,14,14
294:6,12 295:1
298:2 299:4
jeeze 29:17 108:17
157:22
jim 83:4,7,16,18
job 30:22 135:20
139:22 196:24
225:4
jobs 23:23 133:6,9
134:9 150:4
joe's 95:16
john 13:7 76:21
98:18

join 136:2 138:23
138:24 139:5
165:20,22
joined 140:16
170:7,8,10,12
joining 136:7,13
jonathon 2:11
6:12
jones 79:9
jordan 79:9
joseph 79:4 95:6
253:17,19
jreinisch 2:14
judge 92:15,19
93:10 215:4
judgment 80:1,14
80:18 81:5,18,21
82:1,12 84:1,7,8
84:11,13 86:10,21
251:19 262:9
267:17
judgments 71:14
71:15 72:13 79:23
96:15 262:8
july 170:7,12
jump 45:6 169:10
287:8
jumped 15:21
june 124:17,18
269:12
junk 16:10,13

**k**

k 297:2
karma 62:3,5,14
62:21 64:8 65:9
65:12 66:10,12
67:3 70:11 104:5
karma's 64:20
65:1,6 67:1
keep 68:8 121:18
133:11 148:19

271:24 292:14
keeping 293:5
kelly 1:15 5:20
109:8 297:3 298:7
kept 130:6
kevin 2:20 5:17
265:11,24
key 145:23
kid 10:20 94:3
96:6 124:2
kidding 291:16
kids 32:7
kilcoyne 5:20 50:6
kimrey 2:10 3:7
6:3,10,10,14 7:1,8
7:10 15:11,14
17:18 18:15,22
19:9 20:17,24
21:5,10,15,23 22:7
22:15,19 23:5,11
24:8,12,19 25:2
26:22 27:6,9,16
28:2,6,12,21 29:5
29:21 30:6 31:15
31:22 33:9,17
34:2 35:14,24
36:4,8,13,17,24
37:8,14,18 38:1,9
38:20,21 39:10,12
40:12,16,23 41:20
42:6,9,15,24 43:8
43:14,16,21 44:5,9
44:12,14,21 45:2,8
45:9,15 46:16,20
47:8,15,22 48:5,12
48:16,18 49:2,10
49:18,21 50:1,5,13
50:24 51:2,7,10,13
51:19,22 52:5,10
52:18 53:3,13,22
54:14 55:6,17

**[kimrey - know]**

| | | | |
|---|---|---|---|
| 56:4,15 57:2,15 | 141:1,7 142:5,21 | 231:9 232:11 | **klatt** 59:20 |
| 58:9 60:4,13 | 143:7,14 144:1,14 | 234:22 235:8,22 | **klatte** 58:20,21,22 |
| 61:13,20 62:15 | 145:6 146:9 147:8 | 236:5,19 237:2,24 | 59:17,18,18,19,21 |
| 63:3,11,18 64:12 | 147:22 150:5,14 | 238:16 240:10,19 | 79:11 87:7 90:8 |
| 64:19,24 65:5,17 | 150:19 151:18 | 240:21 241:4,12 | 91:8,23 98:16 |
| 66:17 67:7 68:1 | 152:3,15,21 153:1 | 241:16 242:8 | 118:1,9,13,16,18 |
| 68:10,18,24 70:5 | 153:14 154:10,18 | 243:21 244:3,12 | 118:21 |
| 70:15,21 71:8,19 | 155:23 156:12,15 | 244:19 245:2,14 | **klein** 30:10,17 |
| 72:4,6,10,12,20 | 156:21 157:5 | 245:20 246:2,9,16 | **knew** 253:11 |
| 73:10,17,24 74:2 | 158:12 159:2,6,15 | 246:24 248:12 | **know** 8:12 9:6 |
| 75:24 76:6,12 | 159:23 160:2 | 249:8,24 250:5,11 | 13:19 17:8 18:3 |
| 77:22 78:8,17 | 161:1,20,23 162:8 | 252:2,11 253:4,13 | 18:19 19:22 22:20 |
| 80:22 85:7,15 | 162:10,16 163:17 | 254:15 256:12 | 32:17 34:14,20,21 |
| 86:3,9 88:5,21 | 164:4,7,12,15,16 | 257:8 258:9,19 | 35:17 41:3,7 |
| 89:14,19 91:6,20 | 165:11 166:2,8,10 | 259:2,7,18 260:2 | 59:21 62:10,13,16 |
| 92:17 93:14 94:14 | 168:13,14 169:17 | 260:17 261:12,20 | 63:2,5,10,13 64:11 |
| 94:19 95:3 97:9 | 169:22 171:2,18 | 262:16 265:11,15 | 64:14,18,22 65:11 |
| 97:16,23 98:1,2,12 | 172:18 173:2 | 265:22 266:6,9,16 | 65:16 66:10 67:1 |
| 98:14 99:15 | 174:5 175:13 | 268:7,19 269:3 | 72:15 75:20 76:3 |
| 101:16 103:5 | 176:4,24 179:20 | 270:14 272:17,23 | 76:11 77:24 78:5 |
| 104:4,8,14 105:1 | 181:3 183:13 | 273:22 274:6,20 | 78:20 84:14 87:16 |
| 105:14,17 106:15 | 184:10 185:20 | 275:12 276:3,24 | 87:18 89:4 92:11 |
| 106:23 107:6 | 186:12 188:24 | 277:9 278:3,16,24 | 93:15,17 94:3 |
| 108:3,14,21 109:2 | 189:15 190:10,18 | 279:10,22 280:6 | 95:2,19 100:10 |
| 110:5,12,16 | 190:24 191:21 | 281:2,21,24 | 101:19 102:19 |
| 111:17 112:20 | 193:3,15 194:14 | 285:17 286:6,23 | 104:23 105:12,15 |
| 113:3,5 115:7,12 | 196:16 197:19,21 | 287:1,7 288:3,11 | 106:16 109:5 |
| 116:3 117:11 | 198:19,21 199:8 | 288:14,18 289:10 | 110:4,6,7,13,17 |
| 118:8,14,17 | 199:19 200:2,8,24 | 289:18,23 290:3,8 | 111:15,19,20 |
| 119:15,20 120:11 | 201:14 202:7 | 290:15,23 291:2 | 113:17 115:5 |
| 121:9,16,22 122:2 | 206:12 208:13 | 291:11,15,20,24 | 116:2 117:12 |
| 122:13,23 123:3 | 210:17 211:4,11 | 292:7,13,17,24 | 127:4,4,6,8,9,11 |
| 123:17 124:19 | 211:19 212:2,12 | 294:8,11,17,22 | 127:20 128:12 |
| 125:4,7,11,12,20 | 212:23 214:17,21 | 295:8 | 129:6,18 130:1 |
| 125:21 126:7,9,20 | 214:23 215:18 | **kind** 13:18,19,21 | 134:5 135:6 136:1 |
| 127:1 128:2 | 216:9,14 217:13 | 14:1 17:6,16 18:1 | 136:15,21 143:13 |
| 130:18,20 132:17 | 217:16,20,22,24 | 19:12 92:19 115:8 | 155:5 156:16 |
| 133:12,22 134:15 | 218:24 219:7,12 | 128:21 135:6 | 157:10,12,13,14 |
| 134:20 135:3,5 | 220:10,14 225:16 | 138:17 155:14 | 157:18,19 163:7 |
| 136:10,12 138:1,7 | 227:10 228:12,22 | 162:24 165:22 | 163:11 165:17 |
| 139:14 140:5 | 229:15 230:8 | 213:6 230:10 | 167:18 168:18 |

**[know - line]** Page 26

172:4 182:19
186:14 190:16
195:20 201:2
203:24 205:9
208:19,23 209:12
210:15 212:14,22
213:18,22 214:11
214:14,16 221:11
221:11 223:19
224:8,11 225:15
226:1 229:18,20
230:7,9,16,18,20
230:22,23 231:1
231:14,17 232:4
233:4 235:18
237:7 239:8,12,15
239:24 240:2
241:22,22,24
242:13 243:3,7
247:3 249:16,19
250:24 251:21
252:1,18 253:1
254:4 255:9 256:5
257:7,22 260:16
261:10 265:13
269:1 272:22
273:14 275:20
276:4,4,5,9 278:15
278:22 280:4,8,11
280:11,13,14,21
281:1,11,13 283:9
284:23 286:19
287:3,16 288:11
288:14 290:3
293:22 294:19
**knowing** 78:15
**knowledge** 14:18
75:3 103:4 194:18
220:6,7
**known** 148:21
167:21 174:13

223:21 247:20
255:14,17
**knows** 15:7 38:19
62:4 255:11 258:2
273:1 278:13,19
279:5,16 283:24
**kuykendahl** 77:6
**kyleigh** 96:5

**l**

**la** 11:11
**labeled** 113:1
259:12 277:18
**lack** 165:8
**lake** 134:5
**land** 100:6 205:14
260:24 264:6
275:18
**landlord** 78:22
83:13 253:3
**landlords** 252:22
253:2
**language** 177:18
**laptop** 17:7,17,21
18:9,10 23:16
25:5,11,16 180:5
**large** 149:16
178:15
**larp** 157:24
161:15 166:19
**lasalle** 2:12
**late** 149:18 287:7
293:16
**laura** 95:4 288:19
**law** 43:5,9 46:23
47:1 116:13 123:4
128:14 189:5
212:21 253:20
257:15 273:21
274:5,15 275:7
**law's** 254:5

**lawful** 191:12
**lawsuit** 14:12,14
14:17,19 160:6
161:14 164:21
208:16 213:6
214:4 225:9
**lawsuits** 214:10
**lawyer** 34:15 54:8
54:9,15 126:17
279:18 280:4,20
280:24 281:3,8,13
281:16,18
**lawyers** 250:6,12
**lead** 147:14
**learn** 191:14,22
205:5
**learning** 81:20
**lease** 77:16
**leases** 77:16,19
**leave** 269:20
**leaving** 9:23
**left** 71:10 75:5
86:18 90:4 91:22
93:24 96:9,10
130:16 208:24
219:15 266:17
**legal** 2:20 5:17,18
5:19,20 54:17,22
58:11 108:16
148:19 249:23
250:4,8 259:17,23
260:10 262:8,8
267:17 278:12
279:4,15 280:2,18
280:24 281:13,14
281:14,15 295:16
299:1 302:1
**legalese** 280:5
**legally** 139:2
**letter** 128:9
299:19

**letters** 46:2,6
**lexis** 4:3 32:22
**lexisnexis** 58:10
75:20 78:1,5
**lg** 13:22 14:7,22
15:23 19:17
**lic** 92:3
**license** 74:5,11,17
90:18 91:3,13
94:7 141:15,19
174:9,15,17
201:17,17,18
261:6 264:23
298:8
**licenses** 74:8,9,10
74:14 96:16
**licensing** 178:14
**liens** 71:14,15
72:13 79:23 96:14
**life** 9:10 89:20
131:10 164:20,20
176:6 186:6 195:2
243:9
**light** 290:17
**limit** 120:18
148:17,20 176:13
245:7 257:14
**limitation** 285:19
**limited** 53:9
147:12 149:8
160:17 178:13
282:8,19 283:8
293:7 294:1
**line** 61:16 93:12
100:6 107:23
131:3 132:15
161:18 162:21
186:18,21 191:7,8
192:19 205:15
259:21 261:1
264:6 275:18

299:13 301:7
302:3
**lines** 203:8
**link** 116:13 146:14
146:18,19 147:1
191:23 205:7
210:10 214:24
**linked** 146:17
152:11,16,22
153:2 262:5,7
267:9,12
**linkedin** 4:5 24:6,7
24:22 25:4,6,13,22
26:3,24 27:18
73:21 130:14
131:1,5,7,9 132:9
132:14,16 133:2
136:2 138:2,24
139:2,10 140:3,9
140:11,14,16
141:15,16,18
142:2,18 143:2,9
143:22 144:4,4,10
145:3,7,9 146:4,22
147:4,19 149:3,6
149:16,22 150:3,7
150:9,16,20,24
151:3,5,7,10,13,17
151:20,23 152:4,8
152:11,16,22
153:2,5,12,17,18
153:19,21 154:1,8
154:14,24 155:1,5
155:18 156:2,3,6
156:10 157:7,10
160:17 161:2
167:4 182:15
**linkedin's** 136:7
136:13,22 137:9
137:16 138:2,8,13
138:19 144:18

**links** 139:21 172:7
**liquidated** 245:21
**list** 9:17 17:16
74:10 76:19 77:11
84:19 114:3
131:22 132:9
133:9 156:9 196:5
196:7 218:12
230:11 273:16
**listed** 60:17 76:14
76:16 77:9,12
80:8 81:9 88:12
91:9 99:16 114:1
115:23 117:24
151:17 152:6
171:6 210:5
213:12 219:22
269:22 301:7,17
**listing** 99:3 250:16
250:21 251:4
271:23 301:7
**lists** 92:3 109:14
115:18,18 156:8
210:12 218:13
253:16 254:19
**literally** 54:1,7
225:20
**litigate** 245:3
**litigation** 193:18
194:3 195:5,23
196:13 203:2
**little** 12:8 162:22
170:3 210:19
287:4
**lituanica** 76:20
**live** 7:16 11:6
28:13 83:18,22
94:1,4 99:7,10
158:2,3,19 159:3
159:14 160:18
161:6 166:17,24

171:7 214:17
226:17
**lived** 9:9,15,24
10:1 12:14 77:10
78:15 79:21 83:15
83:22 94:8 99:2,4
99:9 218:12 232:9
275:18
**lives** 183:14
**living** 10:6,19
79:14
**llc** 2:3 84:20 88:3
88:9 254:18
**load** 97:21
**loan** 61:8
**local** 259:12
**locale** 152:4
**locate** 27:1
**located** 168:17
**locater** 96:18,19
96:20,21,22,22
**locations** 212:9
260:21 263:22
**log** 15:9 154:1
169:2,4,6 186:15
211:24 247:20
**logged** 61:24
168:19,21
**logging** 154:8
**logo** 208:24 209:6
209:17,17,23
**long** 13:23 14:3
15:19 17:21 35:17
55:10 62:1,3
102:13 121:24
127:19 134:6,19
286:21 289:6
**longer** 148:12
163:19 257:5,20
257:21 292:1

**look** 12:17 13:20
15:20 17:9,11
58:1 72:15,18
73:18 74:3 76:13
80:11 101:20
102:21 105:20
128:15 137:12
146:14 156:7
168:24 210:18
225:2 238:1
239:14 252:18
257:23 258:24
274:7,23 283:5
284:24
**looked** 149:22
231:23 243:10
253:3,5 261:10
272:11 273:23
284:7
**looking** 12:18,19
13:18 23:16,23
24:15 33:3 35:7
35:19 36:5 39:2
156:14 225:4
255:19 258:2
270:15,18 274:22
279:19 280:9
286:17 288:6
295:6
**looks** 86:14 170:23
177:15 277:5
**loop** 130:6
**los** 11:7
**lost** 68:16 247:10
**lot** 94:3 226:13
230:9
**louis** 11:14,17
**lower** 71:9 86:18
90:4 93:24 96:9
96:10 131:15
161:12 237:11,17

**lr** 4:11
**luis** 2:4
**lukis** 1:4,11 3:6
4:8,8,9,10 5:11,13
7:4,9 21:1,11,17
22:9 23:2,7,13
27:11 28:5 32:6
32:10,24 34:3
37:4 38:11,22
39:14 40:24 41:1
41:3,12,12,12 43:1
43:23 44:22 45:17
48:6 50:9 51:23
52:11,20 53:8,14
56:6,17 57:4,13,17
57:19 58:6,6,7,10
59:19,19,20 72:14
74:4 79:23 81:10
82:19 83:1,21
85:17,19 87:23
90:5 92:18 97:18
98:3,16 105:19
109:12 112:15
113:2 115:10,14
118:5,12,16,19
119:2 121:18,24
122:14,20 123:1
123:10,19 125:14
127:2 129:2
130:22 131:13
138:20 144:16
145:13 154:22
155:3,14 156:1,19
157:6 160:9
161:13 164:10,23
165:9 168:16
169:11,14,23
170:4 173:7
176:10 183:1,6,14
184:12 186:13
189:24 192:3

197:5,23,24 201:8
201:24 202:8
208:5,6 214:18
215:2 216:21,24
219:13 220:10
237:15 240:22
247:14 250:20
251:12,12 253:15
253:17,17,18,19
253:19,21 254:17
255:1 256:17
259:11 260:19
261:24 262:3,5,7
268:9 269:9
276:22 277:3,14
277:18 285:18
286:21 287:23
293:3,16,19
294:24 297:5
299:6,8 300:3,4,9
301:3,4,13 302:20
**lunch** 115:5
121:19 122:8,18
123:21 124:1
266:5
**lyft** 195:7,9

**m**

**m** 59:18,19 81:9
86:11 95:8 118:1
118:20 253:17,18
253:19,21 260:19
261:24 262:3,5,7
268:9
**machine** 148:24
**mad** 224:5 228:6
**madam** 299:10
**maiden** 12:4 59:1
60:7 117:24
118:18 232:10
**mail** 15:16,17 16:7
16:8,9,10,11,14,16

16:19 24:23 35:20
36:5 46:3,5,8,9
117:2 130:5,7
144:21 146:21
147:11 150:22,23
151:2,9 153:2,6,12
179:4 180:1,2,7,8
180:11 186:15
200:22 201:1
210:8 233:4 248:5
285:3
**mailing** 112:9
210:7 233:5
**mails** 24:16
284:24
**main** 112:8 137:12
**maintain** 106:3
**maintained**
116:23
**major** 31:8
**making** 21:21
47:11 61:15 217:7
218:16,17
**manage** 86:4
117:2 148:8
203:11
**managed** 203:15
255:21,24
**management**
84:20 85:2 88:3,9
88:18 89:6 254:19
255:10
**manager** 85:9,11
85:18 87:23 88:2
88:9 254:20,24
**managers** 147:14
**managing** 167:12
**manipulated**
186:7
**marie** 58:20 59:17
59:20 90:8 91:8

91:23
**mark** 166:22
197:17 198:19
**marked** 33:5,6
97:18 112:19,20
112:23 117:22
129:1 197:15
208:3 259:10
277:2,14
**marketing** 176:15
**marketplace**
192:12 193:4,6
**marking** 33:4
**marriage** 31:24
**married** 11:2 12:5
12:5,6,11,11,11,12
12:13 13:3 31:24
32:3
**marry** 31:23
**martin** 79:4
**marty** 79:2
**masquerade** 159:9
159:11 160:3
161:7 162:12
166:19
**master** 295:15
**match** 116:23
180:9
**material** 149:16
149:17 259:13
**materials** 149:20
155:6
**math** 32:18
**matter** 5:12 27:7
80:15 128:14
134:18 137:18,21
137:22 158:10
188:14 201:16
226:21 242:4
256:10

matters 35:23
48:24 49:6,8
126:4
mazur 95:4
mccormick 131:16
131:20 132:10,23
133:5 135:1
mcdaniel 12:12
13:7,8 95:22
mcdaniels 12:6
mcgee 95:24
mean 36:14 85:8
93:9 97:3 153:4
158:5 184:11
201:15 205:14
209:7 224:17
235:6 244:13,13
287:13 288:5
means 52:15,17
92:11 93:16 110:8
184:9 280:7 281:4
measures 181:12
media 5:10 73:22
147:14 174:12,23
192:19 295:15
medical 236:9,18
273:11
medication 234:15
235:11,16
medications 8:16
236:10
meet 35:2 49:3,22
50:14,20 51:15,23
52:11 53:14 55:1
55:10 124:11
125:16 126:13
158:24 167:20
248:16
meeting 147:13
meetings 125:2

mega 83:12 84:15
251:15
member 110:21
110:22 145:21
163:1,5 165:16
167:23 168:3,6
members 139:24
143:17 145:16
158:3,18 165:15
228:10 262:4
267:7
memory 137:16
155:22
mental 224:22
226:14 227:16
235:16
mentally 29:8,9
224:21 234:3
mention 142:13
merger 189:4
messages 19:10
139:22 191:1
275:3
messaging 19:12
19:14 139:20
147:13
messed 76:23
287:15
messenger 190:4
190:13,20 191:2
met 13:4 49:19
50:18 51:4 52:3
52:17 55:22 124:7
125:5 126:1
157:20 167:21
methods 174:12
michael 2:19 13:7
32:6 95:20,22
130:18 214:21,24
247:11 250:18,19
269:6

micor 167:11,13
167:14
microphone 211:3
microphones 5:3
microsoft 196:19
196:21
middle 11:22
59:16 60:6 86:11
92:21 99:3 105:20
109:11 114:8
134:8 172:8 179:2
179:21 188:9
201:16 210:20
midwest 299:17
302:1
mike 211:9
miles 226:18
military 9:15 10:8
94:3
minchella 157:9
157:13 167:9
mind 86:17
mindful 5:6
minds 157:22,23
158:3,18 161:5
163:1,5 165:15
166:19
mine 103:24
167:10
minnesota 9:14,22
10:2,3
minute 33:16
218:23 266:5
285:8,16
minutes 115:3
198:13 265:7
266:2 285:9
mischaracterizat...
123:4
mischaracterizes
275:11

misdemeanor
90:11,21,24 91:9
missed 10:17,19
92:12,13 159:7
206:10 242:22
mississippi 9:22
missouri 11:12,14
11:18,19
mobile 14:9
102:16,17,22,24
103:9,12 144:21
179:4 205:15
260:24 264:6
268:8,13 269:23
269:23 270:20,22
273:4 276:1
modified 141:2
modify 141:3,20
174:11
mom 10:7 11:10
11:15 28:13 29:1
29:6 222:22
223:15 224:16,18
226:3,10 227:13
230:23 231:1
233:6,22 234:7
249:2 270:8
275:21
mom's 10:14
11:24 13:15
moment 221:24
monday 110:24
monetary 228:17
228:23 229:2,8
230:3 234:23
235:20 236:9,13
monetize 201:18
monetizing 212:8
213:13 214:8
money 212:14
213:22 215:14

218:16,18 225:9
**monster** 109:6
**month** 294:15
**monthly** 105:6
**months** 11:10
31:10 74:1 119:7
131:1 134:8
168:20
**morelli** 95:18
**morgan** 77:5
**morning** 5:1 7:9
**morningside** 77:7
**mortgage** 4:8 61:5
253:16 254:14
**mother** 10:12
11:13 29:12 79:8
112:9 185:9
220:18 224:20
273:21 274:5,15
275:7
**mother's** 10:15
**motherboard** 18:7
244:1
**motion** 293:9,22
**motor** 96:17
**move** 22:20 41:15
97:17 128:24
168:15 233:14
254:16 277:13
291:12,24 292:7
**moved** 11:13
222:24 226:6
**moving** 11:10 41:2
41:10 256:13
**multiple** 62:22
275:14 287:18
**murkin** 288:19
**music** 199:7,18
**mute** 37:4 136:11
**mylife** 4:4 107:17
107:23 110:19

111:13 112:23
**mylife's** 109:24
**mylife.com.** 108:2
**myspace** 196:9,11

**n**

**n** 12:21,22
**name** 5:17 11:20
11:22,24 12:4,13
12:15,24 13:10,10
13:13,15,17 30:20
31:5 32:5,9 39:21
39:23 40:1,5
43:10 58:19 59:1
59:17 60:6,7,7,7,8
77:20 79:4,6 81:9
82:19 84:24 87:7
91:22 98:4 107:11
107:12,14 117:24
117:24 118:9,12
118:16,18,19
129:6 131:13
135:8 142:14
144:21 145:23
151:7 157:8
160:14 161:3
163:2 168:24
169:3 180:9,9
184:13 188:16
192:7 205:11
206:5 208:22,23
209:6,9,11,24
210:5,11,14
211:13 212:4,7,17
212:17 213:2,9,13
214:7,8 216:7,18
216:20 217:1,4,6,9
217:10 218:4,6,13
218:18,19 221:6
223:6 224:6,7,9,12
224:13 228:15
229:5 231:24

232:1,9,10 260:9
260:20,23 261:18
262:1,18 265:2
279:9 282:3,7,12
282:19,24 283:10
283:14 284:7,9
299:6 300:3,4,15
301:3,4,21
**name's** 79:2
**named** 157:8,13
157:13 297:5
**names** 12:2,17
13:5 39:18 50:16
60:10 154:15,20
156:9,10
**narrative** 228:7
**native** 287:18
**natural** 115:8
**navigate** 248:1
**ncaa** 171:6,17,20
171:23
**near** 75:5 114:8
117:24 142:10
291:5
**necessary** 148:12
**need** 6:20 8:12
47:23 52:9,13,16
52:21,22,24 62:2
116:20 121:24
144:20,23 156:18
158:13,14 177:15
188:12 227:5,7
229:5 235:4 237:7
240:15 265:8,9,14
273:6 281:3,5,8
283:12 295:2
**needed** 106:2
234:15 293:17
**needs** 118:6
155:19,20 248:16
292:5

**neighborhood**
262:2 267:3
**neither** 21:23
**network** 109:16
110:7,8
**networks** 119:8
**never** 25:20 29:24
30:1 77:10 79:21
84:14 86:17 96:1
98:5,6,8 99:9
106:11,14 107:18
109:9 112:15,17
112:24 131:3
132:14 149:13
182:20 213:23
214:13 222:12,13
229:16 233:6
234:15 238:23
253:2 256:2,10
258:7,11 261:10
276:13,16,18
279:7,7 282:12
284:9
**new** 130:24 223:6
223:16 225:22
226:9 228:1 231:7
232:5 233:5
**news** 139:21
178:11 214:9
216:2,5,7,16 217:5
217:8,14 218:1,7
218:18
**newsworthy**
252:21
**nice** 287:12
**nick** 2:11 6:15
**night** 8:17 73:11
149:15 287:8
293:20
**nilly** 283:2

**nine** 10:1
**nobody's** 78:16
  133:4 258:1 284:8
**non** 141:19 174:9
  181:15
**nope** 90:22 91:4
  91:14 94:6,9
  100:17,22,24
  101:5,10 102:3
  163:4 165:19
  167:8,24 168:5,8
  168:11 183:21
  194:22 201:9
  219:24 255:22
  271:3,16 273:15
  275:16
**normally** 273:8
**north** 2:12 77:5
**northern** 1:2 5:14
  30:14 31:6 32:2
**notarized** 299:14
**notary** 299:24
  300:10,18 301:15
  301:23 302:23
**note** 5:3 6:14
  15:11 22:21 36:4
  40:24 48:16 53:7
  58:4 73:10 123:3
  265:6 299:12
**noted** 7:9 142:12
**notes** 71:13,13
**notice** 141:23
**noticing** 6:1,3
**notify** 106:18
**november** 134:8
  223:11
**now's** 121:16
**number** 4:2 5:15
  10:12 12:13 13:1
  13:9,9,11,14 34:4
  58:5 59:8,10,13

80:7 81:3,12
82:22 86:11,19
90:10,15,17 91:24
91:24 92:24 95:7
95:21,23 96:4,6
98:10 99:18,21,23
100:4,5,6,9,11,14
100:16,18,21
101:1,2,6,9,13,19
101:19,21 103:10
103:18,22,23
104:9,10,18 105:5
105:13 107:14,15
107:16 112:9
113:6,11,12,15,16
113:18,20 114:15
114:17 125:2
144:22 151:19
167:5 185:10,11
186:15 187:17
188:9 189:1
204:16,18,21
205:11,14,18
210:6 213:1
216:18,19 222:24
223:2,3,6,16 224:6
224:17,23 225:1
225:22 226:4,5,9
226:16,23 227:3,4
227:6,8,13 228:1,3
231:2,8,13,21
232:5 233:5 234:8
248:16 260:21
263:11 269:22,23
269:23 270:2,5,6,7
270:20,21,22,23
271:7,8,13,17,20
272:10,11,13,19
272:24 273:1,3,4,7
273:8,10,13,16,18
273:24 274:11,12

275:2,15,17 276:1
276:6,8,19 280:15
281:22 282:11
283:1,2 288:6
293:16 299:7,13
**number's** 151:17
**numbered** 118:4
**numbers** 46:2,6
  59:22 99:16 102:2
  102:5 114:8 150:6
  150:9 151:12
  205:20 218:5,12
  261:1 262:3 264:7
  267:5 268:9,13
  270:3 271:23,24
  272:8 301:7
**numerous** 268:10
  268:14
**nvera** 2:14

**o**

**o** 12:21 297:2,2
**oath** 5:21 8:20
  23:2 41:4 122:15
  123:5,10
**object** 17:13 38:6
  38:17,18 42:20,22
  43:6,18,18 47:18
  48:9,9,22 49:16
  52:14 53:17,17,18
  60:12 85:4,22
  88:20 89:13,16
  93:12 98:7 99:12
  107:22 117:8
  126:4 141:6
  148:17 155:13
  181:2 183:12
  184:7,7 185:19
  186:9 188:21
  189:11 190:9,14
  190:21 191:20
  193:2,14 194:13

196:15 198:18
200:1,7,23 201:13
202:6 206:8
210:16 211:15
212:19 216:13
226:11 228:19
229:10 230:4
231:5 232:6
234:17 235:2
236:3,14,21
237:21 238:15
243:17 244:2,11
244:16,22 245:13
245:17,23 246:6
246:13,23 248:9
249:5 251:23
252:7,12,23 253:7
254:9,11 256:8,20
256:23 258:8,14
258:22 259:6
260:14 262:17,20
263:5,10,15,18,21
264:2,5 265:2
266:18 267:23
273:19 274:2
278:12
**objected** 142:22
**objecting** 15:12
  52:6 287:11
**objection** 15:5
  18:14,18 19:8
  20:12 21:3,13
  22:12 26:21 27:3
  27:20 28:20 29:2
  29:18 30:5 31:3
  31:12,18 35:11,21
  39:7 40:9 41:22
  43:3,6 44:24
  45:13 46:15,18
  47:10,10,11,17
  48:22 49:5,24

50:22 52:8 53:19
54:10,11 55:4,12
55:23 56:12,22
57:9 59:24 61:10
61:15 62:11,23
63:8,17 64:9,16,23
65:4,14 66:14
67:4,22,23,24
68:21 70:2,12,18
71:5,16 75:21
76:5,9,17 77:21
78:3,13 80:19
85:14 86:8 88:4
91:5,17 92:16
93:13 94:13,18,24
97:6,13 101:15
102:6 103:2
104:13,21 105:10
106:12,20 107:2
108:13,18 109:1
110:2,9,15 111:16
112:18,18,23
115:24 118:11
119:14,17 120:8
121:8 122:19
124:12,13,22,22
125:17 126:3,15
127:21 132:12
133:19 137:19
138:6 139:11
140:4,20 142:4,20
143:4,11,24
144:11 145:5
146:6 147:7,21
150:1,11,18
151:15 152:2,14
152:18,24 153:10
155:13 158:6,21
159:5,12,17,24
161:24 162:3,14
163:16,24 165:5

165:23 168:12
170:24 171:13
172:15,22 174:4
175:12,24 176:23
179:19 212:5
235:21 236:1
240:6,20 241:2
242:2,23 249:23
250:4,8,8 255:6
259:17,23 260:10
261:8,19 262:11
268:2,15,22
272:14,20 274:18
275:10,23 277:8
278:11,18 279:4
279:15 280:2,18
**objections** 52:6
53:4,4 162:2
241:14 290:5
**objector** 42:20
**obligated** 8:24
**obligations** 181:10
189:3
**observation** 21:22
**observed** 7:16
**obstructive** 51:21
**obtain** 278:6 279:2
279:13,20 280:16
281:9 284:1
**obtained** 98:4
232:19 233:1
234:8 275:21
276:14
**obvious** 216:3
**occasionally** 89:22
**occupation** 108:11
**occur** 14:10,12
223:10
**occurred** 14:14
41:18 199:22

**october** 81:6
**offense** 90:15,15
90:18 91:9 92:3,4
93:3
**offer** 148:7 187:21
289:22 290:2,7,14
**offered** 128:21
190:4 292:6
**offering** 290:19,20
**offerings** 178:18
**official** 112:2
117:17 121:12
219:11 300:15
301:21
**oftentimes** 156:3
**oh** 9:21,23 10:17
11:12 13:9 79:2
84:21 95:7 101:20
108:17 131:2
184:20 197:19
271:8
**ohio** 93:24 299:2
**okay** 6:17 9:19
10:1 12:23 20:17
22:19 23:15 28:3
33:12 36:17,18
44:7,12 51:14
53:16 55:1 58:1
72:17,20 75:17
77:12 79:3,9 81:3
82:3 88:17 90:3
94:7,22 95:8 96:5
97:17 98:1 99:2
99:16 107:15
110:6 113:6,14
115:13 117:21,21
118:20 120:12
121:16,22 122:2,6
123:3 125:11
126:7 128:24
130:12 131:12

137:16 140:8
141:14 146:10
149:1 156:21
166:22 169:2
170:2 171:19
172:1,6,19 176:8
178:2 182:24
183:14 184:15,23
187:9,17 197:1,14
197:22 198:22
200:9 201:15
203:4,24 207:7
208:14,14,19
209:16 212:16,24
213:15 214:22
216:10 219:1,7,13
221:20 224:10,15
225:6 229:8 230:9
230:15,20 232:12
232:18,24 233:14
237:10,13 238:1
239:1,1 250:19
251:9,10 253:14
253:23 254:6
255:20 256:13
260:18 261:13
262:17 265:1,15
265:22 266:10,17
268:8 269:4,6,8,17
269:22 270:7,17
271:17 272:4,7,8
272:11 273:3
277:13,22 289:20
291:12,23 294:10
294:21 295:8,12
**okays** 215:4
**oklahoma** 10:2
**old** 32:14,18,20
166:23 196:23
**once** 31:24 60:24
98:24 222:20

243:9
**one's** 137:10
**ones** 284:12
**open** 209:19 293:5
  294:23
**operate** 180:3
  181:6 249:20
**operated** 116:20
**operates** 229:24
  259:14
**operating** 204:5
**operation** 189:5
**opinion** 67:11
  243:1 254:13
**opportunity** 40:21
  58:8 71:17 72:1
  73:7 118:7 149:18
  225:2
**oppose** 293:11
**opt** 116:14,17
  117:2 146:14,18
  148:7 230:12
  247:1,6,7
**opted** 116:15
**opting** 230:13
**option** 146:21
**oral** 169:11 223:7
**order** 9:20 12:3
  13:6 52:14 84:5
  85:10 173:5
  179:23 211:24
  212:10 218:5
  224:4 227:2
  273:14 283:11
  289:5
**ordered** 103:23
**organizations**
  174:20 175:1
  187:24
**organized** 287:21

**origin** 90:9
**original** 80:3 81:6
  82:13 86:24
  120:20 221:5
**outcome** 5:23
**outdoor** 132:4
**outlook** 196:17,19
  196:19,21,24
**outs** 148:7
**outside** 11:7,14,19
  41:18 289:5
**overall** 31:11
**owens** 166:22
**owned** 61:3 85:10
  85:21 200:18
  202:11 204:7
  205:10 256:7
**owner** 85:9,11,16
  111:3 113:17
**ownership** 110:22
  111:7 254:6 261:5
  264:21
**owns** 202:1 259:14

**p**

**p** 2:11 253:17
**p.m.** 73:11 111:1
  122:7,11 156:23
  157:3 219:2,5
  265:17,20 266:11
  266:14 286:9,12
  292:19,22 295:13
**page** 23:22 34:17
  35:17 58:19 59:16
  60:14 71:10,20
  72:3 73:6 74:3
  75:4,4,19 76:13
  78:20 79:22 80:11
  81:4 82:13 86:11
  86:11,19 87:12,13
  87:20 90:2,3,14,14
  91:7,21,21 92:21

92:22 93:23 95:4
95:17,24 96:7,8,9
96:9,16 99:3
105:18,20 107:20
108:4 109:10,11
109:14,14 110:7
110:19 112:15
113:6 114:7,8
115:13,17,17
116:4,19 118:23
119:3,21 131:12
131:15 138:18,18
138:23 139:15,16
140:8 141:14
142:8 144:2,15,19
145:11 147:23
170:2,3 172:6,7,19
173:6 174:6
175:14 176:8,9,10
176:12 178:2
179:1,2,21 180:17
183:22,22 186:13
186:13 187:17
188:9,15 189:1
191:5 192:1,10
197:5 201:6,7,15
201:15,23 203:5
204:15 205:9
206:18 208:7,7,11
208:11,14 209:20
210:18,19,20
215:10 222:21
237:13 248:4
266:18 282:5
299:13,15 301:7
302:3
**pages** 73:15
208:20 271:24
289:14 290:18
**pagodas** 132:4,8

**paid** 84:7,9,11
  175:2 223:5 231:7
  231:10,11,11
  261:11
**panic** 226:17,19
  227:5 228:11
  232:17 233:20
  234:4
**paper** 85:6,8,9,20
  295:2
**paperwork** 86:5
**paragraph** 75:23
  110:20 138:22
  141:14 144:2,3
  173:22 174:7
  175:14 178:2
  179:21,22 187:20
  189:1,14 191:6,6
  192:2 216:23
  238:1,3 259:14,19
  260:3,7,18 268:11
**parent** 11:8
**parents** 11:1,4
**park** 134:3,5
**part** 156:2 218:19
  232:21 301:9
**partially** 97:11
**participate** 255:3
**participated**
  158:24
**participating**
  163:20
**particular** 213:2
**particularly**
  148:16 179:7
**parties** 5:9 6:21
  66:13 67:3,16,20
  68:4,15,20 69:4,13
  69:17,21 70:1
  103:1 116:20
  143:9 181:13

[parties - place]

191:11 203:5,8
205:22 248:16,19
282:7,9,18,24
283:8 296:2
**partner** 207:11,11
207:18
**partners** 119:8
175:17 179:2,3,7
179:10,12 191:10
191:12,15 197:7
**party** 5:22 6:2,3
90:9 109:16
143:18 145:19
146:22 175:17
180:20 181:5
189:17 191:8
192:18 203:11
297:17
**passive** 109:18
**password** 144:22
186:15 204:22
**patrick** 94:4
**paul** 32:6,20 83:1
83:16,21 85:17,19
**paul's** 32:12
**pause** 214:20
**pay** 82:8 93:3
103:18 187:24
212:10 218:16,16
226:22 227:1,2
232:4,8 233:5
236:9,10,12
270:16
**payable** 89:23
268:1
**paying** 93:20
187:20
**payment** 144:23
246:4
**payments** 142:10

**pc** 80:12
**pdf** 4:3,3,4,4,5,5,6
4:6,7,7,12 197:20
**peekyou** 117:23
118:24 120:3,7
121:2,4
**peekyou's** 119:12
**peekyou.com**
121:3
**penalty** 9:3
**pending** 7:13 8:7
36:13 43:14 104:7
**people** 8:3 35:7
39:2 78:15 87:21
153:18,20 154:24
160:5,22 161:8
178:8,12 182:19
192:12 204:22
206:4 218:4,16
219:22 232:10
252:18,21 255:14
258:1 259:21
271:11 272:18
274:1 275:1
**people's** 133:6
215:6
**percent** 274:17
**perfect** 8:15
**perfectly** 49:16,18
216:11
**perform** 89:5,21
**performed** 208:5
**performing**
154:11 155:14,20
**period** 13:4 18:23
100:1 134:10
285:21
**perjury** 9:4
**permission** 146:24
171:12 188:14,15
188:18 279:8,21

280:11 281:20
**permissions**
188:10,12
**permit** 261:6
264:23
**permutations**
59:17
**person** 29:11 47:5
78:10 96:18,19,19
96:21,22 132:6
147:13 183:10
225:21 229:22
275:1 282:2 283:4
283:21
**personal** 16:7
34:11 67:11
105:21 106:5,5,6,7
107:5 115:19
116:12 144:6
146:15,17 147:24
148:8,9,11,14,18
148:20,23,24
162:21 164:20
180:18 181:9,13
181:15,22 182:4,5
188:1 207:20
218:10 250:16,21
**personalize** 180:4
**personally** 300:11
301:15
**pertaining** 1:14
**pest** 84:20,21,24
85:2 88:3,9,18
89:6 254:19
255:10 271:7
**phone** 12:18 13:2
13:14,18,21,23
14:1,6 24:22 36:8
99:16,18,21,23
100:4,5,6 101:13
101:18,19,21

102:18 103:10,17
103:19,22,23
104:10 105:4,5,13
107:14 112:9
113:6,11,17
114:15 151:17
185:10,11 186:15
190:16 204:16,18
204:21 205:11,14
205:15,16,18,19
210:6 216:18,19
218:5,12 222:24
223:2,3,6,9,16
224:17,23 225:1
225:22 226:5,9,16
226:23 227:3,4,6,8
227:13 228:8
231:8,13 232:5
233:5,22 234:1,8
260:20,24 262:3
263:11 264:6
267:5 268:8,13
270:6 271:7
272:10 273:1,3,4,8
273:10,13,16,18
274:10,12,21,22
275:1,3 276:1,6,8
282:11 283:1,1
299:3
**phones** 14:18,20
15:24 16:3 204:3
**photo** 142:14
183:9
**physical** 151:22
205:12
**pick** 5:4
**picture** 183:22
184:1,3,5,18
188:16
**place** 5:9 6:21
76:20,22 77:7

175:17 209:8
269:14 297:14
**placed** 160:15
164:22 248:3
**placement** 171:19
**places** 258:16
285:3
**plaintiff** 6:4,7 9:7
34:9 128:7 251:15
282:6 283:23
284:2 285:6
**plaintiff's** 118:11
278:6 279:2,13
281:10 286:15
**plaintiffs** 1:6 2:2
6:9 35:19 43:2
73:11,13 124:7
134:17
**plan** 106:18,24
182:7 230:15
**planet** 29:14
**planning** 106:22
**plans** 115:4
**play** 158:4,19
159:16 160:3,18
161:6 166:17
168:10 198:9,24
199:10,12
**played** 159:3,8,10
199:3,14
**playing** 158:2
159:14 199:7,18
**plays** 161:15
**pleadings** 239:22
252:6
**pleasant** 79:1
**please** 5:3,5,24
6:17,21 7:23 28:6
36:18,24 37:9
38:1 41:12 50:6
54:13 69:9 117:3

136:11 161:12
198:24 217:11
237:3 241:11,11
299:11,11
**plf** 4:11
**plural** 20:11
**point** 24:5 121:17
129:23 148:10,13
148:17,21 176:12
184:8 199:24
213:2 233:4
234:15 270:19
**points** 149:7
**policies** 71:3
146:23 251:3
**policy** 64:21 65:7
65:13,21 66:2,8
67:2,19 68:19
69:7,11,19 70:11
112:14 115:15
118:24 136:14,19
137:9 138:2,14
142:13 144:7,16
144:18 172:8,11
172:14 173:9,13
176:10 179:15
181:11 187:1,6
189:22,23 190:2
197:9 200:16
201:24 202:2,4
222:17 238:6,11
238:20,23 239:5
239:16 240:4,24
246:21 247:7
249:4 250:17
**pollen** 76:21
**ponder** 23:1 123:6
**pop** 225:5 232:1
**popped** 225:6
**pops** 208:16

**portion** 28:7 37:2
37:10 38:3 50:7
**portions** 111:9
**pose** 21:9
**posed** 37:1
**position** 123:9,12
123:13 126:22
130:24 160:13
210:22 238:10
239:1 243:2
292:10 294:18,20
**possession** 156:1
244:5
**possibility** 36:11
36:15 42:12,16
**possible** 19:23
40:1,5 63:4,6,12
64:15 69:23 74:21
75:1 76:1,4 81:21
81:23 82:10,11
90:5,23 91:1,15,19
93:21,22 97:10
103:6 104:20
136:16 169:23
170:10,12 178:5
185:15 198:16,17
200:5 220:15
223:19,22 225:8
229:6
**possibly** 42:2
89:11 136:17
190:23
**post** 31:16 131:4
132:15,16 139:23
141:17 143:18
150:3 175:3
182:20 184:1,3
198:13,14,16
199:10,22
**posted** 38:15
39:16 149:22

182:13 198:16
200:5 209:23
215:10
**posting** 174:7
178:3 200:3 213:6
213:6,10
**postings** 139:22
**posts** 139:21
143:16 148:6
**potential** 9:3
22:23 45:10 262:5
288:6
**potentially** 94:15
195:22 198:5
202:18
**precaution** 111:4
**preceded** 38:2
**precise** 35:10 62:2
**precision** 9:11
**prefer** 209:22,22
210:1
**preference** 255:13
**preferences**
176:15
**prejudice** 293:8
**premium** 144:22
145:7,9
**prep** 288:20
**preparation** 49:7
49:8,15,19,22
50:21 51:15,24
52:12 55:2,11,21
56:10 57:6,20,23
287:8
**prepare** 48:19
49:3 53:15 295:3
**prepared** 286:20
287:24 288:1
294:19
**preparing** 102:21

**presence** 297:9
**present** 2:18 33:1
  140:17 262:6
  267:10 294:9
**presently** 108:10
**presents** 115:8
**preserve** 244:4
**presumably** 38:15
**pretend** 160:21
**pretended** 159:4,8
**pretending** 161:8
  163:21 165:4
  168:9
**pretty** 7:20 15:21
  236:23 253:9
  256:3 263:1
**prevent** 84:5
**prevention** 248:17
**previous** 67:23
  77:20 107:23
  135:8 260:21
  263:22 269:19
**previously** 294:12
**price** 2:10 6:10,13
  6:15 7:10
**primary** 273:3
**prime** 133:24
  134:6 135:12
**prior** 58:7 86:15
  120:22 169:15
  287:8
**priv** 22:9
**privacy** 64:20 65:6
  65:12,21 66:2,7
  67:1,18 68:19
  69:7,11,19 70:11
  71:2 111:5 112:14
  115:14 118:24
  120:18 136:14,19
  137:9 138:2,13
  140:13,17 141:2,8

142:12 144:7,16
144:18 146:23
160:23 172:8,11
172:14 173:6,9,13
176:9 179:14
181:10 182:2,18
182:18,22 184:24
185:3,13,22,23
186:2,4,8,18,24
187:5,8,14 200:16
201:24 202:2
222:17 238:6,11
238:19,23 239:4
239:16 240:4,24
246:20 247:7
249:4 250:16
**private** 5:4 78:10
107:8,10 112:1
117:16,18 121:11
121:13 140:23
155:9 156:7
160:15 164:20,24
177:13 181:9,13
262:22 263:2
268:4 282:15
**privilege** 8:8 21:4
21:14 22:5,10,13
22:14,23 23:10
27:4,21 35:23
36:11,15 38:7,13
38:18 39:8 40:10
41:23 42:3,13,17
43:19 45:1,11,14
46:3,19 47:2,12,19
47:21 48:11,23
50:23 51:6,11
52:23 53:21 54:8
54:11,20 55:4,15
55:24 56:13 57:10
122:21 123:7,15
124:23 125:3,9,18

126:5,19,22 242:4
**privileged** 27:6
39:10 40:18 42:18
47:22 125:2,20
126:4,7
**prize** 170:19
**probably** 64:2,5
127:8 136:6,9
167:5 170:1,21
172:24 182:11
193:22 196:10
212:15 242:21
295:2
**procedure** 1:13
286:2 300:5 301:5
**proceed** 20:23
33:24 36:23 37:24
44:20 122:12
157:4 219:6
265:21 266:15
286:13 292:23
293:1
**proceeding** 41:4
**proceedings** 199:3
199:14
**process** 141:21
144:5 174:10
190:3 206:1,4
288:5
**processing** 173:16
**produce** 27:2
202:19 287:21
**produced** 19:24
20:7 73:12,13
141:8 149:15
154:7 155:4,7
156:2 161:3
237:15,16,19
243:12 269:9
287:14,17 289:14
290:17

**producing** 19:15
19:19 20:9 27:19
102:20 155:20
285:22
**product** 8:9 22:5
22:10,23 40:18
45:11 123:7
**production** 20:5
149:18 154:7
203:1 287:7,9,10
288:6 289:1
293:18,19 294:1
299:15,17,22
**products** 187:21
187:22 188:1
190:4 192:6,14,15
192:20 207:18
247:17
**professional** 168:3
168:7 261:5
264:23 293:17
**professionals**
58:11
**profile** 25:4 106:5
106:6 107:1
110:21,21,22
111:3,7,8,10,14
117:7,13 121:1,5
132:10,14 139:21
143:3 145:15,16
145:24 146:1,14
147:10,12,14,16
148:5 153:19
177:14,18 188:16
192:9 220:2
223:18 224:3,4
225:11 226:8
229:17 251:7
**profit** 217:7
**profiting** 217:2,4,5
252:16

program 97:22
178:16
programming
178:9
prolonging 53:5
162:1
promote 142:14
174:18 187:24
209:3
promoting 209:5
promotion 174:22
pronouncing
58:20
proper 22:24
123:6
properly 53:1
properties 83:12
84:15 251:15
property 61:2,3,6
61:9 253:23 254:4
261:5 264:21
propose 289:3
proposing 290:24
291:3,10,17,19,20
propounded 74:1
134:19 155:8
221:2
prosecute 242:18
249:14
prosecuting 239:9
239:19 240:5
241:1 242:1 249:9
249:21 250:2,7
protect 111:4
protected 40:18
123:14
protection 8:9,9
22:6,6,11,11,24
45:11 123:8
provide 66:11,12
67:3 77:18 105:24

116:21 129:12
141:22 144:6,19
144:20,23 148:3
148:12 150:23
151:2,5,7,9,12,19
151:22 152:1
155:17 156:10
169:18 173:10,22
174:18 188:13
191:9 192:13
221:17 230:10
232:18,24 233:11
247:18 258:5
277:22
provided 33:8
58:6 59:9 73:6
88:18 98:8 112:24
113:2 118:3
135:15 148:24
152:8 155:18
180:3 200:20
201:3 205:10,12
226:22 233:6
240:8 241:3,3,9
248:19 263:5,10
263:15,21 264:2,6
276:22
provider 104:15
146:21
providers 175:17
181:9,14 191:9
273:11
provides 67:2
117:4 170:3
218:10 259:20
260:8
providing 116:22
153:5 154:14
191:14 210:4,6,6,7
210:8

provision 103:12
105:3 265:2
266:18
pst 111:1
public 40:18 47:3
76:2,8 78:11
97:12 98:13 107:8
110:21 111:8
112:1,6 113:15
117:3,16 119:8
120:5 121:11
143:16,17,19
156:3 165:1
177:17 185:17
192:2,5,8,9,10,11
192:13,16 206:6
242:16,17 252:9
256:15 257:11,16
257:17 259:20
261:3 262:23,23
264:15 268:6
300:10,18 301:15
301:23 302:23
publication
174:22
publicity 34:22
171:21 172:2,4
212:18
publicly 33:10,11
34:16 109:17
113:3 178:3 184:5
184:9,12 206:6,10
210:4 251:22
252:3,6 253:15
254:10,14 255:7
256:21 257:6,24
publish 141:21
174:11
pull 66:19 107:14
154:12 169:18
198:19 204:10

214:17
pulled 58:11
107:19 111:22
112:13 117:23
141:12 183:1
232:23 252:17
pulling 212:3,7
pulls 211:22,22
purchases 191:8
purely 159:20,20
purpose 158:10,13
224:24 287:17
purposefully
282:14
purposes 111:6
135:20 203:1
204:19 249:20
273:2
pursuant 1:12
181:14
pushed 171:23
put 37:4 113:19
133:1,13 161:2
257:14
putting 95:10
133:10

q

quagmire 40:22
quantities 178:14
query 247:19
question 8:1,7,8
8:11 17:14 18:19
21:4,9,14,17 23:9
27:14,15 28:5,6,22
36:13,24 37:7
38:1,6,8,11 40:20
41:24 42:2,6 43:7
43:14 44:2 45:1,8
46:22 47:14,18,20
48:2,2,23 49:14,16
49:18 50:1,5,10

51:19 52:7,14,15
52:19 53:1,11,17
53:18,19 54:5,12
54:12,20 55:8,16
56:1,2,14,23 57:11
57:13 61:17 67:23
68:9,11,13,16
69:10 71:23 85:23
101:17 107:23,24
107:24 124:14
158:11,14,16
161:22 162:7,8
164:14 166:1,6
184:8 209:4
212:22 220:8,9
221:7 226:1 236:4
236:24 241:6,17
241:18 276:22
278:12,15,21
279:12,12 280:13
281:1,12 282:11
285:13,15
**questioning** 23:1
61:16 93:13
107:23 123:7
161:17 162:21
211:10
**questions** 7:21,22
7:23 34:5 41:19
45:19,22 73:8
127:5 160:10
166:14,16,18
235:15 240:17
242:24 277:4
287:2 288:1,2
**quick** 20:16 32:18
**quiet** 52:9
**quit** 163:11,12,13
163:14
**quite** 218:22

**quote** 110:19
139:19

**r**

**r** 95:11
**race** 90:10
**rae** 12:5,10 79:7
**raise** 291:13,14,14
**raising** 291:15
**ran** 84:21 134:17
**random** 46:2,6
78:6 273:9 275:1
**randomly** 282:23
**range** 260:20
263:6
**rao** 95:4
**reach** 180:11
**reached** 182:3
293:1
**read** 6:18,18 28:8
34:23 37:3,11
38:4 50:8 65:1,6
65:18,21,23 66:2,4
66:7 70:10,16,24
76:15 97:1 103:11
105:2 106:8
109:21 111:11
120:22 129:22
136:22,24 137:9
139:7 140:1
141:24 142:16
143:20 144:8,24
146:1 147:2,17
149:1,7 162:8
168:2 172:3,20
173:17,23 175:7
175:20 176:18
177:22 178:19
179:15 180:12,22
181:16 188:3
189:8 190:5
191:15 192:20

197:9 201:8
203:12 204:24
206:7 207:21
212:21 238:4,7
239:23,23 240:17
240:17 241:11
242:19,22 246:17
246:20 248:5,8,19
269:11 296:3
300:5,6,12 301:5,6
301:17
**readable** 148:24
**reading** 75:23
219:17 299:19
**real** 61:9
**realizes** 227:4
**really** 30:1 149:24
158:6 204:2
212:21 256:10
272:16 274:4
285:13
**reason** 103:9
107:4 109:23
112:2,4,7,8,10
113:14 115:22
119:11 120:7
121:12,14 136:18
154:23 157:9
187:9 201:10
202:1 226:5
237:18,23 238:22
248:7,22 252:4,9
255:18 256:17
262:24 263:3,8,13
263:14,17,18,24
264:1,1,4,8,10,12
264:14,16,18,20
264:22,24 265:3
266:21,22,24
267:2,4,6,8,11,14
267:16,18,20,21

267:23 299:14
301:8 302:3
**reasonable** 111:2
111:8 160:23
283:23
**reasonably** 283:24
**reasons** 53:8 78:12
78:18 117:19
293:15
**recall** 61:22 74:8
89:10 91:12 93:7
100:10 102:12
103:24 104:19
105:7 124:14
128:17 137:3
149:20 177:11
198:15 200:20
203:19 205:8
220:19 221:12
222:20 240:18,18
284:2
**recalls** 155:17
**receipt** 111:1
299:18
**receive** 119:4
130:4 191:7,10,15
255:20,23
**received** 54:17,22
277:11
**receives** 179:14
**recognize** 113:11
114:10,12,16,19
114:21,23 115:1
130:22 275:15,17
**recollection** 57:8
199:9
**reconsider** 123:11
**record** 5:2,9 6:1
6:14 15:11 20:18
20:22 21:6,20
22:1,22 23:2 28:8

33:15,17,19,23
35:1 36:5,19,22
37:3,11,14,18,19
37:22,23 38:4
44:14,15,19 47:3
50:8 53:7 58:4
72:20,21 73:1,5
84:6 97:23 98:13
107:22 108:6
113:15 121:23
122:7,11 156:22
157:3 215:1,11,14
215:21,22 216:12
219:2,5 242:16,17
252:10 253:12
257:2,16,17 265:7
265:14,15,16,20
266:9,10,14
276:20 278:1
285:11,20 286:8
286:12,17 288:12
288:13,15,22
289:23 292:3,6,14
292:15,17,18,22
292:24 293:8
295:13 301:9
**recorded** 5:11
**recording** 5:8 8:3
247:24
**records** 74:21 76:2
76:8 90:5 96:14
116:10 117:3
214:11,14 256:15
258:12 261:3,4,6
262:8,9,9 264:15
264:17,19,23
267:15,17,19
**recovery** 234:23
235:12,13,16
246:3

**rectify** 182:4
**rectifying** 181:22
**redactions** 287:16
**redirect** 265:9
**reduced** 297:9
**refer** 59:23 60:10
72:1 202:12 232:4
237:10
**reference** 60:15
214:3 216:21
238:6 260:22
299:7 300:2 301:2
**referenced** 297:8
297:12 300:11
301:15
**referral** 109:17
**referred** 268:11
**referring** 20:2,4
72:3 118:20
130:23
**refers** 80:1 90:7
91:24 98:15
118:21 181:24
**reflect** 73:5 178:19
**refresh** 57:7 199:9
**refuse** 155:2
166:14,16,18
**refusing** 54:5
169:6
**reg** 92:3
**regarding** 54:20
**regardless** 200:9
**register** 144:22
**registered** 4:9
75:9,11,14 222:12
**registering** 138:24
**registration** 75:6
92:4,7 144:20
**registrations**
96:17

**registry** 114:1,5
**reinisch** 2:11
**reinish** 6:12,12
**reject** 116:17
**relate** 208:21
**related** 5:22 9:7
25:12 26:16,19
27:2 57:8 61:9
70:17 78:23 80:18
84:2 100:9 102:18
103:11 104:18
105:2 108:6 121:1
124:4 128:10
149:16,17 166:15
180:6 191:2 213:6
228:18,21,24
229:3 243:13
244:14,21 245:4,8
245:11,16,22
246:4 250:13
251:4 252:5
256:16 258:6
260:8 270:19
287:2 293:23
**relates** 202:9,10
**relation** 25:23
26:4,7,10,13 27:19
**relationship** 28:17
29:24 30:2
**relative** 297:16
**relatives** 228:2
260:22 261:1
264:3,9
**release** 87:3
**released** 90:9
**relevance** 15:6,12
127:15 155:2
158:7 159:19
**relevancy** 124:13
**relevant** 53:24
54:4 101:14

153:24 154:4
155:1 161:9
164:21 165:24
188:3 204:24
235:14 279:20
**relinquishment**
113:23
**remain** 111:10
**remains** 147:15
**remarry** 11:15
**remember** 12:12
12:16,24 13:8,10
30:21 31:5 34:24
39:1,2,20,22,24
40:3,4,7 43:10
47:6 48:7 61:23
64:6 79:6 86:2
88:24 89:18 90:20
91:2 92:6,20
93:19 94:2 102:8
102:9 104:3
128:19 129:8
137:7,15 157:9
163:10 165:21
167:6,21 170:18
184:4,19,21 200:3
221:24 230:22
234:19 270:3
**remote** 2:1 5:16
**remotely** 1:21
6:21
**removal** 120:15,22
251:4,7
**remove** 106:24
110:21 111:8,14
116:18 117:2,14
120:5,12,18 121:6
223:18 224:4,12
225:10 250:15,21
258:18

**removed** 220:2
224:3,9,14 229:17
251:6
**removing** 119:24
120:14 133:10
201:18
**rental** 77:14 84:2
**rentals** 77:13
**renting** 77:15
**rep** 164:23
**repeat** 67:8 111:18
211:10 220:8
251:5 284:17
**repeating** 285:12
**rephrase** 27:13,14
41:24 47:20,23
48:23 56:1
**reply** 46:1,2,7
293:13
**report** 58:11 62:18
62:20 63:24 64:3
70:7 71:11 74:4
76:7 97:4 98:3
105:19 112:13
117:23 206:2
223:5 232:13,19
233:1,7,8 257:5,19
257:21 260:23
261:23 265:1
269:8 270:16
276:14,17,18
**reported** 1:21
**reporter** 1:16 5:19
6:18,22 8:2 68:8
68:12 240:16
241:10,10 297:4
300:7
**reporter's** 3:11
**reporting** 63:1,15
71:1

**reports** 64:7 69:24
70:17 112:23
113:10 258:3,4
261:4,17
**represent** 105:23
**representation**
48:1 119:12
128:10
**representative**
128:19,22 161:10
199:6,17 285:18
286:3
**representing**
128:14
**reproduce** 174:10
**request** 19:16
62:20 70:7,9
110:20 111:1,4
116:9,11,21 117:1
154:7 220:1
221:17,18 230:15
258:17 277:16,17
277:19 278:5
279:23 280:15
281:22,22 282:1
283:3 287:3 301:9
301:11
**requested** 28:7
37:2,10 38:3 50:7
61:14,21 62:8,17
62:18 63:24 64:3
224:13 229:16
**requesting** 69:23
70:17 169:13
**requests** 116:14
116:17 117:2
221:3,3,8,15
**require** 111:5
116:16 120:20
191:12

**required** 116:13
156:11 241:7,8
299:24
**reread** 28:6 36:24
37:8 38:1 50:5
68:10
**resellers** 119:7
**reserve** 22:20 77:1
116:16 149:19
**reset** 14:8
**reshared** 192:17
**reside** 262:3
**resided** 59:12
76:15
**residence** 272:2,4
**resident** 79:18
**residential** 260:21
263:22
**respect** 123:9
175:2
**respective** 253:2
**respond** 45:24
**responded** 45:23
46:4
**responding** 62:6
202:17 207:4
**response** 19:15,19
20:9 39:6 40:8,17
41:21 42:10 43:1
141:9 204:11
217:12,19 243:14
246:11 274:8
276:22 278:4
279:23 280:15
282:5,17 283:6,23
295:10
**responses** 221:1
221:18,20 222:1
277:16,17,17,19
293:24

**responsive** 23:17
73:24 104:6
105:15 134:18
191:2 193:17
194:2,11 195:5,22
196:12 198:5
279:11
**rest** 134:1 174:16
**restaurant** 30:24
**restaurants**
273:14
**reston** 131:21
167:1
**restrict** 148:17
**restricted** 185:15
**result** 42:14
208:15 233:17
294:7
**results** 119:24
147:11 192:15
206:5
**resume** 122:2
285:9 293:5
**resurface** 120:17
**retail** 30:24
**retain** 202:23
**retained** 295:15
**retrieve** 36:5
**retrieving** 27:18
**return** 210:21,23
211:12 213:1,24
214:6 219:21
232:3
**returned** 299:18
**returns** 208:20
210:21
**review** 55:21
57:19 58:8 71:17
73:8 106:6 118:7
123:21 149:18,20
155:6 203:11

277:6,22 285:24
289:9 293:20
299:12 300:1
301:1
**reviewed**  56:2
71:2 251:3,7
288:7
**revo**  91:10
**revoke**  147:1
**revoked**  91:13
**reynolds**  12:5,10
**rfas**  287:2
**rfp**  256:6,11
**ridiculous**  290:8
**right**  12:18 17:4
17:11 20:4 22:20
30:16,23 33:3
34:21 37:1 43:13
54:12 58:7,20
60:14 70:11 73:24
79:5,20 97:19
101:2,22 116:16
118:3,18,18 124:8
131:13 141:20
142:9 144:3
148:19,22 149:13
149:19 154:12
155:21 156:20
164:10 165:9
168:15 171:3,21
172:2,3 174:10,18
185:23 186:8
191:5 197:18
201:18 204:5
209:24 212:18
213:7 214:4
215:10 216:15
217:3 224:18,19
224:24 229:20
230:10 231:2
232:14 236:20

237:11,17 241:1,5
254:21 270:15
272:3,8,9,12,24
274:13,21 275:13
276:14 287:4,6
288:5,13 289:11
289:14 294:2,3,18
**rights**  116:5
119:22 147:24
174:13 175:6
189:2,17 191:9,13
206:2 244:21
**ritual**  165:22
**rlc**  2:7
**road**  76:21 77:6
98:18
**robert**  95:20
108:10,16,16,22
216:23
**roberto**  2:4 6:8
21:20 39:23 40:5
41:13 50:17,18
124:7 129:3 239:3
240:23 286:14
**role**  85:3 158:2,4
158:19 159:3,14
160:18 161:6
166:17 168:10
**roles**  89:20
**roommate**  83:8,11
166:23
**roughly**  9:11
18:23 31:10 35:10
88:22 89:15 100:1
124:21 163:8
170:8 184:20
269:20
**royalty**  174:9
**rule**  155:23 259:12
285:19

**rules**  1:13 7:20
21:8 22:2 286:1,2
300:5 301:5
**run**  84:10,16
214:18 283:12,14
**running**  35:17
88:16 265:11
287:4
**rural**  11:19

**s**

**s**  59:18 60:6
299:15 301:8,8
302:3
**sale**  189:4
**sam**  157:8,13
**samantha**  83:8,10
83:16,19,21
**samsung**  14:2,3,5
14:21 15:3 16:2,3
**samuel**  157:15,19
160:18 161:3
166:15,20
**sanctionable**
126:23 159:24
169:21
**saving**  203:1
**saw**  36:1 83:24
140:19 223:12
234:20 276:13,16
**saying**  24:6,6
34:15 70:22 88:8
202:11 288:14
291:3 292:10
**says**  17:12,17,20
60:17 61:2 71:10
71:14 72:16 74:5
74:7,21 75:5,6
79:23 80:5 81:4
82:13,16 86:19
87:5,12,20 90:4,14
91:8,22 92:9,21

96:8,13,16 98:18
99:2,4 105:21
108:9 109:11
110:19 115:14
116:4,7,9 118:24
119:3,21,24
130:24 131:12,15
135:19 137:10,21
137:23 138:2,20
138:23 139:16,19
141:15 142:9
143:15 144:3,4,16
144:19 145:12,15
146:11,13 147:23
148:3 154:14
157:11 167:12
170:4,14,17 173:9
173:22 174:7
175:15 176:12
177:16 178:3
179:1 181:21
187:13 188:12
189:2,16,23 190:2
191:7 192:5 197:5
198:9,10 202:13
203:5,8 204:15,18
205:5,22 206:1,21
207:8 208:10
215:4 238:2,3
242:23 247:12,16
248:13 250:20
254:24 259:14,19
260:3,7,18 261:16
268:8 269:5 278:4
279:23 282:1,6,17
283:3,6,20,23
**scale**  178:15
**schmick's**  131:17
131:20 132:10,23
133:5 135:1

**school** 30:7,9,10
  30:13,17,23 31:16
**scientific** 9:11
**scientifically**
  35:10 62:2
**score** 61:14,21
  62:8,17,21
**scores** 62:22
**scratch** 162:9
  216:10 259:8
**screen** 37:16,17
  146:18 197:22
  198:8,23 219:8
**scroll** 216:21
  250:18 269:6
  271:22 272:7
**seal** 269:10 300:15
  301:21
**sealed** 269:5
**search** 19:17,20
  20:10 23:16 25:6
  25:12,16,22 26:3,6
  26:9,12,15,18 62:5
  115:18,23 117:7
  117:10,12 119:24
  120:3 143:18
  145:19,23 147:11
  150:4 154:12
  155:21 177:14
  191:1 192:15,18
  193:16 194:1
  198:4 206:4,5
  207:3,3,4 208:5,15
  208:20,22 209:10
  209:12,14,16
  210:11,20,21,22
  210:24 211:12,21
  212:4 213:1 214:6
  219:13,21 221:5
  232:3 243:22
  247:19 252:19

255:9,10 257:7
  260:19 261:24
**searchable** 107:13
  184:14
**searched** 116:12
  194:10 195:4,21
  196:11 213:1
  220:20 232:1
  243:12 246:10
  260:9,24 261:18
**searches** 257:18
**searching** 26:23
  27:17 98:4 257:4
**second** 23:21
  41:11 76:13 97:18
  140:9 142:9
  143:15 144:2
  173:21 181:4
  183:6,15 186:18
  186:21 189:2,19
  214:19 216:23
  227:3 238:1,3
  259:19 261:16
  270:20 278:4
**secret** 8:9 22:6,11
  22:24 123:8
**secretary** 254:17
  255:4,16
**secrets** 45:12
**section** 110:23
**secure** 182:18
**security** 59:8,10
  59:13,22 80:7
  81:12 82:22 91:24
  176:15 181:12
**see** 12:12,19 24:21
  33:4 35:18 38:14
  38:22 58:12,13
  59:16 60:15,18,19
  70:9 71:11 72:16
  74:4 75:7 79:23

80:3,5,8,12 81:7
  81:10,13,16 82:14
  82:16,20,23 83:1,5
  86:12,20,21,24
  87:3,5,7,10,14,20
  87:24 90:4,12,18
  91:10 92:1,4,9
  93:1,5 96:8,9,10
  96:23 97:24,24
  98:15,19 99:3,5,16
  100:12,19 101:7
  107:21 108:2
  109:10,19 113:6
  114:7 115:14,20
  116:4 117:4,23
  118:9,23 119:8,21
  126:17 127:14
  130:15,16 131:24
  138:19,20 139:15
  139:16 144:15
  145:11,13 146:10
  148:1 153:24
  154:3,4 160:5
  170:5 171:3,6,15
  172:1,7 173:6
  176:10 181:21
  182:20,21,23
  183:6,9,9 186:14
  186:16,19,22
  187:17 188:9
  189:5,23 192:1
  199:20 201:15,19
  202:15 203:4
  204:15,23 205:5
  205:22 206:19
  208:7,8,10,15,16
  208:24 209:17,21
  210:19,23 213:3
  214:1 215:1,2,7,9
  219:14 220:21
  231:23 238:9

247:10,13 250:20
  250:23,24 251:1
  253:24 254:20
  255:18 259:11
  269:13,24 271:18
  271:23 273:23
  274:8,23 277:14
  277:20,21 278:8
  282:1,3 284:24
  295:1
**seeing** 98:10
  235:18
**seek** 53:7 80:23
  235:17 245:8
**seeking** 130:24
  229:9 234:23
  235:12,13,15,19
  235:19,24 236:8,9
  236:12
**seen** 80:17 98:5,6
  112:15 129:15,19
  139:24 192:5,17
  222:5 228:13
  276:18 277:3
**sell** 132:8 213:17
  213:20 215:22
  216:6,7 218:6
**selling** 216:12
**sells** 211:23
  214:12,15 259:20
  261:16
**semester** 30:18
**sen** 281:13
**send** 46:5 192:13
**sending** 89:22
**sense** 8:4,14,15
  203:2
**sensitive** 5:4
**sent** 46:3,10 275:6
**sentence** 142:9
  143:15 173:21

175:14 180:17
181:4 189:2,14,19
191:6 278:5
280:21,24 281:14
281:16 283:6,22
**september** 29:4
32:2 102:14
103:15 104:9
124:16,16 131:17
131:23 132:19,20
132:22 185:6,16
185:21,22 186:1
231:1
**series** 46:6 186:16
**servant** 262:23
**serve** 128:6,22
142:10 143:2
212:16 286:3
**served** 221:7
**server** 131:16
**servers** 247:20
**service** 100:9
102:18 103:12
104:15 105:23,23
106:1 142:13
144:23 146:22
172:8,11,14 181:9
181:14 187:14
198:11 201:8,11
222:9,15 248:2
**services** 80:23
88:18 89:5 120:15
131:22 139:1,3,6
139:19 140:1
141:17,22,22
142:15 143:18,20
145:15,17,18,19
145:22 146:11,14
146:15,20,20,23
147:11,15 148:12
173:11,12 174:8

174:19,20,23
175:4,5,16,18,19
180:4 181:5,6,8
187:18,21 188:13
191:11 192:18,20
203:10,10 204:20
205:2 206:3,16,22
207:9,12,13,16,19
207:23 209:3
210:10 211:14
238:4 247:17
248:1 258:13
**session** 288:20
289:12 293:7
**set** 173:13 177:11
177:13 182:19
243:2 260:19
270:19 277:19
282:15 288:18
298:1
**setting** 182:2
**settings** 13:20 17:9
17:11 120:18
140:13,18 141:2,8
142:15 144:8
145:17,20 146:13
147:10 148:8
149:13 156:6
176:13 177:3,5,7
177:12 179:23
182:3,19,22
184:24 185:3,14
185:22,23 186:2,5
186:8 187:8,14
203:15 204:1,20
207:17
**seven** 35:16 257:1
257:4,16,20 265:8
265:24 285:20
287:11 290:23
291:3,8

**sex** 90:10
**shape** 210:9
**share** 3:14 33:10
33:13 70:9 135:11
135:16 137:5,11
137:17,23 138:3
139:23 143:16
145:12 146:19
160:16 163:1
179:3,13 180:2,17
180:18,21 181:8
188:15 191:13
192:8,10 197:6,8
207:16 228:1
271:11 272:13
282:3,7,12,19
283:4,8,21 284:3,5
284:15,21
**shared** 129:10
130:9 135:7 150:6
150:15 160:19
176:18 179:10
180:8 203:6 221:4
221:9,13,15
272:18 273:24
274:10 277:23
**shares** 180:7
**sharing** 66:11 67:2
67:15,19 68:3,15
68:20 69:2,12,16
69:20,24 102:24
135:15,21,23
139:16,20 146:16
148:4 160:11
173:23 203:9
**she'd** 226:23
**sheet** 269:5 299:13
301:7,10,18 302:1
**shopper** 133:21,24
134:7 135:12

**short** 13:3
**shorthand** 1:16
297:3
**show** 56:11 57:7
93:10,15,17
147:12 180:5
187:23 188:2
232:4 257:19
289:12
**showed** 226:17
232:9
**showing** 112:15
**shown** 116:11
262:14 268:12
299:16
**siblings** 79:13
**side** 60:14 90:4
101:2 171:3
215:10 227:20
**sign** 16:9,10
128:13 138:24
141:3 149:12
173:5 184:20
187:12,16 217:10
222:13 232:15
282:14 296:3
**signature** 296:1
298:5 299:14
**signed** 109:3,6,8
128:9 140:22
149:10 182:3
184:15,19,23
185:2 186:1
195:14 224:12
238:20,21 240:1
300:13 301:18
**signify** 238:4
**signing** 139:9
164:23 172:10
223:23 299:19

**signs** 249:1
**silence** 42:23
**similar** 138:24
    139:5 179:8 210:9
**similarly** 1:5
**simply** 73:20
    110:23
**simultaneously**
    8:3
**sincerely** 299:21
**single** 160:16
    162:3 230:14
    285:22
**sir** 21:18 299:10
**sit** 127:9 230:2,20
    286:1
**site** 247:22,24
**sites** 203:11 206:5
    206:19 207:8,10
    215:6 223:17
    230:10
**sitting** 18:7 169:7
    220:4 244:7
**situated** 1:5
**situation** 236:18
    236:20
**six** 10:12 11:10
    13:9,11 74:22
    131:1 199:22
    222:4 237:12
**skimmed** 136:24
**skipping** 259:9
**skype** 195:17,19
    195:21
**slip** 269:5
**slow** 12:8
**small** 11:18 248:3
    248:4
**smlukis** 16:14
    168:17 169:3,8,23
    170:7

**social** 59:8,10,13
    59:22 73:22 80:7
    81:12 82:22 91:24
    109:16 110:7,8
    119:7 142:11
    147:13 157:20,21
    158:9 160:7,7
**societies** 168:4,7
**society** 157:22,23
    158:3,18 161:5
    163:1,6 165:15
    166:19
**sof** 4:10
**soft** 167:2,7
**software** 188:18
**sole** 116:17 224:24
**solicit** 134:17
**solution** 292:1,4
**solutions** 5:17,19
    5:20 295:16 299:1
    302:1
**somebody** 40:24
    225:21 227:1
    243:5 255:8
    257:18,22 279:9
**somebody's**
    136:10
**someone's** 208:22
**son** 95:21
**sons** 95:9,16
**soon** 15:22
**sorry** 10:18 12:7
    14:5 18:17 23:24
    24:7,10,15,16,18
    24:22,24 26:1
    32:21 37:6,15
    52:14,21 54:10
    58:17 68:8 69:8
    73:3,4 79:15
    97:17 113:19
    133:23 142:22

    159:7 206:6 211:8
    211:9 216:5 222:5
    236:2 251:5
**sort** 54:22 255:20
**sorts** 135:11
    149:21
**sounds** 288:22
**source** 96:10,13,14
    96:15,16,17,18,19
    96:20,20,21,22,23
**sources** 96:13 97:4
    97:12 109:16
    115:20,23 119:4,5
    119:5,8,16 120:20
**south** 76:19,23
    77:1 83:13 84:16
    88:12 253:23
**southeast** 94:4
**space** 91:10,10
**spam** 274:23,24
**span** 186:7
**spark** 167:2,7
**speak** 47:4 48:6
    57:22 123:24
    127:7,19 198:12
    275:3
**speaker** 199:5,16
**speaking** 8:3
    21:21 46:23 48:24
    49:14 52:6 53:4
    54:2,4 149:21
    159:23 240:19
    241:14
**specialist** 5:18
**specific** 59:2
    211:23 218:4
    280:21 282:7,18
    283:7
**specifically** 48:3
    217:6 243:6

**specifics** 18:4 40:3
**specified** 297:15
**speculate** 242:6,14
**speculation**
    260:14 261:8,19
    262:11 274:19
    278:18
**speeding** 94:23
**spoke** 47:1,5 48:21
    49:7,9 54:1,7,21
    56:8 127:12,16
    198:10
**spoken** 54:3
    124:20
**sponsored** 188:17
**sports** 180:5,6
**spring** 30:10
**springer** 12:6,11
    13:7,8
**springfield** 253:24
**sprint** 104:16,17
    105:2,8,14 199:20
**ss** 297:1
**ssn** 87:10 90:8
**st** 11:14,17
**staff** 108:15
**staffing** 109:4
**stalker** 112:8
    185:9
**stamp** 237:17
    247:9,12
**stand** 36:18
**standard** 178:15
**standing** 74:17
    254:18
**stands** 56:24 57:14
**start** 9:9 202:24
    225:9 287:9,11
    288:3
**started** 17:2 34:23
    163:11 266:4,8

**starting** 6:1,4 12:4
179:1,22 285:14
**state** 1:16 8:24 9:2
75:11,15,17 80:2
90:8 230:1 245:3
255:4 297:1,4
300:10 301:15
**state's** 254:17
255:16
**stated** 105:22
**statement** 56:18
56:21 72:5 120:7
248:23 259:13
281:19 300:13,14
301:19,19
**states** 1:1,13 9:16
9:24 63:15 74:8
173:15
**statistics** 206:2
262:2 267:3
**status** 90:9 294:15
**stay** 93:24
**stefanie's** 108:10
**stenotype** 297:9
**step** 10:10,11,13
**stepdads** 13:6 30:3
**stepfather** 79:4
**stephani** 59:20
**stephanie** 1:4,11
3:6 4:8,8,9,10
5:11,12 7:4 58:20
59:17,18,18,18,19
59:19,19,20 81:9
82:19 87:7,23
90:8 91:8,23
97:18 98:16 118:1
118:5,12,20
131:12 170:4
183:6,14 197:23
208:6 216:24
251:12 254:24

260:19 261:24
262:3,5,7 268:9
277:18 297:5
299:6,8 300:3,4,9
301:3,4,13 302:20
**stephanie.lukis**
16:13 46:12 130:8
151:4
**stephanielukis**
170:7 219:20
**steps** 111:2,8
120:18
**sterling** 99:9
**stip** 295:4
**stipulate** 6:21
290:16 293:10,12
**stipulated** 293:21
**stop** 24:8 41:16
118:14 120:6
148:18 262:20
**stopped** 227:22
**stopping** 291:8
**storage** 173:15
**store** 132:7 134:1
144:5
**stored** 153:8,15,17
**street** 2:5,12 76:20
76:21,22,24 77:5
88:13 94:4
**stress** 226:13,20
227:14 234:14
**strike** 209:21
239:2
**structure** 219:10
**stuff** 16:10 104:3
132:8 137:3
202:24 234:20
**stylo** 13:22 14:22
15:23 19:17
**sub** 107:16 112:12
117:21 129:1

142:8 168:16
197:15 208:2
277:1,13
**subbing** 219:9
**subfolders** 287:18
**subject** 111:3
142:15 145:17
146:13 147:9
174:23 179:22,22
181:10 188:13
201:16 293:21
**sublicense** 174:10
**sublicenseable**
141:20
**submissions**
109:15
**submit** 141:17
175:3 247:19
**submitted** 141:10
174:19 175:20
**submitting** 174:6
174:7
**subscribed** 300:10
301:14 302:21
**subscriptions**
145:21 214:15
**sue** 225:3,7
**sued** 216:24
252:20
**suffer** 234:12
**suffered** 233:17
**suffering** 233:20
**suffers** 9:3
**sufficient** 175:5
**suggest** 49:13
**suggesting** 291:6,8
**suggests** 79:18
**suing** 165:1
**suit** 225:12,17
**suite** 2:5 299:2

**summary** 71:11
72:3 74:4 76:14
213:5
**summons** 90:9
**superior** 299:1
**supervisor** 198:10
198:12
**support** 190:3
247:19 293:13
**supposed** 167:13
281:15
**sure** 12:3,9 14:13
15:5 52:22,24
122:5 209:4
214:19 218:24
220:13 221:12
234:19 236:23
253:9 280:9
294:21,21
**surprise** 169:20
**suspended** 91:13
**suspending** 293:4
**suspension** 91:10
**swanson** 83:4,7,10
83:16,16,18,22
**swanson's** 83:8
**swear** 6:17,22
**switched** 14:18,20
**sworn** 7:2,5 23:2
297:6 300:10,13
301:14,18 302:21
**sycamore** 77:2
**syncing** 206:22
207:9
**syndication**
174:21
**system** 204:5
**systems** 111:11

[t - think]

**t**

**t** 14:9 102:16,17
102:21,24 103:9
103:12
**take** 5:9 6:21 8:6,7
8:11,12 20:16
36:12,16 42:23
43:12,13,15 44:10
44:13 72:9,18,19
111:2,7 120:17
121:18 148:22
156:19 218:22
235:9 266:6 285:8
285:16,19 286:6,7
289:8 293:17
294:20
**taken** 1:12,14 5:11
8:16 20:21 31:2
33:22 36:21 44:18
61:5,8 72:24
122:9 157:2
160:11,12,13
179:6 219:4
265:19 266:7,13
286:11 290:9
292:21 297:14
**takes** 238:9
**talent** 147:14
**talk** 21:1 153:18
155:1 156:19
171:23 172:4
226:18 229:14
230:6,17,19 235:4
235:7 237:5,7,8
288:21
**talked** 30:1,1
127:5,14 132:7,7
204:4 250:12
270:3 272:8
**talking** 23:3 37:5
47:24 48:3 52:23

54:1,8 141:11
171:17 227:22
235:5 268:10
275:5 290:3
291:21
**tamper** 244:5
**technologies**
109:19
**technology** 19:13
178:8 179:9
**telephone** 114:7
150:6,9 151:12,19
271:23
**tell** 17:12 21:23
35:1 55:14 154:23
219:22 230:2
237:15 239:20
243:3 280:22,23
**tells** 158:15
**temporary** 108:9
108:15
**ten** 15:21 16:6
17:2 18:8,21 19:4
89:3 182:13
283:17
**term** 142:2 143:22
144:10 145:3
146:4 147:19
173:19 174:2
175:23 176:21
177:24 180:24
189:10,14 205:3
206:15 207:24
260:19 261:24
**terminated** 17:1
**terms** 64:8 65:1,9
65:18,23 66:4,11
67:14 68:2,14
69:1,15 70:10,16
70:24 105:22
112:14 136:7,19

136:22 137:17
138:8 144:7 147:5
149:4 172:8,11,13
174:23 175:10
178:15,17,23
180:15 181:18
186:22 187:3,11
187:13,13,22
188:7,19 189:3,13
189:16 192:23
200:13 201:7,11
201:21 222:9,14
237:14,19 238:2,5
238:11,19,22,23
239:4,16 240:3,23
246:17 247:2
249:3
**terrace** 77:1,7
**testified** 7:6 19:6
202:8 228:24
229:3 284:20
**testify** 24:14,19
36:2 202:10
242:15 297:6
**testifying** 118:14
**testimonials**
109:15
**testimony** 8:18
160:8 243:8
267:22 275:11
285:20 295:14
297:8,11 300:6,7
301:6,9,12
**texas** 9:23 10:2,3
30:10 31:6 74:10
74:12 75:16
**text** 19:10 248:3
273:18,23 274:4,7
274:13 275:2,7
**texted** 274:23
275:8

**texting** 274:1
**texts** 274:24 275:5
**thank** 21:22
294:24 295:11,17
**thanks** 286:14
**therapist** 227:7
**thing** 39:1 105:4
105:12 118:16
130:21 131:1,3
202:21,23 208:16
224:7 257:22
282:20,20
**thing's** 130:13
**things** 147:7,21
171:6 176:15
197:16 202:23
210:4 234:5
235:12,13 243:1
255:16
**think** 9:24 10:4,6
17:22 19:24 20:1
20:7,14 44:11
46:10 53:24 56:3
56:23 62:18 63:10
71:17,24 72:8
81:1 89:2 95:9,14
95:16 99:14 101:3
102:10 103:7,8,13
103:20 108:20
113:16 118:21
121:16 124:16,17
124:17 125:2,6,8,9
128:15 129:7
138:17 143:13
150:13 152:6
154:1,4 155:8,9,16
155:19 156:10,13
156:18,18 157:22
157:22 161:9
167:21 170:16
183:4 185:13

193:24 195:18
196:24 199:22
200:22 205:13
215:13 218:22
220:18 221:23
222:5,6 224:12
225:8 232:21
233:19 237:19
241:9 252:20
259:3,8 266:17
268:6 271:21
272:18 282:21,22
283:18 285:8,8
287:4 292:1
293:15 294:15
**thinks** 249:13
**third** 16:13 66:12
67:3,16,19 68:4,15
68:20 69:4,12,17
69:20 70:1 103:1
109:16 116:20
143:9,18 145:19
146:22 167:6
175:17 176:12
180:20 181:5,12
189:17 191:8,11
192:18 203:8,11
205:22 240:7,7
248:15,19 260:3
276:21 282:7,9,18
282:23 283:7
**thirty** 299:18
**thisselle** 4:10
**thought** 50:3 82:9
177:13 289:7
**three** 14:4 16:15
16:18 25:18,24
26:2,8,12 27:1
32:15 35:15 63:14
74:7,8 95:23
100:2 136:4

141:12 154:17
157:10,12 167:5
168:21 170:5
182:13 236:24
237:12 240:16
241:19 285:12
293:7
**tickets** 218:14
**ties** 160:19,21,22
165:1
**time** 8:3 11:6 13:4
16:5 28:24 29:15
31:8 35:9 40:20
47:3 53:8 61:23
73:12 75:2 80:17
83:8,11 88:16
93:4 98:11 100:1
124:7 126:1
127:16 130:1
140:16 149:9,20
154:9 155:6 160:7
160:10 164:5
177:7,18,20 186:4
199:24 202:15
213:2 223:21
224:11 227:6,7
238:3 240:7,7
241:15 257:14
265:9,11 270:19
274:24,24 276:21
282:13 285:19,21
285:23 287:4
288:4 289:24,24
290:16,17 291:22
294:14,24 297:14
**times** 54:7 124:20
125:5 126:13
127:5 140:17
182:13 203:20,24
222:19 230:21
236:24 240:16

241:19 275:14
285:13
**tired** 222:5 284:18
285:7
**tiring** 285:14
**title** 92:3
**today** 5:19 8:16,18
8:21 19:6 23:16
32:24 34:6,8
48:20 49:4 50:19
83:24 106:14
111:15,19 117:6
124:8 126:2 127:7
127:9,17 129:2
131:2 195:15
204:4 230:2,20
268:12 269:2
286:19,22 288:1,2
**today's** 295:14
**toe** 288:4
**toes** 287:10
**told** 24:13 44:7
94:1 160:4 161:4
222:22 223:4,15
231:21 233:12
234:8 236:8 243:6
253:5,9 266:1
268:24 276:6,19
**toll** 110:24
**tomorrow** 295:5
**ton** 227:23 242:24
**tonight** 293:3
**tons** 275:2
**tools** 192:16
207:14
**top** 75:5,23 80:11
98:15 107:20
110:20 115:15
117:24 118:10
138:19 144:16
170:5 173:7

176:10 177:16
181:4 183:7,15
189:23 197:5
203:5 238:2
269:13 277:18
**total** 291:6,17
292:11
**totally** 121:19
161:13,18,18
**toth** 2:19 33:15
130:19 197:16
208:12 214:19
**touch** 28:15
**towel** 41:1
**town** 11:19
**tracking** 109:19
**trade** 8:9 22:6,11
22:23 45:12 123:8
**traffic** 218:14
262:9 267:19
**training** 54:17,22
**transaction** 262:8
267:13
**transcribed**
297:10 300:7
**transcript** 3:1
296:3 299:11,12
300:5,12 301:5,11
301:17
**transcription**
297:11
**transfer** 14:22
173:14
**transferable**
141:19
**transforming**
174:14
**transitioned** 96:4
**translating** 174:15
**transmit** 174:11
175:3

**transunion** 63:7
63:22 64:1 69:10
104:6
**transunion's** 66:4
66:7 69:1,11
**traut** 95:10
**tried** 256:11
**tries** 29:10,13
**trolling** 43:2
**true** 108:11
170:11 297:11
**trulia** 170:18
**truncated** 59:9,22
80:8 81:12 82:22
91:23 167:12
**truth** 8:24 9:2
222:2 297:6,6,7
**truthful** 8:17
**try** 17:10 25:19
33:12 132:8
168:19,23 204:10
223:17 226:18
256:1
**trying** 47:12,13
155:12 180:10
185:8 220:18
225:20 227:12
278:23 280:23
281:17 287:9
**tuesday** 288:9,10
288:18,20 289:3,8
291:1
**turkey** 9:23 10:1
**turn** 78:20 79:22
115:13,17 116:4
118:23 119:21
139:15 144:18
176:8,9 201:6,7
247:9 250:15
269:4

**turned** 14:7 224:8
232:2,17 243:11
**turns** 32:15
**tv** 168:2 192:19
**tweet** 170:17,20
174:22 178:3
**tweeted** 177:21
**tweets** 170:5
177:19,20 178:8
178:11
**twice** 186:8 240:12
241:6,21
**twitter** 4:5 25:8,9
25:13 26:6,9,24
27:18 146:19
152:11 168:16,17
168:19 169:4,6,12
169:14,15,18,24
170:15,22 171:16
172:7,10,13,20,20
173:3,16,19 174:2
174:18 175:1,9,15
175:16,23 176:5,9
176:17,18,21
177:3,5,8,17,21,24
178:12,18,19,22
179:11,13,13,17
180:3,6,14,24
181:19 182:3,4,12
**two** 12:16 16:8
17:22 35:15 63:1
63:2 66:20 73:22
73:22 88:13,14
99:1 104:1 134:8
136:4,6 197:16
219:20 231:3
237:12 244:4
250:6 260:4
**type** 17:8,17 90:11
155:20 247:23

**typed** 224:6 285:4
**types** 191:14
260:20,23 262:1
**typically** 208:21
**typing** 136:10
**typo** 261:2 272:9

**u**

**u.s.** 5:13 9:15
10:10 256:15
**uber** 194:23 195:1
195:4
**ulcer** 227:23
228:11,13,18,21
233:15,19 234:16
234:24
**un** 185:14
**unable** 116:18
265:13
**unaffiliated** 120:4
120:19
**unauthorized**
171:20 210:13
**unaware** 117:10
**uncles** 227:18
**uncomfortable**
78:6
**understand** 7:22
8:20,23 9:3 34:6
37:16 41:9 47:12
47:13 52:2,2,13,16
53:1 72:2,4
120:16 122:15
124:12 158:7,17
159:18 161:11
173:11 181:7
184:11 227:11
235:6 238:5,11
240:9 279:18,19
280:7 281:3,8,16
291:2,21 293:2

**understandably**
224:15
**understanding**
143:1,8 294:4
**understood** 42:23
226:7 227:11
**undisputed** 259:13
**unemployed**
283:18
**unidentified** 199:5
199:16
**unintelligible**
38:20
**unit** 5:10 83:13,15
**united** 1:1,13
63:15 173:14
**universe** 38:16
**unlawfully** 148:21
**unlisted** 113:16,20
113:22
**unnecessarily**
53:5 162:2
**unredacted**
218:17 223:5
231:12
**unsealed** 269:10
**update** 106:2,6
132:14 133:10
147:15 148:15
188:18
**updated** 131:1,3
**updates** 130:2
178:19
**updating** 248:17
**upload** 146:21
197:23
**uploaded** 176:17
**upper** 75:5 91:22
130:15 208:24
219:15

**upset** 224:15
　270:7
**url** 120:14 214:18
　247:22
**usa** 81:15 82:5
**usage** 145:22
**use** 16:8,9 19:10
　19:12 24:11 25:5
　25:11,16 106:1
　116:24 135:14,23
　137:22 139:6
　140:9 141:20
　142:13 144:5
　146:16,24 148:4
　148:17,20 149:8
　160:12 161:17
　165:7 171:20
　173:11,11,12,16
　174:10,24 175:4
　175:16 176:14
　178:8,11 179:23
　181:5,7,13,15
　187:20 188:1,14
　188:16,18 190:13
　191:11,13 193:4
　193:20 206:2,22
　206:23 207:9,13
　207:18 208:23
　209:12 210:14
　213:9 214:7,8
　237:14,19 238:3,4
　238:10 247:17
　248:1,2 271:4
　278:7 279:3,8,13
　281:10,20
**useless** 256:4
**user** 38:15 138:19
　138:20 139:5
　147:12 168:24
　169:3 172:20,21
　192:7

**users** 111:5 145:19
　248:14
**uses** 174:24
　201:17 207:18
**utility** 96:21
**utube** 197:22,23
　198:4 200:9,12,15
　200:18,21 201:4,7
　201:11,17,21,24
　202:1,4,10 207:15
**utube's** 200:12,15
　202:11

**v**

**v** 299:6 300:3
　301:3
**va** 80:12
**vague** 34:24 39:1
**valid** 162:3
**validate** 111:2
**valley** 77:2
**value** 179:14
　236:13
**vampire** 159:9,11
　160:3,21 161:6,8
　162:11 163:22
　164:9 165:4
　166:19 168:9
**vampires** 159:4,8
　160:18
**vanburen** 2:5
**variety** 181:5
**various** 33:1 76:14
　115:19 181:6
　221:8 258:13
**vedder** 2:10 6:10
　6:13,15 7:10
**vedderprice.com**
　2:13,14,14
**vehicle** 96:17
**vera** 2:11 6:15

**verification** 111:7
　116:16
**verify** 116:21
**verifying** 248:17
**veritext** 5:17,19
　5:20 6:23 295:15
　299:1,7 302:1
**veritext.com.**
　299:17
**version** 177:21
　261:11 269:10
　270:12
**versus** 5:13 14:17
　215:5
**video** 5:2,8,10,18
　6:23 20:18 21:24
　23:3 33:19 36:19
　44:15 72:21 122:6
　122:11 154:12
　156:22 198:9,20
　198:22,24 199:4
　199:15 200:3,5
　219:1 265:16
　286:8 295:13
**videographer** 2:20
　5:1 20:18 33:19
　36:18 37:19 44:15
　72:21 73:3 122:6
　156:22 211:2,6,9
　219:1 265:13,16
　266:1,10 286:8
　292:18 295:12
**videos** 207:15
**videotaped** 1:11
**vienna** 94:5
**view** 146:1 164:19
　171:11,19 179:5
　208:22 209:2
　211:12 293:23
**viewing** 145:21

**violation** 171:21
　172:1
**virginia** 10:3,4,5
　28:14 30:14 31:6
　32:2 74:15 75:16
　79:19 80:2 81:5
　86:21 90:7,9 91:8
　91:22 92:21 94:5
　98:16,19 99:9
　131:21 167:1
　256:16 257:23
**virtual** 5:16 6:23
　33:1
**virtue** 273:24
**visibility** 148:6
**visible** 142:12
　145:16,18
**visit** 106:5 110:23
　177:5 180:4
　191:10 222:19
**visited** 9:24
　106:10 177:3,7
　220:4,11,15,21
　221:21 222:2,3
　230:21 231:22
　239:8 243:8
　247:22
**visiting** 222:8,16
　243:13
**visitors** 139:24
　145:18
**visits** 207:10
　235:10
**voice** 161:13
　270:23,24 271:2,4
　291:14,15
**voicemails** 228:9
**volume** 149:16
**voluminous** 73:21
　287:20

**[voluntary - withdraw]** Page 50

**voluntary** 109:15
**vote** 75:9,11,14
**voter** 75:6
**vs** 1:7

**w**

**w** 87:13,18
**w2** 133:15
**wait** 8:1 13:8
 37:15 140:8 220:6
 272:9 290:6
**waiting** 198:13
**waived** 299:19
**waiver** 244:20
 293:14,22
**walk** 9:10
**walked** 40:24
**wall** 232:4
**want** 8:6 12:1
 24:11 33:15 35:7
 39:3 112:5 121:18
 123:3,11 127:2
 185:9 197:17,18
 199:11 202:23
 226:4 227:14
 232:15 265:22
 266:6 280:12,13
 280:14 285:24
 286:3 288:11,15
 289:11,20 290:1
 290:21 292:9
 294:18
**wanted** 226:19
 286:16
**wants** 105:21
**warrant** 105:23
**washington** 31:7
**wasting** 164:5
 241:14 289:24
 291:22
**watch** 168:2

**way** 26:13 40:19
 42:19 70:23 78:23
 112:8 128:6
 129:20 130:5
 155:4,7,7,7 160:16
 193:21 210:3,9
 223:14,24 224:1
 225:24 226:3,8
 229:7,23 233:17
 238:19 244:9
 257:2 288:4 289:6
 290:11
**ways** 139:20
 146:24
**we've** 34:3 98:8
 152:9 183:4
 218:21 265:7,23
 266:1,7 270:2
 294:11
**web** 23:22 34:17
 35:17 109:18
 117:4 120:13
 180:20 209:15,16
 214:17 222:21
 248:3,4 258:13
**website** 78:6
 107:13 111:9,23
 112:17 121:6
 137:4 178:12
 179:6,8 207:13
 213:23 214:13
 218:3 223:24
 227:1,2 229:6,23
 229:24 230:21
 232:16 238:10,18
 238:20,23 239:9
 243:9,14 247:22
 250:24 252:17
 254:17 255:16
 257:23 259:15
 279:8 284:11

**websites** 71:1
 120:5,19 178:10
 179:11 180:5
 192:19 207:11
 231:3,22 258:17
 268:10,10,14,18
 268:21 269:2
**wechat** 146:19
**wedding** 13:4
 29:20
**week** 289:9 290:14
 290:20,20 291:9
**weird** 96:3 287:14
 287:21
**welcome** 27:14
**went** 9:12 10:1
 37:17 208:20
 256:2
**west** 2:5 76:20,20
 76:21,22,24,24
 77:2,6 88:13
 269:14
**whatnot** 125:2
**whatsoever** 26:13
 54:18,23
**whb** 2:7
**whereof** 298:1
**whispering** 5:4
**white** 90:10
**whitepages** 1:8 4:7
 5:13 6:11,13
 19:16,20 20:10
 23:17 141:9
 161:17 165:8
 210:9,11,21 211:1
 211:13,18,22
 214:9 215:5 218:2
 218:8,15 223:4,16
 225:3,7,10,11
 226:8 229:16
 230:16,21,24

231:10,11,15
 232:19 233:7,18
 233:21 234:9
 237:14,19 238:9
 239:5,9 240:24
 243:9,13,14
 244:13 246:11,17
 246:20 247:2,7
 248:14,18 249:2
 250:23 252:12
 257:4 258:5,7,11
 259:12,14,19
 260:8 261:16
 262:18 263:5,10
 263:15,21 264:2,6
 267:23 274:8
 275:22 276:7
 278:10 279:2,8,12
 279:24 280:1,16
 299:6 300:3 301:3
**whitepages.com**
 160:6 220:2,5,16
 220:22 221:6,21
 222:2,3,8,16,19
 268:14,21
**whitepages.com.**
 34:12 35:8 39:3
 219:21 220:11
**wife** 95:14 253:22
**wikis** 181:7
**william** 2:4 6:6
 39:21 40:1 50:17
 50:20 124:9,11
**willing** 45:19,22
 286:22 289:16,21
**willy** 283:2
**win** 170:18
**wiped** 14:8,21
**wishes** 229:23
**withdraw** 219:7

**withdrawn** 219:9
**witness** 6:17,22
  7:2,5 15:6,7,8
  17:15 18:20 20:13
  22:3,15,17 23:8
  24:2,7,9,13,15,18
  24:20 27:4 28:9
  29:3,19 31:4,13,19
  35:12,22 36:7,9
  37:6 38:7,19 39:8
  40:11 42:4,11,14
  42:22 43:4,19
  44:1,3 45:14
  46:19 47:19 48:10
  50:11 51:3 52:22
  53:2,20 54:13
  55:5,13,16,24
  56:13 57:10,14
  60:2 61:11,18
  62:12,24 63:9
  64:10,17 65:15
  66:15 67:5 68:22
  70:3,13,19 71:6,17
  71:21 72:1,1
  75:22 76:10,18
  78:4,14 80:20
  85:5 86:1 89:17
  91:18 95:1 97:7
  97:14 99:13 102:7
  103:3 104:22
  105:11 106:13,21
  107:3 108:1,19
  110:3,10 115:11
  116:1 117:9
  118:15 119:18
  120:9 121:20
  122:1,5,22 123:5
  124:15,24 125:10
  125:19 126:6
  127:24 132:13
  133:8,20 137:20

139:12 140:21
143:5,12 144:12
146:7 150:2,12
151:16 152:19
153:11 154:16
156:5 158:8,22
159:13 171:14
172:16,23 176:2
186:10 188:22
189:12 190:15,22
206:9 211:7,16
212:6,20 215:16
215:24 220:12
225:14 226:12
228:5,20 229:11
230:5 231:6 232:7
234:18 235:3
236:2,15,22
237:22 242:5
243:18 244:17,23
245:18,24 246:7
246:14 248:10
249:6 250:9
251:24 252:8,24
253:8 254:12
256:9,24 258:15
258:23 259:24
260:12,15 261:9
262:13 268:3,16
268:23 270:11
272:15,21 273:20
274:3 275:24
278:13,14,19,20
279:5,6,16,17
280:3,19 281:7,23
285:10 286:5
297:5,8,10,12
298:1 299:8,11
300:1,4,11 301:1,4
301:15

**witnesses** 294:6,11
**witness'** 299:14
**woman** 41:16
  85:10,21 226:14
  226:21 255:21,24
  256:7
**word** 137:1,1
  145:23 186:18,22
  280:7 281:4
**words** 88:8 137:22
  186:16 219:20
**work** 8:8,9 22:5,10
  22:11,23 40:18
  45:11 87:21 115:9
  122:3 123:7
  128:18 132:23
  167:11,14 184:23
  191:11 295:5
**worked** 30:24
  167:7,16 250:6
**working** 11:18
  131:2 134:11
  249:10
**works** 157:18
  295:6
**world** 174:16
  178:8 197:8
**worldwide** 141:19
  174:9
**worthless** 29:12
**write** 280:21
  281:19
**writing** 12:7
**written** 23:17
  220:24 243:14
  246:10,11 278:7
  279:3,13,24
  280:17 281:10
  282:6,12,18 283:7
  284:2,5,15,20

**wrong** 50:24 51:2
  118:22 123:11
  125:11 126:8
  159:23 161:20
  228:8
**www.mylife.com**
  107:20
**www.peekyou.c...**
  120:13,17
**www.whitepage...**
  259:15

**x**

**x'ed** 59:3
**xxxx** 87:10,24
  90:8

**y**

**yeah** 12:19 17:20
  24:12 33:17 36:7
  36:9 40:9 53:17
  68:12 71:12 79:6
  86:17 99:6 103:13
  109:13 112:20
  124:17 128:16
  130:19 131:2
  132:21 134:14
  136:17 138:17,21
  143:6 157:16
  168:23 170:6,16
  170:21,23 171:5,8
  182:8 184:6
  199:12,21 200:6
  206:14 210:1
  211:12 222:5,7
  231:11 237:18
  244:7 254:23
  255:2 271:19,24
  272:7 275:5
  279:11 286:24
  288:14 289:2,19
  294:3,17,22

**year** 12:14 13:24
14:11 17:22 30:11
31:14 104:1 136:4
184:4,16,19
**years** 14:4 15:21
16:6 17:3,22
18:21 35:15,15,16
62:4,19 64:2,5
99:1,24 100:2
102:10 104:1
113:12 114:18
136:4,4,6 158:9
159:10 162:22
163:10,13 166:21
167:22 182:13
184:22 193:22
199:22 226:15
257:1,5,16,20
283:17
**yelp** 194:15,17
**yep** 8:5 122:4,16
270:9
**yesterday** 125:16
127:14,16 285:23
**young** 10:20
**youtube** 4:6 198:2

---

**z**

---

**zip** 99:5,5,7,11
**zone** 177:18
**zoom** 68:7 195:11
195:15 254:22
269:6,13 288:24
290:10
**zoomed** 254:21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit B

Page 303

1            IN THE UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF ILLINOIS
                      EASTERN DIVISION
3
4  STEPHANIE LUKIS, individually )
   and on behalf of all others   )
5  similarly situated,           )
                                 )
6           Plaintiffs,          )
                                 )
7      vs.                       )  No. 1:19-cv-04871
                                 )
8  WHITEPAGES, INC.,             )
                                 )
9           Defendant.           )
10
11
           The videotaped deposition of STEPHANIE LUKIS,
12
   called for examination, taken pursuant to the Federal
13
   Rules of Civil Procedure of the United States District
14
   Courts pertaining to the taking of depositions, taken
15
   before KELLY A. BRICHETTO, CSR No. 84-3252, Certified
16
   Shorthand Reporter of the State of Illinois, on the 13th
17
   day of January, 2021, at 9:30 a.m.
18
19
                      VOLUME II
20
21
   REPORTED REMOTELY FROM CHICAGO, ILLINOIS
22
23
24

Page 304

```
1  REMOTE APPEARANCES:
2
        On behalf of the Plaintiffs:
3
        BEAUMONT COSTALES, LLC, by
4      MR. WILLIAM BEAUMONT
        107 West VanBuren Street
5      Suite 209
        Chicago, Illinois  60605
6      (773) 831-8000
        whb@beaumontcostales.com
7
8      On behalf of the Defendant:
9      VEDDER PRICE, by
        MR. BLAINE C. KIMREY
10     MR. JONATHON P. REINISCH
        222 North LaSalle Street
11     Chicago, Illinois  60601
        (312) 609-7500
12     bkimrey@vedderprice.com
        jreinisch@vedderprice.com
13
14     - - - - - - -
15
16 ALSO PRESENT:
17 MICHAEL TOTH, Concierge
18 KEVIN DUNCAN, Legal Videographer
19
20
21
22
23
24
```

Page 306

```
1              INDEX OF EXHIBITS
2  NUMBER         DESCRIPTION        IDENTIFIED
3  Exhibit No. 18   2.9 pdf            308
   Exhibit No. 19   Reddit             317
4  Exhibit No. 20   Credit Karma       379
   Exhibit No. 21   Craigslist         381
5  Exhibit No. 22   Verification of
                    Interrogatories    386
6  Exhibit No. 23   Cover e-mail
                    with interrogatories 386
7  Exhibit No. 24   E-mail from Beaumont
                    to Kimrey          389
8  Exhibit No. 25   E-mail from Beaumont
                    to Kimrey          410
9  Exhibit No. 26   Bates 281-1113     412
   Exhibit No. 27   Facebook           414
10 Exhibit No. 28   Facebook           423
   Exhibit No. 29   Facebook           425
11 Exhibit No. 30   Facebook Bates 52-64  427
   Exhibit No. 31   Apps on Facebook   449
12 Exhibit No. 32   Facebook Bates 1162  456
   Exhibit No. 33   Facebook post      459
13 Exhibit No. 34   Recently viewed Facebook  469
   Exhibit No. 35   Recently viewed Facebook  470
14 Exhibit No. 36   Instagram          471
   Exhibit No. 37   Bates 1114-1153    473
15 Exhibit No. 38   Facebook photos    474
   Exhibit No. 39   Facebook videos    475
16 Exhibit No. 40   Facebook posts     477
   Exhibit No. 41   Facebook profile info  487
17 Exhibit No. 42   Facebook profile update  488
   Exhibit No. 43   Facebook account activity  492
18 Exhibit No. 44   Facebook login     494
   Exhibit No. 45   Mobile devices     496
19 Exhibit No. 46   Facebook login     497
   Exhibit No. 47   LinkedIn           497
20
21
22
23
24
```

Page 305

```
1           TRANSCRIPT INDEX
2  APPEARANCES . . . . . . . . . . . . . . . . . . . . 304
3
4  INDEX OF EXHIBITS . . . . . . . . . . . . . . . . 306
5
6  EXAMINATION OF STEPHANIE LUKIS
7  BY MR. KIMREY . . . . . . . . . . . . . . . . . . . 308
8  BY MR. BEAUMONT . . . . . . . . . . . . . . . . . 499
9  BY MR. KIMREY . . . . . . . . . . . . . . . . . . . 513
10
11 REPORTER'S CERTIFICATE . . . . . . . . . . . . . 525
12
13 EXHIBIT CUSTODY
14 EXHIBIT SHARE
15
16
17
18
19
20
21
22
23
24
```

Page 307

```
1        THE VIDEOGRAPHER:  Good morning.  We are going
2  back on the video record at 9:31 a.m. on January 13th,
3  2021.
4        Here begins media unit one, Volume II in
5  the videorecorded deposition of Ms. Stephanie Lukis in
6  the case matter of Stephanie Lukis, et al. versus
7  Whitepages, Inc.
8        My name is Kevin Duncan, and I'm a
9  Certified Legal Videographer from Veritext Legal
10 Solutions, and the court reporter today is Ms. Kelly
11 Kilcoyne from Veritext Legal Solutions.
12        Will the court reporter please confirm
13 that the witness is still under oath?
14              (Witness sworn.)
15        THE VIDEOGRAPHER:  Thank you.
16        You may proceed.
17
18
19
20
21
22
23
24
```

2 (Pages 304 - 307)

Page 308

1 WHEREUPON:
2          STEPHANIE LUKIS,
3 called as a witness herein, having been first duly sworn,
4 was examined and testified as follows:
5          DIRECT EXAMINATION
6          Continued
7 BY MR. KIMREY:
8    Q.   Good morning, Ms. Lukis.  You understand that
9 you're still under oath?
10   A.   Yes.
11   Q.   Have you taken any medications in the past 24
12 to 48 hours that would inhibit your ability to give
13 truthful testimony today?
14   A.   No.
15   Q.   Are you prepared to give truthful testimony
16 today under potential penalty of perjury?
17   A.   Yes.
18   Q.   I'd like to refer you to what was previously
19 marked in the first session of your deposition as Exhibit
20 11.  Please turn to what is Bates stamped 18,
21 WHITEPAGES18 in the lower right-hand corner.
22       MR. TOTH:  Blaine, do you know how many pages
23 that's in?
24       MR. KIMREY:  I don't know.  I'd say maybe ten.

Page 309

1          Could we go off the record?
2       THE VIDEOGRAPHER:  Sure.  Please stand by.
3 Going off the video record at 9:33 a.m.
4          (Discussion had off the
5            record.)
6       We are back on record at 9:34 a.m.
7       You may proceed.
8 BY MR. KIMREY:
9    Q.   Ms. Lukis, we're looking at what was produced
10 in this case as Bates WHITEPAGES00018, and you've seen
11 this before because we entered it in the previous session
12 of your deposition.  At the top do you see where it says
13 "Whitepages Terms of Use"?
14   A.   Yes.
15   Q.   I'd like to refer you to Bates stamp
16 WHITEPAGES00020, Section 3.4.  Okay.  So you testified
17 previously that your mom obtained your new cell phone
18 number and that -- used that to contact you and harass
19 you.  Do you recall that?
20   A.   Yes.
21       MR. BEAUMONT:  Object to form.
22 BY MR. KIMREY:
23   Q.   And that -- can you see one, two, three,
24 four, five, six, seven, eight, nine lines down in the

Page 310

1 Terms and Conditions for Whitepages it says:  "You will
2 not use the services in a manner that may cause emotional
3 or physical harm to anyone or to stalk, threaten, defame,
4 libel or otherwise harass another person."  Did I read
5 that accurately?
6    A.   Yes.  Your microphone sounded weird.
7    Q.   Can you hear me now?
8    A.   Yes.
9    Q.   You testified that your mom by signing up for
10 Whitepages' services agreed to Whitepages' Terms and
11 Conditions; correct?
12       MR. BEAUMONT:  Object to form.
13 BY THE WITNESS:
14   A.   Yes.
15 BY MR. KIMREY:
16   Q.   Your mom agreed that she would not use the
17 information that she obtained from Whitepages to harass
18 anybody; correct?
19       MR. BEAUMONT:  Object to form.
20 BY THE WITNESS:
21   A.   Yes.
22 BY MR. KIMREY:
23   Q.   But she used the information she obtained
24 from Whitepages to harass you; correct?

Page 311

1       MR. BEAUMONT:  Object to form.
2 BY THE WITNESS:
3    A.   Yes.
4 BY MR. KIMREY:
5    Q.   And in doing so, she breached Whitepages'
6 Terms and Conditions; correct?
7       MR. BEAUMONT:  Object to form.
8 BY THE WITNESS:
9    A.   Yes.
10 BY MR. KIMREY:
11   Q.   Your mom violated her contract with
12 Whitepages; correct?
13       MR. BEAUMONT:  Object to form.
14 BY THE WITNESS:
15   A.   Yes.
16 BY MR. KIMREY:
17   Q.   Please turn to WHITEPAGES23, so Bates stamp
18 WHITEPAGES_000023 at Section 11.2.  Do you see the
19 section that says:  "Limitation of Liability," Ms. Lukis?
20   A.   Yes.
21   Q.   It says:  "In no event shall Whitepages or
22 any other providers be liable, whether any implied
23 indemnities or otherwise, for any direct, indirect,
24 incidental, special, consequential, exemplary, punitive

3 (Pages 308 - 311)

Page 312

1 or other damages, whether in an action, a contract, tort
2 including but not limited to negligence, or otherwise
3 arising out of or in any way connected with, 1, use of
4 the services of the content including but not limited to
5 any damage caused by any reliance on or any delays,
6 inaccuracies, errors or omissions in the services or
7 content whether provided by Whitepages or by third
8 parties; 2, any use or inability to use or access the
9 services for any reason; 3, unauthorized access, use or
10 alteration of your searches, content or account; 4, any
11 content provided by or conduct of any third party
12 including without limitation any defamatory, offensive or
13 illegal conduct of third parties or --" I'm sorry. The
14 last one was 3. "-- or, 4, any content or services
15 discussed, purchased or obtained directly or indirectly
16 through the services even if Whitepages and/or the
17 providers are advised of the possibility of such damages.
18 In no event shall the aggregate liability of Whitepages'
19 other providers arising out of or relating to the use of
20 the services and/or the content exceed the greater of
21 U.S. $100 or the amount you paid to Whitepages, if any,
22 in the past six months for access to or use of the
23 services." Did I read that accurately?
24     A.   Yes.

Page 313

1     Q.   Did your mom agree to that by signing up for
2 Whitepages' services?
3         MR. BEAUMONT:  Object to form.
4 BY THE WITNESS:
5     A.   Yes.
6 BY MR. KIMREY:
7     Q.   All right. Going to 11.3, Indemnification,
8 it says: "You agree to hold harmless, defend and
9 indemnify Whitepages and the providers from all
10 liabilities, claims, demands and expenses, including but
11 not limited to reasonable attorneys' fees that are due to
12 arise from or otherwise relate to your use or misuse of
13 the services or the content including without limitation
14 any actual or threatened suit, demand or claim made
15 against Whitepages or any provider that arises out of or
16 relates to, 1, any intellectual property rights or other
17 proprietary rights of any third party and, 2, your breach
18 of this agreement.  Whitepages may assume exclusive
19 control of any defense of any matter subject to
20 indemnification by you which shall not excuse your
21 obligation to indemnify Whitepages, and you agree to
22 agree to cooperate with Whitepages in such event.  You
23 shall not settle any dispute subject to your
24 indemnification under this agreement without prior

Page 314

1 written consent from Whitepages."  Did I read that
2 accurately?
3     A.   Yes.
4     Q.   By using the Whitepages services did your mom
5 agree to the indemnification term?
6         MR. BEAUMONT:  Object to legal conclusion.
7 Actually, I object to this entire line of questioning as
8 a legal conclusion.
9         The witness can answer.
10 BY THE WITNESS:
11    A.   I don't know.
12 BY MR. KIMREY:
13    Q.   Did she agree to the terms and conditions by
14 using the services, Ms. Lukis?
15        MR. BEAUMONT:  Object to form.
16 BY THE WITNESS:
17    A.   I would assume so, but, again, I don't know
18 exactly what she -- what she did.  I don't know what her
19 actions were.
20 BY MR. KIMREY:
21    Q.   So Whitepages has a right, Ms. Lukis, to sue
22 your mom for indemnification if your allegations against
23 her for her harassment arising out of her use of the
24 services are true.  Do you object to Whitepages suing

Page 315

1 your mom for indemnity and contribution related to your
2 allegations in this case?
3         MR. BEAUMONT:  Object to form and legal
4 conclusion.
5         The witness can answer.
6 BY THE WITNESS:
7     A.   I wouldn't object to you guys suing her, but
8 I don't -- I don't know.
9 BY MR. KIMREY:
10    Q.   Do you realize that pursuing this case you're
11 forcing Whitepages to sue your mom?
12        MR. BEAUMONT:  Object to form and also legal
13 conclusion.
14        The witness can answer.
15 BY THE WITNESS:
16    A.   I guess.
17 BY MR. KIMREY:
18    Q.   Do you understand that it's Whitepages'
19 position that she is a necessary party to this litigation
20 because your claims against Whitepages arise out of her
21 alleged breach of the terms and conditions by Whitepages?
22        MR. BEAUMONT:  Object to form and calls for
23 legal conclusion.
24

4 (Pages 312 - 315)

Page 316

1 BY THE WITNESS:
2　　A.　I don't know.
3 BY MR. KIMREY:
4　　Q.　Please turn to 12.10, WHITEPAGES24. Do you
5 see where it says: "Dispute Resolution Agreement to
6 Arbitrate," Ms. Lukis?
7　　A.　Yes.
8　　Q.　Did your mom agree to this provision by using
9 the Whitepages' services?
10　　MR. BEAUMONT: Object to form, calls for legal
11 conclusion.
12　　The witness can answer.
13 BY THE WITNESS:
14　　A.　I don't know.
15 BY MR. KIMREY:
16　　Q.　If your mom did agree to arbitrate pursuant
17 to this provision, is your claim arbitrable?
18　　MR. BEAUMONT: Object to form, also calls for
19 legal conclusion.
20　　The witness can answer.
21 BY THE WITNESS:
22　　A.　I don't know.
23 BY MR. KIMREY:
24　　Q.　Is it possible that because your mom agreed

Page 317

1 to the arbitration clause your claim is arbitrable?
2　　MR. BEAUMONT: Same objection.
3 BY THE WITNESS:
4　　A.　I don't know.
5　　MR. KIMREY: Okay. Let's go off the record.
6　　THE VIDEOGRAPHER: Going off the video record
7 at 9:44 a.m.
8　　　　(Discussion had off the
9　　　　record.)
10　　We are back on record at 9:44 a.m.
11　　You may proceed.
12　　MR. KIMREY: Folder 121, Reddit, please enter
13 as Exhibit 19.
14 BY MR. KIMREY:
15　　Q.　Ms. Lukis, are you the Autumnsilver as
16 depicted here?
17　　A.　Yes.
18　　Q.　Is that your avitar?
19　　A.　I think so.
20　　Q.　Did you choose that avitar to represent you?
21　　MR. BEAUMONT: Object to form.
22 BY THE WITNESS:
23　　A.　I guess.
24

Page 318

1 BY MR. KIMREY:
2　　Q.　What is the avitar?
3　　A.　It's called a snew.
4　　Q.　What's a snew?
5　　A.　That's what Reddit calls their avitar.
6　　Q.　But what is your avitar? What is that thing
7 on the top of her head, for instance?
8　　A.　That's whatever they put on the drawing. I
9 don't know what it is. I don't know what it's supposed
10 to symbolize.
11　　Q.　Are you aware that your Reddit account under
12 the pseudonym Autumnsilver is available to the public?
13　　A.　I didn't know that beforehand.
14　　MR. BEAUMONT: Object to form.
15 BY MR. KIMREY:
16　　Q.　So you're learning that --
17　　A.　Now that I do, I'm going to privatize it.
18　　Q.　Let's turn to the post -- let's scroll down.
19 I'll tell you when to stop. Slow down. Right there. Go
20 back. Where it says: "Just no family." Right there.
21 Okay. Did you make this post approximately nine months
22 ago, Ms. Lukis, that is in the box?
23　　A.　Yes.
24　　Q.　Okay. And you wrote nine months ago the

Page 319

1 following: "Check instantcheckmate.com or
2 whitepages.com. All she needs is your name and a city
3 and she can pay to get your new info. It also shows
4 court documents so the name change would be on there. I
5 am primary on the class action lawsuit against them both
6 because my narcissistic mother keeps finding me through
7 those. You might be able to get them to pull your
8 information if you point out multiple violations of
9 restraining orders from your information being
10 searchable." Did I read that accurately?
11　　A.　Yes.
12　　Q.　You posted that; correct?
13　　A.　Yes. It was after I found out about you
14 guys.
15　　Q.　What did you say?
16　　A.　It's after I found out about you guys.
17　　Q.　And that post in combination with
18 Autumnsilver would enable pretty much anyone to determine
19 that this is your Reddit account; correct?
20　　MR. BEAUMONT: Object to form.
21 BY THE WITNESS:
22　　A.　There are tons of people who use the name
23 Autumnsilver all over the place.
24

5 (Pages 316 - 319)

Page 320

1 BY MR. KIMREY:
2    Q.   Are there tons of people who are a punitive
3 class representative in a case in federal court against
4 Whitepages and ICM?
5    A.   Not to my knowledge.
6    Q.   Okay.  So are you telling -- who are you
7 talking to here?
8        MR. BEAUMONT:  Object to form.
9 BY THE WITNESS:
10   A.   I -- it was a person who had posted a comment
11 about she kept trying to get away from her abusive parent
12 and they kept finding her information on line.
13 BY MR. KIMREY:
14   Q.   In response to that, you had --
15   A.   They found out she changed her name.
16   Q.   In response to that, you told her to go to
17 Instant CheckMate and to Whitepages; correct?
18       MR. BEAUMONT:  Object to form.
19 BY THE WITNESS:
20   A.   Yes, because nobody should have their
21 information on your website.
22 BY MR. KIMREY:
23   Q.   Okay.  Let's scroll forward to -- you can
24 probably search for SherLovesCats.  So that's S-H-E-R

Page 321

1 LovesCats all one word.
2        Let's go off the record.
3        THE VIDEOGRAPHER:  Off the record at 9:49 a.m.
4            (Discussion had off the
5            record.)
6        We are back on the record at 9:51 a.m.
7 BY MR. KIMREY:
8    Q.   Ms. Lukis, do you see the post that's been
9 highlighted for you?
10   A.   Yeah.
11   Q.   Did you write about a year ago:  "You could
12 also be drinking cranberry juice --" I'm sorry.  Did you
13 write about a year ago:  "Just be careful in how much
14 cranberry juice you drink.  Large quantities have a
15 laxative effect.  Source:  Happened to me.  Ugh."
16   A.   Yes.
17   Q.   Who could read that when you posted that?
18       MR. BEAUMONT:  Object to the form.
19 BY THE WITNESS:
20   A.   The person in that thread who I replied to.
21 BY MR. KIMREY:
22   Q.   Okay.  Are you aware that that post is
23 publicly available?
24   A.   No, I wasn't.

Page 322

1        MR. BEAUMONT:  Object to form.
2 BY MR. KIMREY:
3    Q.   Is this something that you would want to
4 reveal to the public?
5        MR. BEAUMONT:  Object to form.
6 BY THE WITNESS:
7    A.   I -- I don't know how this is relevant to you
8 guys using -- selling my information on line.
9 BY MR. KIMREY:
10   Q.   Can you answer the question?
11   A.   No, it's not something I'd want on line, but
12 it has nothing to do with you guys selling my
13 information.
14       MR. KIMREY:  Can we go off the record?
15       THE VIDEOGRAPHER:  Going off the video record
16 at 9:53 a.m.
17           (Discussion had off the
18           record.)
19       We are back on the record at 9:54 a.m.
20       You may proceed.
21 BY MR. KIMREY:
22   Q.   Do you see the post that's at the top of the
23 page, Ms. Lukis?
24   A.   Yes.

Page 323

1    Q.   Excuse me?  What did you say?
2    A.   I was just reading it.
3    Q.   Did you publish this post?
4    A.   Yes, and I thought the person I was
5 responding to was the only one who could read it.
6    Q.   Are you aware that this is publicly
7 available?
8    A.   Now I am.
9        MR. BEAUMONT:  Object to form.
10 BY MR. KIMREY:
11   Q.   Is this something that you would have want to
12 have said to the public at large?
13       MR. BEAUMONT:  Object to form.
14 BY THE WITNESS:
15   A.   I don't know.  It's nothing inflammatory, and
16 it also has nothing to do with identifying me personally
17 as to where I worked or who I'm talking about.
18 BY MR. KIMREY:
19   Q.   When did you work at Cheesecake Factory?
20   A.   Four -- I don't remember.  Years ago.
21   Q.   Where was The Cheesecake Factory?
22   A.   Don't know how it matters, but Virginia and
23 Illinois.
24   Q.   For how long did you work for The Cheesecake

6 (Pages 320 - 323)

Page 324

1 Factory in Virginia?
2     A.   I don't remember.
3     Q.   For how long did you work at The Cheesecake
4 Factory in Illinois?
5     A.   I don't remember.  It was years ago.
6     Q.   But you definitely worked for a Cheesecake
7 Factory in Virginia?
8     A.   Yes.
9     Q.   You definitely worked for a Cheesecake
10 Factory in Illinois?
11     A.   Yes.
12     Q.   In this exhibit can we conclude that every
13 post that is preceded by Autumnsilver is a post made by
14 you?
15         MR. BEAUMONT:  Object to form.
16 BY THE WITNESS:
17     A.   In this exhibit, after you talking to me
18 about it, yes.  Would anybody know who Autumnsilver is
19 outside of you guys doing research and finding other
20 things with Autumnsilver in it?  No.
21 BY MR. KIMREY:
22     Q.   Is your lawsuit public record?
23         MR. BEAUMONT:  Object to form.
24

Page 325

1 BY THE WITNESS:
2     A.   Yes, it is.
3 BY MR. KIMREY:
4     Q.   Can anyone on planet earth look up your name
5 in connection with the lawsuit?
6         MR. BEAUMONT:  Object to form.
7 BY THE WITNESS:
8     A.   That's not the only thing that comes up when
9 they search my name.
10 BY MR. KIMREY:
11     Q.   Again, were you aware of anyone on planet
12 earth who has sued Whitepages and Instant CheckMate in
13 punitive class actions other than you?
14     A.   I have no idea.
15         MR. BEAUMONT:  Object to form.
16         MR. KIMREY:  Let's go off the record.
17         THE VIDEOGRAPHER:  Going off the video record
18 at 9:57 a.m.
19             (Discussion had off the
20             record.)
21         We are back on the record at 9:57 a.m.
22 BY MR. KIMREY:
23     Q.   Do you see the post that's on the screen, Ms.
24 Lukis?

Page 326

1     A.   Yes.
2     Q.   Did you write this post?
3     A.   Yes.
4     Q.   Did you intend for the post to be available
5 to the public generally?
6     A.   No.
7     Q.   Are you aware that it is available to the
8 public generally?
9         MR. BEAUMONT:  Object to form.
10 BY THE WITNESS:
11     A.   Now I am.
12 BY MR. KIMREY:
13     Q.   Do you see at the second to the last
14 paragraph it says:  "Funny but a few years later I was in
15 a different car accident and had to get X-rays on my neck
16 and back.  Turns out, in the accident senior year I had
17 chipped a chunk off one of my vertebrae and it had healed
18 but now presses against the disc between the vertebrae."
19 Did I read that accurately?
20     A.   Yes.
21     Q.   Do you consider that information to be
22 private information?
23         MR. BEAUMONT:  Object to form.
24

Page 327

1 BY THE WITNESS:
2     A.   Yes.
3 BY MR. KIMREY:
4     Q.   Do you consider that to be sensitive
5 information protected by HIPAA?
6         MR. BEAUMONT:  Object to form and also calls
7 for legal conclusion.
8 BY THE WITNESS:
9     A.   I'm not familiar with everything that's in
10 HIPAA, so I wouldn't know.
11 BY MR. KIMREY:
12     Q.   Have you ever advised anyone related to
13 HIPAA?
14     A.   No, not that I can think of.
15         MR. KIMREY:  Let's go off the record.
16         MR. BEAUMONT:  Before we go off the record, I
17 object to the form of the last question, but it's fine to
18 go off the record.
19         THE VIDEOGRAPHER:  Okay.  Going off the video
20 record at 9:58 a.m.
21             (Discussion had off the
22             record.)
23         We are back on record at 9:59 a.m.
24

7 (Pages 324 - 327)

Page 328

1 BY MR. KIMREY:
2    Q.   Ms. Lukis, do you see the post in the middle
3 that starts with:  "Holy shit"?
4    A.   Yeah.
5    Q.   Did you write that post?
6    A.   I don't know.  I don't remember.
7    Q.   Are you Autumnsilver?
8    A.   Yes.  Again, I don't remember writing the
9 post.
10    Q.   Okay.  Is it possible you wrote that post?
11    A.   Possible.
12    Q.   Okay.  And did you say:  "Holy shit.
13 Knowingly violating HIPAA at that level is $10,000 per
14 violation.  If I recall, five to ten years of jail time
15 depending on the judge."  Did I read that accurately?
16    A.   Yes.
17    Q.   Did you write that?
18    A.   I suppose so.
19    Q.   Then you wrote:  "If the cousin gets busted
20 for sharing our entire medical file, she could be
21 seriously up shit creek."  Did you write that?
22    A.   I suppose so.
23    Q.   Did you intend for that to be available to
24 the public?

Page 329

1    A.   Nope.
2       MR. BEAUMONT:  Object to form.
3 BY MR. KIMREY:
4    Q.   Are you aware that it is available to the
5 public?
6       MR. BEAUMONT:  Object to form.
7 BY THE WITNESS:
8    A.   As of today I am.
9 BY MR. KIMREY:
10    Q.   Are you aware that it's been available to the
11 public ever since you wrote it?
12       MR. BEAUMONT:  Object to form.
13 BY THE WITNESS:
14    A.   As of today I am.  I thought I was responding
15 directly to that person.
16       MR. KIMREY:  Okay.  Let's go off the record.
17       THE VIDEOGRAPHER:  Off the record at 10
18 o'clock a.m.
19          (Discussion had off the
20           record.)
21       We are back on record at 10:01 a.m.
22 BY MR. KIMREY:
23    Q.   Ms. Lukis, did you draft the post that's at
24 the top of the page?

Page 330

1    A.   Yes.
2       MR. BEAUMONT:  Object to form.
3 BY MR. KIMREY:
4    Q.   It says:  "I am officially at a loss of
5 words. So a long story short, my N mom --" what is N
6 mom?
7    A.   Narcissistic mother.
8    Q.   Who is your narcissistic mother?
9    A.   Debbie I think she's going by Egan now.  I
10 don't know what last name she's currently using.
11    Q.   "My narcissistic mom was helping us put out
12 bills --" or sorry.  "My narcissistic mom was helping us
13 out with bills and paid my husband and I's March rent on
14 her credit card.  At the end of April, beginning of May
15 we got into a huge fight where we stopped talking to her
16 and basically went NC for a month."  What is NC?
17    A.   No contact.
18    Q.   "During that time, apparently she called the
19 credit card company and reversed the charge for our rent.
20 Well, our apartment company instead of talking to us and
21 seeing if maybe we could set up some sort of payment
22 arrangement for March's rent just tacked it onto August
23 doubling our rent.  We were already going to be late
24 because of financial difficulties, but there is no way

Page 331

1 for us to find another almost $2,000 before the end of
2 month and still have $1800 on September 1."  Did I read
3 that accurately?
4    A.   Yes.
5    Q.   Did you post that?
6    A.   Yes.
7    Q.   By paying your rent was your mom harassing
8 you?
9       MR. BEAUMONT:  Object to form.
10 BY THE WITNESS:
11    A.   At the time when I was talking to her, she
12 was -- she emotionally and mentally harassed me, but I
13 was still talking to her at the time.
14 BY MR. KIMREY:
15    Q.   Did you intend for this post to be public?
16       MR. BEAUMONT:  Object to form.
17 BY THE WITNESS:
18    A.   That one, yes.
19 BY MR. KIMREY:
20    Q.   So this one you intended to be public but the
21 other ones you did not?
22       MR. BEAUMONT:  Same objection.
23 BY THE WITNESS:
24    A.   I -- again, when I would reply to somebody's

8 (Pages 328 - 331)

1 post, I thought I was replying directly to that person
2 not posting -- not having it be a public thing. Whenever
3 anybody responds to you you get -- you get that response
4 in a -- inside the website as a -- as a thing. You
5 get -- so that's what I thought I was doing was
6 getting -- giving people direct responses.
7      Q.   Did you intend for this post to be public?
8      A.   This one, yes.
9           MR. BEAUMONT:  Objection.
10 BY MR. KIMREY:
11     Q.   Why did you intend for this one to be public
12 but the other ones not to be?
13          MR. BEAUMONT:  Same objection.
14 BY THE WITNESS:
15     A.   I was asking for help.
16 BY MR. KIMREY:
17     Q.   Okay.  Can you move down?  The person
18 responding to you says one, two, three, four lines down:
19 "Fucking, Christ.  Your mom is a fuckwit."  Do you see
20 that?
21     A.   Yes.
22     Q.   And you respond:  "Thanks.  Honestly, I just
23 needed to vent.  Fuckwit, heh.  I think I might use that
24 as her new nickname around here.  A lot better than some

1 of the other things I have been saying lately."  Did I
2 read that accurately?
3      A.   Yes.
4      Q.   Did you write that post?
5      A.   Yes.
6      Q.   Did you intend for that post to be public?
7           MR. BEAUMONT:  Object to form.
8 BY THE WITNESS:
9      A.   No.  I thought I was responding directly to
10 the person who had directly responded to me.
11 BY MR. KIMREY:
12     Q.   So do you now call your mom fuckwit?
13     A.   No.
14          MR. BEAUMONT:  Object to form.
15          MR. KIMREY:  Let's go off the record.
16          THE VIDEOGRAPHER:  Off the record at 10:05
17 a.m.
18               (Discussion had off the
19               record.)
20          We are back on record at 10:06 a.m.
21          You may proceed.
22 BY MR. KIMREY:
23     Q.   Do you see in the middle here, Ms. Lukis,
24 there's a post by you that says:  "Creditkarma.com allows

1 you to look at your credit reports for free instantly
2 after signing up, so I would go check them out,
3 especially if one of those is where you had the funny
4 questions pop up.  Edit:  You can look at the TransUnion
5 and Equifax reports."  Did I read that accurately?
6      A.   Yes.
7      Q.   Did you write that?
8      A.   I would assume so.
9           MR. BEAUMONT:  Object to form.
10 BY MR. KIMREY:
11     Q.   Did you intend for that to be public?
12          MR. BEAUMONT:  Same objection.
13 BY THE WITNESS:
14     A.   No.
15 BY MR. KIMREY:
16     Q.   Okay.  Why are you referring someone to
17 creditkarma.com?
18     A.   Because the comment I was responding to is
19 that person thought that their parent may have taken out
20 a $100,000 mortgage in that person's name.
21     Q.   So why did you refer them to creditkarma.com?
22     A.   Because I had learned about that website
23 where you can get access to your credit reports for free.
24     Q.   Why did you refer them to TransUnion and

1 Equifax?
2      A.   I didn't refer them to TransUnion and
3 Equifax.  If you look at it, it says:  "You can look at
4 the TransUnion and Equifax reports," referring to Credit
5 Karma.
6      Q.   So, in other words, you're saying you can get
7 your TransUnion and Equifax reports through Credit Karma;
8 is that right?
9      A.   You can get some information from your credit
10 report not everything.
11          MR. KIMREY:  Let's go off the record.
12          THE VIDEOGRAPHER:  Stand by.  Going off the
13 video record at 10:07 a.m.
14               (Discussion had off the
15               record.)
16          We are back on record at 10:08 a.m.
17          You may proceed.
18 BY MR. KIMREY:
19     Q.   Do you see the post at the top by you, Ms.
20 Lukis, that begins with:  "First round"?
21     A.   Yes.
22     Q.   Did you write this?
23     A.   Yes.
24     Q.   Did you intend for this to be public?

9 (Pages 332 - 335)

Page 336

1    A.   No.  Again, I was responding to someone.
2         MR. BEAUMONT: Object to form.
3  BY MR. KIMREY:
4    Q.   Why did you not want it to be public?
5         MR. BEAUMONT: Object to form.
6  BY THE WITNESS:
7    A.   Because it's talking about my medical
8  information.
9         MR. KIMREY: Okay.  Let's go off the record.
10        THE VIDEOGRAPHER: We're off the video record
11 at 10:09 a.m.
12             (Discussion had off the
13             record.)
14        We are back on record at 10:09 a.m.
15 BY MR. KIMREY:
16   Q.   Do you see the post, Ms. Lukis, that starts
17 with: "Honestly"?
18   A.   Yes.
19   Q.   Did you write this?
20   A.   Yes.
21   Q.   You providing legal advice here?
22        MR. BEAUMONT: Object to form and -- give me
23 one quick second.  I just want to think about this real
24 quick.  And I'm also going to object as calls for legal

Page 337

1  conclusion.
2         The witness can answer.
3  BY THE WITNESS:
4    A.   I wouldn't say I was providing legal advice
5  at all, no.
6  BY MR. KIMREY:
7    Q.   Did you mean for this post to be public?
8    A.   No.
9         MR. BEAUMONT: Object to form.
10 BY THE WITNESS:
11   A.   I was replying to someone else.
12        MR. KIMREY: Let's go off the record.
13        THE VIDEOGRAPHER: We are going off the video
14 record at 10:09 a.m.
15             (Discussion had off the
16             record.)
17        We are back on the record at 10:10 a.m.
18 BY MR. KIMREY:
19   Q.   Okay.  Do you see the post that begins with:
20 "Similar," Ms. Lukis?
21   A.   Yes.
22   Q.   You wrote: "Similar but not regarding her
23 parents as they both died before my narcissist mom's
24 narcissism got full blown.  My husband happened to

Page 338

1  mention narcissism while they were watching a movie over
2  Christmas while we were visiting and now all my mother
3  can talk about is how my --" what is an M-I-L?
4    A.   Mother-in-law.
5    Q.   "-- my mother-in-law is a giant narc.
6  Totally not true and she is projecting because my
7  mother-in-law would give life, limbs, organs and her last
8  dime to make sure her kids were okay.  Everything my
9  narcissistic mom says my mother-in-law does is actually
10 things she has done or said, but she totally gaslights
11 herself into remembering how horrible my mother-in-law is
12 to me and trying to convince me and my husband of her
13 version of reality."  Did you write that?
14   A.   Yes.
15        MR. BEAUMONT: Object to form.
16 BY MR. KIMREY:
17   Q.   Did you intend for that to be public?
18        MR. BEAUMONT: Object to form.
19 BY THE WITNESS:
20   A.   No, I did not.  I was responding to someone
21 else.
22 BY MR. KIMREY:
23   Q.   Are you aware that it is public?
24   A.   Now I am.

Page 339

1         MR. BEAUMONT: Form.
2         MR. KIMREY: Off the record.
3         THE VIDEOGRAPHER: Off the video record at
4  10:11 a.m.
5
6              (Discussion had off the
7              record.)
8         We are back on record at 10:12 a.m.
9  BY MR. KIMREY:
10   Q.   Do you see the post by you, Ms. Lukis, that
11 starts with: "Don't do it"?
12   A.   Yes.
13   Q.   Did you write this post?
14   A.   Yes.
15   Q.   What is an ACON?
16   A.   Adult child of a narcissist.
17   Q.   Did you intend for this post to be public?
18   A.   No.  I was --
19        MR. BEAUMONT: Form.
20 BY THE WITNESS:
21   A.   -- responding to someone else.
22 BY MR. KIMREY:
23   Q.   Are you aware that it is public?
24   A.   Now I am.

10 (Pages 336 - 339)

Page 340

1        MR. BEAUMONT:  Object to form.
2  BY MR. KIMREY:
3    Q.   Okay.  Let's go to claiming.  Move forward.
4  Again, I think we -- let's go off the record.
5        THE VIDEOGRAPHER:  Off the video record at
6  10:12 a.m.
7            (Discussion had off the
8            record.)
9        We are back on record at 10:13 a.m.
10 BY MR. KIMREY:
11   Q.   Do you see the comment that begins:  "I would
12 say," Ms. Lukis?
13   A.   Yeah.
14   Q.   Did you write this comment?
15   A.   I would assume so.
16   Q.   Okay.  And it says:  "I would say talk to a
17 tax professional ASAP.  It will get fined and his refund
18 audited once you file your taxes.  He knows he is wrong
19 for filing you on his taxes but he just wants the child
20 tax credit to offset anything he might have to pay.  I am
21 in a similar situation with my non-narcissistic
22 mother-in-law.  My sister-in-law, 14, has been living
23 with us since April/May and we have paid for everything
24 for her, so she was put on our taxes.  My mother-in-law

Page 341

1  tried to file with the 14-year old on her taxes and they
2  got rejected only because we managed to file first."  Did
3  I read that accurately?
4    A.   Yes.
5        MR. BEAUMONT:  Object to form.
6  BY MR. KIMREY:
7    Q.   So did you list your 14-year old
8  sister-in-law as a dependent on your taxes?
9        MR. BEAUMONT:  Object to form and calls for
10 legal conclusion.
11 BY THE WITNESS:
12   A.   I don't recall.
13 BY MR. KIMREY:
14   Q.   Do you see where it says:  "So she was put on
15 our taxes"?
16   A.   Yes.  I'm assuming I did, but I don't recall.
17   Q.   Okay.  And your mother-in-law tried to do the
18 same thing?
19   A.   Yes.
20       MR. BEAUMONT:  Object to form.
21 BY MR. KIMREY:
22   Q.   Do you know what tax fraud is?
23       MR. BEAUMONT:  Object to form and calls for
24 legal conclusion.

Page 342

1
2  BY THE WITNESS:
3    A.   I -- I vaguely have an idea.
4  BY MR. KIMREY:
5    Q.   Do you think it's appropriate for you to
6  claim your sister-in-law as a dependent on your taxes?
7    A.   She was a --
8        MR. BEAUMONT:  Objection, calls for legal
9  conclusion.
10       The witness can answer.
11 BY THE WITNESS:
12   A.   She was a dependent.  We paid for everything
13 for her for more than a year and a half.
14 BY MR. KIMREY:
15   Q.   Do you think it was appropriate for your
16 mother-in-law to claim your sister-in-law as a dependent
17 on her taxes at the same time you claimed the
18 sister-in-law to be a dependent on your taxes?
19       MR. BEAUMONT:  Object to form and calls for
20 legal conclusion.
21 BY THE WITNESS:
22   A.   I -- I don't know.  I'm not -- I'm not a tax
23 professional and I'm not an attorney.
24 BY MR. KIMREY:

Page 343

1    Q.   So you think it could be appropriate for both
2  you and your mother-in-law to claim the sister-in-law as
3  a dependent simultaneously on your tax returns for the
4  same year?
5    A.   I would assume not.
6        MR. BEAUMONT:  Object to form and calls for a
7  legal conclusion.
8        The witness can answer.
9  BY THE WITNESS:
10   A.   I would assume not.
11 BY MR. KIMREY:
12   Q.   What did you say?
13   A.   I would assume not.
14       MR. KIMREY:  Okay.  Let's go off the record.
15       THE VIDEOGRAPHER:  Off the video record at
16 10:16 a.m.
17           (Discussion had off the
18           record.)
19       We are back on the record at 10:16 a.m.
20 BY MR. KIMREY:
21   Q.   Do you see the post that begins:  "I am
22 totally feeling"?
23   A.   Yes.
24   Q.   Did you write that?

11 (Pages 340 - 343)

Page 344

1   A.   Yes.
2   Q.   Did you intend for it to be public?
3   A.   No, because I was --
4        MR. BEAUMONT:  Form.
5   BY THE WITNESS:
6   A.   -- replying to another person.
7   BY MR. KIMREY:
8   Q.   It says that your husband got a fantastic new
9   job making double what he had previously.  What was that
10  job?
11  A.   I don't remember.  It was five years ago.
12  Q.   Do you remember any job he's ever had?
13  A.   Yes.  He was working in a sales role for --
14  but I don't remember which company he was working for at
15  the time.
16  Q.   Do you remember any company he's ever worked
17  for ever in the history of his life?
18  A.   Yes, but I don't see how what companies my
19  husband has worked for is relevant.
20  Q.   What companies has your husband worked for?
21       MR. BEAUMONT:  Form.
22  BY THE WITNESS:
23  A.   Johnson Controls, Orkin, Weiser Security.
24  There was a couple other -- there's a couple other, but I

Page 345

1   can't remember who they are.
2   BY MR. KIMREY:
3   Q.   Was this new job making double what he had
4   made previously at Johnson Controls, Orkin or Weiser
5   Security?
6   A.   I don't know.  I would assume so since that's
7   what I wrote.
8   Q.   You wrote that his new job was at Johnson
9   Controls, Orkin or Weiser Security?
10       MR. BEAUMONT:  Form.
11  BY THE WITNESS:
12  A.   I didn't write the name of the company
13  because I don't remember, so I don't know who it was.
14  BY MR. KIMREY:
15  Q.   Okay.  And you say:  "I am getting a job
16  again after being out of the workforce."  What was that
17  job?
18  A.   I don't remember who I was working for five
19  years ago.  I think -- five years ago is -- I don't -- I
20  don't recall who it was.
21       MR. KIMREY:  Let's go off the record.
22       THE VIDEOGRAPHER:  Going off the video record
23  at 10:18 a.m.
24       (Discussion had off the

Page 346

1        record.)
2        We are back on record at 10:18 a.m.
3   BY MR. KIMREY:
4   Q.   Do you see where it says:  "This period," Ms.
5   Lukis?
6   A.   Yes.
7   Q.   It says in full:  "This.  If she goes
8   snooping pretending to be a nurse for your doctor, be
9   sure to report her.  She knows that shit is illegal for
10  her to do, but her narcissismness let's her believe she
11  can get away with it."  Did I read that accurately?
12  A.   Yes.
13       MR. BEAUMONT:  Form.
14  BY MR. KIMREY:
15  Q.   Did you post that?
16  A.   Yes.
17  Q.   Did you intend for it to be public?
18       MR. BEAUMONT:  Object to form.
19  BY THE WITNESS:
20  A.   Did I intend for it --
21  BY MR. KIMREY:
22  Q.   Did you intend for it to be public?
23       MR. BEAUMONT:  I'm sorry.  There's some
24  static.  Would you mind repeating your question because I

Page 347

1   can't hear?
2   BY MR. KIMREY:
3   Q.   Did you intend for it to be public?
4   A.   No.
5        MR. BEAUMONT:  Object to form.
6        MR. KIMREY:  How's my sound?
7        MR. BEAUMONT:  There's some sort of distortion
8   in the line.
9        MR. KIMREY:  Let's go off the record.
10       THE VIDEOGRAPHER:  Please stand by.  Going off
11  the video record at 10:20 a.m.
12       (Discussion had off the
13       record.)
14       We are back on record at 10:22 a.m.
15       You may proceed.
16       MR. BEAUMONT:  I'd just like to make clear
17  that there was some distortion in the line, and for the
18  previous question I objected to the form of the question.
19  BY MR. KIMREY:
20  Q.   The post that we were just talking about
21  continues onto this page.  Do you see that, Ms. Lukis?
22  A.   Yes.
23  Q.   And you wrote this entire post; correct?
24  A.   Yes.

12 (Pages 344 - 347)

Page 348

1    Q.   You did not intend for this to be public;
2 correct?
3    A.   No, I did not.
4       MR. BEAUMONT:  Object to form.
5 BY MR. KIMREY:
6    Q.   What are flying monkeys?
7    A.   Let's see.  It's a reference to the
8 characters from the Wizard of Oz.  They're the people who
9 mess with you from -- that are sent -- how do you
10 describe it?  People who are sent by the narcissist in
11 your life to mess with you and try to convince you that
12 you're in the wrong.
13    Q.   Who are the flying monkeys in your life?
14    A.   My siblings --
15       MR. BEAUMONT:  Object to form.
16 BY THE WITNESS:
17    A.   My siblings, my aunts, cousins, uncles, all
18 people I have cut out of my life.
19 BY MR. KIMREY:
20    Q.   So all of your siblings are flying monkeys?
21    A.   Yes.
22       MR. BEAUMONT:  Object to form.
23 BY THE WITNESS:
24    A.   They all do whatever my mother tells them to.

Page 349

1 Well, the only one living -- remaining does.
2 BY MR. KIMREY:
3    Q.   All of your aunts and uncles are flying
4 monkeys?
5       MR. BEAUMONT:  Object to form.
6 BY THE WITNESS:
7    A.   On my mother's side, yes.
8 BY MR. KIMREY:
9    Q.   Is your mom's entire side of the family
10 comprised of flying monkeys?
11       MR. BEAUMONT:  Object to form.
12 BY THE WITNESS:
13    A.   The ones that I have contact with are, yes,
14 or had contact with are.
15 BY MR. KIMREY:
16    Q.   Could you list by name the flying monkeys?
17    A.   I don't see how it's relevant to list the
18 names of my family members.
19       MR. BEAUMONT:  Object to form.
20 BY MR. KIMREY:
21    Q.   Could you list by name the flying monkeys?
22       MR. BEAUMONT:  Object to form again.
23 BY THE WITNESS:
24    A.   Brian, Patricia, Terri.

Page 350

1
2 BY MR. KIMREY:
3    Q.   What are their last names?
4    A.   Brian Klatte, Patricia Jones, Terri, I don't
5 know her last name.  I barely ever talk to her.  God.
6 What the heck is -- I haven't talked to most of them in
7 years, so I don't remember most of their names, and I
8 only interacted with them at most once or twice a year
9 unless my mother was sending them to harass me.
10    Q.   Have you been diagnosed with any mental
11 illnesses?
12       MR. BEAUMONT:  Object to form.
13 BY THE WITNESS:
14    A.   I don't know why my medical history is
15 relevant.
16 BY MR. KIMREY:
17    Q.   Have you been diagnosed with any mental
18 illnesses?
19       MR. BEAUMONT:  Form.
20 BY THE WITNESS:
21    A.   Anxiety due to -- due to my mother and
22 bipolar disorder.
23 BY MR. KIMREY:
24    Q.   When were you diagnosed with bipolar

Page 351

1 disorder?
2    A.   God.
3       MR. BEAUMONT:  Object to form.
4 BY THE WITNESS:
5    A.   I don't remember.  It's been years.
6 BY MR. KIMREY:
7    Q.   Do you take any medications for your bipolar
8 disorder?
9       MR. BEAUMONT:  Object to form.
10 BY THE WITNESS:
11    A.   Since my medical history is not being
12 submitted, I really would prefer not to answer that
13 question.
14 BY MR. KIMREY:
15    Q.   You have to answer it because your adequacy
16 as the class representative is at issue in this case.
17       So do you take any medications for your
18 bipolar disorder?
19    A.   Yes, Lamictal.
20    Q.   For the past three years have you taken
21 anything for your bipolar disorder other than Lamictal?
22       MR. BEAUMONT:  Object to form.
23 BY THE WITNESS:
24    A.   I don't know.  I don't recall.

13 (Pages 348 - 351)

Page 352

1  BY MR. KIMREY:
2      Q.  Who prescribed Lamictal to you?
3      A.  My psychiatrist.
4      Q.  Who is that?
5      A.  Helena Radomska.
6      Q.  Could you spell that?
7      A.  R-A-D-O-M-S-K-A.
8      Q.  What was the first name?
9      A.  Helena.
10     Q.  Where is her office?
11     A.  Chicago.
12     Q.  Where?
13     A.  Mag Mile.  I don't know the address.
14     Q.  What's the name of her practice?
15     A.  Her name.
16     Q.  Do you have her telephone number?
17     A.  No.  I contact her through ZocDoc.
18     Q.  Have you agreed to ZocDoc's terms and
19  conditions?
20         MR. BEAUMONT:  Object to form.
21  BY THE WITNESS:
22     A.  Yeah.
23  BY MR. KIMREY:
24     Q.  What was that?

Page 353

1      A.  Yes.
2      Q.  Have you agreed to ZocDoc's privacy policy?
3          MR. BEAUMONT:  Form.
4  BY THE WITNESS:
5      A.  Yes.
6  BY MR. KIMREY:
7      Q.  When were you -- have you been clinically
8  diagnosed with anxiety?
9      A.  Yes.
10         MR. BEAUMONT:  Form.
11  BY MR. KIMREY:
12     Q.  Who diagnosed you with anxiety?
13     A.  I don't remember the doctor's name.  I
14  haven't seen that doctor in years.
15     Q.  How long ago did you receive the clinical
16  diagnosis of anxiety?
17     A.  About ten years ago.
18     Q.  Do you know what the DSM-5 is?
19     A.  No.
20     Q.  Do you know what the DSM-IV is?
21     A.  No.
22     Q.  Have you been diagnosed with any mental
23  conditions other than bipolar disorder and anxiety?
24     A.  No.

Page 354

1          MR. BEAUMONT:  Object to form.
2
3  BY MR. KIMREY:
4      Q.  How does your bipolar disorder manifest
5  itself?
6          MR. BEAUMONT:  Object to form.
7  BY THE WITNESS:
8      A.  Well, other than the fact it hasn't
9  manifested in five years, it's manic episodes followed by
10  depressive episodes.
11  BY MR. KIMREY:
12     Q.  In this post at the end you refer to a
13  restraining order.  Do you see that?  Last two words of
14  the post.
15     A.  Yes.
16     Q.  Have you ever sought a restraining order
17  against your mom, Deborah Egan?
18     A.  I wish I could, but I didn't -- I wasn't
19  documenting the issues that she was causing me at the
20  time.
21     Q.  So you've never sought a restraining order
22  against your mom?
23     A.  I wanted to, but I don't have any evidence
24  that -- when I went -- took the information to the police

Page 355

1  to request one, they said that I don't have enough in
2  evidence in order to get one.
3      Q.  What police did you go to?
4      A.  God, it was like six years ago.  I think it
5  was Chicago PD.
6      Q.  Did you file a report?
7      A.  The officer I talked to said I don't have
8  enough information to be able to file anything.
9      Q.  Who was the officer?
10     A.  Heck if I know.
11         MR. KIMREY:  Let's go off the record.
12         THE VIDEOGRAPHER:  Please stand by.  Off the
13  video record at 10:29 a.m.
14             (Discussion had off the
15             record.)
16         We are back on the record at 10:29 a.m.
17  BY MR. KIMREY:
18     Q.  Has your bipolar disorder ever caused you to
19  do anything that you regret?
20         MR. BEAUMONT:  Object to form.
21  BY THE WITNESS:
22     A.  Not -- not that I can think of.
23  BY MR. KIMREY:
24     Q.  Has your anxiety ever caused you to do

14 (Pages 352 - 355)

Page 356

1 anything that you regret?
2      MR. BEAUMONT: Form.
3 BY THE WITNESS:
4      A.   Not that I can think of.
5 BY MR. KIMREY:
6      Q.   Okay. Do you see this post that begins with:
7 "Heck yes"?
8      A.   Yes.
9      Q.   Here you're talking about your biological mom
10 and accidents she's been in. Do you see that?
11      A.   Yes.
12      Q.   Did you write this post?
13      A.   Yes.
14      Q.   Did you intend for this to be public?
15      A.   No.
16      MR. BEAUMONT: Object to form.
17 BY MR. KIMREY:
18      Q.   Are you aware that it is public?
19      A.   I am now.
20      MR. BEAUMONT: Object to form.
21 BY MR. KIMREY:
22      Q.   Okay. Let's go to "Stop now."
23      Do you see the post that begins: "Stop now,"
24 Ms. Lukis?

Page 357

1      A.   Yes.
2      Q.   Did you write this?
3      A.   Yes.
4      Q.   Did you intend for this to be public?
5      MR. BEAUMONT: Form.
6 BY THE WITNESS:
7      A.   No.
8 BY MR. KIMREY:
9      Q.   Are you aware that it is public?
10      MR. BEAUMONT: Object to form.
11 BY THE WITNESS:
12      A.   Now I know.
13 BY MR. KIMREY:
14      Q.   Did your mom pay for your wedding?
15      A.   Regretfully.
16      Q.   Is the answer yes?
17      A.   Yes.
18      Q.   What did it cost?
19      A.   I don't know.
20      Q.   What else has your mom paid for for you?
21      MR. BEAUMONT: Object to form.
22 BY THE WITNESS:
23      A.   Other than the one time she paid my rent,
24 Christmas and birthday gifts.

Page 358

1 BY MR. KIMREY:
2      Q.   Do you have her address?
3      A.   Not anymore. I don't know where she lives
4 right now.
5      Q.   Is your mom aware of this lawsuit?
6      MR. BEAUMONT: Object to form.
7 BY THE WITNESS:
8      A.   Not to my knowledge.
9 BY MR. KIMREY:
10      Q.   Have you told your mom to hold onto any
11 evidence that may be relevant to this case and
12 proportional to its needs?
13      MR. BEAUMONT: Object to form.
14 BY THE WITNESS:
15      A.   I have not talked to her in any way, shape or
16 form in over two and a half years.
17      MR. KIMREY: Let's go off the record.
18      THE VIDEOGRAPHER: Off the video record at
19 10:32 a.m.
20      (Discussion had off the
21      record.)
22      We are back on the record at 10:32 a.m.
23 BY MR. KIMREY:
24      Q.   Do you see the post, Ms. Lukis, that begins

Page 359

1 with: "The problem is --"
2      A.   Yes.
3      Q.   -- at the bottom?
4      Did you write that post?
5      A.   Yes.
6      Q.   Did you intend for it to be public?
7      A.   Nope.
8      MR. BEAUMONT: Object to form.
9 BY MR. KIMREY:
10      Q.   Are you aware that it is public?
11      A.   Now I am.
12 BY MR. KIMREY:
13      Q.   Okay. You refer here to Yelp. Do you see
14 that?
15      A.   Yes.
16      Q.   Have you ever used Yelp?
17      A.   No.
18      Q.   So how do you know that they use the highest
19 Yelp rated restaurant for each area?
20      A.   The comment I was responding to says that.
21      Q.   Okay. But you have never used Yelp at all in
22 your entire life?
23      A.   No.
24      MR. BEAUMONT: Object to form.

15 (Pages 356 - 359)

1    MR. KIMREY: Let's go off the record.

2    THE VIDEOGRAPHER: Off the video record at

3 10:33 a.m.

4         (Discussion had off the

5         record.)

6    We are back on record at 10:33 a.m.

7 BY MR. KIMREY:

8    Q.   Do you see the post that begins with: "I

9 know one of the things that has been helping me to curb

10 any desires to binge eat"?

11    A.   Yes.

12    Q.   Did you write this post?

13    A.   Yes.

14    Q.   And did you write the post directly below the

15 post by Diane Chucksondick which is lower on the page

16 beginning with: "My husband"?

17    A.   Yes.

18    Q.   Did you intend for this to be public?

19    A.   No.

20    MR. BEAUMONT: Object to form.

21 BY THE WITNESS:

22    A.   I was replying to the person who sent the

23 original comment.

24 BY MR. KIMREY:

1    Q.   Are you aware that it is public?

2    MR. BEAUMONT: Object to form.

3

4 BY THE WITNESS:

5    A.   I am now.

6 BY MR. KIMREY:

7    Q.   Okay. Let's go to: "Two questions."

8    Do you see the post that begins: "Two

9 questions," Ms. Lukis?

10    A.   Yes.

11    Q.   Did you write this post?

12    A.   Yes. Six years ago.

13    Q.   So you're responding to parking question for

14 fellow Chicagoans; is that right?

15    A.   Yes.

16    Q.   What are you giving advice on here?

17    MR. BEAUMONT: Object to form and calls for

18 legal conclusion.

19 BY THE WITNESS:

20    A.   My personal knowledge of dealing with having

21 to register a car.

22 BY MR. KIMREY:

23    Q.   Okay. And it says at the paragraph that

24 begins with: "My husband." Second sentence: "When We

1 had the garage, we didn't get a sticker for our cars."

2 Do you see that?

3    A.   Yeah.

4    Q.   Were you required by the City to have

5 stickers for your cars at that time?

6    A.   We had just moved, so at the time I -- we

7 were not living in the City.

8    Q.   You didn't live in the City when your car was

9 in the garage?

10    A.   No. That -- I think we were --

11    MR. BEAUMONT: Object to form.

12 BY THE WITNESS:

13    A.   -- living out in the suburbs.

14 BY MR. KIMREY:

15    Q.   Where'd you live?

16    A.   Shoot. I don't -- I don't really remember.

17 It's six years ago.

18    Q.   If you lived out in the suburbs, why did you

19 write here: "When we had the garage, we didn't get a

20 City sticker for our cars"? Why would that even be

21 relevant if your cars weren't even in the City?

22    A.   I don't know. Again, this is six years ago.

23 I don't -- I don't remember every single detail of my

24 life from six years ago. If it was --

1    Q.   Are you saying even though a sticker was

2 required by the City when we had our cars in the garage,

3 we didn't get a sticker because the police couldn't see

4 the car when -- the cars when they were parked because

5 they were in a garage not on the street but once we

6 started parking on the street in the City after having

7 parked in a garage in the City we had to get stickers

8 because the cops could see --

9    MR. BEAUMONT: Object to form.

10 BY MR. KIMREY:

11    Q.   -- our car on the street; whereas, they

12 couldn't see the cars in the garage; isn't that what

13 you're saying?

14 BY THE WITNESS:

15    A.   I guess.

16    MR. BEAUMONT: Object to form.

17 BY MR. KIMREY:

18    Q.   Is the answer yes?

19    A.   I guess. I don't know.

20    Q.   Okay. So would your car not having a sticker

21 in the garage or cars not having a sticker in a garage in

22 the City of Chicago when you were a resident in Chicago

23 be a violation of the law?

24    MR. BEAUMONT: Object to form and calls for

16 (Pages 360 - 363)

Page 364

1 legal conclusion.
2 BY THE WITNESS:
3    A.  I'm not a lawyer, so I don't know what --
4 whether that would -- what the rule is.  I know vaguely,
5 but I don't know the exact legal terminology for
6 requirements for City stickers.
7 BY MR. KIMREY:
8    Q.  But you're providing advice about that in
9 this post, aren't you?
10    A.  I'm talking about --
11       MR. BEAUMONT:  Objection, calls for legal
12 conclusion.
13 BY THE WITNESS:
14    A.  -- general knowledge.
15 BY MR. KIMREY:
16    Q.  How often have you broken the law, Ms. Lukis?
17       MR. BEAUMONT:  Object to form and it also
18 calls for legal conclusion.
19 BY THE WITNESS:
20    A.  I can think of it -- like two speeding
21 tickets.  I've never been -- never been to court for
22 anything other than like two speeding tickets.
23 BY MR. KIMREY:
24    Q.  Anything else?

Page 365

1    A.  As far as I can recall, that's all I've ever
2 been to court for.
3    Q.  Have you ever lied to anybody?
4       MR. BEAUMONT:  Object to form.
5 BY THE WITNESS:
6    A.  Seriously?  Everybody on the planet has told
7 somebody a white lie for something.
8 BY MR. KIMREY:
9    Q.  So you have lied?
10    A.  If you're telling me that I never lied to
11 anybody in my life, I would call you a liar.
12    Q.  So you have lied before?
13    A.  Yeah, to random people about stuff that's
14 none of their damn business.
15    Q.  Have you ever defrauded anybody?
16    A.  No.
17       MR. BEAUMONT:  Object to form and calls for
18 legal conclusion.
19 BY MR. KIMREY:
20    Q.  Okay.  Let's go to:  "So when I was in
21 college."  Do you see this post, Ms. Lukis, that begins
22 with:  "So when I was in college"?
23    A.  Yes.
24    Q.  Did you write this?

Page 366

1    A.  Yes.
2    Q.  Did you intend for it to be public?
3    A.  No.
4       MR. BEAUMONT:  Object to form.
5 BY MR. KIMREY:
6    Q.  Are you aware that it is public?
7    A.  Now I am.
8       MR. BEAUMONT:  Object to form.
9 BY MR. KIMREY:
10    Q.  Okay.  Second paragraph it says:  "So one day
11 one of the high school kids was working in the kitchen
12 and while he was used to some of the shenanigans this guy
13 pulled, apparently that day nothing was right for him.
14 His fries were cold -- just pulled from the fryer
15 especially for him -- his fish was cold, and the tartar
16 sauce was bad, et cetera.  After the third time remaking
17 his sandwich and wasting two tubes of tartar sauce, the
18 employee decided to mess with this guy.  He took one of
19 the tubes of tartar sauce and a cup to the back storage
20 room out of sight of any cameras and proceeded to whack
21 it in the cup and add tartar sauce to the mix."  What do
22 you mean by whack it in the cup?
23       MR. BEAUMONT:  Object to form.
24 BY THE WITNESS:

Page 367

1    A.  I found out that he was masturbating in the
2 back room.
3
4 BY MR. KIMREY:
5    Q.  "When he bought -- when he brought the new
6 special sandwich to the customer, the customer was elated
7 and ate every bit of the sandwich even licking the sauce
8 off the wrapper."  Did I read that accurately?
9    A.  Yes.
10    Q.  How do you know that?
11       MR. BEAUMONT:  Object to form.
12 BY THE WITNESS:
13    A.  Because after the fact -- after the fact we
14 found out he did it and was fired immediately upon that
15 situation, upon learning of that situation.
16 BY MR. KIMREY:
17    Q.  How did you know the detail even licking the
18 sauce off the wrapper?
19       MR. BEAUMONT:  Object to form.
20 BY THE WITNESS:
21    A.  Because the kid made the sandwich, watched
22 him eat and told us about it.
23 BY MR. KIMREY:
24    Q.  Did you know that he was about to serve this

17 (Pages 364 - 367)

Page 368

1  sandwich to the customer before he served it?
2     A.   Absolutely not.
3        MR. BEAUMONT: Object to form.
4  BY MR. KIMREY:
5     Q.   Let's go to: "A lot of portals in airports."
6  Do you see the post that says -- that begins with: "A
7  lot of portals in airports," Ms. Lukis?
8     A.   Yeah.
9     Q.   Did you write this?
10     A.   Yeah.
11     Q.   Did you intend for it to be public?
12     A.   No.
13        MR. BEAUMONT: Objection, form.
14  BY MR. KIMREY:
15     Q.   What is a Deadalus plane?
16     A.   It's a plane hanging up in the Dulles
17  Airport.
18     Q.   I don't understand. A plane hanging up?
19     A.   Just like it at the Air and Space Museum in
20  D.C. where they have planes hanging from the ceiling,
21  it's the same thing. It's just a plane hanging from the
22  ceiling at Dulles Airport.
23     Q.   What are you referring to when you refer to a
24  portal and capturing it in this post?

Page 369

1     A.   I think it's --
2        MR. BEAUMONT: Object to form.
3
4  BY THE WITNESS:
5     A.   -- a game I was playing at the time.
6  BY MR. KIMREY:
7     Q.   What was the game?
8     A.   I don't remember. It was some -- it was some
9  game where you go places and try to -- I think it was --
10  might have been a Pokemon game. I don't remember.
11        MR. KIMREY: Let's go off the record.
12        THE VIDEOGRAPHER: Off the video record at
13  10:42 a.m.
14        (Discussion had off the
15        record.)
16        We are back on record at 10:43 a.m.
17  BY MR. KIMREY:
18     Q.   Do you see this Reddit User Agreement, Ms.
19  Lukis?
20     A.   Yes.
21     Q.   By using Reddit did you agree to this?
22     A.   Yes.
23        MR. BEAUMONT: Objection, calls for legal
24  conclusion.

Page 370

1  BY MR. KIMREY:
2     Q.   Do you see where it says: "Hello, Redditors
3  and people of the internet. This Reddit User Agreement
4  applies to your access to use of the websites, mobile
5  apps, widgets, APIs, e-mails and other on-line products
6  and services collectively. The service is provided by
7  Reddit, Inc." Do you see that?
8     A.   Yes.
9     Q.   By using the services did you agree to that?
10        MR. BEAUMONT: Objection, calls for legal
11  conclusion.
12  BY THE WITNESS:
13     A.   I didn't know I agreed to it.
14  BY MR. KIMREY:
15     Q.   Additionally, it says in the next paragraph,
16  second sentence: "By accessing or using our services you
17  agree to be bound by these terms. If you do not agree to
18  these terms, you may not access or use the services." By
19  using the services did you agree to that term?
20        MR. BEAUMONT: Objection, legal conclusion.
21  BY THE WITNESS:
22     A.   Yes. I'd assume so.
23  BY MR. KIMREY:
24     Q.   Okay. Let's go forward. Start scrolling

Page 371

1  ahead in the document. Keep going. Keep going. Privacy
2  Policy. There we go. Let's go back on -- are we --
3  we're on the record.
4        Do you see it says: "Reddit Privacy Policy,"
5  Ms. Lukis?
6     A.   Yes.
7     Q.   By using Reddit did you agree to the privacy
8  policy?
9        MR. BEAUMONT: Objection, legal conclusion.
10  BY THE WITNESS:
11     A.   I would assume so.
12  BY MR. KIMREY:
13     Q.   Do you see all of the different kinds of
14  information Reddit says that it collects? Let's scroll
15  down. Account information, contact you submit, actions
16  you take, transactional information, other information,
17  do you see all of that?
18     A.   Yes.
19     Q.   Did you agree to that by using the service?
20        MR. BEAUMONT: Objection, legal conclusion.
21  BY THE WITNESS:
22     A.   Yes.
23  BY MR. KIMREY:
24     Q.   And then it says: "Information we collect

18 (Pages 368 - 371)

Page 372

1  automatically," and it lists various categories. Did you
2  agree to that by using the services?
3      MR. BEAUMONT: Objection, legal conclusion.
4  BY THE WITNESS:
5      A.  By using the service.
6  BY MR. KIMREY:
7      Q.  So you did agree to it?
8      A.  Yes.
9      Q.  And then it says: "Information collected
10 from other sources." Did you agree to all of that by
11 using the service?
12     A.  By using the service, yes.
13     Q.  And then it says: "Information collected by
14 third parties." Did you agree to all of that by using
15 the service?
16     A.  By using the service, yes.
17     MR. BEAUMONT: Objection, legal conclusion.
18 BY MR. KIMREY:
19     Q.  And then it says: "We -- go down to: "We
20 use information about you too." Yes. Do you see that at
21 the bottom of the page?
22     A.  Yes.
23     Q.  And then there are bullet points. Do you see
24 that?

Page 373

1      A.  Yes.
2      MR. BEAUMONT: Same objection.
3
4  BY MR. KIMREY:
5      Q.  Did you agree to all of these uses by using
6  the service?
7      MR. BEAUMONT: Same objection.
8  BY THE WITNESS:
9      A.  By using the service, yes.
10 BY MR. KIMREY:
11     Q.  And do you see below the bullet points it
12 says: "Much of the information on the services is public
13 and accessible to everyone even without an account. By
14 using the services you are directing us to share this
15 information publicly and freely." Do you see that?
16     MR. BEAUMONT: Form.
17 BY THE WITNESS:
18     A.  Yes.
19 BY MR. KIMREY:
20     Q.  By using the services you agreed to that;
21 correct?
22     MR. BEAUMONT: Object to legal conclusion.
23 BY MR. KIMREY:
24     Q.  Is that correct?

Page 374

1      A.  Yeah.
2      Q.  Okay. And then the next paragraph: "When
3  you submit content," do you see that? It begins with:
4  "When you submit content."
5      A.  Yes.
6      Q.  Did you agree to that provision by using the
7  service?
8      MR. BEAUMONT: Same objection.
9  BY MR. KIMREY:
10     Q.  Did you agree to that paragraph by using the
11 service?
12     A.  I'm reading that paragraph. I -- by using
13 the service, I guess I did.
14     Q.  Okay. And the next paragraph did you
15 agree -- the one that begins with: "Your Reddit," did
16 you agree to that paragraph by using the service?
17     MR. BEAUMONT: Legal conclusion.
18 BY THE WITNESS:
19     A.  I guess.
20 BY MR. KIMREY:
21     Q.  Okay. The next paragraph, did you agree to
22 that by using the service?
23     MR. BEAUMONT: Objection, legal conclusion.
24 BY THE WITNESS:

Page 375

1      A.  I don't know. I guess.
2  BY MR. KIMREY:
3      Q.  Okay. Do you have a Tumblr account?
4      A.  No.
5      Q.  Go to "Your Choices." You see all these
6  choices Reddit says that you have?
7      A.  Yes.
8      Q.  Did you ever exercise any of these choices?
9      A.  I don't accept cookies on my computer.
10     Q.  Did you make that a setting within Reddit?
11     A.  It's a setting within my web browser not
12 on -- I don't know if I changed it in Reddit or not, but
13 my computer does not allow cookies. My internet -- my
14 web pages don't allow cookies.
15     Q.  Have you ever told Reddit to make your posts
16 private?
17     A.  I didn't know they were public --
18     MR. BEAUMONT: Object to form.
19 BY THE WITNESS:
20     A.  -- but I will be doing so now.
21 BY MR. KIMREY:
22     Q.  Okay. Go to "Your rights." Do you see that
23 you can request a copy of the information Reddit has
24 about your account? Do you see that?

19 (Pages 372 - 375)

Page 376

1    A.   Yeah.
2    Q.   In responding to discovery in this case, have
3  you requested a copy of your information from Reddit?
4    A.   No.  I didn't know I was supposed to.
5    Q.   You are.  Will you now and will you produce
6  it in this case?
7    A.   Yeah, now that I know I have to.
8    Q.   Okay.  You said that you were gonna change a
9  bunch of things at Reddit.  Keep in mind that before you
10 change anything you have to preserve it as part of this
11 case.  Do you understand that?
12   A.   Yes.
13   Q.   Between the last deposition session and today
14 did you change any settings on any of the websites we
15 addressed during that session?
16   A.   No, I haven't because I -- after the -- we
17 talked I ended up having stuff go down with my kid and I
18 forgot all about it.  I have the list on my -- saved on
19 my computer.  I'm going to go fix that.
20   Q.   Okay.  So you haven't done anything since
21 your last deposition session to change any privacy
22 settings on any websites at all; correct?
23   A.   I didn't think I was allowed to.
24   Q.   Am I correct?

Page 377

1    A.   Yeah.
2        MR. KIMREY:  Okay.  Let's go off the record.
3        THE VIDEOGRAPHER:  Please stand by.  Going off
4  the video record at 10:50 a.m.
5             (Discussion had off the
6             record.)
7        We are back on the record at 10:51 a.m.
8        You may proceed.
9  BY MR. KIMREY:
10   Q.   Ms. Lukis, you have a Credit Karma account;
11 correct?
12   A.   Yes.
13   Q.   How long have you had a Credit Karma account?
14   A.   I have no idea.
15   Q.   Have you had it for a year?
16   A.   A couple years, I think.
17       MR. BEAUMONT:  Object to form.
18 BY MR. KIMREY:
19   Q.   Okay.  By signing up for Credit Karma did you
20 agree to its terms and conditions and privacy policy?
21       MR. BEAUMONT:  Calls for a legal conclusion.
22 BY THE WITNESS:
23   A.   I wouldn't know.
24

Page 378

1  BY MR. KIMREY:
2    Q.   You don't know whether by signing up for
3  Credit Karma you agreed to their terms and conditions and
4  privacy policy?
5    A.   I would believe so.
6    Q.   Okay.  Let's turn to one, two, three, three
7  pages in, "Terms of Service."  Do you see at the top of
8  the page it says:  "Terms of Service," Ms. Lukis?
9    A.   Yes.
10   Q.   By using Credit Karma do you agree to these
11 terms?
12       MR. BEAUMONT:  Objection, calls for legal
13 conclusion.
14 BY THE WITNESS:
15   A.   I think so.
16 BY MR. KIMREY:
17   Q.   Okay.  Let's go to the next page.  Do you see
18 at the top it says:  "By accessing and using our services
19 you are agreeing to these terms of service, our privacy
20 statement, any applicable additional terms defined below
21 and our community rules"?  Do you see that?
22   A.   Yes.
23   Q.   By using Credit Karma did you agree to that?
24       MR. BEAUMONT:  Objection, calls for legal

Page 379

1  conclusion.
2  BY THE WITNESS:
3    A.   I guess.
4        MR. TOTH:  Blaine, are we marking this as
5  Exhibit 20?
6        MR. KIMREY:  We are.
7  BY MR. KIMREY:
8    Q.   Do you know whether Credit Karma shared your
9  cell phone number with any third parties?
10       MR. BEAUMONT:  Form.
11 BY THE WITNESS:
12   A.   They don't have my cell phone number.
13 BY MR. KIMREY:
14   Q.   Are you sure Credit Karma does not have your
15 cell phone number?
16   A.   I've never entered it into there.  Not that I
17 know of.
18   Q.   Did you agree to arbitrate any disputes
19 related to Credit Karma?
20       MR. BEAUMONT:  Object to form.  I'm sorry.
21 Calls for legal conclusion.
22 BY THE WITNESS:
23   A.   I don't know.  On there -- it says there
24 dispute resolution and arbitration.  I think that's what

20 (Pages 376 - 379)

Page 380

1 that means.
2 BY MR. KIMREY:
3    Q.  Okay.  Let's go to "How We Share
4 Information -- How We Share Your Information."  Do you
5 know how Credit Karma makes money?
6    A.  No.
7    Q.  Do they charge you anything ever?
8    A.  No.
9    Q.  Keep going.  Keep going.  Yeah.  So not Use,
10 Share.  Okay.  So do you see this page says:  "How We
11 Share Your Information," Ms. Lukis?
12    A.  Yes.
13    Q.  And they say they share your information --
14 Credit Karma says it shares your information with your
15 consent when "you connect with an into it platform,
16 partner or when you connect to your social media account
17 for research, for joint features, sales, promotions and
18 events with financial services, providers, when you
19 publicly post the information, the service providers or
20 agents, for mergers and acquisitions," et cetera.  Do you
21 see all of the different ways in which they say they
22 share your information?
23    A.  Yes.
24    Q.  Did you agree to all of that in using Credit

Page 381

1 Karma?
2    MR. BEAUMONT:  Objection, calls for legal
3 conclusion.
4
5 BY THE WITNESS:
6    A.  I don't know.  I guess.
7 BY MR. KIMREY:
8    Q.  Okay.  Let's go to Deletion.
9    I don't know if this is word searchable.
10 It's a page with Deletion in the middle followed by
11 non-verification.  Keep going.
12    Let's go off the record.
13    THE VIDEOGRAPHER:  Going off the video record
14 at 10:56 a.m.
15         (Discussion had off the
16         record.)
17    We are back on record at 11:02 a.m.
18    You may proceed.
19 BY MR. KIMREY:
20    Q.  Ms. Lukis, an exhibit related to Craigslist
21 has just been entered as Exhibit 21.  Do you see that?
22    A.  Yes.
23    Q.  When did you start using Craigslist?
24    A.  I don't know.  I'd have to go look.  It's

Page 382

1 been awhile.
2    Q.  Where would you look?
3    A.  I don't know.  I'd have to go through
4 Craigslist and look for it.
5    Q.  Okay.  Has it been many years?
6    A.  A couple years at least, yeah.
7    Q.  Okay.  Let's go to the second page.  You see
8 at the top it says:  "We, Craigslist, Inc., hope you find
9 it useful by accessing or otherwise interacting with our
10 servers, services, websites, mobile app or any associated
11 content postings together CL if you agree to these terms
12 of use."  Did I read that accurately?
13    A.  Yes.
14    Q.  In using Craigslist did you agree to that?
15    MR. BEAUMONT:  Objection, legal conclusion.
16 BY THE WITNESS:
17    A.  I guess.
18 BY MR. KIMREY:
19    Q.  Is that a yes?
20    A.  I guess.  I -- I suppose so.
21    Q.  Let's go a few pages in to:  "The data we
22 collect, use and disclose."  Do you see at number 2 on
23 this page, Ms. Lukis, the heading:  "Data we collect, use
24 and disclose"?

Page 383

1    A.  Yes.
2    Q.  And do you see all the different data types
3 listed below that?
4    A.  Yeah.
5    Q.  And do you see that it includes phone number?
6    A.  Yeah.
7    Q.  Did you agree to disclosure of these data
8 types --
9    MR. BEAUMONT:  Objection, calls for legal
10 conclusion.
11 BY MR. KIMREY:
12    Q.  -- on Craigslist?
13    MR. BEAUMONT:  I'm sorry.  Objection, calls
14 for legal conclusion.
15 BY THE WITNESS:
16    A.  I -- I guess so.
17 BY MR. KIMREY:
18    Q.  Okay.  Have you ever -- let's go to
19 "Contact."  It's at the end.  It's the last page.  Have
20 you ever -- do you see there it says, "Contact," and
21 there's an e-mail address privacy@craigslist.org?
22    A.  Yes.
23    Q.  Have you ever sent an e-mail to that address?
24    A.  No.

21 (Pages 380 - 383)

1    Q.   Have you ever asked Craigslist in any way to
2  remove any of your information from Craigslist's servers?
3    A.   From their servers, I don't know, but I've
4  deleted posts off of there.
5    Q.   What posts have you deleted off of
6  Craigslist?
7    A.   When I was advertising to sell something.
8    Q.   Okay.  Have you ever had Craigslist remove
9  anything from your account?
10   A.   Not to my knowledge.
11       MR. KIMREY:  Let's go off the record.
12       THE VIDEOGRAPHER:  Off the video record at
13  11:05 a.m.
14            (Discussion had off the
15            record.)
16       We are back on record at 11:09 a.m.
17       You may proceed.
18  BY MR. KIMREY:
19   Q.   Ms. Lukis, do you see that what we're looking
20  at here on the screen is an e-mail from William Beaumont
21  who's currently defending you in this deposition to me
22  and Jonathon Reinisch, copy to Roberto Costales?  Do you
23  see that?
24   A.   Yes.

1    Q.   It's dated January 5th, 2021.  Do you see
2  that?
3    A.   Yes.
4    Q.   Have you ever seen this e-mail before?
5    A.   No.  I know what it's -- know I talked about
6  it.
7    Q.   Okay.  And it says:  "Attached is Plaintiff's
8  fee agreement."  Do you see that?
9    A.   Yes.
10   Q.   Let's scroll down to the agreement.
11  Actually, so let's go back to the first page.  Zoom in.
12  So the letter says it attaches a fee agreement or the
13  e-mail says it attaches a fee agreement, and it also says
14  it attaches Lukis' verification of her interrogatories.
15  Do you see that?
16   A.   Yes.
17   Q.   Okay.  So let's go back to the verification.
18  So do you see Stephanie Lukis' Verification of Her
19  Interrogatory Responses?
20   A.   Yes.
21   Q.   Is that your signature on the signature line?
22   A.   For what I can do on a phone, yes.
23   Q.   So did you sign this document?
24   A.   Yes.

1    Q.   On January 4th, 2021?
2    A.   Yes.
3    Q.   Okay.  Scroll down or is this the end of the
4  exhibit?  Does this history accurately reflect the
5  migration of this document?
6    A.   Yeah.
7    Q.   Okay.  Let's go to the first PDF at 2.52.
8        MR. KIMREY:  Let's go off the record.
9        THE VIDEOGRAPHER:  Off the video record at
10  11:11 a.m.
11            (Discussion had off the
12            record.)
13       We are back on record at 11:13 a.m.
14  BY MR. KIMREY:
15   Q.   Okay.  So we were talking about the cover
16  e-mail, Ms. Lukis, that was entered in with your
17  Verification of Interrogatories as Exhibit 22.
18       What we're looking at now has been marked as
19  Exhibit 23.  Do you see that it starts with the same
20  cover e-mail?  Do you see that?
21   A.   Yes.
22   Q.   And then attached to it is your engagement
23  letter for this case.  Do you see that?
24   A.   Yes.

1    Q.   Do you recognize this document?
2    A.   Yes.
3    Q.   Is this, in fact, the engagement letter that
4  you entered into with Beaumont Costales to prosecute the
5  case you're giving a deposition in right now?
6    A.   Yes.
7    Q.   Do you know why the paragraph at the bottom
8  of the letter is redacted?
9    A.   No.  I do not have a copy of the letter right
10  now.
11   Q.   Okay.  So do you know what it says?  I'm not
12  asking you to tell me what it says.  I'm just -- do you
13  know what it says underneath the black?
14       MR. BEAUMONT:  I have some clarification.
15  BY THE WITNESS:
16   A.   I've read it before, but I couldn't recall
17  off the top of my head what it says.
18  BY MR. KIMREY:
19   Q.   Your counsel's taken the position that
20  whatever's underneath that black is attorney/client
21  privileged and/or work product protected.  Do you
22  understand that?
23   A.   Yes, I understand that.
24       MR. KIMREY:  Okay.  Well, we don't think it

22 (Pages 384 - 387)

Page 388

1 is, and we ask that the redaction be removed immediately
2 and that this document be produced to us, and we'd like
3 to use it without the redaction in this deposition. So
4 if you're willing to do that, Mr. Beaumont, please do.
5 Is that -- or if you're not, can you say that on the
6 record?
7         MR. BEAUMONT: I object to -- we object to
8 unredacting this as it contains matters that are
9 attorney/client privileged. We're fine to submit this
10 document to the Court for an in-camera review if -- if
11 that's what you'd like to do right now.
12        MR. KIMREY: Yeah, we can't do it right now
13 because the Court's -- you know, the Court's probably
14 busy, but yes, let's do submit it, you know, ASAP for
15 in-camera review, and if this redaction is ordered
16 removed by Judge Feinerman, then we reserve the right to
17 resume with the deposition for many reasons including but
18 not limited to being able to ask Ms. Lukis about what's
19 redacted there.
20        Okay. Let's go off the record.
21        THE VIDEOGRAPHER: Off the video record at
22 11:16 a.m.
23            (Discussion had off the
24            record.)

Page 389

1            We're back on record at 11:17 a.m.
2 BY MR. KIMREY:
3    Q.   Ms. Lukis, we've just entered Exhibit 24, and
4 it begins with an e-mail from your counsel to us dated
5 January 4th, 2021. Do you see that?
6    A.   Yes.
7    Q.   And it purports to forward a letter and
8 Supplemental Discovery Responses. Do you see that?
9    A.   Yes.
10   Q.   As well as documents Bates labeled 1 through
11 2205. Do you see that?
12   A.   Yes.
13   Q.   Are you aware of your counsel producing any
14 documents in this case to us before this e-mail?
15   A.   I know I sent a bunch of stuff over for him
16 to forward to you.
17   Q.   What did you send -- and I believe that was
18 basically your Facebook account and your LinkedIn
19 account; is that right?
20   A.   Yes.
21   Q.   And that's it; right? There was nothing
22 else?
23   A.   Twitter.
24   Q.   Does this -- you provided your Twitter

Page 390

1 account to your counsel to produce to us?
2    A.   Yeah, but it was -- it took awhile for
3 Twitter to get it to me, so I didn't download it until
4 like two days ago.
5    Q.   Do you know -- so you've provided the
6 download from your Twitter account to your counsel which
7 is -- but that was not produced to us as of January 4th;
8 correct?
9    A.   I don't know. I don't know when they sent it
10 to you.
11   Q.   When did you download the Twitter account?
12   A.   This past Sunday or Monday, I think.
13   Q.   Okay. So that was after January 4th; right?
14   A.   Yes.
15   Q.   Okay. So let's go into this. I'd like to go
16 to the document request responses at Page 10. So they
17 are the first document after the cover letter at Page 10.
18        Let's go off the record.
19        THE VIDEOGRAPHER: Going off the video record
20 at 11:19 a.m.
21            (Discussion had off the
22            record.)
23        We are back on record at 11:22 a.m.
24 BY MR. KIMREY:

Page 391

1    Q.   Ms. Lukis, do you see at interrogatory 8 we
2 ask about social media accounts?
3    A.   Yes.
4    Q.   Do you see that? Do you have an Instagram
5 account?
6    A.   No.
7    Q.   Do you have a TikTok account?
8    A.   No.
9    Q.   Do you have a Twitch account?
10   A.   No.
11   Q.   Have you ever had an Instagram, TikTok or
12 Twitch account?
13   A.   Not to my knowledge. I don't think so.
14   Q.   Do you have or have you ever had a Vimeo
15 account?
16   A.   Nope. Don't know what it is.
17   Q.   Have you ever had a Tumblr account?
18   A.   Not to my knowledge.
19   Q.   Have you ever had a Pintrest account?
20   A.   Nope.
21   Q.   Have you ever had a Google+ account?
22   A.   Yes.
23   Q.   Did you search your Google+ account in
24 responding to discovery in this case?

23 (Pages 388 - 391)

Page 392

1   A.  No.
2   Q.  Have you ever had a Snapchat account?
3   A.  No.
4   Q.  Have you ever had a Tinder account?
5   A.  I'm not sure what that is, so I don't know.
6   Q.  Okay. Have you ever had a Flickr account?
7   A.  Don't have a clue what that is.
8   Q.  Do you -- have you ever had any social media
9  accounts other than with Facebook, LinkedIn, Twitter and
10 Reddit?
11   A.  I think I had a myspace account before --
12 before Facebook, but I don't remember.
13   Q.  Anything beyond myspace?
14   A.  I don't think I've been on myspace in 15
15 years.
16   Q.  Right. But have you had any social media
17 accounts other than LinkedIn, Facebook, Reddit and
18 myspace?
19   A.  No.
20      MR. KIMREY: Go off the record.
21      THE VIDEOGRAPHER: Please stand by. Off the
22 video record at 11:24 a.m.
23         (Discussion had off the
24         record.)

Page 393

1      We are back on the record at 11:42 a.m.
2      You may proceed.
3      MR. KIMREY: Mr. Beaumont, you had something
4 to say?
5      MR. BEAUMONT: Yes. As discussed briefly
6 during our break, I would like to withdraw instructions I
7 provided not to answer questions concerning matters
8 that -- such as the LARPing or other matters that I
9 previously objected to on the grounds of harassment such
10 as the vampires and going to -- going to colleges or
11 events concerning -- concerning LARPing or that type of
12 activity, so any of those questions that involve that,
13 and it's my understanding that Ms. Lukis is fully
14 prepared to talk about that should counsel so desires
15 along with questions concerning the Minds Eye Society,
16 Vampire of the Masquerade or her connections with Samuel
17 Dietzmann.
18      MR. KIMREY: As highlighted by the Rule 11
19 letter that we transmitted to you, there were -- this is
20 off the top of my head because I'm not looking at the
21 letter right now, but there were almost 30 instructions
22 not to answer during the deposition, and as I sit here
23 right now, I don't know to what degree those related to
24 LARP, vampires, your claims of harassment and the degree

Page 394

1 to which they related to other things, and it's going to
2 take me some time to figure out what objections are
3 actually withdrawn since there were so many instructing
4 her not to answer.
5      And we've only agreed to my having three
6 hours, you know, on the record subject to further relief
7 from the Court here today, so I'm not going to jump into
8 those issues because I'm not prepared to do so. I didn't
9 know you were withdrawing those objections until right
10 now.
11      So we reserve the right to continue at a
12 later date with Ms. Lukis' deposition, and to the extent
13 you've withdrawn objections, you need to identify by page
14 and line what objections are withdrawn because I need to
15 know specifically what areas you're going to allow me to
16 ask her about and have her answer about that you
17 previously inappropriately instructed her not to answer.
18      MR. BEAUMONT: It's your call.
19 BY MR. KIMREY:
20   Q.  Moving forward, Ms. Lukis, we're still on
21 Exhibit Number 24, and on the screen is a blowup of
22 interrogatory 10, your response, your original response
23 to interrogatory 10 and then your supplemental response
24 to interrogatory 10. Do you see that?

Page 395

1   A.  Yes.
2   Q.  Did you provide input on these responses?
3   A.  Yes, I did.
4   Q.  Okay. You originally said -- so the
5 interrogatory says: "Identify by date every time you
6 have visited the Whitepages website at
7 www.whitepages.com." And one of the reasons we've asked
8 for this is it ties into whether you agree to Whitepages'
9 Terms and Conditions and Privacy Policy. So it's our
10 position that this is relevant and proportional to the
11 needs of the case. Your original response was:
12 "Plaintiff objects to this request as unduly burdensome
13 as it requests Plaintiff provide information she does not
14 recall." Do you now recall how many times you visited
15 the Whitepages website?
16   A.  Once when I found out about it.
17   Q.  So in your entire life you visited the
18 Whitepages website only once; is that correct?
19   A.  As far as I'm aware, yes. When I found out
20 about the web page, I looked it up to see what
21 information my mother could get about me.
22   Q.  But you have not searched for your browser
23 history on any device to see whether there's any evidence
24 of your having visited the Whitepages website on other

24 (Pages 392 - 395)

Page 396

1 occasions; right?
2        MR. BEAUMONT: Object to form.
3 BY THE WITNESS:
4        A. No, I haven't.
5 BY MR. KIMREY:
6        Q. So I'm right in that regard; correct?
7        A. You are correct. I haven't checked browsers.
8        Q. Okay. You further said: "This request is
9 further unduly burdensome as Defendant is in possession
10 of this information." Did I read that accurately?
11       A. Yes.
12       Q. How is Whitepages in possession of this
13 information?
14       A. I don't know. I don't know everything about
15 the website.
16       Q. Okay. So you don't know whether Whitepages
17 has this information or not; correct?
18       MR. BEAUMONT: Form.
19 BY THE WITNESS:
20       A. You have access to whenever somebody searches
21 someone's name.
22 BY MR. KIMREY:
23       Q. What do you base that assumption on?
24       A. Just my personal belief that that's one of

Page 397

1 the things that you guys store because it would be useful
2 for you to know who's being researched.
3        Q. Anything else?
4        A. It's just my personal belief.
5        Q. Do you believe that a visit to the site
6 without a search for a name is saved by Whitepages?
7        MR. BEAUMONT: Object to form.
8 BY THE WITNESS:
9        A. I don't know.
10 BY MR. KIMREY:
11       Q. Okay. So you don't know whether visits, I'm
12 not talking about searches of names, you don't know
13 whether visits to the website are saved by Whitepages or
14 not; correct?
15       MR. BEAUMONT: Object to form.
16 BY THE WITNESS:
17       A. No.
18 BY MR. KIMREY:
19       Q. So I'm right in that regard?
20       A. Yes, you're correct.
21       Q. Okay. So you don't know whether this
22 information is in the possession of Whitepages; right?
23       MR. BEAUMONT: Object to form.
24 BY THE WITNESS:

Page 398

1        A. No, I don't know.
2 BY MR. KIMREY:
3        Q. Okay. And here you say: "Subject to and
4 without waiving the foregoing, Plaintiff has not visited
5 the website located at www.whitepages.com since the
6 filing of this lawsuit."
7        A. No, I haven't.
8        Q. The interrogatory doesn't ask you, does it,
9 whether you visited the website after the filing of the
10 lawsuit?
11       MR. BEAUMONT: Form.
12 BY THE WITNESS:
13       A. Okay.
14 BY MR. KIMREY:
15       Q. Does it --
16       A. No.
17       Q. -- say that?
18       A. It asks every time I visited the web -- the
19 website.
20       Q. Why did you not just answer the question and
21 say the single date you allegedly visited the website
22 instead of saying I haven't visited it since I filed the
23 lawsuit?
24       A. I -- I don't -- I don't -- I'm not a lawyer,

Page 399

1 so I don't understand -- you're trying to get me to talk
2 about legalese. I don't understand the question.
3        Q. The question is actually in plain English.
4 Why did you say you had not visited the website since the
5 filing of the lawsuit in response to a question that
6 asked you to identify by date every time you had visited
7 the Whitepages website?
8        A. I --
9        MR. BEAUMONT: Object to form.
10 BY THE WITNESS:
11       A. I don't know.
12 BY MR. KIMREY:
13       Q. Are you aware that we sent a Rule 11 letter
14 to your counsel?
15       MR. BEAUMONT: Object to form.
16 BY THE WITNESS:
17       A. Rule 11 letter? Is that the thing that was
18 sent over yesterday?
19 BY MR. KIMREY:
20       Q. I don't know what your counsel sent to you,
21 but we after your first deposition session sent a letter
22 to your counsel saying that the first session of your
23 deposition had clearly demonstrated that you were not
24 adequate to serve as a class representative in this case

25 (Pages 396 - 399)

Page 400

1 and if you proceeded with the case we would seek
2 sanctions from the Court against you and your counsel.
3 Does that ring any bells?
4    A.   Yes.
5    Q.   Okay.  Do you intend to proceed with the case
6 despite our letter?
7    A.   Yes.
8         MR. BEAUMONT:  Object to form.
9 BY MR. KIMREY:
10   Q.   Okay.  In your supplemental response it says:
11 "Plaintiff visited Whitepages' website in 2018, and
12 Plaintiff does not recall the precise date or time."  In
13 that response are you intending to say you visited the
14 site only once?
15   A.   Yes.  I went when I found out about the
16 website and was so disgusted by it.  I never went back to
17 it again.
18   Q.   Okay.  And then you say:  "See possibly also
19 Plaintiff's Bates Number 480."  Do you see that?
20   A.   Yes.
21   Q.   Are you aware that 480 is a black box in your
22 production?
23   A.   No.
24        MR. BEAUMONT:  Object to form.

Page 401

1 BY THE WITNESS:
2    A.   I haven't read every single document on every
3 single file.  I've read almost all of them, but I'm not
4 going to be logged into the Bates, so I wouldn't be able
5 to know which one it is.
6 BY MR. KIMREY:
7    Q.   Well, we can't see 480 because it was
8 produced completely redacted.  So why are you telling us
9 in the supplemental response to see something that you
10 produced that was completely redacted?
11   A.   You would have to ask my attorney why that
12 line was included.
13   Q.   What is at 480?
14        MR. BEAUMONT:  Form.
15 BY THE WITNESS:
16   A.   I -- I don't recall.  I haven't looked -- I
17 don't -- I'm not logged -- currently logged into Bates,
18 so I can't tell you every single document that's on there
19 and what they are.
20 BY MR. KIMREY:
21   Q.   Okay.  Well, because you referred to 480 in
22 the supplemental response, we need to see 480, and we
23 can't see it because it was produced completely redacted,
24 so it needs to be produced immediately unredacted.  And I

Page 402

1 make that request.  Okay.
2         So let's go to the document request
3 responses, same exhibit, Page 9.  So actually Page 8.  So
4 what we're highlighting is request 13, the response and
5 the supplemental response.
6         MR. BEAUMONT:  Blaine, could we go off the
7 record real quick?
8         MR. KIMREY:  Sure.
9         THE VIDEOGRAPHER:  Going off the video record
10 at 11:54 a.m.
11             (Discussion had off the
12             record.)
13         Back on record at 11:54, a.m.
14         MR. KIMREY:  Mr. Beaumont, you had something
15 to say?
16         MR. BEAUMONT:  Yes.  I believe that for
17 Plaintiff's Bates Number 480, what you were just
18 referring to, is, in fact, referring to Plaintiff's Bates
19 Number 460.
20         MR. KIMREY:  Okay.  So 480 may be a typo.  So
21 I'll address 460 now.
22 BY MR. KIMREY:
23   Q.   So we're looking at document request number
24 13 and the response, Ms. Lukis, the original response and

Page 403

1 the supplemental response.  Do you see that?
2    A.   Yes.
3    Q.   And request number 13 says:  "All documents,
4 communications evidencing your access with Whitepages'
5 website, including documents showing how you discovered
6 that Whitepages uses your name, age, city of domicile and
7 the identity of relatives and advertisements on the
8 Whitepages website as alleged in paragraph 22 of the
9 Complaint."  Did I read that accurately?
10   A.   Yes.
11   Q.   Originally you said:  "Plaintiff objects to
12 this as the basis of Plaintiff's knowledge is irrelevant
13 to the claims and defenses presented."  Do you stand by
14 that objection as you sit here today?
15        MR. BEAUMONT:  Objection, legal conclusion.
16 BY THE WITNESS:
17   A.   I wouldn't know.  I'd have to ask my
18 attorney.
19 BY MR. KIMREY:
20   Q.   So you're not willing to withdraw that
21 objection as you sit here today?
22   A.   I'm not -- that is something that would -- I
23 would have to ask my attorney about.
24   Q.   Okay.  And then it says:  "Plaintiff objects

26 (Pages 400 - 403)

Page 404

1  to this request to the extent that it calls for documents
2  readily or more accessible to Defendant." But you don't
3  know what's accessible to Whitepages; correct?
4       MR. BEAUMONT: Objection, form.
5  BY THE WITNESS:
6       A.  I would assume that you have better access to
7  your own website than I do.
8  BY MR. KIMREY:
9       Q.  Okay. What is your assumption based on?
10      A.  Personal opinion.
11      Q.  Okay. And then you respond in a circular
12  fashion saying: "Subject to and without waiving the
13  foregoing, see the Complaint --"
14      A.  Yes.
15      Q.  "-- and the First Amended Complaint." Do you
16  know whether First Amended Complaint has been filed in
17  this case?
18      A.  I believe so. I think it's one of the
19  documents I have on Bates.
20      Q.  How did the First Amended Complaint change
21  the Complaint?
22      A.  I'm not an attorney. I wouldn't be able to
23  tell you what the legalese that -- was that changed
24  between the Complaint and First Amended.

Page 405

1       Q.  Okay. Were additional plaintiffs added?
2       A.  I don't know. I currently don't have the
3  document in front of me. I wouldn't be able to tell you.
4       Q.  So as you sit here today, you can't
5  testify about any differences between the Complaint and
6  the First Amended Complaint; correct?
7       MR. BEAUMONT: Objection, form.
8  BY THE WITNESS:
9       A.  I'd have to go into -- log into Bates to be
10  able to check and see what they are, and I don't have
11  access to Bates right now. I'm not logged into Bates.
12  BY MR. KIMREY:
13      Q.  But you believe that the First Amended
14  Complaint is the operative Complaint?
15      MR. BEAUMONT: Objection, form.
16  BY THE WITNESS:
17      A.  I would have to ask my attorney what's going
18  on.
19  BY MR. KIMREY:
20      Q.  Okay. Do you know whether there are other
21  complaints beyond the Complaint and First Amended
22  Complaint?
23      A.  I don't know. I'd have to look in Bates to
24  see what's there.

Page 406

1       Q.  When you say look in Bates, what do you mean?
2       A.  I have -- I don't -- I think it is Bates.
3  It's -- I have access to a Dropbox of some sort that
4  lists all of the filings that I can go in and read the
5  PDFs.
6       Q.  Okay. So in your supplemental response you
7  said: "Defendant states this request further seeks
8  Plaintiff's internet browsing history of Defendant's
9  website," and it says: "See Plaintiff's Bates Number
10  460." Do you see that?
11      A.  Yes.
12      Q.  Okay. Are you aware that 460 was produced to
13  us as a fully redacted black box?
14      MR. BEAUMONT: Objection, form.
15  BY THE WITNESS:
16      A.  I wouldn't know. I would have to ask my
17  attorney what they submitted.
18  BY MR. KIMREY:
19      Q.  Okay. Do you know what 460 is?
20      A.  I don't have access to Bates right now. I
21  don't -- I can't look at it. I can't look it up.
22      Q.  Did you give your attorneys anything that
23  could correspond to 460?
24      MR. BEAUMONT: Object to form.

Page 407

1  BY THE WITNESS:
2       A.  I don't know what's on the document, so I
3  don't know, not without referring to the document.
4
5  BY MR. KIMREY:
6       Q.  Further states: "Plaintiff may have a hard
7  drive containing her internet browsing history. However,
8  producing her browsing history, if any, from the hard
9  drive is unduly burdensome as Plaintiff does not have the
10  present capability to operate the hard drive." Did I
11  read that accurately?
12      A.  Yes.
13      Q.  Can we have the hard drive to image it?
14      A.  Hell no.
15      MR. BEAUMONT: Objection, form.
16  BY THE WITNESS:
17      A.  I'm not giving you a hard drive just so that
18  way you can copy it. There's maybe stuff on there that I
19  don't want anybody to have access to it.
20  BY MR. KIMREY:
21      Q.  Okay. Are you willing to have a third-party
22  forensics vendor image your hard drive and then have
23  search terms agreed to by counsel run against it and then
24  have only the material that is relevant and proportional

27 (Pages 404 - 407)

Page 408

1 to the needs of the case from the hard drive produced to
2 us?
3        MR. BEAUMONT:  Form.
4
5 BY THE WITNESS:
6        A.   I'd have to -- I would have to know who's
7 doing it, who's doing the search and what you're
8 searching because I'm not just going to hand my hard
9 drive over to any party to let them download an entire
10 copy of my hard drive.
11 BY MR. KIMREY:
12        Q.   Do you agree that your browser history is
13 relevant to this case?
14        A.   Yes, but giving you a full two terabyte hard
15 drive or one ter -- yeah, two terabyte hard drive for you
16 to download an entire copy of it is a violation of my
17 personal privacy.  I don't know what books, e-mails,
18 content may be on that hard drive, and I'm not just going
19 to hand it over for you -- for somebody else to go
20 complete a -- make a complete copy of it and then hand it
21 over to you.
22        Q.   And you won't even search it yourself; right?
23        A.   I can't.
24        MR. BEAUMONT:  Objection, form.

Page 409

1 BY THE WITNESS:
2        A.   I don't have a computer that has a
3 motherboard that I can attach the web -- the hard drive
4 to.  If you want to buy me a new computer and monitor
5 with a motherboard and a video card so I can access that
6 hard drive, sure, I'll do it, but I don't have a computer
7 that can access that hard drive.
8        MR. KIMREY:  Yeah so, again, counsel, this
9 alleged punitive class representative hasn't searched a
10 single digital device for anything related to this case.
11 All she's done is produced information from Facebook,
12 LinkedIn and Twitter and that's it, and it's clearly
13 inadequate and clearly inconsistent with the Rules of
14 Civil Procedure and inconsistent with her obligations as
15 a purported class rep to produce material that is
16 relevant to the case and proportional to the needs of the
17 case.
18        Let's go off the record.
19        THE VIDEOGRAPHER:  Off the video record at
20 12:02 p.m.
21        (Discussion had off the
22        record.)
23        Good afternoon.  We are going back on the
24 video record at 12:06 p.m.

Page 410

1        You may proceed.
2 BY MR. KIMREY:
3        Q.   Ms. Lukis, what we're looking at right now
4 has been entered as Exhibit 25 in the deposition, and you
5 can see that it's an e-mail from your counsel to us as
6 counsel for Whitepages dated January 4th of this year at
7 4:44:32 p.m.  Do you see that?
8        A.   Yes.
9        Q.   And do you recall that you sat for the
10 original session of your deposition starting at 9:30 a.m.
11 on January 5th?
12        A.   Do I remember what?
13        Q.   Do you recall sitting for the first session
14 of your deposition in this case starting at 9:30 a.m.
15 Central on January 5th, 2021?
16        A.   Yes.
17        Q.   Okay.  So this is less than 24 hours before
18 your deposition started; correct?
19        A.   Yes.
20        MR. BEAUMONT:  Objection, form.
21 BY MR. KIMREY:
22        Q.   And you can see that it says:  "In the links
23 below you will find Plaintiff's Bates numbers 1 through
24 2205."  Do you see that?

Page 411

1        A.   Yes.
2        Q.   Okay.  Do you have any reason to believe that
3 any document production was made by your counsel in this
4 case before this e-mail?
5        MR. BEAUMONT:  Objection, form.
6 BY THE WITNESS:
7        A.   I wouldn't know.  I'd have to ask him.
8 BY MR. KIMREY:
9        Q.   Well, this was the first production by your
10 counsel in the case less than 24 hours before your
11 deposition, and you can tell because it starts with Bates
12 number 1, so that's the first document produced in this
13 case, Bates number 1.  And if you scroll forward, so go
14 down.  So this is an index of all of the documents that
15 were produced with this e-mail less than 24 hours before
16 your deposition commenced, and if you scroll forward, you
17 can see all of -- go ahead and scroll through the entire
18 document -- how many different folders there were and how
19 voluminous the production was.  Do you see that?
20        A.   Yes.
21        Q.   Do you have any reason to believe that this
22 index does not accurately reflect what your counsel
23 produced on January 4th of this year?
24        A.   No.  I believe it's what he produced.

28 (Pages 408 - 411)

Page 412

1    Q.   Okay.  So let's enter Exhibit 26 which is 2,
2  sub 18.  Okay.  This is the range of documents that
3  includes Bates 480 and Bates 460.  The range is Bates 281
4  through 1113.  And if you at look it printed out, it
5  looks like this.  That's how thick it is (indicating).
6  Okay.  So can you see based on my camera that this is
7  about two and a half inches thick?
8    A.   Approximately.
9    Q.   Okay.  And it looks like -- and you can
10 scroll through the document, but it looks like -- let's
11 see if I can do this backwards.  It looks like this.
12 It's just black box after black box after black box.
13       MR. BEAUMONT:  Form.
14 BY MR. KIMREY:
15    Q.   Do you know whether you intended to produce
16 this exhibit which is roughly two and a half pages thick
17 if you print it out totally redacted?
18       MR. BEAUMONT:  Objection, form.
19 BY MR. KIMREY:
20    Q.   Is that what you intended?
21    A.   I would have to ask my attorney what is on --
22 what is on the documentation that would be redacted.
23    Q.   Okay.  Well, your interrogatories -- your
24 supplemental interrogatory responses and your

Page 413

1  supplemental document request responses direct us to
2  documents within this range that allegedly are Bates
3  stamped 460 and 480, and we can't see them.  There's been
4  no privilege log produced in the case.  We've been
5  provided no justification for why this is entirely
6  redacted.  It should be produced unredacted, and we
7  reserve the right to continue your deposition after today
8  so we can question you about these documents which
9  presumably were produced by you because you concluded
10 they were relevant and proportional to the needs of the
11 case, and they're specifically cross-referenced in your
12 interrogatory and document request responses as things we
13 should look at to understand when, how, why, et cetera,
14 you visited the Whitepages website, but they give us no
15 understanding because they're completely black.  Do you
16 understand that?
17    A.   Yes.
18       MR. BEAUMONT:  Objection, form.
19       MR. KIMREY:  Okay.  Let's go off the record.
20       THE VIDEOGRAPHER:  Off the video record at
21 12:11 p.m.
22            (Discussion had off the
23             record.)
24       We are back on record at 12:14 p.m.

Page 414

1        You may proceed.
2  BY MR. KIMREY:
3    Q.   Okay.  So let's enter Exhibit 27 which is sub
4  folder 2.19.  All right, Ms. Lukis.  This is part of the
5  Facebook-related production that you testified you pulled
6  roughly three days before the beginning of your
7  deposition on January 5th and that your counsel produced
8  on the eve of the deposition.  And you can see up at the
9  top that's your picture; correct?
10    A.   Yes.
11    Q.   And this information that is in this Exhibit
12 27 is from your Facebook account; is that right?
13    A.   It looks like it.
14    Q.   Is this information that you pulled for
15 production in this case?
16    A.   If it's a part of my Facebook profile, yes.
17    Q.   Okay.  Do you see at the top of the first
18 page it says:  "Advertisers who uploaded a contact list
19 with your information, advertisers who run ads using a
20 contact list they uploaded that includes contact info you
21 shared with them or with one of their data partners"?  Do
22 you see that?
23    A.   Yes.
24    Q.   So this says that Facebook believes you

Page 415

1  shared your contact information with all of these
2  entities in this list for advertising purposes; is that
3  true?  Is that what you did?
4    A.   No.
5        MR. BEAUMONT:  Objection to form.
6  BY MR. KIMREY:
7    Q.   Why is that not true?
8    A.   I don't recognize most of the names on there,
9  so I have no idea who they are.
10    Q.   Okay.
11    A.   I recognize 1800 Tequilla and that's about
12 it.  It also says it's got data from their data partners,
13 so who knows who their data partners are.
14    Q.   Okay.  So as you scroll through this, it
15 lists, keep scrolling, in alpha order perhaps over 1,000
16 companies that Facebook says you gave consent to to run
17 ads using your contact list that includes contact
18 information for you shared with them or with one of their
19 data partners.  That's what Facebook is saying.  Do you
20 understand that?
21    A.   Yes.
22        MR. BEAUMONT:  Object to form.
23 BY MR. KIMREY:
24    Q.   But your position is that Facebook is wrong?

29 (Pages 412 - 415)

Page 416

1        MR. BEAUMONT: Object to form.
2   BY THE WITNESS:
3        A.   No.  My position is they could have gotten
4   this information from any of their data partners.  I have
5   no idea who Facebook buys and sells their information
6   from.
7   BY MR. KIMREY:
8        Q.   Okay.  So, again, at the top it says:
9   "Advertisers who uploaded a contact list with your
10  information," and then it says:  "Advertisers who run ads
11  using a contact list they uploaded that includes contact
12  info you," you, Stephanie Lukis, "shared with them or you
13  shared with one of their data partners."  Do you
14  understand that?
15       A.   Yes.
16       MR. BEAUMONT: Object to form.
17  BY MR. KIMREY:
18       Q.   Okay.
19       A.   It also means --
20       Q.   Facebook is taking the position that you
21  shared your contact list with all of these entities as
22  well as with their data partners, and your position is
23  that Facebook is lying; is that right?
24       MR. BEAUMONT: Object to form.

Page 417

1   BY THE WITNESS:
2        A.   No.  It says advertisers uploaded a contact
3   list my name was a part of.
4   BY MR. KIMREY:
5        Q.   That's not what it says.  What it says is:
6   "Advertisers who run ads using a contact list they
7   uploaded that includes contact info you shared with them
8   or with one of their data partners."  This is saying you
9   shared your contact information with these entities and
10  their data partners for advertising.  Is that incorrect?
11       MR. BEAUMONT: Object to form.
12  BY THE WITNESS:
13       A.   I wouldn't know who they -- who their data
14  partners are, who bought and sold the information, so I
15  don't know.
16  BY MR. KIMREY:
17       Q.   But it's possible you did provide the consent
18  for sharing for advertising purposes as set forth by
19  Facebook in this exhibit; correct?
20       MR. BEAUMONT: Object to form.
21  BY THE WITNESS:
22       A.   I -- I don't know.
23  BY MR. KIMREY:
24       Q.   Okay.  And it's possible that that is how

Page 418

1   Whitepages got your information; correct?
2        MR. BEAUMONT: Object to form.
3
4   BY THE WITNESS:
5        A.   That doesn't explain how Whitepages got my
6   addresses I haven't lived at in years, family members I'm
7   connected to I'm not linked in to on Facebook or anywhere
8   else.
9   BY MR. KIMREY:
10       Q.   Please answer the question.  Is it possible
11  that Whitepages got your information from one of the
12  entities listed in this exhibit?
13       MR. BEAUMONT: Object to form.
14  BY THE WITNESS:
15       A.   I wouldn't know.
16  BY MR. KIMREY:
17       Q.   Okay.  And is it possible you consented to
18  the sharing of your information by these entities with
19  Whitepages for advertising purposes?
20       MR. BEAUMONT: Object to form.
21  BY THE WITNESS:
22       A.   I don't know.
23  BY MR. KIMREY:
24       Q.   Is it possible that you actually provided

Page 419

1   written consent to Whitepages to use your information to
2   advertise?
3        A.   No.
4        MR. BEAUMONT: Object to form.
5   BY MR. KIMREY:
6        Q.   Why is that?
7        A.   Because I've only been on Whitepages once,
8   and I never logged in for an account there, so I never
9   gave you permission to use my information.
10       Q.   Did you give permission to any of these
11  entities to share information about you with whoever they
12  want?
13       MR. BEAUMONT: Object to form.
14  BY THE WITNESS:
15       A.   I don't know.
16  BY MR. KIMREY:
17       Q.   Is it possible that you did consent to
18  sharing of your information by one of these entities and
19  to sharing by them with others for advertising purposes
20  and they shared your information pursuant to that written
21  consent ultimately with Whitepages which Whitepages then
22  used to advertise?
23       MR. BEAUMONT: Object to form and -- actually,
24  just -- my objection is just objection, form.

30 (Pages 416 - 419)

Page 420

1 BY THE WITNESS:
2     A.   I don't know.
3
4 BY MR. KIMREY:
5     Q.   So you don't know as you sit here today
6 whether Whitepages had your or an authorized
7 representative of yours written consent to use your
8 information to advertise; right?
9         MR. BEAUMONT:  Objection.  Object to form.
10 BY THE WITNESS:
11     A.   You're asking me if I know any website I've
12 ever been to if they've sold my information.  That's
13 something I just don't know.
14 BY MR. KIMREY:
15     Q.   And you don't know whether they shared your
16 information for advertising purposes by others pursuant
17 to written consent that you gave them; right?  You just
18 don't know?
19         MR. BEAUMONT:  Object to form.
20 BY THE WITNESS:
21     A.   I don't know.  I don't know who their data
22 partners are, so I don't know who they -- who they sold
23 the information to.
24 BY MR. KIMREY:

Page 421

1     Q.   And it's possible that their -- they would
2 take the position that by virtue of your sharing of the
3 information via Facebook you provided written consent to
4 them to share your data with others for purposes of
5 advertising by those others; correct?
6     A.   No.
7         MR. BEAUMONT:  Object to form.
8 BY MR. KIMREY:
9     Q.   Why not?
10     A.   I -- I'm a private person.  I don't give out
11 my information willy nilly, and I would not -- I would
12 not knowingly tell somebody yes, they can sell my
13 information to someone else.
14     Q.   Okay.  But Facebook says you gave your
15 information to all of these entities which seems pretty
16 willy nilly and --
17     A.   Again, I didn't give permission for all of
18 these websites to get it.  They got it from their data
19 partners, and I don't know who those are.
20     Q.   That's not what this says.  Again, what it
21 says is advertisers who run ads using a contact list they
22 uploaded that includes contact info you shared, that's
23 you, Stephanie Lukis, shared with them or with one of
24 their data partners, so the sharing occurred by you

Page 422

1 pursuant to your opting into Facebook's terms and your
2 opting into Facebook's privacy policy and consenting to
3 widespread distribution of your data to third parties for
4 purposes of their use for advertising.  That's what
5 occurred.  Do you disagree with that?
6         MR. BEAUMONT:  Object to form and calls for
7 legal conclusion.
8 BY THE WITNESS:
9     A.   I don't know.  I'm not a lawyer.  I couldn't
10 answer the legality of what -- of their data partners and
11 who they are.
12 BY MR. KIMREY:
13     Q.   Okay.  So you don't know what you consented
14 to and what you didn't consent to; is that right?
15     A.   I don't --
16         MR. BEAUMONT:  Object to form.
17 BY THE WITNESS:
18     A.   I said I don't know who their data partners
19 are, and I don't -- so I wouldn't know who I consented to
20 to give this information.
21 BY MR. KIMREY:
22     Q.   Okay.
23     A.   I don't -- I'm probably going to be deleting
24 Facebook after this because they're selling my

Page 423

1 information out, and I didn't know they were doing that
2 and I talked to --
3     Q.   Do not delete Facebook without preserving it.
4         Let's move onto the next exhibit.  This is
5 220 which is going to be marked as Exhibit 28.  Actually,
6 let's -- I'm sorry.  Let's go back to that prior exhibit.
7     A.   I don't even know who any of these people
8 are.
9         MR. KIMREY:  Let's go off the record.
10         THE VIDEOGRAPHER:  Off the video record at
11 12:24 p.m.
12             (Discussion had off the
13             record.)
14         We are back on record at 12:25 p.m.
15 BY MR. KIMREY:
16     Q.   Okay.  So let's go to Exhibit 28 which is
17 220, I believe.  Yes.  Okay.  This also was part of your
18 Facebook-related production on the eve of your first
19 deposition session, Ms. Lukis, and this is Bates 00001
20 which is weird but setting that aside.  Do you see your
21 picture at the top?
22     A.   Yes.
23     Q.   Do you see that it says:  "Face recognition"?
24     A.   Yes.

31 (Pages 420 - 423)

Page 424

1    Q.   And it says: "Your face recognition settings
2  allow you to choose if you want Facebook to be able to
3  recognize you in photos and videos." Do you see that?
4    A.   Yes.
5    Q.   Do you know whether your face recognition
6  settings, in fact, allow Facebook to recognize you in
7  photos and videos?
8    A.   No.  My Facebook settings do not allow
9  people -- the only way I'm known in pictures is if
10 somebody tags me.
11   Q.   Okay.  Have your Facebook settings or has
12 your Facebook account ever been open?
13   A.   No.
14        MR. BEAUMONT:  I'm sorry.  Can you -- can you
15 repeat that?  I wasn't -- I didn't hear the question.  I
16 apologize.
17        MR. KIMREY:  She already answered it.
18 BY THE WITNESS:
19   A.   No, my Facebook settings have never been
20 allowed to have facial recognition working on my
21 Facebook.
22 BY MR. KIMREY:
23   Q.   Okay.  That's not the question.  I asked you
24 whether they had ever been opened, and you said --

Page 425

1    A.   No.
2    Q.   -- no.
3         Have you ever told anybody that your Facebook
4  settings aren't open?
5    A.   No.
6        MR. BEAUMONT:  I object to the previous two
7  questions as to form.
8  BY MR. KIMREY:
9    Q.   Okay.  Let's move onto 28 which is 220.
10       MR. TOTH:  We're on 220.
11       MR. KIMREY:  Oh, we are.  Okay.  Is that 28?
12 Is that Exhibit 28?
13       MR. TOTH:  Yes, it is.
14       MR. KIMREY:  Okay.  Let's go to 221, Exhibit
15 29.
16 BY MR. KIMREY:
17   Q.   Okay.  This is another part of your
18 production, Ms. Lukis.  It has a Bates of 3 on it in the
19 lower right-hand corner.  You see your name on there?
20   A.   Yes.
21   Q.   And you see your profile picture?
22   A.   Yes.
23   Q.   Do you see down below it says your phone
24 number?

Page 426

1    A.   Yes.
2    Q.   That's your current cell phone number; right?
3    A.   Yes.
4    Q.   That's the cell phone number that you didn't
5  want your mom to find; correct?
6    A.   Yes.
7    Q.   That's the cell phone number that you said is
8  private; correct?
9    A.   Yes.
10       MR. BEAUMONT:  Object to form.
11 BY MR. KIMREY:
12   Q.   You shared that cell phone number with
13 Facebook.  That's why they produced it back to you; is
14 that correct?
15   A.   Yes.
16   Q.   Okay.  Given the wide distribution rights
17 Facebook has, do you really have a reasonable expectation
18 of privacy in that cell phone number given that you gave
19 it to Facebook?
20   A.   Yes.
21       MR. BEAUMONT:  Object to form.
22 BY MR. KIMREY:
23   Q.   Why is that?
24   A.   Because I didn't -- my phone number is listed

Page 427

1  as private.  Nobody can actually search me by my phone
2  number or even see my phone number on my profile, so I
3  assumed that that was not something that they were giving
4  away willy nilly.
5    Q.   What was that assumption based on?
6    A.   Personal opinion, when they --
7        MR. BEAUMONT:  Form.
8  BY MR. KIMREY:
9    Q.   Anything else?
10   A.   -- ask you if you want your phone number to
11 be listed as private and you say yes.
12   Q.   Is it based on anything other than personal
13 opinion?
14   A.   No.
15       MR. BEAUMONT:  Object to form.
16 BY MR. KIMREY:
17   Q.   Okay.  Let's move to Exhibit, I think it's,
18 30, and we're at 223.  Okay.  So this is another part of
19 your production from Facebook on the eve of your first
20 deposition session.  It's Bates 52 through 64.  At the
21 top you can see your profile picture; correct?
22   A.   Yes.
23   Q.   And below it says: "Your Address
24 Books."  Do you see that?

32 (Pages 424 - 427)

Page 428

1    A.   Yes.
2    Q.   And it says: "Contact information you've
3 added for friends and other people." Do you see that?
4    A.   Yes.
5    Q.   So did you add all of this contact
6 information in this exhibit to Facebook?
7    A.   No. I don't know who half of these names are
8 that I can just see on this first page.
9    Q.   So these just magically appeared as something
10 Facebook thinks that you uploaded?
11       MR. BEAUMONT: Object to form.
12 BY THE WITNESS:
13    A.   I -- I don't know. I don't recognize these
14 names or numbers so --
15 BY MR. KIMREY:
16    Q.   Okay. Let's go to 53. Do you recognize
17 the -- so Bates stamp 53 of this same exhibit. Do you
18 recognize at the bottom the second to the last entry, Dr.
19 Zhang? Do you recognize that?
20    A.   Nope.
21    Q.   Do you recognize the reference to neuropsych?
22    A.   No.
23    Q.   Okay. Do you recognize -- keep going to Page
24 54, Bates 54. Do you recognize at the top Inova Primary

Page 429

1 Care?
2    A.   Yes.
3    Q.   Who is that?
4    A.   That is -- was my doctor when I lived in
5 northern Virginia. That was his office.
6    Q.   Okay. And did you upload that to Facebook?
7    A.   No.
8       MR. BEAUMONT: Form.
9 BY MR. KIMREY:
10    Q.   How did Facebook get it?
11       MR. BEAUMONT: Object to form.
12 BY THE WITNESS:
13    A.   Probably through one of their partners. I
14 put it into my cell phone which is an Android phone which
15 is linked to Google.
16 BY MR. KIMREY:
17    Q.   Okay. And did you link your Android cell
18 phone and Google to Facebook?
19       MR. BEAUMONT: Object to form.
20 BY THE WITNESS:
21    A.   I don't know.
22 BY MR. KIMREY:
23    Q.   Okay. So it's possible you did, in fact,
24 link your phone and your Google accounts to Facebook?

Page 430

1    A.   I logged into Facebook on my phone.
2    Q.   Okay. And by doing so did you share your
3 contact information on your phone with Facebook?
4    A.   No.
5    Q.   How did it get to Inova Primary Care?
6    A.   I don't know.
7       MR. BEAUMONT: Form.
8 BY MR. KIMREY:
9    Q.   Is it possible they got it from you because
10 you gave it to them?
11       MR. BEAUMONT: Object to form.
12 BY THE WITNESS:
13    A.   I didn't give them access to all of my phone
14 numbers and my contact lists on my cell phone.
15 BY MR. KIMREY:
16    Q.   Okay. But it says at the beginning of this
17 exhibit, doesn't it: "Contact information you've added
18 for friends and other people," and you in that sentence
19 is you, Stephanie Lukis; correct?
20    A.   I would assume so.
21    Q.   Okay. So Facebook was just lying? You
22 didn't upload this data?
23       MR. BEAUMONT: Object to form.
24 BY THE WITNESS:

Page 431

1    A.   When I'm -- when I'm looking at names on here
2 that I've never seen before, that I have no idea who they
3 are, that I don't recall ever having in my -- in my own
4 phone -- like I have no idea who Paul Boots is.
5 BY MR. KIMREY:
6    Q.   Okay. Can you search in your phone right now
7 to see if he's listed in your contacts?
8       MR. BEAUMONT: Object to form.
9 BY MR. KIMREY:
10    Q.   Search Boots.
11       Note for the record, and it's on video, Ms.
12 Lukis is searching her phone for Paul Boots.
13       Is he there?
14    A.   No results found.
15    Q.   Okay. Possibly he was there at one time and
16 he is now gone?
17    A.   No.
18       MR. BEAUMONT: Objection, form.
19 BY THE WITNESS:
20    A.   I don't know anybody named Paul Boots.
21 BY MR. KIMREY:
22    Q.   Okay. Let's go to 54. Do you see where it
23 says: "My Psychiatry" on Bates 54? One more page down.
24 Yeah, right in the middle.

33 (Pages 428 - 431)

Page 432

1    A.   Yeah.
2    Q.   Do you recognize that number?
3    A.   Nope.
4    Q.   Is it possible that number is in your
5  contacts?
6    A.   Nope.
7        MR. BEAUMONT:  Object to form.
8  BY MR. KIMREY:
9    Q.   Okay.  Next page, 55.  Do you see "Debbie
10 Egan" at the top?
11   A.   Yep.
12   Q.   Is that your mom?
13   A.   Yep.
14   Q.   Is that your mom's number?
15   A.   Don't know.
16   Q.   Is it possible that (703) 476-2866 was your
17 mom's number as of December 22nd, 2017 at 11:18 p.m.?
18   A.   Could have been.
19       MR. BEAUMONT:  Object to form.
20 BY MR. KIMREY:
21   Q.   Is it possible Facebook got that number from
22 you at that time?
23       MR. BEAUMONT:  Object to form.
24 BY THE WITNESS:

Page 433

1    A.   I believe they got it for her because her
2  Facebook account was linked to mine at the time.
3
4  BY MR. KIMREY:
5    Q.   Why was her Facebook account linked to yours
6  at the time?
7    A.   Because she was listed on my friends list,
8  and my friends had access to my -- my contact information
9  if they're not blocked.
10   Q.   Okay.  So your friends have access to your
11 full cell phone contacts if they're on --
12       MR. BEAUMONT:  Object to form.
13 BY THE WITNESS:
14   A.   No.
15 BY MR. KIMREY:
16   Q.   What?
17   A.   No.
18   Q.   What do you mean by they have contact -- they
19 have access to your contacts?
20   A.   They -- they -- my friends' settings on my
21 Facebook account allow people to see my e-mail address.
22   Q.   But how did Facebook get your mom's number?
23   A.   Probably because she gave them permission and
24 when I linked my account -- I don't know.

Page 434

1    Q.   Okay.
2    A.   I don't know the minutia for Facebook and how
3  they do everything.  Who the hell --
4    Q.   What about 56?  What are you reacting to?
5  Why were you saying what the hell?
6    A.   I'm trying to figure out who Benjamin Tansur
7  is.  Never even heard of him.
8    Q.   Okay.  Page 56, Bates 56.  Do you see at the
9  bottom where it says "Sean Egan"?
10   A.   Yes.
11   Q.   Who is that?
12   A.   That's Debbie's stepson.
13   Q.   Okay.  How did Facebook get that number?
14       MR. BEAUMONT:  Object to form.
15 BY THE WITNESS:
16   A.   I don't know.
17 BY MR. KIMREY:
18   Q.   Is it possible they got it from you?
19       MR. BEAUMONT:  Form.
20 BY THE WITNESS:
21   A.   I don't know.
22 BY MR. KIMREY:
23   Q.   Okay.
24   A.   I don't think I've ever --

Page 435

1    Q.   At Page 57, Bates 57, do you see there toward
2  the top it says "Marty Egan"?
3    A.   Yes.
4    Q.   Who's that?
5    A.   My -- Debbie's sixth husband.
6    Q.   Okay.  And is it possible that's his number
7  or it was his number as of May 23rd, 2017?
8        MR. BEAUMONT:  Object to form.
9  BY THE WITNESS:
10   A.   I don't know.
11 BY MR. KIMREY:
12   Q.   How did Facebook get that?
13   A.   I don't know.
14       MR. BEAUMONT:  Object to form.
15 BY MR. KIMREY:
16   Q.   Do you think they got it from you?
17   A.   I don't know.
18       MR. BEAUMONT:  Object to form.
19 BY MR. KIMREY:
20   Q.   Okay.  Moving on, 58, Bates 58.  Do you see
21 "Paul Lukis" right there?
22   A.   Yes.
23   Q.   Is that your husband?
24   A.   Yes.

34 (Pages 432 - 435)

Page 436

1    Q.   Was that his number as of May 23rd, 2017?
2    A.   I think so.
3    Q.   Okay.  How did Facebook get that?
4    A.   I don't know.
5         MR. BEAUMONT:  Object to form.
6 BY MR. KIMREY:
7    Q.   Okay.  Could they have gotten it from you?
8         MR. BEAUMONT:  Object to form.
9 BY THE WITNESS:
10   A.   I don't know.
11 BY MR. KIMREY:
12   Q.   Do you see right below that "Debbie Egan"
13 again?
14   A.   Yes.
15   Q.   How'd Facebook get that?
16   A.   I don't know.
17        MR. BEAUMONT:  Object to form.
18 BY MR. KIMREY:
19   Q.   Could Facebook have gotten it from you?
20   A.   I don't know.
21        MR. BEAUMONT:  Object to form.
22 BY MR. KIMREY:
23   Q.   Okay.  Going down, bottom of 58, do you see
24 "Joe Lukis"?

Page 437

1    A.   Yes.
2    Q.   Who is that?
3    A.   My father-in-law.
4    Q.   Okay.  Do you see the number on the next
5 page?  Do you see that?
6    A.   Yeah.
7    Q.   How did Facebook get that?
8    A.   I don't know.
9         MR. BEAUMONT:  Object to form.
10 BY MR. KIMREY:
11   Q.   Did Facebook get it from you?
12        MR. BEAUMONT:  Object to form.
13 BY THE WITNESS:
14   A.   I don't know.
15 BY MR. KIMREY:
16   Q.   Is it possible Facebook got it from you?
17   A.   I don't know.
18        MR. BEAUMONT:  Object to form.
19 BY MR. KIMREY:
20   Q.   Okay.  Do you see "Sam Dietzmann" below that?
21   A.   Yes.
22   Q.   That's your LARPing friend; right?
23   A.   Yes.  He's just a friend now.
24   Q.   Okay.  And that's his number; right, as of

Page 438

1 that date?
2    A.   I don't know.  I'd have to look.
3    Q.   How did Facebook get that?
4    A.   I don't know.
5         MR. BEAUMONT:  Object to form.
6 BY MR. KIMREY:
7    Q.   Did they get it from you?
8    A.   I don't know.
9         MR. BEAUMONT:  Object to form.
10 BY MR. KIMREY:
11   Q.   Is it possible they got it from you?
12   A.   I don't know.
13        MR. BEAUMONT:  Object to form.
14 BY THE WITNESS:
15   A.   He's in my --
16 BY MR. KIMREY:
17   Q.   Do you see lower on that page it says
18 "Chicago LARP"?  Do you see that?
19   A.   Yeah.
20   Q.   Okay.  Did Facebook get that from you?
21        MR. BEAUMONT:  Object to form.
22 BY THE WITNESS:
23   A.   I don't know.  They got it off of -- off of
24 my phone contact list.

Page 439

1 BY MR. KIMREY:
2    Q.   So they got it off your phone contacts list?
3         MR. BEAUMONT:  Object to form.
4 BY THE WITNESS:
5    A.   I don't know.
6 BY MR. KIMREY:
7    Q.   Is it possible they did?
8    A.   I don't know.
9         MR. BEAUMONT:  Object to form.
10 BY MR. KIMREY:
11   Q.   Okay.  But you know what Chicago LARP is;
12 right?
13   A.   That's a Google Voice number for people to
14 get ahold of each other way back in the day.
15   Q.   Okay.  Who like to dress up like vampires;
16 right?
17   A.   Yes.
18   Q.   Okay.  And you like to do that; right?
19   A.   I also like to play Call of Duty --
20        MR. BEAUMONT:  Object to form.
21 BY THE WITNESS:
22   A.   -- but that doesn't make me a soldier in the
23 U.S. military.
24        MR. KIMREY:  Okay.  That was nonresponsive.

35 (Pages 436 - 439)

Page 440

1  BY THE WITNESS:
2      A.  I don't --
3
4  BY MR. KIMREY:
5      Q.  Samantha Swanson.  Let's go to Page 60.  Do
6  you see "Samantha Swanson"?
7      A.  Yes.
8      Q.  Who is that?
9      A.  Ex-roommate.
10     Q.  Okay.  Is that her number as of that date?
11     A.  I don't know.
12     Q.  Is it possible that it was?
13         MR. BEAUMONT:  Object to form.
14 BY THE WITNESS:
15     A.  I don't know.
16 BY MR. KIMREY:
17     Q.  Okay.  At that time you lived in the
18 Chicagoland area; right?
19     A.  Yes.
20     Q.  Okay.  Is (847) a Chicagoland area code?
21     A.  Yes.
22     Q.  Okay.  Who's Crystal Klatte?  Next item.
23     A.  My sister-in-law.
24     Q.  Okay.  Is that her -- was that her number as

Page 441

1  of May 23rd, 2017?
2      A.  I don't know.  Her phone number is not in
3  my --
4      Q.  Is it possible it was?
5          MR. BEAUMONT:  Object to form.
6  BY THE WITNESS:
7      A.  I don't know.
8  BY MR. KIMREY:
9      Q.  Okay.  How did Facebook get that?
10     A.  I don't know.
11         MR. BEAUMONT:  Same objection.
12 BY MR. KIMREY:
13     Q.  Could Facebook have gotten it from you?
14     A.  I don't know.
15         MR. BEAUMONT:  Same objection.
16 BY MR. KIMREY:
17     Q.  So it is possible Facebook got it from you?
18         MR. BEAUMONT:  Same objection.
19 BY THE WITNESS:
20     A.  I don't know.
21 BY MR. KIMREY:
22     Q.  These are a lot of people you're connected to
23 that Facebook just so happens to have information on.
24 Facebook says it got it from you.  Is there any reason to

Page 442

1  think that Facebook did not actually get it from you?
2          MR. BEAUMONT:  Object to form.
3
4  BY THE WITNESS:
5      A.  I don't know.
6  BY MR. KIMREY:
7      Q.  Okay.  Down lower, 68, it says "Greg Klatte."
8  Do you see that?
9      A.  Yes.
10     Q.  Who's that?
11     A.  My father.
12     Q.  Okay.  And is -- was that his number as of
13 May 27, 2017?
14     A.  No.
15     Q.  Okay.  How did Facebook get that?
16     A.  I don't know.
17         MR. BEAUMONT:  Object to form.
18 BY MR. KIMREY:
19     Q.  Was that ever his number?
20     A.  No.
21     Q.  Okay.  Is it possible Facebook got it from
22 you?
23         MR. BEAUMONT:  Object to form.
24 BY THE WITNESS:

Page 443

1      A.  If it was never his number, they didn't get
2  it from me.
3
4  BY MR. KIMREY:
5      Q.  Okay.  I think you said you didn't know.  But
6  Jerry Klatte, who's that?
7      A.  An uncle.
8      Q.  Okay.  Your uncle?
9      A.  Yes.
10     Q.  Was that a number of his at any point in
11 time?
12     A.  I wouldn't have any idea.
13     Q.  How did Facebook get that?
14     A.  I don't know.
15         MR. BEAUMONT:  Object to form.
16 BY MR. KIMREY:
17     Q.  Did they get it from you?
18         MR. BEAUMONT:  Same objection.
19 BY THE WITNESS:
20     A.  I don't know.
21 BY MR. KIMREY:
22     Q.  Okay.  Next, going down that page, this is
23 61, do you see where it says "Debbie was John Horn"?
24     A.  Yep.

36 (Pages 440 - 443)

Page 444

1    Q.   Okay.  So you testified previously that one
2  of your step-fathers I think had a sex change.  Is that
3  who this is?
4    A.   Yep.
5    Q.   Okay.  Is that that person's number as of
6  that date?
7    A.   I don't know.
8    Q.   Okay.  So how would Facebook know Debbie was
9  John Horn and have this number?
10      MR. BEAUMONT:  Object to form.
11  BY THE WITNESS:
12    A.   Because I put that information into my cell
13  phone.
14  BY MR. KIMREY:
15    Q.   Okay.  And so Facebook got it from your cell
16  phone; is that right?
17      MR. BEAUMONT:  Object to form.
18  BY THE WITNESS:
19    A.   That's the only way I can think of.
20  BY MR. KIMREY:
21    Q.   Okay.  Is that how in your cell phone
22  currently this person is listed -- Debbie was John Horn?
23    A.   I don't know.
24    Q.   Is it possible?

Page 445

1      MR. BEAUMONT:  Object to form.
2  BY THE WITNESS:
3    A.   Maybe.
4  BY MR. KIMREY:
5    Q.   Okay.  Could you just look at your phone
6  because it's right in front of you and you did it
7  already?
8    A.   Yes.  Still in my phone under that screen.
9    Q.   Could you show us on the screen?
10    A.   Can you see it?
11    Q.   Yes.  And that contact information is the
12  exact same number that we're showing in the exhibit.
13      Okay.  What about at the bottom, "Matt
14  Lukis"?
15    A.   Brother-in-law.
16    Q.   Okay.  And is that your brother-in-law's
17  e-mail address boxermatt@gmail.com?
18    A.   I would have no idea.
19    Q.   Is he a boxer?
20    A.   No.
21    Q.   Does he box at all?
22      MR. BEAUMONT:  Object to form.
23  BY THE WITNESS:
24    A.   He did when he was a kid.

Page 446

1  BY MR. KIMREY:
2    Q.   Okay.  How did Facebook get that information?
3      MR. BEAUMONT:  Same objection.
4  BY THE WITNESS:
5    A.   I don't know.
6  BY MR. KIMREY:
7    Q.   Could they have gotten it from you?
8      MR. BEAUMONT:  Same objection.
9  BY THE WITNESS:
10    A.   I don't know.
11  BY MR. KIMREY:
12    Q.   Okay.  63, Bates 63.  Do you see "Anya
13  Klatte"?
14    A.   Yes.
15    Q.   Who's that?
16    A.   My sister.
17    Q.   Okay.  Was that her telephone number as of
18  May 23rd, 2017?
19    A.   I don't know.
20    Q.   Okay.  Do you notice anything about all these
21  dates?  These dates and times are all the same.  Do you
22  see that?
23    A.   Yes.
24      MR. BEAUMONT:  Object to form.

Page 447

1  BY MR. KIMREY:
2    Q.   Okay.  So Facebook is saying that it got this
3  information from you on that date in one data dump.
4  Okay.  Is that possible that that happened?
5      MR. BEAUMONT:  Object to form.
6  BY THE WITNESS:
7    A.   It's possible that that's the day that I
8  logged into my phone on Facebook.
9  BY MR. KIMREY:
10    Q.   And whatever you did caused Facebook to deem
11  itself to have permission to download this contact
12  information into Facebook; right?
13      MR. BEAUMONT:  Object to form.
14  BY THE WITNESS:
15    A.   I don't know why they did it.
16  BY MR. KIMREY:
17    Q.   Okay.  But it's possible that you -- they did
18  it because they perceived you to have consented to it;
19  right?
20      MR. BEAUMONT:  Object to form.
21  BY THE WITNESS:
22    A.   I didn't consent to them downloading my
23  contact list, no.
24  BY MR. KIMREY:

37 (Pages 444 - 447)

Page 448

1    Q.   Okay.  So Facebook stole this from you; is
2  that right?
3         MR. BEAUMONT:  Object to form.
4
5  BY THE WITNESS:
6    A.   I don't know.
7  BY MR. KIMREY:
8    Q.   Okay.  So Facebook may have been the
9  gratuitous recipient of your giving this to Facebook;
10  right?
11        MR. BEAUMONT:  Object to form.
12 BY THE WITNESS:
13   A.   I -- I don't know.
14 BY MR. KIMREY:
15   Q.   Look, it's clear.  Facebook got it from you.
16 So did Facebook get it from you because it stole it from
17 you or did Facebook get it from you because you
18 voluntarily provided it?
19        MR. BEAUMONT:  Object to form.
20 BY THE WITNESS:
21   A.   I don't voluntarily provide my information,
22 but it is possible that they just download it when you
23 log into your phone on Facebook.  I --
24 BY MR. KIMREY:

Page 449

1    Q.   Do they do that because they view you to
2  have -- they view you to have consented to it or do they
3  do it surreptitiously to steal your information without
4  your consent?
5         MR. BEAUMONT:  Object to form.
6  BY THE WITNESS:
7    A.   I'd say surreptitiously because I didn't give
8  them permission to download all my contacts.
9  BY MR. KIMREY:
10   Q.   Okay.  So if we subpoena Facebook and
11 Facebook puts on a witness and tells the jury that you
12 consented and presents evidence of your consent, your
13 testimony to the jury in response is going to be Facebook
14 is a liar; is that correct?
15        MR. BEAUMONT:  Object to form.
16 BY THE WITNESS:
17   A.   I don't know.  You're -- you're confusing me.
18 BY MR. KIMREY:
19   Q.   Okay.  Let's move on.  225 which is going to
20 be marked as 31.  Okay.  So this is also from your
21 production on the eve of your first deposition session.
22 Do you see your profile picture at the top?
23   A.   Yes.
24   Q.   You see that the Bates at the bottom is 1154?

Page 450

1    A.   Yeah.
2    Q.   Okay.  So this says at the top:  "Apps you've
3  used Facebook to log into."  So you have used Facebook to
4  log into Misplay, Legend of the Phoenix, IHOP, Aurelio's
5  Pizza, Bumble, Scrabble Go, One Q, cure.com, Peek, et
6  cetera, blagh, blagh, blagh.  It goes on and on.  You
7  used Facebook to log onto all of these apps; is that
8  correct?
9         MR. BEAUMONT:  Object to form.
10 BY MR. KIMREY:
11   Q.   Or you used -- yes.  Is that correct?
12   A.   I don't -- I don't know.  I've never had a
13 Yelp account.  I've never been -- I don't know what
14 tophatter is, radio.com.  I don't know half of these
15 websites.
16   Q.   Okay.  So Facebook says you used Facebook to
17 log into these apps, and Facebook provides the date and
18 the time when you did that.  And you're saying Facebook
19 is lying, is that what you're saying?
20   A.   No.
21        MR. BEAUMONT:  Object to form.
22 BY THE WITNESS:
23   A.   I'm saying my phone or my computer may have
24 been logged into Facebook and other people were going to

Page 451

1  websites, and it logged in that I was the one who logged
2  into it.
3  BY MR. KIMREY:
4    Q.   Okay.  So it says at 1155 you used ZocDoc to
5  log into Facebook?
6    A.   Yes.
7    Q.   And you use ZocDoc; right?
8    A.   Yes.
9    Q.   Okay.  Is it possible you used ZocDoc to log
10 into Facebook?
11   A.   I thought it was via my e-mail address, but
12 it is possible.  I haven't logged in since 2019?  Jeeze.
13   Q.   Or actually what this says is you used
14 Facebook to log into ZocDoc.  Is it possible that you did
15 that?
16        MR. BEAUMONT:  Object to form.
17 BY THE WITNESS:
18   A.   I guess.  I don't know.
19 BY MR. KIMREY:
20   Q.   Okay.  And it also says, even though you said
21 in your previous deposition session that you never used
22 Grubhub, that you used Facebook to log into at Bates 1156
23 Grubhub; right?
24        MR. BEAUMONT:  Object to form.

38 (Pages 448 - 451)

Page 452

1 BY THE WITNESS:
2     A.   Again, my computer could have been logged in
3 and somebody else logged -- logged into Grubhub.  My
4 computer --
5 BY MR. KIMREY:
6     Q.   So somebody else was on your computer --
7         MR. BEAUMONT:  Blaine, I'd just like to ask
8 you allow her --
9 BY MR. KIMREY:
10    Q.   -- of your Facebook account --
11        MR. BEAUMONT:  -- to finish her response.
12 BY MR. KIMREY:
13    Q.   -- and logged onto Grubhub; is that right?
14        MR. BEAUMONT:  And I'd just like you to let
15 Ms. Lukis finish her response.  Object to form.
16 BY THE WITNESS:
17    A.   There are -- my computer is logged onto
18 Facebook, and other people can use it to log onto
19 websites.  I don't know who does but it's -- somebody
20 logged onto Grubhub but I didn't, but they could have
21 just logged onto Grub -- hit -- there's a button that
22 could hit log in via Facebook.  I don't know.  I didn't
23 do it because I don't use Grubhub because I hate those
24 delivery services.  They charge extra --

Page 453

1 BY MR. KIMREY:
2     Q.   What do you have a basis to hate Grubhub for?
3     A.   Because they charge all of the restaurants
4 additional fees and mark up their prices on food.
5     Q.   Okay.  You have a password on your computer?
6     A.   What?
7     Q.   You have a password on your computer?
8     A.   Yes.
9     Q.   Okay.  Is that private?
10        MR. BEAUMONT:  Object to form.
11 BY THE WITNESS:
12    A.   My husband knows it.
13 BY MR. KIMREY:
14    Q.   Who else knows it?
15    A.   Back then, 2018 it was on a different
16 computer, so at that time it would have also been --
17 shoot -- probably a family member or two.
18    Q.   Who?
19    A.   It was before I went and locked everything
20 down.
21    Q.   Who?
22    A.   I think my mother and Anya.
23    Q.   So your mom as of August 20th, 2018 had the
24 password to your computer; is that right?

Page 454

1     A.   My desktop, yes.
2     Q.   Even though she abuses and harasses you?
3     A.   This was before I cut contact with her.
4     Q.   Do you have a password for Facebook?
5     A.   What?
6     Q.   As of August 20th, 2018, did you have a
7 password for Facebook?
8     A.   No.  It was saved on my computer.  You just
9 go to Facebook and it -- because the password was saved
10 in Chrome, it would log you in.
11    Q.   Okay.  So is it your position that maybe your
12 mom ordered Grubhub through your computer in your
13 Facebook account on August 20th, 2018?
14    A.   She could have, yeah.
15    Q.   Is it possible that you did that?
16    A.   No.  I don't use those services because they
17 charge additional money on the restaurants.  I order --
18        MR. BEAUMONT:  Object to the form of that
19 question.
20 BY MR. KIMREY:
21    Q.   Okay.  Do you dispute that one or more of
22 your digital devices was used by somebody on each of
23 these dates to use Facebook to log into these apps?
24    A.   Some of them are mine.  Some of them are not.

Page 455

1 I'd have to go through the entire list and tell you
2 who's -- which one's what.
3     Q.   And that would be a highly individualized
4 inquiry; right?
5     A.   Yeah, I'd have to see --
6         MR. BEAUMONT:  Objection, form, also legal
7 conclusion.
8 BY THE WITNESS:
9     A.   There's some of them that I recognize, but
10 there's a bunch I don't.
11 BY MR. KIMREY:
12    Q.   Okay.  Because none of these are
13 standardized; right?  You'd have to go to each and every
14 one to see whether you actually logged in --
15    A.   No.
16    Q.   -- is that right?
17        MR. BEAUMONT:  Object to form.
18 BY THE WITNESS:
19    A.   I have to go through, look at the list and
20 say yes, I did that one; no, I didn't do that one; yes, I
21 did that one.
22 BY MR. KIMREY:
23    Q.   Okay.  Let's move on.
24        MR. BEAUMONT:  Counsel, is it possible just to

39 (Pages 452 - 455)

Page 456

1 take a two-, three-minute break?
2    MR. KIMREY: Sure.
3    MR. BEAUMONT: All right. Thank you.
4    THE VIDEOGRAPHER: Going off the video record
5 at 12:51 p.m.
6        (WHEREUPON, a break was
7         taken.)
8    We are back on the record at 12:59 p.m.
9    You may proceed.
10 BY MR. KIMREY:
11   Q.   Okay. So now we're on what's been marked as
12 Exhibit 32. Starting with Bates 1162, do you see that,
13 Ms. Lukis?
14   A.   Yes.
15   Q.   Do you see your picture at the top?
16   A.   Yes.
17   Q.   So this is part of your production, you know,
18 on the eve of your first deposition session from
19 Facebook, and it says: "Posts from apps and websites,
20 posts from the apps you've given permission to post on
21 your behalf." Do you see that?
22   A.   Yes.
23   Q.   So Facebook has taken the position that you
24 gave permission for these apps to post to Facebook on

Page 457

1 your behalf. Do you understand that?
2    A.   Yes.
3    MR. BEAUMONT: Object to form.
4 BY MR. KIMREY:
5    Q.   Do you agree with that?
6    A.   No.
7    MR. BEAUMONT: Object to form.
8 BY THE WITNESS:
9    A.   In my settings it doesn't allow them to do
10 it.
11 BY MR. KIMREY:
12   Q.   Okay. So they do this without your
13 permission?
14   MR. BEAUMONT: Form.
15 BY THE WITNESS:
16   A.   That's not what I said.
17 BY MR. KIMREY:
18   Q.   Is it true that you gave permission to
19 Facebook to post from the apps on your behalf as listed
20 in this exhibit?
21   MR. BEAUMONT: Object to form.
22 BY THE WITNESS:
23   A.   I don't know.
24 BY MR. KIMREY:

Page 458

1    Q.   Okay. Do you ever use MyVegasSlots?
2    A.   Yes.
3    Q.   Do you ever use Preguntados?
4    A.   It's Trivia Crack.
5    Q.   Do you ever use Trivia Crack?
6    A.   Way back in the day.
7    Q.   Do you ever use Trivia -- I'm sorry.
8 BingoBlitz?
9    A.   I don't know.
10   Q.   Is it possible that you used BingoBlitz?
11   A.   I don't know.
12   Q.   Do you use Yahtzee With Buddies?
13   A.   I don't know.
14   Q.   Do you use Island Experiment? Have you ever
15 used Island Experiment?
16   A.   I have no idea what that is.
17   Q.   Possible you used Island Experiment?
18   A.   I don't know.
19   MR. BEAUMONT: Object to form.
20 BY MR. KIMREY:
21   Q.   It looks like you used it a lot in 2016. Is
22 it possible that you did?
23   A.   I don't know.
24   MR. BEAUMONT: Object to form.

Page 459

1 BY THE WITNESS:
2    A.   It looks like it's a phone game.
3 BY MR. KIMREY:
4    Q.   Do you play phone games?
5    A.   Yeah. Not very much anymore with a toddler.
6    Q.   Back in 2015 did you use Throne Rush?
7    A.   Throne Rush? I don't know what that is.
8    Q.   Possible that back in 2015 you used Throne
9 Rush?
10   A.   I don't know.
11   MR. BEAUMONT: Object to form.
12 BY THE WITNESS:
13   A.   It's five years ago, five and a half.
14 BY MR. KIMREY:
15   Q.   Okay. Let's move on. Next exhibit, we're
16 going to 227 which will be marked as Exhibit 33. This
17 was also part of your late production. You see your
18 profile picture up at the top?
19   A.   Yes.
20   Q.   Okay. On Page 1231 about midway down the
21 page it says: "Stephanie Lukis replied to Abi Wan
22 Kenabi's comment," and it's September 19, 2020, "Come get
23 it you fucking cunts." Did you write that?
24   A.   It was an inside joke.

40 (Pages 456 - 459)

Page 460

1      MR. BEAUMONT:  Form.
2 BY MR. KIMREY:
3    Q.   Did you write that?
4    A.   Yes.  It's an inside joke.
5    Q.   What's the joke?
6    A.   Abi and I pick on each other.
7    Q.   Who is Abi?
8    A.   A friend.
9    Q.   What is Abi's real name?
10    A.   Abi Maldonado.
11    Q.   Where does Abi Maldonado live?
12    A.   I think he's in Niles.
13    Q.   So are all these posts that Facebook says you
14 posted, were they, in fact, posted by you?
15      MR. BEAUMONT:  Object to form.
16 BY THE WITNESS:
17    A.   I don't know.
18 BY MR. KIMREY:
19    Q.   Is it possible that you did write and post
20 all of these posts?
21      MR. BEAUMONT:  Object to form.
22 BY THE WITNESS:
23    A.   I -- I don't know.  I don't know how many
24 times I've commented on Facebook.  I'd have to look

Page 461

1 through them to see if I recognize them all.
2 BY MR. KIMREY:
3    Q.   Facebook says these are all your comments.
4 Do you disagree?
5      MR. BEAUMONT:  Object to form.
6 BY THE WITNESS:
7    A.   Again, I don't know.
8 BY MR. KIMREY:
9    Q.   You want to go off the record and read them
10 all and confirm they're your comments?
11    A.   They could be, but I don't know if all of
12 them are.
13    Q.   Do you have any reason to believe that they
14 are not all your comments?
15      MR. BEAUMONT:  Object to form.
16 BY THE WITNESS:
17    A.   I don't know.  I think they are.
18 BY MR. KIMREY:
19    Q.   Okay.  So at Page 1233, so that's Bates 1233,
20 at the middle of the page it says:  "Bone Gnawer versus
21 Shadow Lord pissing match in the basement at Werewolf.
22 You are still an s-s-s but I like you."  Did you write
23 that?
24    A.   I think so.

Page 462

1    Q.   What does that mean -- Bone Gnawer versus
2 Shadow Lord pissing match in the basement of werewolf?
3    A.   It was a game.  It's characters in a game.
4    Q.   Who is Bone Gnawer?
5    A.   It's a -- it's a class within a game.
6    Q.   And is Shadow Lord also a class within a
7 game?
8    A.   Yes.
9    Q.   What is the game?
10    A.   Werewolf.
11    Q.   What -- how do you play Werewolf?
12    A.   It's a LARP and a video game.
13    Q.   Okay.  How do you play it?  How do you play
14 the LARP?
15    A.   You make a character and interact with
16 people.
17    Q.   Who were you in Werewolf?
18    A.   The storyteller.
19    Q.   Is that like the dungeon master in D and D?
20    A.   Yes.
21    Q.   Is that the only character you played in
22 Werewolf?
23    A.   Yeah.  No.  I don't remember, and I wasn't
24 playing a character.  I was running the game.

Page 463

1    Q.   Okay.  Did you perform any other role with
2 respect to Werewolf other than the storyteller?
3      MR. BEAUMONT:  Form.
4 BY THE WITNESS:
5    A.   Yeah, I think I played a couple -- played a
6 couple characters, but it's been so long I don't remember
7 anything about them.
8 BY MR. KIMREY:
9    Q.   Okay.  So if you go to Bates 1234.  About,
10 you know, four inches down it says:  "Stephanie Lukis
11 commented on Debbie Egan's post" on May 17, 2017," but we
12 don't have the comment.  Do you know why?
13      MR. BEAUMONT:  Object to form.
14 BY THE WITNESS:
15    A.   Because she's blocked on Facebook, so I guess
16 it deleted any comments that were connected to her.
17 BY MR. KIMREY:
18    Q.   Okay.  At this point in time were you still
19 on good terms with your mom?
20    A.   I've never been on good terms --
21      MR. BEAUMONT:  Object to form.
22 BY THE WITNESS:
23    A.   -- with her, but I was still talking to her.
24 BY MR. KIMREY:

41 (Pages 460 - 463)

Page 464

1    Q.   Okay.  You can see that there are several
2 similar posts on this page -- "Stephanie Lukis commented
3 on Debbie Egan's post, Stephanie Lukis commented on
4 Debbie Egan's post," et cetera.  Do you see all those?
5    A.   Yes.
6    Q.   Okay.  And it's your position that we can't
7 see it because of your mom's privacy settings; is that
8 right?
9    A.   No.  I think it's because of my privacy
10 settings, but I don't know why you can see the last one
11 when you can't see anything else.  I don't know.  I'm not
12 a computer scientist, a data scientist.  I don't know why
13 some show up and why some don't.
14    Q.   Okay.  Let's go to the next page, 1235.
15 About four inches down it says:  "Stephanie Lukis
16 commented on Paul Michael's post."  Who is Paul Michael?
17    A.   My husband.
18    Q.   Okay.  It says:  "And after he watched it I
19 heard grumbles and cranky responses.  Why is Dan Harmon
20 being a dick and messing everything up?"  Did you write
21 that?
22    A.   Yeah.  I'm talking about a TV show.
23    Q.   Then farther down the page there's more
24 commenting on the Debbie Egan post.  Do you see that?

Page 465

1    A.   Yeah.
2    Q.   And then there's more of that at 1236,
3 "Stephanie Lukis," at the top of the page, "commented on
4 Debbie Egan's post."  Do you see that?
5    A.   Yeah.
6    Q.   Then at Page 1238, Bates 1238 there's more
7 commenting by you on Debbie Egan's post.  Do you see
8 that?
9    A.   Yes.
10    Q.   Okay.  Then it says:  "Stephanie Lukis
11 replied to her own comment," and you say:  Due date the
12 27th but C-section on the 20th.  Genevieve is a troll,
13 but we like the idea of cousins the same age to remind
14 her she is not alone", you know, smiley face.  Who are
15 you communicating with there?
16    A.   I have no idea.  It's talking about when my
17 daughter was born.
18    Q.   Let's go to 1239.  About four inches down
19 from the top you write:  "2016 can go to hell.  I have a
20 list and if any of them die, I am going on a murderous
21 rampage."  Why are you saying that?
22    A.   I have no idea.
23         MR. BEAUMONT:  Object to form.
24 BY MR. KIMREY:

Page 466

1    Q.   Okay.  Let's go to 1240, Bates 1240.
2 Actually, let's skip past that.
3         Go to 1242.  In the middle there's a comment
4 from you in a group called Chicago Second Apocalypse.
5 What is that group?
6    A.   That was the werewolf group.
7    Q.   You say:  "Also, Boot Party is without a pack
8 again as those who were part of her pack moved on.
9 Anyone looking for a realm side, combat or intel pack hit
10 me up."  Are you Boot Party?
11    A.   That was a character.  Yes.
12    Q.   That you played?  Is it a character you
13 played in Werewolf?
14    A.   A long time ago, yeah.
15    Q.   Okay.  And what was Boot Party, what kind of
16 character?
17    A.   A fighter.
18    Q.   Was it a human?
19    A.   She was a werewolf.
20    Q.   How did you perform as Boot Party?
21    A.   Walked and talked with other people.
22    Q.   In a werewolf costume?
23    A.   No.  In jeans and a flannel T-shirt.
24    Q.   Okay.  But you pretended to be a werewolf?

Page 467

1    A.   Yes, just like I pretend to be Geralt on the
2 Witcher.
3    Q.   Who?
4    A.   It's a -- it's a character on a video game on
5 Nintendo Switch.  Just like I'm pretending to be that
6 character in the video game, I'm pretending to be that
7 character in that game.
8    Q.   Okay.  What is -- 1247 about midway down the
9 page it says:  "Stephanie Lukis commented on Paul
10 Michael's post."  There's a URL there.  Yeah, it looks
11 like a duplicate URL.  It's there twice.  Do you know
12 what was posted at the URL?
13    A.   Probably a picture.
14    Q.   What does 6NfmQ stand for?
15    A.   I don't know.  I don't know anything about
16 Imgur.
17    Q.   Let's go to 1251.  It says in the middle of
18 the page:  "The Rumble will be inside the Weaver room and
19 we have gotten confirmation that they found the remotes
20 for the air conditioners.  I am planning on making sure
21 all the AC units are on and vent the building as soon as
22 I get there."  What is the Rumble and what is the Weaver
23 room?
24    A.   I don't remember.

42 (Pages 464 - 467)

Page 468

1    Q.   1257.  Do you see that again you're
2    commenting on a Debbie Egan post?  Do you see that?
3    A.   No.
4    Q.   Did you say yes?
5    A.   Yes.
6    Q.   And then you're commenting on Debbie Hahn
7    posts.  Is that the same person?
8    A.   No.  That's John was Debbie Horn or Debbie
9    was John Horn.
10   Q.   1259.  At the bottom it says:  "So just sharp
11   knives.  I took a few layers off my thumb.  Going to take
12   awhile to heal.  Worst is -- worst part is there are
13   exposed nerves, so using my thumb hurts.  Gotta love
14   Oragel."
15   A.   Oragel.
16   Q.   Say that again.
17   A.   Oragel.
18   Q.   Oragel.  What happened here?  What are you
19   describing?
20   A.   I cut my thumb, and I was using the tooth
21   numbing Oragel to make it stop hurting.
22   Q.   And who were you communicating that to?
23   A.   I just posted it up onto Facebook.
24   Q.   At 1261, last post, it says June 3rd, 2010.

Page 469

1    It's a comment on Paul Michael's photo which I guess is
2    your husband's photo.  And you say:  "I am watching you,
3    asshole.  You will come over here one day and never know
4    what hit you."  What are you trying to convey there?
5    A.   In case you notice, there's a smiling face on
6    the end.
7    Q.   What?
8    A.   In case you notice, there a smiling face on
9    the end.
10   Q.   Right.  What are you trying to convey to him?
11   A.   I'd rather not say as it's personal.
12   Q.   That's not a basis not to answer.  What are
13   you trying to convey to him?
14   A.   That when he gets back home he's gonna get
15   laid.
16   Q.   Okay.  Can anyone else see that post?
17   A.   Probably.
18        MR. BEAUMONT:  Object to form.
19   BY MR. KIMREY:
20   Q.   What?
21   A.   I don't know.
22   Q.   Okay.  Let's move onto the next exhibit.
23   It's 228, Exhibit 34.  So what this shows -- this is part
24   of your late production.  What this shows is items you've

Page 470

1    recently viewed on Facebook including articles, groups,
2    stories, marketplace, items, live videos and more.  Do
3    you see that?
4    A.   Yes.
5    Q.   Do you have any reason to believe that that's
6    not what this shows?
7    A.   No.
8    Q.   Okay.  Let's go onto the next one.  This is
9    folder 229, Exhibit 35.  So this says -- this is from
10   your production.  You can see your photo up at the top;
11   right?
12   A.   Yeah.
13   Q.   Okay.  It says:  "Areas of Facebook you
14   recently visited including people's profiles, pages,
15   groups and events."  Do you have any reason to believe
16   that is not what this shows?
17   A.   I don't know.  I assume that's what it has on
18   there.
19        MR. BEAUMONT:  Object to form.
20   BY MR. KIMREY:
21   Q.   Do you know who has access to this
22   information?
23        MR. BEAUMONT:  Form.
24   BY THE WITNESS:

Page 471

1    A.   As to what websites I visited?
2    BY MR. KIMREY:
3    Q.   Yes.
4    A.   I -- I don't have permission for anybody to
5    know that.
6    Q.   Is it possible that that is not the case
7    under your privacy settings?
8        MR. BEAUMONT:  Form.
9    BY THE WITNESS:
10   A.   My privacy settings on Facebook are locked
11   down as tight as I can get them.
12   BY MR. KIMREY:
13   Q.   Have you produced in this case any of your
14   privacy settings at any point in time with respect to any
15   website ever?
16   A.   I don't know.  I don't think so.
17   Q.   Okay.  Well, you should, and we ask that you
18   do that.
19        Okay.  Next item, 230, Exhibit 36.  This is
20   Bates stamped 65.  Okay.  This is part of your
21   production, Ms. Lukis.  You see your photo up at the top
22   there?
23   A.   Yes.
24   Q.   Okay.  It says "Instagram account and

43 (Pages 468 - 471)

Page 472

1 Profiles." Do you have an Instagram account?
2     A.   I have -- I have an Instagram account?
3 That's news to me.
4     Q.   It says here -- is that you?
5     A.   Yeah. Apparently I have an Instagram
6 account.
7     Q.   Okay. And the cell phone number that you
8 didn't want your mom to have is (312) 459-076 -- 0876;
9 correct?
10    A.   Yes.
11    Q.   Okay. And Facebook has that number; right?
12    A.   Yes, but it's --
13         MR. BEAUMONT:  Object to form.
14 BY THE WITNESS:
15    A.   -- marked as private.
16 BY MR. KIMREY:
17    Q.   Do you see anything on here that says
18 private?
19    A.   No. It's in a different part of the
20 settings.
21    Q.   Where?
22    A.   When you hit settings, there's a privacy
23 thing inside the -- inside your settings.
24    Q.   Did you produce that in this case?

Page 473

1     A.   I don't know. It -- I don't know if it's
2 part of the Facebook data dump.
3     Q.   It's not. So you didn't produce it in the
4 case, but we want it. We want your privacy settings on
5 every single website you ever visited and then at
6 minimum, you know, related to the data that you provided
7 to us voluntarily. So we need, you know, from the
8 beginning of your account to the present, your privacy
9 settings as to Facebook, your privacy settings as to
10 LinkedIn, your privacy settings as to Twitter, your
11 privacy settings as to Reddit, et cetera. Do you
12 understand that?
13    A.   Yeah.
14    Q.   Do you intend to produce that?
15    A.   I would have to talk to my attorney. I don't
16 know whether or not -- I just don't know whether or not I
17 can do that or how to do it.
18    Q.   Okay. Let's move on. Next item is folder
19 231. This is Exhibit 37. Okay. You produced this on
20 the eve before your first deposition session. It's Bates
21 stamped or labeled 1114 through 1153, and it's just a
22 series of black boxes again. Did you intend to produce
23 just a series of black boxes?
24    A.   I don't know what -- what's specifically on

Page 474

1 those pages.
2     Q.   Okay. Well, this should be produced not as
3 black boxes. So we request that that be done
4 immediately.
5         Moving on. Okay. Let's go to 234 which I
6 think will be Exhibit 38, the time line photos. This was
7 also part of your production on the eve of the first
8 deposition session the evening of January 4th. Did you
9 produce this to us?
10    A.   I would assume it was part of the data dump.
11    Q.   Okay. And it has various pictures. It's a
12 time line. Do you see that time line of the photos --
13    A.   Yes.
14    Q.   -- that you posted to Facebook?
15         So that's what this is; right?
16    A.   That's what I would assume.
17    Q.   Okay. And this time line includes at Bates
18 stamp 1360 -- can we go there, 1360 -- a posting with a
19 caption: "Hanging out at Ice in D.C. with my mom at," a
20 number, "Debbie Horn, Paul Lukis, Brian Klatte, Crystal
21 Klatte and Susan Klatte." So are all those people
22 depicted in this photo?
23    A.   Yeah.
24    Q.   Which one is your mom?

Page 475

1     A.   The redhead on the left or on the right.
2 Sorry.
3     Q.   Were you getting along with her at this time?
4         MR. BEAUMONT:  Object to form.
5 BY THE WITNESS:
6     A.   Off and on.
7 BY MR. KIMREY:
8     Q.   Do you know who can see this time line?
9     A.   It's --
10        MR. BEAUMONT:  Object to form.
11 BY THE WITNESS:
12    A.   I don't know. Probably nobody because it's
13 set for privacy unless it -- I -- I don't know.
14 BY MR. KIMREY:
15    Q.   So you posted all these photos to Facebook;
16 correct?
17    A.   No.
18    Q.   Who posted them to Facebook if not you?
19    A.   It could have been multiple people posting
20 the pictures and then I just -- I tagged myself where I
21 just flipped it over to a time line picture.
22    Q.   Okay. Let's move on. 3 -- 235 which is
23 going to be Exhibit 39. Okay. This is also from your
24 late production. Do you see at the top it says: "Your

44 (Pages 472 - 475)

Page 476

1  videos"?
2      A.  Yes.
3      Q.  So it says:  "These are videos you've
4  uploaded and shared."  Do you see that?
5      A.  Yes.
6      Q.  Do you have any reason to believe that you
7  did not upload and share these videos?
8      A.  No.
9      Q.  Okay.  With whom did you share?
10     A.  My friends on Facebook and only my friends on
11  Facebook.
12     Q.  Who were they?
13     A.  I don't know everybody -- I can't list off
14  the top of my head everybody I'm friends with on
15  Facebook.
16     Q.  Well, do your best.
17     A.  Good, God.  I don't even know.  Debbie Egan,
18  Debbie Hahn, Paul Lukis, Abi Maldonado, Chris Minchella,
19  Ray Minchella, Ryan Klatte, Crystal Klatte.  I haven't
20  been on Facebook other than this data dump in six months,
21  like actively went on it.
22     Q.  Who else?
23     A.  I'm thinking.  I -- let's see.  I think Sam
24  Dietzmann, Ray Minchella.  God, I don't know.  I don't

Page 477

1  know who all -- who's all listed on my Facebook.  I don't
2  know everybody who's on there.
3          MR. BEAUMONT:  And I'd just like to note that
4  I object to the form of that question, the previous
5  question.
6  BY MR. KIMREY:
7      Q.  Let's move on.  So I think we're now on 237,
8  2.37 which is Exhibit 40.  And this is part of your
9  production, Ms. Lukis, starting at Bates 1407.  Do you
10  see that?
11     A.  Yeah.
12     Q.  Actually, this does not appear to be what I'm
13  looking at.
14         MR. KIMREY:  Could we go off the record?
15         THE VIDEOGRAPHER:  Going off the video record
16  at 1:26 p.m.
17             (Discussion had off the
18              record.)
19         We are back on the record at 1:27 p.m.
20  BY MR. KIMREY:
21     Q.  Okay.  So we had a little bit of an exhibit
22  snafu there.  But now what you're looking at is what's
23  been marked as Exhibit 40, I'm sorry, which starts with
24  Bates 1407.  Do you see that?

Page 478

1      A.  Yeah.
2      Q.  And this, again, appears to be a listing of
3  your posts.  Do you see that at the top?  It says "Your
4  Posts"?
5      A.  Yep.
6      Q.  Okay.  Do you know who could see these posts?
7      A.  People who are on my friends list.
8      Q.  Could anybody else see these posts?
9      A.  No.
10         MR. BEAUMONT:  Form.
11  BY MR. KIMREY:
12     Q.  Again, you can't as you sit here today
13  remember all of the people who have been your friends
14  over the history of your Facebook account; right?
15     A.  Yeah, I'd have to look at it in order to be
16  able to see because I've added and deleted a ton of
17  people over the years.
18     Q.  Let's go to 1421, Bates 1421.  Okay.  So do
19  you see it says:  "Stephanie Lukis updated her status"?
20  Do you see that?
21     A.  Yes.
22     Q.  It says:  "So I just found out about a new
23  genealogy website that would either be very careful or
24  very scary depending on your thoughts.  Every address you

Page 479

1  have ever had on a driver's license, ID card or utility
2  bill is available for free and instant search on the
3  website familytreenow.com.  One of the advantages is that
4  you can choose to opt out of the public database which I
5  am planning on doing."  Did you write that at that time?
6      A.  Yeah.
7          MR. BEAUMONT:  Object to form.
8  BY MR. KIMREY:
9      Q.  Was all of your data available for free on
10  that website?
11     A.  No.
12         MR. BEAUMONT:  Object to form.
13  BY THE WITNESS:
14     A.  It was another website like Whitepages where
15  you have to pay to get all the access.
16  BY MR. KIMREY:
17     Q.  Okay.  But it says in your post:  "Every
18  address you've ever had on a driver's license, ID card or
19  utility bill is available for free and instant search on
20  the website."  You said that; right?
21     A.  Yeah, but I believe it was actually -- you
22  have to pay to actually get the information.  I said that
23  to try and scare people.
24     Q.  Oh, so you lied in this post?

45 (Pages 476 - 479)

Page 480

1    A.   I -- on a Facebook post from three and a
2 half -- yeah, three years ago?  It's -- it was literally
3 just trying to get people to go to the website and get
4 their information off of it.
5    Q.   But it was done actually false.  That every
6 address you have ever had a driver's license, ID card or
7 utility bill is available for free and instant search on
8 the website, that's actually false?
9    A.   The information is behind a pay wall.
10    Q.   Okay.  So you knew that when you wrote that
11 that was false and you were trying to deceive people so
12 that they would go to the website out of fear; is that
13 right?
14       MR. BEAUMONT:  Object to form.
15 BY THE WITNESS:
16    A.   I don't know.  I don't know what my
17 motivation was at the time.
18 BY MR. KIMREY:
19    Q.   Okay.  But you definitely lied; right?
20    A.   Well -- I don't know.
21    Q.   What you said was untrue; right?
22    A.   I don't know.  I don't recall.
23    Q.   Okay.  Did you, in fact, opt out on the
24 website?

Page 481

1    A.   I don't know.  It was three years ago.
2    Q.   Did you visit familytreenow.com ever?
3    A.   I don't know.  I found out about it from -- I
4 found out about it from Reddit.
5    Q.   Okay.  Well, we want you to produce your full
6 profile from familytreenow.com.
7       And then, again, you can see you tagged your
8 mom down at the bottom?
9    A.   Yes.
10    Q.   Were you getting along at that time?
11    A.   Barely.
12    Q.   What does that mean?
13    A.   I'd only ever see her for Christmas, and I
14 talked to her on the phone maybe once every three months.
15    Q.   Go to Page 1428, Bates 1428.  Do you see the
16 post with the laptop and the -- it looks like a drive of
17 some kind?
18    A.   I don't know what that is.  It's not a hard
19 drive.
20    Q.   Are those your devices?
21    A.   They were before they crashed.  Actually, no,
22 that's not -- that's not -- I don't know whose laptop
23 that is.  No, yeah.
24    Q.   Is that your laptop?

Page 482

1    A.   Let me think.
2    Q.   Did you have an LG laptop and an LG drive?
3       MR. BEAUMONT:  Object to form.
4 BY THE WITNESS:
5    A.   The -- the LG is actually paperwork out of my
6 cell phone when I got a new phone.  The computer, yes,
7 was ours.
8 BY MR. KIMREY:
9    Q.   Do you still have that LG drive?
10       MR. BEAUMONT:  Counsel, I'd like to interject
11 here.  We've been on the record now for more than three
12 hours today.
13       MR. KIMREY:  Let's go off the record.
14       THE VIDEOGRAPHER:  Going off the video record
15 at 1:32 p.m.
16          (Discussion had off the
17          record.)
18       We are back on record at 1:34 p.m.
19       You may proceed.
20       MR. KIMREY:  Yeah, so Mr. Beaumont just
21 highlighted that we've been going for over three hours,
22 and we went off the record and confirmed with Kevin, the
23 videographer, that we're currently at three hours and one
24 minute.

Page 483

1       I have just a handful of additional
2 questions related to Ms. Lukis' Facebook account and
3 related to her LinkedIn account which were as I've noted
4 produced on the eve of her first deposition session and
5 we didn't have time to review and question her about.
6 I'd like to finish that up and then hold the deposition
7 open if Mr. Beaumont and Ms. Lukis are unwilling to go
8 forward for a whole host of additional issues that don't
9 relate to my inability to get through the Facebook
10 account and the LinkedIn account because I -- I think I
11 can get through those in like the next ten minutes.
12       I do note among other issues the Twitter
13 account was recently produced to us, but we have not been
14 able to figure out how to read it because of the format.
15 We have hired a third-party vendor to assist with that.
16 I have not been able to review the Twitter materials
17 because they were just produced, so that's one of the
18 reasons why we are gonna hold Ms. Lukis' deposition open
19 even though we're going to be able to get through the
20 Facebook material and the LinkedIn material in the next
21 ten minutes if, you know, Mr. Beaumont and Ms. Lukis
22 allow me to ask, you know, the handful of questions that
23 I have related to the Facebook and LinkedIn account
24 before we close for the day holding the deposition open.

46 (Pages 480 - 483)

Page 484

1    So, Mr. Beaumont, are you willing to allow
2 me to finish my questions about this computer that we see
3 in the photo, this particular exhibit and a couple of
4 other exhibits that relate to the Facebook and LinkedIn
5 production that was made on January 4th?
6    We can't hear you.
7    MR. BEAUMONT: I'm just hearing about this.
8 Give me -- let's go off the record and let's take a quick
9 break.
10    MR. KIMREY: Okay.
11    THE VIDEOGRAPHER: Going off the video record
12 at 1:36 p.m.
13    (WHEREUPON, a break was
14    taken.)
15    We are back on record at 1:41 p.m.
16    You may proceed.
17 BY MR. KIMREY:
18    Q.   Ms. Lukis, this computer that we're looking
19 at in this photo, is that the computer --
20    MR. BEAUMONT: Wait.  You mind if I just
21 interject?  We left -- before we went off the record you
22 had asked me whether it was okay for an additional ten
23 minutes of questioning concerning Facebook and LinkedIn.
24 We've discussed this off the record, and I'd just like it

Page 485

1 to be clear that we have no objection to an additional
2 ten minutes.
3 BY MR. KIMREY:
4    Q.   Okay.  Is that your computer, Ms. Lukis?
5    A.   Yes.  It's one of them.
6    Q.   Do you still have that computer?
7    A.   Yes.  Still have the hard drive for it.
8    Q.   What is it?  What kind of computer is it?
9    A.   I think it's an HP.
10    Q.   Okay.  So we'd, you know, definitely like you
11 to search for information in this case.
12    Do you still have that drive, that LG drive?
13    A.   That's not a hard drive.  That's a piece of
14 paper that was inside the box for my cell phone when I
15 got it.
16    Q.   Oh, okay.  Got it.
17    A.   Like the registration and that -- the
18 information packet that you get for a new phone.
19    Q.   Okay.  Let's go to 1430.  So do you see about
20 four inches from the bottom it says:  "Dude," and I think
21 this is your post:  "Dude, I just found out that Popeye's
22 delivers to my house through Grubhub and that there are
23 places in the U.S. where gas is under $1 a gallon."  Did
24 you write that?

Page 486

1    A.   No.  Actually, that was my -- my
2 sister-in-law who was living with us at the time.
3 Thought she was logged into her Facebook.
4    Q.   And who is your sister-in-law?
5    A.   Sophia.  I think she's --
6    Q.   And do you have --
7    A.    -- times on Facebook.
8    Q.   I'm sorry.  What's her name again?
9    A.   Sophia Garcia.
10    Q.   So you remember as you sit here today that on
11 January 18, 2016 Sophia was logged onto your Facebook
12 account on your computer and posted about Popeye's
13 delivering through Grubhub?  You remember that today?
14    MR. BEAUMONT: Object to form.
15 BY THE WITNESS:
16    A.   Yes, because she got in trouble for posting
17 on my Facebook account.  She posted a bunch of other
18 stuff that had been deleted.  I just forgot about
19 deleting that one.  She had posted pictures and a bunch
20 of other stuff that was on my Facebook but she thought
21 she was on hers.
22 BY MR. KIMREY:
23    Q.   Okay.  Let's go to 1440.
24    A.   What?

Page 487

1    Q.   Let's go to 1440.  At the bottom of this page
2 you posted:  "I just want to let you know how amazing my
3 husband is.  He never posts terrible Facebook statuses
4 for me no matter how many times he catches my account
5 open."  Do you see that?
6    A.   Yes.
7    Q.   Did you write that?
8    A.   Yes.
9    Q.   How does he catch your account open?
10    A.   At the time we each had our own computers.
11    Q.   So, in other words, you're talking about his
12 ability to just walk up to your computer and start
13 posting in your Facebook account as his computer?
14    A.   He also knows my user name and password.
15 He's my husband.  You're telling me your wife doesn't
16 know any of your user name and passwords?
17    Q.   But that's not that says.  He says -- this
18 says:  "He never posts terrible Facebook statuses for me
19 no matter how many times he catches my account open."
20    A.   Yeah.  It's -- he walks up to my computer and
21 I'm logged into Facebook.  It's not that difficult.
22    Q.   Okay.  Let's move on, next exhibit.  This is
23 at 237.  It will be marked as 41.  So this is part of
24 your production, and it says "Profile Information."  Is

47 (Pages 484 - 487)

Page 488

1 this, in fact, your profile information for Facebook?
2    A.   As far as I know.
3    Q.   Did you provide all of this information to
4 Facebook?
5        MR. BEAUMONT:  Object to form.
6 BY THE WITNESS:
7    A.   I don't know how they got my birth date.
8 Most of it's correct.
9 BY MR. KIMREY:
10   Q.   Did -- did you provide it to Facebook?
11   A.   I didn't give them my birth date.
12   Q.   Did you provide everything else to Facebook
13 that's --
14   A.   Yes.
15   Q.   -- depicted in this profile?
16   A.   Yes.
17   Q.   Okay.  Let's move on.  Next item, this is the
18 next exhibit.  It's going to be marked I think 41 or no,
19 42, and it's from folder 238.  It's the Profile Update
20 History.  So this indicates -- this is part of your
21 production, Ms. Lukis.  You can see Bates 1447 in the
22 lower right-hand corner.  And this is your Profile Update
23 History for Facebook.  Do you see that?
24   A.   Yes.

Page 489

1    Q.   And it shows that on October 18, 2018 you
2 provided cell phone number (312) 459-0876 to Facebook.
3 Do you see that?
4    A.   Yes.
5    Q.   Is that after you had the phone call with
6 your mom where your mom said she got the phone number
7 from Whitepages and Instant CheckMate?
8    A.   Yes.
9        MR. BEAUMONT:  Object to form.
10 BY MR. KIMREY:
11   Q.   So after your mom called you and told you
12 about finding out your number you then shared that number
13 with Facebook; is that right?
14   A.   Oh, no.
15       MR. BEAUMONT:  Object to form.
16 BY THE WITNESS:
17   A.   It was a -- I had a different phone number
18 that she had found on Instant CheckMate, and then I ended
19 up switching to that phone number when I switched
20 carriers.
21 BY MR. KIMREY:
22   Q.   What?
23   A.   That -- I've had -- I changed that to that
24 phone number after she called me and got a different

Page 490

1 phone number.  I just don't remember what that other
2 phone number was because I only had it for two weeks.
3    Q.   So when did you change the phone number (312)
4 459-0876?
5    A.   I got that in October, but in September I had
6 changed my phone number when I was on Sprint because we
7 left Virginia to come back to Chicago, and I had that
8 phone number about two weeks, and then she went and --
9 went and bought the profile information, got the new
10 phone number, and then I changed it again.  Even changed
11 carrier.
12   Q.   Okay.  You testified previously in your
13 deposition that the phone number that she obtained from
14 Whitepages and ICM is (312) 459-0876.  So are you saying
15 that that's not correct?
16       MR. BEAUMONT:  Form.
17 BY THE WITNESS:
18   A.   I'm getting confused.  Hold on.  Let me
19 think.  Let me see what phone number I had.  I don't
20 remember.  I'm confusing myself.  I don't know.  I can't
21 remember which phone number it was that -- I think it was
22 the 0876 that she called me on.  It's just -- I know I
23 had to change my phone number multiple times after we
24 left Virginia.

Page 491

1 BY MR. KIMREY:
2    Q.   But your current phone number on your cell
3 phone is (312) 459-0876; correct?
4    A.   Yes.
5    Q.   And do you know what date you obtained that
6 phone number on?
7    A.   I think sometime in -- sometime in October.
8 I don't remember the exact date.
9    Q.   October 2018?
10   A.   Yes.
11   Q.   Was it after -- was it after or before you
12 had the phone call with your mom where she said that she
13 obtained your number from Instant CheckMate and
14 Whitepages?
15   A.   I don't recall the exact date of the phone --
16 of the -- that I had the phone call with her.  You've got
17 me confused right now, and I'm -- I just need a second to
18 try and think.  I'm getting myself confused, and I don't
19 want to do that.
20       MR. KIMREY:  Can you reread my last question?
21           (Requested portion of the
22           record read.)
23       MR. BEAUMONT:  Object to the form of the
24 question.

48 (Pages 488 - 491)

Page 492

1 BY THE WITNESS:
2     A.   This is the -- this is the phone number that
3 she got. I got myself all confused. This is the phone
4 number she got from Instant CheckMate and Whitepages.
5 BY MR. KIMREY:
6     Q.   Okay. And after she got it from Instant
7 CheckMate and Whitepages allegedly you shared the phone
8 number with Facebook; right?
9     A.   It is only visible to people who are my
10 friends.
11    Q.   So once you shared the phone number with
12 Facebook it became visible to all of your friends; is
13 that right?
14        MR. BEAUMONT: Object to form.
15 BY THE WITNESS:
16    A.   To my friends, yes, but by that time, my
17 mother was already blocked. She couldn't get it.
18 BY MR. KIMREY:
19    Q.   Okay. Let's move onto Exhibit 43 which is
20 239. This exhibit I'm not going to -- I just want to
21 confirm that you produced it. It looks like that when
22 you print it out. It's about four inches thick, and at
23 the top you can see -- this is part of what you produced
24 on the eve of your first deposition session, and it's

Page 493

1 Account Activity. Do you see that?
2     A.   Yes.
3     Q.   So this is a log of all of your account
4 activity on Facebook. Do you have any reason to believe
5 that that is not the case?
6     A.   No.
7         MR. BEAUMONT: Object to form.
8
9 BY MR. KIMREY:
10    Q.   Okay. So this accurately reflects all of
11 your activity on Facebook; correct?
12        MR. BEAUMONT: Object to form.
13 BY THE WITNESS:
14    A.   That was the last time I logged into
15 Facebook, correct.
16 BY MR. KIMREY:
17    Q.   But this log accurately reflects all of your
18 activity on Facebook; correct?
19    A.   I don't know.
20        MR. BEAUMONT: Object to form.
21 BY THE WITNESS:
22    A.   I would assume so.
23 BY MR. KIMREY:
24    Q.   Do you have any reason to believe that this

Page 494

1 log does not accurately reflect all of your activity on
2 Facebook?
3         MR. BEAUMONT: Object to form.
4 BY THE WITNESS:
5     A.   It -- I would assume it records every time
6 that my Facebook profile has been activated, but, again,
7 I'm not the only person who knows how to get into my
8 Facebook account.
9 BY MR. KIMREY:
10    Q.   Okay. Who knows how to get into your
11 Facebook account besides you?
12    A.   My husband.
13    Q.   Who else?
14    A.   That's it.
15    Q.   Okay. Let's move onto the next exhibit.
16 This is 41, 2.41. This also was part of your production
17 on January 4th, and it shows authorized log-ins to your
18 account. Do you see that?
19    A.   Yes.
20    Q.   Okay. Do you have any reason to believe that
21 this does not accurately reflect the authorized log-ins
22 to your account?
23        MR. BEAUMONT: Objection --
24

Page 495

1 BY THE WITNESS:
2     A.   No.
3         MR. BEAUMONT: -- form of the question. Also,
4 objection to the form of the previous question.
5 BY THE WITNESS:
6     A.   Sorry. What was that?
7 BY MR. KIMREY:
8     Q.   So this shows all of the devices and browsers
9 you used and IP addresses to access your account. Do you
10 see that?
11    A.   I would guess so.
12    Q.   Okay. So all of these devices and browsers
13 are material to this litigation, and we want for all of
14 the browser history and all of the devices that are
15 depicted in this exhibit to be properly searched for
16 material that's relevant and proportional to the needs of
17 this case. So we make that request because it's our
18 understanding that you did not search any of these
19 devices, you know, related to this litigation.
20        Let's move onto the next exhibit.
21        MR. BEAUMONT: Counsel, I'd just like to note
22 that we're past ten minutes.
23        Should we go off the record and discuss
24 what additional --

49 (Pages 492 - 495)

Page 496

1    MR. KIMREY: Yeah, I've got a little bit more
2 on Facebook and then a little bit on LinkedIn, and then
3 I'm going to hold it open after that unless you just shut
4 it down and don't let me get through everything that's
5 material from the January 4th production.
6    THE WITNESS: Well, I do have --
7    MR. BEAUMONT: Can you provide an estimate as
8 to how much more you have?
9    MR. KIMREY: I'd say another ten minutes to
10 get through Facebook and LinkedIn.
11    MR. BEAUMONT: Let's take a quick break.
12    MR. KIMREY: Okay.
13    THE VIDEOGRAPHER: Going off the video record
14 at 1:52 p.m.
15         (WHEREUPON, a break was
16         taken.)
17    We are back on record at 2:03 p.m.
18    You may proceed.
19 BY MR. KIMREY:
20    Q.  Okay. So what's on the screen right now, Ms.
21 Lukis, has been marked as Exhibit 45. It's part of your
22 production from January 4th. It shows mobile devices
23 with which you've logged onto Facebook. And do you have
24 any reason to believe that this is not your mobile

Page 497

1 device?
2    A.  It looks like my --
3    MR. BEAUMONT: Object to form.
4 BY MR. KIMREY:
5    Q.  Does the LMQ720 look like your current cell
6 phone?
7    A.  Yes.
8    Q.  Okay. Next exhibit, this will be 46. And
9 it's 2.43. No, this is not the right one. That's the
10 right one. Okay. So this has been marked as 46. This
11 is a log from Facebook that you produced that shows where
12 you logged in from. Do you have any reason to believe
13 that this information is incorrect?
14    MR. BEAUMONT: Object to form.
15 BY THE WITNESS:
16    A.  Not to my knowledge.
17 BY MR. KIMREY:
18    Q.  Okay. Let's move onto the next exhibit.
19 This is going to be 47. It's at 245. I think we just
20 flashed it on the screen earlier. No, next. We're not
21 using that. It's at tab I believe 245. Yes. No, that's
22 not it. Keep going. Yes.
23    Okay. This was from your production on
24 January 4th, Ms. Lukis, related to LinkedIn, and LinkedIn

Page 498

1 apparently has this number (312) 459-0876. Did you
2 provide that number to LinkedIn?
3    A.  Yes.
4    Q.  Okay.
5    MR. BEAUMONT: Object to form.
6    MR. KIMREY: All right. So Mr. Beaumont wants
7 to do Redirect. You need to leave, Ms. Lukis, at 2:45 to
8 run next door or a few doors down to get your daughter.
9    I'm not done questioning you because of a
10 whole host of issues, but to accommodate Mr. Beaumont and
11 you given your need to pick up your child, I am handing
12 it over to Mr. Beaumont.
13    You know, I reserve the right to, you
14 know, respond to his Redirect, and I'm also going to hold
15 the deposition open because a lot of what you produced is
16 black boxes.
17    Mr. Beaumont, the e-mail that you just
18 sent to us just sent us black boxes again, so you can't
19 see what you sent us. It's all black boxes. And there
20 are a lot of things we've asked for that we haven't
21 gotten that we should have gotten before your deposition
22 even began.
23    So with that, I'm turning it over to Mr.
24 Beaumont.

Page 499

1    MR. BEAUMONT: And we're going to take another
2 quick break.
3    MR. KIMREY: Okay.
4    THE VIDEOGRAPHER: Going off the video record
5 at 2:06 p.m.
6         (WHEREUPON, a break was
7         taken.)
8    We are back on the record at 2:21 p.m.
9    You may proceed.
10    MR. BEAUMONT: Good afternoon, Ms. Lukis. I
11 just have a few questions for you.
12         CROSS EXAMINATION
13 BY MR. BEAUMONT:
14    Q.  Do you -- do you review the documents
15 that get filed in this case?
16    MR. KIMREY: Objection, vague.
17    MR. BEAUMONT: I'm sorry. Is Ms. Lukis there?
18    THE VIDEOGRAPHER: She is present on camera.
19    MR. BEAUMONT: Ms. Lukis, can you hear me?
20    THE VIDEOGRAPHER: Would you like to go off --
21    MR. TOTH: She might have her speakers down or
22 something.
23    THE VIDEOGRAPHER: All right. Let's go off
24 record. We are off record at 2:22 p.m.

50 (Pages 496 - 499)

Page 500

1          (Discussion had off the
2          record.)
3          We are back on the record at 2:23 p.m.
4          You may proceed.
5 BY MR. BEAUMONT:
6     Q.   Ms. Lukis --
7     A.   Yep.
8     Q.   -- do you review the filings that get filed
9 in this case?
10         MR. KIMREY:  Objection, vague, ambiguous, no
11 specification as to time frame.
12 BY THE WITNESS:
13    A.   Yes, I do.
14 BY MR. BEAUMONT:
15    Q.   And how do you do that?
16         MR. KIMREY:  Same objections, no specification
17 as to time frame.
18 BY THE WITNESS:
19    A.   On my computer I get them e-mailed and then
20 there's a shared drive that I can -- that I can access to
21 be able to look at them.
22 BY MR. BEAUMONT:
23    Q.   Is it your understanding that you may be
24 compensated for your work as a class representative

Page 501

1 should the case be successful?
2         MR. KIMREY:  Objection --
3 BY THE WITNESS:
4     A.   Yes.
5         MR. KIMREY:  -- inappropriate leading.  You
6 can't lead your own client.  That was a leading question.
7 It's improper, vague, ambiguous.
8
9 BY THE WITNESS:
10    A.   Yes, I am aware.
11 BY MR. BEAUMONT:
12    Q.   Were you sent the Complaint in this matter
13 before it was filed?
14    A.   The initial one --
15         MR. KIMREY:  Objection, vague, ambiguous.
16 BY THE WITNESS:
17    A.   The initial one I -- I don't have the stamp
18 on the top of it whether it was already filed before I
19 was sent it.  I think I received it before it was
20 actually filed.
21         MR. KIMREY:  Objection, inconsistent with
22 prior testimony.  I move to strike.
23 BY MR. BEAUMONT:
24    Q.   Do you understand how Illinois law defines

Page 502

1 the role of a manager of an LLC?
2         MR. KIMREY:  Objection, vague, ambiguous.
3 BY THE WITNESS:
4     A.   I don't know.  I mean no, I do not.
5 BY MR. BEAUMONT:
6     Q.   When -- when you were asked earlier in this
7 deposition if you were the manager of Evergreen Pest
8 Control, what was your understanding of the word manager
9 when you answered that question?
10    A.   I was --
11         MR. KIMREY:  Objection, vague, ambiguous,
12 calls for a legal conclusion.
13 BY THE WITNESS:
14    A.   I was the person on the LLC paperwork, and on
15 the LLC paperwork it lists manager.
16 BY MR. BEAUMONT:
17    Q.   Okay.  So when you were -- when you were
18 asked about whether you were a manager, your response was
19 no?
20         MR. KIMREY:  Objection, misleading,
21 mischaracterizes her testimony, asked and answered.
22 BY MR. BEAUMONT:
23    Q.   Do you recall that?
24         MR. KIMREY:  Objection --

Page 503

1 BY THE WITNESS:
2     A.   Yes.
3         MR. KIMREY:  -- misleading, mischaracterizes
4 her testimony, asked and answered.
5 BY MR. BEAUMONT:
6     Q.   I'm sorry, Ms. Lukis.  Did you answer the
7 question?
8     A.   Yes.
9         MR. KIMREY:  Objection, misleading,
10 mischaracterizes her testimony, asked and answered.
11         MR. BEAUMONT:  Whether she had answered.
12 BY MR. BEAUMONT:
13    Q.   And so when you -- when you said that you
14 were not the manager, what was your understanding of --
15 of the word manager when --
16    A.   My understanding was --
17         MR. KIMREY:  Objection, unintelligible.
18 BY THE WITNESS:
19    A.   My understanding --
20 BY MR. BEAUMONT:
21    Q.   You can go ahead, Ms. Lukis.
22         MR. KIMREY:  Same objection, vague, ambiguous,
23 unintelligible, asked and answered.
24 BY THE WITNESS:

51 (Pages 500 - 503)

Page 504

1    A.   Would you like for me to answer?
2  BY MR. BEAUMONT:
3    Q.   Yes, please.
4       MR. KIMREY:  Same objections.
5  BY THE WITNESS:
6    A.   The day-to-day management of the operation
7  was done by my husband.  I was not the manager who
8  handled any of the pest control side of it.  I was just
9  the manager on the LLC paperwork.
10  BY MR. BEAUMONT:
11    Q.   Have you had any motor vehicle infractions?
12       MR. KIMREY:  Objection, vague, ambiguous, no
13  specification to time frame.
14  BY THE WITNESS:
15    A.   Yes, I've gotten tickets for like not having
16  a driver's or not having -- a suspended license and
17  whatnot.
18  BY MR. BEAUMONT:
19    Q.   Do you remember -- do you remember every
20  single one of your motor vehicle infractions?
21       MR. KIMREY:  Objection, vague, ambiguous,
22  asked and answered, calls for speculation.
23  BY THE WITNESS:
24    A.   No, I don't.  I -- if you -- if I get a

Page 505

1  ticket for speeding, I pay it and send it off, and I
2  just -- I don't think about it after that.
3  BY MR. BEAUMONT:
4    Q.   How did you meet me, your lawyer, in this
5  case?
6       MR. KIMREY:  Objection.  You instructed her
7  not to answer when I asked her that question, and you
8  claimed that it was attorney/client privilege and work
9  product protected.  You're now asking her the exact same
10  question I asked her to elicit the testimony you barred
11  me from eliciting from her.  It's inappropriate, but you
12  can answer.
13  BY THE WITNESS:
14    A.   I answered an InstantCheck -- I'm sorry.  I
15  answered a Craigslist ad and was -- received an e-mail
16  response from -- I believe she was a paralegal.
17       MR. KIMREY:  Okay.  And I'd like to note we
18  would like that Craigslist ad produced to us immediately
19  as I've already noted before.
20  BY MR. BEAUMONT:
21    Q.   Earlier in this deposition you were asked
22  about whether you had used your current phone number to
23  send text messages, and it was a little bit unclear as to
24  what your response was, and so I would like to clarify

Page 506

1  the record.  I believe that your response was that you
2  quote -- you only really text with your husband and
3  mother-in-law.  And so I'd like you to tell me what you
4  meant by that.
5       MR. KIMREY:  Objection, asked and answered,
6  vague, ambiguous.
7  BY THE WITNESS:
8    A.   I -- the only -- if I need to get in contact
9  with someone, I call them.  I don't text back and forth.
10  The only reason I really get in text conversations with
11  my mother-in-law and my husband is regarding going and
12  doing something.  I do receive text messages spam all the
13  time, and if it counts, I respond to them to opt out and
14  I've -- I've texted my sister-in-law once with my new
15  phone number, and I have -- I have text messages between
16  me and Mr. Beaumont, but the rest of the text messages I
17  get are literally spam and most of the time in Chinese.
18  BY MR. BEAUMONT:
19    Q.   I'd like to switch now to -- Blaine, did you
20  introduce Bates numbers 281 to 113 -- no, I'm sorry --
21  1113, Plaintiff's Bates numbers 281 to 1113 as an exhibit
22  in the -- in this deposition?
23       MR. KIMREY:  That was one of the exhibits that
24  was just a series of black boxes, and I believe it was

Page 507

1  entered as Exhibit 26, but it shows nothing.  It's just a
2  series of black boxes.
3       And I just note for the record that you
4  e-mailed it to us again because you said that it wasn't a
5  series of black boxes, but your e-mail attached a PDF
6  that was, in fact, a series of black boxes.
7       MR. BEAUMONT:  I'd like to ask Mr. Toth to
8  pull up Exhibit 26, please.
9       MR. KIMREY:  Yeah, that's fine with me.  This
10  is Blaine Kimrey.
11       MR. BEAUMONT:  Mr. Toth, I ask you to scroll
12  down to Page 180.
13       MR. KIMREY:  I just note for the record that
14  I've never seen this before.  Is this the only page in
15  this entire exhibit that's not redacted?
16       MR. BEAUMONT:  Yes.  Yes.  And we were on
17  Bates number -- you can actually -- for whatever reason I
18  can't see the Bates number.  Mr. Toth, can you tell us --
19       MR. KIMREY:  It says -- I'll say it.
20       MR. BEAUMONT:  -- what the Bates number is?
21       MR. KIMREY:  It says Plaintiff's Bates Number
22  460.
23       MR. BEAUMONT:  Thank you.  It's cut off at the
24  bottom of my screen.

52 (Pages 504 - 507)

Page 508

1 MR. KIMREY: This is the first time I'm
2 actually seeing Plaintiff's Bates Number 460 which says:
3 "Your Off Facebook activity." What's weird is her
4 profile is actually blacked out on this.
5 So go ahead, Mr. Beaumont. And what I
6 mean by her profile is blacked out, her picture is a
7 black circle rather than her face.
8
9 BY MR. BEAUMONT:
10 Q. Ms. Lukis, in reviewing your Facebook records
11 we found a record of someone associated with your
12 computer visiting Whitepages last year. Can you explain
13 that?
14 A. My -- the computer that I'm using right now
15 is communal between me, my husband, my mother-in-law and
16 my sister-in-law, and I'm not always on it and I'm not
17 always here, so I don't know what everybody does when
18 they're on this computer.
19 MR. KIMREY: So just note for the record
20 because this is the first time I'm seeing this, and this
21 helps me process it, has a unique ID and event that says
22 page view and it was received on July 20th of 2020 at
23 7:16 p.m. and then it shows -- but how -- so I'm
24 confused. How can you -- wait. Okay. I see. Activity

Page 509

1 received from Whitepages.com, and it looks like this
2 shows three visits -- July 20th, 2020 at 7:16 p.m.,
3 July 20th, 2020 at 3:24 p.m. and December 6, 2019 at 5:18
4 a.m., and this is the first time I'm realizing that Ms.
5 Lukis' Facebook account reveals somebody through her
6 Facebook account visiting Whitepages on three occasions,
7 one in 2019, two in 2020, and incidentally neither one of
8 these or none of these refers to 2018.
9 THE WITNESS: This is from when -- my
10 computer -- this computer is logged into my Facebook
11 account. I didn't log into -- I wasn't logged in. My
12 husband --
13 BY MR. BEAUMONT:
14 Q. Ms. Lukis, I'd just like to say that at
15 present Mr. Kimrey is not questioning you. I believe
16 he's just making some observations.
17 A. Okay. I'll shut my mouth.
18 Q. -- out loud.
19 And so the -- it appears as though from this
20 that it is describing that you are or that Facebook is
21 receiving some activity concerning Whitepages on
22 July 20th of 2020 and December 6th of 2019. Do you see
23 that?
24 A. Yes.

Page 510

1 Q. Was this you?
2 A. No.
3 Q. Okay. And the last thing is -- that I'd like
4 to go over are some questions Mr. Kimrey asked you
5 previously concerning vampires and LARPing, and I'd like
6 to make clear that I withdrew my objections to those, and
7 so some of the questions were -- I've instructed you not
8 to answer. However, I would like to go through those --
9 go through those questions now and get answers to them.
10 A. Okay.
11 Q. And the -- the first question I see here
12 is -- that you were asked is: "How did you engage in
13 Vampire of the Masquerade -- when, where, who, why, how
14 and with whom?"
15 MR. KIMREY: Okay. This is highly unusual and
16 objectionable because you're now repeating the questions
17 verbatim that I asked her that you instructed her not to
18 answer on. That's not proper at all. I object to it.
19 You should stop. You can't go through and ask all the
20 questions that I asked that you improperly instructed her
21 to answer on. That is not routine --
22 MR. BEAUMONT: Yeah --
23 MR. KIMREY: -- in federal court.
24 MR. BEAUMONT: Yeah, I've withdrawn those

Page 511

1 objections, and so I think that -- I know -- then you and
2 I off the record talked about asking those questions, if
3 you would like to ask those questions now or if you would
4 like to --
5 MR. KIMREY: No. What I said was you need to
6 identify by page and line the objections you're
7 withdrawing so I can then evaluate whether I'm going to
8 pursue additional questioning of Ms. Lukis on the issues
9 that you're now withdrawing your inappropriate
10 instructions not to answer as to. And I'm not prepared
11 to do that until you identify by page and line what
12 instructions not to answer you're withdrawing. But you
13 are not entitled to go through and ask all the questions
14 I asked and deem that to be satisfactory to me when you
15 are the one who inappropriately instructed her not to
16 answer in the first place.
17 The proper course is for you to identify
18 by page and line what objections you're withdrawing and
19 what instructions not to answer you're withdrawing so
20 that I can then depose Ms. Lukis further on those issues
21 to which you inappropriately instructed her not to
22 answer.
23 MR. BEAUMONT: The questions that you asked
24 are found on Pages 162, lines 11 through 13; 164, lines 8

53 (Pages 508 - 511)

Page 512

1 to 9; 165, lines 3 to 4; 165, line 22; 166, lines 14 to
2 21.
3          MR. KIMREY: Anything else? Because you made
4 approximately 26 I think, give or take, instructions not
5 to answer that were inappropriate. Are those the only
6 ones that you're withdrawing?
7          MR. BEAUMONT: That's correct.
8          MR. KIMREY: Okay. I don't have her
9 transcript in front of me. I don't have those line and
10 page references. I'll need time to look at those to
11 figure out what I'm going to do next, and she has told us
12 that she has to leave by 2:45 Central, and that's two
13 minutes. And what I'm most interested in asking her
14 about at this moment is not her pretending to be a
15 vampire and engaging in LARPing but her Facebook account
16 indicating that she visited Whitepages in 2019 and 2020
17 which I just learned for the first time a few moments
18 ago, so that's what I'm going to spend my time on if I
19 have any more before she needs to pick up her daughter.
20          MR. BEAUMONT: Well, I'll turn the time
21 over to you, and you can ask the questions that you'd
22 like to ask.
23          MR. KIMREY: Okay. Please pull up Exhibit 26
24 at the page that reflected Bates 460.

Page 513

1          MR. BEAUMONT: I forgot what page that was.
2          MR. KIMREY: I don't know what page it is.
3          MR. BEAUMONT: It's 180. It's 180.
4          REDIRECT EXAMINATION
5 BY MR. KIMREY:
6     Q.   Okay. We're looking at Exhibit 26, Bates 460
7 which I saw for the first time today. The rest of this
8 exhibit is black boxes. We didn't recognize that there
9 was one single non-black box in the black boxes, and we
10 couldn't search it by Bates, so we hadn't seen Bates 460
11 until today. And what this appears to show is that
12 someone was inside of your Facebook account on your
13 computer, Ms. Lukis, and engaging in some kind of
14 activity on Whitepages.com. Who was that?
15    A.   I don't know. My Face -- my -- the computer
16 was logged into Facebook under my account, but I don't
17 know who did it. It could have been my mother-in-law, my
18 husband or my sister-in-law.
19    Q.   Did you ask your husband whether he did this?
20    A.   No.
21    Q.   Did you ask your --
22    A.   I didn't know about it --
23    Q.   -- mother-in-law whether she did this?
24    A.   No. I didn't know about it until today.

Page 514

1     Q.   Didn't you produce this?
2     A.   Yes, but I didn't look through every single
3 page of it.
4     Q.   Did you ask anybody whether they're
5 responsible for this activity?
6     A.   No.
7     Q.   Okay. So the most likely conclusion is that
8 you are responsible for it because it's in your Facebook
9 account and it was on your computer with --
10    A.   It is a shared computer.
11          MR. BEAUMONT: Object to form.
12 BY MR. KIMREY:
13    Q.   -- the password protected; right?
14          MR. BEAUMONT: Object to form.
15 BY THE WITNESS:
16    A.   It's a shared computer, so multiple people
17 could have been on it. I could have just left my
18 Facebook account open and somebody --
19 BY MR. KIMREY:
20    Q.   But you didn't bother asking anybody whether
21 they did, did you?
22    A.   I didn't know this -- I didn't know this was
23 there. I didn't go through every single page of the --
24 what was it -- a couple hundred megabytes of a file from

Page 515

1 Facebook.
2     Q.   Is it possible that you visited Whitepages
3 more than once?
4     A.   No, as I was instructed not to go onto the
5 website once the lawsuit began.
6     Q.   I'm not asking you about once the lawsuit
7 began. I'm asking you whether it's possible that at any
8 point in time you visited the Whitepages website more
9 than once.
10    A.   No. I went on it when --
11          MR. BEAUMONT: Object to form.
12 BY THE WITNESS:
13    A.   -- I found out about it.
14 BY MR. KIMREY:
15    Q.   What was the answer?
16    A.   I said no. I went on it when I found out
17 about it and got mad at it and walked away from it. I've
18 never gone back onto the website since.
19    Q.   Okay. So on July 20th, 2020 who had access
20 to your Facebook account?
21          MR. BEAUMONT: Object to form.
22 BY THE WITNESS:
23    A.   My husband, my mother-in-law and my
24 sister-in-law. They had access -- at any point they had

54 (Pages 512 - 515)

Page 516

1 access to this computer.
2 BY MR. KIMREY:
3    Q.   And at any point they had access to your
4 Facebook account?
5    A.   If I forgot to log out.
6    Q.   But don't you have a password on your
7 computer?
8        MR. BEAUMONT:  Object to form.
9 BY THE WITNESS:
10    A.   That the three of them know.
11 BY MR. KIMREY:
12    Q.   What's your mother-in-law's name?
13    A.   Arlene Elm or Garcia.  I'm not sure which one
14 it pulled up on her.
15    Q.   Okay.  We want to depose her right away,
16 Arlene Elm/Garcia.
17        What's your sister-in-law's name?
18    A.   Sophia Ramirez.
19    Q.   Sophia Ramirez.  We want to depose her right
20 away, and we also want to depose Paul right away because
21 we want -- so are those the only people who could have
22 engaged in this activity other than you on July 20th,
23 2020?
24    A.   They are the only people who would have

Page 517

1 access to this computer.
2    Q.   Okay.  What about on December 6, 2019, who
3 had the ability to log into your Facebook account and
4 access Whitepages through it?
5    A.   Like I said, if I left my computer -- left
6 the computer logged into Facebook, any activity for that
7 day would be logged in as under my Facebook account.
8    Q.   No, but who had access --
9    A.   My husband, my --
10    Q.   -- the same people?
11    A.   -- mother-in-law and my sister-in-law.
12    Q.   Anybody else?
13    A.   No.  They're the only ones who have access to
14 this computer.
15    Q.   You've realize that you've just made them
16 witnesses in this case and they're going to have to sit
17 for depositions in this case as to the issues of
18 arbitrability and class waiver?
19        MR. BEAUMONT:  Object to form.
20 BY MR. KIMREY:
21    Q.   Do you realize that?
22        MR. BEAUMONT:  Objection, calls for legal
23 conclusion.
24 BY THE WITNESS:

Page 518

1    A.   I don't understand what you're -- what you
2 mean.
3
4 BY MR. KIMREY:
5    Q.   So we have asserted in this case that you
6 agreed to arbitration of your claim and you agreed to
7 waiver -- to waive your right to proceed on behalf of the
8 class because of your activity related to the Whitepages
9 website, and we've now just learned that despite your
10 testimony that you visited the site only once that
11 Facebook has evidence of your computer accessing
12 Whitepages on at least three other occasions, and that is
13 relevant to arbitrability of your claim and whether you
14 can proceed for class relief.  And we need to get to the
15 bottom of who engaged in this activity including but not
16 limited to deposing your husband, your mother-in-law and
17 your sister-in-law but also sending a subpoena to
18 Facebook.  Do you understand that?
19    A.   Yes.
20        MR. BEAUMONT:  Object to form.
21 BY MR. KIMREY:
22    Q.   And are you -- despite that are you still
23 willing to proceed as a class representative in this
24 litigation?

Page 519

1    A.   Yes.
2        MR. BEAUMONT:  Object to form.
3
4        THE WITNESS:  And I've got to get going.
5        MR. KIMREY:  So I'm not finished, and I
6 understand you need to pick up your daughter, and that's
7 fine.  I understand picking up kids, but just two more
8 quick questions.
9 BY MR. KIMREY:
10    Q.   Have you ever searched for anyone's phone
11 number on line?
12        MR. BEAUMONT:  Object to form.
13 BY THE WITNESS:
14    A.   Like typing in their phone number trying to
15 find it or --
16 BY MR. KIMREY:
17    Q.   Yeah, trying to find it on the internet.
18    A.   No.  If I need somebody's phone number, I'll
19 ask them for it.
20    Q.   So you've never ever in your life searched
21 for someone's phone number on the internet?
22        MR. BEAUMONT:  Object to form.
23 BY THE WITNESS:
24    A.   I don't know.  I don't know.

55 (Pages 516 - 519)

Page 520

1 BY MR. KIMREY:
2    Q.   So it's possible that you did?
3    A.   I don't know what I've done over the past 20
4 years.
5    Q.   So it's possible that you did search for --
6       MR. BEAUMONT:  Object to form.
7 BY MR. KIMREY:
8    Q.   -- someone's phone number on the internet?
9 BY THE WITNESS:
10    A.   I don't know.
11 BY MR. KIMREY:
12    Q.   So I guess it's possible then.
13       Do you know any other members of the class by
14 name?
15       MR. BEAUMONT:  Object to form.
16 BY THE WITNESS:
17    A.   No.  I don't -- on all the forms I've seen
18 it's just my name.
19 BY MR. KIMREY:
20    Q.   Okay.  So you haven't seen anybody else
21 proposed to be a class representative in this case; is
22 that right?
23       MR. BEAUMONT:  Object to form.
24 BY THE WITNESS:

Page 521

1    A.   As far as I've seen, that's correct.
2
3 BY MR. KIMREY:
4    Q.   Okay.  Mr. Beaumont asked you how you met
5 him, and you said that you sent a message through
6 Craigslist and a paralegal called you.  What's the name
7 of the paralegal?
8    A.   Victoria.  I think her last name was LaTorre.
9    Q.   What happened next?
10    A.   I was sent the information.  I talked to -- I
11 talked to her about being a class representative, and
12 then I was sent all of the documentation over to -- to
13 the client -- the paperwork to get this started with me
14 as a client.
15    Q.   When did you first speak with Mr. Beaumont?
16    A.   I don't remember.  I'd have to go searching
17 my e-mail.
18       And I've -- I'm willing to pick this up again
19 on Tuesday or Wednesday so that way I don't -- my
20 mother's not late for work.
21       MR. KIMREY:  That's fine.  We are holding the
22 deposition open.  We reserve all rights.  We reserve our
23 objections, and we will consult with your counsel about
24 when we resume the deposition based on their schedule,

Page 522

1 our schedule and the various deadlines in the case.
2       So with that, you know, by all means, go
3 pick up your daughter.
4       And does anyone have anything else to say?
5       MR. BEAUMONT:  I'm sorry, Blaine.  I didn't --
6 can you repeat that?
7       MR. KIMREY:  I said does anyone else have
8 anything else to say.
9       MR. BEAUMONT:  Okay.  Okay.  I think we're
10 done.
11       MR. KIMREY:  Well, we're not done.  We're
12 holding it open, but we're suspending for today so Ms.
13 Lukis can go pick up her daughter.
14       With that, we can go off the record.
15       THE VIDEOGRAPHER:  We are going off the video
16 record at 2:53 p.m.
17       That concludes the testimony.  That's it.
18 Thank you, all.
19       MR. BEAUMONT:  She would like to read and
20 sign.
21
22
23
24

Page 523

1       SIGNATURE:
2 It was agreed by and between counsel and the parties that
3 the Deponent will read and sign the transcript of said
4 deposition.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

56 (Pages 520 - 523)

Page 524

```
 1  STATE OF ILLINOIS )
                      ) SS:
 2  COUNTY OF C O O K )
 3
         I, KELLY A. BRICHETTO, a Certified Shorthand
 4
    Reporter of said state, do hereby certify
 5
    that the within named witness, STEPHANIE LUKIS, was by me
 6
    first duly sworn to testify the truth, the whole truth
 7
    and nothing but the truth in the cause aforesaid; that
 8
    the testimony then given by the above-referenced witness
 9
    was by me reduced to stenotype in the presence of said
10
    witness; afterwards transcribed, and that the foregoing
11
    is a true and correct transcription of the testimony so
12
    given by the above-referenced witness.
13
         I do further certify that this deposition was
14
    taken at the time and place in the foregoing caption
15
    specified and was completed without adjournment.
16
         I do further certify that I am not a relative,
17
    counsel or attorney for either party or otherwise
18
    interested in the event of this action.
19
20
21
22
23
24
```

Page 525

```
 1        IN WITNESS WHEREOF, I do hereunto set my hand
 2  this 15th day of January, 2021.
 3
 4
 5
 6                  Kelly Brichetto
 7        KELLY A. BRICHETTO
 8        CSR License No. 84-3252
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 526

```
 1            Veritext Legal Solutions
                 1100 Superior Ave
 2                  Suite 1820
                Cleveland, Ohio 44114
 3              Phone: 216-523-1313
 4
    January 15, 2021
 5
    To: Mr. Beaumont
 6
    Case Name: Lukis, Stephanie  v. Whitepages, Inc.
 7
    Veritext Reference Number: 4397615
 8
    Witness:  Stephanie Lukis , VOL. II     Deposition Date:  1/13/2021
 9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24  NO NOTARY REQUIRED IN CA
```

Page 527

```
 1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 4397615
 3  CASE NAME: Lukis, Stephanie  v. Whitepages, Inc.
    DATE OF DEPOSITION: 1/13/2021
 4  WITNESS' NAME: Stephanie Lukis , VOL. II
 5  In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7  I have made no changes to the testimony
    as transcribed by the court reporter.
 8  _____
 9  Date            Stephanie Lukis , VOL. II
10  Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
    They have read the transcript;
13  They signed the foregoing Sworn
       Statement; and
14  Their execution of this Statement is of
       their free act and deed.
15
    I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17  _____
18  Notary Public
19  _____
    Commission Expiration Date
20
21
22
23
24
25
```

57 (Pages 524 - 527)

Page 528

1       DEPOSITION REVIEW
      CERTIFICATION OF WITNESS
2

     ASSIGNMENT REFERENCE NO: 4397615
3    CASE NAME: Lukis, Stephanie v. Whitepages, Inc.
     DATE OF DEPOSITION: 1/13/2021
4    WITNESS' NAME: Stephanie Lukis , VOL. II
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9     I request that these changes be entered
   as part of the record of my testimony.
10

    I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
   that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
   Date        Stephanie Lukis , VOL. II
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
   the referenced witness did personally appear
16  and acknowledge that:
17     They have read the transcript;
    They have listed all of their corrections
18      in the appended Errata Sheet;
    They signed the foregoing Sworn
19      Statement; and
    Their execution of this Statement is of
20      their free act and deed.
21    I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23  _____
    Notary Public
24
25    Commission Expiration Date

Page 529

1       ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 4397615
3  PAGE/LINE(S) /     CHANGE    /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
  _____   _____
20  Date        Stephanie Lukis , VOL. II
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
    Notary Public
24
25  _____
    Commission Expiration Date

58 (Pages 528 - 529)

**0**

00001   423:19
000023   311:18
04871   303:7
0876   472:8 490:22

**1**

1   312:3 313:16
   331:2 389:10
   410:23 411:12,13
   485:23
1,000   415:15
1/13/2021   526:8
   527:3 528:3
10   329:17 390:16
   390:17 394:22,23
   394:24
10,000   328:13
100   312:21
100,000   334:20
107   304:4
10:01   329:21
10:06   333:20
10:07   335:13
10:08   335:16
10:09   336:11,14
   337:14
10:10   337:17
10:11   339:4
10:12   339:8 340:6
10:13   340:9
10:16   343:16,19
10:18   345:23
   346:2
10:20   347:11
10:22   347:14
10:29   355:13,16
10:32   358:19,22
10:33   360:3,6
10:42   369:13

10:43   369:16
10:50   377:4
10:51   377:7
10:56   381:14
11   308:20 393:18
   399:13,17 511:24
11.2.   311:18
11.3   313:7
1100   526:1
1113   412:4 506:21
   506:21
1114   473:21
1114-1153   306:14
113   506:20
1153   473:21
1154   449:24
1155   451:4
1156   451:22
1162   306:12
   456:12
11:02   381:17
11:05   384:13
11:09   384:16
11:11   386:10
11:13   386:13
11:16   388:22
11:17   389:1
11:18   432:17
11:19   390:20
11:22   390:23
11:24   392:22
11:42   393:1
11:54   402:10,13
12.10   316:4
121   317:12
1231   459:20
1233   461:19,19
1234   463:9
1235   464:14
1236   465:2

1238   465:6,6
1239   465:18
1240   466:1,1
1242   466:3
1247   467:8
12498   525:6
1251   467:17
1257   468:1
1259   468:10
1261   468:24
12:02   409:20
12:06   409:24
12:11   413:21
12:14   413:24
12:24   423:11
12:25   423:14
12:51   456:5
12:59   456:8
13   402:4,24 403:3
   511:24
1360   474:18,18
13th   303:16 307:2
14   340:22 341:1,7
   512:1
1407   477:9,24
1421   478:18,18
1428   481:15,15
1430   485:19
1440   486:23 487:1
1447   488:21
15   392:14 526:4
15th   525:2
162   511:24
164   511:24
165   512:1,1
166   512:1
17   463:11
18   306:3 308:20
   412:2 486:11
   489:1

180   507:12 513:3,3
1800   331:2 415:11
1820   526:2
19   306:3 317:13
   459:22
1:19   303:7
1:26   477:16
1:27   477:19
1:32   482:15
1:34   482:18
1:36   484:12
1:41   484:15
1:52   496:14

**2**

2   312:8 313:17
   382:22 412:1
2,000   331:1
2.19.   414:4
2.37   477:8
2.41.   494:16
2.43.   497:9
2.52.   386:7
2.9   306:3
20   306:4 379:5
   520:3 527:16
   528:22 529:22
2010   468:24
2015   459:6,8
2016   458:21
   465:19 486:11
2017   432:17 435:7
   436:1 441:1
   442:13 446:18
   463:11
2018   400:11
   453:15,23 454:6
   454:13 489:1
   491:9 509:8
2019   451:12 509:3
   509:7,22 512:16
   517:2

**2020** 459:22
508:22 509:2,3,7
509:22 512:16
515:19 516:23
**2021** 303:17 307:3
385:1 386:1 389:5
410:15 525:2
526:4
**209** 304:5
**20th** 453:23 454:6
454:13 465:12
508:22 509:2,3,22
515:19 516:22
**21** 306:4 381:21
512:2
**216-523-1313**
526:3
**22** 306:5 386:17
403:8 512:1
**220** 423:5,17 425:9
425:10
**2205** 389:11
410:24
**221** 425:14
**222** 304:10
**223** 427:18
**225** 449:19
**227** 459:16
**228** 469:23
**229** 470:9
**22nd** 432:17
**23** 306:6 386:19
**230** 471:19
**231** 473:19
**234** 474:5
**235** 475:22
**237** 477:7 487:23
**238** 488:19
**239** 492:20
**23rd** 435:7 436:1
441:1 446:18

**24** 306:7 308:11
389:3 394:21
410:17 411:10,15
**245** 497:19,21
**25** 306:8 410:4
**26** 306:9 412:1
507:1,8 512:4,23
513:6
**27** 306:9 414:3,12
442:13
**27th** 465:12
**28** 306:10 423:5,16
425:9,11,12
**281** 412:3 506:20
506:21
**281-1113** 306:9
**29** 306:10 425:15
**2:03** 496:17
**2:06** 499:5
**2:21** 499:8
**2:22** 499:24
**2:23** 500:3
**2:45** 498:7 512:12
**2:53** 522:16

**3**

**3** 312:9,14 425:18
475:22 512:1
**3.4.** 309:16
**30** 306:11 393:21
427:18
**304** 305:2
**306** 305:4
**308** 305:7 306:3
**31** 306:11 449:20
**312** 304:11 472:8
489:2 490:3,14
491:3 498:1
**317** 306:3
**32** 306:12 456:12
**33** 306:12 459:16

**34** 306:13 469:23
**35** 306:13 470:9
**36** 306:14 471:19
**37** 306:14 473:19
**379** 306:4
**38** 306:15 474:6
**381** 306:4
**386** 306:5,6
**389** 306:7
**39** 306:15 475:23
**3:24** 509:3
**3rd** 468:24

**4**

**4** 312:10,14 512:1
**40** 306:16 477:8,23
**41** 306:16 487:23
488:18 494:16
**410** 306:8
**412** 306:9
**414** 306:9
**42** 306:17 488:19
**423** 306:10
**425** 306:10
**427** 306:11
**43** 306:17 492:19
**4397615** 526:7
527:2 528:2 529:2
**44** 306:18
**44114** 526:2
**449** 306:11
**45** 306:18 496:21
**456** 306:12
**459** 306:12
**459-076** 472:8
**459-0876** 489:2
490:4,14 491:3
498:1
**46** 306:19 497:8,10
**460** 402:19,21
406:10,12,19,23
412:3 413:3

507:22 508:2
512:24 513:6,10
**469** 306:13
**47** 306:19 497:19
**470** 306:13
**471** 306:14
**473** 306:14
**474** 306:15
**475** 306:15
**476-2866** 432:16
**477** 306:16
**48** 308:12
**480** 400:19,21
401:7,13,21,22
402:17,20 412:3
413:3
**487** 306:16
**488** 306:17
**492** 306:17
**494** 306:18
**496** 306:18
**497** 306:19,19
**499** 305:8
**4:44:32** 410:7
**4th** 386:1 389:5
390:7,13 410:6
411:23 474:8
484:5 494:17
496:5,22 497:24

**5**

**5** 353:18
**513** 305:9
**52** 427:20
**52-64** 306:11
**525** 305:11
**53** 428:16,17
**54** 428:24,24
431:22,23
**55** 432:9
**56** 434:4,8,8

**[57 - actual]**

**57** 435:1,1
**58** 435:20,20
436:23
**5th** 385:1 410:11
410:15 414:7

**6**

**6** 509:3 517:2
**60** 440:5
**60601** 304:11
**60605** 304:5
**609-7500** 304:11
**61** 443:23
**63** 446:12,12
**64** 427:20
**65** 471:20
**68** 442:7
**6nfmq** 467:14
**6th** 509:22

**7**

**703** 432:16
**773** 304:6
**7:16** 508:23 509:2

**8**

**8** 391:1 402:3
511:24
**831-8000** 304:6
**84-3252** 303:15
525:8
**847** 440:20

**9**

**9** 402:3 512:1
**9:30** 303:17
410:10,14
**9:31** 307:2
**9:33** 309:3
**9:34** 309:6
**9:44** 317:7,10
**9:49** 321:3

**9:51** 321:6
**9:53** 322:16
**9:54** 322:19
**9:57** 325:18,21
**9:58** 327:20
**9:59** 327:23

**a**

**a.m.** 303:17 307:2
309:3,6 317:7,10
321:3,6 322:16,19
325:18,21 327:20
327:23 329:18,21
333:17,20 335:13
335:16 336:11,14
337:14,17 339:4,8
340:6,9 343:16,19
345:23 346:2
347:11,14 355:13
355:16 358:19,22
360:3,6 369:13,16
377:4,7 381:14,17
384:13,16 386:10
386:13 388:22
389:1 390:20,23
392:22 393:1
402:10,13 410:10
410:14 509:4
**abi** 459:21 460:6,7
460:10,11 476:18
**abi's** 460:9
**ability** 308:12
487:12 517:3
**able** 319:7 355:8
388:18 401:4
404:22 405:3,10
424:2 478:16
483:14,16,19
500:21
**absolutely** 368:2
**abuses** 454:2

**abusive** 320:11
**ac** 467:21
**accept** 375:9
**access** 312:8,9,22
334:23 370:4,18
396:20 403:4
404:6 405:11
406:3,20 407:19
409:5,7 430:13
433:8,10,19
470:21 479:15
495:9 500:20
515:19,24 516:1,3
517:1,4,8,13
**accessible** 373:13
404:2,3
**accessing** 370:16
378:18 382:9
518:11
**accident** 326:15
326:16
**accidents** 356:10
**accommodate**
498:10
**account** 306:17
312:10 318:11
319:19 371:15
373:13 375:3,24
377:10,13 380:16
384:9 389:18,19
390:1,6,11 391:5,7
391:9,12,15,17,19
391:21,23 392:2,4
392:6,11 414:12
419:8 424:12
433:2,5,21,24
450:13 452:10
454:13 471:24
472:1,2,6 473:8
478:14 483:2,3,10
483:10,13,23

**486:12,17 487:4,9**
487:13,19 493:1,3
494:8,11,18,22
495:9 509:5,6,11
512:15 513:12,16
514:9,18 515:20
516:4 517:3,7
**accounts** 391:2
392:9,17 429:24
**accurately** 310:5
312:23 314:2
319:10 326:19
328:15 331:3
333:2 334:5 341:3
346:11 367:8
382:12 386:4
396:10 403:9
407:11 411:22
493:10,17 494:1
494:21
**acknowledge**
527:11 528:16
**acon** 339:15
**acquisitions**
380:20
**act** 527:14 528:20
**action** 312:1 319:5
524:18
**actions** 314:19
325:13 371:15
**activated** 494:6
**actively** 476:21
**activity** 306:17
393:12 493:1,4,11
493:18 494:1
508:3,24 509:21
513:14 514:5
516:22 517:6
518:8,15
**actual** 313:14

**ad** 505:15,18
**add** 366:21 428:5
**added** 405:1 428:3
430:17 478:16
**additional** 378:20
405:1 453:4
454:17 483:1,8
484:22 485:1
495:24 511:8
**additionally**
370:15
**address** 352:13
358:2 383:21,23
402:21 427:23
433:21 445:17
451:11 478:24
479:18 480:6
526:15
**addressed** 376:15
**addresses** 418:6
495:9
**adequacy** 351:15
**adequate** 399:24
**adjournment**
524:15
**ads** 414:19 415:17
416:10 417:6
421:21
**adult** 339:16
**advantages** 479:3
**advertise** 419:2,22
420:8
**advertisements**
403:7
**advertisers** 414:18
414:19 416:9,10
417:2,6 421:21
**advertising** 384:7
415:2 417:10,18
418:19 419:19
420:16 421:5

422:4
**advice** 336:21
337:4 361:16
364:8
**advised** 312:17
327:12
**affixed** 527:15
528:21
**aforesaid** 524:7
**afternoon** 409:23
499:10
**age** 403:6 465:13
**agents** 380:20
**aggregate** 312:18
**ago** 318:22,24
321:11,13 323:20
324:5 344:11
345:19,19 353:15
353:17 355:4
361:12 362:17,22
362:24 390:4
459:13 466:14
480:2 481:1
512:18
**agree** 313:1,8,21
313:22 314:5,13
316:8,16 369:21
370:9,17,17,19
371:7,19 372:2,7
372:10,14 373:5
374:6,10,15,16,21
377:20 378:10,23
379:18 380:24
382:11,14 383:7
395:8 408:12
457:5
**agreed** 310:10,16
316:24 352:18
353:2 370:13
373:20 378:3
394:5 407:23

518:6,6 523:2
**agreeing** 378:19
**agreement** 313:18
313:24 316:5
369:18 370:3
385:8,10,12,13
**ahead** 371:1
411:17 503:21
508:5
**ahold** 439:14
**air** 368:19 467:20
**airport** 368:17,22
**airports** 368:5,7
**al** 307:6
**allegations** 314:22
315:2
**alleged** 315:21
403:8 409:9
**allegedly** 398:21
413:2 492:7
**allow** 375:13,14
394:15 424:2,6,8
433:21 452:8
457:9 483:22
484:1
**allowed** 376:23
424:20
**allows** 333:24
**alpha** 415:15
**alteration** 312:10
**amazing** 487:2
**ambiguous** 500:10
501:7,15 502:2,11
503:22 504:12,21
506:6
**amended** 404:15
404:16,20,24
405:6,13,21
**amount** 312:21
**android** 429:14,17

**answer** 314:9
315:5,14 316:12
316:20 322:10
337:2 342:10
343:8 351:12,15
357:16 363:18
393:7,22 394:4,16
394:17 398:20
418:10 422:10
469:12 503:6
504:1 505:7,12
510:8,18,21
511:10,12,16,19
511:22 512:5
515:15
**answered** 424:17
502:9,21 503:4,10
503:11,23 504:22
505:14,15 506:5
**answers** 510:9
**anxiety** 350:21
353:8,12,16,23
355:24
**anya** 446:12
453:22
**anybody** 310:18
324:18 332:3
365:3,11,15
407:19 425:3
431:20 471:4
478:8 514:4,20
517:12 520:20
**anymore** 358:3
459:5
**anyone's** 519:10
**apartment** 330:20
**apis** 370:5
**apocalypse** 466:4
**apologize** 424:16
**app** 382:10

**apparently** 330:18
366:13 472:5
498:1
**appear** 477:12
527:11 528:15
**appearances**
304:1 305:2
**appeared** 428:9
**appears** 478:2
509:19 513:11
**appended** 528:11
528:18
**applicable** 378:20
**applies** 370:4
**appropriate** 342:5
342:15 343:1
**approximately**
318:21 412:8
512:4
**apps** 306:11 370:5
450:2,7,17 454:23
456:19,20,24
457:19
**april** 330:14
340:23
**arbitrability**
517:18 518:13
**arbitrable** 316:17
317:1
**arbitrate** 316:6,16
379:18
**arbitration** 317:1
379:24 518:6
**area** 359:19
440:18,20
**areas** 394:15
470:13
**arises** 313:15
**arising** 312:3,19
314:23

**arlene** 516:13,16
**arrangement**
330:22
**articles** 470:1
**asap** 340:17
388:14
**aside** 423:20
**asked** 384:1 395:7
399:6 424:23
484:22 498:20
502:6,18,21 503:4
503:10,23 504:22
505:7,10,21 506:5
510:4,12,17,20
511:14,23 521:4
**asking** 332:15
387:12 420:11
505:9 511:2
512:13 514:20
515:6,7
**asks** 398:18
**asserted** 518:5
**asshole** 469:3
**assignment** 527:2
528:2 529:2
**assist** 483:15
**associated** 382:10
508:11
**assume** 313:18
314:17 334:8
340:15 343:5,10
343:13 345:6
370:22 371:11
404:6 430:20
470:17 474:10,16
493:22 494:5
**assumed** 427:3
**assuming** 341:16
**assumption**
396:23 404:9
427:5

**ate** 367:7
**attach** 409:3
**attached** 385:7
386:22 507:5
528:7
**attaches** 385:12,13
385:14
**attorney** 342:23
387:20 388:9
401:11 403:18,23
404:22 405:17
406:17 412:21
473:15 505:8
524:17
**attorneys** 313:11
406:22
**audited** 340:18
**august** 330:22
453:23 454:6,13
**aunts** 348:17
349:3
**aurelio's** 450:4
**authorize** 528:11
**authorized** 420:6
494:17,21
**automatically**
372:1
**autumnsilver**
317:15 318:12
319:18,23 324:13
324:18,20 328:7
**available** 318:12
321:23 323:7
326:4,7 328:23
329:4,10 479:2,9
479:19 480:7
**ave** 526:1
**avitar** 317:18,20
318:2,5,6
**aware** 318:11
321:22 323:6

325:11 326:7
329:4,10 338:23
339:23 356:18
357:9 358:5
359:10 361:1
366:6 389:13
395:19 399:13
400:21 406:12
501:10
**awhile** 382:1
390:2 468:12

**b**

**back** 307:2 309:6
317:10 318:20
321:6 322:19
325:21 326:16
327:23 329:21
333:20 335:16
336:14 337:17
339:8 340:9
343:19 346:2
347:14 355:16
358:22 360:6
366:19 367:2
369:16 371:2
377:7 381:17
384:16 385:11,17
386:13 389:1
390:23 393:1
400:16 402:13
409:23 413:24
423:6,14 426:13
439:14 453:15
456:8 458:6 459:6
459:8 469:14
477:19 482:18
484:15 490:7
496:17 499:8
500:3 506:9
515:18 526:15

| | | | |
|---|---|---|---|
| **backwards** 412:11 | 311:1,7,13 313:3 | 378:12,24 379:10 | 449:15 450:9,21 |
| **bad** 366:16 | 314:6,15 315:3,12 | 379:20 381:2 | 451:16,24 452:7 |
| **barely** 350:5 | 315:22 316:10,18 | 382:15 383:9,13 | 452:11,14 453:10 |
| 481:11 | 317:2,21 318:14 | 384:20 387:4,14 | 454:18 455:6,17 |
| **barred** 505:10 | 319:20 320:8,18 | 388:4,7 393:3,5 | 455:24 456:3 |
| **base** 396:23 | 321:18 322:1,5 | 394:18 396:2,18 | 457:3,7,14,21 |
| **based** 404:9 412:6 | 323:9,13 324:15 | 397:7,15,23 | 458:19,24 459:11 |
| 427:5,12 521:24 | 324:23 325:6,15 | 398:11 399:9,15 | 460:1,15,21 461:5 |
| **basement** 461:21 | 326:9,23 327:6,16 | 400:8,24 401:14 | 461:15 463:3,13 |
| 462:2 | 329:2,6,12 330:2 | 402:6,14,16 | 463:21 465:23 |
| **basically** 330:16 | 331:9,16,22 332:9 | 403:15 404:4 | 469:18 470:19,23 |
| 389:18 | 332:13 333:7,14 | 405:7,15 406:14 | 471:8 472:13 |
| **basis** 403:12 453:2 | 334:9,12 336:2,5 | 406:24 407:15 | 475:4,10 477:3 |
| 469:12 | 336:22 337:9 | 408:3,24 410:20 | 478:10 479:7,12 |
| **bates** 306:9,11,12 | 338:15,18 339:1 | 411:5 412:13,18 | 480:14 482:3,10 |
| 306:14 308:20 | 339:19 340:1 | 413:18 415:5,22 | 482:20 483:7,21 |
| 309:10,15 311:17 | 341:5,9,20,23 | 416:1,16,24 | 484:1,7,20 486:14 |
| 389:10 400:19 | 342:8,19 343:6 | 417:11,20 418:2 | 488:5 489:9,15 |
| 401:4,17 402:17 | 344:4,21 345:10 | 418:13,20 419:4 | 490:16 491:23 |
| 402:18 404:19 | 346:13,18,23 | 419:13,23 420:9 | 492:14 493:7,12 |
| 405:9,11,11,23 | 347:5,7,16 348:4 | 420:19 421:7 | 493:20 494:3,23 |
| 406:1,2,9,20 | 348:15,22 349:5 | 422:6,16 424:14 | 495:3,21 496:7,11 |
| 410:23 411:11,13 | 349:11,19,22 | 425:6 426:10,21 | 497:3,14 498:5,6 |
| 412:3,3,3 413:2 | 350:12,19 351:3,9 | 427:7,15 428:11 | 498:10,12,17,24 |
| 423:19 425:18 | 351:22 352:20 | 429:8,11,19 430:7 | 499:1,10,13,17,19 |
| 427:20 428:17,24 | 353:3,10 354:1,6 | 430:11,23 431:8 | 500:5,14,22 |
| 431:23 434:8 | 355:20 356:2,16 | 431:18 432:7,19 | 501:11,23 502:5 |
| 435:1,20 446:12 | 356:20 357:5,10 | 432:23 433:12 | 502:16,22 503:5 |
| 449:24 451:22 | 357:21 358:6,13 | 434:14,19 435:8 | 503:11,12,20 |
| 456:12 461:19 | 359:8,24 360:20 | 435:14,18 436:5,8 | 504:2,10,18 505:3 |
| 463:9 465:6 466:1 | 361:2,17 362:11 | 436:17,21 437:9 | 505:20 506:16,18 |
| 471:20 473:20 | 363:9,16,24 | 437:12,18 438:5,9 | 507:7,11,16,20,23 |
| 474:17 477:9,24 | 364:11,17 365:4 | 438:13,21 439:3,9 | 508:5,9 509:13 |
| 478:18 481:15 | 365:17 366:4,8,23 | 439:20 440:13 | 510:22,24 511:23 |
| 488:21 506:20,21 | 367:11,19 368:3 | 441:5,11,15,18 | 512:7,20 513:1,3 |
| 507:17,18,20,21 | 368:13 369:2,23 | 442:2,17,23 | 514:11,14 515:11 |
| 508:2 512:24 | 370:10,20 371:9 | 443:15,18 444:10 | 515:21 516:8 |
| 513:6,10,10 | 371:20 372:3,17 | 444:17 445:1,22 | 517:19,22 518:20 |
| **beaumont** 304:3,4 | 373:2,7,16,22 | 446:3,8,24 447:5 | 519:2,12,22 520:6 |
| 305:8 306:7,8 | 374:8,17,23 | 447:13,20 448:3 | 520:15,23 521:4 |
| 309:21 310:12,19 | 375:18 377:17,21 | 448:11,19 449:5 | 521:15 522:5,9,19 |

526:5
**beaumontcostal...**
304:6
**began** 498:22
515:5,7
**beginning** 330:14
360:16 414:6
430:16 473:8
**begins** 307:4
335:20 337:19
340:11 343:21
356:6,23 358:24
360:8 361:8,24
365:21 368:6
374:3,15 389:4
**behalf** 303:4 304:2
304:8 456:21
457:1,19 518:7
**belief** 396:24
397:4
**believe** 346:10
378:5 389:17
397:5 402:16
404:18 405:13
411:2,21,24
423:17 433:1
461:13 470:5,15
476:6 479:21
493:4,24 494:20
496:24 497:12,21
505:16 506:1,24
509:15
**believes** 414:24
**bells** 400:3
**benjamin** 434:6
**best** 476:16
**better** 332:24
404:6
**beyond** 392:13
405:21

**bill** 479:2,19 480:7
**bills** 330:12,13
**binge** 360:10
**bingoblitz** 458:8
458:10
**biological** 356:9
**bipolar** 350:22,24
351:7,18,21
353:23 354:4
355:18
**birth** 488:7,11
**birthday** 357:24
**bit** 367:7 477:21
496:1,2 505:23
**bkimrey** 304:12
**black** 387:13,20
400:21 406:13
412:12,12,12
413:15 473:22,23
474:3 498:16,18
498:19 506:24
507:2,5,6 508:7
513:8,9,9
**blacked** 508:4,6
**blagh** 450:6,6,6
**blaine** 304:9
308:22 379:4
402:6 452:7
506:19 507:10
522:5
**blocked** 433:9
463:15 492:17
**blown** 337:24
**blowup** 394:21
**bone** 461:20 462:1
462:4
**books** 408:17
427:24
**boot** 466:7,10,15
466:20

**boots** 431:4,10,12
431:20
**born** 465:17
**bother** 514:20
**bottom** 359:3
372:21 387:7
428:18 434:9
436:23 445:13
449:24 468:10
481:8 485:20
487:1 507:24
518:15
**bought** 367:5
417:14 490:9
**bound** 370:17
**box** 318:22 400:21
406:13 412:12,12
412:12 445:21
485:14 513:9
**boxer** 445:19
**boxermatt** 445:17
**boxes** 473:22,23
474:3 498:16,18
498:19 506:24
507:2,5,6 513:8,9
**breach** 313:17
315:21
**breached** 311:5
**break** 393:6 456:1
456:6 484:9,13
496:11,15 499:2,6
**brian** 349:24
350:4 474:20
**brichetto** 303:15
524:3 525:7
**briefly** 393:5
**broken** 364:16
**brother** 445:15,16
**brought** 367:5
**browser** 375:11
395:22 408:12

495:14
**browsers** 396:7
495:8,12
**browsing** 406:8
407:7,8
**buddies** 458:12
**building** 467:21
**bullet** 372:23
373:11
**bumble** 450:5
**bunch** 376:9
389:15 455:10
486:17,19
**burdensome**
395:12 396:9
407:9
**business** 365:14
**busted** 328:19
**busy** 388:14
**button** 452:21
**buy** 409:4
**buys** 416:5

**c**

**c** 304:9 465:12
524:2
**ca** 526:24
**call** 333:12 365:11
394:18 439:19
489:5 491:12,16
506:9
**called** 303:12
308:3 318:3
330:18 466:4
489:11,24 490:22
521:6
**calls** 315:22
316:10,18 318:5
327:6 336:24
341:9,23 342:8,19
343:6 361:17
363:24 364:11,18

365:17 369:23
370:10 377:21
378:12,24 379:21
381:2 383:9,13
404:1 422:6
502:12 504:22
517:22
**camera** 388:10,15
412:6 499:18
**cameras** 366:20
**capability** 407:10
**caption** 474:19
524:14
**capturing** 368:24
**car** 326:15 361:21
362:8 363:4,11,20
**card** 330:14,19
409:5 479:1,18
480:6
**care** 429:1 430:5
**careful** 321:13
478:23
**carrier** 490:11
**carriers** 489:20
**cars** 362:1,5,20,21
363:2,4,12,21
**case** 307:6 309:10
315:2,10 320:3
351:16 358:11
376:2,6,11 386:23
387:5 389:14
391:24 395:11
399:24 400:1,5
404:17 408:1,13
409:10,16,17
410:14 411:4,10
411:13 413:4,11
414:15 469:5,8
471:6,13 472:24
473:4 485:11
493:5 495:17

499:15 500:9
501:1 505:5
517:16,17 518:5
520:21 522:1
526:6 527:3 528:3
**catch** 487:9
**catches** 487:4,19
**categories** 372:1
**cause** 310:2 524:7
**caused** 312:5
355:18,24 447:10
**causing** 354:19
**ceiling** 368:20,22
**cell** 309:17 379:9
379:12,15 426:2,4
426:7,12,18
429:14,17 430:14
433:11 444:12,15
444:21 472:7
482:6 485:14
489:2 491:2 497:5
**central** 410:15
512:12
**certificate** 305:11
528:11
**certification** 527:1
528:1
**certified** 303:15
307:9 524:3
**certify** 524:4,13
524:16
**cetera** 366:16
380:20 413:13
450:6 464:4
473:11
**change** 319:4
376:8,10,14,21
404:20 444:2
490:3,23 526:13
526:14 528:8
529:3

**changed** 320:15
375:12 404:23
489:23 490:6,10
490:10
**changes** 526:12
527:7 528:7,9
**character** 462:15
462:21,24 466:11
466:12,16 467:4,6
467:7
**characters** 348:8
462:3 463:6
**charge** 330:19
380:7 452:24
453:3 454:17
**check** 319:1 334:2
405:10
**checked** 396:7
**checkmate** 320:17
325:12 489:7,18
491:13 492:4,7
**cheesecake** 323:19
323:21,24 324:3,6
324:9
**chicago** 303:21
304:5,11 352:11
355:5 363:22,22
438:18 439:11
466:4 490:7
**chicagoans** 361:14
**chicagoland**
440:18,20
**child** 339:16
340:19 498:11
**chinese** 506:17
**chipped** 326:17
**choices** 375:5,6,8
**choose** 317:20
424:2 479:4
**chris** 476:18

**christ** 332:19
**christmas** 338:2
357:24 481:13
**chrome** 454:10
**chucksondick**
360:15
**chunk** 326:17
**circle** 508:7
**circular** 404:11
**city** 319:2 362:4,7
362:8,20,21 363:2
363:6,7,22 364:6
403:6
**civil** 303:13
409:14 527:5
528:5
**cl** 382:11
**claim** 313:14
316:17 317:1
342:6,16 343:2
518:6,13
**claimed** 342:17
505:8
**claiming** 340:3
**claims** 313:10
315:20 393:24
403:13
**clarification**
387:14
**clarify** 505:24
**class** 319:5 320:3
325:13 351:16
399:24 409:9,15
462:5,6 500:24
517:18 518:8,14
518:23 520:13,21
521:11
**clause** 317:1
**clear** 347:16
448:15 485:1
510:6

clearly 399:23
409:12,13
cleveland 526:2
client 387:20
388:9 501:6 505:8
521:13,14
clinical 353:15
clinically 353:7
close 483:24
clue 392:7
code 440:20
cold 366:14,15
collect 371:24
382:22,23
collected 372:9,13
collectively 370:6
collects 371:14
college 365:21,22
colleges 393:10
combat 466:9
combination
319:17
come 459:22 469:3
490:7
comes 325:8
commenced
411:16
comment 320:10
334:18 340:11,14
359:20 360:23
459:22 463:12
465:11 466:3
469:1
commented
460:24 463:11
464:2,3,16 465:3
467:9
commenting
464:24 465:7
468:2,6

comments 461:3
461:10,14 463:16
commission
527:19 528:25
529:25
communal 508:15
communicating
465:15 468:22
communications
403:4
community
378:21
companies 344:18
344:20 415:16
company 330:19
330:20 344:14,16
345:12
compensated
500:24
complaint 403:9
404:13,15,16,20
404:21,24 405:5,6
405:14,14,21,22
501:12
complaints 405:21
complete 408:20
408:20
completed 524:15
526:15
completely 401:8
401:10,23 413:15
comprised 349:10
computer 375:9
375:13 376:19
409:2,4,6 450:23
452:2,4,6,17 453:5
453:7,16,24 454:8
454:12 464:12
482:6 484:2,18,19
485:4,6,8 486:12
487:12,13,20

500:19 508:12,14
508:18 509:10,10
513:13,15 514:9
514:10,16 516:1,7
517:1,5,6,14
518:11
computers 487:10
concerning 393:7
393:11,11,15
484:23 509:21
510:5
concierge 304:17
conclude 324:12
concluded 413:9
concludes 522:17
conclusion 314:6,8
315:4,13,23
316:11,19 327:7
337:1 341:10,24
342:9,20 343:7
361:18 364:1,12
364:18 365:18
369:24 370:11,20
371:9,20 372:3,17
373:22 374:17,23
377:21 378:13
379:1,21 381:3
382:15 383:10,14
403:15 422:7
455:7 502:12
514:7 517:23
conditioners
467:20
conditions 310:1
310:11 311:6
314:13 315:21
352:19 353:23
377:20 378:3
395:9
conduct 312:11,13

confirm 307:12
461:10 492:21
confirmation
467:19
confirmed 482:22
confused 490:18
491:17,18 492:3
508:24
confusing 449:17
490:20
connect 380:15,16
connected 312:3
418:7 441:22
463:16
connection 325:5
connections
393:16
consent 314:1
380:15 415:16
417:17 419:1,17
419:21 420:7,17
421:3 422:14
447:22 449:4,12
consented 418:17
422:13,19 447:18
449:2,12
consenting 422:2
consequential
311:24
consider 326:21
327:4
consult 521:23
contact 309:18
330:17 349:13,14
352:17 371:15
383:19,20 414:18
414:20,20 415:1
415:17,17 416:9
416:11,11,21
417:2,6,7,9 421:21
421:22 428:2,5

430:3,14,17 433:8
433:18 438:24
445:11 447:11,23
454:3 506:8
**contacts** 431:7
432:5 433:11,19
439:2 449:8
**containing** 407:7
**contains** 388:8
**content** 312:4,7,10
312:11,14,20
313:13 374:3,4
382:11 408:18
**continue** 394:11
413:7
**continued** 308:6
**continues** 347:21
**contract** 311:11
312:1
**contribution**
315:1
**control** 313:19
502:8 504:8
**controls** 344:23
345:4,9
**conversations**
506:10
**convey** 469:4,10
469:13
**convince** 338:12
348:11
**cookies** 375:9,13
375:14
**cooperate** 313:22
**cops** 363:8
**copy** 375:23 376:3
384:22 387:9
407:18 408:10,16
408:20
**corner** 308:21
425:19 488:22

**correct** 310:11,18
310:24 311:6,12
319:12,19 320:17
347:23 348:2
373:21,24 376:22
376:24 377:11
390:8 395:18
396:6,7,17 397:14
397:20 404:3
405:6 410:18
414:9 417:19
418:1 421:5 426:5
426:8,14 427:21
430:19 449:14
450:8,11 472:9
475:16 488:8
490:15 491:3
493:11,15,18
512:7 521:1
524:11
**corrections** 526:12
528:17
**correspond**
406:23
**cost** 357:18
**costales** 304:3
384:22 387:4
**costume** 466:22
**counsel** 389:4,13
390:1,6 393:14
399:14,20,22
400:2 407:23
409:8 410:5,6
411:3,10,22 414:7
455:24 482:10
495:21 521:23
523:2 524:17
**counsel's** 387:19
**counts** 506:13
**county** 524:2
527:10 528:15

**couple** 344:24,24
377:16 382:6
463:5,6 484:3
514:24
**course** 511:17
**court** 303:1
307:10,12 319:4
320:3 364:21
365:2 388:10
394:7 400:2
510:23 527:7
**court's** 388:13,13
**courts** 303:14
**cousin** 328:19
**cousins** 348:17
465:13
**cover** 306:6
386:15,20 390:17
**crack** 458:4,5
**craigslist** 306:4
381:20,23 382:4,8
382:14 383:12
384:1,6,8 505:15
505:18 521:6
**craigslist's** 384:2
**craigslist.org**
383:21
**cranberry** 321:12
321:14
**cranky** 464:19
**crashed** 481:21
**credit** 306:4
330:14,19 334:1
334:23 335:4,7,9
340:20 377:10,13
377:19 378:3,10
378:23 379:8,14
379:19 380:5,14
380:24
**creditkarma.com**
333:24 334:17,21

**creek** 328:21
**cross** 413:11
499:12
**crystal** 440:22
474:20 476:19
**csr** 303:15 525:8
**cunts** 459:23
**cup** 366:19,21,22
**curb** 360:9
**cure.com** 450:5
**current** 426:2
491:2 497:5
505:22
**currently** 330:10
384:21 401:17
405:2 444:22
482:23
**custody** 305:13
**customer** 367:6,6
368:1
**cut** 348:18 454:3
468:20 507:23
**cv** 303:7

**d**

**d** 352:7 462:19,19
**d.c.** 368:20 474:19
**damage** 312:5
**damages** 312:1,17
**damn** 365:14
**dan** 464:19
**data** 382:21,23
383:2,7 414:21
415:12,12,13,19
416:4,13,22 417:8
417:10,13 420:21
421:4,18,24 422:3
422:10,18 430:22
447:3 464:12
473:2,6 474:10
476:20 479:9

database 479:4
date 394:12 395:5
  398:21 399:6
  400:12 438:1
  440:10 444:6
  447:3 450:17
  465:11 488:7,11
  491:5,8,15 526:8
  527:3,9,19 528:3
  528:13,25 529:20
  529:25
dated 385:1 389:4
  410:6
dates 446:21,21
  454:23
daughter 465:17
  498:8 512:19
  519:6 522:3,13
day 303:17 366:10
  366:13 439:14
  447:7 458:6 469:3
  483:24 504:6,6
  517:7 525:2
  527:16 528:22
  529:22
days 390:4 414:6
  526:18
deadalus 368:15
deadlines 522:1
dealing 361:20
dear 526:10
debbie 330:9
  432:9 436:12
  443:23 444:8,22
  463:11 464:3,4,24
  465:4,7 468:2,6,8
  468:8 474:20
  476:17,18
debbie's 434:12
  435:5

deborah 354:17
deceive 480:11
december 432:17
  509:3,22 517:2
decided 366:18
deed 527:14
  528:20
deem 447:10
  511:14
deemed 526:19
defamatory
  312:12
defame 310:3
defend 313:8
defendant 303:9
  304:8 396:9 404:2
  406:7
defendant's 406:8
defending 384:21
defense 313:19
defenses 403:13
defined 378:20
defines 501:24
definitely 324:6,9
  480:19 485:10
defrauded 365:15
degree 393:23,24
delays 312:5
delete 423:3
deleted 384:4,5
  463:16 478:16
  486:18
deleting 422:23
  486:19
deletion 381:8,10
delivering 486:13
delivers 485:22
delivery 452:24
demand 313:14
demands 313:10

demonstrated
  399:23
department
  526:22
dependent 341:8
  342:6,12,16,18
  343:3
depending 328:15
  478:24
depicted 317:16
  474:22 488:15
  495:15
deponent 523:3
depose 511:20
  516:15,19,20
deposing 518:16
deposition 303:11
  307:5 308:19
  309:12 376:13,21
  384:21 387:5
  388:3,17 393:22
  394:12 399:21,23
  410:4,10,14,18
  411:11,16 413:7
  414:7,8 423:19
  427:20 449:21
  451:21 456:18
  473:20 474:8
  483:4,6,18,24
  490:13 492:24
  498:15,21 502:7
  505:21 506:22
  521:22,24 523:4
  524:13 526:8,11
  527:1,3 528:1,3
depositions 303:14
  517:17
depressive 354:10
describe 348:10
describing 468:19
  509:20

description 306:2
desires 360:10
  393:14
desktop 454:1
despite 400:6
  518:9,22
detail 362:23
  367:17
determine 319:18
device 395:23
  409:10 497:1
devices 306:18
  454:22 481:20
  495:8,12,14,19
  496:22
diagnosed 350:10
  350:17,24 353:8
  353:12,22
diagnosis 353:16
diane 360:15
dick 464:20
die 465:20
died 337:23
dietzmann 393:17
  437:20 476:24
differences 405:5
different 326:15
  371:13 380:21
  383:2 411:18
  453:15 472:19
  489:17,24
difficult 487:21
difficulties 330:24
digital 409:10
  454:22
dime 338:8
direct 308:5
  311:23 332:6
  413:1
directing 373:14

**directly** 312:15
329:15 332:1
333:9,10 360:14
**disagree** 422:5
461:4
**disc** 326:18
**disclose** 382:22,24
**disclosure** 383:7
**discovered** 403:5
**discovery** 376:2
389:8 391:24
**discuss** 495:23
**discussed** 312:15
393:5 484:24
**discussion** 309:4
317:8 321:4
322:17 325:19
327:21 329:19
333:18 335:14
336:12 337:15
339:6 340:7
343:17 345:24
347:12 355:14
358:20 360:4
369:14 377:5
381:15 384:14
386:11 388:23
390:21 392:23
402:11 409:21
413:22 423:12
477:17 482:16
500:1
**disgusted** 400:16
**disorder** 350:22
351:1,8,18,21
353:23 354:4
355:18
**dispute** 313:23
316:5 379:24
454:21

**disputes** 379:18
**distortion** 347:7
347:17
**distribution** 422:3
426:16
**district** 303:1,2,13
**division** 303:2
**doctor** 346:8
353:14 429:4
**doctor's** 353:13
**document** 371:1
385:23 386:5
387:1 388:2,10
390:16,17 401:2
401:18 402:2,23
405:3 407:2,3
411:3,12,18
412:10 413:1,12
**documentation**
412:22 521:12
**documenting**
354:19
**documents** 319:4
389:10,14 403:3,5
404:1,19 411:14
412:2 413:2,8
499:14
**doing** 311:5
324:19 332:5
375:20 408:7,7
423:1 430:2 479:5
506:12
**domicile** 403:6
**door** 498:8
**doors** 498:8
**double** 344:9
345:3
**doubling** 330:23
**download** 390:3,6
390:11 408:9,16
447:11 448:22

449:8
**downloading**
447:22
**dr** 428:18
**draft** 329:23
**drawing** 318:8
**dress** 439:15
**drink** 321:14
**drinking** 321:12
**drive** 407:7,9,10
407:13,17,22
408:1,9,10,15,15
408:18 409:3,6,7
481:16,19 482:2,9
485:7,12,12,13
500:20
**driver's** 479:1,18
480:6 504:16
**dropbox** 406:3
**dsm** 353:18,20
**dude** 485:20,21
**due** 313:11 350:21
350:21 465:11
**dulles** 368:16,22
**duly** 308:3 524:6
**dump** 447:3 473:2
474:10 476:20
**duncan** 304:18
307:8
**dungeon** 462:19
**duplicate** 467:11
**duty** 439:19

**e**

**e** 306:6,7,8 320:24
370:5 383:21,23
384:20 385:4,13
386:16,20 389:4
389:14 408:17
410:5 411:4,15
433:21 445:17
451:11 498:17

500:19 505:15
507:4,5 521:17
**earlier** 497:20
502:6 505:21
**earth** 325:4,12
**eastern** 303:2
**eat** 360:10 367:22
**edit** 334:4
**effect** 321:15
**egan** 330:9 354:17
432:10 434:9
435:2 436:12
464:24 468:2
476:17
**egan's** 463:11
464:3,4 465:4,7
**eight** 309:24
**either** 478:23
524:17
**elated** 367:6
**elicit** 505:10
**eliciting** 505:11
**elm** 516:13,16
**email** 526:17
**emotional** 310:2
**emotionally**
331:12
**employee** 366:18
**enable** 319:18
**enclosed** 526:11
**ended** 376:17
489:18
**engage** 510:12
**engaged** 516:22
518:15
**engagement**
386:22 387:3
**engaging** 512:15
513:13
**english** 399:3

| | | | f |
|---|---|---|---|

enter 317:12 412:1
414:3
entered 309:11
379:16 381:21
386:16 387:4
389:3 410:4 507:1
528:9
entire 314:7
328:20 347:23
349:9 359:22
395:17 408:9,16
411:17 455:1
507:15 527:5
528:5
entirely 413:5
entities 415:2
416:21 417:9
418:12,18 419:11
419:18 421:15
entitled 511:13
entry 428:18
episodes 354:9,10
equifax 334:5
335:1,3,4,7
errata 526:13,18
528:7,10,18 529:1
errors 312:6
especially 334:3
366:15
estimate 496:7
et 307:6 366:16
380:20 413:13
450:5 464:4
473:11
evaluate 511:7
eve 414:8 423:18
427:19 449:21
456:18 473:20
474:7 483:4
492:24

evening 474:8
event 311:21
312:18 313:22
508:21 524:18
events 380:18
393:11 470:15
evergreen 502:7
everybody 365:6
476:13,14 477:2
508:17
evidence 354:23
355:2 358:11
395:23 449:12
518:11
evidencing 403:4
ex 440:9
exact 364:5 445:12
491:8,15 505:9
exactly 314:18
examination
303:12 305:6
308:5 499:12
513:4
examined 308:4
exceed 312:20
exclusive 313:18
excuse 313:20
323:1
executed 528:10
execution 527:14
528:19
exemplary 311:24
exercise 375:8
exhibit 305:13,14
306:3,3,4,4,5,6,7,8
306:9,9,10,10,11
306:11,12,12,13
306:13,14,14,15
306:15,16,16,17
306:17,18,18,19
306:19 308:19

317:13 324:12,17
379:5 381:20,21
386:4,17,19 389:3
394:21 402:3
410:4 412:1,16
414:3,11 417:19
418:12 423:4,5,6
423:16 425:12,14
427:17 428:6,17
430:17 445:12
456:12 457:20
459:15,16 469:22
469:23 470:9
471:19 473:19
474:6 475:23
477:8,21,23 484:3
487:22 488:18
492:19,20 494:15
495:15,20 496:21
497:8,18 506:21
507:1,8,15 512:23
513:6,8
exhibits 305:4
306:1 484:4
506:23
expectation
426:17
expenses 313:10
experiment
458:14,15,17
expiration 527:19
528:25 529:25
explain 418:5
508:12
exposed 468:13
extent 394:12
404:1
extra 452:24
eye 393:15

face 423:23 424:1
424:5 465:14
469:5,8 508:7
513:15
facebook 306:9,10
306:10,11,11,12
306:12,13,13,15
306:15,16,16,17
306:17,18,19
389:18 392:9,12
392:17 409:11
414:5,12,16,24
415:16,19,24
416:5,20,23
417:19 418:7
421:3,14 422:24
423:3,18 424:2,6,8
424:11,12,19,21
425:3 426:13,17
426:19 427:19
428:6,10 429:6,10
429:18,24 430:1,3
430:21 432:21
433:2,5,21,22
434:2,13 435:12
436:3,15,19 437:7
437:11,16 438:3
438:20 441:9,13
441:17,23,24
442:1,15,21
443:13 444:8,15
446:2 447:2,8,10
447:12 448:1,8,9
448:15,16,17,23
449:10,11,13
450:3,3,7,16,16,17
450:18,24 451:5
451:10,14,22
452:10,18,22
454:4,7,9,13,23

456:19,23,24
457:19 460:13,24
461:3 463:15
468:23 470:1,13
471:10 472:11
473:2,9 474:14
475:15,18 476:10
476:11,15,20
477:1 478:14
480:1 483:2,9,20
483:23 484:4,23
486:3,7,11,17,20
487:3,13,18,21
488:1,4,10,12,23
489:2,13 492:8,12
493:4,11,15,18
494:2,6,8,11 496:2
496:10,23 497:11
508:3,10 509:5,6
509:10,20 512:15
513:12,16 514:8
514:18 515:1,20
516:4 517:3,6,7
518:11,18
**facebook's** 422:1,2
**facial** 424:20
**fact** 354:8 367:13
367:13 387:3
402:18 424:6
429:23 460:14
480:23 488:1
507:6
**factory** 323:19,21
324:1,4,7,10
**false** 480:5,8,11
**familiar** 327:9
**family** 318:20
349:9,18 418:6
453:17
**familytreenow.c...**
481:2

**familytreenow.c...**
479:3 481:6
**fantastic** 344:8
**far** 365:1 395:19
488:2 521:1
**farther** 464:23
**fashion** 404:12
**father** 437:3
442:11
**fathers** 444:2
**fear** 480:12
**features** 380:17
**federal** 303:12
320:3 510:23
**fee** 385:8,12,13
**feeling** 343:22
**fees** 313:11 453:4
**feinerman** 388:16
**fellow** 361:14
**fight** 330:15
**fighter** 466:17
**figure** 394:2 434:6
483:14 512:11
**file** 328:20 340:18
341:1,2 355:6,8
401:3 514:24
**filed** 398:22
404:16 499:15
500:8 501:13,18
501:20
**filing** 340:19 398:6
398:9 399:5
**filings** 406:4 500:8
**financial** 330:24
380:18
**find** 331:1 382:8
410:23 426:5
519:15,17 526:11
**finding** 319:6
320:12 324:19
489:12

**fine** 327:17 388:9
507:9 519:7
521:21
**fined** 340:17
**finish** 452:11,15
483:6 484:2
**finished** 519:5
**fired** 367:14
**first** 308:3,19
335:20 341:2
352:8 385:11
386:7 390:17
399:21,22 404:15
404:16,20,24
405:6,13,21
410:13 411:9,12
414:17 423:18
427:19 428:8
449:21 456:18
473:20 474:7
483:4 492:24
508:1,20 509:4
510:11 511:16
512:17 513:7
521:15 524:6
**fish** 366:15
**five** 309:24 328:14
344:11 345:18,19
354:9 459:13,13
**fix** 376:19
**flannel** 466:23
**flashed** 497:20
**flickr** 392:6
**flipped** 475:21
**flying** 348:6,13,20
349:3,10,16,21
**folder** 317:12
414:4 470:9
473:18 488:19
**folders** 411:18

**followed** 354:9
381:10
**following** 319:1
**follows** 308:4
**food** 453:4
**forcing** 315:11
**foregoing** 398:4
404:13 524:10,14
527:13 528:18
**forensics** 407:22
**forgot** 376:18
486:18 513:1
516:5
**form** 309:21
310:12,19 311:1,7
311:13 313:3
314:15 315:3,12
315:22 316:10,18
317:21 318:14
319:20 320:8,18
321:18 322:1,5
323:9,13 324:15
324:23 325:6,15
326:9,23 327:6,17
329:2,6,12 330:2
331:9,16 333:7,14
334:9 336:2,5,22
337:9 338:15,18
339:1,19 340:1
341:5,9,20,23
342:19 343:6
344:4,21 345:10
346:13,18 347:5
347:18 348:4,15
348:22 349:5,11
349:19,22 350:12
350:19 351:3,9,22
352:20 353:3,10
354:1,6 355:20
356:2,16,20 357:5
357:10,21 358:6

358:13,16 359:8
359:24 360:20
361:2,17 362:11
363:9,16,24
364:17 365:4,17
366:4,8,23 367:11
367:19 368:3,13
369:2 373:16
375:18 377:17
379:10,20 396:2
396:18 397:7,15
397:23 398:11
399:9,15 400:8,24
401:14 404:4
405:7,15 406:14
406:24 407:15
408:3,24 410:20
411:5 412:13,18
413:18 415:5,22
416:1,16,24
417:11,20 418:2
418:13,20 419:4
419:13,23,24
420:9,19 421:7
422:6,16 425:7
426:10,21 427:7
427:15 428:11
429:8,11,19 430:7
430:11,23 431:8
431:18 432:7,19
432:23 433:12
434:14,19 435:8
435:14,18 436:5,8
436:17,21 437:9
437:12,18 438:5,9
438:13,21 439:3,9
439:20 440:13
441:5 442:2,17,23
443:15 444:10,17
445:1,22 446:24
447:5,13,20 448:3

448:11,19 449:5
449:15 450:9,21
451:16,24 452:15
453:10 454:18
455:6,17 457:3,7
457:14,21 458:19
458:24 459:11
460:1,15,21 461:5
461:15 463:3,13
463:21 465:23
469:18 470:19,23
471:8 472:13
475:4,10 477:4
478:10 479:7,12
480:14 482:3
486:14 488:5
489:9,15 490:16
491:23 492:14
493:7,12,20 494:3
495:3,4 497:3,14
498:5 514:11,14
515:11,21 516:8
517:19 518:20
519:2,12,22 520:6
520:15,23
**format** 483:14
**forms** 520:17
**forth** 417:18 506:9
**forward** 320:23
340:3 370:24
389:7,16 394:20
411:13,16 483:8
526:15
**found** 319:13,16
320:15 367:1,14
395:16,19 400:15
431:14 467:19
478:22 481:3,4
485:21 489:18
508:11 511:24
515:13,16

**four** 309:24
323:20 332:18
463:10 464:15
465:18 485:20
492:22
**frame** 500:11,17
504:13
**fraud** 341:22
**free** 334:1,23
479:2,9,19 480:7
527:14 528:20
**freely** 373:15
**friend** 437:22,23
460:8
**friends** 428:3
430:18 433:7,8,10
433:20 476:10,10
476:14 478:7,13
492:10,12,16
**fries** 366:14
**front** 405:3 445:6
512:9
**fryer** 366:14
**fucking** 332:19
459:23
**fuckwit** 332:19,23
333:12
**full** 337:24 346:7
408:14 433:11
481:5
**fully** 393:13
406:13
**funny** 326:14
334:3
**further** 394:6
396:8,9 406:7
407:6 511:20
524:13,16

**g**

**gallon** 485:23
**game** 369:5,7,9,10
459:2 462:3,3,5,7
462:9,12,24 467:4
467:6,7
**games** 459:4
**garage** 362:1,9,19
363:2,5,7,12,21,21
**garcia** 486:9
516:13,16
**gas** 485:23
**gaslights** 338:10
**genealogy** 478:23
**general** 364:14
**generally** 326:5,8
**genevieve** 465:12
**geralt** 467:1
**getting** 332:6
345:15 475:3
481:10 490:18
491:18
**giant** 338:5
**gifts** 357:24
**give** 308:12,15
336:22 338:7
406:22 413:14
419:10 421:10,17
422:20 430:13
449:7 484:8
488:11 512:4
**given** 426:16,18
456:20 498:11
524:8,12
**giving** 332:6
361:16 387:5
407:17 408:14
427:3 448:9
**gmail.com** 445:17
**gnawer** 461:20
462:1,4

**go** 309:1 317:5
318:19 320:16
321:2 322:14
325:16 327:15,16
327:18 329:16
333:15 334:2
335:11 336:9
337:12 340:3,4
343:14 345:21
347:9 355:3,11
356:22 358:17
360:1 361:7
365:20 368:5
369:9,11 370:24
371:2,2 372:19
375:5,22 376:17
376:19 377:2
378:17 380:3
381:8,12,24 382:3
382:7,21 383:18
384:11 385:11,17
386:7,8 388:20
390:15,15,18
392:20 402:2,6
405:9 406:4
408:19 409:18
411:13,17 413:19
423:6,9,16 425:14
428:16 431:22
440:5 450:5 454:9
455:1,13,19 461:9
463:9 464:14
465:18,19 466:1,3
467:17 470:8
474:5,18 477:14
478:18 480:3,12
481:15 482:13
483:7 484:8
485:19 486:23
487:1 495:23
499:20,23 503:21

508:5 510:4,8,9,19
511:13 514:23
515:4 521:16
522:2,13,14
**god** 350:5 351:2
355:4 476:17,24
**goes** 346:7 450:6
**going** 307:1 309:3
313:7 317:6
318:17 322:15
325:17 327:19
330:9,23 335:12
336:24 337:13
345:22 347:10
371:1,1 376:19
377:3 380:9,9
381:11,13 390:19
393:10,10 394:1,7
394:15 401:4
402:9 405:17
408:8,18 409:23
422:23 423:5
428:23 436:23
443:22 449:13,19
450:24 456:4
459:16 465:20
468:11 475:23
477:15 482:14,21
483:19 484:11
488:18 492:20
496:3,13 497:19
497:22 498:14
499:1,4 506:11
511:7 512:11,18
517:16 519:4
522:15
**gonna** 376:8
469:14 483:18
**good** 307:1 308:8
409:23 463:19,20
476:17 499:10

**google** 391:21,23
429:15,18,24
439:13
**gotta** 468:13
**gotten** 416:3 436:7
436:19 441:13
446:7 467:19
498:21,21 504:15
**gratuitous** 448:9
**greater** 312:20
**greg** 442:7
**grounds** 393:9
**group** 466:4,5,6
**groups** 470:1,15
**grub** 452:21
**grubhub** 451:22
451:23 452:3,13
452:20,23 453:2
454:12 485:22
486:13
**grumbles** 464:19
**guess** 315:16
317:23 363:15,19
374:13,19 375:1
379:3 381:6
382:17,20 383:16
451:18 463:15
469:1 495:11
520:12
**guy** 366:12,18
**guys** 315:7 319:14
319:16 322:8,12
324:19 397:1

| h |
|---|

**h** 320:24
**hahn** 468:6 476:18
**half** 342:13 358:16
412:7,16 428:7
450:14 459:13
480:2

**hand** 308:21 408:8
408:19,20 425:19
488:22 525:1
**handful** 483:1,22
**handing** 498:11
**handled** 504:8
**hanging** 368:16,18
368:20,21 474:19
**happened** 321:15
337:24 447:4
468:18 521:9
**happens** 441:23
**harass** 309:18
310:4,17,24 350:9
**harassed** 331:12
**harasses** 454:2
**harassing** 331:7
**harassment**
314:23 393:9,24
**hard** 407:6,8,10
407:13,17,22
408:1,8,10,14,15
408:18 409:3,6,7
481:18 485:7,13
**harm** 310:3
**harmless** 313:8
**harmon** 464:19
**hate** 452:23 453:2
**head** 318:7 387:17
393:20 476:14
**heading** 382:23
**heal** 468:12
**healed** 326:17
**hear** 310:7 347:1
424:15 484:6
499:19
**heard** 434:7
464:19
**hearing** 484:7
**heck** 350:6 355:10
356:7

heh 332:23
helena 352:5,9
hell 407:14 434:3
  434:5 465:19
hello 370:2
help 332:15
helping 330:11,12
  360:9
helps 508:21
hereunto 525:1
high 366:11
highest 359:18
highlighted 321:9
  393:18 482:21
highlighting 402:4
highly 455:3
  510:15
hipaa 327:5,10,13
  328:13
hired 483:15
history 344:17
  350:14 351:11
  386:4 395:23
  406:8 407:7,8
  408:12 478:14
  488:20,23 495:14
hit 452:21,22
  466:9 469:4
  472:22
hold 313:8 358:10
  483:6,18 490:18
  496:3 498:14
holding 483:24
  521:21 522:12
holy 328:3,12
home 469:14
honestly 332:22
  336:17
hope 382:8
horn 443:23 444:9
  444:22 468:8,9

474:20
horrible 338:11
host 483:8 498:10
hours 308:12
  394:6 410:17
  411:10,15 482:12
  482:21,23
house 485:22
how'd 436:15
how's 347:6
hp 485:9
huge 330:15
human 466:18
hundred 514:24
hurting 468:21
hurts 468:13
husband 330:13
  337:24 338:12
  344:8,19,20
  360:16 361:24
  435:5,23 453:12
  464:17 487:3,15
  494:12 504:7
  506:2,11 508:15
  509:12 513:18,19
  515:23 517:9
  518:16
husband's 469:2

## i

ice 474:19
icm 320:4 490:14
idea 325:14 342:3
  377:14 415:9
  416:5 431:2,4
  443:12 445:18
  458:16 465:13,16
  465:22
identified 306:2
identify 394:13
  395:5 399:6 511:6
  511:11,17

identifying 323:16
identity 403:7
ihop 450:4
ii 303:19 307:4
  526:8 527:4,9
  528:4,13 529:20
illegal 312:13
  346:9
illinois 303:2,16
  303:21 304:5,11
  323:23 324:4,10
  501:24 524:1
illnesses 350:11,18
image 407:13,22
imgur 467:16
immediately
  367:14 388:1
  401:24 474:4
  505:18
implied 311:22
improper 501:7
improperly
  510:20
inability 312:8
  483:9
inaccuracies 312:6
inadequate 409:13
inappropriate
  501:5 505:11
  511:9 512:5
inappropriately
  394:17 511:15,21
inches 412:7
  463:10 464:15
  465:18 485:20
  492:22
incidental 311:24
incidentally 509:7
included 401:12
  526:13

includes 383:5
  412:3 414:20
  415:17 416:11
  417:7 421:22
  474:17
including 312:2,4
  312:12 313:10,13
  388:17 403:5
  470:1,14 518:15
inconsistent
  409:13,14 501:21
incorporated
  528:12
incorrect 417:10
  497:13
indemnification
  313:7,20,24 314:5
  314:22
indemnify 313:9
  313:21
indemnities
  311:23
indemnity 315:1
index 305:1,4
  306:1 411:14,22
indicates 488:20
indicating 412:5
  512:16 526:13
indirect 311:23
indirectly 312:15
individualized
  455:3
individually 303:4
inflammatory
  323:15
info 306:16 319:3
  414:20 416:12
  417:7 421:22
information
  310:17,23 319:8,9
  320:12,21 322:8

322:13 326:21,22
327:5 335:9 336:8
354:24 355:8
371:14,15,16,16
371:24 372:9,13
372:20 373:12,15
375:23 376:3
380:4,4,11,13,14
380:19,22 384:2
395:13,21 396:10
396:13,17 397:22
409:11 414:11,14
414:19 415:1,18
416:4,5,10 417:9
417:14 418:1,11
418:18 419:1,9,11
419:18,20 420:8
420:12,16,23
421:3,11,13,15
422:20 423:1
428:2,6 430:3,17
433:8 441:23
444:12 445:11
446:2 447:3,12
448:21 449:3
470:22 479:22
480:4,9 485:11,18
487:24 488:1,3
490:9 497:13
521:10
**infractions** 504:11
504:20
**inhibit** 308:12
**initial** 501:14,17
**inova** 428:24
430:5
**input** 395:2
**inquiry** 455:4
**ins** 494:17,21
**inside** 332:4
459:24 460:4

467:18 472:23,23
485:14 513:12
**instagram** 306:14
391:4,11 471:24
472:1,2,5
**instance** 318:7
**instant** 320:17
325:12 479:2,19
480:7 489:7,18
491:13 492:4,6
**instantcheck**
505:14
**instantcheckmat...**
319:1
**instantly** 334:1
**instructed** 394:17
505:6 510:7,17,20
511:15,21 515:4
**instructing** 394:3
**instructions** 393:6
393:21 511:10,12
511:19 512:4
**intel** 466:9
**intellectual** 313:16
**intend** 326:4
328:23 331:15
332:7,11 333:6
334:11 335:24
338:17 339:17
344:2 346:17,20
346:22 347:3
348:1 356:14
357:4 359:6
360:18 366:2
368:11 400:5
473:14,22
**intended** 331:20
412:15,20
**intending** 400:13
**interact** 462:15

**interacted** 350:8
**interacting** 382:9
**interested** 512:13
524:18
**interject** 482:10
484:21
**internet** 370:3
375:13 406:8
407:7 519:17,21
520:8
**interrogatories**
306:5,6 385:14
386:17 412:23
**interrogatory**
385:19 391:1
394:22,23,24
395:5 398:8
412:24 413:12
**introduce** 506:20
**involve** 393:12
**ip** 495:9
**irrelevant** 403:12
**island** 458:14,15
458:17
**issue** 351:16
**issues** 354:19
394:8 483:8,12
498:10 511:8,20
517:17
**item** 440:22
471:19 473:18
488:17
**items** 469:24
470:2
**iv** 353:20

**j**

**jail** 328:14
**january** 303:17
307:2 385:1 386:1
389:5 390:7,13
410:6,11,15

411:23 414:7
474:8 484:5
486:11 494:17
496:5,22 497:24
525:2 526:4
**jeans** 466:23
**jeeze** 451:12
**jerry** 443:6
**job** 344:9,10,12
345:3,8,15,17
**joe** 436:24
**john** 443:23 444:9
444:22 468:8,9
**johnson** 344:23
345:4,8
**joint** 380:17
**joke** 459:24 460:4
460:5
**jonathon** 304:10
384:22
**jones** 350:4
**jreinisch** 304:12
**judge** 328:15
388:16
**juice** 321:12,14
**july** 508:22 509:2
509:3,22 515:19
516:22
**jump** 394:7
**june** 468:24
**jury** 449:11,13
**justification** 413:5

**k**

**k** 352:7 524:2
**karma** 306:4
335:5,7 377:10,13
377:19 378:3,10
378:23 379:8,14
379:19 380:5,14
381:1

**keep** 371:1,1 376:9
380:9,9 381:11
415:15 428:23
497:22
**keeps** 319:6
**kelly** 303:15
307:10 524:3
525:7
**kenabi's** 459:22
**kept** 320:11,12
**kevin** 304:18
307:8 482:22
**kid** 367:21 376:17
445:24
**kids** 338:8 366:11
519:7
**kilcoyne** 307:11
**kimrey** 304:9
305:7,9 306:7,8
308:7,24 309:8,22
310:15,22 311:4
311:10,16 313:6
314:12,20 315:9
315:17 316:3,15
316:23 317:5,12
317:14 318:1,15
320:1,13,22 321:7
321:21 322:2,9,14
322:21 323:10,18
324:21 325:3,10
325:16,22 326:12
327:3,11,15 328:1
329:3,9,16,22
330:3 331:14,19
332:10,16 333:11
333:15,22 334:10
334:15 335:11,18
336:3,9,15 337:6
337:12,18 338:16
338:22 339:2,9,22
340:2,10 341:6,13

341:21 342:4,14
342:24 343:11,14
343:20 344:7
345:2,14,21 346:3
346:14,21 347:2,6
347:9,19 348:5,19
349:2,8,15,20
350:2,16,23 351:6
351:14 352:1,23
353:6,11 354:3,11
355:11,17,23
356:5,17,21 357:8
357:13 358:1,9,17
358:23 359:9,12
360:1,7,24 361:6
361:22 362:14
363:10,17 364:7
364:15,23 365:8
365:19 366:5,9
367:4,16,23 368:4
368:14 369:6,11
369:17 370:1,14
370:23 371:12,23
372:6,18 373:4,10
373:19,23 374:9
374:20 375:2,21
377:2,9,18 378:1
378:16 379:6,7,13
380:2 381:7,19
382:18 383:11,17
384:11,18 386:8
386:14 387:18,24
388:12 389:2
390:24 392:20
393:3,18 394:19
396:5,22 397:10
397:18 398:2,14
399:12,19 400:9
401:6,20 402:8,14
402:20,22 403:19
404:8 405:12,19

406:18 407:5,20
408:11 409:8
410:2,21 411:8
412:14,19 413:19
414:2 415:6,23
416:7,17 417:4,16
417:23 418:9,16
418:23 419:5,16
420:4,14,24 421:8
422:12,21 423:9
423:15 424:17,22
425:8,11,14,16
426:11,22 427:8
427:16 428:15
429:9,16,22 430:8
430:15 431:5,9,21
432:8,20 433:4,15
434:17,22 435:11
435:15,19 436:6
436:11,18,22
437:10,15,19
438:6,10,16 439:1
439:6,10,24 440:4
440:16 441:8,12
441:16,21 442:6
442:18 443:4,16
443:21 444:14,20
445:4 446:1,6,11
447:1,9,16,24
448:7,14,24 449:9
449:18 450:10
451:3,19 452:5,9
452:12 453:1,13
454:20 455:11,22
456:2,10 457:4,11
457:17,24 458:20
459:3,14 460:2,18
461:2,8,18 463:8
463:17,24 465:24
469:19 470:20
471:2,12 472:16

475:7,14 477:6,14
477:20 478:11
479:8,16 480:18
482:8,13,20
484:10,17 485:3
486:22 488:9
489:10,21 491:1
491:20 492:5,18
493:9,16,23 494:9
495:7 496:1,9,12
496:19 497:4,17
498:6 499:3,16
500:10,16 501:2,5
501:15,21 502:2
502:11,20,24
503:3,9,17,22
504:4,12,21 505:6
505:17 506:5,23
507:9,10,13,19,21
508:1,19 509:15
510:4,15,23 511:5
512:3,8,23 513:2,5
514:12,19 515:14
516:2,11 517:20
518:4,21 519:5,9
519:16 520:1,7,11
520:19 521:3,21
522:7,11
**kind** 466:15
481:17 485:8
513:13
**kinds** 371:13
**kitchen** 366:11
**klatte** 350:4
440:22 442:7
443:6 446:13
474:20,21,21
476:19,19
**knew** 480:10
**knives** 468:11

**[know - legal]**                                      Page 20

**know** 308:22,24
314:11,17,18
315:8 316:2,14,22
317:4 318:9,9,13
322:7 323:15,22
324:18 327:10
328:6 330:10
341:22 342:22
345:6,13 350:5,14
351:24 352:13
353:18,20 355:10
357:19 358:3
359:18 360:9
362:22 363:19
364:3,4,5 367:10
367:17,24 370:13
375:1,12,17 376:4
376:7 377:23
378:2 379:8,17,23
380:5 381:6,9,24
382:3 384:3 385:5
385:5 387:7,11,13
388:13,14 389:15
390:5,9,9 391:16
392:5 393:23
394:6,9,15 396:14
396:14,16 397:2,9
397:11,12,21
398:1 399:11,20
401:5 403:17
404:3,16 405:2,20
405:23 406:16,19
407:2,3 408:6,17
411:7 412:15
417:13,15,22
418:15,22 419:15
420:2,5,11,13,15
420:18,21,21,22
421:19 422:9,13
422:18,19 423:1,7
424:5 428:7,13

429:21 430:6
431:20 432:15
433:24 434:2,16
434:21 435:10,13
435:17 436:4,10
436:16,20 437:8
437:14,17 438:2,4
438:8,12,23 439:5
439:8,11 440:11
440:15 441:2,7,10
441:14,20 442:5
442:16 443:5,14
443:20 444:7,8,23
446:5,10,19
447:15 448:6,13
449:17 450:12,13
450:14 451:18
452:19,22 456:17
457:23 458:9,11
458:13,18,23
459:7,10 460:17
460:23,23 461:7
461:11,17 463:10
463:12 464:10,11
464:12 465:14
467:11,15,15
469:3,21 470:17
470:21 471:5,16
473:1,1,6,7,16,16
473:24 475:8,12
475:13 476:13,17
476:24 477:1,2
478:6 480:16,16
480:20,22 481:1,3
481:18,22 483:21
483:22 485:10
487:2,16 488:2,7
490:20,22 491:5
493:19 495:19
498:13,14 502:4
508:17 511:1

513:2,15,17,22,24
514:22,22 516:10
519:24,24 520:3
520:10,13 522:2
**knowingly** 328:13
421:12
**knowledge** 320:5
358:8 361:20
364:14 384:10
391:13,18 403:12
497:16
**known** 424:9
**knows** 340:18
346:9 415:13
453:12,14 487:14
494:7,10

---
**l**
---

**l** 338:3
**labeled** 389:10
473:21
**laid** 469:15
**lamictal** 351:19,21
352:2
**laptop** 481:16,22
481:24 482:2
**large** 321:14
323:12
**larp** 393:24
438:18 439:11
462:12,14
**larping** 393:8,11
437:22 510:5
512:15
**lasalle** 304:10
**late** 330:23 459:17
469:24 475:24
521:20
**lately** 333:1
**latorre** 521:8
**law** 338:4,5,7,9,11
340:22,22,24

341:8,17 342:6,16
342:16,18 343:2,2
363:23 364:16
437:3 440:23
445:15 486:2,4
501:24 506:3,11
506:14 508:15,16
513:17,18,23
515:23,24 517:11
517:11 518:16,17
**law's** 445:16
516:12,17
**lawsuit** 319:5
324:22 325:5
358:5 398:6,10,23
399:5 515:5,6
**lawyer** 364:3
398:24 422:9
505:4
**laxative** 321:15
**layers** 468:11
**lead** 501:6
**leading** 501:5,6
**learned** 334:22
512:17 518:9
**learning** 318:16
367:15
**leave** 498:7 512:12
**left** 475:1 484:21
490:7,24 514:17
517:5,5
**legal** 304:18 307:9
307:9,11 314:6,8
315:3,12,23
316:10,19 327:7
336:21,24 337:4
341:10,24 342:8
342:20 343:7
361:18 364:1,5,11
364:18 365:18
369:23 370:10,20

371:9,20 372:3,17
373:22 374:17,23
377:21 378:12,24
379:21 381:2
382:15 383:9,14
403:15 422:7
455:6 502:12
517:22 526:1
529:1
**legalese** 399:2
404:23
**legality** 422:10
**legend** 450:4
**letter** 385:12
386:23 387:3,8,9
389:7 390:17
393:19,21 399:13
399:17,21 400:6
526:19
**level** 328:13
**lg** 482:2,2,5,9
485:12
**liabilities** 313:10
**liability** 311:19
312:18
**liable** 311:22
**liar** 365:11 449:14
**libel** 310:4
**license** 479:1,18
480:6 504:16
525:8
**licking** 367:7,17
**lie** 365:7
**lied** 365:3,9,10,12
479:24 480:19
**life** 338:7 344:17
348:11,13,18
359:22 362:24
365:11 395:17
519:20

**limbs** 338:7
**limitation** 311:19
312:12 313:13
**limited** 312:2,4
313:11 388:18
518:16
**line** 314:7 320:12
322:8,11 347:8,17
370:5 385:21
394:14 401:12
474:6,12,12,17
475:8,21 511:6,11
511:18 512:1,9
519:11 526:13
528:7 529:3
**lines** 309:24
332:18 511:24,24
512:1,1
**link** 429:17,24
**linked** 418:7
429:15 433:2,5,24
**linkedin** 306:19
389:18 392:9,17
409:12 473:10
483:3,10,20,23
484:4,23 496:2,10
497:24,24 498:2
**links** 410:22
**list** 341:7 349:16
349:17,21 376:18
414:18,20 415:2
415:17 416:9,11
416:21 417:3,6
421:21 433:7
438:24 439:2
447:23 455:1,19
465:20 476:13
478:7
**listed** 383:3
418:12 426:24
427:11 431:7

433:7 444:22
457:19 477:1
528:7,17
**listing** 478:2 528:7
**lists** 372:1 406:4
415:15 430:14
502:15
**literally** 480:2
506:17
**litigation** 315:19
495:13,19 518:24
**little** 477:21 496:1
496:2 505:23
**live** 362:8,15
460:11 470:2
**lived** 362:18 418:6
429:4 440:17
**lives** 358:3
**living** 340:22
349:1 362:7,13
486:2
**llc** 304:3 502:1,14
502:15 504:9
**lmq720** 497:5
**located** 398:5
**locked** 453:19
471:10
**log** 405:9 413:4
448:23 450:3,4,7
450:17 451:5,9,14
451:22 452:18,22
454:10,23 493:3
493:17 494:1,17
494:21 497:11
509:11 516:5
517:3
**logged** 401:4,17,17
405:11 419:8
430:1 447:8
450:24 451:1,1,12
452:2,3,3,13,17,20

452:21 455:14
486:3,11 487:21
493:14 496:23
497:12 509:10,11
513:16 517:6,7
**login** 306:18,19
**long** 323:24 324:3
330:5 353:15
377:13 463:6
466:14
**look** 325:4 334:1,4
335:3,3 381:24
382:2,4 405:23
406:1,21,21 412:4
413:13 438:2
445:5 448:15
455:19 460:24
478:15 497:5
500:21 512:10
514:2
**looked** 395:20
401:16
**looking** 309:9
384:19 386:18
393:20 402:23
410:3 431:1 466:9
477:13,22 484:18
513:6
**looks** 412:5,9,10
412:11 414:13
458:21 459:2
467:10 481:16
492:21 497:2
509:1
**lord** 461:21 462:2
462:6
**loss** 330:4
**lot** 332:24 368:5,7
441:22 458:21
498:15,20

[loud - midway]

**loud** 509:18
**love** 468:13
**lovescats** 321:1
**lower** 308:21
 360:15 425:19
 438:17 442:7
 488:22
**lukis** 303:4,11
 305:6 307:5,6
 308:2,8 309:9
 311:19 314:14,21
 316:6 317:15
 318:22 321:8
 322:23 325:24
 328:2 329:23
 333:23 335:20
 336:16 337:20
 339:10 340:12
 346:5 347:21
 356:24 358:24
 361:9 364:16
 365:21 368:7
 369:19 371:5
 377:10 378:8
 380:11 381:20
 382:23 384:19
 385:14,18 386:16
 388:18 389:3
 391:1 393:13
 394:12,20 402:24
 410:3 414:4
 416:12 421:23
 423:19 425:18
 430:19 431:12
 435:21 436:24
 445:14 452:15
 456:13 459:21
 463:10 464:2,3,15
 465:3,10 467:9
 471:21 474:20
 476:18 477:9

 478:19 483:2,7,18
 483:21 484:18
 485:4 488:21
 496:21 497:24
 498:7 499:10,17
 499:19 500:6
 503:6,21 508:10
 509:5,14 511:8,20
 513:13 522:13
 524:5 526:6,8
 527:3,4,9 528:3,4
 528:13 529:20
**lying** 416:23
 430:21 450:19

**m**

**m** 338:3 352:7
**mad** 515:17
**madam** 526:10
**mag** 352:13
**magically** 428:9
**mail** 306:6,7,8
 383:21,23 384:20
 385:4,13 386:16
 386:20 389:4,14
 410:5 411:4,15
 433:21 445:17
 451:11 498:17
 505:15 507:5
 521:17
**mailed** 500:19
 507:4
**mails** 370:5
 408:17
**making** 344:9
 345:3 467:20
 509:16
**maldonado** 460:10
 460:11 476:18
**managed** 341:2
**management**
 504:6

**manager** 502:1,7,8
 502:15,18 503:14
 503:15 504:7,9
**manic** 354:9
**manifest** 354:4
**manifested** 354:9
**manner** 310:2
**march** 330:13
**march's** 330:22
**mark** 453:4
**marked** 308:19
 386:18 423:5
 449:20 456:11
 459:16 472:15
 477:23 487:23
 488:18 496:21
 497:10
**marketplace**
 470:2
**marking** 379:4
**marty** 435:2
**masquerade**
 393:16 510:13
**master** 462:19
**masturbating**
 367:1
**match** 461:21
 462:2
**material** 407:24
 409:15 483:20,20
 495:13,16 496:5
**materials** 483:16
**matt** 445:13
**matter** 307:6
 313:19 487:4,19
 501:12
**matters** 323:22
 388:8 393:7,8
**mean** 337:7
 366:22 406:1
 433:18 462:1

 481:12 502:4
 508:6 518:2
**means** 380:1
 416:19 522:2
**meant** 506:4
**media** 307:4
 380:16 391:2
 392:8,16
**medical** 328:20
 336:7 350:14
 351:11
**medications**
 308:11 351:7,17
**meet** 505:4
**megabytes** 514:24
**member** 453:17
**members** 349:18
 418:6 520:13
**mental** 350:10,17
 353:22
**mentally** 331:12
**mention** 338:1
**mergers** 380:20
**mess** 348:9,11
 366:18
**message** 521:5
**messages** 505:23
 506:12,15,16
**messing** 464:20
**met** 521:4
**michael** 304:17
 464:16
**michael's** 464:16
 467:10 469:1
**microphone** 310:6
**middle** 328:2
 333:23 381:20
 431:24 461:20
 466:3 467:17
**midway** 459:20
 467:8

**midwest** 526:17 529:1
**migration** 386:5
**mile** 352:13
**military** 439:23
**minchella** 476:18 476:19,24
**mind** 346:24 376:9 484:20
**minds** 393:15
**mine** 433:2 454:24
**minimum** 473:6
**minute** 456:1 482:24
**minutes** 483:11,21 484:23 485:2 495:22 496:9 512:13
**minutia** 434:2
**mischaracterizes** 502:21 503:3,10
**misleading** 502:20 503:3,9
**misplay** 450:4
**misuse** 313:12
**mix** 366:21
**mobile** 306:18 370:4 382:10 496:22,24
**mom** 309:17 310:9 310:16 311:11 313:1 314:4,22 315:1,11 316:8,16 316:24 330:5,6,11 330:12 331:7 332:19 333:12 338:9 354:17,22 356:9 357:14,20 358:5,10 426:5 432:12 453:23 454:12 463:19

472:8 474:19,24 481:8 489:6,6,11 491:12
**mom's** 337:23 349:9 432:14,17 433:22 464:7
**moment** 512:14
**moments** 512:17
**monday** 390:12
**money** 380:5 454:17
**monitor** 409:4
**monkeys** 348:6,13 348:20 349:4,10 349:16,21
**month** 330:16 331:2
**months** 312:22 318:21,24 476:20 481:14
**morning** 307:1 308:8
**mortgage** 334:20
**mother** 319:6 330:7,8 338:2,4,5 338:7,9,11 340:22 340:24 341:17 342:16 343:2 348:24 350:9,21 395:21 453:22 492:17 506:3,11 508:15 513:17,23 515:23 516:12 517:11 518:16
**mother's** 349:7 521:20
**motherboard** 409:3,5
**motivation** 480:17
**motor** 504:11,20

**mouth** 509:17
**move** 332:17 340:3 423:4 425:9 427:17 449:19 455:23 459:15 469:22 473:18 475:22 477:7 487:22 488:17 492:19 494:15 495:20 497:18 501:22
**moved** 362:6 466:8
**movie** 338:1
**moving** 394:20 435:20 474:5
**multiple** 319:8 475:19 490:23 514:16
**murderous** 465:20
**museum** 368:19
**myspace** 392:11 392:13,14,18
**myvegasslots** 458:1

**n**

**n** 330:5,5
**name** 307:8 319:2 319:4,22 320:15 325:4,9 330:10 334:20 345:12 349:16,21 350:5 352:8,14,15 353:13 396:21 397:6 403:6 417:3 425:19 460:9 486:8 487:14,16 516:12,17 520:14 520:18 521:6,8 526:6 527:3,4,15 528:3,4,21

**named** 431:20 524:5
**names** 349:18 350:3,7 397:12 415:8 428:7,14 431:1
**narc** 338:5
**narcissism** 337:24 338:1
**narcissismness** 346:10
**narcissist** 337:23 339:16 348:10
**narcissistic** 319:6 330:7,8,11,12 338:9 340:21
**nc** 330:16,16
**necessary** 315:19
**neck** 326:15
**need** 394:13,14 401:22 473:7 491:17 498:7,11 506:8 511:5 512:10 518:14 519:6,18
**needed** 332:23
**needs** 319:2 358:12 395:11 401:24 408:1 409:16 413:10 495:16 512:19
**negligence** 312:2
**neither** 509:7
**nerves** 468:13
**neuropsych** 428:21
**never** 354:21 359:21 364:21,21 365:10 379:16 400:16 419:8,8 424:19 431:2

434:7 443:1
450:12,13 451:21
463:20 469:3
487:3,18 507:14
515:18 519:20
**new** 309:17 319:3
332:24 344:8
345:3,8 367:5
409:4 478:22
482:6 485:18
490:9 506:14
**news** 472:3
**nickname** 332:24
**niles** 460:12
**nilly** 421:11,16
427:4
**nine** 309:24
318:21,24
**nintendo** 467:5
**non** 340:21 381:11
513:9
**nonresponsive**
439:24
**nope** 329:1 359:7
391:16,20 428:20
432:3,6
**north** 304:10
**northern** 303:2
429:5
**notarized** 526:14
**notary** 526:24
527:10,18 528:15
528:23 529:23
**note** 431:11 477:3
483:12 495:21
505:17 507:3,13
508:19 526:12
**noted** 483:3
505:19
**notice** 446:20
469:5,8

**number** 306:2
309:18 352:16
379:9,12,15
382:22 383:5
394:21 400:19
402:17,19,23
403:3 406:9
411:12,13 425:24
426:2,4,7,12,18,24
427:2,2,10 432:2,4
432:14,17,21
433:22 434:13
435:6,7 436:1
437:4,24 439:13
440:10,24 441:2
442:12,19 443:1
443:10 444:5,9
445:12 446:17
472:7,11 474:20
489:2,6,12,12,17
489:19,24 490:1,2
490:3,6,8,10,13,19
490:21,23 491:2,6
491:13 492:2,4,8
492:11 498:1,2
505:22 506:15
507:17,18,20,21
508:2 519:11,14
519:18,21 520:8
526:7,13
**numbers** 410:23
428:14 430:14
506:20,21 528:7
**numbing** 468:21
**nurse** 346:8

**o**

**o** 352:7 524:2,2
**o'clock** 329:18
**oath** 307:13 308:9
**object** 309:21
310:12,19 311:1,7

311:13 313:3
314:6,7,15,24
315:3,7,12,22
316:10,18 317:21
318:14 319:20
320:8,18 321:18
322:1,5 323:9,13
324:15,23 325:6
325:15 326:9,23
327:6,17 329:2,6
329:12 330:2
331:9,16 333:7,14
334:9 336:2,5,22
336:24 337:9
338:15,18 340:1
341:5,9,20,23
342:19 343:6
346:18 347:5
348:4,15,22 349:5
349:11,19,22
350:12 351:3,9,22
352:20 354:1,6
355:20 356:16,20
357:10,21 358:6
358:13 359:8,24
360:20 361:2,17
362:11 363:9,16
363:24 364:17
365:4,17 366:4,8
366:23 367:11,19
368:3 369:2
373:22 375:18
377:17 379:20
388:7,7 396:2
397:7,15,23 399:9
399:15 400:8,24
406:24 415:22
416:1,16,24
417:11,20 418:2
418:13,20 419:4
419:13,23 420:9

420:19 421:7
422:6,16 425:6
426:10,21 427:15
428:11 429:11,19
430:11,23 431:8
432:7,19,23
433:12 434:14
435:8,14,18 436:5
436:8,17,21 437:9
437:12,18 438:5,9
438:13,21 439:3,9
439:20 440:13
441:5 442:2,17,23
443:15 444:10,17
445:1,22 446:24
447:5,13,20 448:3
448:11,19 449:5
449:15 450:9,21
451:16,24 452:15
453:10 454:18
455:17 457:3,7,21
458:19,24 459:11
460:15,21 461:5
461:15 463:13,21
465:23 469:18
470:19 472:13
475:4,10 477:4
479:7,12 480:14
482:3 486:14
488:5 489:9,15
491:23 492:14
493:7,12,20 494:3
497:3,14 498:5
510:18 514:11,14
515:11,21 516:8
517:19 518:20
519:2,12,22 520:6
520:15,23
**objected** 347:18
393:9

objection 317:2
331:22 332:9,13
334:12 342:8
364:11 368:13
369:23 370:10,20
371:9,20 372:3,17
373:2,7 374:8,23
378:12,24 381:2
382:15 383:9,13
403:14,15,21
404:4 405:7,15
406:14 407:15
408:24 410:20
411:5 412:18
413:18 415:5
419:24,24 420:9
431:18 441:11,15
441:18 443:18
446:3,8 455:6
485:1 494:23
495:4 499:16
500:10 501:2,15
501:21 502:2,11
502:20,24 503:9
503:17,22 504:12
504:21 505:6
506:5 517:22
objectionable
510:16
objections 394:2,9
394:13,14 500:16
504:4 510:6 511:1
511:6,18 521:23
objects 395:12
403:11,24
obligation 313:21
obligations 409:14
observations
509:16
obtained 309:17
310:17,23 312:15

490:13 491:5,13
occasions 396:1
509:6 518:12
occurred 421:24
422:5
october 489:1
490:5 491:7,9
offensive 312:12
office 352:10
429:5
officer 355:7,9
official 527:15
528:21
officially 330:4
offset 340:20
oh 425:11 479:24
485:16 489:14
ohio 526:2
okay 309:16 317:5
318:21,24 320:6
320:23 321:22
327:19 328:10,12
329:16 332:17
334:16 336:9
337:19 338:8
340:3,16 341:17
343:14 345:15
356:6,22 359:13
359:21 361:7,23
363:20 365:20
366:10 370:24
374:2,14,21 375:3
375:22 376:8,20
377:2,19 378:6,17
380:3,10 381:8
382:5,7 383:18
384:8 385:7,17
386:3,7,15 387:11
387:24 388:20
390:13,15 392:6
395:4 396:8,16

397:11,21 398:3
398:13 400:5,10
400:18 401:21
402:1,20 403:24
404:9,11 405:1,4
405:20 406:6,12
406:19 407:21
410:17 411:2
412:1,2,6,9,23
413:19 414:3,17
415:10,14 416:8
416:18 417:24
418:17 421:14
422:13,22 423:16
423:17 424:11,23
425:9,11,14,17
426:16 427:17,18
428:16,23 429:6
429:17,23 430:2
430:16,21 431:6
431:15,22 432:9
433:10 434:1,8,13
434:23 435:6,20
436:3,7,23 437:4
437:20,24 438:20
439:11,15,18,24
440:10,17,20,22
440:24 441:9
442:7,12,15,21
443:5,8,22 444:1,5
444:8,15,21 445:5
445:13,16 446:2
446:12,17,20
447:2,4,17 448:1,8
449:10,19,20
450:2,16 451:4,9
451:20 453:5,9
454:11,21 455:12
455:23 456:11
457:12 458:1
459:15,20 461:19

462:13 463:1,9,18
464:1,6,14,18
465:10 466:1,15
466:24 467:8
469:16,22 470:8
470:13 471:17,19
471:20,24 472:7
472:11 473:18,19
474:2,5,11,17
475:22,23 476:9
477:21 478:6,18
479:17 480:10,19
480:23 481:5
484:10,22 485:4
485:10,16,19
486:23 487:22
488:17 490:12
492:6,19 493:10
494:10,15,20
495:12 496:12,20
497:8,10,18,23
498:4 499:3
502:17 505:17
508:24 509:17
510:3,10,15 512:8
512:23 513:6
514:7 515:19
516:15 517:2
520:20 521:4
522:9,9
old 341:1,7
omissions 312:6
once 340:18 350:8
363:5 395:16,18
400:14 419:7
481:14 492:11
506:14 515:3,5,6,9
518:10
one's 455:2
ones 331:21
332:12 349:13

[ones - perform]                                                                    Page 26

512:6 517:13
**open** 424:12 425:4
  483:7,18,24 487:5
  487:9,19 496:3
  498:15 514:18
  521:22 522:12
**opened** 424:24
**operate** 407:10
**operation** 504:6
**operative** 405:14
**opinion** 404:10
  427:6,13
**opt** 479:4 480:23
  506:13
**opting** 422:1,2
**oragel** 468:14,15
  468:17,18,21
**order** 354:13,16
  354:21 355:2
  415:15 454:17
  478:15
**ordered** 388:15
  454:12
**orders** 319:9
**organs** 338:7
**original** 360:23
  394:22 395:11
  402:24 410:10
**originally** 395:4
  403:11
**orkin** 344:23
  345:4,9
**outside** 324:19
**oz** 348:8

**p**

**p** 304:10
**p.m.** 409:20,24
  410:7 413:21,24
  423:11,14 432:17
  456:5,8 477:16,19
  482:15,18 484:12

484:15 496:14,17
  499:5,8,24 500:3
  508:23 509:2,3
  522:16
**pack** 466:7,8,9
**packet** 485:18
**page** 322:23
  329:24 347:21
  360:15 372:21
  378:8,17 380:10
  381:10 382:7,23
  383:19 385:11
  390:16,17 394:13
  395:20 402:3,3
  414:18 428:8,23
  431:23 432:9
  434:8 435:1 437:5
  438:17 440:5
  443:22 459:20,21
  461:19,20 464:2
  464:14,23 465:3,6
  467:9,18 481:15
  487:1 507:12,14
  508:22 511:6,11
  511:18 512:10,24
  513:1,2 514:3,23
  526:13,15 528:7
  529:3
**pages** 308:22
  375:14 378:7
  382:21 412:16
  470:14 474:1
  511:24
**paid** 312:21
  330:13 340:23
  342:12 357:20,23
**paper** 485:14
**paperwork** 482:5
  502:14,15 504:9
  521:13

**paragraph** 326:14
  361:23 366:10
  370:15 374:2,10
  374:12,14,16,21
  387:7 403:8
**paralegal** 505:16
  521:6,7
**parent** 320:11
  334:19
**parents** 337:23
**parked** 363:4,7
**parking** 361:13
  363:6
**part** 376:10 414:4
  414:16 417:3
  423:17 425:17
  427:18 456:17
  459:17 466:8
  468:12 469:23
  471:20 472:19
  473:2 474:7,10
  477:8 487:23
  488:20 492:23
  494:16 496:21
  528:9
**particular** 484:3
**parties** 312:8,13
  372:14 379:9
  422:3 523:2
**partner** 380:16
**partners** 414:21
  415:12,13,19
  416:4,13,22 417:8
  417:10,14 420:22
  421:19,24 422:10
  422:18 429:13
**party** 312:11
  313:17 315:19
  407:21 408:9
  466:7,10,15,20
  483:15 524:17

**password** 453:5,7
  453:24 454:4,7,9
  487:14 514:13
  516:6
**passwords** 487:16
**patricia** 349:24
  350:4
**paul** 431:4,12,20
  435:21 464:16,16
  467:9 469:1
  474:20 476:18
  516:20
**pay** 319:3 340:20
  357:14 479:15,22
  480:9 505:1
**paying** 331:7
**payment** 330:21
**pd** 355:5
**pdf** 306:3 386:7
  507:5
**pdfs** 406:5
**peek** 450:5
**penalty** 308:16
**people** 319:22
  320:2 332:6 348:8
  348:10,18 365:13
  370:3 423:7 424:9
  428:3 430:18
  433:21 439:13
  441:22 450:24
  452:18 462:16
  466:21 474:21
  475:19 478:7,13
  478:17 479:23
  480:3,11 492:9
  514:16 516:21,24
  517:10
**people's** 470:14
**perceived** 447:18
**perform** 463:1
  466:20

**period** 346:4
**perjury** 308:16
**permission** 419:9
  419:10 421:17
  433:23 447:11
  449:8 456:20,24
  457:13,18 471:4
**person** 310:4
  320:10 321:20
  323:4 329:15
  332:1,17 333:10
  334:19 344:6
  360:22 421:10
  444:22 468:7
  494:7 502:14
**person's** 334:20
  444:5
**personal** 361:20
  396:24 397:4
  404:10 408:17
  427:6,12 469:11
**personally** 323:16
  527:11 528:15
**pertaining** 303:14
**pest** 502:7 504:8
**phoenix** 450:4
**phone** 309:17
  379:9,12,15 383:5
  385:22 425:23
  426:2,4,7,12,18,24
  427:1,2,10 429:14
  429:14,18,24
  430:1,3,13,14
  431:4,6,12 433:11
  438:24 439:2
  441:2 444:13,16
  444:21 445:5,8
  447:8 448:23
  450:23 459:2,4
  472:7 481:14
  482:6,6 485:14,18

489:2,5,6,17,19,24
490:1,2,3,6,8,10
490:13,19,21,23
491:2,3,6,12,15,16
492:2,3,7,11 497:6
505:22 506:15
519:10,14,18,21
520:8 526:3
**photo** 469:1,2
  470:10 471:21
  474:22 484:3,19
**photos** 306:15
  424:3,7 474:6,12
  475:15
**physical** 310:3
**pick** 460:6 498:11
  512:19 519:6
  521:18 522:3,13
**picking** 519:7
**picture** 414:9
  423:21 425:21
  427:21 449:22
  456:15 459:18
  467:13 475:21
  508:6
**pictures** 424:9
  474:11 475:20
  486:19
**piece** 485:13
**pintrest** 391:19
**pissing** 461:21
  462:2
**pizza** 450:5
**place** 319:23
  511:16 524:14
**places** 369:9
  485:23
**plain** 399:3
**plaintiff** 395:12,13
  398:4 400:11,12
  403:11,24 407:6,9

**plaintiff's** 385:7
  400:19 402:17,18
  403:12 406:8,9
  410:23 506:21
  507:21 508:2
**plaintiffs** 303:6
  304:2 405:1
**plane** 368:15,16
  368:18,21
**planes** 368:20
**planet** 325:4,11
  365:6
**planning** 467:20
  479:5
**platform** 380:15
**play** 439:19 459:4
  462:11,13,13
**played** 462:21
  463:5,5 466:12,13
**playing** 369:5
  462:24
**please** 307:12
  308:20 309:2
  311:17 316:4
  317:12 347:10
  355:12 377:3
  388:4 392:21
  418:10 504:3
  507:8 512:23
  526:11,11
**point** 319:8 443:10
  463:18 471:14
  515:8,24 516:3
**points** 372:23
  373:11
**pokemon** 369:10
**police** 354:24
  355:3 363:3
**policy** 353:2 371:2
  371:4,8 377:20
  378:4 395:9 422:2

**pop** 334:4
**popeye's** 485:21
  486:12
**portal** 368:24
**portals** 368:5,7
**portion** 491:21
**position** 315:19
  387:19 395:10
  415:24 416:3,20
  416:22 421:2
  454:11 456:23
  464:6
**possession** 396:9
  396:12 397:22
**possibility** 312:17
**possible** 316:24
  328:10,11 417:17
  417:24 418:10,17
  418:24 419:17
  421:1 429:23
  430:9 432:4,16,21
  434:18 435:6
  437:16 438:11
  439:7 440:12
  441:4,17 442:21
  444:24 447:4,7,17
  448:22 451:9,12
  451:14 454:15
  455:24 458:10,17
  458:22 459:8
  460:19 471:6
  515:2,7 520:2,5,12
**possibly** 400:18
  431:15
**post** 306:12
  318:18,21 319:17
  321:8,22 322:22
  323:3 324:13,13
  325:23 326:2,4
  328:2,5,9,10
  329:23 331:5,15

332:1,7 333:4,6,24
335:19 336:16
337:7,19 339:10
339:13,17 343:21
346:15 347:20,23
354:12,14 356:6
356:12,23 358:24
359:4 360:8,12,14
360:15 361:8,11
364:9 365:21
368:6,24 380:19
456:20,24 457:19
460:19 463:11
464:3,4,16,24
465:4,7 467:10
468:2,24 469:16
479:17,24 480:1
481:16 485:21
**posted** 319:12
320:10 321:17
460:14,14 467:12
468:23 474:14
475:15,18 486:12
486:17,19 487:2
**posting** 332:2
474:18 475:19
486:16 487:13
**postings** 382:11
**posts** 306:16
375:15 384:4,5
456:19,20 460:13
460:20 464:2
468:7 478:3,4,6,8
487:3,18
**potential** 308:16
**practice** 352:14
**preceded** 324:13
**precise** 400:12
**prefer** 351:12
**preguntados**
458:3

**prepared** 308:15
393:14 394:8
511:10
**prescribed** 352:2
**presence** 524:9
**present** 304:16
407:10 473:8
499:18 509:15
**presented** 403:13
**presents** 449:12
**preserve** 376:10
**preserving** 423:3
**presses** 326:18
**presumably** 413:9
**pretend** 467:1
**pretended** 466:24
**pretending** 346:8
467:5,6 512:14
**pretty** 319:18
421:15
**previous** 309:11
347:18 425:6
451:21 477:4
495:4
**previously** 308:18
309:17 344:9
345:4 393:9
394:17 444:1
490:12 510:5
**price** 304:9
**prices** 453:4
**primary** 319:5
428:24 430:5
**print** 412:17
492:22
**printed** 412:4
**prior** 313:24 423:6
501:22
**privacy** 353:2
371:1,4,7 376:21
377:20 378:4,19

383:21 395:9
408:17 422:2
426:18 464:7,9
471:7,10,14
472:22 473:4,8,9
473:10,11 475:13
**private** 326:22
375:16 421:10
426:8 427:1,11
453:9 472:15,18
**privatize** 318:17
**privilege** 413:4
505:8
**privileged** 387:21
388:9
**probably** 320:24
388:13 422:23
429:13 433:23
453:17 467:13
469:17 475:12
**problem** 359:1
**procedure** 303:13
409:14 527:5
528:5
**proceed** 307:16
309:7 317:11
322:20 333:21
335:17 347:15
377:8 381:18
384:17 393:2
400:5 410:1 414:1
456:9 482:19
484:16 496:18
499:9 500:4 518:7
518:14,23
**proceeded** 366:20
400:1
**process** 508:21
**produce** 376:5
390:1 409:15
412:15 472:24

473:3,14,22 474:9
481:5 514:1
**produced** 309:9
388:2 390:7 401:8
401:10,23,24
406:12 408:1
409:11 411:12,15
411:23,24 413:4,6
413:9 414:7
426:13 471:13
473:19 474:2
483:4,13,17
492:21,23 497:11
498:15 505:18
**producing** 389:13
407:8
**product** 387:21
505:9
**production** 400:22
411:3,9,19 414:5
414:15 423:18
425:18 427:19
449:21 456:17
459:17 469:24
470:10 471:21
474:7 475:24
477:9 484:5
487:24 488:21
494:16 496:5,22
497:23 526:15,17
526:22
**products** 370:5
**professional**
340:17 342:23
**profile** 306:16,17
414:16 425:21
427:2,21 449:22
459:18 481:6
487:24 488:1,15
488:19,22 490:9
494:6 508:4,6

profiles 470:14
472:1
projecting 338:6
promotions
380:17
proper 510:18
511:17
properly 495:15
property 313:16
proportional
358:12 395:10
407:24 409:16
413:10 495:16
proposed 520:21
proprietary
313:17
prosecute 387:4
protected 327:5
387:21 505:9
514:13
provide 395:2,13
417:17 448:21
488:3,10,12 496:7
498:2
provided 312:7,11
370:6 389:24
390:5 393:7 413:5
418:24 421:3
448:18 473:6
489:2
provider 313:15
providers 311:22
312:17,19 313:9
380:18,19
provides 450:17
providing 336:21
337:4 364:8
provision 316:8,17
374:6
pseudonym
318:12

psychiatrist 352:3
psychiatry 431:23
public 318:12
322:4 323:12
324:22 326:5,8
328:24 329:5,11
331:15,20 332:2,7
332:11 333:6
334:11 335:24
336:4 337:7
338:17,23 339:17
339:23 344:2
346:17,22 347:3
348:1 356:14,18
357:4,9 359:6,10
360:18 361:1
366:2,6 368:11
373:12 375:17
479:4 527:10,18
528:15,23 529:23
publicly 321:23
323:6 373:15
380:19
publish 323:3
pull 319:7 507:8
512:23
pulled 366:13,14
414:5,14 516:14
punitive 311:24
320:2 325:13
409:9
purchased 312:15
purported 409:15
purports 389:7
purposes 415:2
417:18 418:19
419:19 420:16
421:4 422:4
pursuant 303:12
316:16 419:20
420:16 422:1

pursue 511:8
pursuing 315:10
put 318:8 330:11
340:24 341:14
429:14 444:12
puts 449:11

**q**

quantities 321:14
question 322:10
327:17 346:24
347:18,18 351:13
361:13 398:20
399:2,3,5 413:8
418:10 424:15,23
454:19 477:4,5
483:5 491:20,24
495:3,4 501:6
502:9 503:7 505:7
505:10 510:11
questioning 314:7
484:23 498:9
509:15 511:8
questions 334:4
361:7,9 393:7,12
393:15 425:7
483:2,22 484:2
499:11 510:4,7,9
510:16,20 511:2,3
511:13,23 512:21
519:8
quick 336:23,24
402:7 484:8
496:11 499:2
519:8
quote 506:2

**r**

r 320:24 352:7
radio.com. 450:14
radomska 352:5

ramirez 516:18,19
rampage 465:21
random 365:13
range 412:2,3
413:2
rated 359:19
ray 476:19,24
rays 326:15
reacting 434:4
read 310:4 312:23
314:1 319:10
321:17 323:5
326:19 328:15
331:2 333:2 334:5
341:3 346:11
367:8 382:12
387:16 396:10
401:2,3 403:9
406:4 407:11
461:9 483:14
491:22 522:19
523:3 527:5,6,12
528:5,6,17
readily 404:2
reading 323:2
374:12 526:19
real 336:23 402:7
460:9
reality 338:13
realize 315:10
517:15,21
realizing 509:4
really 351:12
362:16 426:17
506:2,10
realm 466:9
reason 312:9
411:2,21 441:24
461:13 470:5,15
476:6 493:4,24
494:20 496:24

497:12 506:10
507:17 526:14
528:8 529:3
**reasonable** 313:11
426:17
**reasons** 388:17
395:7 483:18
**recall** 309:19
328:14 341:12,16
345:20 351:24
365:1 387:16
395:14,14 400:12
401:16 410:9,13
431:3 480:22
491:15 502:23
**receipt** 526:18
**receive** 353:15
506:12
**received** 501:19
505:15 508:22
509:1
**receiving** 509:21
**recipient** 448:9
**recognition**
423:23 424:1,5,20
**recognize** 387:1
415:8,11 424:3,6
428:13,16,18,19
428:21,23,24
432:2 455:9 461:1
513:8
**record** 307:2
309:1,3,5,6 317:5
317:6,9,10 321:2,3
321:5,6 322:14,15
322:18,19 324:22
325:16,17,20,21
327:15,16,18,20
327:22,23 329:16
329:17,20,21
333:15,16,19,20

335:11,13,15,16
336:9,10,13,14
337:12,14,16,17
339:2,3,7,8 340:4
340:5,8,9 343:14
343:15,18,19
345:21,22 346:1,2
347:9,11,13,14
355:11,13,15,16
358:17,18,21,22
360:1,2,5,6 369:11
369:12,15,16
371:3 377:2,4,6,7
381:12,13,16,17
384:11,12,15,16
386:8,9,12,13
388:6,20,21,24
389:1 390:18,19
390:22,23 392:20
392:22,24 393:1
394:6 402:7,9,12
402:13 409:18,19
409:22,24 413:19
413:20,23,24
423:9,10,13,14
431:11 456:4,8
461:9 477:14,15
477:18,19 482:11
482:13,14,17,18
482:22 484:8,11
484:15,21,24
491:22 495:23
496:13,17 499:4,8
499:24,24 500:2,3
506:1 507:3,13
508:11,19 511:2
522:14,16 528:9
**records** 494:5
508:10
**redacted** 387:8
388:19 401:8,10

401:23 406:13
412:17,22 413:6
507:15
**redaction** 388:1,3
388:15
**reddit** 306:3
317:12 318:5,11
319:19 369:18,21
370:3,7 371:4,7,14
374:15 375:6,10
375:12,15,23
376:3,9 392:10,17
473:11 481:4
**redditors** 370:2
**redhead** 475:1
**redirect** 498:7,14
513:4
**reduced** 524:9
**refer** 308:18
309:15 334:21,24
335:2 354:12
359:13 368:23
**reference** 348:7
428:21 526:7
527:2 528:2
**referenced** 413:11
524:8,12 527:11
528:15
**references** 512:10
**referred** 401:21
**referring** 334:16
335:4 368:23
402:18,18 407:3
**refers** 509:8
**reflect** 386:4
411:22 494:1,21
**reflected** 512:24
**reflects** 493:10,17
**refund** 340:17
**regard** 396:6
397:19

**regarding** 337:22
506:11
**register** 361:21
**registration**
485:17
**regret** 355:19
356:1
**regretfully** 357:15
**reinisch** 304:10
384:22
**rejected** 341:2
**relate** 313:12
483:9 484:4
**related** 315:1
327:12 379:19
381:20 393:23
394:1 409:10
414:5 423:18
473:6 483:2,3,23
495:19 497:24
518:8
**relates** 313:16
**relating** 312:19
**relative** 524:16
**relatives** 403:7
**relevant** 322:7
344:19 349:17
350:15 358:11
362:21 395:10
407:24 408:13
409:16 413:10
495:16 518:13
**reliance** 312:5
**relief** 394:6 518:14
**remaining** 349:1
**remaking** 366:16
**remember** 323:20
324:2,5 328:6,8
344:11,12,14,16
345:1,13,18 350:7
351:5 353:13

362:16,23 369:8
369:10 392:12
410:12 462:23
463:6 467:24
478:13 486:10,13
490:1,20,21 491:8
504:19,19 521:16
**remembering**
338:11
**remind** 465:13
**remote** 304:1
**remotely** 303:21
**remotes** 467:19
**remove** 384:2,8
**removed** 388:1,16
**rent** 330:13,19,22
330:23 331:7
357:23
**rep** 409:15
**repeat** 424:15
522:6
**repeating** 346:24
510:16
**replied** 321:20
459:21 465:11
**reply** 331:24
**replying** 332:1
337:11 344:6
360:22
**report** 335:10
346:9 355:6
**reported** 303:21
**reporter** 303:16
307:10,12 524:4
527:7
**reporter's** 305:11
**reports** 334:1,5,23
335:4,7
**represent** 317:20
**representative**
320:3 351:16

399:24 409:9
420:7 500:24
518:23 520:21
521:11
**request** 355:1
375:23 390:16
395:12 396:8
402:1,2,4,23 403:3
404:1 406:7 413:1
413:12 474:3
495:17 528:9,11
**requested** 376:3
491:21
**requests** 395:13
**required** 362:4
363:2 526:24
**requirements**
364:6
**reread** 491:20
**research** 324:19
380:17
**researched** 397:2
**reserve** 388:16
394:11 413:7
498:13 521:22,22
**resident** 363:22
**resolution** 316:5
379:24
**respect** 463:2
471:14
**respond** 332:22
404:11 498:14
506:13
**responded** 333:10
**responding** 323:5
329:14 332:18
333:9 334:18
336:1 338:20
339:21 359:20
361:13 376:2
391:24

**responds** 332:3
**response** 320:14
320:16 332:3
394:22,22,23
395:11 399:5
400:10,13 401:9
401:22 402:4,5,24
402:24 403:1
406:6 449:13
452:11,15 502:18
505:16,24 506:1
**responses** 332:6
385:19 389:8
390:16 395:2
402:3 412:24
413:1,12 464:19
**responsible** 514:5
514:8
**rest** 506:16 513:7
**restaurant** 359:19
**restaurants** 453:3
454:17
**restraining** 319:9
354:13,16,21
**results** 431:14
**resume** 388:17
521:24
**returned** 526:18
**returns** 343:3
**reveal** 322:4
**reveals** 509:5
**reversed** 330:19
**review** 388:10,15
483:5,16 499:14
500:8 526:12
527:1 528:1
**reviewing** 508:10
**right** 308:21 313:7
314:21 318:19,20
335:8 358:4
361:14 366:13

387:5,9 388:11,12
388:16 389:19,21
390:13 392:16
393:21,23 394:9
394:11 396:1,6
397:19,22 405:11
406:20 408:22
410:3 413:7 414:4
414:12 416:23
420:8,17 422:14
425:19 426:2
431:6,24 435:21
436:12 437:22,24
439:12,16,18
440:18 444:16
445:6 447:12,19
448:2,10 451:7,23
452:13 453:24
455:4,13,16 456:3
464:8 469:10
470:11 472:11
474:15 475:1
478:14 479:20
480:13,19,21
488:22 489:13
491:17 492:8,13
496:20 497:9,10
498:6,13 499:23
508:14 514:13
516:15,19,20
518:7 520:22
**rights** 313:16,17
375:22 426:16
521:22
**ring** 400:3
**roberto** 384:22
**role** 344:13 463:1
502:1
**room** 366:20
367:2 467:18,23

**roommate** 440:9
**roughly** 412:16
  414:6
**round** 335:20
**routine** 510:21
**rule** 364:4 393:18
  399:13,17
**rules** 303:13
  378:21 409:13
  527:5 528:5
**rumble** 467:18,22
**run** 407:23 414:19
  415:16 416:10
  417:6 421:21
  498:8
**running** 462:24
**rush** 459:6,7,9
**ryan** 476:19

**s**

**s** 320:24 352:7
  461:22,22,22
  526:15 528:8,8
  529:3
**sales** 344:13
  380:17
**sam** 437:20 476:23
**samantha** 440:5,6
**samuel** 393:16
**sanctions** 400:2
**sandwich** 366:17
  367:6,7,21 368:1
**sat** 410:9
**satisfactory**
  511:14
**sauce** 366:16,17
  366:19,21 367:7
  367:18
**saved** 376:18
  397:6,13 454:8,9
**saw** 513:7

**saying** 333:1 335:6
  363:1,13 398:22
  399:22 404:12
  415:19 417:8
  434:5 447:2
  450:18,19,23
  465:21 490:14
**says** 309:12 310:1
  311:19,21 313:8
  316:5 318:20
  326:14 330:4
  332:18 333:24
  335:3 338:9
  340:16 341:14
  344:8 346:4,7
  359:20 361:23
  366:10 368:6
  370:2,15 371:4,14
  371:24 372:9,13
  372:19 373:12
  375:6 378:8,18
  379:23 380:10,14
  382:8 383:20
  385:7,12,13,13
  387:11,12,13,17
  395:5 400:10
  403:3,24 406:9
  410:22 414:18,24
  415:12,16 416:8
  416:10 417:2,5,5
  421:14,20,21
  423:23 424:1
  425:23 427:23
  428:2 430:16
  431:23 434:9
  435:2 438:17
  441:24 442:7
  443:23 450:2,16
  451:4,13,20
  456:19 459:21
  460:13 461:3,20

  463:10 464:15,18
  465:10 467:9,17
  468:10,24 470:9
  470:13 471:24
  472:4,17 475:24
  476:3 478:3,19,22
  479:17 485:20
  487:17,17,18,24
  507:19,21 508:2
  508:21
**scare** 479:23
**scary** 478:24
**schedule** 521:24
  522:1
**school** 366:11
**scientist** 464:12,12
**scrabble** 450:5
**screen** 325:23
  384:20 394:21
  445:8,9 496:20
  497:20 507:24
**scroll** 318:18
  320:23 371:14
  385:10 386:3
  411:13,16,17
  412:10 415:14
  507:11
**scrolling** 370:24
  415:15
**seal** 527:15 528:21
**sean** 434:9
**search** 320:24
  325:9 391:23
  397:6 407:23
  408:7,22 427:1
  431:6,10 479:2,19
  480:7 485:11
  495:18 513:10
  520:5
**searchable** 319:10
  381:9

**searched** 395:22
  409:9 495:15
  519:10,20
**searches** 312:10
  396:20 397:12
**searching** 408:8
  431:12 521:16
**second** 326:13
  336:23 361:24
  366:10 370:16
  382:7 428:18
  466:4 491:17
**section** 309:16
  311:18,19 465:12
**security** 344:23
  345:5,9
**see** 309:12,23
  311:18 316:5
  321:8 322:22
  325:23 326:13
  328:2 332:19
  333:23 335:19
  336:16 337:19
  339:10 340:11
  341:14 343:21
  344:18 346:4
  347:21 348:7
  349:17 354:13
  356:6,10,23
  358:24 359:13
  360:8 361:8 362:2
  363:3,8,12 365:21
  368:6 369:18
  370:2,7 371:4,13
  371:17 372:20,23
  373:11,15 374:3
  375:5,22,24 378:7
  378:17,21 380:10
  380:21 381:21
  382:7,22 383:2,5
  383:20 384:19,23

385:1,8,15,18
386:19,20,23
389:5,8,11 391:1,4
394:24 395:20,23
400:18,19 401:7,9
401:22,23 403:1
404:13 405:10,24
406:9,10 410:5,7
410:22,24 411:17
411:19 412:6,11
413:3 414:8,17,22
423:20,23 424:3
425:19,21,23
427:2,21,24 428:3
428:8 431:7,22
432:9 433:21
434:8 435:1,20
436:12,23 437:4,5
437:20 438:17,18
440:6 442:8
443:23 445:10
446:12,22 449:22
449:24 455:5,14
456:12,15,21
459:17 461:1
464:1,4,7,10,11,24
465:4,7 468:1,2
469:16 470:3,10
471:21 472:17
474:12 475:8,24
476:4,23 477:10
477:24 478:3,6,8
478:16,19,20
481:7,13,15 484:2
485:19 487:5
488:21,23 489:3
490:19 492:23
493:1 494:18
495:10 498:19
507:18 508:24
509:22 510:11

**seeing** 330:21
508:2,20
**seek** 400:1
**seeks** 406:7
**seen** 309:10
353:14 385:4
431:2 507:14
513:10 520:17,20
521:1
**sell** 384:7 421:12
**selling** 322:8,12
422:24
**sells** 416:5
**send** 389:17 505:1
505:23
**sending** 350:9
518:17
**senior** 326:16
**sensitive** 327:4
**sent** 348:9,10
360:22 383:23
389:15 390:9
399:13,18,20,21
498:18,18,19
501:12,19 521:5
521:10,12
**sentence** 361:24
370:16 430:18
**september** 331:2
459:22 490:5
**series** 473:22,23
506:24 507:2,5,6
**seriously** 328:21
365:6
**serve** 367:24
399:24
**served** 368:1
**servers** 382:10
384:2,3
**service** 370:6
371:19 372:5,11

372:12,15,16
373:6,9 374:7,11
374:13,16,22
378:7,8,19 380:19
**services** 310:2,10
312:4,6,9,14,16,20
312:23 313:2,13
314:4,14,24 316:9
370:6,9,16,18,19
372:2 373:12,14
373:20 378:18
380:18 382:10
452:24 454:16
**session** 308:19
309:11 376:13,15
376:21 399:21,22
410:10,13 423:19
427:20 449:21
451:21 456:18
473:20 474:8
483:4 492:24
**set** 330:21 417:18
475:13 525:1
**setting** 375:10,11
423:20
**settings** 376:14,22
424:1,6,8,11,19
425:4 433:20
457:9 464:7,10
471:7,10,14
472:20,22,23
473:4,9,9,10,11
**settle** 313:23
**seven** 309:24
**sex** 444:2
**shadow** 461:21
462:2,6
**shape** 358:15
**share** 305:14
373:14 380:3,4,10
380:11,13,22

419:11 421:4
430:2 476:7,9
**shared** 379:8
414:21 415:1,18
416:12,13,21
417:7,9 419:20
420:15 421:22,23
426:12 476:4
489:12 492:7,11
500:20 514:10,16
**shares** 380:14
**sharing** 328:20
417:18 418:18
419:18,19 421:2
421:24
**sharp** 468:10
**sheet** 526:13 528:7
528:10,18 529:1
**shenanigans**
366:12
**sherlovescats**
320:24
**shirt** 466:23
**shit** 328:3,12,21
346:9
**shoot** 362:16
453:17
**short** 330:5
**shorthand** 303:16
524:3
**show** 445:9 464:13
464:22 513:11
**showing** 403:5
445:12
**shown** 526:16
**shows** 319:3
469:23,24 470:6
470:16 489:1
494:17 495:8
496:22 497:11
507:1 508:23

**[shows - stephanie]**

509:2

**shut** 496:3 509:17

**siblings** 348:14,17
348:20

**side** 349:7,9 466:9
504:8

**sight** 366:20

**sign** 385:23 522:20
523:3

**signature** 385:21
385:21 523:1
525:6 526:14

**signed** 527:13
528:18

**signing** 310:9
313:1 334:2
377:19 378:2
526:19

**similar** 337:20,22
340:21 464:2

**similarly** 303:5

**simultaneously**
343:3

**sincerely** 526:21

**single** 362:23
398:21 401:2,3,18
409:10 473:5
504:20 513:9
514:2,23

**sir** 526:10

**sister** 340:22
341:8 342:6,16,18
343:2 440:23
446:16 486:2,4
506:14 508:16
513:18 515:24
516:17 517:11
518:17

**sit** 393:22 403:14
403:21 405:4
420:5 478:12

486:10 517:16

**site** 397:5 400:14
518:10

**sitting** 410:13

**situated** 303:5

**situation** 340:21
367:15,15

**six** 309:24 312:22
355:4 361:12
362:17,22,24
476:20

**sixth** 435:5

**skip** 466:2

**slow** 318:19

**smiley** 465:14

**smiling** 469:5,8

**snafu** 477:22

**snapchat** 392:2

**snew** 318:3,4

**snooping** 346:8

**social** 380:16
391:2 392:8,16

**society** 393:15

**sold** 417:14 420:12
420:22

**soldier** 439:22

**solutions** 307:10
307:11 526:1
529:1

**somebody** 365:7
396:20 408:19
421:12 424:10
452:3,6,19 454:22
509:5 514:18

**somebody's**
331:24 519:18

**someone's** 396:21
519:21 520:8

**soon** 467:21

**sophia** 486:5,9,11
516:18,19

**sorry** 312:13
321:12 330:12
346:23 379:20
383:13 423:6
424:14 458:7
475:2 477:23
486:8 495:6
499:17 503:6
505:14 506:20
522:5

**sort** 330:21 347:7
406:3

**sought** 354:16,21

**sound** 347:6

**sounded** 310:6

**source** 321:15

**sources** 372:10

**space** 368:19

**spam** 506:12,17

**speak** 521:15

**speakers** 499:21

**special** 311:24
367:6

**specifically** 394:15
413:11 473:24

**specification**
500:11,16 504:13

**specified** 524:15

**speculation**
504:22

**speeding** 364:20
364:22 505:1

**spell** 352:6

**spend** 512:18

**sprint** 490:6

**ss** 524:1

**stalk** 310:3

**stamp** 309:15
311:17 428:17
474:18 501:17

**stamped** 308:20
413:3 471:20
473:21

**stand** 309:2
335:12 347:10
355:12 377:3
392:21 403:13
467:14

**standardized**
455:13

**start** 370:24
381:23 487:12

**started** 363:6
410:18 521:13

**starting** 410:10,14
456:12 477:9

**starts** 328:3
336:16 339:11
386:19 411:11
477:23

**state** 303:16 524:1
524:4 527:10
528:15

**statement** 378:20
527:13,14 528:19
528:19

**states** 303:1,13
406:7 407:6

**static** 346:24

**status** 478:19

**statuses** 487:3,18

**steal** 449:3

**stenotype** 524:9

**step** 444:2

**stephanie** 303:4
303:11 305:6
307:5,6 308:2
385:18 416:12
421:23 430:19
459:21 463:10
464:2,3,15 465:3

465:10 467:9
478:19 524:5
526:6,8 527:3,4,9
528:3,4,13 529:20
**stepson** 434:12
**sticker** 362:1,20
363:1,3,20,21
**stickers** 362:5
363:7 364:6
**stole** 448:1,16
**stop** 318:19
356:22,23 468:21
510:19
**stopped** 330:15
**storage** 366:19
**store** 397:1
**stories** 470:2
**story** 330:5
**storyteller** 462:18
463:2
**street** 304:4,10
363:5,6,11
**strike** 501:22
**stuff** 365:13
376:17 389:15
407:18 486:18,20
**sub** 412:2 414:3
**subject** 313:19,23
394:6 398:3
404:12
**submit** 371:15
374:3,4 388:9,14
**submitted** 351:12
406:17
**subpoena** 449:10
518:17
**subscribed** 527:10
528:14 529:21
**suburbs** 362:13,18
**successful** 501:1

**sue** 314:21 315:11
**sued** 325:12
**suing** 314:24
315:7
**suit** 313:14
**suite** 304:5 526:2
**sunday** 390:12
**superior** 526:1
**supplemental**
389:8 394:23
400:10 401:9,22
402:5 403:1 406:6
412:24 413:1
**suppose** 328:18,22
382:20
**supposed** 318:9
376:4
**sure** 309:2 338:8
346:9 379:14
392:5 402:8 409:6
456:2 467:20
516:13
**surreptitiously**
449:3,7
**susan** 474:21
**suspended** 504:16
**suspending** 522:12
**swanson** 440:5,6
**switch** 467:5
506:19
**switched** 489:19
**switching** 489:19
**sworn** 307:14
308:3 524:6
527:10,13 528:14
528:18 529:21
**symbolize** 318:10

**t**

**t** 466:23
**tab** 497:21

**tacked** 330:22
**tagged** 475:20
481:7
**tags** 424:10
**take** 351:7,17
371:16 394:2
421:2 456:1
468:11 484:8
496:11 499:1
512:4
**taken** 303:12,14
308:11 334:19
351:20 387:19
456:7,23 484:14
496:16 499:7
524:14
**talk** 338:3 340:16
350:5 393:14
399:1 473:15
**talked** 350:6 355:7
358:15 376:17
385:5 423:2
466:21 481:14
511:2 521:10,11
**talking** 320:7
323:17 324:17
330:15,20 331:11
331:13 336:7
347:20 356:9
364:10 386:15
397:12 463:23
464:22 465:16
487:11
**tansur** 434:6
**tartar** 366:15,17
366:19,21
**tax** 340:17,20
341:22 342:22
343:3
**taxes** 340:18,19,24
341:1,8,15 342:6

342:17,18
**telephone** 352:16
446:17
**tell** 318:19 387:12
401:18 404:23
405:3 411:11
421:12 455:1
506:3 507:18
**telling** 320:6
365:10 401:8
487:15
**tells** 348:24 449:11
**ten** 308:24 328:14
353:17 483:11,21
484:22 485:2
495:22 496:9
**tequilla** 415:11
**ter** 408:15
**terabyte** 408:14
408:15
**term** 314:5 370:19
**terminology** 364:5
**terms** 309:13
310:1,10 311:6
314:13 315:21
352:18 370:17,18
377:20 378:3,7,8
378:11,19,20
382:11 395:9
407:23 422:1
463:19,20
**terri** 349:24 350:4
**terrible** 487:3,18
**testified** 308:4
309:16 310:9
414:5 444:1
490:12
**testify** 405:5 524:6
**testimony** 308:13
308:15 449:13
501:22 502:21

[testimony - transcription]                                     Page 36

503:4,10 505:10
518:10 522:17
524:8,11 527:6,7
528:6,9,12
**text** 505:23 506:2
506:9,10,12,15,16
**texted** 506:14
**thank** 307:15
456:3 507:23
522:18
**thanks** 332:22
**thick** 412:5,7,16
492:22
**thing** 318:6 325:8
332:2,4 341:18
368:21 399:17
472:23 510:3
**things** 324:20
333:1 338:10
360:9 376:9 394:1
397:1 413:12
498:20
**think** 317:19
327:14 330:9
332:23 336:23
340:4 342:5,15
343:1 345:19
355:4,22 356:4
362:10 364:20
369:1,9 376:23
377:16 378:15
379:24 387:24
390:12 391:13
392:11,14 404:18
406:2 427:17
434:24 435:16
436:2 442:1 443:5
444:2,19 453:22
460:12 461:17,24
463:5 464:9
471:16 474:6

476:23 477:7
482:1 483:10
485:9,20 486:5
488:18 490:19,21
491:7,18 497:19
501:19 505:2
511:1 512:4 521:8
522:9
**thinking** 476:23
**thinks** 428:10
**third** 312:7,11,13
313:17 366:16
372:14 379:9
407:21 422:3
483:15
**thirty** 526:18
**thought** 323:4
329:14 332:1,5
333:9 334:19
451:11 486:3,20
**thoughts** 478:24
**thread** 321:20
**threaten** 310:3
**threatened** 313:14
**three** 309:23
332:18 351:20
378:6,6 394:5
414:6 456:1 480:1
480:2 481:1,14
482:11,21,23
509:2,6 516:10
518:12
**throne** 459:6,7,8
**thumb** 468:11,13
468:20
**ticket** 505:1
**tickets** 364:21,22
504:15
**ties** 395:8
**tight** 471:11

**tiktok** 391:7,11
**time** 328:14
330:18 331:11,13
342:17 344:15
354:20 357:23
362:5,6 366:16
369:5 394:2 395:5
398:18 399:6
400:12 431:15
432:22 433:2,6
440:17 443:11
450:18 453:16
463:18 466:14
471:14 474:6,12
474:12,17 475:3,8
475:21 479:5
480:17 481:10
483:5 486:2
487:10 492:16
493:14 494:5
500:11,17 504:13
506:13,17 508:1
508:20 509:4
512:10,17,18
513:7 515:8
524:14
**times** 395:14
446:21 460:24
486:7 487:4,19
490:23
**tinder** 392:4
**today** 307:10
308:13,16 329:8
329:14 376:13
394:7 403:14,21
405:4 413:7 420:5
478:12 482:12
486:10,13 513:7
513:11,24 522:12
**toddler** 459:5

**told** 320:16 358:10
365:6 367:22
375:15 425:3
489:11 512:11
**ton** 478:16
**tons** 319:22 320:2
**tooth** 468:20
**top** 309:12 318:7
322:22 329:24
335:19 378:7,18
382:8 387:17
393:20 414:9,17
416:8 423:21
427:21 428:24
432:10 435:2
449:22 450:2
456:15 459:18
465:3,19 470:10
471:21 475:24
476:14 478:3
492:23 501:18
**tophatter** 450:14
**tort** 312:1
**totally** 338:6,10
343:22 412:17
**toth** 304:17 308:22
379:4 425:10,13
499:21 507:7,11
507:18
**transactional**
371:16
**transcribed**
524:10 527:7
**transcript** 305:1
512:9 523:3
526:11,12 527:5
527:12 528:5,11
528:17
**transcription**
524:11

**transmitted**
393:19
**transunion** 334:4
334:24 335:2,4,7
**tried** 341:1,17
**trivia** 458:4,5,7
**troll** 465:12
**trouble** 486:16
**true** 314:24 338:6
415:3,7 457:18
524:11
**truth** 524:6,6,7
**truthful** 308:13,15
**try** 348:11 369:9
479:23 491:18
**trying** 320:11
338:12 399:1
434:6 469:4,10,13
480:3,11 519:14
519:17
**tubes** 366:17,19
**tuesday** 521:19
**tumblr** 375:3
391:17
**turn** 308:20
311:17 316:4
318:18 378:6
512:20
**turning** 498:23
**turns** 326:16
**tv** 464:22
**twice** 350:8 467:11
**twitch** 391:9,12
**twitter** 389:23,24
390:3,6,11 392:9
409:12 473:10
483:12,16
**two** 309:23 332:18
354:13 358:16
361:7,8 364:20,22
366:17 378:6

390:4 408:14,15
412:7,16 425:6
453:17 456:1
490:2,8 509:7
512:12 519:7
**type** 393:11
**types** 383:2,8
**typing** 519:14
**typo** 402:20

**u**

**u.s.** 312:21 439:23
485:23
**ugh** 321:15
**ultimately** 419:21
**unauthorized**
312:9
**uncle** 443:7,8
**unclear** 505:23
**uncles** 348:17
349:3
**underneath**
387:13,20
**understand** 308:8
315:18 368:18
376:11 387:22,23
399:1,2 413:13,16
415:20 416:14
457:1 473:12
501:24 518:1,18
519:6,7
**understanding**
393:13 413:15
495:18 500:23
502:8 503:14,16
503:19
**unduly** 395:12
396:9 407:9
**unintelligible**
503:17,23
**unique** 508:21

**unit** 307:4
**united** 303:1,13
**units** 467:21
**unredacted**
401:24 413:6
**unredacting** 388:8
**untrue** 480:21
**unusual** 510:15
**unwilling** 483:7
**update** 306:17
488:19,22
**updated** 478:19
**upload** 429:6
430:22 476:7
**uploaded** 414:18
414:20 416:9,11
417:2,7 421:22
428:10 476:4
**url** 467:10,11,12
**use** 309:13 310:2
310:16 312:3,8,9
312:19,22 313:12
314:23 319:22
332:23 359:18
370:4,18 372:20
380:9 382:12,22
382:23 388:3
419:1,9 420:7
422:4 451:7
452:18,23 454:16
454:23 458:1,3,5,7
458:12,14 459:6
**useful** 382:9 397:1
**user** 369:18 370:3
487:14,16
**uses** 373:5 403:6
**utility** 479:1,19
480:7

**v**

**v** 526:6 527:3
528:3
**vague** 499:16
500:10 501:7,15
502:2,11 503:22
504:12,21 506:6
**vaguely** 342:3
364:4
**vampire** 393:16
510:13 512:15
**vampires** 393:10
393:24 439:15
510:5
**vanburen** 304:4
**various** 372:1
474:11 522:1
**vedder** 304:9
**vedderprice.com**
304:12,12
**vehicle** 504:11,20
**vendor** 407:22
483:15
**vent** 332:23
467:21
**verbatim** 510:17
**verification** 306:5
381:11 385:14,17
385:18 386:17
**veritext** 307:9,11
526:1,7 529:1
**veritext.com.**
526:17
**version** 338:13
**versus** 307:6
461:20 462:1
**vertebrae** 326:17
326:18
**victoria** 521:8
**video** 307:2 309:3
317:6 322:15

325:17 327:19
335:13 336:10
337:13 339:3
340:5 343:15
345:22 347:11
355:13 358:18
360:2 369:12
377:4 381:13
384:12 386:9
388:21 390:19
392:22 402:9
409:5,19,24
413:20 423:10
431:11 456:4
462:12 467:4,6
477:15 482:14
484:11 496:13
499:4 522:15
**videographer**
304:18 307:1,9,15
309:2 317:6 321:3
322:15 325:17
327:19 329:17
333:16 335:12
336:10 337:13
339:3 340:5
343:15 345:22
347:10 355:12
358:18 360:2
369:12 377:3
381:13 384:12
386:9 388:21
390:19 392:21
402:9 409:19
413:20 423:10
456:4 477:15
482:14,23 484:11
496:13 499:4,18
499:20,23 522:15
**videorecorded**
307:5

**videos** 306:15
424:3,7 470:2
476:1,3,7
**videotaped** 303:11
**view** 449:1,2
508:22
**viewed** 306:13,13
470:1
**vimeo** 391:14
**violated** 311:11
**violating** 328:13
**violation** 328:14
363:23 408:16
**violations** 319:8
**virginia** 323:22
324:1,7 429:5
490:7,24
**virtue** 421:2
**visible** 492:9,12
**visit** 397:5 481:2
**visited** 395:6,14,17
395:24 398:4,9,18
398:21,22 399:4,6
400:11,13 413:14
470:14 471:1
473:5 512:16
515:2,8 518:10
**visiting** 338:2
508:12 509:6
**visits** 397:11,13
509:2
**voice** 439:13
**vol** 526:8 527:4,9
528:4,13 529:20
**volume** 303:19
307:4
**voluminous**
411:19
**voluntarily** 448:18
448:21 473:7

**vs** 303:7

**w**

**wait** 484:20
508:24
**waive** 518:7
**waived** 526:19
**waiver** 517:18
518:7
**waiving** 398:4
404:12
**walk** 487:12
**walked** 466:21
515:17
**walks** 487:20
**wall** 480:9
**wan** 459:21
**want** 322:3,11
323:11 336:4,23
407:19 409:4
419:12 424:2
426:5 427:10
461:9 472:8 473:4
473:4 481:5 487:2
491:19 492:20
495:13 516:15,19
516:20,21
**wanted** 354:23
**wants** 340:19
498:6
**wasting** 366:17
**watched** 367:21
464:18
**watching** 338:1
469:2
**way** 312:3 330:24
358:15 384:1
407:18 424:9
439:14 444:19
458:6 521:19
**ways** 380:21

**we've** 389:3 394:5
395:7 413:4
482:11,21 484:24
498:20 518:9
**weaver** 467:18,22
**web** 375:11,14
395:20 398:18
409:3
**website** 320:21
332:4 334:22
395:6,15,18,24
396:15 397:13
398:5,9,19,21
399:4,7 400:11,16
403:5,8 404:7
406:9 413:14
420:11 471:15
473:5 478:23
479:3,10,14,20
480:3,8,12,24
515:5,8,18 518:9
**websites** 370:4
376:14,22 382:10
421:18 450:15
451:1 452:19
456:19 471:1
**wedding** 357:14
**wednesday** 521:19
**weeks** 490:2,8
**weird** 310:6
423:20 508:3
**weiser** 344:23
345:4,9
**went** 330:16
354:24 400:15,16
453:19 476:21
482:22 484:21
490:8,9 515:10,16
**werewolf** 461:21
462:2,10,11,17,22
463:2 466:6,13,19

466:22,24
**west** 304:4
**whack** 366:20,22
**whatever's** 387:20
**whatnot** 504:17
**whb** 304:6
**where'd** 362:15
**whereof** 525:1
**white** 365:7
**whitepages** 303:8
307:7 309:13
310:1,10,10,17,24
311:5,12,18,21
312:7,16,18,21
313:2,9,15,18,21
313:22 314:1,4,21
314:24 315:11,18
315:20,21 316:9
320:4,17 325:12
395:6,8,15,18,24
396:12,16 397:6
397:13,22 399:7
400:11 403:4,6,8
404:3 410:6
413:14 418:1,5,11
418:19 419:1,7,21
419:21 420:6
479:14 489:7
490:14 491:14
492:4,7 508:12
509:6 512:16
515:2,8 517:4
518:8,12 526:6
527:3 528:3
**whitepages.com**
509:1,21
**whitepages.com.**
319:2 513:14
**whitepages00018**
309:10

**whitepages00020**
309:16
**whitepages18**
308:21
**whitepages23**
311:17
**whitepages24**
316:4
**wide** 426:16
**widespread** 422:3
**widgets** 370:5
**wife** 487:15
**william** 304:4
384:20
**willing** 388:4
403:20 407:21
484:1 518:23
521:18
**willy** 421:11,16
427:4
**wish** 354:18
**witcher** 467:2
**withdraw** 393:6
403:20
**withdrawing**
394:9 511:7,9,12
511:18,19 512:6
**withdrawn** 394:3
394:13,14 510:24
**withdrew** 510:6
**witness** 307:13,14
308:3 310:13,20
311:2,8,14 313:4
314:9,10,16 315:5
315:6,14,15 316:1
316:12,13,20,21
317:3,22 319:21
320:9,19 321:19
322:6 323:14
324:16 325:1,7
326:10 327:1,8

329:7,13 331:10
331:17,23 332:14
333:8 334:13
336:6 337:2,3,10
338:19 339:20
341:11 342:2,10
342:11,21 343:8,9
344:5,22 345:11
346:19 348:16,23
349:6,12,23
350:13,20 351:4
351:10,23 352:21
353:4 354:7
355:21 356:3
357:6,11,22 358:7
358:14 360:21
361:4,19 362:12
363:14 364:2,13
364:19 365:5
366:24 367:12,20
369:4 370:12,21
371:10,21 372:4
373:8,17 374:18
374:24 375:19
377:22 378:14
379:2,11,22 381:5
382:16 383:15
387:15 396:3,19
397:8,16,24
398:12 399:10,16
401:1,15 403:16
404:5 405:8,16
406:15 407:1,16
408:5 409:1 411:6
416:2 417:1,12,21
418:4,14,21
419:14 420:1,10
420:20 422:8,17
424:18 428:12
429:12,20 430:12
430:24 431:19

432:24 433:13
434:15,20 435:9
436:9 437:13
438:14,22 439:4
439:21 440:1,14
441:6,19 442:4,24
443:19 444:11,18
445:2,23 446:4,9
447:6,14,21 448:5
448:12,20 449:6
449:11,16 450:22
451:17 452:1,16
453:11 455:8,18
457:8,15,22 459:1
459:12 460:16,22
461:6,16 463:4,14
463:22 470:24
471:9 472:14
475:5,11 479:13
480:15 482:4
486:15 488:6
489:16 490:17
492:1,15 493:13
493:21 494:4
495:1,5 496:6
497:15 500:12,18
501:3,9,16 502:3
502:13 503:1,18
503:24 504:5,14
504:23 505:13
506:7 509:9
512:20 514:15
515:12,22 516:9
517:24 519:4,13
519:23 520:9,16
520:24 524:5,8,10
524:12 525:1
526:8,11 527:1,4
527:11 528:1,4,15
**witnesses** 517:16

witness'  526:14
wizard  348:8
word  321:1 381:9
  502:8 503:15
words  330:5 335:6
  354:13 487:11
work  323:19,24
  324:3 387:21
  500:24 505:8
  521:20
worked  323:17
  324:6,9 344:16,19
  344:20
workforce  345:16
working  344:13
  344:14 345:18
  366:11 424:20
worst  468:12,12
wrapper  367:8,18
write  321:11,13
  326:2 328:5,17,21
  333:4 334:7
  335:22 336:19
  338:13 339:13
  340:14 343:24
  345:12 356:12
  357:2 359:4
  360:12,14 361:11
  362:19 365:24
  368:9 459:23
  460:3,19 461:22
  464:20 465:19
  479:5 485:24
  487:7
writing  328:8
written  314:1
  419:1,20 420:7,17
  421:3
wrong  340:18
  348:12 415:24

wrote  318:24
  328:10,19 329:11
  337:22 345:7,8
  347:23 480:10
www.whitepage...
  398:5
www.whitepage...
  395:7

**x**

x  326:15

**y**

yahtzee  458:12
yeah  321:10 328:4
  340:13 352:22
  362:3 365:13
  368:8,10 374:1
  376:1,7 377:1
  380:9 382:6 383:4
  383:6 386:6
  388:12 390:2
  408:15 409:8
  431:24 432:1
  437:6 438:19
  450:1 454:14
  455:5 459:5
  462:23 463:5
  464:22 465:1,5
  466:14 467:10
  470:12 472:5
  473:13 474:23
  477:11 478:1,15
  479:6,21 480:2
  481:23 482:20
  487:20 496:1
  507:9 510:22,24
  519:17
year  321:11,13
  326:16 341:1,7
  342:13 343:4
  350:8 377:15

410:6 411:23
  508:12
years  323:20
  324:5 326:14
  328:14 344:11
  345:19,19 350:7
  351:5,20 353:14
  353:17 354:9
  355:4 358:16
  361:12 362:17,22
  362:24 377:16
  382:5,6 392:15
  418:6 459:13
  478:17 480:2
  481:1 520:4
yelp  359:13,16,19
  359:21 450:13
yep  432:11,13
  443:24 444:4
  478:5 500:7
yesterday  399:18

**z**

zhang  428:19
zocdoc  352:17
  451:4,7,9,14
zocdoc's  352:18
  353:2
zoom  385:11

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit C



Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore
vedderprice.com

Jonathon P. Reinisch
Associate
+1 312 609 7693
jreinisch@vedderprice.com

December 15, 2020

**VIA E-MAIL**

Roberto Luis Costales, Esq.
BEAUMONT COSTALES LLC
3151 W. 26th Street, Second Floor
Chicago, Illinois 60623
rlc@beaumontcostales.com

Re:  *Lukis v. Whitepages*, **Case No. 19-cv-4871 (U.S. Northern District of Illinois)**

Dear Mr. Costales:

I'm writing to address certain deficiencies with Plaintiff's responses to Whitepages' written discovery requests, for further discussion during our telephonic meet-and-confer scheduled for later today. Plaintiff's responses are evasive, assert disingenuous objections, and appear to evince a belief that Plaintiff has no obligation to provide documents or information outside of what is purportedly in Whitepages' possession.  This letter addresses the most pressing issues with Plaintiff's responses, but it is not intended to address each and every issue.  Whitepages may raise additional concerns as discovery proceeds.

### Requests for Production

Plaintiff did not produce or agree to produce a single document in response to Whitepages' 20 requests for production, and Plaintiff only confirmed that she has no responsive documents in response to one request (Request 8).  Based on the sheer volume of boilerplate, unexplained, and improper objections asserted by Plaintiff, Whitepages cannot reasonably address each issue in this letter.  That problem is compounded by Plaintiff's failure to comply with Rule 34(b)(2)(C), which requires Plaintiff to "state whether any responsive materials are being withheld on the basis of [a particular] objection."  Rule 34(b)(2)(C) is designed to prevent this very scenario, in which a party indiscriminately asserts countless objections that provide no indication of whether responsive documents exist and are being withheld. Whitepages will not litigate every one of Plaintiff objections without first knowing, as it is entitled to know, which objections are the basis for Plaintiff's refusal to produce documents.  Accordingly, please amend your responses to comply with Rule 34(b)(2)(C).

Additionally, below are certain other overarching problems with Plaintiff's responses that should also be remedied.  To the extent Whitepages needs to discuss Plaintiff's noncompliance on a request-by-request basis, Whitepages is prepared to do so during our telephonic conference later today.

222 North LaSalle Street  |  Chicago, Illinois 60601  |  T +1 312 609 7500  |  F +1 312 609 5005

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, and Vedder Price Pte. Ltd., which operates in Singapore.

Roberto Luis Costales, Esq.
December 15, 2020
Page 2

First, Plaintiff objected to many of Whitepages' requests as seeking "irrelevant" information because, according to Plaintiff, her "personal information is a matter of private concern." (*See* Requests 1-5, 15, and 17.) Each of Whitepages' requests seeks information about the same categories of information that are contained in the "Free Preview" and "Background Report" allegedly corresponding to Plaintiff, which are alleged as the bases for Plaintiff's claims against Whitepages. It is highly relevant to Plaintiff's claims and Whitepages' defenses when, how, and to what extent Plaintiff has shared or consented to the use of that same information elsewhere.

Second, Plaintiff asserts countless "vagueness" objections that are not in good faith. (Requests 1-5, 7, 11, 12, and 17.) For example, Plaintiff contends that the terms "current address," "phone numbers," "publicly available," "related to," "database," "use," and "share" are vague and ambiguous.[1] They are not, as you and Plaintiff well know. To the extent you actually need Whitepages to explain what, for example, "phone number" means, we will do so during our upcoming call. But we invite Plaintiff to withdraw these baseless objections without our having to elaborate further.

Third, Plaintiff asserts without support that the "burden" of producing certain documents is outweighed by the needs of this case. (Requests 1, 5, 17.) Whitepages disagrees, and Plaintiff has made no showing of what "burden" exists, such as the number of potentially responsive documents, an estimate of the time it would take to review them, or why "the needs of this case" are insufficient to justify their production. Plaintiff is asserting a statewide putative class action seeking injunctive relief, actual damages, statutory damages, punitive damages, and attorneys' fees. Yet Plaintiff has not produced a single document in support of those claims. Plaintiff's objections based on "burden" are not well-founded.

Fourth, Plaintiff refused to produce her engagement letter with counsel on the basis that the request seeks privileged and irrelevant information. Neither is correct. *See, e.g.*, *Epstein v. Am. Reserve Corp.*, 1985 U.S. Dist. LEXIS 15842, at *7 (N.D. Ill. Sept. 18, 1985) (holding that "fee arrangements are relevant to the ability of named plaintiffs to protect the interest of potential class members and hence are a proper subject to discovery" and "fee arrangements are not ordinarily subject to the attorney-client privilege"). Please produce the responsive engagement letter(s).

Fifth, Plaintiff has failed to produce *any* documents to substantiate her alleged damages, claiming that no documents related to her alleged emotional distress exist and that documents related to her alleged actual damages are in Defendant's possession and/or are protected by privilege. (Requests 8 and 9.) The "amount of money [Whitepages] earned using [Plaintiff's] identity" is not a basis of Plaintiff's actual damages, as you falsely assert in response to Request 9. Nor is damage information privileged or work product protected. Additionally, Plaintiff has refused to produce documents evidencing her litigation fees and expenses, despite seeking an award of each in Counts I and II. (Request 10.) Please supplement this response and produce documents and communications substantiating the damage Plaintiff alleges she incurred, or state that no such documents exist.

---

[1] Plaintiff likewise refused to answer Requests to Admit 21-31 on the basis that "publicly available" is purportedly "vague" and "ambiguous." It is neither.

Roberto Luis Costales, Esq.
December 15, 2020
Page 3

Sixth, Whitepages sought any documents referenced in, related to, or relied upon by Plaintiff to prepare Plaintiff's discovery responses. Plaintiff refused to produce documents related to her responses or relied upon by her to prepare her responses and asserted that every document referenced therein is "in the possession of Defendant." That response is nonsensical because the overwhelming majority of Whitepages' discovery requests concern information about Plaintiff that could only be in Plaintiff's possession, custody, or control. Please supplement these responses and produce the responsive documents.

Seventh, Plaintiff has refused to produce any documents related to her use of Whitepages' Web site or her counsel's use of the site on Plaintiff's behalf, asserting an absurd relevance objection and incorrectly claiming that Whitepages possesses all information about Plaintiff's or her counsel's interactions with its Web site. (Requests 13-14.) Plaintiff's use of Whitepages' site is highly relevant to the pending arbitrability and class waiver issues, as you know, and documents related to that use are plainly discoverable.

Finally, Plaintiff also asserted privilege and/or work product protection objections to nine of the requests. (Requests 1, 2, 6, 7, 8, 9, 11, 12, and 19.) Most, if not all, of those privilege and work-product objections are facially improper because the requests to which they respond cannot possibly be read to seek privileged or work-product protected material. Plaintiff also has not produced a privilege log pursuant to Rule 26(b)(5). For example, Request 1 seeks contracts and applications between Plaintiff and third-party entities, such as banks and utility companies. Yet Plaintiff asserts that those contracts are protected from disclosure by privilege or work product. That is plainly false. Likewise, Request 2 specifically seeks only those documents that are "publicly available," yet Plaintiff incredibly contends that they are protected by privilege and/or work product. And Plaintiff's response to Request 7 suggests a misguided belief that every communication between Plaintiff and any member of the putative (*not* certified) class is privileged. Please withdraw the privilege objections or produce a log of all documents withheld on the basis of privilege or work product.

### Interrogatories

Plaintiff recycles the same improper and unsupported objections in response to Whitepages' interrogatories. To the extent that Whitepages' interrogatories address the same subject matter as any requests for production, Whitepages incorporates its objections above (and those to be asserted later) in response to Plaintiff's corresponding defective interrogatory responses. Whitepages also raises the following issues unique to Plaintiff's interrogatory responses.

First, Plaintiff objects to eight interrogatories "overbroad and unduly burdensome" because they seek information "she does not recall or is able to recall."[2] (Interrogatories 1-7, and 10.) Plaintiff's purported inability to recall the requested information is not a basis for an objection and does not render the request "overbroad." Further, these responses leave Whitepages guessing as to what information Plaintiff

---

[2] Whitepages presumes this objection is intended to say, "… is **_un_**able to recall."

Roberto Luis Costales, Esq.
December 15, 2020
Page 4

purportedly cannot recall and what information is being withheld on the basis of her underdeveloped objections. Please withdraw this "objection" and clarify Plaintiff's responses.

Second, Plaintiff refused to identify her social media accounts, either in response to Interrogatory 8 or Request for Production 15. Her social media accounts are not "matters of private concern," as Plaintiff asserts, because they are often publicly available (in full or in part; in fact, that is why they're called "social media" accounts) and Plaintiff would have agreed that some or all of the information shared with those companies is *not* private during the account creation process. And in other responses, Plaintiff admits to having at least Facebook, Twitter, LinkedIn, and Reddit accounts. (Interrogatory 7.) Complete information about her social media activity is relevant to when, how, and to what extent Plaintiff has shared or consented to the use of the information at issue in this case, and these responses should be clarified and supplemented.

Third, in many instances, Plaintiff does not answer the interrogatory posed and instead answers an entirely different question that she evidently likes better. Interrogatory 10 asks for each date that Plaintiff visited Whitepages' Web site, yet Plaintiff responds that she has not visited the site since the filing of this case. That is not responsive, and Plaintiff elsewhere admits that she "has personally interacted with the website located at www.whitepages.com." Similarly, Interrogatory 11 asks for the dates on which Plaintiff read Whitepages' Terms of Use, yet Plaintiff responds that she "has not visited the website address www.whitepages.com/terms-of-service." That is also not responsive. Please supplement these responses to answer the questions as stated.

Fourth, as with Plaintiff's defective request for production responses related to her damages, Plaintiff's damages interrogatory responses are troubling. Plaintiff now contends that she cannot describe her "actual damages," despite alleging the existence of actual damages, because that information is privileged and unascertainable. (Interrogatory 16.) And despite alleging that Plaintiff has suffered "emotional distress" as a result of Whitepages' conduct, Plaintiff states in response to Interrogatory 17 that "this interrogatory is [] vague because no context is provide [*sic*] for plaintiff's emotional distress" and is "vague and overbroad because to the extent [*sic*] this seeks a response beyond this proceeding." Plaintiff is playing games. Either describe the alleged damages and "emotional distress" forming the bases for Plaintiff's claims for relief or withdraw those allegations.

Fifth, Plaintiff alleges her belief that "it would be extremely easy for Whitepages to maintain their [*sic*] business model while still complying with state law." However, in response to Interrogatories 18-20, each of which seeks to better understand that allegation, Plaintiff alleges that the answer is a "legal conclusion" and Plaintiff "cannot provide [] legal advice." In fact, Plaintiff is required to support her allegation with facts and evidence. Plaintiff alleged a belief and understanding that Whitepages could operate without violating the law, including the IRPA, and these interrogatories properly seek to explore that allegation. Please amend your responses.

Sixth, Plaintiff makes two ridiculous objections that "the basis of [her] knowledge is irrelevant to the claims and defenses presented." (Interrogatories 14, 21.) That is, of course, untrue, as the "basis" of Plaintiff's knowledge and allegations is directly relevant to Plaintiff's pending claims, the pending

Roberto Luis Costales, Esq.
December 15, 2020
Page 5

arbitrability and class waiver issues, and numerous other defenses available to Whitepages.  Plaintiff cannot shield from discovery *how* she acquired the information that forms the bases for her allegations (to the contrary, she must affirmatively prove that her allegations are true).  Please withdraw that "objection" and supplement these responses.

Seventh, Plaintiff failed to verify her responses as required by Rule 33(b).  Please provide Plaintiff's signed verification.

### Requests to Admit

Plaintiff's responses to Whitepages' Requests to Admit are plagued by many of the same issues discussed above.  For instance, Plaintiff refused to answer Requests 21-31 based on absurd objections that the following terms are so "vague" and "ambiguous" that Plaintiff cannot respond: "publicly available," "current address," "former address," "statistics or information about the neighborhood in which you reside," "past and present mobile phone numbers," "past and present landline phone numbers," "your relatives," "bankruptcy records," "traffic records," and "criminal and legal judgment records."  Those objections are not in good faith, not only because those terms are plain English and easily understood (particularly in the context of Plaintiff's claims), but also because Plaintiff was able to answer many other Requests that incorporate those same terms.  *See, e.g.*, Requests 34-42, 51, 100-108.  Additionally, Plaintiff sidestepped certain other requests and volunteered answers to questions other than the ones posed. For example, Requests 77-78 ask Plaintiff to admit that her counsel's actions on Whitepages' Web site were on Plaintiff's behalf, but Plaintiff responded only that her counsel's conduct was "in the process of opposing Defendant's motion for summary judgment."[3]  That partial answer is not entirely responsive.

We look forward to addressing these global issues with you and receiving your revised discovery responses without requiring Court intervention.  Whitepages reserves all rights, including to raise additional issues related to Plaintiff's discovery conduct that are not included in this letter, as appropriate.

Very truly yours,

Jonathon P. Reinisch
Associate

JPR/cs

cc:     William H. Beaumont, Esq., whb@beaumontcostales.com

---

[3] This response, like many others, includes an objection that the request is "irrelevant' because a fact is "uncontested."  The contested nature of an underlying fact does not have anything to do with the relevance of that fact.  In many cases, as here, an "uncontested" fact is also highly relevant.

# Exhibit D



Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore
vedderprice.com

Jonathon P. Reinisch
Associate
+1 312 609 7693
jreinisch@vedderprice.com

December 23, 2020

**BY EMAIL**

William H. Beaumont, Esq.
Beaumont Costales
3151 W. 26th Street, Second Floor
Chicago, Illinois 60623
whb@beaumontcostales.com

Re:     **Deficiencies in plaintiff Stephanie Lukis's written discovery responses, as highlighted in my December 15, 2020 letter and addressed during our 3-hour meet and confer call yesterday (*Lukis v. Whitepages, Inc.*, Case No. 19-cv-4871 (U.S. Northern District of Illinois))**

Dear Mr. Beaumont:

Despite having had Whitepages' written discovery requests since October 9, 2020, and having had Whitepages' December 15, 2020 letter ("Discovery Deficiency Letter") for a full week before our call yesterday, you were entirely unprepared to discuss the issues (including the fact that Plaintiff has failed to produce a single document in this case). You began the call without a copy of the Discovery Deficiency Letter and demonstrated throughout the call that you had not adequately considered or prepared yourself to discuss the problems raised. You have never responded in writing to the letter and declined our invitation to do so. We were thus forced to orally summarize every issue that we had already stated in writing while you groped for responses on the fly. The result was an unnecessary, avoidable, and unproductive **three-hour** phone call during which you committed to do absolutely nothing to resolve Whitepages' concerns and demonstrated that Plaintiff has made *no* effort to locate and produce responsive documents. As we told you on the call, we do not believe that you conducted that conference in good faith.

### Requests for Production

First, we discussed Plaintiff's failure to comply with Rule 34(b)(2)(C) in any of her responses to Whitepages' requests for production. You indicated that you would *consider* whether to amend Plaintiff's responses to comply with that Rule, although compliance with the Rules of Civil Procedure is not optional. We asked that you provide your supplemental responses on or before December 29, 2020, so that we would have an adequate opportunity to consider them before Ms. Lukis's deposition on January 5, 2021. You refused to commit to supplementing the responses and you refused to tell us your position by December 29. Instead, you stated that would advise us by January 4, 2021 if you intended to supplement your responses. That is too late in light of Ms. Lukis's deposition on January 5, 2021.

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, and Vedder Price Pte. Ltd., which operates in Singapore.

William H. Beaumont, Esq.
December 23, 2020
Page 2

Second, we attempted to discuss your objections to Requests for Production 1-5, 15, and 17 based on relevance because, according to Plaintiff, her "personal information is a matter of private concern." You were unable (or unwilling) to state whether Plaintiff was standing on that nonsensical objection or whether Plaintiff was withholding any documents on that basis. You instead asked us to explain the relevance of Request 1, which we did, explaining how Ms. Lukis's dissemination of and consent to share information about herself was relevant to IRPA, the First Amendment defenses, class certification issues, etc. You stated that you would advise us by January 4, 2021 if you intended to supplement your response to Request 1 and produce the responsive documents. You also stated that you would revisit your "private concern" objections asserted in response to Requests 2-5, 15, and 17, advise if you're withholding documents on the basis of that objection, and potentially produce responsive documents, all by January 4. That likewise is too late.

Third, we discussed Plaintiff's objections based on "vagueness" to terms including "current address," "phone numbers," "publicly available," "related to," "use," and "share." You strenuously insisted that each of those terms is, in fact, vague, and demanded that we clarify what "current address" and "publicly available" mean during our call. Not one of those terms is vague, each has a plain and commonly understood meaning, and Plaintiff should have responded to the requests based on that meaning. Your vagueness objections were in bad faith, and your position during the call was absurd. You stated that you would reconsider your responses to Requests 1-5, 7, 11, 12, and 17 and would let us know by January 4 if Plaintiff would supplement her responses. Again, that is too late.

Fourth, we attempted to address Plaintiff's "burden" objection asserted in response to Requests 1, 5, and 17, to determine what "burden" exists for Plaintiff (e.g., how many responsive documents exist, how difficult it would be to retrieve them, why this case does not justify the effort required, etc.). You provided *no* explanation of the purported burden. You stated that you would reconsider your responses and burden objections and would let us know by January 4 if Plaintiff would supplement her responses. That, again, is too late.

Fifth, we reiterated our request that you produce Plaintiff's engagement letter(s) with counsel and explained why Plaintiff's objections were unfounded. You agreed to produce the engagement letter, but not before January 4, without any explanation of why it could not be produced before then. As noted, January 4 is too late.

Sixth, we discussed Plaintiff's failure to produce any documents to substantiate her claimed actual damages, emotional distress damages, and attorneys' fees. You confirmed that Plaintiff has no documents evidencing any alleged emotional distress, confirmed that Plaintiff would stand on her objections to Request 10 seeking documentation of her claimed attorneys' fees and expenses, and stated that you would let us know by January 4 if Plaintiff would stand on her objections and refuse to produce documentation related to her alleged actual damages. That is too late.

Seventh, we discussed Plaintiff's failure to produce any documents related to Plaintiff's use of Whitepages' Web site. You asserted that Plaintiff did not understand that she had any obligation to produce electronic information and had done nothing to search for evidence of her interaction with

William H. Beaumont, Esq.
December 23, 2020
Page 3


Whitepages.com, including by reviewing her browser history or seeking data from her Internet Service Provider. You would not even confirm whether Plaintiff owns a computer or explain how Plaintiff accessed Whitepages.com, which could have assisted us in describing the documents sought by Requests 13-14. Your positions are unreasonable, and your promise to let us know by January 4 what, if anything, Plaintiff may be willing to produce in response to Requests 13-14 is unacceptable.

Eighth, we asked you to clarify whether Plaintiff is withholding any documents on the basis of her privilege objections in response to Requests 1, 2, 6, 7, 8, 9, 11, 12, and 19 and, if so, to produce a privilege log. We explained that none of our requests was intended to capture (or could be fairly read to capture) communications between your office and Ms. Lukis that post-date the filing of this lawsuit. You stated that you would get back to us by January 4 as to whether you would withdraw your privilege objections and/or produce a privilege log. That is too late.

### Interrogatories

We also discussed the many issues related to Plaintiff's interrogatory responses raised in the Discovery Deficiency Letter. First, we explained that it is not a proper objection to claim that a request is "overbroad and unduly burdensome" solely because Plaintiff cannot recall some or all of the responsive information. If Plaintiff cannot recall a response, that should be stated as part of her answer, and Plaintiff should otherwise provide whatever information she can recall or can be discerned from documents in her possession, custody, or control. In response to Interrogatories 1-7 and 10, it seems from the responses and our discussion that Plaintiff made no effort to locate responsive information. You stated that you would consider whether to supplement those responses and would let us know by January 4. That is too late.

Second, we reiterated our request that Plaintiff identify her social media accounts (Interrogatory 8) and explained why those accounts are relevant to Whitepages' defenses, including issues related to consent, the First Amendment, and class certification. You agreed to consider identifying those accounts by January 4, after which we will consider whether it is necessary to retain a forensic firm to capture her accounts. January 4 is too late to start that process.

Third, we asked you to supplement Interrogatories 10 and 11 because Plaintiff's answers are not responsive to the questions posed. You stated that you would let us know whether you will supplement those responses by January 4. That is too late.

Fourth, we asked you to supplement Plaintiff's responses to Interrogatories 16 and 17 seeking information about the damages that Plaintiff alleges to have suffered. You stated that you would let us know whether you will supplement those responses by January 4. That is too late

Fifth, we asked you to supplement Plaintiff's responses to Interrogatories 18-20, which seek to understand Plaintiff's allegation that it would be "extremely easy" for Whitepages to not violate the law and/or to alter how it functions in a way that would satisfy Plaintiff. We explained why your objections based on privilege and relevance are unfounded based on that allegation and Plaintiff's alleged damages. You

William H. Beaumont, Esq.
December 23, 2020
Page 4

stated that you would let us know whether you will supplement those responses by January 4. That is too late.

Sixth, we asked you to supplement Plaintiff's responses to Interrogatories 14 and 21. Plaintiff refused to answer both, asserting that the "basis of her knowledge" is not relevant. That objection is absurd, and we explained that the factual bases for Plaintiff's allegations and how she gained that knowledge is relevant and plainly discoverable. You stated that Plaintiff would stand on her objection and would not supplement either response. Whitepages will proceed accordingly.

Seventh, we asked you to provide a signed verification of Plaintiff's interrogatory responses, as required by Rule 33. You agreed to provide the verification, but not before January 4. There is no reason for that delay.

### Requests to Admit

We also addressed several Requests to Admit that Plaintiff refused to answer on the basis of the same objections discussed above. You stated that you would let us know whether you will supplement Requests to Admit 21-31 by January 4, which is too late.

You also stated that Whitepages can and should construe Plaintiff's response to Requests to Admit 77 and 78 as unqualified admissions. We asked you to amend the responses to provide that unqualified admission, which Plaintiff should have done originally, but you were noncommittal. Thus, regardless of whether we receive amended responses, based on your representation, we will construe Plaintiff's response to Requests to Admit 77 and 78 as "admit," without further explanation or qualification.

### Conclusion

As is clear from the above summary, despite three hours of discussion, Plaintiff agreed to do absolutely nothing to satisfy her long overdue discovery obligations. Plaintiff's evasive responses have the effect of holding Whitepages in abeyance until January 4 while we wait to learn what, if anything, Plaintiff will provide in response to Whitepages' concerns. January 4 is too late to receive whatever supplementation Plaintiff ultimately makes because Ms. Lukis's deposition is scheduled for January 5, Whitepages is required to file its response to Plaintiff's request for leave to amend by January 13, and Whitepages is required to file its reply in support of its motion to compel arbitration by January 20.

For now, we intend to proceed with Ms. Lukis's deposition on January 5 and will reserve the option to hold that deposition open, and to re-call Ms. Lukis, based on the information we receive on or before January 4 (if any).

William H. Beaumont, Esq.
December 23, 2020
Page 5

Sincerely,

/s/ Jonathon P. Reinisch

Jonathon P. Reinisch
Associate

JPR

cc:     Roberto Costales, Esq.

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Stephanie Lukis, | ) | |
| individually and on behalf of all others | ) | CIVIL ACTION NO: 19-cv-4871 |
| similarly situated, | ) | |
| | ) | |
| *Plaintiffs,* | ) | JUDGE FEINERMAN |
| v. | ) | |
| | ) | MAG. GILBERT |
| Whitepages Incorporated, | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**STEPHANIE LUKIS' SUPPLEMENTAL RESPONSES TO DEFENDANT'S
FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**
_____

**GENERAL STATEMENT**: Plaintiff reserves the right to supplement her responses and incorporates this reservation in each of her below responses.

**REQUEST NO. 1:** All documents, including but not limited to landline phone service contracts, cellular phone service contracts, banking contracts, loan contracts, credit check contracts, mortgage contracts, leasing contracts, utility service contracts, credit card contracts, employment applications, employment contracts, gym contracts, education-related contracts, contracts to purchase, lease, or borrow goods, contracts to purchase, lease, or borrow services, and any other document or agreement in which you consented to the sharing of information about you, including but not limited to any one of the following: name, age, date of birth, current address, past addresses, statistics about the neighborhood where you reside, phone numbers, family members and their ages, individuals with whom you may be linked based on your potential past and present addresses, individuals with whom you may be linked by business or transaction, bankruptcy records, legal judgment records, and traffic records.

1

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's personal information is a matter of private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff further objects to this as overbroad, irrelevant, and unduly burdensome to the extent it seeks information concerning the use of Plaintiff's address other than by Defendant. Additionally, the burden to produce this information is vastly outweighed by the needs of the case. Plaintiff objects to the phrase "consented to the sharing of information about you" as vague because this is not defined and is ambiguous. Plaintiff objects to the phrase "all documents" as overbroad and unduly burdensome and objects to producing documents not in her possession. Plaintiff further objects to the following as vague because the terms therein are not defined: current address, past addresses, statistics about the neighborhood where you reside, phone numbers, family members, individuals with whom you may be linked based on your potential past and present addresses, individuals with whom you may be linked by business or transaction, bankruptcy records, legal judgment records, and traffic records.

**SUPPLEMENTAL RESPONSE**: Defendant states this request seeks documents in which Plaintiff agreed that her identifying information may be re-disclosed. The only documents Plaintiff recalls consenting to re-disclose her identity are her employment applications with Amazon and with a temporary employment agency. Plaintiff does not have or have access to these documents and is therefore not withholding any documents because of her objections.

**REQUEST NO. 2:** Every publicly available document listing any one of the following: your name, age, date of birth, current address, past addresses, statistics about the neighborhood where

you reside, phone numbers, family members and their ages, individuals with whom you may be linked based on your potential past and present addresses, individuals with whom you may be linked by business or transaction, bankruptcy records, legal judgment records, or traffic records.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's personal information is a matter of private concern. Plaintiff objects to "publicly available document" as vague because this is not defined and is ambiguous. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff further objects to this as overbroad, irrelevant, and unduly burdensome to the extent it seeks information concerning the use of Plaintiff's personal information other than by Defendant. Plaintiff objects to the phrase "consented to the sharing of information about you" as vague because this is not defined and is ambiguous. Plaintiff objects to this request to the extent that it calls for documents readily or more accessible to Defendant. Plaintiff objects to "every" as overbroad and unduly burdensome and objects to producing documents not in her possession.

**SUPPLEMENTAL RESPONSE**: Defendant states this request seeks documents that Defendant is not aware of or cannot independently find on its own. The only such records Plaintiff is aware of are her social media profiles which she restricted access to. Plaintiff therefore attaches her Facebook and LinkedIn accounts as Plaintiff Bates Nos. 1-2205 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER). Plaintiff has requested her Twitter data. Plaintiff is withholding her Reddit profile data because Defendant has not yet explained how this may be retrieved. Depending on instructions provided, Plaintiff reserves the right to object to the burden to produces her Reddit profile.

**REQUEST NO. 3:** Every document or communication reflecting a request by you that any data or information about or associated with you, the term "Stephanie Lukis," or the term "Stephanie M. Lukis" be removed from public availability.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's personal information is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff further objects to this as overbroad, irrelevant, and unduly burdensome to the extent it seeks information concerning the use of Plaintiff's personal information other than by Defendant. Plaintiff objects to the phrase "public availability" as vague because this is not defined and is ambiguous. Plaintiff objects to this request to the extent that it calls for documents readily or more accessible to Defendant.

**SUPPLEMENTAL RESPONSE**: The only such records Plaintiff is aware of are her social media profiles which she restricted access to. Plaintiff therefore attaches her Facebook and LinkedIn accounts as Plaintiff Bates Nos. 1-2205 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER). Plaintiff has requested her Twitter data. Plaintiff is withholding her Reddit profile data because Defendant has not yet explained how this may be retrieved. Depending on instructions provided, Plaintiff reserves the right to object to the burden to produces her Reddit profile.

**REQUEST NO. 4:** Every document or communication reflecting a request by you that any data about or associated with you, the term "Stephanie Lukis," or the term "Stephanie M. Lukis" be removed from any data set or database.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's personal information is a matter of private concern. This request is further irrelevant

4

because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff further objects to this as overbroad, irrelevant, and unduly burdensome to the extent it seeks information not limited to the Defendant. Plaintiff objects to the phrase "data set or database" as vague because this is not defined and is ambiguous. Plaintiff objects to this request to the extent that it calls for documents readily or more accessible to Defendant.

**SUPPLEMENTAL RESPONSE**: See Plaintiff's supplemental response to request for production number 3.

**REQUEST NO. 5:** Every publicly available manifestation of your identity or any portion of your identity.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's personal information is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff further objects to this as overbroad, irrelevant, and unduly burdensome to the extent it seeks information concerning the use of Plaintiff's personal information other than by Defendant. Plaintiff objects to the phrase "publicly available" as vague because this is not defined and is ambiguous. Plaintiff objects to this request to the extent that it calls for documents readily or more accessible to Defendant. Plaintiff objects to "every" as overbroad and unduly burdensome and objects to producing documents not in her possession. Additionally, the burden to produce this information is vastly outweighed by the needs of the case.

**SUPPLEMENTAL RESPONSE**: See Plaintiff's supplemental response to request for production number 2.

**REQUEST NO. 6:** Any engagement letter or agreement between you and any lawyer related to or arising out of your efforts to pursue any claim under the Illinois Right of Publicity Act, 765 ILCS § 1075/1, *et seq.*

**RESPONSE:** Plaintiff objects to this request as attorney-client privileged and protected attorney work product and Defendant has not shown a substantial need and an inability to obtain the substantial equivalent without undue hardship. Plaintiff further objects as this request is irrelevant because it is not related to the claims and defenses.

**SUPPLEMENTAL RESPONSE**: Plaintiff is withholding documents on the basis of these objections.

**REQUEST NO. 7:** Any communications by you arising out of or related to the Complaint with any other member of the putative class as defined in the Complaint.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects further objects to producing communications with co-plaintiffs as privileged. Plaintiff objects to the phrase "communications by you arising out of or related to the Complaint" as vague and unclear.

**SUPPLEMENTAL RESPONSE**: Plaintiff is not withholding any documents on the basis of her objections.

**REQUEST NO. 8:** All documents and communications related to, arising out of, or evidencing the emotional distress allegedly suffered by you as asserted in the Complaint.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Subject to and without waiving same, none.

**SUPPLEMENTAL RESPONSE**: Defendant states this request does not seek Plaintiff's attorney's fees or costs, and therefore Plaintiff states that she is not withholding any documents on the basis of her objections.

**REQUEST NO. 9:** All documents and communications related to, arising out of, or evidencing the actual damages allegedly incurred by you as asserted in the Complaint.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing and Defendant has not provided Plaintiff with the amount of money it earned using her identity. Plaintiff further objects on the grounds of attorney-client privilege and attorney work product.

**SUPPLEMENTAL RESPONSE**: See Plaintiff's supplemental response to request for production number 8.

**REQUEST NO. 10:** All documents and communications related to, arising out of, or evidencing the "reasonable litigation expenses and attorney's fees" allegedly sought by you as damages in the Complaint.

**RESPONSE:** Because Plaintiff has not yet become a prevailing party, her attorney's expense and billing records are premature and not relevant to any claim or defense. This information is further protected attorney work product and Defendant has not shown a substantial need and an inability to obtain the substantial equivalent without undue hardship.

**REQUEST NO. 11:** All documents and communications referenced in, related to, or relied upon to prepare your responses to Whitepages' First Set of Interrogatories.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to the phrase "related to" as vague because this is not defined and is ambiguous. Plaintiff objects to this request to the extent that it calls for documents readily or more accessible to Defendant. Subject to and without

waiving the foregoing objections, Plaintiff responds that any documents referenced in her responses are in the possession of Defendant.

**SUPPLEMENTAL RESPONSE**: Plaintiff is not withholding any documents on the basis of her objections.

**REQUEST NO. 12:** All documents and communications referenced in, related to, or relied upon to prepare your responses to Whitepages' First Set of Requests to Admit.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to the phrase "related to" as vague because this is not defined and is ambiguous. Plaintiff objects to this request to the extent that it calls for documents readily or more accessible to Defendant. Subject to and without waiving the foregoing objections, Plaintiff responds that any documents referenced in her responses are in the possession of Defendant.

**SUPPLEMENTAL RESPONSE**: Plaintiff is not withholding any documents on the basis of her objections.

**REQUEST NO. 13:** All documents and communications evidencing your access of Whitepages' Web site, including documents demonstrating how you "discovered that Whitepages uses [your] name, age, city of domicile, and the identity of her relatives in advertisements on the Whitepages website," as alleged in Paragraph 22 of the Complaint.

**RESPONSE:** Plaintiff objects to this as the basis of Plaintiff's knowledge is irrelevant to the claims and defenses presented. Plaintiff objects to this request to the extent that it calls for documents readily or more accessible to Defendant. Subject to and without waiving the foregoing objections, see the Complaint and First Amended Complaint.

**SUPPLEMENTAL RESPONSE**: Defendant states this request further seeks Plaintiff's internet browsing history of Defendant's website. See Plaintiff's bates number 000460 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER). Plaintiff may have a hard drive containing her internet browsing history, however, producing her browsing history (if any) from this hard drive is unduly burdensome as Plaintiff does not have the present capability to operate the hard drive.

**REQUEST NO. 14:** All documents and communications evidencing your counsel's access of Whitepages' Web site on your behalf.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's counsel accessed Defendant's services in the process of opposing Defendant's motion for summary judgment is uncontested. Plaintiff objects as requesting protected attorney work product and Defendant has not shown a substantial need and an inability to obtain the substantial equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information.

**REQUEST NO. 15:** All documents and communications related to, arising out of, or evidencing any social media account or profile that you maintain, including but not limited to Facebook, Twitter, Instagram, TikTok, LinkedIn, Twitch, Vimeo, Tumblr, Pintrest, Google+, Snapchat, Reddit, Myspace, YouTube, Tinder, and Flickr.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's social media accounts are matters of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff objects to the phrase "all documents and communications" as overbroad and unduly burdensome.

9

**SUPPLEMENTAL RESPONSE**: Plaintiff attaches her Facebook and LinkedIn accounts as Plaintiff Bates Nos. 1-2205 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER). Plaintiff has requested her Twitter data. Plaintiff is withholding her Reddit profile data because Defendant has not yet explained how this may be retrieved. Depending on instructions provided, Plaintiff reserves the right to object to the burden to produces her Reddit profile.

**REQUEST NO. 16:** All communications between you and Whitepages.

**RESPONSE:** Plaintiff objects to this request to the extent that it calls for documents readily or more accessible to Defendant. Plaintiff objects to this as irrelevant to the claims and defenses presented.

**SUPPLEMENTAL RESPONSE**: Plaintiff is not withholding any documents on the basis of her objections.

**REQUEST NO. 17:** All documents and communications reflecting your consent to use or share any aspect of your identity.

**RESPONSE:** Plaintiff objects to "use or share" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's identity is a matter of private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff further objects to this as overbroad and irrelevant to the extent it seeks information concerning using or sharing Plaintiff's identity other than by Defendant. Plaintiff objects to the phrase "all documents and communications" as overbroad and unduly burdensome. Plaintiff objects to "all" as overbroad and unduly burdensome and objects to producing documents not in

her possession. Additionally, the burden to produce this information is vastly outweighed by the needs of the case.

**SUPPLEMENTAL RESPONSE**: See Plaintiff's supplemental response to request for production number 1.

**REQUEST NO. 18:** All documents that you intend to use as exhibits at trial.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing. Plaintiff reserves the right to supplement this response.

**REQUEST NO. 19:** All documents and communications sent to or received from any third party (other than your counsel) that refer or relate to this Litigation or the claims asserted in the Complaint.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects further objects to producing communications with co-plaintiffs as privileged. Plaintiff objects to the phrase "all documents and communications" as overbroad and unduly burdensome.

**SUPPLEMENTAL RESPONSE**: Plaintiff is not withholding any documents on the basis of her objections.

**REQUEST NO. 20:** To the extent not produced in response to any of the requests above, all documents and communications supporting or relating to the claims and/or defenses asserted in the Complaint.

**RESPONSE:** Plaintiff objects to the phrase "all documents and communications" as overbroad and unduly burdensome. Plaintiff objects to "all" as overbroad and unduly burdensome and objects to producing documents not in her possession. Plaintiff objects to this request to the

extent that it calls for documents readily or more accessible to Defendant. Plaintiff objects to this

as premature as discovery is ongoing. Plaintiff reserves the right to supplement this response.

**SUPPLEMENTAL RESPONSE**: Plaintiff is not withholding any documents on the basis of her

objections.

*Respectfully submitted,*

*/s/ William H. Beaumont*
_____
Roberto Costales
William H. Beaumont
BEAUMONT COSTALES LLC
107 W. Van Buren #209
Chicago, IL 60605
Telephone: (773) 831-8000
*whb@beaumontcostales.com*

*Attorneys for Plaintiff*

## Certificate of Service

I hereby certify that the foregoing was served on counsel of record for Whitepages, Inc.

on this 4th day of January, 2021.

*/s/ William H. Beaumont*

12

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Stephanie Lukis, | ) | |
| individually and on behalf of all others | ) | CIVIL ACTION NO: 19-cv-4871 |
| similarly situated, | ) | |
| | ) | |
| *Plaintiffs,* | ) | JUDGE FEINERMAN |
| v. | ) | |
| | ) | MAG. GILBERT |
| Whitepages Incorporated, | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**STEPHANIE LUKIS' SUPPLEMENTAL RESPONSES TO DEFENDANT'S
FIRST SET OF INTERROGATORIES**
_____

**GENERAL STATEMENT**: Plaintiff reserves the right to supplement her responses and incorporates this reservation in each of her below responses.

**INTERROGATORY NO. 1:** Identify every person or corporate entity you have provided your phone number (including mobile phones and landlines) to and when you provided it.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's phone number is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff objects to this request as overbroad and unduly burdensome as this Interrogatory requests Plaintiff provide information she does not recall or is able to recall. Additionally, the burden to produce this information is vastly outweighed by the needs of the case. Plaintiff objects to the phrase "phone number (including mobile phones and landlines)" as vague because this could have more than one meaning and it is unclear which phone numbers this is requesting.

**INTERROGATORY NO. 2:** Identify every person or corporate entity you have provided your current or any former address to and when you provided it.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's address is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff objects to this request as overbroad and unduly burdensome as this Interrogatory requests Plaintiff provide information she does not recall or is able to recall. Additionally, the burden to produce this information is vastly outweighed by the needs of the case. Plaintiff objects to the phrase "current or any former address" as vague and ambiguous because it is unclear what addresses this is requesting.

**INTERROGATORY NO. 3:** Identify every person or corporate entity you have provided your name and age (or date of birth) to and when you provided it.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's age is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff objects to this request as unduly burdensome as this Interrogatory requests Plaintiff provide information she does not recall or is able to recall. Additionally, the burden to produce this information is vastly outweighed by the needs of the case.

**INTERROGATORY NO. 4:** Identify every restriction you placed on the sharing of your phone number (including mobile phones and landlines) when you provided it to any third party.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's phone number is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an

advertisement. Plaintiff objects to this request as unduly burdensome as this Interrogatory requests Plaintiff provide information she does not recall or is able to recall.

**SUPPLEMENTAL RESPONSE**: Plaintiff restricted sharing of her information on her social media accounts with Facebook, Reddit, LinkedIn, and Twitter.

**INTERROGATORY NO. 5:** Identify every restriction you placed on the sharing of your current or any former address when you provided it to any third party.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's address is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff objects to this request as unduly burdensome as this Interrogatory requests Plaintiff provide information she does not recall or is able to recall.

**SUPPLEMENTAL RESPONSE**: See Plaintiff's supplemental response to Interrogatory Number 4.

**INTERROGATORY NO. 6:** Identify every restriction you placed on the sharing of your name and age (or date of birth) when you provided it to any third party.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's name and age are matters of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff objects to this request as unduly burdensome as this Interrogatory requests Plaintiff provide information she does not recall or is able to recall.

**SUPPLEMENTAL RESPONSE**: See Plaintiff's supplemental response to Interrogatory Number 4.

**INTERROGATORY NO. 7:** Identify and describe each instance that you requested that any information about you, including but not limited to your name, age, date of birth, phone number, address, legal records, or traffic records, be removed from a publicly available catalog, directory, database, or Web site.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's name and age are matters of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff objects to this request as unduly burdensome as this Interrogatory requests Plaintiff provide information she does not recall or is able to recall. Subject to and without waiving the foregoing, Plaintiff has requested restrictions be placed on Facebook, Twitter, LinkedIn, and Reddit.

**SUPPLEMENTAL RESPONSE**: See Plaintiff's supplemental response to Interrogatory Number 4. Plaintiff further identifies her lawsuits in this case and against Instant Checkmate.

**INTERROGATORY NO. 8:** Identify every social media account or profile that you maintain, including but not limited to Facebook, Twitter, Instagram, TikTok, LinkedIn, Twitch, Vimeo, Tumblr, Pintrest, Google+, Snapchat, Reddit, Myspace, YouTube, Tinder, or Flickr.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's social media accounts are matters of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff objects to the word "identify" as vague and unclear because its meaning as defined in Defendant's interrogatories is nonsensical in the context of this Interrogatory.

**SUPPLEMENTAL RESPONSE**: Plaintiff has social media accounts with Facebook and LinkedIn (see Plaintiff Bates Nos. 1-2205 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER)). Plaintiff has requested her Twitter data. Plaintiff is withholding her Reddit profile data because Defendant has not yet provided how this may be retrieved. Depending on instructions provided, Plaintiff reserves the right to object to the burden to produces her Reddit profile.

**INTERROGATORY NO. 9:** Identify by name, address(es), and telephone number(s) every member of the putative class as defined in the Complaint.

**RESPONSE:** Plaintiff objects to this request as unduly burdensome and irrelevant as this Interrogatory requests Plaintiff provide information for potentially millions of people and is beyond the needs of the case. This request is further unduly burdensome as Defendant is in possession of this information.

**INTERROGATORY NO. 10:** Identify by date every time you have visited the Whitepages' Web site at www.whitepages.com.

**RESPONSE:** Plaintiff objects to this request as unduly burdensome as it requests Plaintiff provide information she does not recall. This request is further unduly burdensome as Defendant is in possession of this information. Subject to and without waiving the foregoing, Plaintiff has not visited the website located at www.whitepages.com since the filing of this lawsuit.

**SUPPLEMENTAL RESPONSE**: Plaintiff visited Whitepages' web site in 2018, and Plaintiff does not recall the precise date or time. See possibly also Pl.'s Bates No. 000480 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER).

**INTERROGATORY NO. 11:** Identify by date every time you have read any part of the Terms of Use posted on the Whitepages Web site at www.whitepages.com/terms-of-service.

5

**RESPONSE:** Plaintiff objects to this request as vague and unduly burdensome because a copy of the "Terms of Use" is not provided for Plaintiff to review. This request is further unduly burdensome as Defendant is in possession of this information. Subject to and without waiving same, Plaintiff has not visited the website address www.whitepages.com/terms-of-service.

**SUPPLEMENTAL RESPONSE**: Defendant states these terms can be found at R. Doc. 90-1 and Plaintiff supplements her response that she has not read these "Terms of Use."

**INTERROGATORY NO. 12:** Identify by date every time your counsel has visited the Whitepages' Web site at www.whitepages.com on your behalf.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's counsel purchased Defendant's services in the process of opposing Defendant's motion for summary judgment is uncontested. Plaintiff objects as requesting protected attorney work product and Defendant has not shown a substantial need and an inability to obtain the substantial equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information.

**INTERROGATORY NO. 13:** Identify by date every time your counsel has read any part of the Terms of Use posted on the Whitepages Web site at www.whitepages.com/terms-of-service on your behalf.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's counsel purchased Defendant's services in the process of opposing Defendant's motion for summary judgment is uncontested. Plaintiff objects as requesting protected attorney work product and Defendant has not shown a substantial need and an inability to obtain the substantial equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information.

**INTERROGATORY NO. 14:** Describe how you know that, "[u]pon accessing Whitepages' website, the public-at-large is free to enter the first and last name of a particular individual via a search bar on the homepage"?

**RESPONSE:** Plaintiff objects to this as the basis of Plaintiff's knowledge is irrelevant to the claims and defenses presented. Subject to and without waiving same, Defendant admits this in its Answer and Plaintiff has personally interacted with the website located at www.whitepages.com.

**INTERROGATORY NO. 15:** How can you identify "all Illinois residents who have appeared in an advertisement preview for a Whitepages report"?

**RESPONSE:** Plaintiff objects to this as irrelevant. Plaintiff objects to this as premature because discovery is ongoing. Plaintiff objects to this insofar as it calls for attorney work product. Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 16:** Identify and describe your actual damages as alleged in the Complaint.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing and Defendant has not provided Plaintiff with the amount of money it earned using her identity. Plaintiff objects to the word "identify" as vague and unclear because its meaning as defined in Defendant's interrogatories is nonsensical in the context of this Interrogatory. Plaintiff further objects on the grounds of attorney-client privilege and attorney work product. Due to the nature of Plaintiff's claims (which include a request for attorney's fees), Plaintiff is unable to state the exact amount that Plaintiff will request for herself at trial in this matter.

**SUPPLEMENTAL RESPONSE**: Defendant's behavior is predatory because it allows others to access personal details about her and her family which is disconcerting because of her emotional abuse.

7

**INTERROGATORY NO. 17:** Identify and describe the emotional distress allegedly suffered by you.

**RESPONSE:** Plaintiff objects to this request as vague because it is ambiguous as to what additional description Defendant seeks for emotional distress. This interrogatory is additionally vague because no context is provide for plaintiff's emotional distress. Plaintiff further objects to this request as vague and overbroad because to the extent this seeks a response beyond this proceeding. Plaintiff objects to "identify" as vague and unclear because its meaning as defined in Defendant's interrogatories is nonsensical here.

**SUPPLEMENTAL RESPONSE**: See Plaintiff's supplemental response to Interrogatory Number 17.

**INTERROGATORY NO. 18:** How could Whitepages operate without allegedly violating the Illinois Right of Publicity Act, 765 ILCS § 1075/1, *et seq*.?

**RESPONSE:** Plaintiff objects to this as overbroad and vague because the word Whitepages, as defined as defined in Defendant's Interrogatories, means Whitepages, Inc. and Whitepages, Inc.'s general operations outside of www.whitepages.com are not relevant to any claims or defenses. Plaintiff further objects as premature as discovery is ongoing and the full extent of the operations of whitepages.com is not yet known. Plaintiff further objects as irrelevant as how Whitepages' website could operate is not relevant to any claims or defenses. Plaintiff further objects as requesting a legal conclusion and unduly burdensome because Whitepages is represented by lawyers and Plaintiff cannot provide it with legal advice.

**SUPPLEMENTAL RESPONSE**: See Plaintiff's supplemental response to Interrogatory Number 19.

**INTERROGATORY NO. 19:** How should Whitepages operate in a manner that would be acceptable to you?

**RESPONSE:** Plaintiff objects to this as overbroad and vague because the word Whitepages, as defined as defined in Defendant's Interrogatories, means Whitepages, Inc. and Whitepages, Inc.'s general operations outside of www.whitepages.com are not relevant to any claims or defenses. Plaintiff further objects as premature as discovery is ongoing and the full extent of the operations of whitepages.com is not yet known. Plaintiff further objects as irrelevant as how Whitepages' website could operate is not relevant to any claims or defenses nor is what is acceptable to Plaintiff relevant. Plaintiff further objects as requesting a legal conclusion and unduly burdensome because Whitepages is represented by lawyers and Plaintiff cannot provide it with legal advice. Subject to and without waiving the foregoing, Plaintiff seeks her and other Illinois residents' identities not used in Whitepages' advertisements.

**SUPPLEMENTAL RESPONSE**: Ideally, Defendant would not allow others to access her and other people's personal details.

**INTERROGATORY NO. 20:** What form of search functionality on the Whitepages Web site would be acceptable to you?

**RESPONSE:** Plaintiff objects to this as overbroad and vague because the word Whitepages, as defined as defined in Defendant's Interrogatories, means Whitepages, Inc. and Whitepages, Inc.'s general operations outside of www.whitepages.com are not relevant to any claims or defenses. Defendant does not define what it means in this request by the term "Web site" and thus it is vague and ambiguous whether this means whitepages.com or another website. Plaintiff further objects as premature as discovery is ongoing and the full extent of the operations of whitepages.com is not yet known. Plaintiff further objects as irrelevant as how Whitepages'

website could function is not relevant to any claims or defenses nor is what is acceptable to Plaintiff relevant. Plaintiff further objects as requesting a legal conclusion and unduly burdensome because Whitepages is represented by lawyers and Plaintiff cannot provide it with legal advice.

**SUPPLEMENTAL RESPONSE**: See Plaintiff's supplemental response to Interrogatory Number 19.

**INTERROGATORY NO. 21:** Identify and describe how you "discovered" that Whitepages displays information about you on its Web site, as alleged in Paragraph 22 of the Complaint.

**RESPONSE:** Plaintiff objects to this as the basis of Plaintiff's knowledge is irrelevant to the claims and defenses presented. Subject to and without waiving same, Plaintiff has personally interacted with the website located at www.whitepages.com. Plaintiff reserves the right to supplement.

*Respectfully submitted,*

*/s/ William H. Beaumont*
_____
Roberto Costales
William H. Beaumont
BEAUMONT COSTALES LLC
107 W. Van Buren #209
Chicago, IL 60605
Telephone: (773) 831-8000
*whb@beaumontcostales.com*

*Attorneys for Plaintiff*

## <u>Certificate of Service</u>

I hereby certify that the foregoing was served on counsel of record for Whitepages, Inc. on this 4th day of January, 2021.

*/s/ William H. Beaumont*

# Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Stephanie Lukis, | ) | |
| individually and on behalf of all others | ) | CIVIL ACTION NO: 19-cv-4871 |
| similarly situated, | ) | |
| | ) | |
| *Plaintiffs,* | ) | JUDGE FEINERMAN |
| v. | ) | |
| | ) | MAG. GILBERT |
| Whitepages Incorporated, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**STEPHANIE LUKIS' SUPPLEMENTAL RESPONSES TO DEFENDANT'S
FIRST SET OF REQUESTS FOR ADMISSION**

---

**GENERAL OBJECTION**: Plaintiff objects to Defendant's Requests for Admission Numbers 1-184 as overbroad because they are not limited in time to the relevant statute of limitations.

**GENERAL STATEMENT**: Plaintiff reserves the right to supplement her responses and incorporates this reservation in each of her below responses.

**REQUEST NO. 1:** Admit that you've shared your phone number(s) (including mobile phones and landlines) with others.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's phone number is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff objects to this request as overbroad and unduly burdensome as this requests Plaintiff provide information she does not recall or is able to recall. Plaintiff objects to the phrase "phone number (including mobile phones and landlines)" as vague because this could have more than one meaning and it is unclear which phones numbers this is requesting. Subject

1

to and without waiving same, admitted that Plaintiff shared her phone number(s) (including mobile phones and landlines) with others.

**REQUEST NO. 2:** Admit that you've shared your current or any former address with others.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's address is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff objects to this request as overbroad and unduly burdensome as this Interrogatory requests Plaintiff provide information she does not recall or is able to recall. Plaintiff objects to the phrase "current or any former address" as vague and ambiguous because it is unclear what addresses this is requesting. Subject to and without waiving same, admitted.

**REQUEST NO. 3:** Admit that you've shared your name and age (or date of birth) with others.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's age is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Subject to and without waiving same, admitted.

**REQUEST NO. 4:** Admit that you've shared the identities of your family members with others.

**RESPONSE:** Plaintiff objects to this as vague and ambiguous because "identities" and "family members" are not defined. Regardless, the identities of Plaintiff's family members are irrelevant matters of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Subject to and without waiving same, Plaintiff admits that she has told others the names of some of her family members.

2

**REQUEST NO. 5:** Admit that you've shared the ages (or dates of birth) of your family members with others.

**RESPONSE:** Plaintiff objects to this as vague and ambiguous because "identities" and "family members" are not defined. Regardless, the age and birth dates of Plaintiff's family members are matters of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Subject to and without waiving same, Plaintiff admits that she has told others the age and birth dates of some of her family members.

**REQUEST NO. 6:** Admit that you've shared your bankruptcy records with others.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to this as vague because "bankruptcy records" is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's bankruptcy records are a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Subject to and without waiving same, Plaintiff admits that she has told others some information concerning bankruptcy records.

**REQUEST NO. 7:** Admit that you've shared your traffic records with others.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to this as vague and ambiguous because "traffic records" are not defined. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's traffic records are matters of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to

use her identity in an advertisement. Subject to and without waiving same, Plaintiff admits that she has told others some information concerning driving violations.

**REQUEST NO. 8:** Admit that you've shared your criminal or other legal judgment records with others.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to this as vague because "criminal or other legal judgment records" is not defined and is ambiguous. Plaintiff objects to this as it assumes facts not in evidence. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's legal records are matters of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Subject to and without waiving same, Plaintiff admits that she has told others some information concerning her legal judgments.

**REQUEST NO. 9:** Admit that your present and/or former names are available for free by searching "Stephanie Lukis" on www.truepeoplesearch.com.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's name is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.truepeoplesearch.com has nothing to do with the claims or defenses. Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.truepeoplesearch.com. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

4

**REQUEST NO. 10:** Admit that your age, birth month, and birth year are available for free by searching "Stephanie Lukis" on www.truepeoplesearch.com.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's name is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.truepeoplesearch.com has nothing to do with the claims or defenses. Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.truepeoplesearch.com. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 11:** Admit that your past or present mobile and/or landline phone numbers are available for free by searching "Stephanie Lukis" on www.truepeoplesearch.com.

**RESPONSE:** Plaintiff objects to the phrase "past or present mobile and/or landline phone numbers" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's past or present mobile and/or landline phone numbers is a matter of private concern. Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.truepeoplesearch.com has nothing to do with the claims or defenses. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has

not visited www.truepeoplesearch.com. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 12:** Admit that your past and/or present addresses are available for free by searching "Stephanie Lukis" on www.truepeoplesearch.com.

**RESPONSE:** Plaintiff objects to the phrase "past and/or present addresses" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's past and/or present addresses are a matter of private concern. Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.truepeoplesearch.com has nothing to do with the claims or defenses. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.truepeoplesearch.com. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 13:** Admit that the names of your possible relatives are available for free by searching "Stephanie Lukis" on www.truepeoplesearch.com.

**RESPONSE:** Plaintiff objects to the phrase "possible relatives" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's possible relatives are a matter of private concern. Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.truepeoplesearch.com has nothing to do with the claims or defenses. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to

use her identity in an advertisement. Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.truepeoplesearch.com. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 14:** Admit that the names of your possible associates are available for free by searching "Stephanie Lukis" on www.truepeoplesearch.com.

**RESPONSE:** Plaintiff objects to the phrase "possible associates" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's possible associates are a matter of private concern. Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.truepeoplesearch.com has nothing to do with the claims or defenses. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.truepeoplesearch.com. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 15:** Admit that your present and/or former names are available for free by searching "Stephanie Klatte" on www.checkpeople.com.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's present and/or former names are matters of private concern. Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.checkpeople.com has nothing to do with the claims or defenses. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her

identity in an advertisement. Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.checkpeople.com. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 16:** Admit that your age and birth year are available for free by searching "Stephanie Klatte" on www.checkpeople.com.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's age and birth year are matters of private concern. Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.checkpeople.com has nothing to do with the claims or defenses. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.checkpeople.com. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 17:** Admit that your past or present mobile and/or landline phone numbers are available for free by searching "Stephanie Klatte" on www.checkpeople.com.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's age and birth year are matters of private concern. Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.checkpeople.com has nothing to do with the claims or defenses. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff has made a reasonable inquiry and the information she

knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.checkpeople.com. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 18:** Admit that your past and/or present addresses are available for free by searching "Stephanie Klatte" on www.checkpeople.com.

**RESPONSE:** Plaintiff objects to the phrase "past and/or present addresses" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's past and/or present addresses are matters of private concern. Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.checkpeople.com has nothing to do with the claims or defenses. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.checkpeople.com. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 19:** Admit that the names of your relatives are available for free by searching "Stephanie Klatte" on www.checkpeople.com.

**RESPONSE:** Plaintiff objects to the word "relatives" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's relatives is a matter of private concern. Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.checkpeople.com has nothing to do with the claims or defenses. This request is further irrelevant because Defendant

admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.checkpeople.com. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 20:** Admit that the names of your associates are available for free by searching "Stephanie Klatte" on www.checkpeople.com.

**RESPONSE:** Plaintiff objects to the word "associates" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's associates is a matter of private concern. Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.checkpeople.com has nothing to do with the claims or defenses. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.checkpeople.com. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 21:** Admit that your name is publicly available.

**RESPONSE:** Plaintiff objects to the phrase "publicly available" as vague because this is not defined and is ambiguous. As a result, Plaintiff is unable to object or respond further to this request as written.

**SUPPLEMENTAL RESPONSE:** Defendant states that "publicly available" means available for free or for pay from any source. Using this definition, admitted.

**REQUEST NO. 22:** Admit that your date of birth is publicly available.

**RESPONSE:** See Stephanie Lukis' response to Whitepages' request for admission number 21.

**SUPPLEMENTAL RESPONSE:** Defendant states that "publicly available" means available for free or for pay from any source. Using this definition, admitted.

**REQUEST NO. 23:** Admit that your current address is publicly available.

**RESPONSE:** Plaintiff objects to "current address" as vague because this is not defined and is ambiguous. See Stephanie Lukis' response to Whitepages' request for admission number 21.

**SUPPLEMENTAL RESPONSE:** Defendant states that "publicly available" means available for free or for pay from any source. Using this definition, admitted.

**REQUEST NO. 24:** Admit that your former addresses are publicly available.

**RESPONSE:** Plaintiff objects to "former addresses" as vague because this is not defined and is ambiguous. See Stephanie Lukis' response to Whitepages' request for admission number 21.

**SUPPLEMENTAL RESPONSE:** Defendant states that "publicly available" means available for free or for pay from any source. Using this definition, admitted.

**REQUEST NO. 25:** Admit that statistics about the neighborhood in which you reside, including property sales trends, resident demographics, and crime rates, are publicly available.

**RESPONSE:** Plaintiff objects to "statistics or information about the neighborhood in which you reside" as vague because this is not defined and is ambiguous. See Stephanie Lukis' response to Whitepages' request for admission number 21.

**SUPPLEMENTAL RESPONSE:** Defendant states that "publicly available" means available for free or for pay from any source. Using this definition, admitted.

**REQUEST NO. 26:** Admit that your past and present mobile phone numbers are publicly available.

11

**RESPONSE:** Plaintiff objects to "your past and present mobile phone numbers" as vague because this is not defined and is ambiguous. See Stephanie Lukis' response to Whitepages' request for admission number 21.

**SUPPLEMENTAL RESPONSE:** Defendant states that "publicly available" means available for free or for pay from any source. Using this definition, admitted.

**REQUEST NO. 27:** Admit that your past and present landline phone numbers are publicly available.

**RESPONSE:** Plaintiff objects to "your past and present landline phone numbers" as vague because this is not defined and is ambiguous. See Stephanie Lukis' response to Whitepages' request for admission number 21.

**SUPPLEMENTAL RESPONSE:** Defendant states that "publicly available" means available for free or for pay from any source. Using this definition, admitted.

**REQUEST NO. 28:** Admit that the names and dates of births of your relatives are publicly available.

**RESPONSE:** Plaintiff objects to "your relatives" as vague because this is not defined and is ambiguous. See Stephanie Lukis' response to Whitepages' request for admission number 21.

**SUPPLEMENTAL RESPONSE:** Defendant states that "publicly available" means available for free or for pay from any source. Using this definition, admitted.

**REQUEST NO. 29:** Admit that your bankruptcy records are publicly available.

**RESPONSE:** Plaintiff objects to "bankruptcy records" as vague because this is not defined and is ambiguous. See Stephanie Lukis' response to Whitepages' request for admission number 21.

**SUPPLEMENTAL RESPONSE:** Defendant states that "publicly available" means available for free or for pay from any source. Using this definition, admitted.

12

**REQUEST NO. 30:** Admit that your traffic records are publicly available.

**RESPONSE:** Plaintiff objects to "traffic records" as vague because this is not defined and is ambiguous. See Stephanie Lukis' response to Whitepages' request for admission number 21.

**SUPPLEMENTAL RESPONSE:** Defendant states that "publicly available" means available for free or for pay from any source. Using this definition, admitted.

**REQUEST NO. 31:** Admit that your criminal and legal judgment records are publicly available.

**RESPONSE:** Plaintiff objects to "criminal and legal judgment records" as vague because this is not defined and is ambiguous. See Stephanie Lukis' response to Whitepages' request for admission number 21.

**SUPPLEMENTAL RESPONSE:** Defendant states that "publicly available" means available for free or for pay from any source. Using this definition, admitted.

**REQUEST NO. 32:** Admit that you shared your name without communicating to every person or corporate entity with whom/which you shared that the person or corporate entity should not share your name any further.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's name is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning the use of Plaintiff's name other than by Defendant. Subject to and without waiving same, admitted.

**REQUEST NO. 33:** Admit that you shared your date of birth without communicating to every person or corporate entity with whom/which you shared that the person or corporate entity should not share your date of birth any further.

13

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's date of birth is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning the use of Plaintiff's date of birth other than by Defendant. Subject to and without waiving same, admitted.

**REQUEST NO. 34:** Admit that you shared your current address without communicating to every person or corporate entity with whom/which you shared that the person or corporate entity should not share your current address any further.

**RESPONSE:** Plaintiff objects to the phrase "current address" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's current address is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning the use of Plaintiff's address other than by Defendant. Subject to and without waiving same, admitted.

**REQUEST NO. 35:** Admit that you shared your past addresses without communicating to every person or corporate entity with whom/which you shared that the person or corporate entity should not share your past addresses any further.

**RESPONSE:** Plaintiff objects to the phrase "past addresses" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's past address is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in

an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning the use of Plaintiff's past address other than by Defendant. Subject to and without waiving same, admitted.

**REQUEST NO. 36:** Admit that you shared statistics or information about the neighborhood in which you reside without communicating to every person or corporate entity with whom/which you shared that the person or corporate entity should not share the statistics or information any further.

**RESPONSE:** Plaintiff objects to the phrase "statistics or information about the neighborhood in which you reside" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's residence is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning the use of Plaintiff's address other than by Defendant. Subject to and without waiving same, Plaintiff admits that she has told others some information concerning the neighborhood where she resides.

**REQUEST NO. 37:** Admit that you shared your mobile phone number(s) (including your past mobile phone number(s)) without communicating to every person or corporate entity with whom/which you shared that the person or corporate entity should not share your mobile phone number(s) any further.

**RESPONSE:** Plaintiff objects to the phrase "your mobile phone numbers" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's mobile phone numbers are matters of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to

use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning the use of her mobile phone numbers other than by Defendant. Subject to and without waiving same, admitted.

**REQUEST NO. 38:** Admit that you shared landline phone number(s) (including past landline phone number(s)) without communicating to every person or corporate entity with whom/which you shared that the person or corporate entity should not share your landline phone number(s) any further.

**RESPONSE:** Plaintiff objects to the phrase "landline phone number(s)" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's phone numbers are matters of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning the use of her phone numbers other than by Defendant. Subject to and without waiving same, admitted.

**REQUEST NO. 39:** Admit that you shared information about your family members or relatives, including their dates of birth, without communicating to every person or corporate entity with whom/which you shared that the person or corporate entity should not share that information about your family members or relatives any further.

**RESPONSE:** Plaintiff objects to the phrase "family members or relatives" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's family members are matters of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to

16

the extent it seeks information concerning the use of Plaintiff's family members other than by Defendant. Subject to and without waiving same, admitted.

**REQUEST NO. 40:** Admit that you shared information about your prior bankruptcy(ies) without communicating to every person or corporate entity with whom/which you shared that the person or corporate entity should not share that information any further.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's financial records are matters of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning the use of Plaintiff's financial records other than by Defendant. Subject to and without waiving same, admitted.

**REQUEST NO. 41:** Admit that you shared information about your prior legal judgments without communicating to every person or corporate entity with whom/which you shared that the person or corporate entity should not share that information any further.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to the phrase "legal judgments" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's legal history is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning the use of Plaintiff's legal history other than by Defendant. Subject to and without waiving same, admitted.

**REQUEST NO. 42:** Admit that you shared information about your traffic records without communicating to every person or corporate entity with whom/which you shared that the person or corporate entity should not share that information any further.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to the phrase "traffic records" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because Plaintiff's driving history is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning the use of Plaintiff's driving history other than by Defendant. Subject to and without waiving same, admitted.

**REQUEST NO. 43:** Admit that you gave your consent to a person or corporate entity to share your name with others.

**RESPONSE:** Plaintiff objects to "consent" and "share" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with a "person" or "corporate entity." Subject to and without waiving same, Plaintiff admits that she has given written consent to specific third parties to share her name on a limited basis with others.

**REQUEST NO. 44:** Admit that you gave your consent to a person or corporate entity to share your date of birth with others.

**RESPONSE:** Plaintiff objects to "consent" and "share" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with a "person" or "corporate entity." Subject to and without waiving same, Plaintiff admits that she has given written consent to specific third parties to share her date of birth on a limited basis with others.

**REQUEST NO. 45:** Admit that you gave your consent to a person or corporate entity to share your current address with others.

**RESPONSE:** Plaintiff objects to "consent" and "share" and "current address" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with a "person" or "corporate entity." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she

knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her current address with others.

**REQUEST NO. 46:** Admit that you gave your consent to a person or corporate entity to share any of your prior addresses with others.

**RESPONSE:** Plaintiff objects to "consent" and "share" and "prior addresses" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with a "person" or "corporate entity." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her prior addresses with others.

**REQUEST NO. 47:** Admit that you gave your consent to a person or corporate entity to share your mobile phone number(s) with others.

**RESPONSE:** Plaintiff objects to "consent" and "share" and "mobile phone number(s)" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to

the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with a "person" or "corporate entity." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her mobile phone number(s) with others.

**REQUEST NO. 48:** Admit that you gave your consent to a person or corporate entity to share your landline phone number(s) with others.

**RESPONSE:** Plaintiff objects to "consent" and "share" and "landline phone number(s)" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with a "person" or "corporate entity." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her landline phone number(s) with others.

**REQUEST NO. 49:** Admit that you gave your consent to a person or corporate entity to share the names of your relatives with others.

**RESPONSE:** Plaintiff objects to "consent" and "share" and "relatives" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with a "person" or "corporate entity." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her relatives with others.

**REQUEST NO. 50:** Admit that you gave your consent to a person or corporate entity to share the ages or dates of birth of your relatives with others.

**RESPONSE:** Plaintiff objects to "consent" and "share" and "relatives" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with a "person" or "corporate entity." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does

not recall giving written consent to anyone to share the ages or dates of birth of her relatives with others.

**REQUEST NO. 51:** Admit that you gave your consent to a person or corporate entity to share your bankruptcy records with others.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "consent" and "share" and "bankruptcy records" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with a "person" or "corporate entity." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her bankruptcy records with others.

**REQUEST NO. 52:** Admit that you gave your consent to a person or corporate entity to share your legal judgment records with others.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "consent" and "share" and "legal judgment records" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information

that is a private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with a "person" or "corporate entity." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her legal judgment records with others.

**REQUEST NO. 53:** Admit that you gave your consent to a person or corporate entity to share your traffic records with others.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "consent" and "share" and "traffic records" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff objects to "consent" as overbroad because it is not limited to written consent. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with a "person" or "corporate entity." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable

her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her traffic records with others.

**REQUEST NO. 54:** Admit that you may have given your consent to a person or corporate entity to share your name with others.

**RESPONSE:** See response to request for admission number 43 above.

**REQUEST NO. 55:** Admit that you may have given your consent to a person or corporate entity to share your date of birth with others.

**RESPONSE:** See response to request for admission number 44 above.

**REQUEST NO. 56:** Admit that you may have given your consent to a person or corporate entity to share your current with others.

**RESPONSE:** Plaintiff objects to this as nonsensical.

**REQUEST NO. 57:** Admit that you may have given your consent to a person or corporate entity to share any of your prior addresses with others.

**RESPONSE:** See response to request for admission number 46 above.

**REQUEST NO. 58:** Admit that you may have given your consent to a person or corporate entity to share your mobile phone number(s) with others.

**RESPONSE:** See response for admission number 47 above.

**REQUEST NO. 59:** Admit that you may have given your consent to a person or corporate entity to share your landline phone number(s) with others.

**RESPONSE:** See response to request for admission number 48 above.

**REQUEST NO. 60:** Admit that you may have given your consent to a person or corporate entity to share the names of your relatives with others.

**RESPONSE:** See response to request for admission number 49 above.

**REQUEST NO. 61:** Admit that you may have given your consent to a person or corporate entity to share the ages or dates of birth of your relatives with others.

**RESPONSE:** See response to request for admission number 50 above.

**REQUEST NO. 62:** Admit that you may have given your consent to a person or corporate entity to share your bankruptcy records with others.

**RESPONSE:** See response to request for admission number 51 above.

**REQUEST NO. 63:** Admit that you may have given your consent to a person or corporate entity to share your legal judgment records with others.

**RESPONSE:** See response to request for admission number 52 above.

**REQUEST NO. 64:** Admit that you may have given your consent to a person or corporate entity to share your traffic records with others.

**RESPONSE:** See response to request for admission number 53 above.

**REQUEST NO. 65:** Admit that you have visited the Whitepages' Web site at www.whitepages.com.

**RESPONSE:** Admitted.

**REQUEST NO. 66:** Admit that when you visited the Whitepages Web site, the Terms of Use produced to you as Whitepages_000018-24 were posted on the Web site at www.whitepages.com/terms-of-service.

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.whitepages.com/terms-of-service. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 67:** Admit that when you visited the Whitepages Web site, the Privacy Notice produced to you as Whitepages_000025-26 was posted on the Web site at www.whitepages.com/data-policy.

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.whitepages.com/data-policy. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 68:** Admit that you have conducted one or more searches on Whitepages' Web site at www.whitepages.com.

**RESPONSE:** Admitted.

**REQUEST NO. 69:** Admit that when you conducted one or more searches on the Whitepages Web site, the Terms of Use produced to you as Whitepages_000018-24 were posted on the Web site at www.whitepages.com/terms-of-service.

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.whitepages.com/terms-of-service. Plaintiff objects to visiting this website as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 70:** Admit that when you conducted one or more searches on the Whitepages Web site, the Privacy Notice produced to you as Whitepages_000025-26 was posted on the Web site at www.whitepages.com/data-policy.

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited

27

www.whitepages.com/data-policy. Plaintiff objects to visiting this website as unduly

burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 71:** Admit that your counsel in this case visited the Whitepages' Web site at

www.whitepages.com.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's

counsel visited www.whitepages.com in the process of opposing Defendant's motion for

summary judgment is uncontested. Plaintiff objects as requesting protected attorney work

product and Defendant has not shown a substantial need and an inability to obtain the substantial

equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as

Defendant is in possession of this information. Subject to and without waiving same, admitted

that Plaintiff's counsel agreed on July 21, 2020 to the Terms of Use produced in

Whitepages_000018-24 while in the process of opposing Defendant's motion for summary

judgment.

**REQUEST NO. 72:** Admit that when your counsel in this case visited the Whitepages Web site,

the Terms of Use produced to you as Whitepages_000018-24 were posted on the Web site at

www.whitpages.com/terms-of-service.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's

counsel visited www.whitepages.com in the process of opposing Defendant's motion for

summary judgment is uncontested. Plaintiff objects as requesting protected attorney work

product and Defendant has not shown a substantial need and an inability to obtain the substantial

equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as

Defendant is in possession of this information. Subject to and without waiving same, admitted

that Plaintiff's counsel agreed on July 21, 2020 to the Terms of Use produced in

Whitepages_000018-24 while in the process of opposing Defendant's motion for summary judgment.

**REQUEST NO. 73:** Admit that when your counsel in this case visited the Whitepages Web site, the Privacy Notice produced to you as Whitepages_000025-26 was posted on the Web site at www.whitpages.com/data-policy.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's counsel visited www.whitepages.com in the process of opposing Defendant's motion for summary judgment is uncontested. Plaintiff objects as requesting protected attorney work product and Defendant has not shown a substantial need and an inability to obtain the substantial equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information. Subject to and without waiving same, admitted that Plaintiff's counsel agreed on July 21, 2020 to the Terms of Use produced in Whitepages_000018-24 while in the process of opposing Defendant's motion for summary judgment.

**REQUEST NO. 74:** Admit that your counsel has conducted one or more searches on Whitepages' Web site at www.whitepages.com.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's counsel visited www.whitepages.com in the process of opposing Defendant's motion for summary judgment is uncontested. Plaintiff objects as requesting protected attorney work product and Defendant has not shown a substantial need and an inability to obtain the substantial equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information. Subject to and without waiving same, admitted that Plaintiff's counsel agreed on July 21, 2020 to the Terms of Use produced in

Whitepages_000018-24 while in the process of opposing Defendant's motion for summary judgment.

**REQUEST NO. 75:** Admit that when your counsel conducted one or more searches on the Whitepages Web site, the Terms of Use produced to you as Whitepages_000018-24 were posted on the Web site at www.whitpages.com/terms-of-service.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's counsel visited www.whitepages.com in the process of opposing Defendant's motion for summary judgment is uncontested. Plaintiff objects as requesting protected attorney work product and Defendant has not shown a substantial need and an inability to obtain the substantial equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information. Subject to and without waiving same, admitted that Plaintiff's counsel agreed on July 21, 2020 to the Terms of Use produced in Whitepages_000018-24 while in the process of opposing Defendant's motion for summary judgment.

**REQUEST NO. 76:** Admit that when your counsel conducted one or more searches on the Whitepages Web site, the Privacy Notice produced to you as Whitepages_000025-26 was posted on the Web site at www.whitpages.com/data-policy.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's counsel visited www.whitepages.com in the process of opposing Defendant's motion for summary judgment is uncontested. Plaintiff objects as requesting protected attorney work product and Defendant has not shown a substantial need and an inability to obtain the substantial equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information. Subject to and without waiving same, admitted

that Plaintiff's counsel agreed on July 21, 2020 to the Terms of Use produced in

Whitepages_000018-24 while in the process of opposing Defendant's motion for summary

judgment.

**REQUEST NO. 77:** Admit that your counsel visited the Whitepages Web site at

www.whitepages.com on your behalf.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's

counsel visited www.whitepages.com in the process of opposing Defendant's motion for

summary judgment is uncontested. Plaintiff objects as requesting protected attorney work

product and Defendant has not shown a substantial need and an inability to obtain the substantial

equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as

Defendant is in possession of this information. Subject to and without waiving same, admitted

that Plaintiff's counsel agreed on July 21, 2020 to the Terms of Use produced in

Whitepages_000018-24 while in the process of opposing Defendant's motion for summary

judgment.

**REQUEST NO. 78:** Admit that your counsel conducted one or more searches on the

Whitepages Web site at www.whitepages.com on your behalf.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's

counsel visited www.whitepages.com in the process of opposing Defendant's motion for

summary judgment is uncontested. Plaintiff objects as requesting protected attorney work

product and Defendant has not shown a substantial need and an inability to obtain the substantial

equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as

Defendant is in possession of this information. Subject to and without waiving same, admitted

that Plaintiff's counsel agreed on July 21, 2020 to the Terms of Use produced in

Whitepages_000018-24 while in the process of opposing Defendant's motion for summary judgment.

**REQUEST NO. 79:** Admit that you have not yet identified by name any other member of the putative class as defined in the Complaint.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing. Subject to and without waiving same, denied.

**REQUEST NO. 80:** Admit that you have identified by name five or fewer other members of the putative class as defined in the Complaint.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing. Subject to and without waiving same, admitted as of the time of this response.

**REQUEST NO. 81:** Admit that you have identified by name ten or fewer other members of the putative class as defined in the Complaint.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing. Subject to and without waiving same, admitted as of the time of this response.

**REQUEST NO. 82:** Admit that you have identified by name fifteen or fewer other members of the putative class as defined in the Complaint.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing. Subject to and without waiving same, admitted as of the time of this response.

**REQUEST NO. 83:** Admit that you have identified by name twenty or fewer other members of the putative class as defined in the Complaint.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing. Subject to and without waiving same, admitted as of the time of this response.

**REQUEST NO. 84:** Admit that members of the putative class as defined in the Complaint may have visited the Whitepages Web site at www.whitepages.com when the Terms of Use produced to you as Whitepages_000018-24 were posted on the Web site.

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff is unaware of putative class members' interaction with www.whitepages.com.

**REQUEST NO. 85:** Admit that members of the putative class as defined in the Complaint may have conducted one or more searches on the Whitepages Web site at www.whitepages.com when the Terms of Use produced to you as Whitepages_000018-24 were posted on the Web site.

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff is unaware of putative class members' interaction with www.whitepages.com.

**REQUEST NO. 86:** Admit that members of the putative class as defined in the Complaint may have agreed to the Terms of Use produced to you as Whitepages_000018-24.

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff is unaware of whether putative class members agreed to the Terms of Use produced to you as Whitepages_000018-24.

**REQUEST NO. 87:** Admit that members of the putative class as defined in the Complaint may have visited the Whitepages Web site at www.whitepages.com when the Terms of Use produced to you as Whitepages_000018-24 were posted on the Web site.

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff is unaware of putative class members' interaction with www.whitepages.com.

**REQUEST NO. 88:** Admit that members of the putative class as defined in the Complaint may have conducted one or more searches on the Whitepages Web site at www.whitepages.com when the Privacy Notice produced to you as Whitepages_000025-26 was posted on the Web site.

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff is unaware of putative class members' interaction with www.whitepages.com.

**REQUEST NO. 89:** Admit that members of the putative class as defined in the Complaint may have agreed to the Privacy Notice produced in Whitepages_000025-26.

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff is unaware of whether putative class members agreed to the Privacy Notice produced in Whitepages_000025-26.

**REQUEST NO. 90:** Admit that the Terms of Use produced to you as Whitepages_000018-24 include the following language about arbitration: "ANY DISPUTE, CLAIM OR CONTROVERSY BETWEEN YOU AND WHITEPAGES RELATING IN ANY WAY TO THIS AGREEMENT OR YOUR ACCESS TO OR USE OF THE SERVICES OR CONTENT, WHETHER BASED IN CONTRACT, STATUTE, REGULATION, ORDINANCE, TORT (INCLUDING, WITHOUT LIMITATION, FRAUD, MISREPRESENTATION, FRAUDULENT INDUCEMENT, OR NEGLIGENCE), OR ANY OTHER LEGAL OR EQUITABLE THEORY ('DISPUTE'), WILL BE RESOLVED BY BINDING ARBITRATION

34

IF IT CANNOT BE RESOLVED THROUGH NEGOTIATION AS SET FORTH IN THIS SECTION 12.10. ARBITRATION MEANS THAT THE DISPUTE WILL BE RESOLVED BY A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY. THE ARBITRATOR WILL DECIDE ALL THRESHOLD QUESTIONS, INCLUDING BUT NOT LIMITED TO, ISSUES RELATING TO THE ENFORCEABILITY, REVOCABILITY, OR VALIDITY OF THIS SECTION 12.10 AND WHETHER EITHER PARTY LACKS STANDING TO ASSERT THEIR CLAIM(S)."

**RESPONSE:** Admitted.

**REQUEST NO. 91:** Admit that the Terms of Use produced to you as Whitepages_000018-24 include the following language about class waiver: "YOU AND WHITEPAGES EACH WAIVE ALL RIGHTS TO CONDUCT DISPUTE RESOLUTION PROCEEDINGS IN A CLASS ACTION OR CONSOLIDATED ACTION. YOU AND WHITEPAGES EACH AGREE THAT ANY DISPUTE RESOLUTION PROCEEDINGS WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS, WITH THE SOLE EXCEPTION OF REPRESENTATIVE SUITS THAT ARE PERMITTED BY, AND DEEMED UNWAIVABLE UNDER, STATE LAW. IF FOR ANY REASON A CLAIM PROCEEDS IN COURT RATHER THAN IN ARBITRATION, WE EACH WAIVE ANY RIGHT TO A JURY TRIAL."

**RESPONSE:** Admitted.

**REQUEST NO. 92:** Admit that you are not the only person ever named "Stephanie Lukis."

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of anyone else with this same name nor does Plaintiff have personal knowledge of everyone's name.

**REQUEST NO. 93:** Admit that you are not the only person ever named "Stephane M. Lukis."

**RESPONSE:** Plaintiff objects to this as irrelevant as her name is not "Stephane M. Lukis"

**REQUEST NO. 94:** Admit that you are not the only person ever named "Stephanie Marie Lukis."

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of anyone else with this same name nor does Plaintiff have personal knowledge of everyone's name.

**REQUEST NO. 95:** Admit that you are not the only person ever named "Stephanie Klatte."

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of anyone else with this same name nor does Plaintiff have personal knowledge of everyone's name.

**REQUEST NO. 96:** Admit that you are not the only person ever named "Stephanie M. Klatte."

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of anyone else with this same name nor does Plaintiff have personal knowledge of everyone's name.

**REQUEST NO. 97:** Admit that you are not the only person ever named "Stephanie Marie Klatte."

**RESPONSE:** Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have

personal knowledge of anyone else with this same name nor does Plaintiff have personal knowledge of everyone's name.

**REQUEST NO. 98:** Admit that you have provided written consent to one or more third parties to use your name.

**RESPONSE:** Plaintiff objects to the word "use" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff admits that she has given written consent to specific third parties to use her name on a limited basis with others.

**REQUEST NO. 99:** Admit that you have provided written consent to one or more third parties to use your date of birth.

**RESPONSE:** Plaintiff objects to the word "use" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving

same, Plaintiff admits that she has given written consent to specific third parties to use her date of birth on a limited basis with others.

**REQUEST NO. 100:** Admit that you have provided written consent to one or more third parties to use your current address.

**RESPONSE:** Plaintiff objects to "use" and "current address" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to use her current address with others.

**REQUEST NO. 101:** Admit that you have provided written consent to one or more third parties to use any of your past addresses.

**RESPONSE:** Plaintiff objects to "use" and "past addresses" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving

same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to use her past addresses with others.

**REQUEST NO. 102:** Admit that you have provided written consent to one or more third parties to use your mobile phone number(s).

**RESPONSE:** Plaintiff objects to "use" and "her mobile phone number(s)" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to use her mobile phone number(s) with others.

**REQUEST NO. 103:** Admit that you have provided written consent to one or more third parties to use your landline phone number(s).

**RESPONSE:** Plaintiff objects to "use" and "landline phone number(s)" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome

for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to use her landline phone number(s) with others.

**REQUEST NO. 104:** Admit that you have provided written consent to one or more third parties to use the names of your relatives.

**RESPONSE:** Plaintiff objects to "use" and "relatives" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to use the names of her relatives with others.

**REQUEST NO. 105:** Admit that you have provided written consent to one or more third parties to use the dates of birth of your relatives.

**RESPONSE:** Plaintiff objects to "use" and "relatives" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks

information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to use the dates of birth of her relatives with others.

**REQUEST NO. 106:** Admit that you have provided written consent to one or more third parties to use your bankruptcy records.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "use" and "bankruptcy records" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to use her bankruptcy records with others.

**REQUEST NO. 107:** Admit that you have provided written consent to one or more third parties to use your records of legal judgments.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "use" and "records of legal

41

judgments" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to use records of her legal judgments with others.

**REQUEST NO. 108:** Admit that you have provided written consent to one or more third parties to use your traffic records.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "use" and "traffic records" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny

because Plaintiff does not recall giving written consent to anyone to use her traffic records with others.

**REQUEST NO. 109:** Admit that you may have provided written consent to one or more third parties to use your name.

**RESPONSE:** See response to request for admission number 98 above.

**REQUEST NO. 110:** Admit that you may have provided written consent to one or more third parties to use your date of birth.

**RESPONSE:** See response to request for admission number 99 above.

**REQUEST NO. 111:** Admit that you may have provided written consent to one or more third parties to use your current address.

**RESPONSE:** See response to request for admission number 100 above.

**REQUEST NO. 112:** Admit that you may have provided written consent to one or more third parties to use any of your past addresses.

**RESPONSE:** See response to request for admission number 101 above.

**REQUEST NO. 113:** Admit that you may have provided written consent to one or more third parties to use your mobile phone number(s).

**RESPONSE:** See response to request for admission number 102 above.

**REQUEST NO. 114:** Admit that you may have provided written consent to one or more third parties to use your landline phone number(s).

**RESPONSE:** See response to request for admission number 103 above.

**REQUEST NO. 115:** Admit that you may have provided written consent to one or more third parties to use the names of your relatives.

**RESPONSE:** See response to request for admission number 104 above.

**REQUEST NO. 116:** Admit that you may have provided written consent to one or more third parties to use the dates of birth of your relatives.

**RESPONSE:** See response to request for admission number 105 above.

**REQUEST NO. 117:** Admit that you may have provided written consent to one or more third parties to use your bankruptcy records.

**RESPONSE:** See response to request for admission number 106 above.

**REQUEST NO. 118:** Admit that you may have provided written consent to one or more third parties to use your records of legal judgments.

**RESPONSE:** See response to request for admission number 107 above.

**REQUEST NO. 119:** Admit that you may have provided written consent to one or more third parties to use your traffic records.

**RESPONSE:** See response to request for admission number 108 above.

**REQUEST NO. 120:** Admit that you have provided written consent to one or more third parties to share with others your name.

**RESPONSE:** Plaintiff objects to "share" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff admits that she has given written consent to specific third parties to share her name on a limited basis with others.

**REQUEST NO. 121:** Admit that you have provided written consent to one or more third parties to share with others your date of birth.

**RESPONSE:** Plaintiff objects to "share" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff admits that she has given written consent to specific third parties to share her name on a limited basis with others.

**REQUEST NO. 122:** Admit that you have provided written consent to one or more third parties to share with others your current address.

**RESPONSE:** Plaintiff objects to "share" and "current address" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her current address with others.

**REQUEST NO. 123:** Admit that you have provided written consent to one or more third parties to share with others any of your past addresses.

**RESPONSE:** Plaintiff objects to "share" and "past addresses" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her past addresses with others.

**REQUEST NO. 124:** Admit that you have provided written consent to one or more third parties to share with others your mobile phone number(s).

**RESPONSE:** Plaintiff objects to "share" and "your mobile phone number(s)" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she

knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her mobile phone number(s) with others.

**REQUEST NO. 125:** Admit that you have provided written consent to one or more third parties to share with others your landline phone number(s).

**RESPONSE:** Plaintiff objects to "share" and "your landline phone number(s)" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her landline phone number(s) with others.

**REQUEST NO. 126:** Admit that you have provided written consent to one or more third parties to share with others the names of your relatives.

**RESPONSE:** Plaintiff objects to "share" and "relatives" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving

same, Plaintiff has made a reasonable inquiry and the information she knows or can readily

obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving

written consent to anyone to share the names of her relatives with others.

**REQUEST NO. 127:** Admit that you have provided written consent to one or more third parties

to share with others the dates of birth of your relatives.

**RESPONSE:** Plaintiff objects to "share" and "relatives" as vague because these are not defined

and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented

because this seeks information that is a private concern. This request is further irrelevant because

Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an

advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks

information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her

to review the terms of all of her agreements with "third parties." Subject to and without waiving

same, Plaintiff has made a reasonable inquiry and the information she knows or can readily

obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving

written consent to anyone to share the dates of birth of her relatives with others.

**REQUEST NO. 128:** Admit that you have provided written consent to one or more third parties

to share with others your bankruptcy records.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client

privilege and protected attorney work product. Plaintiff objects to "share" and "bankruptcy

records" as vague because this is not defined and is ambiguous. Plaintiff objects to this as

irrelevant to the claims and defenses presented because this seeks information that is a private

concern. This request is further irrelevant because Defendant admits that it did not obtain

Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as

overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her bankruptcy records with others.

**REQUEST NO. 129:** Admit that you have provided written consent to one or more third parties to share with others your records of legal judgments.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "share" and "records of legal judgments" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her records of legal judgments with others.

**REQUEST NO. 130:** Admit that you have provided written consent to one or more third parties to share with others your traffic records.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "share" and "traffic records" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects as unduly burdensome for her to review the terms of all of her agreements with "third parties." Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not recall giving written consent to anyone to share her traffic records with others.

**REQUEST NO. 131:** Admit that you may have provided written consent to one or more third parties to share with others your name.

**RESPONSE:** See response to request for admission number 120 above.

**REQUEST NO. 132:** Admit that you may have provided written consent to one or more third parties to share with others your date of birth.

**RESPONSE:** See response to request for admission number 121 above.

**REQUEST NO. 133:** Admit that you may have provided written consent to one or more third parties to share with others your current address.

**RESPONSE:** See response to request for admission number 122 above.

**REQUEST NO. 134:** Admit that you may have provided written consent to one or more third parties to share with others any of your past address(es).

**RESPONSE:** See response to request for admission number 123 above.

**REQUEST NO. 135:** Admit that you may have provided written consent to one or more third parties to share with others your mobile phone number(s).

**RESPONSE:** See response to request for admission number 124 above.

**REQUEST NO. 136:** Admit that you may have provided written consent to one or more third parties to share with others your landline phone number(s).

**RESPONSE:** See response to request for admission number 125 above.

**REQUEST NO. 137:** Admit that you may have provided written consent to one or more third parties to share with others the names of your relatives.

**RESPONSE:** See response to request for admission number 126 above.

**REQUEST NO. 138:** Admit that you may have provided written consent to one or more third parties to share with others the dates of birth of your relatives.

**RESPONSE:** See response to request for admission number 127 above.

**REQUEST NO. 139:** Admit that you may have provided written consent to one or more third parties to share with others your bankruptcy records.

**RESPONSE:** See response to request for admission number 128 above.

**REQUEST NO. 140:** Admit that you may have provided written consent to one or more third parties to share with others your records of legal judgments.

**RESPONSE:** See response to request for admission number 129 above.

**REQUEST NO. 141:** Admit that you may have provided written consent to one or more third parties to share with others your traffic records.

**RESPONSE:** See response to request for admission number 130 above.

**REQUEST NO. 142:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to use his, her, or their name(s).

**RESPONSE:** Plaintiff objects to "use" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to use their name(s) with others.

**REQUEST NO. 143:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to use his, her, or their date(s) of birth.

**RESPONSE:** Plaintiff objects to "use" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit

or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to use their dates of birth with others.

**REQUEST NO. 144:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to use his, her, or their current address(es).

**RESPONSE:** Plaintiff objects to "use" and "current address(es)" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to use their current address(es) with others.

**REQUEST NO. 145:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to use any of his, her, or their past addresses.

**RESPONSE:** Plaintiff objects to "use" and "past addresses" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it

obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to use their past addresses with others.

**REQUEST NO. 146:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to use his, her, or their mobile phone number(s).

**RESPONSE:** Plaintiff objects to "use" and "their mobile phone number(s)" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to use their mobile phone number(s) with others.

**REQUEST NO. 147:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to use his, her, or their landline phone number(s).

**RESPONSE:** Plaintiff objects to "use" and "their landline phone number(s)" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and

defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to use their landline phone number(s) with others.

**REQUEST NO. 148:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to use the names of his, her, or their relatives.

**RESPONSE:** Plaintiff objects to "use" and "relatives" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to use the names of their relatives with others.

**REQUEST NO. 149:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to use the dates of birth of his, her, or their relatives.

**RESPONSE:** Plaintiff objects to "use" and "relatives" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to use the names of their relatives' dates of birth with others.

**REQUEST NO. 150:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to use his, her, or their bankruptcy records.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "use" and "bankruptcy records" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written

consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to use the names of their bankruptcy records with others.

**REQUEST NO. 151:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to use his, her, or their records of legal judgments.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "use" and "their records of legal judgments" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to use the names of their records of legal judgments with others.

**REQUEST NO. 152:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to use his, her, or their traffic records.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "use" and "traffic records" as

vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to use the names of their traffic records with others.

**REQUEST NO. 153:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to share with others his, her, or their name(s).

**RESPONSE:** Plaintiff objects to "share" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to share their names with others.

**REQUEST NO. 154:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to share with others his, her, or their date(s) of birth.

**RESPONSE:** Plaintiff objects to "share" as vague because this is not defined and is ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to share their dates of birth with others.

**REQUEST NO. 155:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to share with others his, her, or their current address(es).

**RESPONSE:** Plaintiff objects to "share" and "current address(es)" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether

putative class members gave their written consent to anyone to share their current address(es) with others.

**REQUEST NO. 156:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to share with others any of his, her, or their past address(es).

**RESPONSE:** Plaintiff objects to "share" and "past address(es)" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to share their past address(es) with others.

**REQUEST NO. 157:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to share with others his, her, or their mobile phone number(s).

**RESPONSE:** Plaintiff objects to "share" and "their mobile phone number(s)" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession

of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to share their mobile phone number(s) with others.

**REQUEST NO. 158:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to share with others his, her, or their landline phone number(s).

**RESPONSE:** Plaintiff objects to "share" and "their landline phone number(s)" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to share their landline phone number(s) with others.

**REQUEST NO. 159:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to share with others the names of his, her, or their relatives.

**RESPONSE:** Plaintiff objects to "share" and "relatives" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented

because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to share their relatives' names with others.

**REQUEST NO. 160:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to share with others the dates of birth of his, her, or their relatives.

**RESPONSE:** Plaintiff objects to "share" and "relatives" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to share their relatives' dates of birth with others.

**REQUEST NO. 161:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to share with others his, her, or their bankruptcy records.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "share" and "bankruptcy records" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to share their bankruptcy records with others.

**REQUEST NO. 162:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to share with others his, her, or their records of legal judgments.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "share" and "records of legal judgments" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly

burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to share their records of legal judgments with others.

**REQUEST NO. 163:** Admit that one or more other members of the putative class as defined in the Complaint may have provided written consent to one or more third parties to share with others his, her, or their traffic records.

**RESPONSE:** Plaintiff objects to the extent this requests matters protected by attorney-client privilege and protected attorney work product. Plaintiff objects to "share" and "traffic records" as vague because these are not defined and are ambiguous. Plaintiff objects to this as irrelevant to the claims and defenses presented because this seeks information that is a private concern. Plaintiff also objects to this as overbroad and irrelevant to the extent it seeks information concerning other than by Defendant. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of whether it obtained putative class members' written consent. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff does not have personal knowledge of whether putative class members gave their written consent to anyone to share their traffic records with others.

**REQUEST NO. 164:** Admit that you alleged in the Complaint that "It would be extremely easy for Whitepages to maintain their business model while still complying with state law. For example, Whitepages could merely display the names of searched individuals—without more identifying information, in their advertisements for their services."

**RESPONSE:** Admitted.

**REQUEST NO. 165:** Admit that Whitepages' mere display of names, without more identifying information, in Whitepages' alleged advertisements for its services would not be a violation of the Illinois Right of Publicity Act, 765 ILCS § 1075/1, *et seq*.

**RESPONSE:** Plaintiff objects to this as overbroad and vague because the word Whitepages, as defined as defined in Defendant's Requests for Admission, means Whitepages, Inc. and Whitepages, Inc.'s general operations outside of www.whitepages.com are not relevant to any claims or defenses. Defendant does not define what it means in this request by the term "alleged advertisements" and thus it is vague and ambiguous whether this means the advertisements herein sued upon or other advertisements. Plaintiff further objects as premature as discovery is ongoing and the full extent of the operations of whitepages.com is not yet known. Plaintiff further objects as irrelevant as how Whitepages' website could function is not relevant to any claims or defenses. Plaintiff further objects as requesting a legal conclusion and unduly burdensome because Whitepages is represented by lawyers and Plaintiff cannot provide it with legal advice.

**REQUEST NO. 166:** Admit that Whitepages provides data about people for free.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information. Plaintiff objects to this as overbroad and vague because the word Whitepages, as defined as defined in Defendant's Requests for Admission, means Whitepages, Inc. and Whitepages, Inc.'s general operations outside of www.whitepages.com are not relevant to any claims or defenses. Plaintiff objects to the phrase "provides data about people for free" as vague because this is ambiguous. Subject to and without waiving the foregoing, Plaintiff admits that some data is available for free

on the website located at www.whitepages.com, and Plaintiff denies that all data is available for free on the website located at www.whitepages.com.

**REQUEST NO. 167:** Admit that Whitepages provides data correlating to a searched name for free.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information. Plaintiff objects to this as overbroad and vague because the word Whitepages, as defined as defined in Defendant's Requests for Admission, means Whitepages, Inc. and Whitepages, Inc.'s general operations outside of www.whitepages.com are not relevant to any claims or defenses. Plaintiff objects to the phrase "provides data about people for free" as vague because this is ambiguous. Subject to and without waiving the foregoing, Plaintiff admits that some data is available for free on the website located at www.whitepages.com, and Plaintiff denies that all data is available for free on the website located at www.whitepages.com.

**REQUEST NO. 168:** Admit that Whitepages provides data about people for a fee.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information. Plaintiff objects to this as overbroad and vague because the word Whitepages, as defined as defined in Defendant's Requests for Admission, means Whitepages, Inc. and Whitepages, Inc.'s general operations outside of www.whitepages.com are not relevant to any claims or defenses. Plaintiff objects to the phrase "provides data about people for free" as vague because this is ambiguous. Subject to and without waiving the foregoing, Plaintiff admits that some data is available for a fee on the website located at www.whitepages.com, and Plaintiff denies that all data is available only for a fee on the website located at www.whitepages.com.

**REQUEST NO. 169:** Admit that Whitepages provides data correlating to a searched name for a fee.

**RESPONSE:** Plaintiff objects to this as overbroad and vague because the word Whitepages, as defined as defined in Defendant's Requests for Admission, means Whitepages, Inc. and Whitepages, Inc.'s general operations outside of www.whitepages.com are not relevant to any claims or defenses. Plaintiff objects to the phrase "provides data about people for free" as vague because this is ambiguous. Subject to and without waiving the foregoing, Plaintiff admits that some data is available for a fee on the website located at www.whitepages.com, and Plaintiff denies that all data is available only for a fee on the website located at www.whitepages.com.

**REQUEST NO. 170:** Admit that the data that Whitepages provides about people for a fee includes the data that Whitepages provides about people for free.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing and Defendant has not provided Plaintiff with the response to this information. Plaintiff objects to this request to the extent that it calls for documents readily or more accessible to Defendant.

**REQUEST NO. 171:** Admit that Whitepages advertises data about people for a fee with data about people for free.

**RESPONSE:** Plaintiff objects to this as written because the meaning of this request is not clear and is nonsensical.

**REQUEST NO. 172:** Admit that Whitepages advertises data correlating to a searched name for a fee with data correlating to a searched name for free.

**RESPONSE:** Plaintiff objects to this as written because the meaning of this request is not clear and is nonsensical.

**REQUEST NO. 173:** Admit that when you searched "Stephanie M. Lukis" on Whitepages' Web site at www.Whitepages.com, some data returned in response did not relate to you.

**RESPONSE:** Plaintiff objects to "some data" as vague because this is not defined and is ambiguous. Subject to and without waiving same, admitted.

**REQUEST NO. 174:** Admit that when your counsel searched "Stephanie M. Lukis" on Whitepages' Web site at www.Whitepages.com, some data returned in response did not relate to you.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's counsel visited www.whitepages.com in the process of opposing Defendant's motion for summary judgment is uncontested. Plaintiff objects as requesting protected attorney work product and Defendant has not shown a substantial need and an inability to obtain the substantial equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information. Subject to and without waiving same, admitted that Plaintiff's counsel agreed on July 21, 2020 to the Terms of Use produced in Whitepages_000018-24 while in the process of opposing Defendant's motion for summary judgment.

**REQUEST NO. 175:** Admit that as of October 7, 2020, the mobile phone number (773) 957-6403 was available for free on one or more of the following Web sites: www.truepeoplesearch.com, www.checkpeople.com, www.searchpeoplefree.com.

**RESPONSE:** Plaintiff objects to this as it is unclear what is the relevance of this mobile phone number. Plaintiff objects as irrelevant to the claims and defenses presented because Plaintiff's phone number is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement.

Plaintiff also objects to this as irrelevant to the claims and defenses presented because the search functionality of www.truepeoplesearch.com, www.checkpeople.com, and www.searchpeoplefree.com has nothing to do with the claims or defenses. Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because Plaintiff has not visited www.truepeoplesearch.com, www.checkpeople.com, and www.searchpeoplefree.com. Plaintiff objects to visiting these websites as unduly burdensome if her use of this website would constitute an agreement to the website's terms.

**REQUEST NO. 176:** Admit that as of October 7, 2020, the mobile phone number (703) 313-1364 was available for free on one or more of the following Web sites:

www.truepeoplesearch.com, www.checkpeople.com, www.searchpeoplefree.com.

**RESPONSE:** See response to request for admission number 175.

**REQUEST NO. 177:** Admit that as of October 7, 2020, your current mobile phone number was available for free on one or more publicly available Web sites for free.

**RESPONSE:** Plaintiff objects as irrelevant to the claims and defenses presented because Plaintiff's phone number is a matter of private concern. This request is further irrelevant because Defendant admits that it did not obtain Plaintiff's written consent to use her identity in an advertisement. Plaintiff objects to the phrase "publicly available" as vague because this is not defined and is ambiguous. As a result, Plaintiff is unable to object or respond further to this request as written.

**REQUEST NO. 178:** Admit that you don't know whether name searches on www.whitepages.com are saved.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing. Plaintiff objects to the phrase "name searches" as vague because this is not defined and is ambiguous. Plaintiff further objects as unduly burdensome as this information is in the possession of the Defendant. Subject to and without waiving same, Plaintiff has made a reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny because she has not yet received this information from the Defendant.

**REQUEST NO. 179:** Admit that if searches of names on www.whitepages.com are not saved, there is no way to identify members of the putative class as defined in the Complaint.

**RESPONSE:** Plaintiff objects to this as premature as discovery is ongoing. Plaintiff objects to this as irrelevant to the claims and defenses herein. Plaintiff objects to "identity" as vague because this is not defined and is ambiguous. Plaintiff further objects to this as requesting information on her legal strategy which is protected by attorney-client privilege and protected attorney work product.

**REQUEST NO. 180:** Admit that you don't know how you will identify members of the putative class as defined in the Complaint.

**RESPONSE:** Plaintiff objects to this as irrelevant to the claims and defenses herein. Plaintiff objects to "identify" as vague because this is not defined and is ambiguous. Plaintiff further objects to this as requesting information on her legal strategy which is protected by attorney-client privilege and protected attorney work product.

**REQUEST NO. 181:** Admit that you signed up for a paid membership on www.whitepages.com.

**RESPONSE:** Denied.

**REQUEST NO. 182:** Admit that in investigating your claim and/or in preparing your summary judgment response, your counsel signed up for a paid membership on www.whitepages.com.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's counsel visited www.whitepages.com in the process of opposing Defendant's motion for summary judgment is uncontested. Plaintiff objects as requesting protected attorney work product and Defendant has not shown a substantial need and an inability to obtain the substantial equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information. Subject to and without waiving same, admitted that Plaintiff's counsel agreed on July 21, 2020 to the Terms of Use produced in Whitepages_000018-24 while in the process of opposing Defendant's motion for summary judgment.

**REQUEST NO. 183:** Admit that you've paid for one or more background reports on www.whitepages.com.

**RESPONSE:** Denied.

**REQUEST NO. 184:** Admit that your counsel has paid for one or more background reports on www.whitepages.com.

**RESPONSE:** Plaintiff objects to this request as irrelevant because the fact that Plaintiff's counsel visited www.whitepages.com in the process of opposing Defendant's motion for summary judgment is uncontested. Plaintiff objects as requesting protected attorney work product and Defendant has not shown a substantial need and an inability to obtain the substantial equivalent without undue hardship. Plaintiff objects to this request as unduly burdensome as Defendant is in possession of this information. Subject to and without waiving same, admitted that Plaintiff's counsel agreed on July 21, 2020 to the Terms of Use produced in

Whitepages_000018-24 while in the process of opposing Defendant's motion for summary judgment.

*Respectfully submitted,*

*/s/ William H. Beaumont*

_____

Roberto Costales
William H. Beaumont
BEAUMONT COSTALES LLC
107 W. Van Buren #209
Chicago, IL 60605
Telephone: (773) 831-8000
*whb@beaumontcostales.com*

*Attorneys for Plaintiff*

## Certificate of Service

I hereby certify that the foregoing was served on counsel of record for Whitepages, Inc. on this 4th day of January, 2021.

*/s/ William H. Beaumont*

72

# Exhibit H



Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore
vedderprice.com

Blaine C. Kimrey
Shareholder
+1 312 609 7865
bkimrey@vedderprice.com

January 11, 2021

**BY EMAIL**

William H. Beaumont, Esq.
Beaumont Costales
3151 W. 26th Street, Second Floor
Chicago, Illinois 60623
whb@beaumontcostales.com

Re:   *Lukis v. Whitepages, Inc.*, Case No. 19-cv-4871 (U.S. Northern District of Illinois) -
      **Fed. R. Civ. P. 11 notice and ongoing uncured discovery deficiencies**

Dear Mr. Beaumont:

On behalf of defendant Whitepages, Inc., I'm writing pursuant to Federal Rule of Civil Procedure 11 to address the numerous Rule 11 violations that have come to light in discovery — most notably in the January 5, 2021 first deposition session of your client, plaintiff Stephanie Lukis ("Plaintiff") — and to demand that **you withdraw Ms. Lukis's complaint immediately**.  To the extent you continue with Ms. Lukis's Complaint, we also reserve all rights under 28 U.S.C. § 1927 to recover for excessive fees and costs incurred by Whitepages as a result of your continuing to litigate on her behalf, unreasonably and vexatiously multiplying the proceedings.

As set forth in greater detail below, Plaintiff's testimony January 5 made clear that she does not understand the allegations in the Complaint, she has not reviewed any pleadings (including, but not limited to, the Complaint) before filing, she is not claiming any damages cognizable under the Illinois Right to Publicity Act, 765 ILCS 1075/1, *et al.* ("IRPA"), she has no knowledge of IRPA whatsoever, and she had never met (or, for that matter, spoken with) the attorney who has taken the lead in all hearings in this matter for her (Roberto Costales) before the day of her deposition.  Given these facts, it is obvious that Plaintiff can't prosecute an IRPA claim, that Plaintiff is an inadequate class representative, that Beaumont Costales did not engage in reasonable efforts to investigate her claim before filing a complaint on her behalf, and that Beaumont Costales is inadequate to represent Ms. Lukis as a putative class representative or to represent the putative class.

Plaintiff's deposition also made clear that she is inadequate because she has utterly failed to comply with her obligations in responding to discovery.  She has made no reasonable effort to search for documents, and she identified numerous sources of relevant documents during her testimony that she had not searched.

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, and Vedder Price Pte. Ltd., which operates in Singapore.

William H. Beaumont, Esq.
January 11, 2021
Page 2

These deficiencies are in addition to the ongoing issues identified in our two prior discovery letters, most of which remain unresolved.

Until these issues are addressed and resolved, Whitepages will continue to hold Ms. Lukis's deposition open (if she and you persist in prosecuting this case on her behalf). And unless she voluntarily dismisses her case before then (which she and you should do), we will resume, as agreed, with her deposition at 9:30 a.m. Central January 13, 2021. We hope that before then, based on the issues set forth below, she and you will agree to withdraw without our having to serve you with a motion pursuant Fed. R. Civ. P. 11(c)(2), to be filed with the Court 21 days thereafter.

### Federal Rule of Civil Procedure 11

As you are no doubt aware, Federal Rule of Civil Procedure 11(b) states that:

By presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it — an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed *after an inquiry reasonable under the circumstances* . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law . . . [and] *the factual contentions have evidentiary support* or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

(Emphasis added). When a party fails to meet this standard, a motion for sanctions may be brought under Rule 11(c)(1), which states that "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Notably, "Rule 11 not only obligates an attorney to conduct a reasonable pre-filing investigation, but also to 'review, examine, and re-evaluate his position as the facts of the case come to light.'" *Blossom v. Blackhawk Datsun, Inc.*, 120 F.R.D. 91, 100 (S.D. Ind. 1988); *see also Alimissis v. Chalmers*, 1989 WL 84396, *1 (N.D. Ill. July 19, 1989) (awarding Rule 11 sanctions when counsel should have known after the party's deposition, if not before, that the claim was not tenable). "A pleading, motion, or paper is not well-grounded in fact if it is contradicted by uncontroverted evidence that was or should have been known to the attorney or the party signing the filing.*" In re Alberto*, 119 B.R. 985, 992 (Bankr. N.D. Ill. 1990).

The *Blossom* case is particularly instructive. There, the defendants had filed a counterclaim for defamation. The court noted that "by the time the depositions were taken . . . it is evident that the factual basis for the defamation claim was lacking or at the very least that the defendants could not produce the evidence. Adequate investigation or research should have disclosed the flaws in this claim even before the depositions. By that time, the defendants and their counsel had an obligation to dismiss the claim." 120 F.R.D. at 100. Similarly, as set forth below, it was abundantly clear at Plaintiff's deposition (and it should have been clear to Plaintiff's counsel before the deposition) that her claim has no merit and should be dismissed. Failure to do so will subject Plaintiff and counsel to sanctions under Rule 11.

William H. Beaumont, Esq.
January 11, 2021
Page 3

## A.      The facts do not support the claims asserted by Plaintiff.

Based on Plaintiff's deposition testimony, there are multiple reasons that she can't pursue an IRPA claim. First, Plaintiff was unable to articulate any harms cognizable under IRPA. *See* Deposition of Stephanie Lukis ("Lukis Dep."), at pp. 226-229. Plaintiff complained of an ulcer, emotional distress, and anxiety, but also stated she was not seeking to recover for those harms in this litigation. *Id.* Rather, she stated that her goal in the case is "to get my name and information off of every website possible, and this seems to be the only way to do it." (Lukis Dep. 229:5-7). In addition to being factually incorrect, this is not a form of relief afforded under IRPA, and Plaintiff was not able to describe ***any*** monetary damages that she is seeking in this case. (Lukis Dep. 229:8-14). Moreover, Lukis repeatedly testified her harm resulted only from her mother's having contacted and harassed her after allegedly learning Lukis's new cell phone number from Whitepages and Instant Checkmate. (Lukis Dep. 225:17-229:14). Given multiple opportunities to testify that she allegedly was complaining about alleged use of her identity without her written consent to advertise a separate product, Lukis utterly failed to articulate that theory. (Lukis Dep. 34:10-20; 78:1-19; 111:24-112:11; 117:15-20; 121:10-15; 262:21-263:4).

Second, Plaintiff's deposition established that she has repeatedly agreed in writing to the sharing and use (including advertising use) of her allegedly personal information online. Plaintiff stated throughout her deposition that she provided her personal information to various Web sites without reading their privacy policies and terms of service, such as LinkedIn, Facebook, and Credit Karma. (Lukis Dep. 70:22-71:4). She also acknowledged that she had affirmatively consented to Web site terms and conditions for sites like LinkedIn and Facebook, which include consents for sharing and use of certain information with and by third parties (including for advertising purposes). (Lukis Dep. 138:8-17; 186:24-187:16). Indeed, her phone number was available in her Facebook profile until at least September 2018. (Lukis Dep. 185). Plaintiff also admitted that anyone who signs up for an account on Whitepages.com agrees to be bound by the terms and conditions and privacy policy on the site and that Roberto Costales, who signed up for a Whitepages.com account and admits to having accepted Whitepages' terms and privacy policy, is investigating and prosecuting her case as her agent. (Lukis Dep. 249:1-22).

Any one of these issues alone is sufficient to defeat Plaintiff's IRPA claim (particularly as a class action). Combined, it is clear that Plaintiff's claim has no merit and should be dismissed.

## B.      Plaintiff is not an adequate or typical class representative.

Even if Plaintiff's IRPA claim had merit (which it does not), her first deposition session made clear that she is not a suitable class representative. As an initial matter, Plaintiff suffers serious credibility problems that make her an inadequate class representative. *See e.g., Schleicher v. Wendt* 2009 WL 761157, *3 (S.D. Ind. March 20, 2009) (class representative who was convicted of criminal fraud was unfit to serve as fiduciary for class); *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990) (false testimony during deposition warranted decertification of the class). During her deposition, Plaintiff admitted that she had lied in corporate filings with the state of Illinois so that her husband's business could (falsely) be considered a woman-owned business. (Lukis Dep. 85:2-86:7). This is an admission of criminal fraud. Plaintiff also acknowledged that she is the subject of multiple unpaid civil judgments (Lukis Dep. 81-84)

William H. Beaumont, Esq.
January 11, 2021
Page 4

and misdemeanor offenses (Lukis Dep. 90-94) that she incredibly claimed not to remember. Plaintiff's dishonesty also was shown in the deposition itself — on two separate occasions Plaintiff claimed not to remember entering into a contract and then, mere minutes later, claimed to remember the terms of the contracts (which she presented in a self-serving fashion). *See* Lukis Dep. 102:17-103:24 (addressing TMobile contract); Lukis Dep. 104:17-105:6 (addressing Sprint contract).

Plaintiff also is inadequate because of her shocking lack of participation in, and understanding of, this case. Plaintiff admitted the following during her deposition:

- She does not know what IRPA is. (Lukis Dep. 34:21-35:8)

- She does not know the name of the law firm representing her. (Lukis Dep. 43:9-10).

- She had never met or spoken to one of her attorneys, Mr. Costales, before the day of the deposition. (Lukis Dep. 50:17-19).

- She did nothing to prepare for the deposition. (Lukis Dep. 57:19-21).

- She believes this case is an effort to ensure that her personal information is not available anywhere on the Internet. (Lukis Dep. 34:10-17).

- She believes that her *name* is private information. (Lukis Dep. 107:4-14).

- She has never read any terms and conditions when requesting information online. (Lukis Dep. 70:22-71:4).

- She does not remember what the engagement letter with her counsel said. (Lukis Dep. 128:18).

- She did not review the Complaint before it was filed. (Lukis Dep. 129:9-13).

- She did not review **any** pleadings before filing. (Lukis Dep. 130:9-11).

- She has not discussed damages with counsel. (Lukis Dep. 229:8-14).

- She is not aware of what her counsel is doing in the litigation. (Lukis Dep. 239:3-7, 15-24).

- She is not aware that her counsel Roberto Costales has conceded he accepted Whitepages' terms and privacy policy in investigating and prosecuting her case. (Lukis Dep. 239:15-21).

- She did not search for **any** documents until three days before the deposition. (Lukis Dep. 26:12-14).

William H. Beaumont, Esq.
January 11, 2021
Page 5

- She has not searched for any documents related to Whitepages.  (Lukis Dep. 246:10-15).

- She could not remember whether she visited Whitepages.com (a critical issue in the case) and gave answers inconsistent with her discovery responses.  (Lukis Dep. 220-221).

In short, Plaintiff's deposition showed a stunning lack of understanding for what this case is about and what her role is in it.  As the lead plaintiff for a putative class, Plaintiff obviously must be willing to respond to discovery, having put her privacy and consent at issue by filing this lawsuit.  But Plaintiff repeatedly was unwilling to answer questions, claiming privacy interests in matters that are not private.  *See, e.g.*, Lukis Dep. 154:19-21; 164.

Plaintiff is also inadequate — and atypical of the class — because there are a number of unique facts about her case.  Plaintiffs' experience of allegedly being harassed by her mother because her mother allegedly found Plaintiff's information on Whitepages.com is unique to Plaintiff and raises atypical issues related to Plaintiff's claim (and incidentally subjects her mother, Deborah Egan, to a claim for breach of Whitepages' terms regarding harassment and to defense and indemnity of Whitepages against Lukis's claim).  Moreover, as discussed above, Plaintiff's sharing of her information online, her agreement to certain terms related to sharing and use, and her counsel's agreement to certain terms as her agent make her atypical of the class and subject her to unique defenses that defeat adequacy.

Given the obvious problems with adequacy and typicality, there is no justification for Lukis or her counsel to continue pursuit of a putative class action with Plaintiff as the proposed class representative.

**C.    Beaumont Costales failed to adequately research plaintiff's claims.**

Plaintiff's deposition also brought to light numerous failures by Beaumont Costales that demonstrate that the firm cannot adequately represent the putative class.  Specifically, Plaintiff stated that:

- Beaumont Costales did not share the Complaint with her before filing.  (Lukis Dep. 129:9-13).

- Beaumont Costales did not share any pleadings with her before filing.  (Lukis Dep. 130:9-11).

- Plaintiff had never spoken to or met Roberto Costales before the day of her deposition.  (Lukis Dep. 50:17-19).

- Beaumont Costales had not told Plaintiff that Mr. Costales had accepted the Whitepages terms and privacy policy as her agent.  (Lukis Dep. 239:3-7, 15-24).

- She did not search for *anything* in discovery until three days before the deposition.  (Lukis Dep. 26:12-14).

- Beaumont Costales did not discuss damages with Plaintiff.  (Lukis Dep.  229:8-14).

William H. Beaumont, Esq.
January 11, 2021
Page 6

- She is not aware of what her counsel is doing in the litigation. (Lukis Dep. 239:3-7, 15-24).

- Beaumont Costales failed to produce a single document in this litigation in response to Whitepages' discovery until less than 24 hours before Plaintiff's deposition commenced.

In light of the foregoing, it is clear that Beaumont Costales has failed to fulfill even its most basic duties as counsel for Plaintiff, namely keeping her apprised of what is going on in the case, obtaining client feedback and approval on filings to ensure their accuracy, and coordinating appropriate discovery responses from Plaintiff. These astonishing failures by Beaumont Costales are more than enough to have the firm deemed inadequate class counsel.

Moreover, the conduct by Beaumont Costales during Plaintiff's deposition is separately sanctionable and further demonstrates inadequacy. In an apparent effort to obfuscate and delay, Beaumont Costales made numerous inappropriate objections, including instructing Plaintiff not to answer a stunning 26 times. (Lukis Dep. 21:1-18; 22:1-23:14; 26:23-27:12; 38:10:13; 39:6-15; 40:8-15; 41:21-42:23; 43:9-44:4; 44:22-45:18; 46:17-47:6; 47:9-48:17; 48:19-49:20; 50:17-51:2; 53:14-54:8; 55:1-20; 55:21-56:9; 56:10-57:5; 57:6-18; 122:17-123:20; 124:20-125:15; 125:16-24; 126:1-24; 127:19-128:5; 162:11-20; 164:8-165:14; 166:4-21). These objections not only were inappropriate as a substantive matter (and may require a motion to compel, as discussed below), but also unnecessarily prolonged the deposition and are further evidence of counsel's inadequacy to represent the class.

## Discovery Deficiencies

For the reasons set forth above, plaintiff should promptly withdraw the Complaint in light of the requirements under Federal Rule of Civil Procedure 11. But if the litigation continues in any form, I write here to memorialize the alarming testimony of Plaintiff in her first deposition session, as well as the remaining ongoing issues that were previously addressed in our December 15, 2020 letter ("December 15 Letter"), our December 22, 2020 meet and confer discussion, and our December 23, 2020 letter ("December 23 Letter").

Despite the fact that Plaintiff has had Whitepages' written discovery requests since October 9, 2020, Plaintiff made clear at her first deposition session almost three months later that she made *no effort whatsoever* to search for *any* responsive documents until three days before the deposition — and even then, she only attempted to download her Facebook, LinkedIn, and Twitter accounts for production. (Lukis Dep. 25-26). This is obviously inadequate. Moreover, despite our previous meet and confer efforts, Plaintiff did not produce *any* documents or supplemental discovery responses until after 4 p.m. Central on January 4, 2021, less than 18 hours before Plaintiff's deposition. Plaintiff's discovery responses and production are woefully inadequate and must be supplemented immediately if this litigation continues.

William H. Beaumont, Esq.
January 11, 2021
Page 7

**A.    Issues identified in deposition.**

During Plaintiff's deposition, she identified numerous documents and sources of data responsive to Whitepages' discovery requests but not produced.  Accordingly, Whitepages requests that Plaintiff immediately proceed with the following steps and supplement her responses accordingly:

- Plaintiff must search her LG Stylo 5 (including but not limited to text messages) for any documents responsive to Whitepages' discovery requests (or make available to Whitepages a forensic image of that device).

- Plaintiff must search her Samsung Galaxy phone data in the cloud (including but not limited to text messages) for any documents responsive to Whitepages' discovery requests (or make available to Whitepages a forensic image of that cloud data).

- Plaintiff must search autumnsilver@gmail.com, stephanie.lukis@gmail.com, and smlukis@gmail.com for any documents responsive to Whitepages' discovery requests.

- Plaintiff must search her Dell Inspiron 3584 for any documents responsive to Whitepages' discovery requests (or make available to Whitepages a forensic image of that device).

- Plaintiff must search the hard drive from her old HP desktop for any documents responsive to Whitepages' discovery requests (or make available to Whitepages a forensic image of that device).

- Plaintiff must search the hard drive from her old Dell desktop for any documents responsive to Whitepages' discovery requests (or make available to Whitepages a forensic image of that device).

- Plaintiff must search her Facebook Messenger account for any documents responsive to Whitepages' discovery requests.

Additionally, Plaintiff must produce the following documents that she identified in her deposition:

- The Craigslist ad (or ads) soliciting her to participate as a plaintiff in this litigation and any related email communications.

- Any documents related to her use of CreditKarma.com, Experian, Equifax, and/or TransUnion.

- Her cell phone contracts with TMobile and Sprint.

- Any documents related to her applications to work at Whole Foods, Amazon, McCormick & Schmick's, and Homeliving.

William H. Beaumont, Esq.
January 11, 2021
Page 8

- Her Craigslist account history and profile.

- Her eBay account history and profile.

- Her Amazon account history and profile.

- Her Uber account history and profile.

- Her MySpace account history and profile.

- Her YouTube account history and profile.

- Her Google account history and profile.

- Her browser search history for each digital device that she testified about in the deposition (as well as any others).

Finally, as discussed above, Plaintiff's counsel made numerous improper objections and instructions not to answer during the deposition, and Plaintiff unilaterally refused to answer certain questions without justification. Those objections must be withdrawn and Plaintiff should be prepared to answer those questions at the next deposition session.

**B.      Ongoing discovery issues.**

     **1.      Requests for production**

In Plaintiff's supplemental responses to Requests for Production 2, 3, 4, 5, and 15, Plaintiff states that she is willing to produce her Reddit history, but Whitepages has "not yet explained how this may be retrieved" and Plaintiff will await instructions from Whitepages before determining if the request is overly burdensome. This is absurd. Whitepages does not bear the burden of determining how Plaintiff can accomplish her obligations for responding to discovery, and Whitepages will not provide any "instructions" on how Plaintiff can access her own information. Plaintiff has an obligation under the Federal Rules of Civil Procedure to search for all documents responsive to Whitepages' discovery requests and produce them unless Plaintiff can show a burden that is disproportionate to the needs of the case. To date, Plaintiff has shown no burden whatsoever — indeed, Plaintiff's deposition testimony shows that she did not even ***attempt*** to collect any documents until three days before her deposition, and even then, her search was extremely limited. Plaintiff must proceed with whatever steps are necessary to collect the Reddit history documents, as well as the other online history documents addressed above that were mentioned in Plaintiff's deposition and are responsive to these requests.

With respect to Request for Production 6, Plaintiff's engagement letter with Beaumont Costales has now been produced, but two paragraphs have been redacted. As we have explained previously, the engagement letter is not attorney-client privileged or work product protected. Accordingly, the full, unredacted engagement letter must be produced immediately.

William H. Beaumont, Esq.
January 11, 2021
Page 9

Plaintiff's supplemental response to Request for Production 9 frankly makes no sense. This request seeks: "All documents and communications related to, arising out of, or evidencing the actual damages allegedly incurred by you as asserted in the Complaint." Your response is: "See Plaintiff's supplemental response to request for production number 8." Request for Production 8 seeks: "All documents and communications related to, arising out of, or evidencing the emotional distress allegedly suffered by you as asserted in the Complaint." Your supplemental response is: "Defendant states this request does not seek Plaintiff's attorney's fees or costs, and therefore Plaintiff states that she is not withholding any documents on the basis of her objections." Given that these two requests seek two entirely different types of documents, it is unclear how the response to Request for Production 8 is the same as Request for Production 9. This response should be revised and any responsive documents should be produced.

With respect to Request for Production 13, as discussed above, additional information is needed, including documents from multiple devices (or images of those devices) and Plaintiff's browser histories. Plaintiff's assertion that "producing her browsing history (if any) from this hard drive is unduly burdensome as Plaintiff does not have the present capability to operate the hard drive" is without merit. Plaintiff's Web history is critical evidence in this case in light of the privacy and consent issues (among others) and Plaintiff has an obligation to attempt to access that information. Plaintiff has described no burden that is disproportionate to the needs of the case. Moreover, if Plaintiff is unable to access the hard drive, Plaintiff should enlist the aid of a computer forensics vendor to access the drive or to image the drive and turn the entire drive over to Whitepages for analysis.

With respect to Request for Production 14, it appears Plaintiff is standing on her objection. Given Plaintiff's acknowledgement in the deposition that Beaumont Costales acted as her agent, we urge you to reconsider this position. If you do not, Whitepages will move to compel on this issue.

## 2.    Interrogatories

As discussed on December 22, 2020, and in the December 23 Letter, it is not a proper objection to claim that a request is "overbroad and unduly burdensome" solely because Plaintiff cannot recall some or all of the responsive information. Yet in Plaintiff's supplemental interrogatory responses dated January 4, 2021, Plaintiff asserts the same objections to Interrogatories 1-7 and 10, and Plaintiff has made no effort to locate responsive information. Whitepages therefore intends to move to compel on this issue.

With respect to Interrogatory No. 16, your supplemental response is nonsensical. Interrogatory No. 16 asks Plaintiff to "[i]dentify and describe your actual damages as alleged in the Complaint." Plaintiff's response makes no reference at all to damages, instead saying "Defendant's behavior is predatory because it allows others to access personal details about her and her family which is disconcerting because of her emotional abuse." This is entirely nonresponsive. Whitepages intends to move to compel on this issue unless the response is revised immediately.

William H. Beaumont, Esq.
January 11, 2021
Page 10

With respect to Interrogatory No. 17, your supplemental response states "see Plaintiff's supplemental response to Interrogatory Number 17." This obviously makes no sense and should be further revised immediately.

## Conclusion

Given the issues described above and the fact that they clearly demonstrate the inadequacy of both Plaintiff and her counsel in this case, Plaintiff should immediately voluntarily dismiss her Complaint. But if she does not, Whitepages will proceed with discovery as ordered by Judge Feinerman over Whitepages' objections, including the second deposition session of Ms. Lukis January 13 and the presenting of three deponents from Whitepages later in January, but Whitepages reserves the right to seek recovery of its fees and costs in doing so (pursuant to 28 U.S.C. § 1927) if Beaumont Costales continues to insist on litigating this case on behalf of Ms. Lukis, unnecessarily and vexatiously multiplying the proceedings.

Please know that we do not invoke Rule 11 lightly, but because of the egregious nature of the issues that came to light during Plaintiff's deposition, we feel we have no choice. If you do not confirm by *5 p.m. Central on January 12, 2021*, that you will withdraw Ms. Lukis's claim, we will proceed with preparing and serving a Rule 11 motion, triggering the 21-day period under Fed. R. Civ. P. 11(c)(2).

Sincerely,

Blaine C. Kimrey

cc:     Roberto Costales, Esq.

# Exhibit I

**Clark, Bryan**

| | |
|---|---|
| **From:** | Roberto Luis Costales <rlc@beaumontcostales.com> |
| **Sent:** | Monday, January 18, 2021 4:14 PM |
| **To:** | Kimrey, Blaine C. |
| **Cc:** | William H. Beaumont; Reinisch, Jonathon P. |
| **Subject:** | [EXT] Re: Lukis v. Whitepages (NDIL) |

Blaine:

We do not represent Plaintiff's spouse, mother-in-law, or sister-in-law. So we will not be providing them for any deposition.

With regard to the browser history request, you have not demonstrated its relevance and/or proportionality to the needs of this case. We have reviewed the law on this point and, in our opinion, we've already *overproduced* to you my client's social media information. In addition to not being relevant, your request for her social media was also not targeted (in any way). Yet we provided it-- with the exception of her browser history, which was redacted apart from entries reflecting the access of whitepages.com.

My client has now responded to more than 220 written discovery requests, sat for a 14 hour deposition (including breaks) and provided literally thousands (roughly 2300) of pages of discovery. This is a fishing expedition if I've ever seen one--and worse, it is clearly an attempt to harass my client. I am confident that Judge Feinerman will see it similarly.

Thank you,

Roberto

On Thu, Jan 14, 2021 at 7:49 PM Kimrey, Blaine C. <bkimrey@vedderprice.com> wrote:

> Dear Mr. Beaumont:

1

Please respond.


Sincerely,

Blaine


**Blaine C. Kimrey**, Shareholder

National class and direct litigation and Chair, Privacy, Cybersecurity & Media Practice Group, CIPP/US, CIPP/E, CIPM


VedderPrice

T +1 312 609 7865

Assistant: Deb Mullen +1 312 609 7583

web | email | offices | biography

---

**From:** Kimrey, Blaine C.
**Sent:** Wednesday, January 13, 2021 3:43 PM
**To:** William H. Beaumont <whb@beaumontcostales.com>
**Cc:** Reinisch, Jonathon P. <jreinisch@vedderprice.com>; Roberto Luis Costales <rlc@beaumontcostales.com>
**Subject:** Lukis v. Whitepages (NDIL)


Dear Mr. Beaumont:


I reiterate that Ms. Lukis should withdraw immediately.  Today's deposition session did not help her cause.


But if she and you insist on persisting despite the glaring Rule 11 issues, we need to continue Ms. Lukis's deposition after a proper production from her before the Feb. 1 fact discovery cutoff.  Also before the Feb. 1 fact discovery cutoff, we need to depose her husband, her sister-in-law, and her mother-in-law in light of Ms. Lukis's claim that the attached (which we became aware of for the first time at the end of today's deposition session during your redirect because it was buried in an 833-page file comprised, but for the attached, of black redaction boxes) does not reflect activity by her and instead reflects activity by her husband, her sister in-law, or her mother-in-law.

Please let us know right away whether Ms. Lukis refuses to withdraw. If she won't withdraw, please let us know right away:

- Whether you will voluntarily produce Ms. Lukis's husband, sister-in-law, and mother-in-law for deposition or whether we have to subpoena them; and
- Why large parts of Ms. Lukis's Jan. 4 Facebook-related production were redacted and whether you're willing to remove those redactions and produce the material unredacted immediately.

Sincerely,

Blaine

**Blaine C. Kimrey**, Shareholder

National class and direct litigation and Chair, Privacy, Cybersecurity & Media Practice Group, CIPP/US, CIPP/E, CIPM

# VedderPrice

T +1 312 609 7865

Assistant: Deb Mullen +1 312 609 7583

web | email | offices | biography

CONFIDENTIALITY NOTE: This e-mail is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this e-mail message is not the intended recipient, or the employee or agent responsible for delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this e-mail in error, please notify us immediately by telephone at (312) 609-5038 and also indicate the sender's name. Thank you.

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, with Vedder Price (CA), LLP which operates in California and with Vedder Price Pte. Ltd. which operates in Singapore.

--
**The information contained in this transmission may contain privileged and confidential communications. It is intended only for the use of person(s) named above. If you are not the intended recipient(s), you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient(s), please contact the sender by reply e-mail and kindly destroy all copies of the original message.**

# Exhibit J

DocuSign Envelope ID: 55BC3D08-EC4E-42C1-9BB6-7163E63A862A

# BEAUMONT COSTALES LLC

3801 Canal Street Suite 207 │ New Orleans, Louisiana 70119 │ 504.534.5005

3151 W. 26th Street, 2nd Floor │ Chicago, Illinois 60623 │ 773.831.8000

June 12, 2019

VIA DOCUSIGN

STEPHANIE LUKIS
312-459-0876
STEPHANIE.LUKIS@GMAIL.COM

       **RE:**    Unauthorized use of your identity by WhitePages.com

Dear Stephanie:

       I am writing to set out the terms of the retainer agreement through which we will investigate and potentially prosecute the unauthorized use of your identity by **WhitePages.com**. By signing this letter-agreement, you will have retained the law firm of Beaumont Costales LLC as well as such attorneys as may work with us on this case (hereinafter "the lawyers") to represent you in the aforementioned matter. Should we ultimately decide to file suit, our plan is to pursue this matter on your behalf and on behalf of others similarly situated.

       The lawyers will represent both you and the class on a contingent basis. Should we achieve a recovery on behalf of the class, we will petition the court for an award of attorneys' fees and expenses. Although the court will determine what to award, you agree that a fair award of attorneys' fees from a fund recovered for the class would be one-third of the total recovery plus reimbursement of all costs and expenses.

       Alternatively, should we reach a private or injunctive settlement on your behalf, or if the court uses the lodestar method of awarding fees (number of hours worked times a multiplier) in the event of a settlement or judgment in your favor, you agree that a fair award of fees would be a lodestar based on our then-current hourly rates with a multiplier of at least three, plus the reimbursement of all our costs and expenses.

       If we do not recover any amount on behalf of you or the class, you will not be required to pay us any of our fees, costs, expenses or any other amount whatsoever.

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY       Pl.'s Bates No.002206



You also agree to provide us up-to-date contact information, including your current address, e-mail and telephone number where you can readily be reached.

This agreement is meant to bind and benefit the heirs and successors of each of the parties to this agreement. To that end, you hereby grant the lawyers a lien on any claims, causes of action or recovery that you obtain, whether through settlement, judgment or otherwise, relating to the subject of this agreement. The lien will be based upon the amount of our attorneys' fees, costs, and expenses as set forth above. This lien will not apply if we withdraw as your counsel purely out of our own choice.

If you received this agreement via text message or email, you agree that by responding affirmatively to the text message, such affirmation acts as your signature and is the same as signing and dating below.

This engagement letter is not valid if not signed and returned to me thirty (30) days of the above date.

If you have *any* questions about any aspect of this letter-agreement, please feel free to contact me before you sign it. If you do not have any questions, and the agreement is acceptable, please sign it in the space provided below. We look forward to working with you.

Very truly yours,

*/s/ William H. Beaumont*
Beaumont Costales LLC
107 W Van Buren Street #209
Chicago, Illinois 60605
Tel: (773) 831-8000
whb@beaumontcostales.com

Agreed to: _Stephanie Lukis_
DocuSigned by:
B78646838EE646F...
Stephanie Lukis

6/12/2019
_____
Date