UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEPHANIE LUKIS, individually and on behalf of all others similarly situated, | ) ) |
| | ) 19 C 4871 |
| Plaintiffs, | ) |
| | ) Judge Gary Feinerman |
| vs. | ) |
| | ) |
| WHITEPAGES INCORPORATED, | ) |
| | ) |
| Defendant. | ) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Stephanie Lukis brought this putative class action against Whitepages Inc. in the Circuit

Court of Cook County, alleging violations of the Illinois Right of Publicity Act ("IRPA"), 765

ILCS 1075/1 *et seq*. Doc. 1-1. Whitepages removed the suit under the diversity jurisdiction.

Doc. 1. The court has denied Whitepages's motion to dismiss for failure to state a claim and lack

of personal jurisdiction, Docs. 36-37 (reported at 454 F. Supp. 3d 746 (N.D. Ill. 2020)), and its

motions for reconsideration, leave to appeal, and summary judgment, Docs. 87-88 (reported at

2020 WL 6287369 (N.D. Ill. Oct. 27, 2020)).

Six fully briefed motions are before the court. First, Whitepages moves to dismiss the

suit—though, properly styled, the motion is to compel arbitration and stay the suit, *see Halim v.

Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 561 (7th Cir. 2008) ("As this Court has

noted on numerous occasions, the proper course of action when a party seeks to invoke an

arbitration clause is to stay the proceedings rather than to dismiss outright.") (internal quotation

marks omitted)—or transfer it to the Western District of Washington based on an arbitration

provision and forum selection clause in the terms of use on the Whitepages website. Doc. 89.

Second, Lukis moves to amend her complaint to add two new putative class representatives.

Doc. 97.  Third, Whitepages moves to strike the complaint's class allegations and Lukis's attorneys as putative class counsel.  Doc. 119.  The other three motions relate to discovery: Each side moves to compel discovery from the other side, Doc. 127, 136, and Lukis moves to extend the fact discovery deadline, Doc. 128.

Whitepages's motion to compel arbitration or transfer the suit is denied.  Lukis's motion to amend the complaint is granted.  Whitepages's motion to strike is denied, though it may renew its arguments in opposition to Lukis's recently filed class certification motion.  Doc. 162. Lukis's motion to compel is granted, Whitepages's motion to compel is granted in part and denied in part, and Lukis's motion to extend fact discovery is granted.

## Background

The court assumes familiarity with its prior opinions and reviews the facts, which for purposes of the pending motions are undisputed, only briefly.  Whitepages operates a website that sells background reports on people.  Doc. 76 at ¶¶ 1, 6.  Searching the website for a person's name reveals free information tied to that name.  *Id*. at ¶ 4.  Whitepages also offers more detailed reports for a fee, which it promotes by inviting users to purchase them when viewing a free preview.  *Id*. at ¶ 5; Doc. 80 at ¶¶ 20, 29.  The complaint alleges that Whitepages violated the IRPA by using Lukis's identity to promote Whitepages's services.  Doc. 1-1 at ¶¶ 38-44; *see* 765 ILCS 1075/30(a) ("A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent … ."); *id*. § 1075/5 (defining "commercial purpose" to include "advertising or promoting products, merchandise, goods, or services").

**Discussion**

I.     **Whitepages's Motion to Compel Arbitration or Transfer the Suit**

Whitepages premises its motion to compel arbitration or transfer the suit on certain

dispute resolution provisions set forth in the terms of use on its website.  Doc. 90 at 7-8; Doc. 90-

1 at 14, § 12.10.

   A.     **Motion to Compel Arbitration**

The dispute resolution provisions include an arbitration clause, which states in relevant

part: "ANY DISPUTE, CLAIM OR CONTROVERSY BETWEEN YOU AND WHITEPAGES

RELATING IN ANY WAY TO THIS AGREEMENT OR YOUR ACCESS TO OR USE OF

THE SERVICES OR CONTENT … WILL BE RESOLVED BY BINDING ARBITRATION IF

IT CANNOT BE RESOLVED THROUGH NEGOTIATION … ."  Doc. 90-1 at 14, § 12.10.

Section 2 of the Federal Arbitration Act ("FAA") states:

> A written provision in any … contract evidencing a transaction involving
> commerce to settle by arbitration a controversy thereafter arising out of such
> contract or transaction … shall be valid, irrevocable, and enforceable, save
> upon such grounds as exist at law or in equity for the revocation of any
> contract.

9 U.S.C. § 2.  Section 2 "mandates enforcement of valid, written arbitration agreements," *Tinder*

*v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002), and "embodies both a liberal federal policy

favoring arbitration and the fundamental principle that arbitration is a matter of contract," *Gore*

*v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (quotation marks omitted).  That

said, "because arbitration is a matter of contract, 'a party cannot be required to submit to

arbitration any dispute which he has not agreed so to submit.'"  *Ibid.* (quoting *Howsam v. Dean*

*Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).  Accordingly, "[u]nder the FAA, arbitration

should be compelled if three elements are present: (1) an enforceable written agreement to

arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017).

Whitepages stakes its motion to compel arbitration on § 4 of the FAA, which provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition … for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4; *see* Doc. 89 at 1. Whitepages presents one ground for finding that Lukis assented to its website's terms of use: On July 21, 2020, acting as her agent, Lukis's counsel—Roberto Costales of Beaumont Costales LLC—purchased a Whitepages product and clicked through the terms. Doc. 90 at 10, 14-16. With online contracts, the law distinguishes "'clickwrap' (or 'click-through') agreements, which require users to click an 'I agree' box," from "'browsewrap' agreements, which generally post terms and conditions on a website via a hyperlink at the bottom of the screen." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017); *see also Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011) ("The two most common types of agreements are 'clickwrap' agreements and 'browsewrap' agreements. With clickwrap agreements, the webpage user manifests assent to the terms of a contract by clicking an 'accept' button in order to proceed."). Whitepages's initial brief states that its motion to compel "concerns only [Lukis's] acceptance of Whitepages' clickwrap terms" via Costales. Doc. 90 at 14.

Lukis does not dispute that Costales agreed to the website's terms of use or that he bound her as her agent. Nor does she challenge Whitepages's dubious premise that Costales's use of the website a year into the litigation to better understand how it works and thereby to better represent her—and, if class certification is granted, the class—subjects her IRPA claims, which of course arose before litigation commenced, to arbitration. Lukis argues only that Whitepages

4

waived its right to enforce the arbitration clause by waiting too long to bring its motion. Doc. 103 at 1-4. That argument is correct.

In general, "like any other contractual right, the right to arbitrate can be waived." *Smith v. GC Servs. L.P.*, 907 F.3d 495, 499 (7th Cir. 2018); *see also Auto. Mechs. Loc. 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 746 (7th Cir. 2007) ("[T]he choice of an arbitral forum can be waived early in the proceedings, and generally is waived once the party who later wants arbitration chooses a judicial forum."). "A waiver can be express or implied through action. Either way, the question is whether 'based on all the circumstances, the party against whom the waiver is to be enforced has acted inconsistently with the right to arbitrate.'" *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 891 (7th Cir. 2020) (citation omitted) (quoting *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 637 (7th Cir. 2002)).

### 1. Threshold Question

Normally, "the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). But "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). If they so agree, "an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019).

The arbitration provision in Whitepages's terms of use delegates arbitrability questions to the arbitrator, stating: "THE ARBITRATOR WILL DECIDE ALL THRESHOLD QUESTIONS." Doc. 90-1 at 14, § 12.10. Whitepages argues that the issue of whether it waived its right to enforce the arbitration agreement is such a "threshold question" that must be submitted to the arbitrator. Doc. 132 at 5-8. Whitepages is incorrect. The question whether

Whitepages waived arbitration through litigation conduct or delay is not a gateway or threshold question of arbitrability under governing precedent. Rather, waiver through litigation conduct or delay is necessarily an issue for a court to decide.

For starters, the FAA says so. Section 3 commands courts to stay cases referred to arbitration, "providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. According to the Seventh Circuit, § 3 "expressly gives the courts jurisdiction to determine the existence of a default," which the court referred to as "waiver by judicial participation." *Halcon Int'l, Inc. v. Monsanto Austl. Ltd.*, 446 F.2d 156, 161 (7th Cir. 1971); *see also St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 588 (7th Cir. 1992) ("The essential question is whether, based on the circumstances, the alleged defaulting party has acted inconsistently with the right to arbitrate."). Other circuits agree that § 3 directs courts to address questions of waiver through litigation conduct. *See Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 13 (1st Cir. 2005) ("A 'default' has generally been viewed by courts as including a 'waiver.'"); *Glass v. Kidder Peabody & Co.*, 114 F.3d 446, 455 n.62 (4th Cir. 1997) (stating that a "section 3 default" arises "when a party seeking arbitration has substantially utilized the litigation machinery before pursuing arbitration") (quotation marks and alteration omitted); *Morewitz v. W. of Eng. Ship Owners Mut. Prot. & Indem. Ass'n (Lux.)*, 62 F.3d 1356, 1365 n.16 (11th Cir. 1995) ("Although the [FAA] uses the term 'default,' 9 U.S.C. § 3, the case law on this subject employs the term 'waiver.'"). Whitepages seeks to compel arbitration under § 4, not § 3, but the two provisions are interpreted in tandem. *See Marie*, 402 F.3d at 13 (holding that the "default" language in § 3 also applies to motions under § 4); *Morewitz*, 62 F.3d at 1365-66 & n.16 (relying on § 3 in holding that a motion to compel arbitration was waived through litigation conduct).

Even setting aside § 3, a court's authority to address waiver by litigation conduct goes hand in hand with a party's duty to file a motion invoking an arbitration provision and to do so in a timely manner. Section 6 provides that a party invoking an arbitration provision must move to compel arbitration. *See* 9 U.S.C. § 6 ("Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided."). A corollary is that district courts must not enforce arbitration clauses *sua sponte*. *See Kay v. Bd. of Educ. of Chicago*, 547 F.3d 736, 738 (7th Cir. 2008) ("[F]ederal judges must not invoke arbitration agreements on their own motion."); *CPL, Inc. v. Fragchem Corp.*, 512 F.3d 389, 392-93 (7th Cir. 2008) (holding that the district court erred in dismissing a lawsuit *sua sponte* on the basis of an arbitration clause). The duty to bring arbitrability to the court's attention thus falls squarely on the party seeking arbitration.

Given this, motions to compel arbitration are subject to the general rule that litigants must raise in a timely manner grounds for relief they would like to seek. Except for motions challenging subject matter jurisdiction, a district court may always consider whether a party forfeited through delay its ability to seek certain relief. *See Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 914 (7th Cir. 1994) ("[T]he doctrine of waiver … is applicable to all defenses except lack of subject-matter jurisdiction."). Arbitrability does not go to subject matter jurisdiction, *see Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 807 (7th Cir. 2011); *Grasty v. Colo. Tech. Univ.*, 599 F. App'x 596, 597 (7th Cir. 2015), so the court is the appropriate body to consider waiver through litigation conduct or delay.

Absurd consequences would flow from the rule, advanced by Whitepages, that waiver is among the gateway arbitrability questions that can be delegated to the arbitrator. At the motion hearing, Doc. 160, the court asked Whitepages whether, if it moved to compel arbitration on the

second day of trial, the court would be obliged to adjourn the trial for an arbitrator to decide whether Whitepages had waived its objection to the judicial forum. Whitepages agreed, correctly, that this result would follow logically from its position. That Whitepages's position necessarily would entail that result is, to put it mildly, an enormous red flag.

To support its position, Whitepages points to the Supreme Court cases stating that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of *waiver, delay, or a like defense to arbitrability*." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (emphasis added); *see also BG Grp., PLC v. Republic of Arg.*, 572 U.S. 25, 35 (2014) (same); *Howsam*, 537 U.S. at 84 (same). Doc. 132 at 6. But those cases did not address which "threshold issues" parties may contractually delegate to an arbitrator. *Rent-A-Center*, 561 U.S. at 68-69. They instead ruled that certain issues are presumptively for the arbitrator, even without a delegation in an arbitration provision. *See Howsam*, 537 U.S. at 84 ("[T]he presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.'") (quoting *Moses Cone*, 460 U.S. at 25); *see also Lumbermens Mut. Cas. Co. v. Broadspire Mgmt. Servs., Inc.*, 623 F.3d 476, 481 (7th Cir. 2010) ("Our circuit has followed *Howsam* in distinguishing between 'substantive' and 'procedural' arbitrability questions, and in holding that the latter are presumptively for an arbitrator to decide."). So if Whitepages's reading of *Moses Cone* and its progeny were correct, then the delegation clause in Whitepages's terms of use would be irrelevant, for the arbitrator in every case presumptively would decide the issue of waiver through litigation conduct or delay.

*Moses Cone* made no such holding, and Whitepages's argument to the contrary confuses two distinct meanings of the word "waiver." The pertinent meaning here concerns waiver

through litigation conduct or delay. The second meaning refers to a doctrine of contract law under which "the conduct of the party" shows an "intentional relinquishment of a known right." *Ryder v. Bank of Hickory Hills*, 585 N.E.2d 46, 49 (Ill. 1991); *see also Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 830 (7th Cir. 2020) (explaining that the waiver defense "admits the alleged breach but can defeat a remedy"). Closely related to this second meaning of waiver is the equitable defense of laches, which the Supreme Court of Illinois has defined as "a neglect or omission to assert a right, taken in conjunction with a lapse of time of more or less duration, and other circumstances causing prejudice to an adverse party." *Sundance Homes, Inc. v. Cnty. of DuPage*, 746 N.E.2d 254, 262 (Ill. 2001). Like the contractual doctrine of waiver, laches "bars the remedy but does not discharge the right." *Halcon*, 446 F.2d at 159.

*Moses Cone* concerned the contractual meaning of waiver, not the litigation conduct meaning. Although the Seventh Circuit has not expressly so held, it has continued after *Moses Cone* and *Howsam* to address whether a party invoking an arbitration clause has waived arbitration through litigation conduct or delay. *See*, *e.g.*, *Brickstructures*, 952 F.3d at 891; *Smith*, 907 F.3d at 499; *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 994 (7th Cir. 2011). For a court *ever* to address waiver through litigation conduct would be inconsistent with Whitepages's reading of *Moses Cone* and *Howsam*, which posits that those cases consigned waiver through litigation conduct to the arbitrator regardless of whether the arbitration provision contained a delegation clause. In fact, years before *Moses Cone* was decided, the Seventh Circuit expressly distinguished between "'[w]aiver' in the laches or estoppel sense, rather than in the default sense or participating in judicial proceedings." *Halcon*, 446 F.2d at 161. Anticipating *Moses Cone*, the Seventh Circuit held that laches or estoppel issues were for the arbitrator, *id*. at 159 (holding that "[t]he defense of laches [is] a matter for the

determination of the arbitrators"), but made clear that waiver through litigation conduct is reserved for the court, *id*. at 161 ("Section 3 [of the FAA] expressly gives the courts jurisdiction to determine the existence of a default.").

The circuits to have addressed the issue overwhelmingly agree that *Moses Cone* and *Howsam* concern only the contractual sense of waiver. *See Martin v. Yasuda*, 829 F.3d 1118, 1123 (9th Cir. 2016) ("[U]nder *Howsam*, the question [of waiver through litigation conduct or delay] is presumptively for a court and not an arbitrator to decide. Every circuit that has addressed this issue—whether a district court or an arbitrator should decide if a party waived its right to arbitrate through litigation conducted before the district court—has reached the same conclusion.") (citation omitted); *Grigsby & Assocs., Inc. v. M Sec. Inv.*, 664 F.3d 1350, 1353 (11th Cir. 2011) ("[I]t is presumptively for the courts to adjudicate disputes about whether a party, by earlier litigating in court, has waived the right to arbitrate."); *JPD, Inc. v. Chronimed Holdings, Inc.*, 539 F.3d 388, 394 (6th Cir. 2008) ("Unlike contractually-based waiver, courts have long decided whether conduct inconsistent with reliance on an arbitration agreement waives a defendant's ability to seek an arbitration referral … ."); *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 219 (3d Cir. 2007) ("Properly considered within the context of the entire opinion … the [*Howsam*] Court was referring only to waiver, delay, or like defenses arising from non-compliance with contractual conditions precedent to arbitration … and not to claims of waiver based on active litigation in court."); *Marie*, 402 F.3d at 11-13 (distinguishing a "contractual time limit clause," which is "presumed to be for the arbitrator" under *Howsam*, from waiver "due to litigation-related activity," which courts decide). Whitepages suggests that the Eighth Circuit held to the contrary in *National American Insurance Co. v. Transamerica Occidental Life Insurance Co.*, 328 F.3d 462 (8th Cir. 2003). Doc. 132 at 6. That case is distinguishable—it

concerned a claim of waiver based on litigation with unrelated third parties, 328 F.3d at 466—but in any event it is an outlier whose reasoning no other circuit has followed.

In conclusion, *Moses Cone* addressed, not which issues the parties *may* delegate to the arbitrator, but which questions *must presumptively* go to the arbitrator.  It did not hold that a generic clause in an arbitration provision delegating "all threshold questions" covers waiver through litigation conduct or delay.  As shown above, that issue belongs to the court.

### 2.     Whitepages's Litigation Conduct

The standard governing whether a party waived through litigation conduct or delay its ability to invoke an arbitration provision asks whether the party "[did] all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration."  *Smith*, 907 F.3d at 499 (quoting *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995)).  Whitepages did no such thing.

According to Whitepages, it "recognized the arbitrability issue immediately when the complaint was filed," but felt it could not move to compel arbitration at the outset because the complaint "did not allege that [Lukis] had interacted with the website, nor did [it] allege that she had gone past the pay wall."  Doc. 103-1 at 15:24-16:3.  Whitepages's original answer did not include an arbitrability affirmative defense.  Doc. 52.  On June 3, 2020, Whitepages amended its answer to include arbitrability and class action waiver defenses.  Doc. 59 at pp. 22-23, ¶¶ 22-23; *see* Fed. R. Civ. P. 15(a)(1)(A) ("A party may amend its pleading once as a matter of course within … 21 days after serving it … .").  Whitepages moved for summary judgment on June 25. Doc. 61.  The motion did not assert arbitrability.  Doc. 64.

On July 21, Costales purchased a Whitepages product that required him to affirmatively agree to the Whitepages terms through "clickwrap."  Doc. 90-1 at ¶¶ 15-17.  Costales did so in an effort to oppose the summary judgment motion; specifically, on July 23, he submitted a

declaration in support of Lukis's opposition, averring that he had "personally interacted with …
Whitepages.com" and undertook a "comprehensive review of the services offered." Doc. 77-1 at
¶ 2. Costales attached Whitepages's terms of use to his declaration. *Id*. at pp. 11-18.

The filing of Costales's declaration was, as Whitepages admits, a "big moment" for its
thinking about arbitrability. Doc. 103-1 at 16:15-16. According to Whitepages, while it
immediately "recognized the browse wrap implications to Mr. Costales's declaration," it
nonetheless believed that it lacked "any evidence of click wrap." *Id*. at 16:25-17:2. In other
words, Whitepages knew from Costales's declaration that he had visited the website and perhaps
agreed to the terms of use through passive interaction, but did not know with certainty that he
had gone beyond the paywall and thereby affirmatively accepted the terms of use.

On August 6, Whitepages replied in support of its summary judgment motion. Doc. 79.
Whitepages paid close attention to Costales's declaration, vigorously contesting its admissibility.
Doc. 80. Weeks later, on August 31, Whitepages revealed in an interrogatory response that it
believed that Costales had investigated Whitepages's paid services. Specifically, Whitepages
objected to providing a substantive response to an interrogatory concerning its paid offerings on
the ground that Lukis already had the information: "Plaintiff's counsel [in his declaration] …
described all of the information that is available for free *and for pay* that he discovered through
his comprehensive review of Whitepages.com." Doc. 103-2 at 7 (emphasis added). That
interrogatory response suggests that Whitepages had reason to suspect, based on Costales's
declaration, that he might have gone beyond the paywall.

On October 9, Whitepages served on Lukis its first set of interrogatories and requests for
admission. Doc. 94-1. Many of the requests for admission obviously concerned arbitrability.
Here is a sample: "Admit that you have visited the Whitepages' Web site." *Id*. at 28. "Admit

that you have conducted one or more searches on Whitepages' Web site." *Ibid*. "Admit that when you conducted one or more searches on the Whitepages Web site, the Terms of Use … were posted on the Web site." *Ibid*. "Admit that your counsel visited the Whitepages Web site … on your behalf." *Id*. at 30. "Admit that members of the putative class as defined in the Complaint may have visited the Whitepages Web site … when the Terms of Use … were posted on the Web site." *Id*. at 31. Other requests for admission reproduced the arbitration clause and class action waiver from the terms of use. *Id*. at 32.

Nevertheless, in responding to Lukis's waiver by litigation conduct argument, Whitepages asserts that it did not discover until October 20 that Costales had made the July 21 purchase and thereby gone beyond the paywall. Doc. 90 at 10; Doc. 90-1 at ¶ 15. That realization did not result from Whitepages obtaining any new information from *Lukis or Costales* on or shortly before October 20. Rather, the realization resulted from Whitepages conducting a search of its *own records*—a search it easily could and should have conducted on or shortly after receiving Costales's July 23 declaration.

Nadine Thisselle, Whitepages's Vice President of Finance and Operations, testified at her deposition that Whitepages retains a record of every purchase, including the purchaser's first and last name and email address. Doc. 103-3 at 1 (80:10-18), 3-4 (102:20-103:4). Yet, Thisselle recounted, Whitepages did not search its records for Costales's name until October 20 because it simply had not "occurred to anybody" to do so. *Id*. at 4 (103:8). Whitepages filed the present motion shortly thereafter, on October 24, about an hour after the court denied Whitepages's summary judgment motion. Doc. 89.

Although it appears that Whitepages did not deliberately delay filing is motion to compel arbitration until after its summary judgment motion was denied, its delay did waive its right to

seek arbitration of Lukis's claim. Whitepages admits that it has been thinking about arbitration since the complaint was filed in 2019. On July 23, 2020, Whitepages received Costales's declaration, which gave notice that he engaged with the website and might have gone beyond the paywall and triggered the clickwrap agreement. Whitepages's August 31 interrogatory response likewise suggests that it read the declaration to convey that Costales might have gone beyond the paywall. Whitepages's October 9 interrogatories further demonstrate that it was paying close attention to arbitrability.

Yet despite its manifest suspicion prompted by Costales's declaration, Whitepages inexplicably neglected to investigate by searching *its own records*—which revealed that Costales indeed went beyond the paywall—until October 20, after it replied in support of its summary judgment motion. Doc. 79. That course of action does not come close to showing that Whitepages "[did] all it could *reasonably* have been expected to do to make *the earliest feasible determination* of whether to proceed judicially or by arbitration." *Smith*, 907 F.3d at 499 (emphasis added). It necessarily follows that Whitepages, through its litigation conduct and delay, waived its right to invoke the arbitration provision. *See id.* at 500 (holding that the defendant waived its right to seek arbitration given its "inexplicable delay" in obtaining the documents it needed to move to compel arbitration); *Cabinetree*, 50 F.3d at 391 (holding that the defendant waived its right to seek arbitration where it delayed several months while it "weigh[ed] its options").

### 3. New Theories Presented in Whitepages's Reply Brief

Whitepages's reply brief presents two new theories for why Lukis is bound to arbitrate her claims. First, citing her January 2021 deposition testimony and discovery responses, Whitepages argues that Lukis agreed to the terms of use, separate and apart from Costales, by making her own visits to the website. Doc. 132 at 14-16; Doc. 132-1 at ¶¶ 6-7. According to

Whitepages, Lukis thus assented to the terms of use, and thus the arbitration provision, under a browsewrap theory even though she did not purchase a paid service or click through the terms. Doc. 132 at 16-17; *see Van Tassell*, 795 F. Supp. 2d at 790 ("[B]rowsewrap agreements typically involve a situation where notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink.") (quotation marks omitted).

The court could disregard this argument because Whitepages presented it for the first time in its reply brief. *See O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) ("[W]e have repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived."); *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."). But judicial economy favors addressing the issue now, given that it could continue to shadow this litigation going forward.

As with Costales's purchase of a Whitepages product on July 21, Whitepages waived Lukis's browsing activity as a basis for compelling arbitration. As noted, Whitepages admits that it "recognized the arbitrability issue immediately when the complaint was filed." Doc. 103-1 at 15:24-25. Indeed, the complaint clearly conveyed that Lukis had personally visited the Whitepages website, alleging: "In 2018 Lukis discovered that Whitepages uses her name, age, city of domicile, and the identity of her relatives in advertisements on the Whitepages website … . These advertisements were the same or substantially similar to those shown in Paragraph 10." Doc. 1-1 at ¶ 22. Paragraph 10, in turn, displayed screenshots from the Whitepages website. *Id*. at ¶ 10. It is difficult to imagine how Lukis might have "discovered" advertisements on the website without visiting it. Whitepages therefore had everything it needed

based on the complaint's allegations to move to compel arbitration based on a browsewrap theory.

Whitepages argues that such a motion was not possible at that time because it needed evidence from outside the pleadings to confirm that Lukis visited the website. Doc. 103-1 at 16:4-11. This argument reflects a misunderstanding of the pertinent procedures. True enough, a motion to compel arbitration may go beyond the pleadings. *See Tinder*, 305 F.3d at 735 (holding that "the evidentiary standard a party seeking to avoid compelled arbitration must meet" is analogous to "that required of a party opposing summary judgment"); *Armbrister v. Pushpin Holdings, LLC*, 896 F. Supp. 2d 746, 753 n.3 (N.D. Ill. 2012) (holding that, in ruling on a motion to stay litigation under § 3 of the FAA, a court "may consider matters outside the pleadings"). But if there are factual disputes about whether the parties agreed to arbitration, the FAA requires the court to "proceed summarily to the trial thereof." 9 U.S.C. § 4; *see Deputy v. Lehman Bros.*, 345 F.3d 494, 509-10 (7th Cir. 2003) ("Section 4 … required the court to hold a trial if the making of the arbitration agreement was in issue."). This sequence of events played out in *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705 (7th Cir. 2019), where the plaintiff filed a lawsuit, the defendant immediately moved to compel arbitration, the district court concluded a trial was needed on the issue of contract formation, and the court ultimately granted summary judgment to the defendant on that issue. *Id*. at 709-10.

Whitepages could and should have followed that procedure here. Whitepages acknowledges that it was pondering the arbitration issue as soon as the complaint was filed, and the complaint all but admitted that Lukis had visited the website. Whitepages could have immediately raised the issue by motion, and the parties could have focused on the arbitration question—including by conducting any necessary discovery—before broaching substantive

issues in the case. Instead, Whitepages filed and the court expended considerable resources deciding two dispositive motions concerning the merits of this suit. To now enforce the arbitration provision based on Lukis's visits to the website, after Whitepages's repeated and unexcused failures to assert the provision's existence or applicability, would improperly accord the provision a special status that the court would not give to other contractual provisions. *See Volkswagen Of Am., Inc. v. Sud's Of Peoria, Inc.*, 474 F.3d 966, 970 (7th Cir. 2007) ("[T]he FAA's purpose is not to provide special status for [arbitration] agreements. Rather, it makes 'arbitration agreements as enforceable as other contracts, but not more so.'") (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)); *Cabinetree*, 50 F.3d at 390 ("In determining whether a waiver has occurred, the court is not to place its thumb on the scales; the federal policy favoring arbitration is, at least so far as concerns the interpretation of an arbitration clause, merely a policy of treating such clauses no less hospitably than other contractual provisions.").

The second new theory asserted in Whitepages's reply brief turns on Lukis's deposition testimony that her (apparently estranged) mother used Whitepages's service to locate and harass her. Doc. 132 at 17. Whitepages argues that: (1) Lukis's mother's harassment of Lukis breached Whitepages's terms of use; (2) through this lawsuit, Lukis seeks to hold Whitepages liable for that breach; (3) Whitepages will have to bring an indemnification claim against Lukis's mother in arbitration; and (4) Lukis will be a necessary party to that arbitration proceeding, requiring arbitration of this suit as well. *Ibid*. Whitepages's chain of reasoning breaks down at its second link: Lukis is not suing Whitepages for her mother's harassment. Rather, this is a lawsuit to redress Whitepages's alleged violation of the IRPA by making commercial use of her identity. Whitepages may seek arbitration of a claim based on the harassment if Lukis brings one.

### B. Motion to Transfer

In the alternative to moving to compel arbitration, Whitepages moves under 28 U.S.C.

§ 1404(a) to transfer this suit to the Western District of Washington based on the forum selection

clause in the terms of use. Doc. 89 at 1; Doc. 90 at 18. The forum selection clause states:

> If the arbitrator determines [the dispute resolution provisions are]
> unenforceable, invalid, or ha[ve] been revoked as to any claim(s), then the
> Dispute as to such claim(s) will be decided by the courts in the state of
> Washington, King County, or the United States District Court for the Western
> District of Washington, and the parties irrevocably submit to the exclusive
> jurisdiction of such courts. If the class action waiver clause is determined to
> be illegal or unenforceable, th[ese] entire [dispute resolution provisions] will
> be unenforceable, and the Dispute will be decided by the courts of the state of
> Washington, King County, or the United States District Court for the Western
> District of Washington, and the parties irrevocably submit to the exclusive
> jurisdiction of such courts.

Doc. 90-1 at 14, § 12.10. The capitalized term "Dispute" is defined to mean "ANY DISPUTE,

CLAIM OR CONTROVERSY BETWEEN YOU AND WHITEPAGES RELATING IN ANY

WAY TO THIS AGREEMENT OR YOUR ACCESS TO OR USE OF THE SERVICES OR

CONTENT." *Ibid*.

As with the arbitration clause, the court accepts as true that Lukis, through Costales's

purchase of a Whitepages product, agreed to the forum selection clause. Forum selection clauses

are enforced through a motion under 28 U.S.C. § 1404(a). *See Atl. Marine Const. Co. v. U.S.

Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55-59 (2013); *Mueller v. Apple Leisure Corp.*, 880

F.3d 890, 894 (7th Cir. 2018) (same). But transfer under § 1404(a) is warranted only if the

clause applies to the suit in question. *See Vance v. Gallagher*, 280 F. App'x 533, 537 (7th Cir.

2008) (holding that a forum selection clause did not apply because it governed only contract

claims and the plaintiff sued under a quantum meruit theory).

Whitepages's forum selection clause by its own terms does not apply here. First, this suit

is not a "Dispute" as defined in the terms of use. Lukis's IRPA claim has three elements:

"(1) the appropriation of one's identity, (2) without one's consent, (3) for another's commercial benefit." *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1008 (7th Cir. 2019). None of these elements "relat[es] in any way to" Whitepages's terms of use or Lukis's use of Whitepages's services. Doc. 90-1 at 14, § 12.10. That is, in order to prevail on her IRPA claim, Lukis need not prove anything about the terms of use or that she ever used the Whitepages website. Her claim is directed solely at Whitepages's publicizing her identity for a commercial purpose. So there is no "Dispute" here to which the forum selection clause could apply. *Cf. uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 429 n.2 (7th Cir. 2010) (holding that a forum selection clause in an online company's terms of use was "not relevant" because the company's "alleged misconduct toward a third party … ha[d] nothing to do with the jurisdictional expectations the company has fostered with those customers who read all the details of the form contract").

A second and independent reason that the forum selection clause does not apply is that neither of its preconditions has been satisfied. The clause is triggered either when "the arbitrator determines" that the dispute resolution provisions are invalid or when "the class action waiver clause is determined to be illegal or unenforceable." Doc. 90-1 at 14, § 12.10. No arbitrator has determined anything, and this court has not even addressed, let alone held unenforceable, the class action waiver clause. The motion to transfer is denied for that reason as well.

## II.    Lukis's Motion for Leave to Amend the Complaint

On November 9, 2020, less than two weeks after Whitepages moved to compel arbitration, Lukis moved "to amend her complaint to add additional putative class representatives whose claims are not subject to arbitration." Doc. 97 at 2. The proposed first amended complaint adds two new plaintiffs/putative class representatives—Mantas Norvaisas and Shawn Brown—and allegations concerning Whitepages's commercial use of their identities. Doc. 97-1 at ¶¶ 1, 30-43. The amendment otherwise leaves the complaint unchanged.

19

Rule 15(a)(2) provides that "court[s] should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). That said, district courts "have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 693 (7th Cir. 2017) (quotation marks omitted).

Governing precedent endorses motions to join additional named plaintiffs to a putative class action in prompt response to a challenge raised by the defendant to the original named plaintiff(s). In *Randall v. Rolls-Royce Corp.*, 637 F.3d 818 (7th Cir. 2011), the Seventh Circuit observed that the entry into the case of new putative class representatives is appropriate if it is "sought as soon as a substantial challenge to certification is made" by the defendant to the original putative class representative's adequacy or typicality. *Id*. at 827. The Seventh Circuit affirmed the district court's denial of leave to add new class members, but only because the plaintiff did not seek leave until "after the judge had denied class certification … and long after it was plain that there were substantial doubts about the typicality of the named plaintiffs' claims and the adequacy of their representation of the class." *Ibid*. Here, by contrast, Lukis moved for leave to amend less than two weeks after Whitepages moved to compel arbitration of her claims, precisely the time frame contemplated by *Randall*. *See In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 615-16 (7th Cir. 2020) (affirming the district court's grant of leave to amend to add a new lead plaintiff, and rejecting the argument that the new plaintiff had "somehow waived its ability to act as a class representative in this case by relying for a time on the original lead plaintiff to pursue the case").

Whitepages's contrary arguments are unpersuasive. First, it contends that the proposed amendment would be futile. Doc. 124 at 9-15. Usually, a defendant asserts futility when the original complaint fails to state a claim and the question is whether a proposed amended complaint might cure the original's defects. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 520 (7th Cir. 2015) ("Where it is clear that the defect cannot be corrected so that amendment is futile, it might do no harm to deny leave to amend and to enter an immediate final judgment … ."). The futility analysis asks whether, under "the legal sufficiency standard of Rule 12(b)(6)[,] … the proposed amended complaint fails to state a claim." *Id*. at 524; *see also Townsel v. DISH Network L.L.C.*, 668 F.3d 967, 969 (7th Cir. 2012) ("The judge deemed the proposed amendment futile, which is functionally the same as allowing amendment and then dismissing under [Rule] 12(b)(6)."). Here, the court has already concluded that the existing complaint *does* state a claim. 454 F. Supp. 3d at 760-63.

The specific futility arguments that Whitepages advances also fail on the merits, at least for purposes of a Rule 15(a)(2) motion. For example, Whitepages argues that Lukis's deposition testimony contradicts allegations in the complaint. Doc. 124 at 13-15. That argument cannot be considered in assessing the viability of a pleading under Rule 12(b)(6), and the same holds for assessing the futility of an amended pleading under Rule 15(a)(2). *See McDaniel v. Loyola Univ. Med. Ctr.*, 317 F.R.D. 72, 79 (N.D. Ill. 2016) ("[I]t is inappropriate for the Court to go beyond the pleadings and any critical documents referred to therein when considering Defendants' futility objection to Plaintiff's motion to amend."); *Tissue Prods. Tech. Corp. v. Factory Mut. Ins. Co.*, 2008 WL 11345876, at *1 (E.D. Wis. Aug. 21, 2008) ("[T]he fact that futility may sometimes constitute a reason for denial of a motion to amend is not a general invitation … to raise defenses that require analysis of matters outside the pleadings.").

Whitepages next argues that the two proposed putative class representatives "fail[] to plead facts establishing that [their] claims are not subject to binding arbitration and class waiver." Doc. 124 at 10. But a plaintiff need not plead around arbitrability. As discussed above, the onus is on the party *seeking* arbitration to raise the issue. *See* 9 U.S.C. § 6; *Goplin v. WeConnect, Inc.*, 893 F.3d 488, 491 (7th Cir. 2018) ("WeConnect bore the burden of establishing its right to enforce the arbitration agreement."); *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018) ("[A]s the party seeking to compel arbitration, Credit One had the burden of showing that A.D. was bound by the cardholder agreement as an authorized user."). Arbitrability is thus akin to an affirmative defense, which complaints need not anticipate. *See Stuart v. Loc. 727, Int'l Bhd. of Teamsters*, 771 F.3d 1014, 1018 (7th Cir. 2014) ("A plaintiff is not required to negate an affirmative defense in his or her complaint, for the painfully obvious reason that the defendant will not have pleaded any affirmative defenses until it files its answer or a motion to dismiss.") (citations omitted).

Whitepages next argues that leave to amend should be denied because the proposed class cannot be certified. Specifically, Whitepages contends that Lukis and her counsel inadequately represent the class, Doc. 124 at 12, which is the same argument it makes in moving to strike the class allegations, Docs. 119, 121. Whitepages adds that the proposed class definition is flawed because it does not exclude class members who have agreed to arbitrate their claims against Whitepages. Doc. 124 at 18-19. The court will address those arguments in ruling on Whitepages's motion to strike.

Finally, Whitepages argues that Lukis unduly delayed in seeking amendment, Doc. 124 at 15-18, and that she brings her motion to amend in bad faith, *id*. at 19-20. To the contrary, and as just noted, Lukis brought her motion less than two weeks after Whitepages made "a substantial

challenge" to her ability to represent a class, which the Seventh Circuit has held is an appropriate time to seek leave to amend. *See Randall*, 637 F.3d at 827. Whitepages retorts that Lukis had a duty to seek leave to amend much earlier, on July 21, when Costales went beyond the paywall. Doc. 124 at 15-16. But it is the timing of the defendant's invocation of an arbitration clause that matters, not the plaintiff's first inkling of a possible issue that the defendant might choose to raise. Again, Whitepages, not Lukis, had the duty to assert arbitrability. After Whitepages finally did so, Lukis moved with the requisite dispatch for leave to amend.

## III.  Whitepages's Motion to Strike Class Allegations and Counsel

In moving to strike the complaint's class allegations and putative class counsel, Whitepages argues that Lukis's testimony at her January 2021 deposition shows that she is an inadequate class representative, Doc. 121 at 8-16, and that Beaumont Costales is inadequate class counsel because it chose Lukis as a named plaintiff, inadvertently bound her to arbitrate her claims, and has not kept her apprised of the litigation, *id.* at 16-19. In addition, Whitepages argues that the class definition fails because it does not exclude individuals who have agreed to arbitrate their claims against Whitepages. Doc. 124 at 18-19.

Whitepages's motion to strike relies throughout on matters outside the pleadings rather than on flaws inherent to the class as alleged in the complaint. It is unclear whether a motion to strike class allegations or class counsel can properly go beyond the complaint in that manner. Granted, Rule 23(c)(1), not Rule 12(f), governs motions to strike class allegations. *See Cook Cnty. Coll. Tchrs. Union, Loc. 1600 v. Byrd*, 456 F.2d 882, 884 (7th Cir. 1972) (stating that the defendants' motion to reject class certification was "pursuant to Rule 23(c)(1)"); *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014) (St. Eve, J.) ("Courts in this District … evaluate motions to strike class allegations under Rule 23, not Rule 12(f)."); *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 829 (N.D. Ill. 2013) (relying on Rule 23(c)(1) as

the procedural mechanism for a motion to strike class allegations). And there is no question that the analysis of a motion to *certify* a class under Rule 23 must go beyond the pleadings. *See Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017) ("Unlike a motion under Federal Rule of Civil Procedure 12(b)(6), a motion to certify a class under Rule 23(c) is not one for which the court may simply assume the truth of the matters as asserted by the plaintiff. Instead, if there are material factual disputes, the court must receive evidence and resolve the disputes before deciding whether to certify the class.") (citation, alterations, and quotation marks omitted).

For motions to *strike* class allegations, however, the analysis may be limited to the face of the complaint. Rule 23(c)(1)(A) provides that the court must address class certification "[a]t an early practicable time after a person sues … as a class representative." Fed. R. Civ. P. 23(c)(1)(A). That "practicable time" can sometimes arrive "at the pleading stage." *Al Haj v. Pfizer Inc.*, 338 F. Supp. 3d 741, 757 (N.D. Ill. 2018). That said, courts have held that "[i]t is 'practicable' to resolve the class certification question at the pleadings stage only when it is *apparent from the complaint* that class certification is inappropriate." *Rysewyk v. Sears Holdings Corp.*, 2015 WL 9259886, at *7 (N.D. Ill. Dec. 18, 2015) (emphasis added); *see also Hill*, 946 F. Supp. 2d at 829 ("Most often it will not be 'practicable' for the court to [reject class certification] at the pleading stage, but sometimes *the complaint will make it clear* that class certification is inappropriate.") (emphasis added). On this view, a motion to strike should be granted only when "the plaintiff's class allegations are facially and inherently deficient." *Buonomo*, 301 F.R.D. at 295; *see also DuRocher v. NCAA*, 2015 WL 1505675, at *1 (S.D. Ind. Mar. 31, 2015) ("Even on a motion to strike class allegations, it is not appropriate for the Court to consider matters outside the pleadings."). At least one decision from this District has held to

24

the contrary, reasoning that a motion to strike is "a vehicle for analyzing the appropriateness of class certification," so "the court is not limited to the face of plaintiff's complaint." *Lee v. Children's Place Retail Stores, Inc.*, 2014 WL 5100608, at *2 (N.D. Ill. Oct. 8, 2014). But the majority view is that, when a defendant moves to strike class allegations, the inquiry is limited to the facial plausibility of the class as alleged in the complaint.

Under the majority rule, Whitepages's motion to strike fails because its arguments go beyond the pleadings. But there is no need to definitively so hold here. Lukis moved for class certification in early March 2021. Doc. 162. At the presentment hearing, Doc. 166, Whitepages asked that briefing on that motion be postponed pending resolution of its motion to compel arbitration. Now that the motion to compel arbitration has been denied, Whitepages may press in its opposition to Lukis's class certification motion all the points raised in its motion to strike, unclouded by the procedural question of whether a motion to strike may look beyond the pleadings. It is thus prudent to deny Whitepages's motion to strike, without prejudice to Whitepages's reasserting any of its arguments in opposition to class certification.

## IV.    Lukis's Motion to Compel

Lukis moves to compel Whitepages to disclose information, documents, and testimony concerning the non-party entities with which Whitepages contracts to obtain data for its free previews and background reports. Doc. 127 at 1. There is no question that those agreements exist. Rohn Ramon, Whitepages's Director of Strategy, testified: "All data is sourced from data sources. We at Whitepages do not scrape the internet or anything like that to collect our data, so it comes from other data sources." Doc. 145 at 201 (49:6-9).

Lukis first attempted to obtain information and documents about Whitepages's data providers in written discovery requests served on July 31, 2020. *Id*. at 6-11. Interrogatories 3 and 4 asked Whitepages to "[i]dentify every person that you contracted with … to collect or

25

obtain [personal identity information] for use on your Website" and to "[i]dentify which person(s) you contracted with to obtain [Lukis's] mobile telephone number(s)." *Id*. at 9. Document Request 2 sought "[a]ll documents considered or relied on in answering Plaintiff's interrogatories." *Id*. at 10. Whitepages objected, asserting that the interrogatories sought "confidential and/or trade secret information that is protected from disclosure by applicable law and contractual provisions," and that, in answering those interrogatories, it had not considered or relied on any documents not already in Lukis's possession. Doc. 127-1 at 4-5, 11. On December 28, Lukis sent a second discovery request seeking the contracts between Whitepages and its data providers, to which Whitepages has not responded. Doc. 127-3 at 3. Finally, Whitepages directed three of its witnesses—Thisselle, the Vice President of Finance and Operations; Laura Mehrkens, the Director of Product; and Ramon, the Director of Strategy—to not answer deposition questions on the subject of data providers due to its confidentiality agreements with them. Doc. 145 at 65-66 (63:22-66:7), 98 (71:19-72:2), 133 (212:22-213:19), 200-201 (42:23-48:20).

Lukis seeks an order that would: (1) require Whitepages's witnesses to provide deposition testimony on those issues; (2) authorize a second deposition of Ramon in light of the previous refusals to answer questions; and (3) compel Whitepages to respond substantively to Lukis's interrogatories and document requests on those subjects. Doc. 127 at 6.

Lukis has complied with Local Rule 37.2. A motion to compel must include a statement "that after consultation in person or by telephone and good faith attempts to resolve differences [the parties] are unable to reach an accord." N.D. Ill. L.R. 37.2. Lukis's Local Rule 37.2 statement asserts that her counsel and Whitepages's counsel orally conferred about the non-party data providers in phone calls on September 9 and December 15, 2020, and at a deposition in

January 2021. Doc. 127 at 7. Whitepages confirms that counsel discussed those issues on September 9 and December 15. Doc. 145 at 2, ¶¶ 4-5, 9. Lukis's counsel sent an email to Whitepages's counsel on December 16 documenting the December 15 call. Doc. 127-2. The email stated that Lukis requested (1) the names of the data providers, (2) Whitepages's contracts with them, and (3) testimony by Whitepages's witnesses about its relationships with them. *Id*. at 1. Whitepages confirmed receipt of the email but stated that it still needed consent from the data providers to turn over that information and those documents. Doc. 127-3 at 1-2. Thus, the parties conferred orally, but Whitepages refused to provide discovery about the data providers due to its confidentiality agreements with them.

In response to Lukis's motion to compel, Whitepages has abandoned its position that the confidentiality agreements bar discovery on those issues. Doc. 147. That change of heart is correct: "Contracts bind only the parties. No one can 'agree' with someone else that a stranger's resort to discovery under the Federal Rules of Civil Procedure will be cut off." *Gotham Holdings, LP v. Health Grades, Inc.*, 580 F.3d 664, 665 (7th Cir. 2009). The principal reason that Whitepages set forth in its objections has thus disappeared.

Whitepages continues to oppose Lukis's motion to compel on other grounds, though. First, Whitepages argues that the motion is moot because its motions to compel arbitration and to strike class allegations should be granted. Doc. 147 at 8-9. As explained, both motions are denied, so the motion to compel remains a live issue.

Second, Whitepages argues that the details of its relationships with its data providers are not relevant to any claim or defense. *Id*. at 9-13. The scope of relevant discovery is broad: "Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and

27

proportional to the needs of the case … ." Fed. R. Civ. P. 26(b)(1). Information "need not be admissible in evidence to be discoverable." *Ibid*. For that reason, information may be relevant under Civil Rule 26 even if it would not be admissible at trial under Evidence Rule 401: "Admissibility at trial is not the test. Evidence is relevant in a discovery context if it is relevant to the subject matter of the litigation as Rule 26(b)(1) states, not just the particular issues presented in the pleadings." *Eggleston v. Chi. Journeymen Plumbers' Loc. Union No. 130*, 657 F.2d 890, 903 (7th Cir. 1981).

Whitepages's relationships with its data providers are unquestionably relevant to a defense it has pleaded. As discussed in the court's summary judgment opinion, one of Whitepages's defenses rests on the premise that its background reports fall under the IRPA's statutory exemption for non-commercial purposes, 765 ILCS 1075/35(b)(2), because the reports incorporate publicly available information and public records. 2020 WL 6287369, at *6-7; *see* Doc. 59 at p. 17, ¶ 1 (asserting § 35(b)(2) in Whitepages's first affirmative defense). Lukis seeks information about Whitepages's data sources to determine whether the information they provide is, in fact, publicly available or derived from public records. Doc. 127 at 5; Doc. 157 at 2-3. This direct connection to Whitepages's defense establishes the relevance of the information, documents, and testimony that Lukis seeks.

Discovery regarding Whitepages's data providers also could relate to an element of Lukis's claim: her lack of consent. One element for liability under the IRPA is that the defendant lacked "previous written consent" from the plaintiff to use her identity for commercial purposes. 765 ILCS 1075/30(a); *see Dancel*, 949 F.3d at 1008 (holding that an IRPA plaintiff must prove appropriation "without one's consent"). Whitepages contests that element on what might be called a third-party consent theory. While admitting that it did not obtain Lukis's

28

consent directly, Doc. 59 at p. 10, ¶ 25, Whitepages suggests that Lukis may have provided her consent, along with her personal data, to other entities, which in turn provided her data to Whitepages, which in turn deployed that data for commercial purposes.  As Whitepages describes it, its first request for production "sought contracts between Lukis and third parties that contain provisions related to the sharing of Lukis's personal information and Lukis's consent to such sharing."  Doc. 161 at 9; *see* Doc. 138-1 at 251.  If Whitepages believes that *Lukis's* contracts with non-party data providers are relevant because they might show that she consented to the commercial use of her identity, then it cannot plausibly maintain that *its own* contracts with data providers are irrelevant to that same issue.  The third-party consent theory provides another basis for the relevance of Lukis's discovery requests and deposition questions.

Whitepages's third basis for opposing Lukis's motion to compel is that Thisselle, Mehrkens, and Ramon have already testified about its data providers.  Doc. 147 at 13-14. Without excessively quoting the deposition passages that Whitepages cites, it suffices to say that Whitepages's counsel prevented Lukis from obtaining any meaningful testimony on that subject. Counsel objected to nearly every question asked by Costales, based on confidentiality or some other reason.  Indeed, Whitepages instructed its witnesses not to answer questions or to limit their answers in several of the passages that it now asserts support its position.  Doc. 145 at 65 (65:16-21), 98 (71:19-72:2), 200 (43:7-44:13).

This is a good point to pause and remind counsel that "Rule 30(c)(2) … provides only three justifications for instructing a deponent not to answer a question: to preserve a privilege; to enforce a limitation imposed by the court; or to present a Rule 30(d)(3) motion."  *Rojas v. X Motorsport, Inc.*, 275 F. Supp. 3d 898, 902 (N.D. Ill. 2017) (citing *Redwood v. Dobson*, 476 F.3d 462, 467-68 (7th Cir. 2007)).  "There often can be a fine line between zealous advocacy,

which of course is allowed, and violating Rule 30(c)(2) and engaging in other obstreperous deposition conduct, which is not." *Id*. at 908. There is no need to decide here whether Whitepages's repeated objections and instructions not to answer crossed that line, but Whitepages certainly prevented Lukis from obtaining the information she seeks in this motion.

Fourth, Whitepages argues that ordering its witnesses to provide testimony regarding its data providers would amount to an advisory opinion. Doc. 147 at 14-15. It is true that district courts should avoid ruling on "hypothetical future discovery requests." *Novelty, Inc. v. Mountain View Mktg., Inc*., 2009 WL 10687825, at *2 (S.D. Ind. Oct. 15, 2009). But that is not the situation here: Lukis served discovery requests targeting the information she seeks and asked pertinent questions at depositions. Whitepages refused to substantively respond to those requests and directed its witnesses to not answer those questions. Now Lukis moves to compel, and there is nothing advisory about the court's granting the motion and ordering Whitepages to produce the information, documents, and testimony in question.

Finally, Whitepages argues that Lukis's motion should be denied as untimely. Doc. 147 at 15-16. That argument is unpersuasive. Lukis filed her motion on January 28, 2021, Doc. 127, before the fact discovery deadline of February 1, Doc. 75. This case therefore does not resemble *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049 (7th Cir. 2000), where the plaintiff did not move to extend discovery until four months after discovery closed. *Id*. at 1056-57. Still, Whitepages emphasizes that it notified Lukis of its confidentiality objection on August 31 and that she did not move to compel until nearly five months later. Doc. 147 at 16. Much of that delay, however, is properly attributed to Whitepages. Whitepages objected to discovery regarding its data providers on confidentiality grounds, but then on December 15 promised to seek the data providers' consent, Doc. 127-2 at 1; Doc. 127-3 at 1, and then revealed at Mehrkens's deposition

on January 19 that no consent would be forthcoming, Doc. 145 at 133-134 (213:20-214:9). Lukis filed her motion to compel nine days after receiving that news. Under those circumstances, Lukis was not dilatory in filing her motion.

## V.    Whitepages's Motion to Compel

Whitepages moves to compel Lukis to produce eighteen items: (1) the Craigslist advertisement that Beaumont Costales posted soliciting potential plaintiffs for this suit; (2) documents related to Lukis's use of four credit reporting agencies; (3) her cell phone contracts with two companies; (4) her applications to work at four specific employers; her account history and profiles at (5) Craigslist, (6) eBay, (7) Amazon, (8) Uber, (9) MySpace, (10) YouTube, (11) Google, (12) Google+, and (13) FamilyTreeNow.com; (14) her "privacy settings on all relevant Web sites"; (15) all browser history and other documentation of her visits to Whitepages.com; (16) an unredacted copy of her engagement letter with Beaumont Costales; (17) the transcript of a deposition that she gave in another case; and (18) a privilege log for any documents she has withheld on the basis of privilege. Doc. 138 at 9-15. Whitepages asks that Lukis search for documents responsive to these requests on at least nine designated devices and accounts. *Id*. at 8-9.

Most of the eighteen items have not been discussed in a Local Rule 37.2 conference. As noted, the local rule requires that a motion to compel must be preceded by "consultation *in person or by telephone*." N.D. Ill. L.R. 37.2 (emphasis added). This court's discovery procedures reiterate that "an exchange of correspondence—as opposed to an in-person or telephonic conference—ordinarily will not suffice." Case Procedures, Discovery and Discovery Motions, https://www.ilnd.uscourts.gov/PrintContent.aspx?cmpid=642. Courts in this District routinely enforce the requirement that the consultation take place orally. *See Jackson-El v. City of Markham*, 332 F.R.D. 583, 584 (N.D. Ill. 2019) ("[A]s significant as emails are for evidentiary

purposes, for purposes of Rule 37.2, emails do not count.") (citation omitted); *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 343 F. Supp. 3d 742, 744 (N.D. Ill. 2018) (holding that letters and emails are insufficient to comply with Local Rule 37.2); *Geraci v. Andrews*, 2017 WL 1822290, at *1 (N.D. Ill. May 5, 2017) ("Local Rule 37.2 makes it plain that letters and emails don't count, and with good reason."); *Transcap Assocs., Inc. v. Euler Hermes Am. Credit Indem. Co.*, 2009 WL 1543857, at *5 (N.D. Ill. June 3, 2009) ("[T]here is no indication that the parties ever consulted in person or by telephone prior to the filing of Transcap's motion … ."); *Sondker v. Philips Elecs.*, 2004 WL 1687016, at *2 (N.D. Ill. July 27, 2004) ("[T]his letter does not satisfy the requirements of Local Rule 37.2.").

In its Local Rule 37.2 certification, Doc. 138 at 16, and reply brief, Doc. 161 at 5-6, Whitepages relies heavily on a letter that it sent to Lukis's counsel on January 11, 2021, six days after her January 5 deposition. Doc. 138-1 at 348-357. Most of the specific "discovery deficiencies" listed in the letter sought further information based on Lukis's deposition testimony, *id.* at 354-355, and Whitepages's motion to compel targets those alleged deficiencies. No oral conference followed the letter. Whitepages's counsel sent a follow-up email on January 13 seeking additional items of discovery but not requesting a telephonic conference. *Id.* at 360-361. On January 18, Lukis's counsel responded by email simply refusing to supplement her discovery. *Id.* at 359. The net result of this impasse is that the matters raised in the January 11 letter have not been the subject of an oral discussion between counsel.

The only oral conference compliant with Local Rule 37.2 took place the previous month, on December 22, 2020. *Id.* at 3, ¶ 7. Whitepages's counsel wrote a letter to Lukis's counsel on December 23 memorializing what they had discussed. *Id.* at 245-249. The letter shows that only some of the items raised in Whitepages's motion to compel were discussed on December 22. In

particular, the parties seem to have discussed Whitepages's requests related to Lukis's social media accounts—Document Request 15 and Interrogatory 8—which sought information related to MySpace, YouTube, and Google+. *Id.* at 246-247, 259, 267. Counsel also discussed Whitepages's request for records of Lukis's visits to the Whitepages website, including any information stored in browser history on her devices, as sought through Documents Requests 13 and 14. *Id.* at 246-247, 258-259. Finally, counsel discussed whether Lukis would produce a privilege log for documents that she claims as privileged. *Id.* at 247.

Thus, the December 22 oral consultation concerned only items (9), (10), (12), (15), and (18). None of the other items has been discussed at a Rule 37.2 conference. Items (1) through (8) and (11) appeared for the first time in Whitepages's counsel's January 11 letter. *Id.* at 354-355. Items (13), (14), and (17) appeared for the first time in the motion to compel itself. Doc. 138 at 10, 13-14. As for item (16), the Beaumont Costales engagement letter, counsel did discuss that issue on December 22. Doc. 138-1 at 246. But Lukis produced the letter, with two out of eleven paragraphs redacted. *Id.* at 4, ¶ 18; 363-364. The motion to compel seeks to remove the redactions, Doc. 138 at 12-13, but there has been no oral discussion between counsel of the redaction issue.

Whitepages argues that Lukis's generally dilatory and evasive discovery conduct renders "preposterous" the notion that it has failed properly to confer on those issues. Doc. 161 at 5-6. There may be blame to go around, and both parties are reminded to respond to discovery requests timely and candidly. But Whitepages's frustration cannot excuse it from complying with Local Rule 37.2. The oral conferral requirement is no mere formality, as conversation encourages productive compromise better than dueling letters or emails:

> There are sound reasons why what [Whitepages] call[s] a "meet-and-confer letter" is not authorized by Local Rule 37.2. [Doc. 138-1 at 3, ¶ 13.] Anyone

> can write a letter. But that does not mean that the recipient will fairly consider
> the letter before dashing off one of his own that does little more than persist in
> setting forth his partisan point of view. The letters and the emails that one all
> too often see[s] do little more than articulate the parties' polar positions with
> the clash of pretending absolutes left unresolved. Local Rule 37.2 is based on
> the teaching of long experience that face-to-face [or at least telephonic]
> discussions are far more likely to result in compromise and agreement than is
> an exchange of letters that are all too easy to brush aside.

*Slaven v. Great Am. Ins. Co.*, 2014 WL 4470723, at *2 (N.D. Ill. Sept. 11, 2014). Only items

(9), (10), (12), (15), and (18) are proper subjects for a motion to compel.

Items (9), (10), and (12) concern Lukis's account histories and profiles at MySpace,

YouTube, and Google+. Whitepages sought those items through Document Request 15, which

requested "[a]ll documents and communications related to … any social media account or profile

that you maintain," listing sixteen specific social media sites. Doc. 138-1 at 259. Relatedly,

Document Request 17 sought "[a]ll documents and communications reflecting your consent to

use or share any aspect of your identity." *Id*. at 260. Lukis initially objected to both requests on

the grounds that her social media accounts were irrelevant and that the requests were unduly

burdensome. *Id*. at 259-260. But Lukis later produced downloads of her Facebook, LinkedIn,

and Twitter accounts, though with redactions. *Id*. at 3, ¶¶ 10-11; *id*. at 260. Lukis now

maintains that she overproduced irrelevant private materials, *id*. at 359, and that more production

would go even further beyond what is proportional to the needs of this case, Doc. 158 at 4-5.

As discussed in connection with Lukis's motion to compel, Whitepages submits that

Lukis's interactions with other technology companies are relevant to its third-party consent

theory: "Lukis has given broad, written consent for thousands of third parties to use and disclose

her personal information (including for advertising purposes)." Doc. 161 at 13. For the same

reasons that Whitepages's contracts with data providers are potentially relevant on this basis,

Lukis's contracts with other non-parties could be relevant. Granted, Whitepages's original

request for production was broader than necessary for that purpose, but Whitepages now limits its motion to compel to "the same kinds of data from [Lukis's] MySpace, YouTube, and Google+ accounts that she produced from her Facebook account." *Id*. at 14. So narrowed, the motion is granted with respect to items (9), (10), and (12).

The motion is also granted as to item (15), which concerns browser history and other documentation of Lukis's visits to the Whitepages website. Document Request 13 sought records of Lukis's visits to the website, Doc. 138-1 at 258, and Request 14 sought records of Lukis's counsel's visits, *id*. at 259. Whitepages argues that the history of Lukis's interactions with its website is relevant to its arbitration and class waiver defenses. Doc. 161 at 15-17. As explained above, Whitepages unduly delayed in raising, and accordingly waived, any arbitration defense. But the court has not addressed whether Whitepages forfeited an attempt to enforce the class action waiver. Doc. 90-1 at 14, § 12.10 ("YOU AND WHITEPAGES EACH WAIVE ALL RIGHTS TO CONDUCT DISPUTE RESOLUTION PROCEEDINGS IN A CLASS ACTION OR CONSOLIDATED ACTION."). Whitepages indicates that it will assert the class action waiver in opposing class certification. Doc. 59 at p. 22, ¶ 23; Doc. 124 at 18-19; Doc. 165 at 16. Whatever the merits of that assertion, it shows that Lukis's interactions with the Whitepages website remain relevant, given the broad scope of relevant discovery.

Opposing discovery on this topic, Lukis argues that her devices—in particular, an old hard drive—could be difficult to search and may not contain any additional relevant information. Doc. 138-1 at 259; Doc. 158 at 7-8 & n.4. A party may refuse to produce "electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B). But when confronted with a motion to compel, the party then "must show that the information is not reasonably accessible because of undue burden

or cost." *Ibid*.  Lukis's bare assertion of technical difficulty does not make the required showing. *See Gunn v. Stevens Sec. & Training Servs., Inc.*, 2018 WL 1737518, at *2 (N.D. Ill. Apr. 11, 2018) (holding that the Rule 26(b)(2)(B) showing was not made because "[a] lawyer's unsupported statement in a brief is not evidence"); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 2005 WL 1300778, at *1 (N.D. Ill. Apr. 28, 2005) ("If the discovery appears relevant, the party objecting to the discovery request bears the burden of showing why that request is improper."). Accordingly, Lukis must supplement her responses to Document Requests 13 and 14.

Finally, item (18) seeks a privilege log identifying any documents Lukis withheld claiming privilege and explaining why she redacted large portions of her Facebook production. Doc. 138 at 14-15.  Under Rule 26(b)(5)(A), a party who "withholds information otherwise discoverable by claiming that the information is privileged … must … describe the nature of the documents, communications, or tangible things not produced or disclosed."  Fed. R. Civ. P. 26(b)(5)(A)(ii).  According to Lukis's supplemental discovery responses, she withheld only a single document based on privilege: the Beaumont Costales engagement letter, Doc. 138-1 at 256, which she has now produced, *id*. at 4, ¶ 18; 363-364.  So that portion of the privilege log request is moot.  Granted, Whitepages still seeks an unredacted copy of the engagement letter, Doc. 138 at 12-13, but a privilege log would not provide any more clarity about the "nature of the document," which is mostly unredacted.  Fed. R. Civ. P. 26(b)(5)(A)(ii).

As for the Facebook production, Lukis states that the redacted portions contain purely private data of no relevance to this lawsuit.  Doc. 158 at 9-10.  That is not a claim of privilege governed by Rule 26(b)(5).  *See Harris Davis Rebar, LLC v. Structural Iron Workers Loc. Union No. 1, Pension Tr. Fund*, 2019 WL 454324, at *4 (N.D. Ill. Feb. 5, 2019) (explaining that a party must "comply with Rule 26(b)(5) and … produce a privilege log" for "any relevant, responsive

documents … subject to privilege"). Whitepages disagrees with Lukis's decision to redact based on relevance, Doc. 161 at 18, but a privilege log would not address that concern.

## VI.     Lukis's Motion to Extend the Discovery Deadline

Lukis moves to extend the February 1, 2021 discovery deadline. Doc. 128. A schedule may be modified "for good cause." Fed. R. Civ. P. 16(b)(4). "In making a Rule 16(b) good-cause determination, the primary consideration for district courts is the diligence of the party seeking amendment." *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011). As discussed above, Lukis acted with adequate diligence in bringing her motion to compel, and the court has ordered Whitepages to produce further discovery. The court has also ordered Lukis to produce certain information to Whitepages. Fact discovery has not previously been extended. The court finds that there is good cause to amend the schedule and extend the fact discovery deadline to June 22, 2021.

## Conclusion

Whitepages's motion to compel arbitration or transfer the suit is denied. Lukis's motion to amend the complaint is granted. Lukis shall file her amended complaint as a separate docket entry. Whitepages's motion to strike is denied without prejudice to its presenting its arguments in opposition to Lukis's pending class certification motion. Lukis's motion to compel is granted. Whitepages shall allow its witnesses to testify regarding its non-party data providers, including their identities and its contractual relationships with them; make Ramon available for a second deposition regarding those subjects; and produce complete responses to Lukis's Interrogatories 3 and 4, Document Request 2, and December 28, 2020 supplemental document request. Whitepages's motion to compel is granted in part and denied in part. Lukis shall produce the same kinds of data from her MySpace, YouTube, and Google+ accounts that she produced from her Facebook account, and also shall supplement her responses to Whitepages's Document

Requests 13 and 14.  The parties shall make their supplemental productions by May 10, 2021, and shall schedule the depositions as expeditiously as possible.  Lukis's motion to extend the fact discovery deadline is granted.  The new fact discovery deadline is June 22, 2021.

April 23, 2021

_____
United States District Judge